# 21-1058-cr

To be argued by:
**COLLEEN P. CASSIDY**

**United States Court of Appeals**
**for the Second Circuit**

_____

Docket No. 21-1058-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT AKAYED ULLAH**

FEDERAL DEFENDERS OF NEW YORK, INC.
 APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 *Of Counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTIONAL STATEMENT PURSUANT TO FED.R.APP.P.28(a) . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    Crime Scene Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.    Ullah's Post-arrest Statement . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    Searches of Ullah's Residence and Workplace . . . . . . . . . . . 12

        4.    Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            (a)    The toolmark examiner . . . . . . . . . . . . . . . . . . . . . 13

            (b)    Explosive experts . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            (c)    The terrorism expert . . . . . . . . . . . . . . . . . . . . . . . 15

        5.    The Victim-Bystander Witnesses . . . . . . . . . . . . . . . . . . . . 17

    C.    Rule 29 Motion and Disputed Jury Instructions . . . . . . . . . . . . . . 18

        1.    Material Support to a Terrorist Organization . . . . . . . . . . . . . 18

        2.    Attack Against a Mass Transportation System . . . . . . . . . . . 21

        3.    The §924(c) Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    D.    Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.      Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

POINT I

The Evidence Was Insufficient as a Matter of Law to Prove
That Ullah Provided Material Support and Resources as Charged
in Count One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

POINT II

In the Alternative, The District Court's Erroneous Jury
Instructions on the Provision of Personnel and Services
Require Vacatur of the Conviction for material support to
a terrorist organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

   A.      The charged "personnel" theory of conviction was invalid. . . . . . . . 40

   B.      The "services" theory, as charged to the jury, likewise was
           erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   C.      This count must be vacated . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

POINT III

The Evidence Was Legally Insufficient to Prove the Elements
of 18 U.S.C. §§1992(a)(2) or (a)(7) Because it Failed to Prove That
Ullah "Placed" the Device "On, In or Near" a Mass Transportation
Vehicle, or That He Intended to Kill or Seriously Injure Any Person
Other Than Himself, and It Failed to Prove the Aggravating Element
of §1992B for Committing an Attack On a Mass Transportation Vehicle
Carrying a Passenger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   A.      The evidence was legally insufficient to establish that the
           defendant "placed" a destructive device in a mass transportation
           vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ii

B.      The government's new theory for Ullah's violation of §1992(a)(2) was not charged in the indictment and was a constructive amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

C.      The district court's jury instructions on the placement theory were unbalanced and presented only the government's theory. . . . . . . . . 56

D.      The Aggravating Element of 18 U.S.C. §1992(b), Raising the Maximum Sentence From 20 Years to Life in Prison for an Attack on a Mass Transportation Vehicle that Contains a Passenger, Does Not Apply to subsection (a)(7), which Prohibits Any Assault in a Terminal or Station and not an Attack Against a Vehicle, and That Portion of the Verdict Should Be Vacated . . . . . . . . . . . . . . . . . . . . 57

POINT IV

The §924(c) Conviction Must be Vacated Because Ullah Did Not Use a Destructive Device in Furtherance of a Qualifying Crime of Violence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

A.      Count Three cannot support the §924(c) conviction because placing an explosive device in a place of public use does not require the use of force against the person or property of another. . . . . . . . . . . . . . 63

B.      Count Five cannot support the §924(c) conviction because section 1992(a)(2) requires only a reckless state of mind and §(a)(7) prohibits the commission of "any act" with intent to cause death or serious physical injury, which encompasses non-forceful conduct and even omissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

C.      The §924(c) count is multiplicitous with Counts Three and Five, which prohibit the same conduct, using or carrying the same explosive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

D.      Attempting to commit any of the offenses of conviction is not a crime of violence under the force clause. . . . . . . . . . . . . . . . . . . . . . . . . . 70

POINT V

The Life Sentence Plus 30 Years is Procedurally and Substantively Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

A.      Imposition of overlapping terrorism enhancements impermissibly double-counted the same conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . 74

iii

B.     The court incorrectly ruled that Ullah could not qualify for acceptance of responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

C.     The life plus 30-year sentence was based on clearly erroneous factual findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

D.     The life plus 30-year sentence is substantively unreasonable. . . . . . . 79

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

# TABLE OF AUTHORITIES

*Cases*

*Ball v. United States,*
470 U.S. 854 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

*Barrett v. United States*,
139 S. Ct. 2774 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 77

*Borden v. United States,*
141 S. Ct. 1817 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 62, 65

*Chrzanoski v. Ashcroft,*
327 F.3d 188 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 69

*Collier v. United States,*
989 F.3d 212 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Descamps v. United States,*
570 U.S. 254 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Graham v. Florida,*
560 U.S. 48 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Griffin v. United States,*
502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Harmelin v. Michigan,*
501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Hill and United States v. Acosta,*
470 F.3d 132 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hylton v. Sessions,*
897 F.3d 57 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*McDonnell v. United States,*
136 S. Ct. 2355 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Musacchio v. United States*,
  136 S.C. 709, 715 (2016)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Muscarello v. United States*,
  524 U.S. 125, 128 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Pica v. United States,*
  No. 20-1272 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Russell v. United States*,
  471 U.S. 858 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Rutledge v. United States,*
  517 U.S. 292 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Stirone v. United States,*
  361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 52

*United States v. Abuhamra,*
  389 F.3d 309 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Anderson,*
  787 F.3d 51 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Assi,*
  748 F.2d 62 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Awan,*
  607 F.3d 306 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Barrett,*
  903 F.3d 166 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Bastian,*
  770 F.3d 212 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*United States v. Beardsley,*
  691 F.3d 252 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Burris,*
  912 F.3d 386 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Castano,*
  999 F. 2d (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

vi

*United States v. Cavera,*
  550 F.3d 181 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73,81

*United States v. Davis*,
  139 S. Ct. 2319 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. D'Amelio,*
  683 F.3d 412 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Desnoyers*,
  637 F.3d 105 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Dove,*
  916 F.2d 41 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 56

*United States v. Frank,*
  156 F.3d 332 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Garcia,*
  992 F. 2d (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Gaudin,*
  173 F. 3d (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Gayle,*
  342 F.3d 89 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Hernandez*,
  894 F.3d 1104, 1110 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Hill,*
  890 F.3d 51 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Hudson,*
  972 F.2d 504 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Jackson,*
  560 F.2d 112 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

*United States v. Johnson,*
  850 F. 3d (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Mayo,*
  901 F.3d 218 (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Miller,*
  471 U.S. 130 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

vii

*United States v. Milstein*,
  401 F.3d 53 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Mink*,
  __ F.4th __ 2021 WL 3556090 (8th Cir. Aug. 12, 2021) . . . . . . . . . . . . . . . . . 63

*United States v. Napoli,*
  179 F. 3d 1, 12 n. 9 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Novak,*
  443 F.3d 150 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Polouizzi,*
  564 F.3d 142 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

*United States v. Prawl,*
  168 F.3d 622 , 626 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Rappaport,*
  999 F.2d 57 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Reed,*
  756 F.3d 184 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Resendiz-Moreno,*
  705 F.3d 203 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Rigas,*
  490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Sabhnani,*
  599 F. 3d (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

*United States v. Salas,*
  889 F.3d 681 (10th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*United States v. Santos,*
  553 U.S. 503 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Scott,*
  990 F.3d 94 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Singh,*
  877 F. 2d (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Skyfield,*
 No. 21-1415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Stallworth,*
 543 F.2d 1038 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Stewart,*
 590 F.3d 93 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Sturdivant,*
 244 F.3d 71 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Taylor,*
 979 F.3d 203 (4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . 72, 76,77

*United States v. Trevino-Trevino,*
 178 F.App'x 701 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Volpe,*
 224 F. 3d (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

 *United States v. Wilder,*
 2020834 Fed. Appx. 782 (4th Cir. 2020) . . . . . . . . . . . . . . . . . 63

*United States v. Yousef,*
 327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Zingaro,*
 858 F.2d 94 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*Yates v. United States,*
 354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

### *Statutes*

18 U.S.C. §(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

18 U.S.C. §(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 65

18 U.S.C. §16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

18 U.S.C. §846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

18 U.S.C. §924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §926A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. §§1992(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §1992(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 62, 67

18 U.S.C. §1992(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 46, 58

18 U.S.C. §2113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

18 U.S.C. §2332f(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 73

18 U.S.C. §§2332f(a)(i)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. §2332f(e)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

18 U.S.C. §2339A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. §2339(A)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. §2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 41

18 U.S.C. §2339(B)(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

***United States Sentencing Guidelines and Other Regulations***

U.S.S.G. §2M6.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 76

U.S.S.G. §3A1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

U.S.S.G. §3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Model Penal Code §§5.01(2)(c), (e) & (g) . . . . . . . . . . . . . . . . . . . . . . . . 72

**United States Court of Appeals
for the Second Circuit**

———————————————

Docket No. 21-1058-cr

———————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT AKAYED ULLAH**

**JURISDICTIONAL STATEMENT PURSUANT TO FED.R.APP.P.28(a)**

Defendant-Appellant Akayed Ullah appeals from a judgment entered in the United States District Court for the Southern District of New York (Hon. Richard J. Sullivan) on April 22, 2021. A notice of appeal was timely filed on April 23, 2021. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742(a). The district court had jurisdiction under 18 U.S.C. §3231.

**QUESTIONS PRESENTED**

1.    Whether the evidence was insufficient as a matter of law to prove that Mr. Ullah provided material support and resources to a terrorist organization as charged in Count One.

2.    Whether, in the alternative, the District Court's erroneous jury instructions on the provision of personnel and services require vacatur of the conviction for material support to a terrorist organization.

3.    Whether the evidence was legally insufficient to prove the elements of 18 U.S.C. §§1992 (a)(2) or (a)(7) because it failed to prove that Ullah "placed" the device "on, in or near" a mass transportation vehicle, or that he intended to kill or seriously injure any person other than himself, and it failed to prove the aggravating element of §1992(b) for committing an attack on a mass transportation vehicle carrying a passenger.

4.    Whether the conviction under 18 U.S.C. §924(c) for use of an explosive device in furtherance of a crime of a  crime of violence must be vacated.

5.    Whether the life sentence plus 30 years is procedurally and substantively unreasonable.

**STATEMENT OF THE CASE**

Akayed Ullah appeals from a judgment of the United States District Court

2

for the Southern District of New York convicting him of six counts: providing material support to a terrorist organization (18 U.S.C. §2339(A)); using a weapon of mass destruction against persons or property (18 U.S.C. §§2332a(a)(2)(A)(B)(C) and (D)); bombing a place of public use and a public transportation system (18 U.S.C. §§2332f(a)(i)(A) and B and (b)(I), (B) and (E)); destroying property by means of fire or explosives (18 U.S.C. §844(I)); attacking a mass transportation system (18 U.S.C. §1992(a)(2)(a)(7) and (b)(I)); and using a destructive device during and in furtherance of a crime of violence (18 U.S.C. §§924(c)(i)(A) and (B)(ii)). The court sentenced Mr. Ullah to life imprisonment on Counts Two, Three and Five, and 20 years' imprisonment on Counts One and Four, to run concurrently, followed by a term of 30 years' imprisonment on Count 6, to run consecutively to the sentences imposed on Counts One through Five. This Court continued the Federal Defenders of New York, Inc., Appeals Bureau, as counsel on appeal under the Criminal Justice Act.

## STATEMENT OF FACTS

### A.    **The Indictment**

The indictment charged six counts based on Ullah's  deflagration of a small pipe bomb attached to his body in a tunnel between the Port Authority Bus Terminal and the Times Square subway station.

Count One charged him with providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339(a). Specifically, it charged him with providing personnel and services to the Islamic State of Iraq and al Sham ("ISIS") by detonating the device in the vicinity of the Port Authority Bus Terminal. A.21-22.

Count Two charged him with using and attempting to use a weapon of mass destruction against persons or property within the United States in violation of 18 U.S.C. §§2332a (a)(2)(A)(B)(C) and (D) by detonating a destructive device in the vicinity of the Port Authority Bus Terminal. A.22-23.

Count Three charged him with delivering, placing, discharging, and detonating an explosive device in, into, and against a place of public use and a public transportation system with the intent to cause death and serious bodily injury and with the intent to cause extensive destruction of such a place and system, and where such destruction resulted in and was likely to result in major economic loss. It alleged that Ullah committed this offense, in violation of 18 U.S.C. §§2332f(a)(1)(A), (a)(1)(B), (b)(1)(B), and (b)(1)(E), by detonating the device in the vicinity of the Port Authority Bus Terminal. A.23.

Count Four charged Ullah with maliciously damaging and destroying or attempting to damage and destroy, by means of fire and explosives, a building,

vehicle, and other real and personal property used in interstate commerce, in violation of 18 U.S.C. §844(I), by detonating the device in the vicinity of the Port Authority Bus Terminal. A.24.

Count Five charged Ullah with perpetrating an attack against a mass transportation system, in violation of 18 U.S.C. §§1992(a)(2), (a)(4)(B), (a)(7) (a)(10) (b)(1) and (c)(1), by detonating the device in the vicinity of the Port Authority Bus Terminal, under three theories:

1) that Ullah "placed" and attempted to place the destructive device "in, upon, and near a mass transportation vehicle -- which was carrying passengers and employees at the time of the offense -- with intent to endanger the safety of persons, and with a reckless disregard for the safety of human life;"

2) that he "placed" and attempted to place the destructive device "in upon, and near a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of, and in support of the operation of, a mass transportation vehicle -- which was carrying passengers and employees at the time of the offense -- and with intent, and knowing and having reason to know, that such activity would likely derail, disable, and wreck a mass transportation vehicle used, operated, and employed by a mass transportation provider;" and

3) that he "committed" and attempted to commit "an act, including the use of

5

a dangerous weapon, with the intent to cause death and serious bodily injury to persons who were on or in a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of, and in support of the operation of, a mass transportation vehicle, which mass transportation vehicle was carrying passengers and employees at the time of the offense." A.24-26.

The aggravating element in section 1992 (b) raised the statutory maximum from 20 years to life for committing "an offense under subsection (a) in a circumstance in which *the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense*" (emphasis added). Only violations of section 1992 (a)(2) and (4) (theories one and two) encompassed an attack on a mass transportation vehicle. The indictment nevertheless charged the aggravating element with respect to all three theories, including subsection (a)(7). A.25-26.

Count Six charged Ullah with using and carrying a destructive device during and in relation to a crime of violence with respect to each of Counts One through Five, in violation of 18 U.S.C. §924(c), by possessing and detonating the device in the vicinity of the Port Authority Bus Terminal. A.26.

**B.    The Trial Evidence**

The evidence established that Ullah made a small pipe bomb at home from

Christmas tree lights, a 9-volt battery, potassium chlorate scraped from match heads, screws and a piece of pipe. On December 11, 2017, he taped the bomb to his chest, took the subway from his home in Brooklyn to the Times Square station with the bomb disconnected, and walked into the tunnel between the subway station and the Port Authority Bus Terminal, where he connected the wires to the battery and deflagrated the bomb. Ullah himself was severely injured and was hospitalized with burns and lacerations to his liver. No one else sustained serious physical injuries. Two people testified that they were traumatized by the explosion; one of them testified that the blast aggravated his pre-existing hearing loss and that a small piece of metal was removed from his leg in the emergency room.

It was undisputed that Ullah was neither a member of ISIS, nor acquainted with anyone in ISIS. He had downloaded some publicly available ISIS propaganda videos from the Internet and stated, when questioned after his arrest, "I did this for the Islamic State."

The defense conceded that Ullah built and deflagrated the device. The parties disputed whether Ullah intended to injure anyone other than himself. The government argued he intended to injure or kill others. A.175. The defense contended that Ullah was extremely depressed and intended only to kill himself publicly and call attention to ISIS. A.180-82. Videos and photographs introduced

7

at trial showed Ullah walking from a crowded subway into the tunnel and setting off the bomb when, as the district court noted, nobody was very close to him. A.882, GX918, 1001-20, A.1429-30.

### 1. Crime Scene Witnesses

Port Authority Police Officer Sean Gallagher responded to the Port Authority at 7:20 am on December 11. Approaching the tunnel, he saw a lot of smoke, other police at the scene, and Ullah lying on the ground about 30 yards into the 150-200 yard tunnel. A.202-03, 223. Ullah had lacerations and burn marks on the side of his body, his clothing was tattered and torn, and wires protruded from his chest. A.24. Concerned that Ullah had an explosive, Gallagher first withdrew and then re-entered the tunnel with 10 or 12 other officers and handcuffed Ullah. A.25-26. Gallagher recovered Ullah's wallet with his driver's license, and a 9-volt battery attached to an AC wire. A.207-08, 222. Ullah was taken to the hospital. A.242.

The officers were focused on safety and not the preservation of evidence. A.220-22, 232-233. Some officers stepped on and kicked metal fragments away. A.236-38. Gallagher could not say that the debris in the subsequently taken crime scene photographs was in the same place as when the officers first entered the tunnel. A.241-42.

8

FBI Agents Stephen Fullington and Douglas Ventrano from the evidence response team arrived at the Port Authority tunnel at 9:00 am. Clothes were strewn about, along with wiring and other bomb debris. A.245-46, 249, 285-88. The bomb tech team had placed orange cones near pieces of evidence. A.268, 289. Fullington swabbed for residue from the bomb site, the walls near it, and the ceiling above it. A.251-59, 277-78.

Ventrano photographed the scene and evidence. and mapped the area into 6 zones, divided by 12x12 tiles. A.289-98; Exh. 102-01-102-24; 105-2 etc. The large majority of evidence was found in Zone 2, the zone most central to the explosion. A.353, 303-20, 332-36. This included a metal pipe and cap, green wire, a wire nut, a screw, a jagged piece of metal with threading, some small green wires, a white piece of zip tie, another jagged piece of metal, green wires wrapped in tape, plastic from a Christmas mini-bulb, bent and charred screws, a white t-shirt with a red stain, a shredded jacket, boxer shorts, khaki pants, and a plaid button-down shirt that were all torn. *Id.* Further from the explosion, in Zone 3,Ventrano recovered five screws and a piece of velcro, and in Zone 4 a jagged piece of metal. A.337-38. One screw each was found in Zones 5 and 6. A.339-40. Ventrano had no way of knowing whether the outlying pieces were moved by the dozens of law enforcement agents that had passed through the scene since 7:20 am. A.352-53.

9

### 2.  Ullah's Post-arrest Statement

New York City Police Detective Daniel Byrne questioned Ullah at Bellevue Hospital. A.359-74. Numerous armed police officers were present and Ullah was handcuffed to the bed. A.384-88. He had severe burns and lacerations to his liver. A.389. The interview lasted approximately four hours. A.364.

Byrne did not record the interview, although he knew a recording was the best way to provide a clear record of the statement. A.360, 404, 407. He said that no one told him to record it. A.404. Byrne took notes, but said he did not write everything down. A.373. His notes of the four-hour interview spanned only 5 or 6 pages of a small  6x4-inch spiral notebook. A.408, 410. The notes were not verbatim and were mostly single words or phrases, not full sentences. A.411. Byrne  filed a report that did not include everything from his notes. A.374.

Unbeknownst to Byrne, portions of the interview, totaling about 10 minutes, were video-recorded by Inspector Mauro. A.365, 406. This recording revealed some differences between Byrne's rendition of what Ullah said and what he actually said. A.416-24.

Ullah told Byrne where he lived with his mother and siblings on Ocean Parkway, Brooklyn, and that he worked as an electrician at a site at 39th Street and Eighth Avenue in Manhattan. A.368. He said he learned to make the pipe bomb

10

from a video. A.375-76. Ullah said he made the device out of a pipe filled with match heads, plus sugar and four Christmas lights. A.369, 380. He put a cap on the pipe and used a zip screw to make a hole, through which he ran a wire to a 9-volt battery, connected only at one end. A.380. Byrne asked if Ullah knew why the video called for screws, and Ullah said the video said that nails were used to inflict maximum damage. A.380-81, 420. He did not know why sugar was used. A.421.

On December 11, 2017, Ullah attached two zip ties around his chest, conducted his morning prayers, and attached the pipe to his chest with the ties. A.369. He boarded the F train near his home, transferred to the A train at Jay Street, and proceeded to West 42nd Street. A.369. On the subway, he posted on Facebook, "Oh, Trump, you failed to protect your nation," with "Baqiya," an Arabic word meaning "long live." A.370-72. Ullah said that would show the Islamic State that the attack was done in its name. A.370.

Ullah told Byrne he set off the device by connecting the wire to the 9-volt battery. A.374. He chose the spot in the tunnel because it was the location of a TV interview of a passenger who said he did not feel threatened by recent Islamic State warnings. A.375. Ullah said he had expected to die. A.378. He intended to terrorize people and he chose Monday because there would be more passengers. A.375, 378. Byrne testified that he asked Ullah if he expected others to die, and he said

11

"Maybe." A.378. This statement was neither recorded in Byrne's report nor captured in the video. A.419.

Ullah said he had researched how to build a bomb during the preceding year and made the bomb in the week before the explosion. A.375, 378. He watched propaganda videos online urging people to take the fight to wherever they were. A.375-76. Some videos showed ways to terrorize Americans. A.376. He said he "did it on behalf of the Islamic State" and "for Allah." A.376. He said the United States supplied the bombs for Israel to bomb the Gaza Strip in 2014 and America's foreign policies were the "symptoms to the cause." A.377.

Ullah's cellphone and Facebook page were searched, A.395, 397, and showed no contacts with ISIS members.

### 3. Searches of Ullah's Residence and Workplace

Agents Fullerton and Andrew Bennett searched Ullah's workplace, a sandwich shop at Eighth Avenue and West 39th Street. A.620-21,646. They found construction materials related to electrical work: wires, screws, power tools and hand tools, including a pair of pliers. A.650-54.

FBI Agents Andrea Estok, Brian Murtagh, and Andrew Mitchell searched Ullah's residence on Ocean Parkway. A.447-50,615-26, 628-640. A.450. Estok seized a laptop from a bedroom, pieces of Christmas tree lights with bulbs missing

12

and wire ends stripped from a bin, and multiple cellphones. A.455-65. Murtagh collected galvanized pipes, wires and screws from a trash bin, paper bearing red powder that was an energetic substance, a drill bit, screws, and wire caps. A.618-26. On the bottom of a box containing hardware was written "Die in your rage." A.625-26. Mitchell swabbed areas of the apartment for the lab. A.631-32. He also found two passports in a jacket pocket, one a Bangladesh passport for Ullah on which was written "Oh, America, die in your rage." A.635-36.

Surveillance video from the street and subway showed that Ullah left his apartment and traveled by subway to the Port Authority Bus Terminal passageway on December 11, 2007. A.483-503.

### 4. Expert Testimony

#### (a) The toolmark examiner

Derrick McClarin, an FBI toolmark examiner, testified that two pieces of pipe, other metal fragments, the end cap, and a nut found at the scene were once joined together and that the marks on the metal pipe were created by the pliers found at Ullah's workplace. A.656-63, 678, 681, 684-88.

#### (b) Explosive experts

FBI chemist and forensic examiner Robert Gillette testified that a low explosive device explodes at a lower rate and deflagrates, as opposed to a high explosive device, which explodes at a faster rate and detonates. A.692-94. This

device was a low-explosive device that deflagrated. A.702-04. The powder residue was ground match heads, which contained potassium chloride, a typical oxidizer in low-explosive improvised devices. A.705-11. He examined the swabs taken from Ullah's apartment and found residue consistent with potassium chloride. A.711,714-16. Residue at the crime scene was consistent with potassium chloride. A.718-20.

FBI Agent Christopher Rigopolous, an explosives and hazardous device examiner, testified that a low-explosive device explodes by being in a container that fills with gas as the explosive powders burn, fragmenting the container. A.729-42. An electric charge or other heat source causes the reaction. A.740. Rigopolous concluded that the power source here was the 9-volt battery. Wires connected it to the initiator -- a piece of a Christmas tree light bulb; the explosives main charge was low-explosive potassium chloride. The container was a metal pipe with a cap on the end. A.747-48. The circuit was closed when the wires were attached to the battery and the current flowed to the tree lightbulb, which generated heat sufficient to ignite the explosive material. A.752-53. The device was command-initiated: the actor determined when to deflagrate the device by connecting the wires to the battery, acting as the "switch." A.756, 767.

Rigolopous testified that the pipe fragments and several screws found had been exposed to an explosion. A.749. The screws provided added fragmentation,

14

enhancing the lethality of the device. A.757. He testified that an explosion in a confined area like the tunnel increased the potential for damage. A.765. Materials found at Ullah's apartment were similar to those used in the device. A.769-75.

### (c) The terrorism expert

Aaron Zelin, a fellow at the Washington Institute for Near East Policy, testified as an expert in militant jihadist groups, including ISIS. A.504-510. Zelin testified in general about ISIS, also called the Islamic State, and its goal to take over territory in Iraq and Syria and fight "crusader Western governments." A.511-12. Its methods included regular military operations and terrorist attacks abroad. A.512. In 2014, the group's spokesperson, Abu Muhammed al-Adani issued a message on twitter calling for "inspired attacks," primarily in Western countries, leading to a "large pace" of attacks in late 2014 and 2015 through 2017. A.513-14.

An "inspired attack," also called a "loan wolf attack," is one in which an individual commits an attack alone, inspired by ISIS propaganda, without any contact with ISIS members. A.514-15, 525. In such a case, ISIS neither directs the attack nor provides resources. A.542. Usually, ISIS would have no idea who the attacker is. A.543. Zelin said that ISIS encourages such attacks to garner free publicity. A.15. At the opposite end of the spectrum are ISIS-directed attacks, and in the middle are ISIS-enabled attacks, in which it provides resources or training

15

to help someone launch an attack. A.540-41.

Zelin testified that ISIS "typically" considers someone who commits a suicide attack in its name a "martyr" and "soldier of the caliphate." A.516. ISIS often claims credit for such attacks. A.544. ISIS did not claim credit for Ullah's act. A.544. Zelin opined that an action in which an ISIS supporter's goal was only to kill himself and not others would be inconsistent with ISIS's goals. A.591. People in his field speculated that ISIS did not claim credit for Ullah's crime because no one died. A.592.

ISIS disseminates propaganda through magazines and video messages, highlighting their attacks, and seeking to radicalize people in the United States. A.516, 518. Supporters republish such material, which can depict fighting, execution of enemies, daily life in ISIS-controlled territory, and messages to inspire attacks outside its territory. A.521. Some propaganda describes types of attacks or provides bomb-making instructions. A.542-43.

Zelin reviewed ten videos on a laptop found in Ullah's residence and discussed a few of them. A.522-530. One depicted several individuals who had committed attacks. A.524-25. Another showed a celebration after ISIS took territory in 2014 and another showed two bombings. A.528-30. They encouraged foreign fighters to come to Iraq and Syria and join the fight for territory. A.55. The

16

others had similar themes. A.530. Zelin also discussed a video that was not found

on Ullah's laptop, "Flames of War II," released on November 29, 2017. It showed

United States forces bombing Islamic State positions in Syria and Iraq. A.593-596.

The film included the phrase, "So die in your rage, America." A.595.

Shown Ullah's Facebook post, Zelin testified that "Baqiya" was the Arabic

word for "remaining" and was used in 2007 and 2008 as a rallying cry by a former

ISIS leader. A.531. It had since been used in some speeches and video messages.

A.51-52. Zelin acknowledged that "baqiya" was an ordinary Arabic word, that

"Die in your rage" was a phrase used in the Qur'an, and that it was impossible to

know the intentions and motivations of followers of jihadist propagandA.A.598,

606-07.

### 5. The Victim-Bystander Witnesses

The government called two witnesses who testified that they were affected

by the explosion. David Wall had walked past Ullah in the tunnel when the bomb

exploded loudly behind him. A.189. He felt like a flame hit his leg, he felt dizzy

and his head was pounding, but he continued to his office. A.189-90. At his office,

his head was ringing and hurting, his chest felt tight, his heart was beating fast, and

he had trouble breathing. A.193. He felt dizzy and fell. A.193. He called 911 and

went to the hospital, where they removed a small piece of metal from his leg and

17

sent him home. A.194. The explosion exacerbated a pre-existing hearing loss and caused him anxiety in the subway. A.195-96.

Veronica Chavez testified that she was in the tunnel on her way to work when the explosion occurred. A.661-64. She suffered from anxiety about loud noises afterward and had to stop working because her workplace contained loud machines. A.666-67.

## C.     **Rule 29 Motion and Disputed Jury Instructions**

Ullah moved for a judgment of acquittal on all counts at the end of the government's case, A.772, and renewed the motion after trial. A.818, 1154. Challenges to the sufficiency of the evidence were discussed with challenges to jury instructions on particular counts.  A.126-32, 135-41, 147-50.

### 1.     **Material Support to a Terrorist Organization**

Ullah argued the evidence was insufficient to prove the material support charge alleged in Count One because he did not act under the direction or control of ISIS. A.844-48. It was undisputed that there was no evidence he communicated with or even knew a single person associated with ISIS, and the government's theory was that he was inspired by ISIS propaganda to commit the act on his own. The defense contended that this lack of coordination or direction excluded his conduct from the reach of the statute, citing its definition of "personnel," and that

18

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010), applied the same limitation to "services." A.844-48.

The statute defines material support as including "any property . . . or service, including . . . personnel (1 or more individuals who may or include oneself) . . . " 18 U.S.C. §2339(A)(b). Section 2339(B)(h) specifically provides that "no person may be prosecuted under this section in connection with the term 'personnel,' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction and control or to organize, manage, supervise, or otherwise direct the operation of that organization." 18 U.S.C. §2339(h). It further provides: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id*. The Supreme Court in *Holder*, 561 U.S. at 24, held that the same limitation applies to services. A.126-28.

If Count One were submitted to the jury, the defense requested an instruction that the personnel or services had to be provided in coordination with or under the direction of ISIS, to prove material support to a foreign terrorist organization. A.126-28, 841-50. The district court denied the motion for acquittal on Count One

19

and, despite *Holder*, instructed the jury that the provision of services could be found if Ullah performed services "for the benefit of ISIS." A.1075 .

Over strong defense objections, the court charged the jury as follows:

> A person provides or attempts to provide services as that term is defined in the statute when a person performs work commanded or paid for by another *or done for the benefit of another, here ISIS.*
>
> Only *work performed* in coordination with, at the direction of, or *for the benefit of ISIS meets the definition of service.* It's for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such as the conduct alleged here, whether the defendant carried out the conduct alleged here, and, if you find that he did, whether the defendant was motivated by such an invitation.
>
> *If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and* if you find *that the defendant engaged in conduct that was motivated in whole or in part by such an invitation,* that would be *sufficient* to meet the definition of services in the statute.

A.147, 1074-75. (emphasis added). The defense objected on the ground that, in addition to violating *Holder*, the last paragraph effectively directed a verdict for the government. A.939-48.

The district court denied the Rule 29 motion even with respect to personnel, explicitly prohibited by the statutory exclusion. It accepted the government's argument that the provision of personnel could be found on an attempt theory: Ullah attempted to provide himself to ISIS by committing suicide and being

20

accepted as a martyr. A.133-34, 853-55.The court instructed the jury that it could find that Ullah provided "personnel" if it found that he provided or attempted to provide himself to work under the organization's direction and control, but that individuals who act entirely independently of ISIS to advance its goals are not considered to be working under its direction and control. A.1075.

The court submitted no special interrogatories on "personnel" or "services" and charged that the jury need not agree on which one was provided, so long as they agreed that Ullah provided or attempted to provide either personnel or services. A.1075-76.

### 2. Attack Against a Mass Transportation System

The defense moved to dismiss two of the three alternative subsections charged in Count Five because the evidence was insufficient to prove that Mr. Ullah "placed" or attempted to place a destructive device "in, upon, or near a mass transportation vehicle" (§(a)(2)) or that he placed the device in, upon, or near a garage, terminal structure, etc., "with intent to . . . derail, disable or wreck a mass transportation vehicle." (§(a)(4)). The evidence established only that Ullah had detonated the device in a tunnel between the subway station and the Port Authority bus station, not "in, upon, or near" any subway car. A.128-301. Nor was there any proof that he intended to derail, disable, or wreck a subway car. The only facts

21

alleged in the indictment to have constituted the crime of "placing" the device "in upon or near" a mass transportation vehicle were: "*to wit, ULLAH detonated and attempted to detonate an IEP in the vicinity of the Port Authority Bus Terminal which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense*."A.25. (emphasis added).

The government dropped its allegation under subsection (a)(4)(B) (with intent to "derail, disable, or wreck" a subway car carrying passengers), but insisted that subsection (a)(2) ("placed the device "in, upon, or near" a subway car) could be submitted to the jury. A.880-91. In response to the court's statements that the device was detonated nowhere near a subway car and that it would direct a verdict for the defendant on this count, the government offered an alternative theory, not alleged in the indictment. A.881-91. It now contended that Ullah "placed" the device on a mass transportation vehicle within the meaning of the statute when he boarded the subway in Brooklyn to ride to the Port Authority with the disconnected device taped to his chest. A.883-86, 889-90, 921.

The defense argued that "placing" the device could not encompass carrying the disconnected device. In any event, this new theory of the offense was never charged in the indictment and would constitute a constructive amendment. A.137-41, 927-29. The defense pointed out that the crime charged in the indictment was

22

the detonation of the device in the vicinity of the Port Authority and the indictment

did not refer at any point to Ullah's boarding or riding the subway. A.927-29. The

district court expressed surprise at the government's new theory ("When did you

disclose this theory? Did I miss it?"), A.885, and exasperation with its "spinning

theories" the day before summations. A.889, 892.

Nevertheless, the court ultimately permitted the new theory and charged

subsection (a)(2) to the jury. A.921-22, 1088-89. The court further explained the

government's theory to the jury: "Under this theory the government contends that

the defendant violated the statute when he boarded and rode the subway with a

destructive device." A.1089. The court refused to charge the defense theory that

riding the subway with the unconnected device on his person was not "placing" the

device on a subway car, ruling that this was a legal theory the court had rejected.

A.948-53. Instead, it charged the jury only that "[t]he defendant argues that the

government has failed to prove this theory beyond a reasonable doubt." A.949,

1089.

The defense also argued that the aggravating element of 18 U.S.C. §1992(b),

should not be charged with respect to the government's alternative theory for

Count Five, subsection (7), prohibiting "*any act,* including the use of a dangerous

weapon, *with the intent to cause death or serious bodily injury to any person*" who

23

is *in "a garage, terminal, structure, track, . . . or facility* used in the operation of, or in support of the operation of a mass transportation vehicle." A.129-31, 894-900. The aggravating element of section 1992(b) increases the maximum sentence for the offense from 20 years to life for "anyone who commits an offense under subsection (a) in a circumstance in which *the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense*" *Id.* (emphasis added).

The defense contended that this aggravator, by its terms, applies to those offenses in subsection (a) that involve an attack on a mass transportation vehicle, for example, subsection (a)(2), which prohibits "placing . . . a destructive device *in, upon or near* railroad on track equipment or *a mass transportation vehicle,*" and subsection (a)(4)(B), which prohibits "placing . . . a destructive device in upon or near any garage, terminal, structure, track," etc. . . . . "used in the operation of, or in support of the operation of, a mass transportation vehicle," "*with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck a mass transportation vehicle.*" (emphasis added). A.129-31, 894-900, 1181-85. Subsection (a)(7), however, proscribes "any act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person" in a garage, terminal, or facility. Unlike §§(a)(2) and (a)(4)(B), it does not

24

prohibit an attack on a vehicle or railroad on-track equipment. Because subsection (b)'s increased sentence for committing the crime "in a circumstance" in which "*the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee," does not relate to any such vehicle or equipment in §(a)(7), counsel argued that it logically did not apply to §(a)(7). *Id*.

The government contended that the aggravator must apply to §(a)(7) as well because it refers to "anyone who commits an offense under subsection (a)" A.897, 901-03. Because §(a)(7) does not refer to any vehicle, the court asked which vehicle would qualify if subsection (b) applied. A.897. The government responded that it could be any subway car passing through the entire Port Authority/Times Square terminal complex. A.897, 902-03.

The court expressed skepticism of the government's theory, A.901-04, but nonetheless agreed to charge the aggravating element with respect to §(a)(7). A. 929-30. After charging the jury on the two remaining theories of guilt under Count Five, §1992 (a)(2) and (a)(7), it asked the jury to specify in a special interrogatory its findings under either theory. It instructed the jury as follows on the aggravating element of §(b):

> So, with respect to the first theory, that the defendant placed a destructive device in, upon, or near a mass transportation vehicle when he boarded and rode subway with a destructive

25

device, you must determine whether the subway was carrying at least one passenger or one employee at the time.

With respect to the second theory, that the defendant set off a destructive device with intent to cause death or serious bodily injury, you must determine whether the mass transportation vehicle or vehicles supported by the terminal structure, track, tunnel, station, or facility where the destructive device was set off was or were carrying at least one passenger or employee at the time of the offense.

T. 945-46.

### 3. The §924(c) Count

Over defense objection, following the procedure set forth in since-reversed *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018) ("Barrett I"), *vacated and remanded*, *Barrett v. United States*, 139 S. Ct. 2774 (2019), the district court instructed the jury to determine whether each offense in Counts One through Five was a crime of violence under the now-defunct residual clause, *see United States v. Davis*, for purposes of the section §924(c) count charged in Count Six. A.932-39. The court made alternative findings that Counts Three and Five -- but not Counts Two and Four -- qualified as crimes of violence under the force clause. A.932, 958-61, 1308.

### D. Verdict

The jury convicted Ullah of all counts. A.1144-48. On Count Six, the jury

26

found in special interrogatories that Count One was not a crime of violence but that the offenses charged in Counts Two through Five were. A.1146-47.

After *Davis* struck down the residual clause, Ullah moved to vacate the §924(c) conviction, which carried a mandatory consecutive 30-year term. A.1229-47. The government conceded that Counts One, Two and Four did not qualify under the force clause, but contended that Counts Three and Five did. A.1309. The district court ruled that Count Three was a categorical crime of violence and upheld Ullah's conviction for Count Six on this ground, without addressing Count Five. A.1309.

## E.     Sentence

The Probation Office calculated Ullah's Guidelines offense level to be 43, which, even with no criminal history, placed him the Guidelines "range" of life imprisonment, plus 30 years consecutive for the §924(c) count. PSR¶¶ 26-34, 67. The offense level was determined by applying two separate enhancements for terrorism. First, the PSR grouped Counts One through Five and applied the enhanced base offense level of 42 in U.S.S.G. §2M6.1(a)(1) for an offense committed to aid a foreign terrorist organization. PSR¶26. It then added the 12-level terrorism enhancement of U.S.S.G. §3A1.4(a) for a "federal terrorism offense," defined as one "that is calculated to influence or affect the conduct of

27

government by intimidation or coercion, or to retaliate against government conduct." This increased the offense level to 54. PSR¶28. 18 U.S.C. 2332b (g)(5)(A). The Guidelines cap the total offense level at 43, which produced the Guidelines range of life imprisonment. PSR¶34, U.S.S.G. Chapter 5, Part A.

Ullah objected to the 12-level terrorism enhancement on the ground, *inter alia*, that it constituted double-counting of the terrorism component of the offenses. A.1323, 1384. Ullah also requested a two-level reduction for acceptance of responsibility because he had never denied deflagrating the bomb and expressed remorse for his conduct. A.1323-24. He went to trial only because the government offered him nothing but a *Pimentel* letter with a Guidelines range of life plus a mandatory consecutive 30 years. A.1371-73. With an offense level of 42, Ullah's Guidelines range would have been 360 months to life. U.S.S.G. Chapter 5, Part A.

Defense counsel requested the mandatory minimum sentence of 35 years. A.1324-32. Ullah's sentencing submission informed the court, supported by an expert report, that Ullah was severely depressed about being separated from his wife and baby in Bangladesh, that he became fixated on the plight of the Rohinga, and that his conduct was an extreme aberration, while in the throes of deep depression, from his life as a law-abiding and dutiful son and husband. A.1315-19.

The district court rejected all of the defense arguments and imposed the

28

maximum sentence on all counts: life imprisonment on Counts Two, Three and Five and 20 years on Counts One and Four, plus the mandatory consecutive 30 years on Count Six. A.1375-1419. Although there was no evidence at trial that Ullah tried to kill many people or that the small pipe bomb was capable of killing many[1], the district court stated that Ullah "purposefully went into the most crowded station at the most crowded time of day for the purpose of killing indiscriminately men, women, and children, of maiming and injuring others, of spreading terror and fear even wider," and that the crime was "a calculated decision to kill as many people a [he] could." A.1410-11.

## SUMMARY OF ARGUMENT

1.  The statute proscribing provision of material support to a terrorist organization requires proof that "personnel" be provided to work under the "direction or control" of the organization and explicitly excludes from prosecution "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives." 18 U.S.C. §2339B(h). This limitation applies to the provision of "services" as well. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010). The evidence was undisputed that Ullah acted independently, inspired

---

[1] The district court noted at the end of trial that Ullah detonated the bomb "with nobody within 10 feet" of him, and that, with all the expert testimony, there was no opinion offered on the kind of damage this device could have inflicted. A.882.

29

by ISIS propaganda, but with no coordination or contact with ISIS. Therefore his conviction for providing "personnel" or "services" cannot stand. The government's "attempt" theory -- that Ullah attempted to provide himself to ISIS as a martyr by killing himself – is explicitly barred by the statute's prohibition of the prosecution of any person "in connection with the term personnel" who has not provided or attempted to provide someone "to work under that [organization's] direction and control." A dead person cannot " work" under anyone's "direction and control."

2. The district court's jury instructions allowing the jury to convict for either "personnel" or "services" on an attempt theory, and for "services" even if Ullah acted independently but for the "benefit of" ISIS, were erroneous and violated the express statutory prohibition and the Supreme Court's ruling in *Holder*. The court's further instruction that proof that "ISIS did in fact invite its followers or sympathizers to engage in such conduct" with proof "that the defendant engaged in conduct that was motivated in whole or in part by such an invitation" would be "sufficient to meet the definition of services" essentially directed a verdict for the government on this count.

3. The Count Five conviction for a terrorist attack against a mass transportation system fails for numerous reasons. The evidence failed to prove the theory of the offense charged in the indictment under §1992(a)(2) that Ullah

30

"placed" a destructive device "in upon or near railroad on-track equipment or a mass transportation vehicle" when he "detonated and attempted to detonate [the device] in the vicinity of the Port Authority Bus Terminal." The evidence proved that he detonated the device in a tunnel between stations, nowhere near a subway car. Therefore, at the end of trial, the government changed its theory to claim that he "placed" the device on the subway in Brooklyn when he boarded the subway with the unconnected device strapped to his chest. This theory of "placing" is at odds with the plain meaning of "place," as opposed to "carry," a term Congress uses when it means to proscribe transporting. The transporting or carrying of a device is inconsistent with the other acts charged in section 1992 and is charged elsewhere in the Criminal Code. Further, the new placement theory was charged nowhere in the indictment and was a constructive amendment, and an invalid basis for conviction. *See Stirone v. United States*, 361 U.S. 212, 215-16 (1960); *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005). Finally, the court delivered an unbalanced charge on "placement," specifically explaining the government's theory, while refusing to explain the defense theory.

4.  The conviction on Count Five cannot stand under the alternative theory charged under §1992(a)(7) that Ullah committed any "act" in a mass transportation system with the intent to kill or seriously injure a person because the evidence

31

failed to prove that Ullah intended to harm anyone but himself. Even if this is sufficient under the statute to prove an offense under (a)(7), the aggravating element under §1992(b) increasing the maximum sentence to life for "anyone who commits an offense under subsection (a) in a circumstance in which *the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense" does not apply to subsection (a)(7) and the conviction with this element cannot stand. Subsection (b)'s application to those crimes in subsection (a) committed in a "circumstance" in which "the" vehicle was carrying a passenger obviously limits this aggravator to those crimes that were attacks on a mass transportation vehicle or on-track equipment. It does not apply to "any act" committed anywhere in a mass transit station or facility.

5.  The §924(c) conviction cannot stand because Ullah did not use a destructive device in furtherance of a qualifying crime of violence. The district court ruled that Count Three – "delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use or public transportation system" or attempting to do so " with intent to cause death or serious physical injury or to cause extensive destruction of such a place," under §2332f(a), qualifies as a crime of violence under the force clause. It does not. The force clause requires that the offense have as an element the use of force against the person or property

32

of "another." The §2332f(a) offense does not require this. The minimum conduct required is the placing of an explosive devise in a place of public use with intent to seriously injury any person, including the defendant himself. The only alternative theory for the §924(c) offense, Count Five, is likewise not a crime of violence. First, §1992(a)(2) requires only a reckless state of mind, which does not qualify under the force clause. *Borden v. United States*, 141 S. Ct. 1817 (2021). Second, subsection (a)(7) does not require the use of force, only any "act," including an act of omission, committed with intent to cause serious physical injury.

6. The sentence of life plus 30 years, imposed for a crime in which no one was seriously injured except Ullah himself, was both procedurally and substantively unreasonable. First, the court's imposition of a 12-level terrorism enhancement, on top of the enormous base offense level of 42 for a "federal crime of terrorism" constituted impermissible double counting for the same harm. Second, the court unlawfully ruled that Ullah was not eligible for credit for acceptance of responsibility because he went to trial, although he admitted his factual guilt and only contested certain legal theories. Third, the court's sentencing determination was based on a view of the facts -- that Ullah intended to kill as many people as possible -- that was not supported by the evidence. Finally the life plus 30-year sentence was substantively unreasonable in a case in which no on

33

except Ullah was seriously injured.

## STANDARDS OF REVIEW

This Court reviews preserved statutory interpretation questions, sufficiency of the evidence challenges, and jury instructions challenges *de novo. United States v. Gayle*, 342 F.3d 89, 91 (2d Cir. 2003); *United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006); *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017); *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004). The sentence is reviewed for abuse of discretion but the Court "reviews *de novo* all questions of law relating to the district court's application of a federal sentencing enhancement." *United States v. Beardsley*, 691 F.3d 252, 257 (2d Cir. 2012).

## ARGUMENT

### POINT I

**The Evidence Was Insufficient as a Matter of Law to Prove That Ullah Provided Material Support and Resources as Charged in Count One.**

The government's theory was that Ullah provided "material support or resources" to ISIS, in violation of 18 U.S.C. §2339A(a), by deflagrating the bomb in the tunnel of the Port Authority station. Under the statutory language, "material support or resources" includes a "service" and "personnel." 18 U.S.C. §2339A(b).The statute specifically provides that "[n]o person may be prosecuted under this section in connection with the term 'personnel'"

> unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control to organize, manage, supervise, or otherwise direct the operation of that organization. *Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.*

18 U.S.C. §2339B(h) (emphasis added). Although there is no parallel provision in the statute specifically referring to the term "service," the Supreme Court has held

35

that the same limitation applies to services. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010). The government's theory was that Ullah acted alone but was inspired by ISIS propaganda.

The evidence established that Ullah's was an independent act, inspired by ISIS propaganda but not committed under the "direction or control" of ISIS. Ullah was not in communication with nor even acquainted with a single member of ISIS. It was not the government's theory that Ullah acted under the direction and control of, or even in coordination with any ISIS member. Its "personnel" theory was that just such an independent act qualified as providing personnel or as an attempt to provide personnel if committed to become accepted as a martyr by the organization. It argued: "A jury reasonably could conclude from [Dr. Zelin's] testimony that the defendant attempted to provide himself to ISIS and join the group by carrying out a suicide attack -- and that he took a substantial step towards that goal by detonating the pipe bomb -- but that he did not actually provide personnel to ISIS because he did not succeed in killing and martyring himself at its direction." A.133-34. Its "services" theory was that the independent act qualified as providing services or attempting to do so if it was committed for the benefit of ISIS. A.863-64. The district court's denial of the defense Rule 29 motion on both personnel and services was error.

36

The legal sufficiency of the evidence is measured against the statutory elements, not the jury instructions. *Musacchio v. United States*, 136 S.C. 709, 715 (2016). The evidence was insufficient to prove that Ullah provided either "personnel" or "services," within the meaning of 18 U.S.C. §2339B, when he deflagrated the small pipe bomb in the tunnel in the Port Authority bus terminal. Viewing the evidence in the light most favorable to the government, it established: 1) that Mr. Ullah built and deflagrated the bomb entirely on his own, without assistance from or communication with any person; 2) that he was inspired to do it by propaganda videos produced by ISIS; 3) and that he said, when questioned, that he "did it for ISIS."

This is precisely the "lone wolf" conduct explicitly excluded by the statute: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. §2339B(h). While this exclusion is explicit in the statute only with respect to "personnel," the Supreme Court has "interpret[ed] 'service' along the same lines," to cover only an action "performed in coordination with, or at the direction of, a foreign terrorist organization." *Holder*, 561 U.S. at 24. The Supreme Court reasoned that "'service' similarly refers to concerted activity," and that "Congress would not have

37

prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'" *Id.*

Nor did the government's attempt theory make the evidence sufficient. Despite the express statutory exclusion of the independent actor, the district court accepted the government's argument that Ullah could still be convicted of providing personnel or services through an independent act on an attempt theory: that his act was an attempt to "provide himself to ISIS and join the group," by killing himself and being accepted as a martyr. A.133-34, 853-55. This theory does not withstand logical scrutiny: a person cannot attempt to work under the "direction or control" of an organization by killing himself, and without even trying to contact the organization. Had Ullah succeeded in his attempt to kill himself, he would be dead, not "personnel" available "to work under the terrorist organization's direction or control."

Subsection (h) of 2339B unambiguously prohibits the prosecution of any person "*in connection with the term 'personnel'*" unless the person "has knowingly provided, attempted to provide, or conspired to provide" the terrorist organization with someone "to work under that terrorist organization's direction or control." (Emphasis added). This statutory prohibition explicitly covers an attempt charge. Congress went on to specify that "[i]ndividuals who act entirely independently of

38

the foreign terrorist organization to advance its goals or objectives shall not be considered working under [the organization's] direction and control."

The statute could not be clearer that an entirely independent act committed "for ISIS" after watching some propaganda videos -- "to advance its goals or objectives" -- may not be prosecuted as providing or attempting to provide personnel under §2339B. The Supreme Court has held that the same prohibition applies to services. The government's attempt theory was simply an end run around this express prohibition. Under §2339B's express terms, Ullah could not legally be convicted of providing or attempting to provide "personnel" to ISIS by killing himself.

## POINT II

**In the Alternative, The District Court's Erroneous Jury Instructions on the Provision of Personnel and Services Require Vacatur of the Conviction for material support to a terrorist organization.**

The theories submitted to the jury for both "personnel" and "services" were contrary to law, and provided the jury with invalid legal theories on which to convict. Because the jury was instructed incorrectly on both the personnel and services theories, the conviction must be vacated. Even if this Court concludes that only one theory was incorrect, the conviction must be vacated because the general

39

verdict could have been based on either "personnel" or "services."

**A.      The charged "personnel" theory of conviction was invalid.**

As explained, Ullah's prosecution for providing material support through either "personnel" or "services" was legally barred because his conduct fell squarely within the express prohibition of 18 U.S.C. §2339B(h). There was no evidence that he provided, attempted to provide, or conspired to provide ISIS with personnel (including himself) "to work under [the] organization's direction or control." *Holder*, 561 U.S. at 24. He knew not one person in the organization. He acted entirely alone. On the government's own theory, Ullah was merely inspired by ISIS videos; he was exactly one of those "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives," who "*shall not* be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. §2339B(h).

The jury was nevertheless instructed, over objection, that Ullah could be convicted  for "attempting" to provide himself to ISIS as a dead person, a martyr. For the reasons discussed at pp. 36-37, this theory makes no sense and was a blatant circumvention of the statutory exclusion.

40

**B.** **The "services" theory, as charged to the jury, likewise was erroneous.**

The term "services" is undefined in 18 U.S.C. §2339B, but the Supreme Court held in *Holder*, 561 U.S. at 24, that the same limitation applies to "services" as applies to "personnel." Referring to subsection (h)'s express limitation for personnel, and consulting the dictionary definition of service, the Supreme Court reasoned that "'service similarly refers to concerted activity," and that "Congress would not have prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'" *Id.* Thus, the Court concluded: "We interpret 'service' along the same lines," to cover action "performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* The statute does not extend to independent action undertaken for the perceived benefit of an organization; this would amount to an independent act undertaken "to advance it goals or objectives," just the conduct excluded.

However, the district court charged the jury that "a person provides or attempts to provide services as that term is defined in the statute when a person performs work commanded or paid for by another *or done for the benefit of another, here ISIS."* A.924. The court repeated that work performed *"for the benefit of ISIS meets the definition of service." Id.* Finally, the court specifically told the jury that the evidence here was sufficient: *If you find that ISIS did in fact*

41

*invite its followers or sympathizers to engage in such conduct and* if you find *that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient* to meet the definition of services in the statute." A.925 (emphasis added in all).

This charge allowed the jury to convict on the services theory for exactly that conduct barred from prosecution as "personnel" under subsection (h): an entirely independent act undertaken "to advance the goals and objectives" of the organization. Contrary to *Holder*, this instruction allowed a conviction for conduct Congress did not proscribe under this statute. *Holder*, 561 U.S. at 24 (Congress would not have prohibited under "service" what it specifically exempted from prohibition under "personnel").

Moreover, the court's explanation -- unsolicited by the government -- that the services would be sufficiently proven by evidence that "ISIS encouraged its sympathizers to engage in such conduct" and that "the defendant's conduct was motivated in whole or in part by such an invitation" essentially directed a verdict on this theory. This instruction not only incorrectly stated the law, but it told the jury that specific, undisputed facts proved guilt. This instruction was so helpful to the government that it specifically quoted it in its summation. A.989. Such an exceptionally unbalanced charge warrants reversal. *See United v. Dove*, 916 F. 2d

42

41, 46 (2d Cir. 1990) (instructions pointing the jury to a finding guilt with examples analogous to the facts of the case was reversible error).

## C. This count must be vacated.

The jury was not asked to specify the theory on which it convicted. Therefore, it is impossible to know which theory chose; indeed, unanimity was not even required on this point. As argued, each theory was legally invalid, so the conviction cannot stand. Even if this Court concludes that only one theory was invalid, the conviction must be vacated because the jury could have relied on either theory to convict. *Griffin v. United States*, 502 U.S. 46, 59 (1991); *Yates v. United States*, 354 U.S. 298, 312 (1957); *United States v. Garcia*, 992 F. 2d 409, 416 (2d Cir. 1993).

Where "disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty," if either theory is based on "legal deficiencies," the conviction cannot stand. *Garcia*, 992 F. 2d at 416; *see Griffin*, 502 U.S. at 59 (jurors not equipped to determine whether a theory is contrary to law). Unlike a case of simple evidentiary insufficiency, "in which jurors *are* well equipped to analyze the evidence" and settle on the theory supported by the evidence, a general verdict must be vacated where the jury has been given alternative theories of guilt and one theory is based on "a mistake about the law." *United States v. Desnoyers*,

637 F.3d 105, 112 (2d Cir. 2011).

Here the jury had the option of finding Mr. Ullah attempted to provide personnel even if he acted entirely alone, if his act could be seen as an attempt to be accepted as a martyr by ISIS. The jury also had the option of relying on the "services" theory under the erroneous instruction that "services" included an act taken for the benefit of ISIS, even an independent act. Thus the jury's general verdict on Count One should be vacated if either of these theories was invalid. *Griffin*, 502 U.S. at 59.

To be harmless, the government must "show beyond a reasonable doubt that the error complained of did not contribute to the verdict." *United States v. Reed,* 756 F.3d 184, 190 (2d Cir. 2014). Vacatur is therefore required if it is *"possible"* the jury *"may* have convicted . . . for conduct that is not unlawful." *McDonnell v. United States*, 136 S. Ct. 2355 (2016)(emphasis added). Here, it is certainly possible that the jury convicted on either theory. The evidence proved that Ullah acted alone, with no coordination or contact with ISIS, and that he only saw ISIS propaganda distributed to the public. The jury could not have convicted him of providing personnel, which was barred by the statutory exclusion. It could only have convicted for personnel under the erroneous "attempt" theory -- that he attempted provide "personnel" by dying and becoming a martyr (in which case he

44

would be dead "personnel"). Likewise, if the jury convicted on "services," it is highly likely that it would have adopted the theory of guilt that the court handed it, in directed verdict fashion: " *If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and* if you find *that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient* ." A. 1075 (emphasis added).

## POINT III

**The Evidence Was Legally Insufficient to Prove the Elements of 18 U.S.C. §§1992(a)(2) or (a)(7) Because it Failed to Prove That Ullah "Placed" the Device "On, In or Near" a Mass Transportation Vehicle, or That He Intended to Kill or Seriously Injure Any Person Other Than Himself, and It Failed to Prove the Aggravating Element of §1992B for Committing an Attack On a Mass Transportation Vehicle Carrying a Passenger.**

The jury convicted Ullah of Count Five under the theory that he knowingly placed a destructive device "in, upon, or near railroad on-track equipment or a mass transportation vehicle" with "intent to endanger the safety of any person or with reckless disregard for the safety of human life." §1992(a)(2). The only conduct charged in the indictment to constitute this offense was the deflagration of the pipe bomb in the vicinity of the Port Authority bus terminal. However, faced with undisputed on evidence that the bomb was deflagrated in the tunnel nowhere

45

near a mass transportation vehicle, the government changed its theory. It argued in summation, and the court instructed the jury, that Ullah could be convicted under subsection (a)(2) for "placing" the bomb on a subway car when he boarded the subway in Brooklyn carrying the unconnected device. This theory of placement should not have been submitted to the jury because 1) the evidence failed to establish that Ullah "placed" the bomb within the meaning of the statute, and 2) this theory was never charged by the grand jury and constructively amended the indictment.

The government's alternative theory for Count Five was that Ullah violated section 1992(a)(7) by committing an "act" in a mass transportation station or structure with the intent to kill or seriously injure a person. The evidence showed that Ullah deflagrated the small explosive device in a transit structure but failed to prove that he intended to hurt anyone other than himself. Even if the evidence were sufficient to prove a violation of this subsection, the aggravating element of section 1992(b), increasing the maximum sentence to life from 20 years for the commission any of act under subsection (a) against a mass transportation vehicle containing a passenger, could not apply to subsection (a)(7), because (a)(7) does not proscribe an attack on a vehicle, only any act in a station, facility, or structure that supports mass transportation.

46

**A. The evidence was legally insufficient to establish that the defendant "placed" a destructive device in a mass transportation vehicle.**

The term "places," as in "whoever . . . places any . . . destructive device," is not defined in 18 U.S.C. §1992(a)(2). The verb "to place" is defined in the Oxford American Dictionary as "to put into a particular place or rank or position or order," in Webster's Ninth New Collegiate Dictionary as "to put in or as if in a particular place." It means something different from "to carry" or "to transport." *See Muscarello v. United States*, 524 U.S. 125, 128 (1998) ("carries" means to convey on one's person or in a vehicle and "transport" includes carrying but is broad enough to include shipping).

Both the terms "carry" and "transport" are used in the United States Criminal Code. *See*, *e.g.* 18 U.S.C. §924(c)(1) (whoever uses or carries a firearm . . . ); 18 U.S.C. §926A (prohibits "transporting" a firearm). In fact, Ullah was convicted of carrying the destructive device under §924(c)(1) in this very case. If Congress intended §1992(a)(2) to punish one who merely carried or transported, rather than placed, a destructive device on a mass transportation vehicle, it would have said so as it has elsewhere in Title 18. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen it is clear that Congress knew how to specify [one term] when it wanted to" but used "different language" in another part of the statute, "the court assumes different meanings were intended.").

47

To avoid the obvious difference in meaning between "placed" and "carried," the government theorized that Ullah was a "part of the bomb," that he was "the switch," because he had to connect the battery to a wire to deflagrate the bomb. A.145. Under this theory, he "placed" the bomb "on a mass transportation vehicle" when he "placed" himself on a subway car. *Ibid.* But Ullah was no more a "part of" the bomb than a gun carrier is a "part of" the gun because he must pull the trigger to fire. The government's own evidence established that Ullah intentionally placed the bomb in the precise location of a TV interview he had seen: the tunnel in the Port Authority station.

The government's new theory that placing meant carrying is inconsistent with the text of section 1992. It is entitled "Terrorist attacks and other violence against railroad carriers and against mass transportation system on land, on water, or through the air" and that is what Congress intended to capture: conduct that constitutes an attack, *e.g.* the placement of a destructive device in, upon, or near such a vehicle. The acts prohibited in this section are affirmative acts of violence:

> (1)    Wrecks, derails, sets fire to, or disables . . .
>
> (2)    Places any biological agent or toxin, destructive substance, or destructive device on in or near . . .
>
> (3)    Places or releases a hazardous material or a biological  agent or toxin near . . .
>
> (4)    Sets fire to, undermines, makes unworkable or hazardous to work on or use . . .

48

(5) Removes an appurtenance from, damages, or otherwise impairs the operation of a . . . signal system

(6) Disables or incapacitates a dispatcher, driver, or captain

(7) Commits an act . . . with intent to cause or serious bodily injury.

Section 1992 does not prohibit the transporting or carrying of such devices or substances; that is prohibited by 18 U.S.C. §924(c)(1).

Finally, the evidence was legally insufficient to establish that Ullah 's act of boarding the subway carrying the unconnected device created a substantial and unjustifiable risk of harm to human life, and that Ullah knew of that risk and deliberately disregarded it. These are all necessary, at a minimum, to prove that Ullah placed the device in the subway with the intent to endanger the safety of any person or with reckless disregard for the safety of human life. §1992(a)(2). Ullah was an electrician and he knew how to connect or disconnect the device. He traveled with it disconnected and had the device strapped to his chest with the battery in his pocket. He neither intended to endanger nor risked endangering others on the subway.

**B.    The government's new theory for Ullah's violation of §1992(a)(2) was not charged in the indictment and was a constructive amendment.**

Count Five, as charged in the indictment, alleged a single act as the offense Ullah committed, in violation of  three subsections of §§1992(a)(2),(a)(4)(B), and

49

(a)(7): the detonation and attempted detonation of an IED in the tunnel between the two subway stations. This is the theory that was presented to the Grand Jury and this is what it charged. The indictment alleged that Ullah "(a) placed and attempted to place a destructive substance and a destructive device in, upon, and near a mass transportation vehicle . . . with intent to endanger the safety of any person, or with reckless disregard . . .  (b) placed and attempted to place [the device] in, upon, and near a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of . . .  a mass transportation vehicle . . . with intent to . . . derail, disable, or wreck a mass transportation vehicle . . .,[2] and (c) committed and attempted to commit an act, including the use of a dangerous weapon, with the intent to cause death and serious bodily injury to persons who were on or in a garage, terminal, structure, track, . . ., *to wit, Ullah detonated and attempted to detonate an IEP in the vicinity of the Port Authority Bus Terminal which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense*." A.24-26 (emphasis added).

The italicized portion above is the complete and only factual description of the offense charged in Count Five. There is no mention anywhere in that count, or anywhere else in the indictment, of Ullah carrying the unconnected bomb on a

---

[2] The government withdrew this theory at the end of its case for lack of evidence.

50

subway car, or even boarding a subway car at all. The only other language in Count Five sets forth the statutory elements of §§1992(a)(2), (a)(4), and (a)(7).

No one at trial considered Ullah's boarding of the subway in Brooklyn to be the charged crime until the government sprang this theory at the end of trial. The government's opening referred only to the detonation of the bomb as the offense. After describing the explosion and the evidence that would prove the offense, the government told the jury: "Four of the charges relate to how and where the defendant committed this bombing at the Port Authority." A.179. The other two charges were the material support and §924(c) charges, Counts One and Six. Ullah's trip on the subway while carrying the bomb was only mentioned in the narrative of events leading to the bombing itself, along with his building the bomb and posting on Facebook. A.176. At no point did the government allege that Ullah "placed" the bomb on that subway car in Brooklyn or otherwise suggest that merely carrying the bomb to the Port Authority was the charged offense.

Only at the end of trial, when the evidence had proved that the device was detonated nowhere near a mass transportation vehicle, did the government change its theory to the claim that Ullah "placed" the device when he boarded the subway carrying the unconnected device under his clothing. Submission of the government's new theory to the jury was a constructive amendment of the indictment, which was unconstitutional and violated Mr. Ullah's Fifth Amendment

51

right to be tried only for the offense charged by the Grand Jury. *See Stirone v. United States*, 361 U.S. 212, 215-16 (1960); *United States v. Milstein,* 401 F.3d 53, 65 (2d Cir. 2005).

"[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States,* 361 U.S. at 215-16. "When the trial evidence or the jury charge has 'broaden[ed] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended," a *per se* violation of the defendant's Fifth Amendment rights. *United States v. Milstein*, 401 F.3d at 65, *quoting United States v. Miller*, 471 U.S. 130, 138 (1985). Put another way, a constructive amendment is established where "either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the jury  convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998).

Moreover, the indictment must have provided fair notice of the offense charged. If the indictment does not "fairly inform the defendant of the charge against which he must defend" because the government has changed its theory after the indictment was brought, it is a constructive amendment. *See United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007).

The government's new theory of placement was a quintessential constructive

52

amendment. The grand jury did not charge this theory; it is not the crime charged the indictment. Indeed, carrying the bomb on the subway is nowhere mentioned in the indictment. To the contrary, the indictment charges a single act as the offense: that the defendant "detonated and attempted to detonate an IED in the vicinity of the Port Authority Bus Terminal." The government's new theory, that Mr. Ullah violated §1992(a)(2) by boarding the subway in Brooklyn while carrying the unconnected device under his clothes, impermissibly "broaden[ed] the possible bases for conviction". *Milstein,* 401 F.3d at 65; *United States v. Zingaro,* 858 F.2d 94, 99 (2d Cir. 1988).

The district court accepted the government's contention that the indictment charged the new theory by simply quoting the statutory elements charging that Ullah placed the device "in, upon, or near a mass transportation vehicle." A.143, 1306. Relying on this Court's statement in *United States v. Bastian,* 770 F.3d 212, 221 (2d Cir. 2014) that it has "never suggested that a "to wit" clause binds the government to prove the exact facts specified in a criminal indictment," the government argued and the court ruled that the factual conduct described in the indictment is inconsequential. A.143, 1307.

This district court misread *Bastian* and committed legal error. While the government need not prove he exact facts charged in a "to wit" clause, it cannot fundamentally alter the factual basis for the charged offense. Constructive

53

amendment occurs when the factual basis of conviction submitted to the jury constitutes a different act from the core criminal conduct alleged in the indictment. An indictment may simply track the statutory language or otherwise be "drawn in more general terms [to] support a conviction on alternative bases," but "where only one kind of [criminal conduct] is charged . . . a conviction must rest on that charge and not another." *United States v. Zingaro,* 858 F.2d at 99. *Bastian* reaffirms this rule, distinguishing between minor factual variations in the way the crime was committed, *e.g., United States v. D'Amelio,* 683 F.3d 412, 417 (2d Cir. 2012) (use of the telephone rather than the internet to commit the same crime as charged), and a change that "permits conviction for a functionally different crime." 770 F. 3d at 221.

*Bastian* involved plain error review of a guilty plea where the particular firearm used in furtherance of a drug trafficking offense was different from the one charged in the indictment. *Id.* at 223. This Court acknowledged that substitution of a different firearm raised the constitutional concerns of constructive amendment, but affirmed on plain error grounds. *Id*. (because the law on that point was nuanced and unsettled, the Court could not "fault the district judge for failing to parse such novel distinctions" where there was no objection). In this case, the core criminal conduct submitted to the jury -- Ullah's boarding the subway in Brooklyn carrying the unconnected pipe bomb -- was an entirely different act from the single

54

act charged by the grand jury, his detonation of the device in the vicinity of the Port Authority Terminal.

Finally, the specific offense alleged in the indictment, the detonation of the device in the terminal, provided no notice that the crime charged would be that Ullah "placed" the device in a mass transportation vehicle when he boarded the subway while carrying the device much earlier. *See Milstein,* 401 F.3d at 61-65 (indictment allegations of misbranding pharmaceuticals did not provide notice of altered theory that the drugs were unsterile and therefore mislabeled as if they were sterile). This theory was a big surprise to everyone, including the district court. When the government sprang this theory at the charge conference, the district court agreed with defense counsel that it never knew this was the government's theory, asking the government, "When did you disclose this theory? Did I miss it?" and said, "It wasn't obvious to me that that was what you were proposing as your theory for §1992(a)(2)," and "This is the first I'm hearing he did it in two ways here." A.885, 889.

In addition to broadening the bases for conviction and constructively amending the indictment, a *per se* Fifth Amendment violation, *See Milstein*, 401 F.3d at 65, the new theory made Count Five duplicitous: it charged two separate offenses, not a single offense. *United States v. Sturdivant*, 244 F.3d 71, 75 (2001). The first offense was Mr. Ullah "placing" the device on the subway when he

55

boarded it in Brooklyn in violation of §1992(a)(2). The second offense was the

commission of the "act" of detonation in the passageway in violation of

§1992(a)(7). The indictment provided no notice of this, but only charged one act of

detonation, in violation of both subsections. Because Ullah was prejudiced at

sentencing by virtue of his duplicitous conviction, his conviction of this count

should be vacated. *See id.* at 78-80.

## C.   The district court's jury instructions on the placement theory were unbalanced and presented only the government's theory.

The court's jury instructions on a disputed issue must be balanced, and not

unfairly slanted in the government's favor. *United States v. Dove*, 916 F.2d 41, 47

(2d Cir. 1990); *United States v. Assi*, 748 F.2d 62, 67 (2d Cir. 1984). And the court

must instruct the jury on the theory of the defense if it is requested. *United States*

*v. Prawl,* 168 F.3d 622 , 626 (2d Cir. 1999). The jury charge on the government's

placement theory violated both of these rules. The court delivered a one-sided

charge on placement that set forth the government's theory that Ullah "placed" the

bomb on a subway car when he boarded the subway wearing the device, but

refused to charge the defense theory that this did not constitute "placing" the bomb

on a subway car. The court only generally stated that the defense contended the

offense was not proven beyond a reasonable doubt. The reason the court gave for

its one-sided instruction was that the defense theory was a "legal argument" that it

56

"lost." In the court's view, the question of placement of the bomb was not really a question of fact for the jury, but a legal matter, and this justified its extraordinarily unbalanced charge.

**D. The Aggravating Element of 18 U.S.C. §1992(b), Raising the Maximum Sentence From 20 Years to Life in Prison for an Attack on a Mass Transportation Vehicle that Contains a Passenger, Does Not Apply to subsection (a)(7), which Prohibits Any Assault in a Terminal or Station and not an Attack Against a Vehicle, and That Portion of the Verdict Should Be Vacated.**

Ullah was convicted of violating both 18 U.S.C. §§1992(a)(2) and (a)(7), and of the aggravated offense under subsection(b) for both theories. The aggravating element does not apply to the assault in a terminal offense prohibited under subsection (a)(7), and it should not have been submitted to the jury on this theory. In denying Ullah's post-trial Rule 29 motion, the district court declined to address this issue on the ground that it held the evidence sufficient to establish guilt under §1992(a)(2) and the aggravating element applied to that theory. As argued above, the government's theory for subsection (a)(2) should not have been submitted to the jury. And the aggravating element cannot stand based on the theory of guilt under subsection (a)(7).

Section 1992(b) provides for an aggravated offense, increasing the maximum sentence from 20 years to life, for "anyone who commits an offense under subsection (a) in a circumstance in which *the* railroad on-track equipment or

57

mass transportation vehicle was carrying a passenger or employee at the time of the offense" (emphasis added). This applies, by its terms, to those offenses in subsection (a) that involve an attack on a mass transportation vehicle, for example, subsection (a)(2), which prohibits "placing . . . a destructive device *in, upon or near* railroad on track equipment or *a mass transportation vehicle*," and subsection (a)(4)(B), which prohibits "placing . . . a destructive device in upon or near any garage, terminal, structure, track," etc. . . . "used in the operation of, or in support of the operation of, a mass transportation vehicle," "*with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck a mass transportation vehicle*." (emphasis added). These two statutory sections punish attacks on a mass transportation vehicle, *e.g.*, a train or subway car, and subsection (b) punishes more severely an attack against a vehicle that contains passengers or employees.

Subsection (a)(7), however, punishes "any act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person" who is on property described in §(4)(A) or (B). That property includes, as relevant here, "a garage, terminal, structure, track, . . . or facility used in the operation of, or in support of the operation of a mass transportation vehicle." This subsection thus punishes any act intended to kill or seriously injure anyone who is on the property of a subway, train or bus terminal, station, or facility. Unlike

58

subsections (a)(2) and (a)(4)(B), it does not prohibit an attack on a vehicle or railroad on-track equipment. Because subsection (b)'s aggravator for committing the crime under circumstances in which "*the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee," does not relate to any such vehicle or equipment in subsection (a)(7), it logically does not apply to (a)(7).

The government claimed that subsection (b) applied to any subway car passing through the Port Authority/Times Square terminal complex when any offense in subsection (a)(7) was committed. A.747-48, 752-53. This is contrary to the statutory language. Subsection (b) does not refer to *any* vehicle in the terminal, but a specific vehicle, "*the* [] vehicle." It obviously refers to "the" vehicle involved in an offense under those subsections of (a) that prohibit an attack on a vehicle, either by placing a device "in, upon, or near" the vehicle or by placing a device in the terminal with intent to derail, disable, or wreck a vehicle. Subsection (a)(7), by contrast, prohibits any act against a person in the terminal, and requires no attack on a vehicle.

The district court accepted the government's argument that because subsection (b) refers to subsection (a) in general when it includes anyone who "commits an offense under subsection (a) of this section in a circumstance in which" the vehicle was carrying a passenger or employee, it must sweep in every

59

offense in subsection (a). A.779-80. But this section does not reach any subsection (a) offense, only those committed "in a circumstance in which" the vehicle was occupied. And subsection (b) is clearly inapplicable to subsection (a)(9), for example, which likewise does not prohibit attacks on vehicles but prohibits conveying false information concerning an attempt to violate the statute. The district court's reading of subsection (b) -- as sweeping in every offense in subsection (a) -- would apply the 20-year minimum and life maximum sentence to the crime of conveying false information. But in that case, which vehicle would have to be carrying passengers and employees? False statements can be provided anywhere, not necessarily at a station.

The theory that subsection (b) applies to every offense in (a) does not make sense. The only sensible reading of all the terms of subsection(b) -- including "*the railroad on-track equipment or mass transportation vehicle*" -- is that it applies to those acts under subsection (a) that involve such a vehicle, and this is part of the "circumstance" that limits application of the aggravator.

The government's contrary interpretation, besides changing the statutory language from "the" to "any," would have other absurd results that were certainly not intended by Congress. Subsection (a)(7), by its terms, prohibits any assault with intent to cause serious bodily injury in a subway, train or bus station or terminal. This would mean that a simple assault -- someone punching another

60

person in the face -- anywhere in the Port Authority or Times Square stations, or the tunnel connecting them, could subject a participant to a life sentence if any subway car was passing through any part of the station at the time of the assault. This cannot be the meaning of subsection (b).

Finally, if the statute were ambiguous enough to permit such an interpretation, the rule of lenity applies. *See United States v. Santos*, 553 U.S. 503, 514 (2008). "From the face of the statute, there is no more reason to think that," "the []vehicle" means any vehicle, "than there is to think" that it refers to the specific vehicle implicated in each offense directed against a vehicle. *Id.* "Under a long line of [Supreme Court] decisions, the tie must go to the defendant." *Id.* The conviction for §1992(b) as an aggravator to the conviction for violating §1992(a)(7) should be vacated.

## POINT IV

**The §924(c) Conviction Must be Vacated Because Ullah Did Not Use a Destructive Device in Furtherance of a Qualifying Crime of Violence.**

After *Davis* struck down the residual clause of 18 U.S.C. §924(c), the government conceded that Counts One, Two, and Four  no longer qualified as crimes of violence because they did not categorically require the use of force against the person or property of another. The district court did not decide whether

Count Five qualified, but upheld Ullah's §924(c) conviction count in furtherance of Count Three, "delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use or public transportation system" or attempting to do so "with intent to cause death or serious physical injury or to cause extensive destruction of such a place." 18 U.S.C. §2332f(a). This offense does not qualify as a "crime of violence" because the minimum conduct necessary to commit it does not require the use of force against the person or property of another. The Count Five offense does not qualify for the same reason and also because §1992 (a)(2) requires only a reckless *mens rea* and subsection (a)(7) prohibits any act, even one involving no force.

Under *Davis*, 139 S. Ct. 2319 (2019), an offense qualifies as a crime of violence only if it satisfies §924 (c)(3)(A)'s force clause; that is, only if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." In determining whether an offense satisfies the force clause, the Court applies the categorical approach, *id.*, in which "the facts of a given case are irrelevant" and only the elements are considered. *Borden v. United States*, 141 S. Ct. at 1825; *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018). "Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute." *Hylton v. Sessions*, 897 F.3d 57, 60 (2d Cir. 2018), quoting *Hill* and *United States v. Acosta*, 470 F.3d 132, 135

62

(2d Cir. 2006). If the statute sweeps more broadly than the force clause, a conviction under that statute cannot count as a predicate, regardless of the defendant's actual conduct. *Descamps v. United States*, 570 U.S. 254, 261 (2013).

**A.      Count Three cannot support the §924(c) conviction because placing an explosive device in a place of public use does not require the use of force against the person or property of another.**

The minimum conduct necessary to commit the offense of Count Three is the placement of an explosive device "in a place of public use" with the intent to cause death or serious bodily injury. 18 U.S.C. §2332f(a). A place of public use includes "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally." 18 U.S.C. §2332f(e)(6). The statute does not require intent to cause death or serious bodily injury "to another" but includes the perpetrator himself. Analogously, federal arson, which outlaws the burning of any property, can be committed against the defendant's own property, *Russell v. United States*, 471 U.S. 858, 859-62 (1985), and therefore does not require physical force "against the person or property of another." *United States v. Mink*, __ F. 4th __ 2021 WL 3556090 (8th Cir. Aug. 12, 2021); *United States v. Wilder*, 2020834 Fed. Appx. 782 (4th Cir. 2020); *United States v. Salas*, 889 F.3d 681, 683-84 (10th Cir. 2018). Thus, this statute categorically applies to one who would use such a device to blow

63

himself up or set himself on fire in the middle of the Washington mall or other open public space. Such an act is not improbable but is within "human experience."*Chrzanoski v. Ashcroft*, 327 F.3d 188, 195 (2d Cir. 2003). *See, e.g.*, *United States v. Paul Rosenfeld*, Dkt No. 7:19 Cr. 69 (S.D.N.Y.), entries # 1, 18, 27 at ¶¶32-37 (defendant made a bomb intending to blow it and himself up on the National Mall in protest of election laws);[3] https://www.nytimes.com/2019/05/29/us/politics/immolation-white-house. html (report of a man who set himself on fire at ellipse in front of White House).

**B.**   **Count Five cannot support the §924(c) conviction because section 1992(a)(2) requires only a reckless state of mind and §(a)(7) prohibits the commission of "any act" with intent to cause death or serious physical injury, which encompasses non-forceful conduct and even omissions.**

The offense of conviction in Count Five -- entitled "Terrorist Attacks and Other Violence Against a Mass Transportation System" -- is not  a crime of violence under the force clause of §924(c). Of the two alternative subsections of the offense of which Ullah was convicted, subsection (a)(2) requires only a reckless state of mind and subsection (a)(7) requires only the commission of any "act" with

---

[3]    This case was handled by the Federal Defenders office and a plea was negotiated to lesser charges in the information to avoid an indictment on more serious charges of attempted arson and attempted use of a weapon of mass destruction.

intent to cause death or serious bodily injury to any person. Neither of these categorically requires the use of force against the person or property of another.

18 U.S.C. §1992(a)(2) prohibits the placement of any destructive device in, upon or near a mass transportation vehicle "with intent to endanger the safety *of any person, or with reckless disregard for the safety of human life.*" (Emphasis added). An offense with a *mens rea* of recklessness does not qualify under the force clause because the use of violent force must be intentional. *Borden v. United States,* 141 S. Ct. 1817(2021).

The Supreme Court held in *Borden* that the force clause, also called the "elements clause," in the Armed Career Criminal Act requires the intentional use of force against the person of another and does not encompass offenses that can be committed recklessly. 141 S. Ct. at 1825. The Court extended its holding in *Leocal v. Ashcroft*, 543 U.S. 1 (2004) that the force clause in 18 U.S.C. §16(a), did not extend to offenses that could be committed negligently. *Id*. at 1825-26. The §16(a) force clause is identical to that in §924(c) and defines a crime of violence as an "offense that has as an element the use, attempted use, or threatened use of force against the person or property of another." *Borden* adopted *Leocal*'s reasoning that the critical phrase was "against," in section 16(a) "the person or property of another," and in ACCA "another," which demands that the perpetrator target a

65

particular individual or property and does not include reckless conduct. *Id.* 1825, 1827. It distinguished *Voisine,* 136 S. Ct. at 2277, which held that a different statutory force clause defining a misdemeanor crime of domestic violence as one that "has, as an element, the use of attempted use of force," encompassed reckless conduct on the ground that the statute did not include an "against" phrase. The government in this case relied on *Voisine* to argue that a crime of violence under §924(c) included reckless conduct.

*Borden* is dispositive. A conviction under §1992(a)(2) does not fall within the force clause of §924(c) because that clause requires that force be used against the person or property of another, which requires intentional conduct. Because the offense proscribed in §1992(a)(2) requires only a reckless state of mind, it cannot support the §924(c) conviction.

The alternative theory of conviction for Count Five, §1992(a)(7), requires only the commission of any "act" with the intent to cause death or serious bodily injury to "any person" in a terminal, structure, track, or facility, etc. Any "act" is so broad that it includes acts that involve no use of force and that are acts of omission. The "act" need not be against the person or property of another, as required by the force clause. And the intent to cause injury or death is to "any person" in the station, including the defendant himself. The defendant who attempts to kill himself

66

in a subway or train station, by throwing himself on the track, down the stairs, or over a bannister, with intent to kill himself would be guilty, without using force against the person or property of another.

Again, the Supreme Court recently made clear in *Borden* that the phrase "against the person or property of another" is absolutely critical to the force clause.141 S. Ct. at 1825, 1827. If the offense does not require the use of force against another's person or property, it does not meet the force clause. The offense described in subsection (a)(7) does not require the use of force against another person or another person's property.

In addition, the offense of subsection (a)(7) can be committed without the use of force, even if the intent were to cause serious physical injury to someone else. For example, a passenger on a platform could ignore or walk away from a distraught companion who says he will jump on the tracks. An employee with a duty to keep the station safe could maliciously fail to do so -- could commit the "act" of going home without clearing the ice, for example -- with the intent that people be seriously injured. Or an employee could omit to turn on a switch or signal with the intent to cause a crash. This would be an act of omission but not the use of force. Because the statute's proscription of any "act" on its face applies to acts that do not necessarily use, threaten, or attempt to use force, the offense would not

67

qualify as a crime of violence under the holdings of the Fourth, Fifth, Sixth and Ninth Circuits.

This Court recently held in *United States v. Scott*, 990 F.3d 94 (2d Cir. 2021) (en banc), that an act of omission can involve the use of force required by the force clause. A certiorari petition seeking review of that decision is pending before the Supreme Court in *United States v. Gerald Scott*, No. 18-163, certiorari petition filed April 15, 2021. The Circuits are split on this question, with the Fourth, Fifth, Sixth and Ninth Circuits holding that an act of omission does not constitute the use of physical force against the person of another. *United States v. Mayo*, 901 F.3d 218, 228 (3d Cir. 2018); *United States v. Resendiz-Moreno*, 705 F.3d 203, 205 (5th Cir. 2013); *United States v. Burris,* 912 F.3d 386, 398 (6th Cir. 2019); *United States v. Trevino-Trevino*, 178 F.App'x 701, 703 (9th Cir. 2006). Appellant argued below, based on *Chrzanoski* 327 F.3d at 197, that an act of omission does not qualify as the use of force against the person or property of another. Appellant preserves that argument on appeal, in the event that the Supreme Court reverses *Scott.*

**C.    The §924(c) count is multiplicitous with Counts Three and Five, which prohibit the same conduct, using or carrying the same explosive.**

Courts presume that Congress did not intend to punish a defendant twice for the same offense, to avoid Double Jeopardy issues. *Rutledge v. United States*, 517 U.S. 292, 297(1996)(§846 conspiracy was lesser included offense of CCE and

68

convictions for both could not stand);  *Ball v. United States,* 470 U.S. 854, 864

(1985)(possession of a single gun could not support convictions for both possession

and receipt); *United States v. Polouizzi*, 564 F.3d 142, 159(2d Cir. 2009)(two

conviction, one for receipt and one for possession of child pornography, were only

allowed because the charged offenses involved different files, not the same images).

The 924(c) count in this case is based on exactly the same conduct as that

charged in Counts Three and Five. Ullah was convicted of Count Three based on

delivering, placing, discharging or detonating an explosive device in a place of

public use. The 924(c) offense punishes him for an additional consecutive 30 years

for using or carrying the same explosive device in furtherance of the very use of the

explosive device in Count Three. Likewise, Count Five, under the government's

first theory, charged Ullah with placing a destructive device in, upon or near a mass

transportation vehicle in the vicinity of the Port Authority bus terminal. By the end

of trial, however, the government's new theory for this offense, charged to the jury,

was that Ullah committed Count Five when he boarded the subway in Brooklyn

carrying the destructive device. This is the very same offense charged in the §924(c)

count, that "he did use and carry [the very same] destructive device" in furtherance

of the Count Five offense.

While 18 U.S.C. §924(c) was designed to impose extra punishment for using

69

or carrying a destructive device in furtherance of a crime of violence, it cannot be applied to punish the same offense twice: here, using or carrying a destructive devise in furtherance of the crime of using or carrying a destructive device. Just as possession of a single gun or a single image cannot support separate convictions for possession and receipt, *see Ball* and *Polouizzi*, *supra*, use and carrying of a single destructive device is one crime, not two. Thus, the statute cannot constitutionally support two convictions for the very same offense, each carrying a consecutive sentence.

**D.     Attempting to commit any of the offenses of conviction is not a crime of violence under the force clause.**

Counts Three and Five were charged as attempts in the alternative. Therefore, the jury's verdict on each count could have been based on only an attempt to commit the offense. There was no special interrogatory as to whether Ullah was convicted of the substantive offense or the attempt. An attempt to commit each offense does not require "the use, attempted use, or threatened use" of physical force against the person or property of another, as required for a crime of violence under §924(c).

Federal attempt has only two elements: "[T]he defendant '(a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission.'" *United States v. Anderson,* 787 F.3d 51, 73 (2d Cir.

70

2014), *quoting Farhane,* 634 F.3d at 145. Thus, "[a] defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed, so that 'dangerous persons [may be apprehended] at an earlier stage . . . without immunizing them from attempt liability.'" *United States v. Yousef,* 327 F.3d 56, 134 (2d Cir. 2003), *quoting United States v. Jackson,* 560 F.2d 112, 120 (2d Cir. 1977). For example, "reconnoitering the place contemplated for the commission of the crime" shall "not be held insufficient as a matter of law" to constitute a substantial step. Model Penal Code §5.01(2)(c).

This Court, like every other federal appellate court, has adopted the Model Penal Code's definition and standards for federal attempt. *Jackson*, 560 F.2d at 117-18. *See generally Leonard B. Sand et al., Modern Federal Jury Instructions (Criminal)* ¶10.1 at 10-3 (2018). In defining what constitutes a "substantial step," the *MPC* lists several examples of conduct or circumstances it deems legally sufficient, including such reconnaissance and possessing materials needed for the crime  (so long as they are "strongly corroborative of the actor's criminal purpose," the first element of attempt). *See* Model Penal Code §§5.01(2)(c), (e) & (g). Accordingly, where would-be robbers "reconnoitered the place contemplated for the commission of the crime and possessed the paraphernalia to be employed in the commission of the crime," "either type of conduct, standing alone, was sufficient as

71

a matter of law to constitute 'a substantial step.'" *Jackson,* 560 F.2d at 118-20; *see also United States v. Stallworth,* 543 F.2d 1038, 1040-41 n. 5 (2d Cir. 1976).

The Supreme Court will decide this Term whether an attempt to commit a crime of violence necessarily requires the attempted use of force and therefore qualifies as a crime of violence under section 924(c). The Fourth Circuit held that it does not, in the context of attempted Hobbs Act robbery, and the Supreme Court granted certiorari on that question. *United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020), *cert. granted*, ___ S. Ct. ___, 2021 WL 2742792 (July 2, 2021). This Court has left the question open, holding only that attempted bank robbery in violation of 18 U.S.C. §2113 requires the use of force because of the specific statutory language requiring that the attempt to take property be "by force, violence, or by intimidation." *Collier v. United States,* 989 F.3d 212, 221 (2d Cir. 2021) (declining "to determine whether 'attempts' to commit other crimes of violence are themselves 'crimes of violence'"), and has stayed several attempt cases pending the Supreme Court's decision in *Taylor*. *E.g.*, *Pica v. United States,* No. 20-1272; *United States v. Skyfield*, No. 21-1415.

If the defendant prevails in *Taylor*, neither Count Three nor Five would necessarily qualify as a predicate for section 924(c). A defendant who intends to place a bomb in a place of public use or a subway system with intent to cause death

or serious bodily injury to any person, including himself, or to cause extensive destruction of such a place,  and downloads bomb-making instructions, acquires some materials, and reconnoiters his target location, is guilty of attempting to bomb a place of public use in violation 18 U.S.C. §2332f(a). Likewise, a person who takes the same steps with the intent to place the explosive device in, upon or near a mass transportation vehicle with intent to endanger the safety of any person, including himself, or with reckless disregard for the safety of human life, is guilty of attempting to violate 18 U.S.C. §1992(a)(2). This is despite the fact that none of these acts -- downloading instructions, gathering some supplies, or reconnoitering the target place -- nor the intent to do something at some future point, involves "the use, attempted use, or threatened use" of physical force. Because the attempts do not require as an element the "use, attempted use, or threatened use" of physical force, these offenses do not qualify as a crime of violence for the §924(c) count.

## POINT V

### The Life Sentence Plus 30 Years is Procedurally and Substantively Unreasonable.

The sentence imposed was procedurally unreasonable because it was based on an erroneously calculated Guidelines range and clearly erroneous facts. *United States v. Cavera,* 550 F.3d 181 (2d Cir. 2007)(en banc)(a sentence is procedurally unreasonable if based on an error in the calculation of the Guidelines range or on

clearly erroneous facts). The application of two significant increases in the offense

level for the same harm, the base offense level of 42 plus the 12-level enhancement

-- both for the offense being an act of terrorism -- was impermissible double-

counting. Further, the court erroneously ruled Ullah ineligible for credit for

acceptance of responsibility where he never denied that he made and deflagrated the

bomb, and  expressed remorse, but only went to trial because he was offered

nothing but the same life plus 30-year sentence for a guilty plea. Both rulings were

challenged by the defense, and require vacatur of the sentence. In addition, the

court's reasons for imposing this sentence relied on facts that were unsupported by

the record and were clearly erroneous. Finally, a sentence of life plus 30 years is

substantively unreasonable for an offense in which no one was seriously injured

except Ullah himself.

**A.** **Imposition of overlapping terrorism enhancements impermissibly double-counted the same conduct**.

"Impermissible double counting occurs when one part of the guidelines is

applied to increase a defendant's sentence to reflect the kind of harm that has

already been fully accounted for by another part of the guidelines." *United States v.*

*Sabhnani,* 599 F. 3d 215, 251 (2d Cir. 2010), *quoting, United States v. Volpe*, 224

F. 3d 72, 76 (2d Cir. 2000)*, and United States v. Napoli*, 179 F. 3d 1, 12 n. 9 (2d

Cir. 1999). Multiple adjustments may only be imposed "when they aim at different

74

harms emanating from the same conduct." *Id.* Thus, separate enhancements for use of a dangerous weapon and causing serious bodily injury do not aim at same harms because they address different types of conduct that do not necessary overlap. *Sabhnani*, 599 F. 3d at 251. On the other hand, a defendant's use of a dangerous weapon (a car) could not be used to both apply a higher base offense for "aggravated assault" and impose a four-point adjustment for aggravated assault in which a dangerous weapon was used. *United States v. Hudson*, 972 F.2d 504 (2d Cir. 1992).

The 12-level enhancement for a "federal crime of terrorism" under U.S.S.G. §3A1.4 reflects exactly the same harm as does the enormous base offense level of 42 in §2M6.1 for an offense committed with the intent to aid a foreign terrorist organization. *See United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) (terrorism enhancement applies if the defendant's offenses either involved or were intended to promote a federal crime of terrorism). Ullah's statements about his purpose -- that he deflagrated the bomb "for the Islamic State" in response to U.S. actions in the Middle east and his use of slogans from ISIS propaganda -- were the basis for both the terrorism base offense level and enhancement. S. 11-12, PSR¶14. These enhancements did not reflect "different facets of the defendant's conduct," *United States v. Rappaport*, 999 F.2d 57, 60 (2d Cir. 1993), but the very same, that Ullah's

75

purpose was to support ISIS in opposition to the United States. Without the 12-level enhancement, Ullah's total offense level is 42, placing him in a Guidelines range of 360 to life rather than life.

**B.    The court incorrectly ruled that Ullah could not qualify for acceptance of responsibility**.

Ullah never denied that he made and deflagrated the bomb, nor was this disputed at trial. He expressed remorse for his conduct. Yet the court held that he was not entitled to any reduction for acceptance of responsibility because "he went to trial, he challenged the government's evidence," and that this "would turn the notion of acceptance of responsibility on its head." A.12. The court acknowledged that there were "rare instances where a defendant can go to trial and still get credit for accepting responsibility" but said that this was not one, without explaining why. A.12-13.

Credit for acceptance of responsibility cannot be denied solely on the basis of the defendant's exercise of his constitutional right to trial. *United States v. Hernandez*, 894 F.3d 1104, 1110 (9th Cir. 2018); United *States v. Taylor*, 475 F. 3d 65, 69-70 (2007); *United States v. Castano*, 999 F. 2d 615, 617 (2d Cir. 1993); U.S.S.G. §3E1.1, comm. n.2. Ullah went to trial for the simple reason that the government offered him nothing but a guilty plea to the indictment with a *Pimentel* letter stating that the Guidelines range was life to be followed by consecutive 30

76

years. *See United States v. Johnson*, 850 F. 3d 515, 523-24 (2d Cir. 2017) (plea was irrational where defendant stood to gain nothing).

Neither Ullah nor his counsel disputed his factual guilt, but only contested application of particular statutory sections and aggravating elements to his conduct. At trial, both in opening and summation, defense counsel admitted that Ullah built and set off the bomb. A.180, 999-1001.This is the kind of "rare situation" in which the acceptance credit may be applied. *See e.g., Taylor,* 475 F. 3d at 70-71 (going to trial to present an entrapment defense may have permitted the credit, but the court denied it based on all the circumstances); *United States v. Gaudin*, 173 F. 3d 798 (10th Cir. 1999) (credit properly granted where defendant did not deny guilt but only went to trial to contest the legal element of intent). However, the court refused to consider the credit because Ullah went to trial and challenged the government's evidence.

## C.   The life plus 30-year sentence was based on clearly erroneous factual findings.

"A sentencing determination based on clearly erroneous factual findings is procedurally unreasonable." *United States v. Singh*, 877 F. 2d 107, 118 (2d Cir. 2017). In imposing this extremely severe  sentence, the district court made factual statements about the crime that were not supported by the trial record. It stated that Ullah purposefully went to the most crowded station at rush hour "for the purpose

of killing indiscriminately men, women and children, of maiming and injuring other, of spreading terror and fear even wider." A.1410. It further stated that Ullah made a calculated decision "to kill as many people as [he] could." A.1411.

This characterization of Ullah's conduct was not supported by the evidence. None of the counts required a finding that Ullah intended to kill others, as opposed to himself, and the evidence did not support such findings. In his statements, Ullah said that he expected to die, that he wanted to frighten people ("terrorize," according to the detective), and that he went to that tunnel because had seen an interview there of a man whom he thought was insufficiently fearful of ISIS. In the four-hour post-arrest interview, Ullah made many admissions but made no statement about wanting to kill or maim other people. When asked whether he thought anyone else would die other than himself, the most he said was "maybe."

Nor did the forensic evidence suggest that the device he detonated would be capable of killing more people. It was a small pipe bomb, "low explosive," fueled with match head scrapings and sugar. Of all the government experts, not one testified that this was a bomb that was likely to or even could have killed many people. Indeed, the court noted the lack of testimony about the "power of the pipe bomb to do damage" and that Ullah did not deflagrate the bomb until he was out of the subway and "in a hallway with no one within 10 feet" of him. A.882.

78

**D.    The life plus 30-year sentence is substantively unreasonable.**

A federal life sentence, with no possibility of parole, "alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration." *Graham v. Florida*, 560 U.S. 48, 69-70 (2010) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Life imprisonment "'means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" *Id.* at 70 (quoting *Naovarath v. State*, 105 Nev. 525, 526 (1989)).

Federal life sentences are extraordinarily rare. In an average year, federal judges impose life sentences in less than one percent of cases. *See e.g.*, U.S. Sent'g Comm'n, Life Sentences in the Federal System, at 1 (2015) ("Life Sentences) (in FY 2013, judges imposed life or effective life sentences on 0.4 percent of offenders), *available at* https://bit.ly/3yogW8R; *see also id.* at 4. Only 2.8% of BOP's approximately 143,000 inmates are serving life sentences. BOP, Sentences Imposed, https://bit.ly/3yhucMm. Moreover, life sentences for conduct that, like Ullah's, involved no serious physical injury (except to Ullah himself) are even rarer. In FY 2013, for example, in "virtually all" of the federal cases where life imprisonment was imposed, "one or more persons died as a result of the criminal

79

enterprise." Life Sentences, *supra*, at 4. And Ullah received life plus 30 years sentence, far longer than the mean sentences imposed for the most harmful crimes against persons. U.S. Sent'g Comm'n, 2020 Annual Report & Sourcebook of Fed. Sent'g Statistics, at 64 tbl.15 (255 months for murder, 201 months for sexual abuse, 195 months for kidnapping), *available at* https://bit.ly/3wIIzOa; U.S. Sent'g Comm'n, 2005 Sourcebook of Fed. Sent'g Statistics, at tbl.13 (post-*Booker*, 228 months for murder, 224 months for kidnapping/hostage taking, 90 months for sexual abuse), *available at* https://bit.ly/3oACScf.

The sentence of life plus 30 years is unreasonably long and far greater than necessary to achieve the goals of sentencing. The court's reason for choosing this sentence was its view of the nature of the offense, and a view of the facts that, as argued above, was not entirely supported by the record at trial. Although this was a very serious crime, it was also a pathetic one -- an attempted suicide -- and no one other than Ullah himself was seriously injured. The fact that there were no serious injuries should have had some bearing on whether Ullah deserved the absolute maximum sentence, which is ordinarily reserved for the worst of the worst offenders. *See United States v. Stewart*, 590 F.3d 93, 157 (2d Cir. 2009) (Calabresi, J., concurring) (a terrorist who kills multiple people should receive a higher sentence than one who does not). The nature of the offense could not "bear the

80

weight assigned it under the totality of circumstances." *Cavera*, 550 F.3d at 191.

## CONCLUSION

For the foregoing reasons, Ullah's convictions on Counts One, Five, and Six

should be vacated and the case remanded for resentencing.

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU


By: *Colleen P. Cassidy*
       **COLLEEN P. CASSIDY**
       Attorney for Defendant-Appellant
       **AKAYED ULLAH**
       52 Duane Street, 10th Floor
       New York, New York 10007
       Tel.: (212) 417-8742

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by CM/ECF electronic filing on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007.

Executed on:  New York, New York
          October 4, 2021

       *Colleen P. Cassidy*
       **COLLEEN P. CASSIDY**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

>   this brief contains 19,049 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

>   this brief has been prepared in a monospaced typeface using **Corel WordPerfect X3** with **10 characters per inch in courier new** type style.

Attorney for Appellant **AKAYED ULLAH**

Dated:  New York, New York
         October 4, 2021

*Colleen P. Cassidy*
**COLLEEN  P. CASSIDY**

82