# 21-1058-cr

**United States Court of Appeals
for the Second Circuit**

———————————

Docket No. 21-1058-cr

———————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

———————————————

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT AKAYED ULLAH
VOLUME II**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
Of Counsel

**TABLE OF CONTENTS TO THE APPENDIX**
**VOLUME II**

District Court Docket Sheet,
    S.D.N.Y. 18 Cr. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0004

Indictment, filed January 10, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0021

Defendant's Motion to Dismiss Counts,
    dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0030

Memorandum in Support of Motion to Dismiss,
    dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0031

Government's Memorandum in Opposition to Motion to Dismiss,
    dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0046

Defendant's Reply in Support of Motion to Dismiss,
    dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0084

Court Order Denying Motions, dated October 4, 2018 . . . . . . . . . . . . . . . . . . . . . . A 0104

Defendant's Motion in Limine, dated October 5, 2018 . . . . . . . . . . . . . . . . . . . . . . A 0110

Defendant's letter to District Court regarding Rule 29 and Jury Charge
    Issues, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0126

Government's letter to District Court regarding Jury Charge on Attempt,
    dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0133

Defense Letter in Support of Rule 29 Motion and in Opposition to
Government Charge Requests, dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . A 0135

Government's Letter re Jury Charge and Rule 29 Motion,
    dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0142

Defendant's Objections to Proposed Jury Instructions, dated November 4, 2018 . . . . . . A 0147

Trial Transcript, dated October 29, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0151

Trial Transcript, dated October 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0159

Trial Transcript, dated October 31, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0325

Trial Transcript, dated November 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0575

Trial Transcript, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0833

i

Trial Transcript, dated November 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0925

Trial Transcript, dated November 6, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1136

Defendant's Post-trial Motion for Acquittal, dated December 6, 2018 . . . . . . . . . . . . . . A 1154

Memorandum in Support of Motion, dated December 6, 2018 . . . . . . . . . . . . . . . . . . . . A 1155

Government's Memorandum in Opposition to Motion for Acquittal,
        dated December 20, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1186

Reply Memorandum in Support of Motion for Acquittal,
        dated January 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1214

Court's Order for Supplemental Briefing,
        dated July 25, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1223

Defendant's Supplemental Memorandum in Support of Rule 29 Motion,
        dated September 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1224

Government Memorandum in Opposition to Supplemental Motion,
        dated October 22, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1248

Defendant's Reply Memorandum,
        dated November 5, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1275

District Court's  Opinion & Order,
        filed January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1295

Sentencing Memorandum with Exhibits A-I,  dated March 25, 2021 . . . . . . . . . . . . . . . A 1313

Pimentel Letter, dated September 18, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1370

Sentencing Transcript, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1375

Judgment in a Criminal Case, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1420

Notice of Appeal, dated April 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1428

Government Exhibit 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1429

Government Exhibit 1001-02 (Submitted in attached DVD) . . . . . . . . . . . . . . . . . . . . . A 1430

ii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                      18 CR 16 (RJS)

AKAYED ULLAH,

                       Trial
        Defendant.

------------------------------x
                       New York, N.Y.
                       October 30, 2018
                       12:00 p.m.

Before:

        HON. RICHARD J. SULLIVAN

                       District Judge

        APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
     Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
     Assistant United States Attorneys


FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  AMY GALLICCHIO
     JULIA GATTO
     COLLEEN P. CASSIDY


Also Present:

     JOHN MAURER – Special Agent, FBI
     MICHAEL DELUCA – Paralegal, U.S. Attorney
     JASON T. FISCHER – Paralegal, Federal Defenders
     CHIRAAYHU GOSRANI – Paralegal, Federal Defenders

              SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

**A000159**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page5 of 284

(A jury of 12 and 3 alternates was selected and sworn)

(Jury present)

THE COURT: What we are going to do now is I'm going to have Mr. Brody take you into the jury room. Some of you have seen it already. That's where we had the follow-up round or two with some of you. That is your home away from home. You can leave your stuff there. There is a closet, there are hangers.

There is a fridge. If you want to have a Coke or seltzer or some water, it's in the fridge. There will be cookies and snacks and fruit in the afternoon. In the morning we can make sure you have bagels and doughnuts and things you can eat. We will make sure you are hydrated and reasonably well taken care.

Why don't we get you back there, and then I'll bring you back out in maybe five or ten minutes, give you some instructions, and then we will start the trial before we break for lunch at 1:00.

All rise for the jury.

(Jury not present)

THE COURT: We'll give them five or ten minutes to get acclimated. We will then come back, do the preliminary instructions, then openings, then I think that will be lunchtime and then we will pick up with witnesses right after lunch. Who is the first witness?

MS. DONALESKI:  It is David Wall, your Honor.

THE COURT:  How long a witness do you think that is?

MS. DONALESKI:  About 20 minutes.

THE COURT:  After that?

MS. DONALESKI:  After that is one of the first responders, Sean Gallagher.  He is about 45 minutes.  After that is Steve Fullington, who is about 20 minutes.

THE COURT:  We'll have more witnesses to go the balance of the day, I suppose?

MS. DONALESKI:  Certainly, your Honor.

THE COURT:  They are all lined up?

MS. DONALESKI:  Yes, they are all here.

THE COURT:  Defense counsel know who they are, we are all on the same page?

MS. DONALESKI:  Yes.  We have provided them the exhibits that we are going to be introducing through our first ten witnesses, and we understand there are no objections to that exhibits.

THE COURT:  That's fine.

I'll give you an opportunity to take a quick break if you want.  Is there anything we need to cover before we do the preliminaries and then the opening statements?

MS. GALLICCHIO:  No, your Honor.

MS. CROWLEY:  No, your Honor.

THE COURT:  If you need to take five, you can do that.

**A000161**

We'll take a few minutes for the jury to get acclimated but not much more than that.

(Recess)

(Jury present)

THE COURT:  Have a seat.  Ms. Acosta-Gomez is between Mr. Coates and Ms. Frias.  I think that's right.  You will get it down.  You will have this going like clockwork before you know it.

Ladies and gentlemen, thanks.  I hope it's comfortable back there.  We will make you as comfortable as we possibly can.  If there are things that you would like to snack on or things that you would like to see in terms of beverages that you don't see back there, let us know, and within reason we will try to accommodate you.  I think we owe you that much.

In the courtroom I will allow you to bring in water, the little Poland Springs.  I don't want coffee or soft drinks because those spill and create a mess.  You can bring in water if you would like.

I am going to give you now some preliminary instructions.  I'll give you much fuller instructions at the end, but this is to help you as you begin this process of being jurors in this case.

You have now been sworn, so this is the beginning of the next phase of this trial.  As you know, it will be your duty to find from the evidence what the facts are.  You and you

**A000162**

alone are the judges of the facts. That's why we all stand when you come in, because you are judges just like I am.

From the evidence presented at trial, you will decide what happened. You will then have to apply those facts that you found to have been what happened in the case, you have to apply that to the law as I will give it to you. Again, you must follow the law as I explain it to you even if you have a different notion as to what the law is or ought to be.

Nothing that I say or do during the course of this trial is intended to indicate to you what your verdict should be. That is completely your province and yours alone. Don't speculate as to what I may be thinking.

The evidence from which you will find the facts consists of the testimony of witnesses and the documents and other things received in the record as exhibit. The exhibits will all have numbers. The witnesses will all have names. At the end of the case, I'll give you a list of all the witnesses and all the exhibits so you will be able to follow if that's what you would like.

The lawyers may also agree, or stipulate, to certain facts. That will be called a stipulation. That is to be treated like evidence too. You are to accept the stipulated facts as true, but you must decide the weight, if any, to give to those facts. You will, as the jurors, decide the weight to give to any particular evidence.

**A000163**

Certain things are not evidence.  I want to remind you of what those are.  I think I hinted at some of them this morning during jury selection.  The statements, arguments, and questions of lawyers are not evidence.  The objections to questions are not evidence.  You all watch TV.  You see the lawyer say "objection."  The judge says "sustained" or "overruled."  I'll explain what those mean in a minute.

You shouldn't be influenced by whether there was an objection.  If there was an objection to a question and I say "sustained," that means the witness shouldn't answer the question.  You don't worry about what the answer might have been if they had been allowed to answer.  Just put it out of your mind.

If I overrule the objection, then the witness will be allowed to answer the question and you should listen to the witness's testimony because that is evidence.  The fact that it was preceded by an objection doesn't make it more valuable or less valuable.

So don't worry about objections, don't worry about my rulings on objections.  You just focus on the evidence as it is presented.  You don't have to worry about what the objections were or what the answers would have been if the objections have not been sustained.

If I strike an answer, if I say, you know what, that's not responsive, I'm going to strike that answer, jury, you

**A000164**

should disregard that testimony, I'm going to ask you to disregard it. I have no allusions that I can bore it out of your brain, but I expect that you are adults and you will be able to say I'm going to put that to the side and not consider that when it comes time to deliberate, that's off limits, it is not part of the evidence in this case, and it may not be considered.

Anything that you see or hear outside of the courtroom is not evidence and it must be disregarded. Your verdict must be based solely on the evidence or the lack of evidence presented in this courtroom. Be focused on that.

One of the most important tasks you have as jurors is to evaluate the credibility of the witnesses who will be called to testify here at trial. It will be up to you to decide which witnesses to believe, which witnesses to disbelieve, and how much of if any witness's testimony to accept or to reject. That's your province and your province alone. You decide credibility.

Think about it. There are all these eyes, all this experience. You get to assess credibility in a way that no single person, no single judge could do it. That's the great genius of the jury system.

I am going to give you some guidance at the end of the case as to what you should think about when you are assessing credibility. I'll get back to you on that. In the meantime,

just use your common sense, which is to listen carefully to the witnesses, pay attention to everything that the witness says or does on the witness stand.  That's all for you to consider.  It's all important for you to consider in assessing the credibility of the witness.

As I previously noted, under the law a defendant in a criminal case is presumed innocent and cannot be found guilty of the crimes charged unless the jury, after having heard all the evidence in the case, unanimously decides that the evidence proves that the defendant is guilty beyond a reasonable doubt.  Beyond a reasonable doubt.

Moreover, in a criminal case the burden of proof remains with the government.  For the jury to return a verdict of guilty as to the defendant, the government must prove that the defendant is guilty beyond a reasonable doubt.  The person charged with a crime has absolutely no burden to prove that he or she is not guilty.  If the defendant chooses to not present any proof, that decision cannot be held against the defendant because the defendant has no obligation to present any evidence at all.

A few words about your conduct as jurors.  First, during the trial you shouldn't discuss the case with anybody. Don't allow anybody to come talk to you about this case.  Until you retire to the jury room to deliberate, you shouldn't be discussing this case.  That includes even among yourselves.

A000166

At the breaks you shouldn't be talking about the testimony, saying hey, what did you think of that guy, I don't know, are you buying that. No. You're getting a jump start on deliberations if you do that. All of that is reserved for the end. So don't discuss, don't deliberate, don't talk about the evidence or the witnesses or the testimony at the breaks or before you start when you come back to court.

If anybody attempts to talk to you about this trial, let Mr. Brody know. Don't discuss it with your fellow jurors. If somebody tries to talk to you about this case, tell Mr. Brody, he'll tell me, and we will figure out whether there is something we need to do about that.

Again, if you bump into the lawyers or any of the parties out here in the elevators, in the hallways, on the subway -- it could happen -- or on the sidewalk, don't speak to them. You are not being rude, you are just following my instructions. I don't want even the appearance of an impropriety. Just be aloof and don't discuss or even make eye contact or gestures. Keep your distance. That's just the way I want to go. They will do the same to you. They are not being rude. That's just the way I want it to work.

Don't talk about the case. Don't read about the facts in this case. Don't go online. Don't do social media. Don't tweet, blog, any of that stuff. Until this trial is over, this is the only place for you to hear evidence. It is the only

**A000167**

place that you are hearing anything about this case. Otherwise, it will compromise the entire process.

We take that very, very seriously. Every once in a while you read about a case where some juror didn't follow the instructions. It means the entire case has to be redone. It means the juror gets in a ton of trouble. It compromises the whole system and it also looks bad. This is not a long trial, but we take very, very seriously that your job is to listen to the evidence and then ultimately to deliberate about whether the government has met its burden of proof beyond a reasonable doubt.

There may be TV reports, I don't know. I'm not telling you to go into sort of a lockdown where you can't read a paper or watch TV or go on the Internet. But if you come across what you realize is a story about this case, I want you to immediately stop reading, change the page, change the site, change the channel, and I want you to tell Mr. Brody the next minute you can. Don't discuss it with your fellow jurors. I'll then want to figure out whether we have to do something about it. If that happens, I need you to follow my instructions to the letter on that.

(Continued on next page)

**A000168**

THE COURT: Finally, keep an open mind throughout this trial and reserve judgment until all the evidence is in. A jury trial, you know, comes in one witness at a time, one piece of evidence at a time. It takes time to develop. So keep an open mind throughout. Until you've heard all the evidence, until you've heard my instructions on the law, until you've heard the closing arguments of the lawyers, you're not really in a position to make up your mind. So don't jump the gun. At every break I'm going to tell you, keep an open mind, don't discuss the case. You may get tired of it, but that's really the essence of doing your job. So if you follow those instructions, you'll be great.

Now you've got notepads. We've given you a pen and notepads. Those should be where you take notes. You don't have to take notes, but you're free to take notes. So just make sure you put your name on the cover, and that's the exclusive place where you take notes for this case.

Obviously take as much notes as you think appropriate. I mean, some people take a lot of notes. That's just the way they process information. Other people don't take any notes. Whatever works for you.

Don't take the notebooks out of the jury room. So at breaks, go back to the jury room, leave them there; overnight, leave them in the jury room. We'll secure them. Nobody will look at them. We'll just secure them. But they're yours and

**A000169**

yours only, okay? So remember, they're for your use only.

And they're only as an aid for your memory. It's your memory that controls. So if while you're deliberating you realize there's a conflict between one juror's memory and another juror's notes, the fact that one juror wrote it down doesn't mean that the notes win. We have a court reporter. We take it all down. So we can always get you a transcript of what the actual testimony was, and that's the best way to resolve any conflicts between recollections or notes about what took place on the stand.

And so at the end of the case I will give you a list of all the witnesses, a list of all the exhibits, and if you have questions, if you'd like transcripts or portions of the transcripts, we can arrange that for you. But take notes as you like. At some point we all learn the happy medium. Don't get so caught up in note-taking that you're missing every other word. So jot down what you think will be helpful to you, okay?

Now we're about to start this trial. As I said, we generally start 9:30 in the morning, we'll typically go till 5:30 in the afternoon. Tomorrow's Halloween. I think we'll make some adjustments, perhaps. We're not going to sit Friday this week. But we're going to be fine. Don't worry. We're going to make sure this trial moves very efficiently. I know you're busy, you've got other things to do. While you're here, we're going to make sure you're sitting there and not waiting

**A000170**

for us.  We'll work before you get here, we'll work during breaks, we'll work at the end of the day when you're heading home to make sure that your time is used efficiently.  All right?  So trust us on that.  But that requires you to be here on time, ready to go at the breaks.  So take that very seriously.  Just one late juror means we are all stuck.  It means we're all just twiddling our thumbs.  So be very respectful of your fellow jurors and respectful of the fact that a trial requires a lot of participants, and one late person can hang everybody up, okay?

All right.  Let me tell you how this trial is going to proceed.

First we're going to have opening statements.  The government will make an opening statement.  After that I expect counsel for the defense will also make an opening statement, but they're not required to do so.  Because again, the defense has no burden to put on any evidence or make any arguments.  The opening statements, however, are neither evidence nor argument.  They're really a preview of what the parties believe the evidence will show.  And it's helpful.  It's helpful to get a preview, because it will give you a better feel for the evidence that's coming in, and that's the spirit of it.  But it's not evidence.  Don't confuse it with evidence.  And it's not supposed to be argumentative either.  All right?

After the opening statements, the government will

**A000171**

present its case.  The government will call its witnesses, and after each witness testifies on what's called direct examination -- that's the government asking questions of the witness that they call -- then the witness will be cross-examined by defense counsel.  And there may after that be a little bit of redirect examination and then perhaps some recross-examination.  But each will get shorter.  But that's how an examination of a witness will go.

After the government has called all its witnesses and after they've been examined, then the government will rest.

After that, the defendant may put on a case, if he wishes.  But the defendant has no obligation to do so.  You can't hold it against the defendant if he chooses not to do so, because he is presumed innocent and has no burden of proof here.  But if the defendant puts on a case, then the defense will call witnesses.  Those witnesses will be examined and then cross-examined, and then the defense would rest.

After that, we will then have closing arguments, summations, by the lawyers.  That will be argument.  That will be the lawyers' opportunity to argue what the evidence showed. And you should pay attention.  You should listen to what they have to say.  You should take down notes if you'd like.  But it's your recollection of the evidence that controls. Statements of lawyers is not evidence either.  The arguments and statements of lawyers are not evidence.  They might be very

A000172

helpful, but the evidence is what's presented from the witness stand, in the exhibits received during the trial, and the stipulations.  Okay?

After the summations, then I will instruct you on the law.  I will give you a copy of those instructions so you can refer to them while you're in the jury room.  And then at that point you will begin your deliberations.

So I don't think it will be a long trial, but it's a very important trial.  It's important to our system of justice.  So I know you'll take it very, very seriously, as you have all day.

So with that, we will now begin our opening statements.

Ms. Donaleski is going to give the opening statement for the government.

MS. DONALESKI:  December 11, 2017, started out like any other Monday morning in New York City.  It was rush hour, just a few weeks before Christmas.

Early that morning, a man boarded a crowded A train from Brooklyn into Manhattan.  He rode the train as it traveled under the East River, up Eighth Avenue, and into the 42nd Street Port Authority subway station.  He got off the train, along with hundreds of other morning commuters.  He walked into a crowded tunnel, reached into his pocket, and detonated a bomb.  The explosion sent shrapnel flying throughout the

A000173

tunnel.  Smoke filled the tunnel.  People ran screaming.

Who set off that bomb, in the middle of Manhattan?  This man, Akayed Ullah, the defendant.  He designed this, he built it, he packed it with shrapnel and explosives, he picked the time, he picked the location, he strapped a bomb to his chest and detonated it in the middle of a crowded tunnel at rush hour.

Why did he do it?  To terrorize Americans in the name of ISIS, a deadly brutal terrorist organization.  That's why we're here, because the defendant committed a terrorist act in New York City.

Over the next few minutes I'm going to talk to you about what the evidence will show and how the government will prove that the defendant committed this heinous attack.

The evidence will show that the defendant embraced a violent radical ideology.  He studied how terrorist groups like ISIS perpetrate their attacks.  He sought out and watched terrorist propaganda videos online -- videos about how to terrorize and kill Americans, by committing truck attacks, stabbings, and bombings.  He watched lectures by a former Al Qaeda leader.  He watched a terrorist propaganda video that instructed followers that if you couldn't travel to fight overseas, you should take the fight to where you were, including here, in America.

The defendant did just that.  He researched how to

**A000174**

build a bomb.  He studied how to use shrapnel like screws in order to inflict maximum damage, to maim and kill innocent civilians.  Then he used what he learned to execute his attack.

In the weeks leading up to his attack, the defendant gathered the materials he needed to build his bomb.  He took a pipe, wires, and screws from his workplace.  You see, the defendant was an electrician, and he worked at a construction site in Midtown Manhattan, just blocks from the Port Authority.

The defendant built his bomb at his Brooklyn apartment.  He filled a metal pipe with screws and broken Christmas tree lights.  He developed his own explosive material by grinding up match heads and mixing them with sugar.  Sugar acts as fuel when it's put in a bomb.  Then the defendant prepared the bomb for detonation by carefully threading wires into the pipe.

The defendant chose Monday morning rush hour for one reason -- to terrorize as many people as possible.  So on the morning of December 11, 2017, the defendant woke up and strapped a bomb to his chest with zip ties and duct tape.  He slipped the wire from the bomb into a hole in his right pants pocket.  He connected the wire to a 9-volt battery.

The defendant left his apartment in Brooklyn and rode the subway into Manhattan.  His ride lasted just about an hour.  And to everyone else on the subway that morning, the defendant looked like a normal commuter.  But the defendant wasn't a

**A000175**

normal commuter. He was a terrorist with a bomb strapped to his chest -- a bomb filled with shrapnel, a bomb that could have exploded at any moment.

And as the defendant rode the subway that morning, he posted a message to his Facebook account. The message read, "Oh, Trump, you failed to protect your nation." He also posted an Arabic word, *baqiya*, which is part of an ISIS slogan. The defendant did that so that the world would know his attack was committed in the name of ISIS.

At about 7:20 that morning, the defendant got off the subway at the Port Authority bus station. He walked up the stairs and into a tunnel that connected the Port Authority station with the Times Square station, and that's the single busiest subway complex in the entire city. The tunnel was packed. It was filled with commuters who had no idea what was about to happen, ordinary people who were just trying to get to work. The defendant waited until he was in that crowded subway tunnel, surrounded by people, and then he connected the wires to the battery in his pockets and detonated his bomb. Shrapnel exploded into the tunnel and burned into a victim's leg. People ran screaming in terror. By some miracle, no one died, and most people escaped harm that day.

You'll hear that courageous first responders rushed into that smoke-filled tunnel and arrested the defendant. Law enforcement officers interviewed the defendant after the

A000176

attack, and he admitted that he had committed the bombing that morning.  When he was asked why he did it, he said, "I did it for the Islamic State," ISIS.  That's what the evidence at this trial will show.  The defendant was inspired by ISIS and he answered their call.  He brought the fight to where he was and made the streets of New York City his battleground.  He detonated a homemade pipe bomb in New York City in the name of ISIS, to maim, kill, and terrorize Americans.

Let me now take a few moments to explain how the government will prove its case.

I'll start with this.  The Port Authority surveillance cameras captured the defendant's attack.  That's right.  The defendant was caught on video perpetrating this bombing.  You will see that video.  You'll see the defendant, you'll see the explosion, the smoke, the people running in terror.  You'll hear from witnesses at this trial.  You'll hear from law enforcement officers, like the first responders who arrested the defendant.  You'll hear from the FBI agents who processed the bomb scene after the attack.  Those agents will show you the pieces of the defendant's bomb right here in court.  You'll see the pipe bomb, the screws, the wires, the battery.  You will hear from expert witnesses who analyzed that evidence, like the FBI explosive experts, and you will learn that the defendant's DNA was found all over that bomb.

You'll also hear from some of the ordinary people who

**A000177**

had the misfortune of being in the tunnel that Monday morning, some of the victims terrorized by the defendant's attack, who remain haunted to this day by what happened that December morning.

You'll see photographs of the defendant that were taken right after the bombing with the wires still sticking out of his chest. You'll see photographs of the scene of the explosion and other locations that law enforcement agents searched after the bombing, like the defendant's home, and workplace. And what did they find there? Bomb-making materials, Christmas tree lights, explosive powder, screws.

You will watch clips of the ISIS propaganda videos that were found on the defendant's laptop, videos that glorify ISIS and its antiAmerican ideology, its mission of death and terror, videos that celebrate and promote lone wolf attacks against Americans, just like the defendant's attack.

You'll see other physical evidence at this trial. You'll see the bomb-making materials that I just mentioned that were found in the defendant's Brooklyn apartment. You'll see the box full of screws that was found in a closet in the defendant's apartment. And you will see the chilling message that the defendant had scrawled into that box, "Die in your rage." And you'll see the similar message the defendant had scrawled in his passport, "Oh, America, die in your rage."

As a result of the defendant's terror attack, he's

A000178

charged with six federal crimes.  I'm going to say a few words about the charges right now.

The defendant is charged with providing material support to a terrorist organization, ISIS, by committing a bombing on their behalf.

Four of the charges relate to how and where the defendant committed this bombing at the Port Authority.  The defendant is charged with using a weapon of mass destruction, bombing a place of public use and a place of public transportation system, destroying property by means of explosive, and committing a terrorist attack against a mass transportation system.

Finally, the defendant is charged with carrying a bomb in connection with the five crimes I've just mentioned.

The evidence will prove the defendant's guilt on each of these six charges.

At the end of this trial, after you've had a chance to see and hear all the evidence and all of the witnesses, we'll have an opportunity to speak with you again.  Between now and then, we're going to ask you to do three things:

First, pay careful attention to the evidence;

Second, follow Judge Sullivan's instructions on the law; and

Third, use your common sense, the same common sense, same use of judgment you use in your everyday lives.

**A000179**

If you do these three things, you will give the defendant what everyone deserves in an American courtroom, a fair and just trial, and you will reach the only conclusion that is supported by the evidence in this case, that the defendant, Akayed Ullah, is guilty as charged.

Thank you.

THE COURT:  Thank you, Ms. Donaleski.

We'll now hear the defense opening statement by Ms. Gatto.

MS. GATTO:  Thank you.

Ladies and gentlemen, the government got an awful lot right in their opening.  The conduct alleged here is petrifying.  It cuts to the core of being a New Yorker.  It's completely understandable to be outraged.

But for everything they got right in their opening, they got some very key things wrong, and that matters here. This case is not about ISIS.  This case is not about a foreign terrorist organization planting an operative in our midst. That is just wrong.

What this case is about is a young man, a deeply troubled, isolated young man who wanted to take his own life. And in that act, he irrationally wanted to send a message to the world.  It was irrational, profoundly misguided, reckless. And don't get us wrong.  It violates the law.  But the government has overreached here, and included in their charges

**A000180**

are crimes that Akayed Ullah simply did not commit.

So we're not going to ask you to excuse this conduct, we're not going to argue that the acts alleged by the government didn't happen. We're not going to ask you to return a verdict from which Mr. Ullah will escape punishment. We're going to tell you to convict him of the crimes committed, but acquit him of the ones he did not. We are going to ask you to follow the rules of law, to abide by the bedrock principles of our American criminal justice system, the ones set up to protect any defendant, every defendant, no matter how much we loathe their conduct. Put the government to its burden of proof, its heavy burden of proof, and require of them proof beyond a reasonable doubt as to each and every element, as to each and every crime charged. And if they fall short, as to some elements, as it relates to some counts, then yes, we are going to ask you to acquit on those counts.

And they will fall short. Because although they have the basics right, they have the fundamentals wrong. They are fundamentally wrong about ISIS's relationship to this case. It is a mischaracterization of the evidence you yourself will hear, and it gives far too much credit to an organization that deserves none.

It is true, you will hear that Mr. Ullah, depressed and unsound, was on the internet, and in dark corners, he absorbed all sorts of distorted messages, distorted messaging

**A000181**

about politics, the Syrian conflict and a perceived mistreatment of Muslims. But ladies and gentlemen, trolling around the internet does not make you an ISIS member. Akayed Ullah is no ISIS member. He does not know a single person in ISIS, and not a single person in ISIS knows him. He did not operate under the direction or control of ISIS or coordinate with ISIS. This is not a case -- he did not provide material support to ISIS. They have that fundamentally wrong.

They're also fundamentally wrong that Akayed Ullah wanted to kill or maim anyone other than himself. He wanted to die. And in that corrupted and fogged place he must have been, he was contemplating to such an extreme act, in that mental health fog, he wanted to use this act to send a message to Donald Trump and others he believed are mistreating Muslims. And so when he did this act, he chose a method and a location that was guaranteed to make the news, guaranteed to send a very public message. It is chilling. It violates the law, just not each one that he's charged with.

And there you have it. We don't take lightly what we're asking you to do, and nor should you. And to be honest, it's hard to imagine asking a group of New Yorkers to do something more difficult. But it's also hard to imagine a group of people more able to do it, to set aside the emotions the evidence is going to invoke, to follow the rule of law, to put the government to its burden of proof, to abide by the oath

**A000182**

you have taken as jurors, and to acquit Akayed Ullah of the crimes he did not commit.

Thank you.

THE COURT: Okay. Thank you, Ms. Gatto.

All right. So it's a little before 1. Why don't we take lunch here and then we'll pick up with the evidence at 2:00. So at 2:00, be back in the jury room, ready to go. We'll start sharply at 2.

Give yourself a little time to get in and out of the building. Mr. Brody is going to give you swipe cards that will get you into the jury room. The best way to get into the jury room now is up through the main entrance, up through the Pearl Street entrance, okay? He'll give you some pointers as to how to get in and out. But have a good lunch. Don't discuss the case. Keep an open mind. And don't do any research or anything like that, okay? We're glad you're here. Thanks so much for your service so far.

All rise for the jury.

(Jury not present)

THE COURT: Okay. Have a seat. Thank you.

All right. Well done openings.

Is there anything we need to discuss before we break?

MS. CROWLEY: Not from the government.

THE COURT: Not from the government? Okay.

Anything, Ms. Gallicchio, before we break for lunch?

**A000183**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page29 of 284

MS. GALLICCHIO:  Could I just have one second, please.

THE COURT:  Sure.

MS. GALLICCHIO:  Nothing.

THE COURT:  No.  All right.  So we'll pick up at 2. Mr. Ullah can get something to eat now, Marshals, right?  Good. So let's be ready to go, say at least five to 2, let's have a witness ready to go on the stand.  Okay?

Okay.  Thank you very much.

(Luncheon recess)

**A000184**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page30 of 284

AFTERNOON SESSION

1:58 p.m.

(In open court; jury not present)

THE COURT:  How long a witness?

MS. DONALESKI:  About 20 minutes, your Honor.

THE COURT:  Okay.

(Pause)

THE COURT:  So it's 1:59.  So let's start at 2 on the nose, because that's what I promised them we'd be doing.

Anything we need to cover before we bring in the jury?

MS. GATTO:  Your Honor, I think in the end, the juror who had the child care issues was seated.

THE COURT:  Yes.

MS. GATTO:  So I don't know if we want to address that or -- it seemed like if we gave him time to figure out his child care issues --

THE COURT:  Yeah, let's give him a little time.  I think if he raises it again, we'll deal with it.  I'm not going to deal with it again today, I don't think.  I plan on going till 5:30.  If he thinks he needs to do something different, he'll let me know.

MS. GATTO:  Okay.  Because I was going to propose offering to end at 5 just to see if that would alleviate any issues he had.

THE COURT:  I'd rather get as far as we can today, but

**A000185**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page31 of 284

let's see how we're doing. We'll take an afternoon break around -- what did we say?

MS. GALLICCHIO: 3:45.

THE COURT: Okay. So we're going to take a break at 3:45, and at that point we'll see how we're doing, all right? And if I misremember it or I'm just not paying attention to the clock, just sort of catch my eye, okay?

MS. GALLICCHIO: Yes.

THE COURT: All right. Let's bring in the jury. Stand when the jury comes in.

(Continued on next page)

(Jury present)

THE COURT:  Okay.  Have a seat.

Hope you had a good lunch.  Getting the hang of it, I know.  That's great.  And look, it's a pretty comfortable room, and it's not such a bad courthouse to get in and out of when you're not one of 80 or a hundred.  So thanks for being on time.  Thanks for being ready.

We're now going to pick up with the evidence portion of the case.

So the government is going to call its first witness.  And who is that?

MS. DONALESKI:  The government calls David Wall.

THE COURT:  Okay.  I'll ask the witness to please stand and raise your right hand.

(Witness sworn)

THE COURT:  Okay.  Mr. Wall, just keep your voice up nice and loud.  Just answer the questions put to you.

Okay.  You may proceed, Ms. Donaleski.

MS. DONALESKI:  Thank you, your Honor.

DAVID WALL,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DONALESKI:

Q.  Good afternoon, Mr. Wall.

**A000187**

A.   Good afternoon.

Q.   How old are you?

A.   Sixty-five.

Q.   Where do you live?

A.   Northern New Jersey; Hewitt, New Jersey.

Q.   Can you spell that, please.

A.   H-E-W-I-T-T.

Q.   What do you do for a living?

A.   I'm a project manager for a general contractor who renovates New York City schools and NYCHA buildings.

Q.   How long have you been a project manager?

A.   Twenty-five years.

Q.   Where is your office?

A.   Long Island City, Queens.

Q.   What was your route to work back in December 2017?

A.   I take a bus from my house, New Jersey Transit, and that brings me to the Port Authority; and from the Port Authority, I take a couple-of-level stairs down to the -- to the subway, and then I pay my toll and I walk through a tunnel to the 7 train; I get a 7 train; three stops later, I get out at Long Island City and I walk to my office.

Q.   I'd like to direct your attention to December 11, 2017. What day of the week was it?

A.   It was a Monday.

Q.   Did you take your normal route into work that day?

**A000188**

Case 21-1058, Document 40, 10/04/2021, 8186339, Page34 of 284

A. Yes, I did.

Q. What, if anything, happened as you were going into work that day?

A. A very loud explosion occurred in the subway, and I held my head because the noise was so loud.

Q. And Mr. Wall, where in the subway did the explosion happen?

A. After you pay the toll, you take a tunnel that connects the Port Authority to the 7 train station, so I was partially into the subway, and I walked into the -- into the tunnel. When you walk in New York City, you walk at a faster pace than most people normally would. So I'm walking in the subway and I see this fellow in front of me. I thought he was homeless because he wasn't walking that fast and he had baggy cloths, and when I got up to him, I -- I glanced at him, and I feel sorry for the homeless, so I said a little prayer. About three steps later, the loudest explosion I ever heard. The force of it pushed me forward and I tried to hold my ears, and then after the explosion, I turned around behind me to see what happened. And I thought it was a steam pipe. I saw this homeless fellow, what I thought, I saw him laying on the ground. I went back to help him, and then when I got to the smoke, he had -- it smelled like gunpowder to me, and I was stunned, and I just turned around and -- I turned around and looked down the corridor. There was nobody in the subway anymore. And I was dizzy and my head was pounding, and I just continued my path to

**A000189**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page35 of 284

work and -- I got down the subway, there was no one on the subway. I couldn't understand why. And when I got on the subway, the fellow sitting across from me, he was holding his head and crying. I got out at Vernon Boulevard, and then there was an announcement that the subway system was closing down.

Q. Mr. Wall, I'm just going to pause you there.

When the explosion in the tunnel happened, did you feel anything?

A. Well, I felt the force of the explosion and then I felt my right leg like -- like a flame hit my right leg.

MS. DONALESKI: And your Honor, at this time I'd like to offer a stipulation between the parties, which is signed -- it's Government Exhibit 2001 -- as well as the evidence that's the subject of the stipulation, which is 1001, which is a disc containing 1001-01 through 1001-24B.

THE COURT: 1001-0?

MS. DONALESKI: 01 through 1001-24B, as in boy.

THE COURT: Okay. Go ahead. You were going to read the stip?

MS. DONALESKI: I was only going to read portions of the stip at this point, your Honor.

THE COURT: All right. Go ahead.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 2001, and we'll focus on the first page.

The stipulation reads:

**A000190**

"It is hereby stipulated and agreed by and among the United States of America, by Geoffrey S. Berman, United States Attorney for the Southern District of New York, Shawn G. Crowley, Rebekah A. Donaleski, and George D. Turner, Assistant United States Attorneys, of Counsel, the defendant, Akayed Ullah, by and through his attorneys, Amy Gallicchio, Esq. and Julia Gatto, Esq., that Government Exhibit 1001 is a disc containing Government Exhibits 1001-1 through 1001-24B. The government exhibits contained on Government Exhibit 1001 are excerpts of surveillance videos that show the following."

And the stip details for each exhibit what the video shows. And the stipulation is signed and dated by the parties.

THE COURT: All right. You're offering the stipulation itself, 2001?

MS. DONALESKI: I am, 2001, and the disc, which is 1001.

THE COURT: All right. So Government Exhibit 2001, which is the stipulation, and the disc, which is Government Exhibit 1001, are received.

(Government's Exhibits 1001 and 2001 received in evidence)

THE COURT: Are you going to show part of it now?

MS. DONALESKI: Yes, your Honor.

THE COURT: Okay. Go ahead.

MS. DONALESKI: Thank you.

**A000191**

And Mr. DeLuca, could you please publish paragraph 1L on the fourth page. I'll read that aloud.

THE COURT: Ladies and gentlemen, is everybody's screen working? If they're not, let me know. I assume they are. But occasionally things go out, so if there's a problem, let me know about it.

All right. Go ahead.

MS. DONALESKI: "Government Exhibit 1001-23 is an excerpt of a surveillance video that fairly and accurately reflects events in the vicinity of the passageway from 42nd Street and Seventh Avenue located within the Port Authority bus terminal in the vicinity of 42nd Street and Eighth Avenue, New York, New York, on the morning of December 11, 2017."

Mr. DeLuca, could you please play Government Exhibit 1001-23.

(Video played)

MS. DONALESKI: Mr. DeLuca, I'd ask you to replay that and pause at 20 seconds, please.

(Video replayed)

BY MS. DONALESKI:

Q. Mr. Wall, do you see yourself in this video?

A. Yes, ma'am.

Q. Can you please point yourself out.

A. I'm behind the woman with the white collar, holding a newspaper in my right hand.

**A000192**

Q. You mentioned that you saw a man in a heavy coat. Do you see that man in the video?

A. He's right behind me.

MS. DONALESKI: Mr. DeLuca, can you please play the remainder of the video.

(Video played)

MS. DONALESKI: Thank you, Mr. DeLuca.

Q. Mr. Wall, what did you do after the explosion?

A. I turned around -- I turned around like -- like I said, I thought it was a steam pipe. And I went to help the man who was on the floor, and then I smelled gunpowder and turned away. I continued on my journey and I got to my office.

Q. What happened when you got to your office?

A. My head was really ringing and hurting, my chest was really tight, my heart was beating really fast, I had trouble breathing. I video-called my wife. I couldn't hear her. Finally she said, call 911.

So I got up to go to the bathroom, and I collapsed on the floor. I just go so dizzy, and disoriented. I got my cellphone and called 911, and the police officers arrived. And I got up and started -- I was on the second floor, so I was going downstairs, I lost my equilibrium, dizzy. So they caught me on the stairs, and two police officers were there and they showed me to the ambulance.

Q. And where did the ambulance take you?

**A000193**

A.   Mount Sinai Hospital.

Q.   Was anything removed from your body at Mount Sinai Hospital?

A.   Yeah.

Q.   What was removed from your body?

A.   The flame and the pain I felt in my right calf was the -- was actually a piece of metal that burned itself into my calf.

          MS. DONALESKI:  Mr. DeLuca, can you please publish for the witness only Government Exhibits 501, 502, and 503.

Q.   Mr. Wall, do you recognize these photos?

A.   Those are my legs and the metal.

Q.   Does it fairly and accurately depict your injury on December 11, 2017?

A.   Yes, it does.

          MS. DONALESKI:  The Government offers 501 through 503.

          THE COURT:  Any objection?

          MS. GALLICCHIO:  No objection.

          THE COURT:  All right.  Government Exhibits 501 through 503 are received.

          (Government's Exhibits 501, 502, 503 received in evidence)

          THE COURT:  Are you going to show them to the jury?

          MS. DONALESKI:  Yes.

          THE COURT:  So they'll come on the screen in a moment. You're going to ask the witness about them?

**A000194**

MS. DONALESKI: Yes, your Honor.

THE COURT: Okay. Go ahead.

MS. DONALESKI: Mr. DeLuca, could you publish Government Exhibit 501. Thank you.

BY MS. DONALESKI:

Q. Mr. Wall, please describe what we're seeing in Government Exhibit 501.

A. That's a piece of metal that burned itself into my -- my right calf.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 502.

Q. Mr. Wall, what does this depict?

A. That's -- that's the metal in my leg.

MS. DONALESKI: And finally, Government Exhibit 503, Mr. DeLuca.

Q. Mr. Wall, what does this photo depict?

A. The metal they took out of my leg.

MS. DONALESKI: Thank you, Mr. DeLuca.

Q. Mr. Wall, what effect, if any, did the explosion have on your hearing?

A. I'm sorry. The worst that happened, three and a half years ago my son passed away. When you're at a funeral, you -- people talk softly, and I really -- I couldn't hear people talking softly. I went and got hearing aids. They were -- I realize now they were amplifiers. I had to take them out in

**A000195**

order to watch television. I could make the television louder.

But after the explosion, they did me no good. I realized that the day following -- the next day, actually, my youngest daughter was -- would be helping me, and I just didn't hear her voice. I went for hearing aids that I have now, because the constant ringing in the ears, it never goes away. And I lost 30 pitches in my hearing. So if I don't wear my hearing aid, I don't ever hear my daughter talking anymore. I'll tell you, every -- every time I put them on in the morning to stop the ringing, it just, you know, it bothers me.

When my daughter -- my oldest daughter plays piano, and when she plays for me now, it sounds to me like a 1930 recording now. I don't have any of those tones anymore.

My daughter comes in to kiss me good night, I have to get up and put my hearing aids on to hear her now. My hearing, just lost it.

Q. How, if at all, was your life affected after the explosion?

MS. GALLICCHIO: Objection.

THE COURT: Overruled. If you can answer.

Do you understand the question?

THE WITNESS: Yes.

A. Taking the subway is -- it's not easy. Every time you swipe to go in, my chest gets tight, shortness of breath, the heart beats fast, and I look at everybody. On that subway, I'm looking at everybody. No relaxing.

A000196

The worst is when I go home and my job calls me -- I go to all -- all four boroughs -- and I have to go to the Bronx. And when I go to the Bronx for meetings and work on schools, that's the toughest. I just can't get back on the subway after -- after being above-ground. I call my wife, start talking to her. Train after train goes by, I don't get on. And when I get on, I get off way before my stop just to get up above-ground sometimes, just to walk. It's tough.

MS. DONALESKI: No further questions. Thank you, Mr. Wall.

THE COURT: All right. Cross-examination? Ms. Gallicchio?

MS. GALLICCHIO: We have no questions of Mr. Wall.

THE COURT: No questions. Okay.

Mr. Wall, thank you very much. Be careful stepping down from the box up there. Thank you.

(Witness excused)

THE COURT: All right. Government will call its next witness.

MR. TURNER: Your Honor, the government calls Sean Gallagher.

THE COURT: All right.

(Witness sworn)

THE COURT: Okay. Mr. Gallagher, just keep your voice up nice and loud like that. Keep the mic close. And answer

A000197

only the questions put to you, okay?

You may proceed, Mr. Turner.

MR. TURNER:  Thank you, your Honor.

SEAN GALLAGHER,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TURNER:

Q.  Good afternoon, sir.

A.  Good afternoon, sir.

Q.  Where do you work?

A.  I work for the Port Authority Police Department, specifically at the bus terminal command.

Q.  What is your position there?

A.  I'm a police officer.

Q.  How long have you been a police officer at the Port Authority?

A.  Four years, sir.

Q.  What did you do before becoming a police officer?

A.  I served in the United States Marine Corps Reserves for six years, and I worked for a small staffing agency.

Q.  As a police officer at the Port Authority, what are some of your responsibilities?

A.  Enforce the laws of the State of New York, ensure that people travel from and to their destination safely, enforce any

A000198

violations of law or regulations.

Q.   Does it also include responding to potential crime scenes?

A.   Yes, it does.

Q.   Where is the Port Authority bus terminal located?

A.   It's located in Midtown Manhattan between 40th Street and 42nd Street, between Eighth and Ninth avenues.

          MR. TURNER:  Mr. DeLuca, please publish only for the witness what's marked for identification as Government Exhibit 1.

Q.   Officer Gallagher, do you recognize what you're looking at?

A.   Yes, I do.

Q.   What is it?

A.   It's an internet overlay of Midtown Manhattan.

Q.   Does it fairly and accurately depict the area of Midtown Manhattan?

A.   Yes, it does.

          MR. TURNER:  Your Honor, the government offers Government Exhibit 1.

          THE COURT:  Any objection?

          MS. GALLICCHIO:  No.

          THE COURT:  So Government Exhibit 1 is received.

          (Government's Exhibit 1 received in evidence)

          MR. TURNER:  Mr. DeLuca, you can please publish that to the jury.

BY MR. TURNER:

**A000199**

Q. Officer Gallagher, do you see the Port Authority bus terminal on this map?

A. Yes, I do.

Q. Please describe where on the map.

A. On the right side of the picture there is a purple line that denominates 41st Street. Bus terminal is to the left and the right of that purple line.

Q. Now let's turn to Monday, December 11th of 2017. Were you on duty that morning?

A. Yes, I was.

Q. Where were you on duty?

A. I was posted at Post 41 and 9.

Q. What is 41 and 9?

A. It's security post at an exit-only bus terminal close to the intersection of 41st Street and Ninth Avenue.

Q. Is that above-ground or below-ground?

A. It's on street level.

Q. Did there come a time that morning when you were summoned to an incident?

A. Yes, there was.

Q. Approximately what time was that?

A. It was approximately 7:20 that morning.

Q. Where did you respond to?

A. I responded to the south wing lobby that connects the subway system to the Port Authority bus terminal.

**A000200**

Q. What is the south wing lobby?

A. It is a lobby that has a subway entrance into the New York subway system as well as the south wing of the Port Authority bus terminal.

Q. Which subway station can you enter through the south wing?

A. The Port Authority station.

Q. Why did you respond to the Port Authority subway station that morning?

A. I received a series of radio transmissions from Police Officer Anthony Manfredini.

Q. Who is that?

A. He's another police officer that works at the bus terminal.

Q. When you arrived at the south wing entrance to the subway station, what did you see?

A. I saw approximately 25 to 30 people running out of the subway, numerous bus terminal units responding to the scene.

Q. When you say bus terminal unit, what are you referring to?

A. I'm referring to other bus terminal police officers.

Q. What did you do next?

A. I started to look for Officer Manfredini.

Q. And what happened next?

A. I and my fellow officer Jack Collins redirected ourselves to the north wing lobby.

Q. What's the north wing lobby?

A. It's the same thing as the south wing lobby. It connects

A000201

the north wing of the bus terminal to the Port Authority subway station.

Q. Can you enter the Port Authority subway station through the north wing lobby?

A. Yes, you can.

Q. When you arrived there, at the north wing lobby, what did you see?

A. I saw a group of approximately 40 people looking into the subway.

Q. What did you do next?

A. I made entrance into the subway with Officer Collins.

Q. Where did you go after entering the subway station?

A. I went over to the turnstiles and I met with Officer Anthony Manfredini on the mezzanine level of the Port Authority subway station.

Q. Where did you go at that point?

A. I moved to the connecting passageway between Port Authority subway station and the Times Square subway station.

Q. Are you familiar with that passageway through your work as a police officer at the Port Authority?

A. Yes, I am, sir.

Q. Please describe that passageway or tunnel for the jury.

A. The connecting subway tunnel is approximately 150 to 200 yards long. It connects the Port Authority subway station to the Times Square subway station. It goes underneath Eighth

**A000202**

Avenue and parts of Broadway and Seventh Avenue.

Q. Why did you head towards that tunnel?

A. I saw numerous NYPD officers responding from the opposite end of the subway station as well as National Guard personnel.

Q. As you approached the tunnel, what, if anything, did you see?

A. I saw a large amount of smoke coming out of the tunnel.

Q. Did you see anything else?

A. I began to see a outline of a man lying on the floor.

THE COURT: When you refer to outline, what do you mean?

THE WITNESS: Your Honor, there was a lot of smoke coming from the passageway, and I could start to see that a man was lying on the floor.

THE COURT: Oh, okay.

BY MR. TURNER:

Q. When you saw the man lying on the floor in the cloud of smoke, was the man moving at all at that point?

A. Very little, sir.

Q. What did you do next?

A. I ordered the National Guard out of the passageway and I took up the forward covered position to the left-hand side of that passageway.

Q. At that point what did you do?

A. I drew my firearm.

**A000203**

Q.   Please describe what happened next, Officer Gallagher.

A.   Began to assess the situation that we had in front of us. I saw that NYPD officers were at the opposite ends of the passageway from me. We shown our flashlights down at them and they did the same back at us. The smoke started to dissipate at this point, at which point I felt a knee in the small of my back and someone touched my shoulder and then told me that I have other officers behind me in tactile formation.

Q.   What do you mean by that?

A.   A group of police officers formed up behind me with their weapons drawn, raised in a tactical manner.

Q.   Once you were in that formation, what did you do next?

A.   We made entry into the subway passageway tunnel.

Q.   Can you describe what happened when you advanced into the tunnel.

A.   We moved tactically up to the man that was lying on the floor, shouting verbal commands for him not to move; we closed the distance, and I was able to step onto his left arm, and Lieutenant Rubio did the same on his right.

Q.   When you reached the man on the ground, what, if anything, did you see?

A.   I saw that he sustained lacerations to the right side of his body, as well as burn marks, his clothing was torn and tattered, and I noticed that he had wires protruding from his chest.

**A000204**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page50 of 284

Q. After you noticed the wires protruding from his chest, what did you do?

A. I yelled to the other officers with me that he's wired up and we need to withdraw.

Q. Why did you do that?

A. I believed that he had an explosive on him.

Q. Did you in fact withdraw?

A. Yes, I did.

Q. Where did you go?

A. Back to the covered position that I started from.

Q. And what position was that?

A. It would be on the left-hand side of the hallway that has a approximately 45-degree slant that gave me the most forward position to him lying on the ground.

Q. After withdrawing, did you still see the man on the ground lying in the tunnel?

A. Yes, I still could, sir.

Q. Did anything change in terms of his movement?

A. Yes, sir. It appears he became more conscious and he started to move his body.

Q. What happened next?

A. A subway car pulled in underneath us and --

Q. If you could just speak into the microphone, please, Officer Gallagher.

A. Yes, sir.

A000205

Q.  Please continue.  Please describe what happened at this point.

A.  Subway car pulls in, the doors open, people came off the subway car screaming, which compelled myself, Officer Jack Collins, and Officer Drew Preston to re-enter the subway passage.

Q.  What was the purpose of re-entering the subway passage?

A.  To neutralize the threat and place the defendant in custody.

Q.  Did you in fact advance back into the tunnel?

A.  Yes, I did, sir.

Q.  Could you describe what happened.

A.  Once again, myself, Officer Preston, Officer Collins, moved tactically into the passageway, shouting loud verbal commands to the defendant not to move, we were able to close the distance again, and we were able to restrain him in handcuffs.

            (Continued on next page)

**A000206**

Q.  When you say moved tactically into the area, what do you mean by that?

A.  With our firearms drawn, moving in a very decisive manner while shouting very clear, very loud verbal commands for him not to move, not to touch anything.

Q.  Please do speak into the microphone if you can.

A.  Sorry, sir.

Q.  Did you reach the man on the ground?

A.  Yes, I did.

Q.  What happened when you reached the man on the ground?

A.  I stepped on his right wrist.  Officer Collins stepped on his left, and myself and Officer Collins placed him in handcuffs.

Q.  Why did you stand on his wrists?

A.  To restrain him from moving.

Q.  After restraining the man on the ground, what did you do?

A.  Began to search his person.

Q.  How did you do that?

A.  Patted down his pockets, patted down his waistline. Officer Preston briefly removed the defendant from my hand to frisk his back to see if he had any secondary explosives on him.  Then I continued the search of his person.

Q.  What, if anything, did you find on his person?

A.  In his right rear pants pocket I recovered a wallet, and from his front right pants pocket I recovered a 9-volt battery

**A000207**

electrically taped to an AC cable wire, styled wire.

Q. How did you search his front pockets?

A. I asked for a knife and I cut his pocket open.

Q. Why did you take that step?

A. With the exposed wires and a wire protruding into an object I had not yet seen in his pocket, I did not want to yank on any wires on his person.

Q. Officer Gallagher, the man you handcuffed in the Port Authority subway station on December 11, 2017, do you see that person anywhere in this courtroom?

A. Yes, I do.

Q. Please describe where he is sitting, an article of clothing he is wearing.

A. He is sitting at the bench to my far right. He is wearing a suit and he has long hair and has a beard.

MR. TURNER: Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT: Any objection?

MS. GALLICCHIO: No, your Honor.

THE COURT: The record so reflects.

MR. TURNER: Mr. DeLuca, please publish only for the witness Government Exhibit 140.

Q. Officer Gallagher, do you recognize what this is?

A. Yes, I do.

Q. What is it?

**A000208**

A. It's an Internet map showing Port Authority subway station, the Times Square station, and subway connecting tunnel that I described.

Q. Does the diagram fairly and accurately depict those two stations, the Port Authority and Times Square stations?

A. Yes, it does.

MR. TURNER: The government offers Government Exhibit 140.

THE COURT: Any objection?

MS. GALLICCHIO: No objection.

THE COURT: Government Exhibit 140 is received.

(Government's Exhibit 140 received in evidence)

MR. TURNER: Mr. DeLuca, please publish for the jury.

Q. Officer Gallagher, what is on the left side of this image?

A. On the left side of the image is the Port Authority subway station.

Q. What is on the right side of the image?

A. That is the Times Square station.

Q. What subway station did you respond to on the morning of December 11, 2017?

A. Port Authority subway station.

Q. What do we see in the center of this image?

A. That is the tunnel connecting passageway that I described.

Q. Looking at this image, please describe approximately where you found the defendant that morning.

**A000209**

A. If you can make out on the left-hand side of your screen where the passageway starts, you can see where it is slightly slanted. That was my position. Moved down approximately 25 to 30 yards, that's where I found the defendant.

THE COURT: I'm not sure I followed that. Where the 7 shows up?

THE WITNESS: If you follow the platform, the word "platform," your Honor, on the bottom left of your screen, you go straight into the passageway. There is a slight slant where the passageway starts, and just beyond that, 25 yards down the passageway, is where the defendant was lying.

Q. Officer Gallagher, you are looking at the left side of the passageway?

A. Yes, sir.

Q. Is that where you approached?

A. Yes, sir.

Q. Approximately how far past that entrance point was the defendant on the ground?

A. Approximately 25 to 30 yards.

THE COURT: Where in relation to the word "passageway"?

THE WITNESS: That would be approximately 100 yards going towards the Port Authority station.

THE COURT: The defendant was where? Before you got to the words "passageway"?

**A000210**

THE WITNESS:  Yes, sir.

THE COURT:  How much?  Halfway there, a third there?

THE WITNESS:  A third of the way there, sir.

THE COURT:  A third?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

MR. TURNER:  Mr. DeLuca, could you please pull up what is in evidence as Government Exhibit 2001, a stipulation. Please highlight paragraphs 1(m) and 1(n).

Your Honor, with the Court's permission, I will read these two paragraphs of the stipulation.

THE COURT:  Sure.

I told you before what a stipulation is.  That is an agreement between the parties as to certain facts or in some cases as to certain testimony.  In this case facts.  Mr. Turner is going to read some of the facts that they have agreed to. Listen to it and you will give it the weight you think it deserves.

Go ahead.

MR. TURNER:  Government Exhibit 1001-24A is an excerpt of surveillance video that fairly and accurately reflects events in the vicinity of the passageway from 42nd Street and Seventh Avenue located within the Port Authority bus terminal in the vicinity of 42nd Street and Eighth Avenue, New York, New York, beginning at approximately 7:23 a.m. on the morning of

**A000211**

December 11, 2017.

Government Exhibit 1001-24B is an excerpt of surveillance video that fairly and accurately reflects events in the vicinity of the passageway from 47th Street and Seventh Avenue located within the Port Authority bus terminal in the vicinity of 42nd Street and Eighth Avenue, New York, New York, beginning at approximately 7:25 a.m. on the morning of December 11, 2017.

Mr. DeLuca, please publish what is in evidence as 1001-24A and please pause the video 5 seconds in.

(Video shown)

Q.  Officer Gallagher, do you recognize what is shown in this video?

A.  Yes, I do.

Q.  What are we looking at?

A.  Looking at video surveillance footage from the subway passageway that's facing the way that I approached.

Q.  You have described responding to that passageway on the morning of December 11th.  Approximately when is this clip that we have seen in the course of your response?

A.  This is approximately a minute and a half after I went over the turnstile.

Q.  What are you doing at this point?

A.  If you look at the top right of the screen, follow the wall that runs there, I am the first uniformed person outside the

**A000212**

end of that wall.

Q.  At this point what are you doing at that location?

A.  Assessing the situation that we are looking at and awaiting further orders.

Q.  What happens next?

A.  We begin our tactical movement into the passageway.

MR. TURNER:  Mr. DeLuca, can you play the video, pausing at 15 seconds, please.

(Video shown)

Q.  Where are you in your video, Officer Gallagher?

A.  I'm the furthest right police officer.

Q.  Looking at the screen, the furthest to the right?

A.  Correct.

MR. TURNER:  Mr. DeLuca, please play and pause at 22 seconds.

(Video shown)

Q.  Officer Gallagher, what were you doing at this point?

A.  I was standing on the defendant's wrist, restraining him. And I was reaching into the small of my back for a pair of search gloves.

Q.  Were you preparation to do anything at this point?

A.  I was preparing to place handcuffs on him.

Q.  What happened next?

A.  I observed the wires protruding from his chest.

Q.  What did that cause you to do?

**A000213**

A.   To alert the rest of the police officers on scene that he has wires on his chest and that we need to withdraw.

MR. TURNER:  Mr. DeLuca, please play through the end of this clip.

(Video shown)

Now, Mr. DeLuca, please publish the video in evidence as Government Exhibit 1001-24B, and please pause 5 seconds in.

(Video shown)

Q.   Officer Gallagher, what are we seeing here?

A.   This is when I have withdrawn to the covered position and this is approximately the time when that subway train is pulling in underneath me.

Q.   Please speak into the microphone, Officer.

A.   Sorry, sir.

Q.   Approximately when is this video in relation to the video clip that we just watched?

A.   Approximately a minute and a half, two minutes later.

Q.   What happens after this point?

A.   I reenter the subway passage.

MR. TURNER:  Mr. DeLuca, please play and pause at 25 seconds.

(Video shown)

Q.   Officer Gallagher, do you see yourself in the video?

A.   Yes, I do.

Q.   Where are you?

**A000214**

A.   Looking at the top right-hand portion of the screen, I'm the police officer in the middle.

Q.   Is that the three officers who are closest to the man on the ground?

A.   Yes.

Q.   You're in the middle of those three?

A.   Yes, I am.

Q.   What did you do next?

A.   Shouted very loud verbal commands for the defendant not to move, and then we restrained him and handcuffed him.

Q.   Was the defendant moving at all as you advanced back into the tunnel?

A.   He was becoming more aware and starting to move more, yes.

Q.   How, if at all, did that affect the steps that you took?

A.   It heightened our threat levels and hastened our response in the passageway.

        MR. TURNER:  Mr. DeLuca, could you please play and pause at 1 minute and 10 seconds.

        (Video shown)

Q.   What do we see you doing here?

A.   I'm pointing to what I believed to be the IED.

Q.   Why were you doing that?

A.   To alert the other officers on scene in case it had any further unexploded ordinance inside of it.

Q.   When you said "IED," what is that.

**A000215**

A.   Improvised explosive device.

Q.   Please describe what you believe was a part of the IED. What did you see?

A.   I saw a gray metal tube approximately 6 inches in length. One end was complete and the other appeared to be tattered as it had been blown off.

Q.   Did you notice anything else on the ground in the area of the defendant?

A.   Yes.

Q.   What?

A.   A large amount of shrapnel.

Q.   When you say "shrapnel," what are you referring to.

A.   Screws.

        MR. TURNER:  Mr. DeLuca, please play and pause at 1 minute 21 seconds.

        (Video shown)

Q.   Please explain what's happening now?

A.   I asked for a pair of search gloves, as I had left mine further in the rear of the passageway.  I'm preparing to search the defendant's person.

Q.   Could you see at all times what every other law enforcement officer was doing in the tunnel?

A.   No, I could not.

Q.   What was your focus?

A.   My focus was on the defendant, the restraint and search of

**A000216**

him.

MR. TURNER:  Mr. DeLuca, play and pause at 1:35, please.

(Video shown)

Q.  Please explain what is happening at this point.

A.  The defendant is starting to move a great amount, and we are restraining him.

MR. TURNER:  Mr. DeLuca, please play and pause at 1:54.

(Video shown)

Q.  What are you doing at this point?

A.  I'm commencing a search of the defendant's person.

Q.  Had you recovered anything by this point?

A.  I am beginning to recover the wallet in his right rear pants pocket.

Q.  Did you continue to search after this point?

A.  Yes, I did.

MR. TURNER:  Mr. DeLuca, you can may through the end, please.

(Video shown)

MR. TURNER:  Permission to approach, your Honor?

THE COURT:  Yes.

Q.  Officer Gallagher, I hand you what's been marked as Government Exhibits 103-1 through 103-5 for identification.  Do you recognize what I have handed you?

**A000217**

A.   Yes, sir, I do.

Q.   What are they?

A.   These are photographs that were taken at the scene.

Q.   Which scene?

A.   The scene of the December 11th explosion.

Q.   Do they fairly and accurately depict what you observed that morning?

A.   Yes, sir, they do.

          MR. TURNER:  Your Honor, the government offers Government Exhibits 103-1 through 03-5.

          THE COURT:  Any objection?

          MS. GALLICCHIO:  Your Honor, may I ask a couple of questions?

          THE COURT:  A couple.  It's unclear to me what the voir dire is.  Go ahead.

          MS. GALLICCHIO:  Just with respect to 103-1.  Officer Gallagher, did you take that photograph?

          THE WITNESS:  No, ma'am, I did not.

          MS. GALLICCHIO:  Do you know when that photograph was taken?

          THE WITNESS:  No, ma'am, I don't.

          MS. GALLICCHIO:  When was the first time you saw this photograph?

          THE WITNESS:  The first time I saw this photograph, ma'am, was occurring trial prep.

**A000218**

MS. GALLICCHIO:  When you say this fairly and accurately depicts the location of the incident, at what point in the incident?

THE WITNESS:  Ma'am, I'm unsure of that because I did not take this photograph.

THE COURT:  You were asked does it fairly and accurately depict the scene as it appeared on that date.

THE WITNESS:  Yes, minus the defendant lying in the middle of the debris, yes, ma'am.

THE COURT:  So this depicts the scene at what point during that day?

THE WITNESS:  I can't recall, sir.  I did not take this picture.

THE COURT:  This is just generally what the corridor looks like?  Is that the point?

THE WITNESS:  It's how it looked that day, yes, sir.

THE COURT:  Okay.

MR. TURNER:  May I ask one follow-up question, your Honor?

THE COURT:  Sure.

BY MR. TURNER:

Q.  Does it also fairly and accurately depict the items that you observed in the tunnel that day on the ground?

A.  Yes, sir, they do.

THE COURT:  Any objection?

**A000219**

MS. GALLICCHIO: I have no objection, your Honor, subject to cross-examination on this.

THE COURT: Yes, you will get your cross. Government Exhibits 103-1 to 103-5, five photos total -- is that what it is, Mr. Turner?

MR. TURNER: Yes, your Honor.

THE COURT: Those are received in evidence.

(Government's Exhibits 103-1 through 103-5 received in evidence)

MR. TURNER: Mr. DeLuca, please pull up 103-2.

Q. Officer Gallagher, what is depicted in this photograph?

A. This is a picture of the defendant, sir.

Q. What else do you see in this photograph.

A. You see that his clothing is torn, tattered, and frayed, a white zip tie across his chest, and in the bottom left of the picture in the vicinity of his waistline you see wires and an orange end cap to the wire.

MR. TURNER: Mr. DeLuca, please pull up Government Exhibit 103-3.

Q. What are we looking at here?

A. Looking at a close-up picture of the defendant's waistline. At the bottom right of the picture you can see wires and the orange end cap.

MR. TURNER: Mr. DeLuca, if you could please zoom in on the area of the orange end cap.

**A000220**

Q.   Officer Gallagher, did you notice anything in particular about the wires that you saw on the defendant?

A.   Yes.  The white wire was exposed and frayed.

Q.   When you say exposed, what do you mean?

A.   Visible wiring out of the end of the wire.

          MR. TURNER:  Mr. DeLuca, please pull up Government Exhibit 103-4.

Q.   What are we looking at here?

A.   We're looking at the right side of the defendant's body with the lacerations and burn marks on the right side of his body.  And on the right-hand bottom part of the picture you see the wires I just described with the white zip tie.

Q.   Do you see anything else in the area of the wires on the bottom right?

A.   Yes, I do.

Q.   What do you see?

A.   The orange end cap to the wire.

          MR. TURNER:  Thank you, Mr. DeLuca.

Q.   Officer Gallagher, you testified that you recovered a wallet from the defendant?

A.   Yes, I do.

Q.   Did you find anything in particular in that wallet?

A.   A New York State driver's license.

          MR. TURNER:  Mr. DeLuca, please publish what is in evidence as Government Exhibit 103-5.

**A000221**

Q.   Do you recognize what we are looking at here, Officer Gallagher?

A.   Yes, I do.

Q.   What is it?

A.   Driver's license taken from the wallet I recovered.

Q.   What is the name on the driver's license?

A.   Ullah, Akayed.

Q.   Other than your response to the scene on the morning of December 11, 2017, did you have any other involvement in this investigation?

A.   No, I did not.

          MR. TURNER:  Nothing further, your Honor.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. GALLICCHIO:

Q.   Good afternoon, Officer.

A.   Good afternoon, ma'am.

          MS. GALLICCHIO:  If we could, Mr. Fischer, Government Exhibit 140.

Q.   Take a look at Government Exhibit 140, please.  You can see Government Exhibit 140, Officer?

A.   Yes, ma'am.

Q.   You testified on direct examination that the passageway that runs from Port Authority station to Times Square station is approximately, did you say, 150 to 200 yards long?  Is that

**A000222**

right?

A.  Yes, ma'am.

Q.  When you're talking about that measurement, on this diagram are we measuring from the station where the passageway appears to begin to extend?  Right?

A.  Ma'am, I was speaking of the area that I traveled mostly.

Q.  My question is this passageway that we see labeled "passageway," right?

A.  Yes, ma'am.

Q.  There is "141st Street" that's listed above it, right, written above it?

A.  I don't see "141st Street," ma'am.

Q.  Let's focus on "passageway."

A.  Yes, ma'am.

Q.  Were you referring to this passageway when you said that it was 150 to 200 yards long?

A.  Yes, ma'am.

Q.  From what point on this passageway to what other point is that distance, if you can tell us?

A.  Yes, ma'am.  It would be the passageway from the start of the Port Authority subway station to where the passageway starts to take a downward slant towards the rest of the Times Square subway station.

Q.  Is it the entire length of that beige-colored passageway that you say is 150 to 200 yards?

**A000223**

A. No, ma'am. It would be my visible area of view.

Q. By the way, did you actually measure that or is that an estimate that you gave it?

A. That is an estimate, ma'am.

Q. You indicated that where you saw Mr. Ullah was approximately 25 to 30 yards into the passageway from Port Authority station, right?

A. From where I was situated in this, yes.

Q. From where you were situated is where that slant is at the bottom of the passageway, right?

A. Yes, ma'am.

Q. That slanted portion is an upward slant actually in the walkway, right?

A. A slight slant, yes.

Q. A slight hill, right?

A. A slight incline.

Q. "Incline." Better word. Thank you. As you were standing in that passageway, you were looking towards the Times Square station, is that right?

A. I was in a covered position behind the wall, ma'am.

Q. Just in terms of directions, your view was looking towards the Times Square station, which would be eastbound, is that right?

A. That is correct.

Q. The subway, the A, C, and E, would be behind you if you're

**A000224**

standing looking towards Times Square?

A.   It would be underneath me.

Q.   In this diagram here, the train tracks are actually to the left of the passageway, right?

A.   I'm unsure, ma'am.

Q.   How long have you worked at that station?

A.   I work at the Port Authority Bus Terminal, ma'am.

Q.   So you're not familiar with the Port Authority train station in the way that you are familiar with the Port Authority Bus Terminal?

A.   Correct, ma'am.

Q.   Are you familiar with the distance from where the passageway begins at Port Authority, where you began your position, to where the subway is, how long it is, how far it is to get to the subway?

A.   Can you clarify your question, ma'am?

Q.   Sure.  Where you were standing at the beginning of the passageway, at the slant -- right?

A.   Yes.

Q.   Do you know, or don't you, that the train was behind you?

A.   I know that it was behind me, ma'am, and below me.

Q.   Do you know how many yards, for example, the closest stairway to the lower train station is?

A.   It would be from my position approximately 30 yards to my rear, to the right.

**A000225**

Q. Then to get down into the train station, to get the A, C, and E, it's approximately 20 steps down, is that accurate?

A. I'm unfamiliar with how many flights you have to travel down.

Q. When you arrived at the location, you were one of the first few officers responding, right?

A. Yes, ma'am.

Q. When you got there, I believe you said you already saw the National Guard officers arrived?

A. National Guard personnel, yes, ma'am.

Q. Personnel. Are these personnel that you are familiar with, that you worked with before?

A. No, ma'am. They rotate as a greater operation to protect the New York City area. They rotate throughout transit facilities throughout the city. I'm unfamiliar with many of them.

Q. So they are not stationed at that location at a given time, right?

A. That's unbeknownst to me, ma'am.

Q. I'm sorry?

A. Generally in the bus terminal are the only ones I interact with usually.

Q. Do you understand how many National Guard personnel were there when you arrived?

A. No, I don't.

**A000226**

Q. How many NYPD transit units were there when you arrived?

A. Approximately a dozen.

Q. I believe you said when you got there, there were civilian commuters who were still exiting the subway. Is that right?

A. They were exiting the subway, ma'am.

Q. There were no people in the passageway, right?

A. None except for the man lying on the floor.

Q. Right. But they were still in the station, the commuters?

A. No one was left in the station.

Q. When you got there, do you recall seeing a gentleman, a civilian, walking into the corridor taking pictures?

A. No, ma'am, I don't.

Q. Would it be fair to say that at that time the area was not secured to the public?

A. What time are you speaking of?

Q. When you arrived.

A. During our first response, ma'am, we ordered all civilians in the stations to exit as we made our entrance.

Q. During your first approach to Mr. Ullah, you were one of the lead officers, right?

A. Yes, ma'am.

Q. You were with other Port Authority Police Department officers?

A. Yes, ma'am.

Q. Approximately four others?

**A000227**

A. Yes, ma'am.

Q. These are officers that you work with on a regular basis?

A. Yes, ma'am.

Q. There were other, as we saw in the video, National Guard officers that also entered into the passageway with you?

A. National Guard personnel, ma'am?

Q. Yes.

A. Yes.

Q. There were also NYPD transit officers that entered into the passageway?

A. Yes, ma'am.

Q. Is it fair to say that at that time when you entered into the passageway, your concern was to secure Mr. Ullah and to take him into custody? Right?

A. At that point, ma'am, we were there to ensure that nobody else got hurt.

Q. You were concerned for safety?

A. Yes, I was.

Q. Safety of commuters and your own safety, right?

A. Yes, ma'am.

Q. You were weren't concerned about the location of evidence or debris that might have been in the passageway, right?

A. Ma'am, I'm a first responder. My job is to respond to crimes in progress in incidents like that and protect life of everybody on scene and the public.

**A000228**

Q. So you weren't focused on where evidence or debris might be in the passageway when you entered, right?

A. I was focused on the defendant trying to hurt anybody else.

Q. The question is, so you weren't focused on the debris that was on the ground, is that right?

A. No, ma'am, I was not.

Q. Obviously, your concern was for safety, right?

A. Yes, ma'am.

Q. You do have training on the importance of preserving evidence at a scene, at a crime scene, for example, right?

A. Basic training from the police academy, ma'am, yes.

Q. So you understand the importance of, to the extent possible, preserving the location of evidence at a location, right?

A. Yes, ma'am.

Q. Sometimes that is not possible, right?

A. It's depending on the totality of the circumstances on any particular scene, ma'am.

Q. Right. When you approached Mr. Ullah, at the first approach, your concern was obviously not for the preservation of evidence at the scene, right?

A. My concern was the safety of myself, the public, and the other officers down there with me, ma'am.

Q. Right. As we saw on the video, there were a lot of officers, perhaps 10 to 12 officers, who entered into that

A000229

Q. walkway, right?

A. Approximately, ma'am.

Q. You weren't tiptoeing over evidence, right?

A. No, I wasn't, ma'am.

Q. You were concerned about the evidence that was scattered around the location, right?

A. I was concerned not stepping on anything that could hurt me or another officer and getting in there and taking the suspect into custody or mitigating any threat that might be posed.

Q. When you first saw Mr. Ullah, I believe you said he was barely moving, or not moving, right?

A. Slightly moving, ma'am.

Q. Would you describe him as semiconscious at that point?

A. At which point are we speaking, ma'am?

Q. When you first saw him, your first approach.

A. Yes, ma'am.

Q. As you said, you were concerned for your safety, right?

A. Yes, I was.

Q. One of the things that you would normally be concerned about when approaching someone is their hand, right?

A. Yes, ma'am.

Q. That's one of the reasons why you stepped on his hands or his wrists when you approached, right?

A. That is correct.

Q. So if there was another device or another weapon, he

A000230

couldn't reach for it?

A.  That was our intent on restraining his hands, ma'am.

Q.  Based on your investigation and your arrest of Mr. Ullah, you determined that there were no other devices, right?

A.  Ma'am, I'm not an investigator.

Q.  Did you find any other explosive devices on his person?

A.  I did not.

Q.  I believe we saw that if we take a look at the second video -- I don't need to put it up, but I want to talk to you about the second video that we saw, which is Government Exhibit 1001-24B.  You approached Mr. Ullah again, right?

A.  Yes, I did.

Q.  It was approximately a minute after you retreated from the first approach?

A.  Yes, ma'am.

Q.  Again, when you came into the this location next to Mr. Ullah, you stepped on his hand, right?

A.  Yes, ma'am.

Q.  You were now on the other side of him?

A.  Yes, ma'am.

Q.  This time there were many more officers that converged on the scene and approached Mr. Ullah, right?

A.  After we placed him in handcuffs, ma'am.

Q.  But in the approach, the officers coming in, there were at least 20 law enforcement officers from various agencies, right?

**A000231**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page77 of 284

A. Ma'am, I was in front. I was only aware of Officer Preston and Officer Collins with me.

Q. You saw the video, right?

A. I did, ma'am.

Q. You had an opportunity to review it in your preparation for your testimony, right?

A. Yes, ma'am.

Q. And you had an opportunity to view it here in court, right?

A. Yes, ma'am.

Q. Is it fair to say that there were at least 20 officers that entered into that location to apprehend Mr. Ullah?

A. Approximately a dozen behind us, ma'am.

Q. On this occasion when you approached Mr. Ullah, there was still, of course, debris and potential evidence all over the passageway, right?

A. There was shrapnel in the passageway, yes, ma'am.

Q. You also saw a piece of metal, right?

A. Yes, ma'am, a metal pipe.

Q. Again, your primary concern was for safety, right?

A. Yes, ma'am.

Q. You weren't concerned about the location of physical evidence at that point?

A. As I have already stated, ma'am.

Q. This is a separate incident, Officer. I'm asking you on the second approach were you concerned with preservation of

evidence?

A.   I was concerned about my safety, the safety of the other officers on scene, as well as anybody else getting hurt.

Q.   So the answer is no, you were not concerned about the preservation of evidence at the scene?

A.   My concern was for my safety, ma'am.

Q.   Officer, I'm going to ask you if you could answer that question yes or no.  Were you concerned?

          THE COURT:  You weren't focused on evidence gathering or preservation?

          THE WITNESS:  No.

Q.   It is fair to say that watching that video, law enforcement officers were stepping all over the scene, right?

A.   There were numerous other officers on scene other than myself, ma'am.

Q.   So it is fair to say that law enforcement officers were stepping all over the scene?

A.   There were officers all over the scene, ma'am.

Q.   Actually, you were the one that took notice of this piece of metal next to Mr. Ullah's body, right?

A.   I did, ma'am.

Q.   In fact, as we saw in the video, you pointed to it, right?

A.   Yes, I did.

Q.   You pointed to it because you knew it was important, right?

A.   I pointed to it to alert the other officers that were on

**A000233**

scene with me of a potential danger.

Q. From where you were, you could see that it was a piece of metal, right?

A. Yes, ma'am.

Q. That part of it was still intact, correct?

A. That is right.

Q. The other part appeared to have been fragmented?

A. It appeared to be exploded out.

Q. It was fragmented, right?

A. Yes, ma'am.

Q. Did you have any training in explosives?

A. Very, very brief from the police academy and my service in the United States Marine corps.

Q. You were in the police academy how many years ago?

A. I was in the police academy six months ago. I attended it from March of 2014 until August of 2014.

Q. When you say very briefly, brief training on explosives in the police department, can you describe in more detail how many hours.

A. Exact hours, ma'am, no. We received numerous days of training from the federal government on the subject matter.

Q. You also indicated that you saw screws strewn around the floor, right?

A. Yes.

Q. Near Mr. Ullah, is that right?

A000234

A. Yes, ma'am.

Q. You weren't in charge of evidence collection, right?

A. No, I was not.

Q. You were the first one to put a handcuff on Mr. Ullah, right?

A. Myself and Officer Collins.

Q. One on either side?

A. Yes, ma'am.

Q. At that point, once you handcuffed him, you started to roll him over?

A. That is correct, ma'am.

Q. Would it be fair to say that you were doing your best not to step on any of the items of debris that were on the floor, right?

A. Yes, ma'am.

Q. In that video that we saw --

        MS. GALLICCHIO:  Could we play and start at 1:30.

        THE COURT:  Which one?  24A?

        MS. GALLICCHIO:  24B.  Government Exhibit 1001-24B, 1:30.

        (Video shown)

        MS. GALLICCHIO:  If we could stop it right there.

Q. Taking a look at this video at 1:35, in the middle of the photograph there appears to be that metal piece of pipe that you observed, right?

**A000235**

A.  Yes, ma'am.

Q.  Mr. Ullah is to the right of that in this picture, right?

A.  Yes, he is.

Q.  You are in that group of officers who are standing over him handcuffing him and searching him?

A.  He's handcuffed at this point, ma'am, and he's beginning to move, and we are restraining him.

Q.  When you say he was moving, he was moving his legs at that point?

A.  He was moving his legs and his upper body.

Q.  You say at that point he was becoming more conscious, right?

A.  Yes.

Q.  In this photograph we can also see these are the National Guard personnel, right?  They are the ones in military type uniform, right?

A.  Yes, ma'am.

        MS. GALLICCHIO:  If we could play to 1:46.

        (Video shown)

        MS. GALLICCHIO:  Play it just a little bit longer.

        (Video shown)

        MS. GALLICCHIO:  Stop right there.

Q.  As you can see in this, there was a police officer, I think he is NYPD transit, is that right, steps on that metal fragment?

A000236

A. I believe that is Officer Drew Preston.

Q. Officer Drew Preston?

A. Yes, ma'am.

Q. He is with the Port Authority Police Department?

A. Yes, ma'am.

Q. So he is with your unit?

A. Yes, ma'am.

Q. We see in this photograph he actually stepped on that metal fragment, right?

A. It appears to me he stepped over it, ma'am.

MS. GALLICCHIO: Can we go back a few seconds and play it again.

Q. Take a good look.

A. Yes, ma'am.

(Video shown)

MS. GALLICCHIO: Stop right there.

Q. Did it appear to you that he stepped on it?

A. Yes, he did, ma'am.

MS. GALLICCHIO: Then if we can play a little bit further, to 1:54.

(Video shown)

Q. We can see in this at 1:54 it looks like one of the National Guard personnel is pointing towards that object, right?

A. Yes, ma'am.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000237**

MS. GALLICCHIO: Can we continue.

(Video shown)

MS. GALLICCHIO: Stop right there.

Q. You saw in that portion that another personnel, National Guard personnel, kicked that metal fragment to the wall, right?

A. Yes, he did.

MS. GALLICCHIO: You can take that down.

Q. I think you said when you first arrived you saw numerous NYPD officers at the other end of the station. When you say the other end, what do you mean by that?

A. That would be the southern end of the mezzanine level of the station, ma'am. I made entry from the north wing of the bus terminal over the turnstiles.

Q. You weren't referring to the passageway, other end, right?

A. No, I was not.

Q. You stayed at the location for about an hour, right?

A. Stayed on location for approximately an hour?

Q. Yes.

A. Approximately, ma'am.

Q. In fact, you left at about 8:30 and escorted Mr. Ullah to Bellevue Hospital, right?

A. Yes, I did.

Q. You recorded that in your police paperwork, right?

A. I recorded it in my memo log, yes, ma'am.

Q. You carry a memo book with you as part of your job?

A000238

A.   Of police duties, yes, ma'am.  We are required to carry a memo book.

Q.   And you are required to reflect certain information related to your responsibilities and duties on a particular day?

A.   Yes, ma'am.

Q.   One of those is the time of arrival and the time of departure from a particular area, right?

A.   Yes, ma'am.

Q.   And you did that?

A.   To the best of my knowledge, yes, ma'am.

Q.   When you were on the location before you left to take Mr. Ullah to the hospital, you were there when his clothing was cut off of him, right?

A.   No, I was not.

Q.   You were not.  You indicated that you actually did cut a part of his pocket, right?

A.   Yes, I did.

Q.   Did you observe his clothing being cut off of him?

A.   No, I did not.

Q.   Are you aware that his clothing was cut off of him and left at the location?

A.   I was being debriefed at the Port Authority subway station, ma'am, by numerous agencies that responded to the scene.  I did not observe further contact with the defendant after I left him.

**A000239**

Q. When you escorted Mr. Ullah to the hospital, you were not with him in an ambulance, right?

A. I was riding in the passenger seat with the paramedic to my left, and NYPD personnel were in the rear of the ambulance with the defendant.

Q. Was Mr. Ullah clothed?

A. I was unaware, ma'am.

Q. I'm sorry?

A. I was unaware at that time.

Q. So you didn't observe?

A. In the back of the ambulance, ma'am?

Q. Correct.

A. I saw him put in the back of an ambulance where he was wrapped in a blanket, which I believe was a procedure of NYPD EMS.

Q. You couldn't tell whether he was clothed or not?

A. Not at that time, no, ma'am.

Q. I believe at the time you said you were being debriefed by various agencies, right?

A. Yes, ma'am.

Q. That was at the Port Authority?

A. Yes, ma'am.

Q. It would be fair to say that there were many other law enforcement agencies that responded to that location, right?

A. Yes, there were.

A000240

Q. So in addition to all the police officers, all the officers that we saw in these two videos, there were dozens and dozens more that responded to the scene, right?

A. Yes, ma'am.

        MS. GALLICCHIO: Now if we could take a look at Government Exhibit 103, Mr. Fischer, 103-1.

Q. 103-1, Officer, is a photograph you identified earlier, right?

A. Yes, ma'am.

Q. You have already said you didn't take this picture?

A. No, I did not.

Q. You don't know who took this picture?

A. No, ma'am.

Q. You don't know when it was taken, right?

A. No, I don't, ma'am.

Q. You said the first time that you saw this photograph was in preparation for your testimony, right?

A. That is correct.

Q. Is this what the walkway looked like absent Mr. Ullah when he was lying on the ground in terms of everything else that's there?

A. After I left Mr. Ullah handcuffed, I did not return to that scene, ma'am.

Q. What does this depict, then, this photograph?

A. This depicts the subway passageway in the location where

**A000241**

the defendant was arrested and the debris that I observed lying on the floor there.

Q. So we see some items on the floor, right?

A. Debris, ma'am, yes.

Q. Right. It looks messy?

A. Yes, it does.

Q. Do you know if that's exactly the same debris that you saw when you were there?

A. I cannot recall, ma'am.

Q. Do you know if that debris is in the same location as the debris that you saw when you were there?

A. As you stated earlier, ma'am, and as I have stated, I was not paying attention to the debris on the on the ground. I was concentrated on the defendant.

Q. So the answer to that question is no?

A. No, ma'am.

Q. Did you actually go to Bellevue Hospital?

A. Yes, ma'am, I did.

Q. Mr. Ullah was in your custody, correct?

A. The defendant was being escorted by detectives from the NYPD as well as members of the New York City Police Department's emergency service unit.

Q. Are you considered the arresting officer?

A. Yes, I am.

Q. So you were responsible to go with him to the hospital?

**A000242**

A.   Yes, ma'am, I am.

Q.   And obviously you are responsible to fill out a lot of paperwork surrounding your arrest, right?

A.   Yes, I am.

Q.   And you did that?

A.   Yes, ma'am, I did.

          MS. GALLICCHIO:  I have no further questions.

          THE COURT:  Any redirect?

          MR. TURNER:  Briefly, your Honor.

          THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. TURNER:

Q.   Officer Gallagher, do you recall defense counsel asking you questions about the pipe and shrapnel that you observed on the ground in the tunnel?

A.   Yes, sir, I do.

Q.   When you responded to that tunnel, did you walk through that general area?

A.   Yes, sir, I had to.

Q.   Why did you do that.

A.   In order to effect an arrest, sir.

Q.   What was your job in that tunnel?

A.   My job was to protect the other officers on scene, myself, and the public.

Q.   Was your primary focus on those items on the ground around

**A000243**

the defendant?

A.  No, sir, it was not.

Q.  What was your focus.

A.  My safety, the safety of the other officers on scene, and the public.

MR. TURNER:  Nothing further, your Honor.

THE COURT:  Anything else?

MS. GALLICCHIO:  No, your Honor.

THE COURT:  You can step down, Officer.  Thank you.

(Witness excused)

THE COURT:  The government can call its next witness.

MS. CROWLEY:  Your Honor, the government calls Stephen Fullington.

STEPHEN FULLINGTON,

     called as a witness by the government,

     having been duly sworn, testified as follows:

THE COURT:  State your name and spell your name first and last for the record.

THE WITNESS:  Stephen Fullington, S-T-E-P-H-E-N, F-U-L-L-I-N-G-T-O-N.

THE COURT:  Mr. Fullington, keep your voice nice and loud.

You may proceed, Ms. Crowley.

MS. CROWLEY:  Thank you, your Honor.

DIRECT EXAMINATION

A000244

BY MS. CROWLEY:

Q.  Good afternoon, sir.  Where do you work?

A.  I work for the FBI.

Q.  The FBI?

A.  Yes.

Q.  What is your current title.

A.  Supervisory special agent.

Q.  How long have you worked at the FBI?

A.  A little over 16 years.

Q.  Are you assigned to a particular squad or unit?

A.  Yes.  I'm assigned to a cybersquad.

Q.  You said that you are a supervisory special agent, correct?

A.  Yes.

Q.  When did you become a supervisor?

A.  About a year ago, a little less than a year ago.

Q.  Before that, what was your title?

A.  Special agent.

Q.  Before you became a supervisor, what, if any, collateral responsibilities did you have at the FBI?

A.  I was a team leader on our evidence response team.

Q.  Is the evidence response team sometimes called ERT?

A.  Yes, it is.

Q.  Can you explain what that is.

A.  Each field office has an evidence response team, or ERT team.  It is the team dedicated to collection of evidence at

A000245

crime scene scenes or search sites for those respective FBI offices.

Q. How long were you involved with the evidence response team?

A. About ten years.

Q. What, if any, trainings did you receive as a member of the ERT?

A. After my initial training at the FBI academy when I was appointed as a new agent, I went through several trainings as part of ERT. Specifically, initially, when I first joined the ERT team, we did a three-day basic evidence collection case in New York. That was followed up by a two-week in-depth evidence collection course. And I have taken several more specific training courses after that.

Q. Can you describe what some of those more specific training courses were.

A. Sure. I've taken training courses in things like post-blast evidence collection, large vehicle post-blast evidence collection, bomb scheme management, and other specific trainings.

Q. What is post-blast?

A. Simply put, it is how to go about collecting evidence after an explosion.

Q. Generally speaking, what are some of the subjects or things that are covered in post-blast specific training?

A. The training basically deals with what do you do when the

A000246

bomb goes off. The bomb goes off and there are parts spread pretty far from the blast site. We talk about how do you identify those items, how do you go about searching for them, how do you set up a crime scene, and how do you collect those items.

Q. What, if anything, is unique about collecting evidence at a post-blast crime scene compared to other types of crime scenes?

A. If you think about a general crime scene, you might respond to a house, for example, and search the rooms in that house for a piece of evidence. A bomb scene is different in that when a bomb goes off, evidence is spread generally over a large area. Evidence oftentimes is very small. So the bomb goes off and it blasts it into little pieces. We have to be able to find those pieces in an area that can be far away from the blast site. In addition, we might use certain techniques at a blast site that we would not use at other sites, things like explosive evidence swapping.

Q. Have you participated in evidence recovery operations outside of the United States?

A. Yes, I have.

Q. Can you describe some of them.

A. Two examples are in 2010 I deployed with an ERT team to Uganda after a suicide attack at the airing of a World Cup football match. There were several sites where suicide bombers blew them up and they killed 68 people. In 2016 I responded to

**A000247**

a terrorist attack at a mall in Nairobi Kenya.  Terrorists attacked the mall with long guns and grenades and killed a lot of people there as well.

Q.  Have you participated in post-blast recovery operations in the United States?

A.  Yes, I have.

Q.  Could you describe some of those.

A.  Sure.  I responded as part of the FBI's evidence response team to the scene of the bombing during the Boston marathon and as part of the ERT team to the bombing in the Chelsea neighborhood here in Manhattan.

Q.  I'd like to direct your attention to December 11, 2017. Did you do any work for the FBI that day?

A.  Yes, I did.

Q.  Where did you begin your day?

A.  I began my day for the FBI at the Port Authority Bus Terminal in Manhattan.

Q.  Why did you go to the Port Authority Bus Terminal?

A.  On my commute in to work, I received notification in my capacity as a New York team member that there was a possible bombing at or under the Port Authority Bus Terminal and was directed to respond there.

Q.  Approximately what time did you arrive at the Port Authority Bus Terminal?

A.  About 9:00 a.m.

**A000248**

Q.   Where did you go when you arrived?

A.   I think I arrived around Eighth Avenue and proceeded into the subway entrance on Eighth Avenue, down into the lower level beneath the bus terminal to an FBI ERT command post that had been set up just short of the tunnel there.

Q.   What is an ERT command post?

A.   It is simply an area we would set up to manage the scene, where we would have our personnel gather, where we would have our supply, where we would do our paperwork other than administrative action as relates to a search site.

Q.   Could you describe what you saw on the scene when you arrived.

A.   Sure.  I remember seeing what appeared to be a bombing site.  That is to say, there appeared to be clothes strewn about.  There appeared to be maybe wiring and other debris that seemed consistent with the bombing.

        MS. CROWLEY:  Mr. DeLuca, if you could publish for the witness and the Court what has been marked for identification as Government Exhibit 102-26.

Q.   Agent Fullington, do you recognize the scene depicted in this photograph?

A.   Yes, I do.

Q.   What is it?

A.   That is the tunnel that I responded to that morning.

Q.   Does this photograph accurately depict the Port Authority

**A000249**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page95 of 284

tunnel when you arrived on December 11, 2017?

A.   Yes, it does.

MS. CROWLEY:   Your Honor, the government offers Government Exhibit 102-26.

THE COURT:   Any objection?

MS. GATTO:   No.

THE COURT:   Government Exhibit 102-26 is received.

(Government's Exhibit 102-26 received in evidence)

Are you showing it to the jury?

MS. CROWLEY:   Yes, your Honor, we would like to publish it to the jury.

THE COURT:   Do that.

MS. CROWLEY:   May I approach?

THE COURT:   Yes.

Q.   What are the orange cones in this photograph?

A.   Those orange cones are put down to note an important piece of evidence.  Generally speaking before the full evidence collection is done, there will be at least a couple of times where people go down and do a preliminary survey of the site. For example, our bomb technicians would go down and would make sure that there is nothing that is a danger to anyone who might be on the scene.  We would put cones down on relevant pieces of evidence mostly so that they are not missed upon additional evidence processing.

(Continued on next page)

A000250

BY MS. CROWLEY:

Q.   You mentioned bomb technician.

A.   Yes.

Q.   What's a bomb technician?

A.   So a bomb technician is -- they were both, are both FBI and local law enforcement on this case, so NYPD bomb technicians, and they are agents, are detectives who are trained in handling explosive devices, and part of what they do is ensure that at scenes we go to, evidence collection technicians go to, that the scenes are safe for us to go -- to go down.

THE COURT:  Now you said you put the orange cones on the piece of evidence?

THE WITNESS:  Generally speaking, no.  Generally speaking, they would be put next to them, on the side of them. In some cases they could be put on them.  Let's say, for example, they were outside, we're concerned that they could blow away, we might put something on the evidence, but in a scene like this, it would be put next to them.

THE COURT:  All right.

BY MS. CROWLEY:

Q.   Did you participate in evidence collection at this scene?

A.   Yes, I did.

Q.   What did you do?

A.   I was responsible for what we call doing explosive residue swabbing.

**A000251**

Q.   What is swabbing?

A.   So in general terms, if you think about when a bomb goes off and there's a blast and the debris comes off the bomb, in addition to the like hard pieces of the bomb, the chemicals that the bomb are made of will also come off the bomb and it would be left behind, so we will swab areas near the blast site to collect the residue of that, of those chemicals so they could ultimately be tested by our laboratory to try to determine what the bomb was made of.

Q.   Could you describe the procedures that you follow in the collection of swabs.

A.   Sure.  The procedure we follow is two agents generally -- and which was the case in this situation -- will put on protective suits.  It's sort of like you see on TV, the big white suits that you put on.  They cover your feet and your head, and you put on gloves.  And now we're prepared to go down to the site.

The first thing we'll do is what's called a control swab, or swabs, and that is done to make sure that the swabs that we take are not contaminated.  So what we do is we essentially take cotton balls, sterilized cotton balls, and we take one out and we put it in the bag.  So that cotton ball is basically untouched, and it would be tested by our lab to say there's no problem with the cotton ball.

Then we take another one and we swab the person, the

**A000252**

agent who's doing the -- going to do the swab at the scene, so we swab them to make sure that there's no contamination on me, the person doing the swabs.

Then we go down into the scene and begin the actual swabbing. That process is basically the other agent, who's sort of the administrative agent, will pull out a vial with a swab in it. That vial will be handed to me, I will open it up, and with the tweezers, I will pull the swab out, again, sterilized swab, and we will select areas that seem most likely to have absorbed these chemicals that we'll wipe down with the cotton ball.

Once that's done, I put it back in the vial, I seal the vial, and the other agent makes notes about where the swab was taken from, and who collected it, and other administrative items.

Q. Are those the procedures that you followed in this swabbing process on December 11th in the Port Authority bus terminal?

A. Yes.

Q. And were you doing the swabbing alone or with someone else?

A. No. As I mentioned, I had another agent assisting. Special Agent Stephanie Krug.

Q. And what was your role?

A. I was the swabber, so I was the person who was on the scene wiping the areas that we identified as likely possible to have received some of these chemicals.

**A000253**

THE COURT:  What was the other agent's name?

THE WITNESS:  Stephanie Krug, K-R-U-G.

THE COURT:  K-R-U-G?

THE WITNESS:  Yeah.

THE COURT:  Thank you.

BY MS. CROWLEY:

Q.  After you take a swab, where is it stored?

A.  So like I said, we have the tweezer, I swab the area, I put it into the glass vial, I will seal the glass vial, hand it to the other agent.  When we're done with our swabs, they will be packaged according to our normal ERT packaging protocols.  They will then be put into our FBI evidence control process, and then from there, ultimately, they would be transferred to the FBI laboratory in Quantico, Virginia for testing.

MS. CROWLEY:  And may I approach, your Honor.

THE COURT:  Yes, you may.

Q.  Agent Fullington, I'm handing you what's been marked for identification as Government Exhibit 110.  Do you recognize this exhibit?

A.  Yes, I do.

Q.  What is it?

A.  These are the swabs that I took that day.

THE COURT:  When you say swabs, how many items are there?

THE WITNESS:  There are five glass vials with five

**A000254**

cotton balls inside.

Q.   And how do you recognize them?

A.   I recognize them from my handwriting and my initials on the packaging, and from looking at them, they -- they look similar to the ones I collected that day.

Q.   Are the vials in substantially the same condition as they were when you collected the swabs back on December 11, 2017?

A.   Yes, they are.

          MS. CROWLEY:  The government offers Government Exhibit 110.

          MS. GATTO:  We have no objection.

          THE COURT:  Okay.  110, which is actually five separate glass vials, are they distinguishable or are they all the same?  How can you tell what's what?

          THE WITNESS:  They're distinguishable by individual item number that is placed on the glass.

          THE COURT:  All right.  So each has a separate number.

          THE WITNESS:  Yes.

          THE COURT:  All right.  So 110 is received.  Go ahead.

          (Government's Exhibit 110 received in evidence)

BY MS. CROWLEY:

Q.   If you could just arrange the vials on the witness stand so the jury can see them.  Thank you.

          Now you mentioned that the vials have numbers on them.  What are the numbers?

**A000255**

A.  So they have two sets of numbers on them.  The first set is the number that we gave them that day at the scene, and those are Nos. 3, 4, 5, 6, and 7.

Q.  And what's the other set of numbers?

A.  The other set is, when the FBI laboratory received them, they gave them their own set of numbers.  The FBI laboratory numbers are 41, 42, 43, and 44.

MS. CROWLEY:  If we could please publish for the witness and the Court Government Exhibit 102-25.

Q.  Do you recognize what's depicted in this photograph?

A.  Yes, I do.

Q.  What is it?

A.  It's the same scene we were looking at before but it's zoomed in a little bit more.  You can kind of see what looks like a blue and white shirt in the center of the frame.

Q.  And does this accurately depict the scene when you were involved in evidence collection on December 11, 2017?

A.  Yes, it does.

MS. CROWLEY:  Government offers Government Exhibit 102-25.

MS. GATTO:  No objection.

THE COURT:  All right.  102-25 is received.

(Government's Exhibit 102-25 received in evidence)

MS. CROWLEY:  Could we publish it to the jury.

THE COURT:  You may.

A000256

Okay. Everybody's got it on their screen? Let me know if you don't.

Go ahead.

BY MS. CROWLEY:

Q. Agent Fullington, do you see on Government Exhibit 102-25 where you collected the swabs on December 11th?

A. Not all of them, but generally, yes.

Q. Okay. Let's start with the swabs numbered 3 and 5.

A. Okay.

Q. Do you see where you collected the swabs numbered 3 and 5 in this photograph?

A. Yes, I do.

Q. Could you please describe where you collected those swabs.

A. Sure. So in the center of the frame, I referenced the blue and white shirt. Swab 3 was collected to the right of -- right side of the blue and white shirt, what we described as the south side of it, on the ground.

Swab 5 was collected to the left side, or the north side, of the shirt on the ground.

Q. And what factors did you consider in your determination to collect the swabs from those two locations?

A. The same factors we consider when we do any explosive swabbing, really, which is two things. One is, where did the blast go off. So we want to be as close to the blast site as possible, because that is the area where there's most likely to

**A000257**

be chemicals left behind. Then secondly is the objects around it. So what objects would have taken those chemicals, absorbed them. So we look for basically close to the site and some object that would collect these chemicals.

Q. And how did you determine that this was close to the blast site?

A. So in consultation with the bomb techs I referenced before, we discussed where it was likely that the -- that the blast had gone off, and they identified this general area as a site.

Q. Let's turn now to the vials marked 4, 6, and 7.

A. 4, 6, and 7.

Q. What are the FBI lab numbers on these vials?

A. On item 4, it is No. 41; item 6, it is 43; and on item 7, it is 44.

MS. CROWLEY: If we could please publish what's in evidence as Government Exhibit 102-26.

Q. Do you see in this photograph where you collected those three swabs?

A. Yes, I do.

Q. Could you please describe where you collected them.

A. So item 4, swab 4, was collected on the wall on the very right side of the screen, so the south wall between two of the iPhone X ads.

Item 6 was collected on the opposite wall, so on the left side of the screen just past the caricature of the man

**A000258**

with the hat.

And the final item, item 7, was collected from one of the beams above what would go through the blast site, directly above it.

Q. Why did you swab those three locations?

A. Those were the sort of next logical areas that I described before where the blast would have went off, and you can kind of visualize the chemicals going out and potentially hitting those areas.

MS. CROWLEY: You can take that down, Mr. DeLuca.

Q. Approximately how long did the swabbing process take?

A. About 20 minutes.

Q. And what was the next step in the evidence collection process after the swabbing?

A. So after they're swabbed, I think I'd referenced before, we then seal the vials, we put evidence tape on them, we document where we collected them from, they get put -- again, packaged in this brown paper that I have here, sealed again, and then they go into our evidence control process and ultimately to the FBI lab in Quantico.

Q. And what was the next step of the scene evidence collection process after you completed the swabbing?

A. So after I completed the swabbing, I was -- I left the scene. I can tell you what the next step would have been, but I had left.

**A000259**

Q.  And where did you go after you left?

A.  After I left, I went to an additional scene at 601 Eighth Avenue.

Q.  Why did you go there?

A.  So we received information that there was another site to be searched, as a work site of the suspect involved.  It was about two or three blocks south of where we were located, around 39th Street.

Q.  And what type of building was located at 601 Eighth Avenue?

A.  It was a two-story commercial building with like some restaurants on the first floor, maybe some retail on the second floor.

Q.  And did you participate in a search at that building?

A.  Yes, I did.

Q.  And where was the search conducted?

A.  So it was what looked like or appeared to be a Pret sandwich shop that was under construction so it wasn't open yet, but inside there was a search, and specifically, there was a metal box inside that we were -- that we ultimately received a search warrant to -- to search.

Q.  What was your role in the search?

A.  My role was team leader.

Q.  What does that mean?

A.  That means basically I over -- oversee the search for the evidence response team, which means that I assign personnel to

**A000260**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page106 of 284

various assignments, I make any decisions that need to be made, and assure the overall operation is a success.

Q. And what within the Pret sandwich shop was searched?

A. So it was a metal construction box.

Q. And who conducted the search of the box?

A. Most of the search was done by two agents who were under me at the time -- Special Agents Andrew Bennett and Megan Kirkland.

Q. Did you observe the search?

A. Yes, I did.

Q. What types of items were located?

A. Items of a construction/electrical nature, things like nails, things like wiring, tools, cutting tools, things of that -- that sort.

Q. Agent Fullington, apart from the two searches that we've just discussed, did you have any further involvement in this investigation?

A. No, I did not.

MS. CROWLEY:  Nothing further.

THE COURT:  All right.

MS. GATTO:  Your Honor, would it make sense to break?

THE COURT:  Yes.  How long do you think you'll be?

MS. GATTO:  Maybe 10, 15 minutes, your Honor.

THE COURT:  All right.  We'll usually take a short afternoon break.  It will vary depending on what the logical

A000261

breaking point is.  This is probably a logical point, sort of right before the cross.

So there should be snacks, cookies, whatever back there for you.  If there's other stuff you'd like, let us know. Mr. Brody is a terrific baker, so maybe he'll make something tonight.

Don't discuss the case.  Keep an open mind.  But stretch a bit.  We'll pick up in about 10 or 15 minutes, okay?

So all rise for the jury.

(Continued on next page)

**A000262**

113

(Jury not present)

THE COURT: All right. Have a seat.

So Mr. Ullah, the Marshals will take you to the back, and then if anybody else needs to slip away, you can. I don't have a computer back there so I'm going to just do a little work, okay?

You can step down if you'd like. Otherwise you can sit, whatever you prefer.

THE WITNESS: Okay.

(Recess)

(In open court; jury not present)

THE COURT: Okay. Are we all set? How long does he need?

MS. GATTO: I think he's done. I know the Marshals will find out, but I think he's ready.

THE COURT: Okay. Great.

Until he's out, we're not going to bring in the jury, so you can sit until we knock with the jury.

Okay. Thanks.

(Continued on next page)

A000263

114

(Jury present)

THE COURT: Okay. So have a seat. Thanks.

So let us know if there's anything you'd like that you're not seeing or you're seeing too much of. Sometimes they send all one kind of soda and everybody wants the diet and they don't send enough.

THE JURORS: More coffee.

THE COURT: Okay. There wasn't enough? You're a coffee-drinking crowd. But it's getting cold. That makes sense. So anyway, you let Mr. Brody know and we'll convey it.

I just wanted to, before we get started, just make sure that we were okay for this afternoon, for Mr. Kyeremeh. I'm having trouble with your name. Mr. Kyeremeh, am I saying that right?

JUROR: Excuse me?

THE COURT: How are you tonight with your pickup of the kids?

JUROR: I do have someone that will pick them up.

THE COURT: You're sure? It's okay if we go to 5:30? If we end at 5:15, is that better?

JUROR: That's better. It will cost me a little more, but --

THE COURT: Okay. 5:15 will be all right?

JUROR: Yes.

THE COURT: You're sure?

A000264

JUROR: Yes.

THE COURT: All right. We'll do that.

All right. So let's now begin the cross-examination of the FBI Special Agent, Mr. -- I'm having a senior moment.

THE WITNESS: Fullington.

THE COURT: -- Mr. Fullington, by Ms. Gatto. Thank you.

MS. GATTO: Thank you, your Honor.

CROSS-EXAMINATION

BY MS. GATTO:

Q. Good afternoon, Agent Fullington.

A. Good afternoon.

Q. Agent Fullington, when you arrive on the scene at the Port Authority, you're there to collect evidence, correct?

A. Yes.

Q. You're part of the evidence collection unit --

A. Yes.

Q. -- do I have that right? So before you have come, first responders are the first on the scene, right?

A. Yes.

Q. Those were the ones who are responsible for making the arrest, correct?

A. Yes.

Q. And before you've arrived also there have been some units that have passed through to secure it, is that right?

**A000265**

A.  Yes.

Q.  Those would include bomb-sniffing dogs, things like that, is that correct?

A.  I'm not sure if there were dogs there, but certainly bomb technicians and --

Q.  Any other steps before the evidence collection unit gets there?

A.  I guess in general terms, after the bomb goes off, I would -- I would think that paramedics probably arrive, other units.  I don't know, police department, fire department, Port Authority.  Once all of the, like, initial triage is done, that is to say that danger to life is removed and people who are injured are removed, then a barrier would be set up and -- before the evidence collection begins.

Q.  And in this case you know that EMT was at the scene, correct?

A.  I did not know specifically, but I'm not surprised to hear that.

Q.  And you testified that when you got to the scene, you observed various debris, including clothes.  Do you recall that?

A.  Yes.

Q.  And you know in this case that those clothes had been cut off by the EMT?

A.  Yeah, I knew they were cut off.

A000266

117

Q. You knew they were cut off. You don't know by whom, is that what you're saying?

A. Right.

Q. When you get to the scene, before you do the swabbing that you testified about, you do a walk-through?

A. Yes.

Q. You do that with other evidence collection people?

A. Generally, yes.

Q. No, I'm talking specifically in this case.

A. Yes.

Q. You did a walk-through.

A. Yes.

Q. And the purpose of the walk-through is just to kind of mentally assess the scene, is that fair?

A. Yeah, and to look for any safety concerns or any evidence that might be transitory in nature that needs to be collected immediately.

Q. Oh, so something that's going to disintegrate or something like that.

A. Exactly, yeah.

Q. But other than that, are you also taking note of where debris or matter that has evidentiary value, where it is throughout the scene?

A. Yes, that's right.

Q. Okay. But at that point when you're doing this

A000267

Case 21-1058, Document 40, 10/04/2021, 3186339, Page113 of 284

walk-through, you're not putting those orange cones that we saw?

A.  No, I certainly did not.

Q.  And when you got to the scene, were those orange cones there?

A.  Yes.

Q.  Okay.  And those had been put on, put up by bomb tech people?

A.  I believe they were put up by bomb tech people, but again, it was before I was there.

Q.  And so the orange cones were to indicate matters of evidentiary value or matters that could be potentially dangerous; do you know?

A.  Generally evidence, items of evidence.  If they were of danger, they would be removed or addressed in one way or another.

Q.  But there's another separate process of identifying the matters on the floor that have evidentiary value, am I right?  They put up numbers, is that right?

A.  Yes.  In general terms, yes.  What happens is -- and maybe this will help clarify a little bit -- when a walk-through is done, whether it's bomb techs or other FBI personnel, initially if there are items that are evidence, we want them to be flagged, right, so that they're not missed.  Then the swabbing would be done, if that was to be done, and then we might put up

A000268

a grid and then we might do a full search, and that full search would usually mean, in a scene like this, a line search, where you line everyone up from wall to wall and you walk from one end to the other and you put down flags for each evidence that you found, and in some cases those are numbers, right, the little yellow flags of numbers, but it doesn't have to be. Because sometimes you may not have that. Sometimes it's letters, sometimes it's cones. It could be a variety of things. But generally it's just a way to mark evidence that we see so that we don't miss them when we collect them, which is the next stage.

Q. And it's important to mark them so you can collect them, correct?

A. Exactly.

Q. But also to note exactly where they are on the scene, correct?

A. Yeah, to note where they are.

Q. Because especially for a postblast evidence collection, the location of the matter can matter, correct?

A. It depends on the item. What I would say to that is, the -- like general area is important, but like, if you're talking about like measuring items to a millimeter or to a centimeter to an inch, it may not matter as much, which is why we do like quadrants and grids in postblast scenes as opposed to like measuring to the exact point.

A000269

Q. In an ideal situation, the evidence collection team would get there shortly after the blast, correct?

A. Yes.

Q. And they would get there before other officers have been through the scene, in an ideal situation.

A. I don't know that I would agree because it's -- that's impossible, because the bomb goes off, right, and there's no way for the FBI evidence collection people to be there before other people are there, and the reason I disagree with calling it ideal is like I want people, victims pulled out of there and I want to make sure the scene is safe for my people before they go down to the scene.

Q. So for all law enforcement who are involved in a postblast scene, safety is the number one concern, correct?

A. Yes.

Q. And then other concerns include preservation of the scene, correct?

A. Yes.

Q. And to keep evidence where it was, to the extent possible, before law enforcement got there, correct?

A. Yes, absolutely.

Q. And so that's why I understand your quibble with ideal, but if one goal is to preserve the scene, you would agree with me that it would be best for evidence collection to get there as soon as possible, correct?

A000270

A.   Yes.

Q.   And if the goal is to preserve the scene, it would be best if evidence collection got there before other officers have been back and forth through the scene, correct?

A.   Yes.  So the sooner that evidence collection can begin, the better, just purely in terms of those items of evidence being collected.

Q.   And the same goes for taking photographs of the evidence, correct?

A.   I'm not sure what you're asking.

Q.   When photographs are taken, the purpose is to preserve, make a record of exactly where that evidence was located, correct?

A.   Yes, and to be able to demonstrate the scene after the fact.

Q.   Right.  And so if the goal is to preserve the scene, is to record it, you would agree that it's best if the photographs are taken before they have been moved by other officers, correct?

A.   Yes.  The -- the sooner we can do any and all of this, the better, for sure.

Q.   Okay.  And you were not involved in the taking of the photographs of the scene for this particular incident, correct?

A.   No, I was not.

Q.   Have you been involved in the photographs, taking of

photographs in other scenes?

A.  Yes, I have.

Q.  Okay.  And here the NYPD took charge of this photographing, do I have that right?

A.  I think that's right.

Q.  CSU, is that an NYPD unit?

A.  Crime scene unit, yes.

Q.  And Officer Cutrone, is that a name that you know, took the photographs?

A.  No, it's not.

Q.  You testified about another search you conducted at the Pret a Manger.  Do you recall that testimony?

A.  Yes.

Q.  You were the team leader for that search, correct?

A.  Yes.

Q.  When you got there, the scene had been sealed by FBI agents, correct?

A.  Yes.

Q.  And what I mean by that -- and just correct me if I'm wrong -- is that no one was allowed into the scene or out of the scene until the evidence collection unit got there, correct?

A.  Well, no one that didn't belong there.

Q.  Yes, that's what I mean, law enforcement.  Correct?  Other than law enforcement?

**A000272**

A.   Yeah, and I think when I got there, there was a number of press or the construction company's management there as well, but aside from that, yes.

Q.   And all law enforcement who get there after the scene is sealed, they have to sign in to a sign-in sheet; do I have that right?

A.   Yes.

Q.   And the goal is to preserve the site, not to interfere with it, correct?

A.   Well, the point of the sign-in sheet is just to really document who's there.

Q.   Okay.  And also to make sure that the scene is preserved, right?

A.   That's not really the goal of the sign-in sheet.  The sign-in sheet is so that after the fact we can say, okay, who has been here, who might testify in this case, who might have information that is of value to the court, and that's really the point of the sign-in sheet.

Q.   There were searches conducted inside that location, correct?

A.   Which, the Pret?

Q.   Yes.

A.   Yes.

Q.   You got a warrant for at least some of the search --

A.   Yes.

**A000273**

Q. -- is that right?  And no one was allowed to search until you got authorization, until you heard that a warrant had been executed, correct?

A. I'm not sure.  The only reason I give that qualification is, I don't know what happened, what the other FBI agents did before I got there, right?  What I can say for sure is the item that we had the search warrant for, which was the metal box, was not searched before we got there.  I don't know that consent wasn't given for other areas within the Pret that was under the control of the management.

Q. And before you search it, there are initial photographs taken of any item searched, before they're searched, correct?

A. Yes.

Q. And that's to make sure that you have a record of exactly how they looked before they're opened, correct?

A. Yes.

Q. And then as they're opened, photographs are taken again, correct?

A. Yes.

Q. And then there are exit photos too that show exactly how the scene looked.

A. That's correct.

Q. And the goal is to preserve exactly how the scene looked before law enforcement got there, is that right?

A. Yeah.  There's a lot of reasons.  It's not just that,

A000274

although that is part of it. Part of it is just to document, for liability purposes, what it looked like so that someone after the fact can't say, oh, I had a million dollars in that box and the FBI owes me that. It's our way of saying, here's what it looked like beforehand.

Q. The one goal is to make sure that the FBI doesn't get sued for damage, is that --

A. Yes.

Q. But the other goal, you'd agree, is to make sure that evidence is preserved for whether it's a court case or prosecution?

A. Yes.

Q. And so that's part of also the sealing of the site, correct?

A. Yes.

Q. Okay. Very good.

Going back to the Port Authority, after you conducted your walk-through, then you did your swabbing; do I have that right?

A. Yes.

Q. And the swabbing happens before the photographs; do I have that right?

A. I think so. I wouldn't be surprised. I don't recall exactly, but some of the photographs may have been going on while we were swabbing.

A000275

Case 21-1058, Document 40, 10/04/2021, 3186339, Page121 of 284

Q. Okay. And you described a two-person team; do I have that right?

A. Doing the swabbing, yes.

Q. Yes. One person does the swab and the other one is taking notes, is that right?

A. Basically, yes.

Q. And it's important for the notetaker to keep track of where the swabs are coming from, is that right?

A. Yes.

Q. And what you're looking for is explosive residue; is that the purpose of the swab?

A. Yes.

Q. And then you're going to swab it -- you don't know when you swab it whether or not you get the residue, is that right?

A. That is correct.

Q. Because the residue could be so fine that you don't see it with the naked eye, is that right?

A. Yes, that's correct.

Q. And then that residue is going to be sent off to the lab, is that right?

A. Yes.

Q. And the lab is going to test it to see if it's positive or negative for the explosive residue; do I have that right?

A. Yes.

Q. Are they looking for anything else that you know of at the

A000276

lab?

MS. CROWLEY:  Objection, your Honor.

THE COURT:  Are they looking?

MS. GATTO:  Are the lab people to whom the swabs are sent.

A.  The best answer is, I don't know.

Q.  Okay.  But your purpose is to obtain explosive residue.

A.  Yes.

Q.  And so the locations that you pick to actually swab are based on what you believe to be a location where explosive residue will be located.

A.  Or likely to be, yes.

Q.  And you base that decision on your experience at other blast sites, correct?

A.  Yes.

Q.  You testified you've been a FBI agent for a decade and a half; do I have that right?

A.  Little bit more, yes.

Q.  You testified you've been at several very high-profile postblast scenes, correct?

A.  Yes.

Q.  So based on that experience, you choose the location to swab, yes?

A.  Yes.

Q.  And based on your experience, you believe, right, that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000277**

places closest to the center of the blast will be the place

that you're most likely to get residue, correct?

A. Yes. That's fair.

Q. And you took how many swabs in this case?

A. So we did two control swabs and then five swabs where we were attempting to collect residue.

Q. So the five swabs were all taken in locations where you believed residue would be, correct?

A. Could be, yes.

Q. Based on your experience, correct?

A. Yes.

Q. And based on the scene as you saw it, correct?

A. Yes.

MS. GATTO: I have no further questions. Thank you.

THE COURT: Okay. Any redirect?

MS. CROWLEY: Just very briefly, your Honor.

THE COURT: Sure.

MS. CROWLEY: May I inquire.

THE COURT: Yes.

REDIRECT EXAMINATION

BY MS. CROWLEY:

Q. Special Agent Fullington, you were asked about the walk-through that you performed when you arrived at the scene. Do you recall that?

A. Yes.

**A000278**

MS. CROWLEY:  Mr. DeLuca, if we could please publish Government Exhibit 102-26.

Q.  And can you remind us what we're looking at in this photograph.

A.  Yes.  That is the scene that I saw when we arrived.

Q.  When you first arrived?

A.  Yes.

Q.  And the cones were down when you first arrived?

A.  Yeah, I believe so, yes.

Q.  And when you performed this walk-through, did you move or touch any of the items on the scene?

A.  No.

Q.  And after you did the walk-through, you performed the swabbing, right?

A.  Yes.

Q.  And when you performed the swabbing, did you move any of the items that were on the scene?

A.  No, I did not.

Q.  Why not?

A.  Because that was not what I was there to do.  I was there to swab the area, and the items would be photographed and collected at a later time by other members of the ERT team.

MS. CROWLEY:  Thank you.  You can take that down, Mr. DeLuca.

Q.  You were also asked questions about -- I believe Ms. Gatto

**A000279**

called it the preservation of items on the scene. Do you recall those questions?

A. Yes, I do.

Q. And the location of certain pieces of evidence?

A. Yes.

Q. I think she asked you about the ideal situation when people arrive at the scene and process the scene. Do you recall those questions?

A. Yes, I do.

Q. Now you testified that you have been involved in postblast evidence collection in a variety of postblast scenes, right?

A. Yes.

Q. And you said Uganda, Chelsea, the Chelsea bombing?

A. Yes.

Q. And the Boston Marathon bombing?

A. Yes.

Q. And in those three evidence response operations, as far as you know, did first responders arrive at the scene?

A. Yes.

Q. And what about bomb technicians?

A. Yes.

Q. And EMT?

A. Yes.

Q. How, if at all, did the preservation or containment of evidence at those scenes compare to the containment of evidence

**A000280**

at the Port Authority bus terminal?

MS. GATTO: Objection.

THE COURT: If you can answer.

A. In my opinion, this scene was preserved better than any of those scenes, based on where it was located. I found it to be very well protected with -- and mostly it was because where it was located, right? There was one entry and exit point at the end of either tunnel, both two ends were sealed off. That's it.

With those other scenes there were large areas, multiple points of entry and exit that were difficult to secure. I found this scene to be very well protected.

MS. CROWLEY: Thank you. Nothing further.

THE COURT: Okay. Anything, Ms. Gatto?

MS. GATTO: Very briefly.

THE COURT: Sure.

RECROSS EXAMINATION

BY MS. GATTO:

Q. In some of the other scenes that you've worked, there has been debris flung very far, correct?

A. Yes.

Q. Miles, is that fair?

A. No, I don't know. I'd say hundreds and hundreds of yards.

Q. Hundreds and hundreds of yards? So how much? Are we talking 900 yards?

**A000281**

A.   It's hard for me to say without looking at it.  But if you want me to give you a number, let's say 3 or 400 yards.

Q.   3 or 400 yards.

A.   Yes.

Q.   You would agree with me in those scenes it would be less likely that the first responders are 300 yards from the blast center, correct?

A.   Well, so a lot of that debris that I've seen would be like ball bearings, right, and for example, one of those scenes, a ball bearing hit a guy who was far away, into his lung --

Q.   How far away?

A.   -- he later died.

I don't know.

Q.   But my question -- I don't mean to --

A.   We would respond to --

THE COURT:  Let's clarify the question first.

Q.   My question is this:  In a scene where the debris has been scattered much farther away than this scene, you would agree with me that it's less likely that first responders would have contaminated that evidence, correct?

A.   I'm not sure --

Q.   So in a scene -- the first responders typically go to the blast center, correct?

A.   It depends, right?  So they would go to where the injured people are first.

A000282

Q.   And typically, the most damage is at the blast center, correct?

A.   Yes, yes.

Q.   And so typically first responders go to the blast center, correct?

A.   Initially, yes.

Q.   And so the farther out from the blast center that the debris is, the less likely it is that first responders will have been there to contaminate that evidence, yes or no?

A.   Well, I sort of disagree with saying that they contaminate the evidence.

Q.   Okay.  You know what?  Fair enough.  Let me rephrase it.  That's fair enough.

       First responders will typically go to the blast center, correct?

A.   Yes.

Q.   Okay.  And in some sites, the debris will spread out much farther than the blast center, correct?

A.   Yes.

Q.   So almost 300 yards, correct?

A.   Yes.

          MS. GATTO:  No further questions.  Thank you.

          THE WITNESS:  Okay.

          THE COURT:  Okay.  Anything else?

          MS. CROWLEY:  No, your Honor.

**A000283**

THE COURT:  Okay.  You can step down, Agent Fullington.  Thank you.

(Witness excused)

THE COURT:  Government's next witness.

MS. DONALESKI:  The government calls Douglas Vetrano.

Judge, if I may, I'll just wheel this cart up to the witness stand.

THE COURT:  Yes, that's fine.  You don't need to ask if you can approach.  Nobody needs to do that.  Some judges are very formal and so lawyers say, "Can I approach," and if they don't, the judge gets mad.  I don't get mad at that.  I don't like lawyers asking questions over here, but if they need to approach, they can approach.  That goes for both sides.  But try to ask the questions at the lectern just because that's where the mics are, and if you're not near a mic in this courtroom, good luck being heard.  Okay?

(witness sworn)

THE COURT:  Okay.  Mr. Vetrano, just keep your voice up nice and loud like that.

Ms. Donaleski, you may proceed.

MS. DONALESKI:  Thank you, your Honor.

DOUGLAS A. VETRANO,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

**A000284**

DIRECT EXAMINATION

BY MS. DONALESKI:

Q.  Where do you work?

A.  I currently work for the Federal Bureau of Investigation.

Q.  What's your title?

A.  I'm a special agent.

Q.  How long have you worked for the FBI?

A.  I've been a member of the FBI for approximately 11 years.

Q.  And what were you doing before you worked for the FBI?

A.  Prior to joining the FBI, I was an officer in the United States Air Force.

Q.  How long were you in the Air Force?

A.  I was in the Air Force from approximately 1995 through 2007 on active duty, and I'm currently still in the reserves.

Q.  Are you a member of a particular squad or unit at the FBI?

A.  Yes.

Q.  And what is that squad or unit?

A.  I'm a part of a counterterrorism squad that works out of JFK Airport.

Q.  And do you have any collateral duties in addition to being on that counterterrorism squad?

A.  Yes, I'm a member of the evidence response team.

Q.  Is that also called the ERT?

A.  Yes.

Q.  And what are your duties and responsibilities as a special

**A000285**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page131 of 284

agent on the ERT?

A.  As a special agent on the evidence response team, my basic duties are to go to crime scenes and collect and document evidence properly.

Q.  And have you received training at the FBI about how to document and respond to evidence collection scenes?

A.  Yes.

Q.  Can you please describe that training.

A.  Initially when I got on the evidence response team in New York, we received a three-day what we call a mini basic evidence response team training.  And that was basically in order for us to understand how to properly approach a crime scene, organize a crime scene, identify pieces of evidence from a crime scene, properly collect items of evidence from a crime scene, and document those evidence from a crime scene.

Q.  Have you received any training in postblast response?

A.  Yes.

Q.  And what training have you received?

A.  I took a one-week postblast school.

Q.  And describe generally what that training entailed.

A.  Basically a postblast training entails us learning and recognizing, when things explode, how to collect items of evidence from those scenes.

Q.  And how does it affect how you collect evidence, if at all, when something explodes versus doesn't explode?

**A000286**

A. Right. Usually when something explodes, it's more of a chaotic scene, and we have to take extra steps to kind of compartmentalize and organize that scene so we can collect items of evidence in a logical manner.

Q. As an ERT member, have you responded to any postblast sites?

A. Yes.

Q. Where?

A. I responded to the Boston Marathon bombing a few years back, and I also responded to the Chelsea bombing in Manhattan.

Q. Directing your attention to December 11, 2017, did you participate in a search that day as part of the FBI's ERT team?

A. Yes.

Q. And where did you respond to?

A. I responded to the Port Authority bus terminal here in Manhattan.

Q. Approximately what time did you get to the Port Authority bus terminal?

A. Approximately 9 a.m.

Q. And what was your role in the search?

A. My role during that day of the search was to be an evidence collector.

Q. What does that mean?

A. Basically that means my job was to identify pieces of evidence that we thought would be of value to the case, and

**A000287**

properly collect and document that evidence.

Q.   What did you do when you arrived?

A.   When I arrived at the Port Authority that morning, the first thing I do would -- first thing I did was meet up with the rest of my team members, we received kind of a briefing about the situation that was going on, and then we were assigned our roles for the search for that day.

Q.   Explain how you went about conducting the search that day.

A.   So for that particular day, after being assigned our roles, when I responded to the scene, there's already other people at the scene already, so the first thing that we do is kind of approach the scene and the team leader kind of takes an overall survey of the scene to determine what's important, what's not important, and then he or she will let us know what was going on -- this particular day it was a female -- kind of told us what was going on, and then the next thing we do is photograph the crime scene to make it -- so when we show up to the crime scene, we see what it looks like and we can document it photographically.  After photographs are taken, basically members of the team go down and swab different areas where explosive residue could be found toward the seat of the blast and anywhere around the seat of what we call the blast.

And then after the swabs are taken, that's when kind of we do our initial walk-through and identify different pieces of evidence at the crime scene.  We would identify the pieces

A000288

of evidence, use placards to mark the pieces of evidence, and then go ahead and collect and then document the evidence that we collect.

Q.   Were special agent bomb technicians present at the scene?

A.   Yes.

Q.   And explain what a special agent bomb technician is.

A.   A special agent bomb technician is a special agent in the FBI who is expertly trained in explosives.

Q.   And what role, if any, did they play in the search?

A.   Our special agent bomb tech that day basically would point out important pieces of evidence to us and explain what he thought was important for that scene.

Q.   Special Agent Vetrano, you mentioned that one of the first steps in analyzing a crime scene is taking photographs.  Was that done here in this scene?

A.   Yes.

         MS. DONALESKI:  And may I approach, your Honor.

         THE COURT:  I just told you, you don't have to ask.

         MS. DONALESKI:  You're right.  I'll just do it.

Q.   Special Agent Vetrano, I handed you a disc marked Government Exhibit 102.  Do you recognize this disc?

A.   Yes.

Q.   How do you recognize it?

A.   This is a disc of a photograph that we took at the crime scene that day, on December 11, 2017.

**A000289**

Q. Did you review the disc before coming to court today?

A. Yes.

Q. And do the photographs on that disc fairly and accurately depict the crime scene as you saw it that day, on December 11, 2017?

A. Yes.

MS. DONALESKI: Your Honor, at this time we'll offer Government Exhibit 102, which contains a long list of government exhibit numbers, so I'll read that now.

102-01 through 102-24 --

THE COURT: 102-01 through?

MS. DONALESKI: 102-24; 105-2A; 106-2A; 111-2A; 112-2A; 113-2A; 114-2A; 115-2A; 116-2A; 117-2A; 118-2A; 119-2A; 120-2A -- I'm about halfway done -- 121-2A; 125-2A; 126-2A; 128-2A; 129-2A; 130-2A; 131-2A; 131-2B; 131-2C; 131-2D; 131-2E; 131-2F; 131-2G; 131-2H; 131-2I; 131-2J; 133-2A; 134-2A; 134-2B; and finally, 135-2A.

THE COURT: All right. Any objection to these?

MS. GATTO: No, your Honor.

THE COURT: All right. So the photos on the disc, which is Exhibit 102, are received. I'll sort with you those various numbers, which are not contiguous, later. But go ahead. You may proceed.

(Government's Exhibits 102-01 through 102-24 received in evidence)

**A000290**

(Government's Exhibits 105-2A; 106-2A; 111-2A; 112-2A; 113-2A; 114-2A; 115-2A; 116-2A; 117-2A; 118-2A; 119-2A; 120-2A; 121-2A; 125-2A; 126-2A; 128-2A; 129-2A; 130-2A; 131-2A; 131-2B; 131-2C; 131-2D; 131-2E; 131-2F; 131-2G; 131-2H; 131-2I; 131-2J; 133-2A; 134-2A; 134-2B; and 135-2A received in evidence)

MS. DONALESKI:  Thank you, your Honor.

Mr. DeLuca, can you please publish Government Exhibit 102-01.

BY MS. DONALESKI:

Q.  Special Agent Vetrano, describe what we're seeing here.

A.  In Government Exhibit 102-01, we are seeing the mezzanine level of the Port Authority, underneath the Port Authority bus terminal that's leading down into the subway system.  You can see the silver railings in the middle of the picture.  That denotes the stairs that go down to the A/C/E subway level, and that's where you'd get on the subway right there, in those pictures -- right there at the -- by those stairs, rather.

Q.  And there are no people in this photograph.

A.  No.

Q.  And does that accurately depict the scene when you arrived?

A.  Yes.

Q.  And I'll note that there's crime scene tape.  Do you see that?

A.  Yes, the yellow tape that is wrapped around the poles is crime scene tape.

**A000291**

MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 102-02.

Q.  Special Agent Vetrano, describe what we're seeing here.

A.  In Government Exhibit 102-2, we also see another picture of the mezzanine level of the subway system.  If you look straight ahead in the picture again, you see the yellow crime scene tape.  And straight ahead is the exit of the subway system. Again, to the right, where the silver -- silver railings are, are the stairs leading down to the subway platform.

(Continued on next page)

A000292

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 102-03.

Q.   Describe what we are seeing here?

A.   Government Exhibit 102-03 again is the mezzanine level underneath the Port Authority Bus Terminal.  In this picture, if you can imagine, the Port Authority Bus Terminal would be behind us and you see the long tunnel.  That would be the tunnel looking down toward the Times Square subway station.  To the left you see a member in an FBI what we call a raid jacket and some other individuals standing around there.  That was kind of where we staged our evidence response team equipment, was in the area to the left where it is kind of corded off with the white crime scene tape.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 102-04.

Q.   Describe what we are seeing here?

A.   Government Exhibit 102-04 is again the mezzanine level of the subway.  Straight ahead you see the silver railings that lead down to the stairs that lead down to the subway platform itself.  In the distance, if you can make out, you will see some people in orange vests and white hardhats.  Those are workers from the MTA that started putting up plywood so nobody could access the area where we were.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 102-5.

**A000293**

Q.  Describe what we are seeing here.

A.  Government Exhibit 102-5 is a closer-up picture of the tunnel I described earlier.  To the back of us would be the Port Authority Bus Terminal.  Straight ahead, that would lead to the tunnel to the Times Square subway station.  You can see the white crime scene tape in the photo as well, and you start to little orange cones that are on the ground.

Q.  What do the orange cones denote?

A.  The orange cones denote pieces of evidence.

Q.  Who placed those?

A.  The special agent bomb technician would place those orange cones.

        MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-7.

Q.  Describe what we are seeing here.

A.  Government Exhibit 102-7 again is a picture of the passageway between the Port Authority Bus Terminal and Times Square.  To our back again would be the Port Authority Bus Terminal.  Looking straight ahead would be the passageway toward Times Square.

        MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-8.

Q.  Describe what we are seeing here.

A.  Government Exhibit 102-8 again is another picture of the passageway between the Port Authority Bus Terminal and Times Square.  This is a closer-up picture of some of the pieces of evidence that are marked with the orange cones, and you will

A000294

see some other debris scattered about.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-10.

Q.  Describe what we are seeing here.

A.  Government Exhibit 102-10 is again the passageway between the Port Authority Bus Terminal and Times Square except this time we are looking at it from the opposite direction.  Behind us would be Times Square, and we looking at the tunnel toward the Port Authority Bus Terminal.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 102-11.

Q.  What does this photograph show?

A.  Government Exhibit 102-11 are the subway stairs leading down to the 7 subway line.  Looking at the stairs to the left would be the passageway between Times Square and the Port Authority Bus Terminal leading toward the Port Authority Bus Terminal.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-12.

Q.  What does that photograph depict?

A.  Government Exhibit 102-12 is the passageway between Times Square looking toward the Port Authority Bus Terminal.  To the left you will see the doors to a little convenience store that the located there.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-19, please.

Q.  What does this photograph show?

A000295

A. Government Exhibit 102-19 shows a stairway leading down to the A/C/E subway lines. You will notice there is a bunch of plywood not only at the bottom of the stairs but at the top of the stairs. That was so that no passengers could come into our crime scene.

MS. DONALESKI: Mr. DeLuca, Government Exhibit 102-20.

Q. What does this show?

A. Government Exhibit 102-20 again are the stairs leading down to the subway. Again you see the plywood that is placed at the bottom of the stairs, and you see at the top of the stairs there is also plywood.

MS. DONALESKI: Mr. DeLuca, Government Exhibit 102-21.

Q. What does this show?

A. Government Exhibit 102-21 again shows the stairs leading down to the A/C/E subway line. Again at the bottom of the stairs you can see some plywood there to block that off. Toward the distance in the back you can also see the plywood again to block people from entering the subway system through that entrance.

MS. DONALESKI: Mr. DeLuca, Government Exhibit 102-22, please.

Q. What does that show?

A. Government Exhibit 102-22 shows the exit toward the Port Authority Bus Terminal that is boarded up so no passenger could access that area from the outside.

**A000296**

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 102-23, please.

Q.  What does this show?

A.  Government Exhibit 102-23 shows the end of the tunnel that is also boarded off.  This would be looking toward the Times Square station.  That end of the tunnel was also boarded off so no passengers to come into our crime scene.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 102-13.

Q.  Special Agent Vetrano, what does this photograph show?

A.  Government Exhibit 102-13 again is a picture of the passageway between the Port Authority Bus Terminal and Times Square looking toward Times Square.  You will see orange cones again.  Now you start to see numbered placards as well as yellowish-greenish cones in color.

Q.  What do the yellowish-greenish cones in color denote?

A.  They denote different zones we set up to identify the crime scene.

Q.  Explain.

A.  In a post-blast scene, because things are scattered about, we try to organize the crime scene into a different zones to manage the crime scene and to properly document where things are found from that crime scene.  It is similar to if you had a crime scene in an apartment building, you have a kitchen, bathroom, bedroom.  By zoning out the post-blast scene, it

**A000297**

allows us to have those rooms, so to speak.

Q.  How did you zone out this crime scene?

A.  I zoned out the crime scene by using the natural boundaries of the tunnel, using the right side of the tunnel and left side of the tunnel as the end boundaries.  Then I measured approximately 36 tiles between one zone to the other zone to create six zones within the crime scene.

Q.  What were the dimensions of the tunnel from end to end horizontally looking at it here?

A.  The dimensions of the tunnel horizontally were approximately 14 feet 7 inches.

Q.  You mentioned that you gridded out the zone with 36 subway styles per zone?

A.  Yes.

Q.  How big was each subway tile?

A.  Each subway style was one square foot, 12 inches by 12 inches.

Q.  So what were the dimensions of the zone?

A.  Each zone was approximately 36 feet by 14 feet 7 inches.

Q.  How many zones did you create in that tunnel?

A.  We created six zones.

Q.  Which zone are we looking at in this photograph, Government Exhibit 102-13?

A.  If you look at Government Exhibit 102-13, you see the first two yellow-greenish cones closest to us.  That would denote the

A000298

Case 21-1058, Document 40, 10/04/2021, 3186339, Page144 of 284

start of zone 1. The cones a little bit further down in the picture you will see on each side of the subway tunnel, that would denote the end of zone 1 and the beginning of zone 2.

Q. What are the numbered yellow placards? What do those denote in this photograph?

A. The yellow numbered placards denote pieces of evidence that we would be collecting.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 102-15.

Q. What does this photograph show?

A. Government Exhibit 102-15 shows again the passageway between the Port Authority Bus Terminal which is behind us, looking toward Times Square, and this is a closer-up picture where you can start to see the debris I was talking about earlier, you can start to make out what some of those items are.

Q. Which zone are we looking at in this photograph?

A. In this photograph we are looking at zone 2. The start of zone 2 would kind of be right where the bottom of the picture starts, a little bit behind us. Then you can see toward the middle of the picture, on the right side and left side of the tunnel are the yellowish-greenish cones to denote the end of zone 2 and the start of the zone 3.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 102-16.

A000299

Q. What does this photograph show?

A. Government Exhibit 102-16 also denotes the passageway between Times Square and the Port Authority, the Port Authority being behind us, Times Square being in front us. You can see in the picture some numbered placards that remain and mostly orange cones.

Q. Which zones can we see in this photograph?

A. If you look closely, you can see the end of zone 6, zone 5, zone 4, and zone 3.

THE COURT: Where do you see that?

THE WITNESS: The two yellowish-greenish cones closest to us in the picture on the left and right-hand side, that would denote the start of the zone 3. Then toward the middle of the picture there are two more cones; that would be the end of zone 3, start of zone 4. Then there are two other cones on each side of the tunnel separating the other zones. It is difficult to see in this picture.

THE COURT: How do you know that is 3 and 4 and not 4 and 5 from this picture?

THE WITNESS: Because, your Honor, I can see the other cones in the distance on the picture.

THE COURT: Somebody who is not familiar with the crime scene would be able to tell that looking at this or no?

THE WITNESS: Your Honor, I don't know. Probably not. Right now we are looking at the start of zone 3. That is right

**A000300**

in front of us.

THE COURT:  Okay.

MS. DONALESKI:  Mr. DeLuca, can you circle the cone that Special Agent Vetrano noted marking the end of zone 4, which is in the middle, the next cone down, please.

Q.  Special Agent Vetrone, which cone does this mark the end of and the beginning of which zone?

A.  That would be the end of zone 3, the beginning of zone 4.

MS. DONALESKI:  Mr. DeLuca, can you highlight the next sequential cones.

Q.  What does that denote, Special Agent Vetrano?

A.  That would be the end of zone 4, beginning of zone 5.

Q.  The cones behind that, what does that denote?

A.  That would be the end of zone 5 and the beginning of zone 6.

Q.  What is the purpose of zoning out a crime scene?

A.  Again, the purpose to zone out a crime scene is so we can organize it in a logical manner so we can properly collect all the evidence within the zones and so that we don't miss any pieces of evidence.

MS. DONALESKI:  You can take that down, Mr. DeLuca. Thank you.

Q.  How do you collect evidence in each zone?

A.  Typically, in a post-blast zone we have what we call a four-bag collection method.  Within each zone, like evidence

**A000301**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page147 of 284

gets collected with other like evidence.  For example, if you were to sort your laundry after drying and folding it, you would put your underwear with your underwear, your undershirts with your undershirts, your socks with your socks.

In a post- blast seen we do something very similar. Like evidence within each zone gets packaged together.  Then special evidence, sometimes if you have a gown or suit that needs to be drycleaned, we would package that separately in its own package.

Q.  What are the categories?  You mentioned it's the four-bag evidence collection.  What are those four categories?

A.  Basically, with the four-bag method you have the container that the bomb might have been placed in, whether that was in a backpack, whether that was in a pressure cooker, whether that was a pipe.  That would be one of the bags that we would collect.

Another bag we would collect would be kind of all the different components of what might have made up the bomb, such as wiring, any switches, any power sources.  A third bag would be kind of a shrapnel, if there was any shrapnel, that was collected at the scene.  A fourth bag would be miscellaneous items.

Q.  Taking shrapnel, for instance, all of the shrapnel in one zone would be collected together, is that accurate?

A.  Yes.

A000302

Q.  Special Agent Vetrano, I have placed in front of you a cart containing Government Exhibits 104 through 109, 111 through 130, and 132 to 136.  Do you recognize those items?

A.  Yes.

Q.  Did you review them before coming to court here today?

A.  Yes.

Q.  What do you recognize these items to be?

A.  Those items are the pieces of evidence I collected from the scene on December 11, 2017, from the Port Authority Bus Terminal.

Q.  Are they in the same or substantially the same condition as when you collected them?

A.  Yes.

          MS. DONALESKI:  The government offers Government Exhibits 104 through 109, 111 through 130, and 132 through 136.

          THE COURT:  Any objection?

          MS. GATTO:  No, your Honor.

          THE COURT:  Government Exhibits 104 through 109, 111 through 113 and 132 to 136 are received.

          (Government's Exhibits 104 through 109, 111 through 130, and 132 through 136 received in evidence)

Q.  I would like to go through each of those one by one.  Let's start with Government Exhibit 105.  What is Government Exhibit 105?

A.  Government Exhibit 105 is a metal cap.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000303**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page149 of 284

Q.   Can you please show it to the jury.

A.   (Witness complied)

     MS. DONALESKI:  Mr. DeLuca, I will ask you to publish Government Exhibit 105-2a.

Q.   Special Agent Vetrano, what is Government Exhibit 105-2A?

A.   Government Exhibit 105-2A is the metal pipe that I have in my hand that we found within zone 1.

Q.   Why did you collect it?

A.   We collected this piece of evidence because through our training and experience we know that sometimes bombs are placed in pipes that have end caps.

Q.   What did you notice about the condition of the end cap?

A.   If you look closely at the end cap, you can see that it appears to be charred and there are grooves on the inside of the end cap.

Q.   I'll ask you to please pull out Government Exhibit 104. What is Government Exhibit 104?

A.   Government Exhibit 104 is a piece of green wire that we found in zone 1.  It's hard to describe, but it's kind of right where my finger is.  It's about that big.

     MS. DONALESKI:  Your Honor, may we publish it to the jury?

     THE COURT:  Sure.

     I want to be clear.  What you are holding up is a bag that has another bag inside it.  The bag inside it has writing

**A000304**

on it, and the bag you are hold also has writing on it, right?

THE WITNESS:  Yes, your Honor.

THE COURT:  Maybe they will explain all that.  The part you are referring to is what shows up at the very bottom of the larger bag.  It's harder to see.  That's just a tiny object, right?

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.

Q.  Special Agent Vetrano, the bag with writing on it that is red, what is that bag?

A.  The bag with the writing on it that I'm holding up, that was the original packaging that we collected the small piece of green wire in.  It contains writing on it of seven different pieces of documentation we put on all of our evidence.

Q.  In preparation for court, did you take the item of evidence out of that red bag and place it in the larger white bag?

A.  Yes.

MS. DONALESKI:  May we publish it, your Honor?

THE COURT:  You mean hand it to the jury to hold?

MS. DONALESKI:  Yes.

THE COURT:  Okay.  But keep asking questions, too. You can hand it to Juror No. 1, Ms. Coleman.  Go ahead, next question.

Q.  Special Agent Vetrano, could you please pull out Government Exhibit 119.

**A000305**

MS. DONALESKI: Mr. DeLuca, I'll ask you to publish Government Exhibit 119-2A.

Q. What is Government Exhibit 119?

A. Government Exhibit 119 is an orange nut.

Q. Which zone was it collected from?

A. This was collected from zone number 2.

THE COURT: Why do you call that a nut? It looks like a cap of some kind. You called it a nut.

THE WITNESS: Yes, your Honor. Interchangeable: an orange cap, orange nut.

Q. Would you please pull out Government Exhibit 111.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 111-2A.

Q. What is this?

A. Government Exhibit 111 is a black wire with an orange wire nut in there. You can see the nut is where my finger is, and this is black wire that we collected from the scene. It is also depicted in Government Exhibit 111-2A in the picture.

Q. What is a wire nut?

A. A wire nut basically connects ends of wire together.

Q. What, if anything, did you note about the condition of the wires on Government Exhibit 111?

A. If you look closely at the wires, you will see that the wires are kind of twisted together. The covered ends of the wire are sticking out of the coating that goes around the wire,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000306**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page152 of 284

and there appears to be some charring on ends of the wire as well.

Q. Directing your attention to Government Exhibit 111-2A, what do you notice about what debris is around the wires that you just testified about?

A. It's difficult to see, but just to the left of the orange nut you will see a small silver object that is a screw.

MS. DONALESKI: If you can zoom in on that, please, Mr. DeLuca. Thank you. You can take that down.

Q. Special Agent Vetrano, can you please pull out Government Exhibit 109. What is Government Exhibit 109?

A. Government Exhibit 109 again is some small green wires. There appears to be a white piece of zip tie in here as well and some green plastic and a charred piece of cloth.

Q. Thank you. Can you please pull out Government Exhibit 126. What is this?

A. Government Exhibit 126 is a metal cap.

Q. Which zone was it recovered from?

A. This was recovered from zone 2.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 126-2A.

Q. Do you notice anything about the condition of Government Exhibit 126 when you collected it?

A. Yes. You can see at the top of the picture the end cap is slightly dented in. It also looks to be a little bit charred.

A000307

Case 21-1058, Document 40, 10/04/2021, 3186339, Page153 of 284

And in this end cap there is no threading or grooves.

Q. Can you please pull out Government Exhibit 128.

MS. DONALESKI: Mr. DeLuca, I'll ask you to publish Government Exhibit 128-2A.

Q. What is Government Exhibit 128?

A. Government Exhibit 128 is an orange and blue wire nut.

Q. What does Government Exhibit 128-2A depict?

A. Government Exhibit 128-2A depicts the picture of this orange and blue wire nut along with some white fuzzy material that is on top of it.

THE COURT: Did you recover that too?

THE WITNESS: Yes, your Honor.

THE COURT: What is it?

THE WITNESS: Your Honor, it appears to be some sort of stuffing from some clothing.

THE COURT: Go ahead.

Q. Special Agent Vetrano, you mentioned earlier that like is collected with like. How does that affect, if at all, when you find cotton wrapped around a wire mut nut?

A. With the cotton wrapped around the wire nut more than likely -- excuse me. The cotton would be collected with the wire nut. Once this was down at the laboratory, that cotton would be separated from the wire nut.

Q. Can you please pull out Government Exhibit 129.

MS. DONALESKI: Mr. DeLuca, I will ask you to publish

A000308

Government Exhibit 129-2A.

Q.  What is Government Exhibit 129?

A.  Government Exhibit 129 is a piece of metal.

Q.  What is depicted in 129-2A?

A.  In Government Exhibit 129-2A is that piece of metal that is in my hand right now.

Q.  What, if anything, did you notice about the condition of the piece of metal Government Exhibit 129 when you collected it?

A.  The piece of metal is very jagged.  It appears to have some sort of debris on it.  It's discolored.  It doesn't look like it's brand new.

Q.  Does it have threading on it?

        MS. GATTO:  Objection.

A.  Yes.

Q.  What is the threading?

        THE COURT:  Wait.  There was an objection.

        MS. GATTO:  Leading.

        THE COURT:  Rephrase the question.

Q.  Did you notice anything else about the type of metal that you recovered?

A.  Yes.

Q.  What did you notice?

A.  There is grooves or threading in the metal.

Q.  What is threading?

**A000309**

A.   Threading allows one piece of metal to be screwed into another piece.

Q.   Can you please pull out Government Exhibit 125.

MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 125-2A.

Q.   What is Government Exhibit 125?

A.   Government Exhibit 125 is a white zip tie.

Q.   What does Government Exhibit 125-2A depict?

A.   Government Exhibit 125-2A depicts the white zip tie that is in my hand.

Q.   Do you notice anything else in the photograph of Government Exhibit 125-2A?

A.   Yes.  If you notice, toward the middle of the picture there is a small silver object that is lying on the ground just to the left of the gum spot that is on the ground.

MS. DONALESKI:  Can you zoom in on that, Mr. DeLuca.

Q.   What is that small metal object?

A.   This is a screw.

Q.   Can you please pull out Government Exhibit 127.  What is Government Exhibit 127?

A.   Government Exhibit 127 is again another white zip tie.

Q.   Did you notice anything about the condition of the zip tee when you collected it?

A.   Yes.  This zip tie was broken when we collected it.  I wasn't together.  Somebody cut it.  And there was some what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000310**

appear to be a red substance consistent with blood on it.

Q. Did you say blood?

A. Blood, yes.

Q. Can you please pull out Government Exhibit 106. What is Government Exhibit 106?

A. Government Exhibit 106, the package is broken up into four different parts. Where my hand is, where my hands are, those are different screws that we collected from the tunnel passageway. They are different size screws and they have different type of screw heads on them. On the bottom where my left hand is, it's material that seems to be charred and discolored.

Q. What zone was this collected from?

A. This was collected from zone 2.

Q. Did you notice anything about the condition of the screws?

A. Yes. If you look at the screws, they appear to be discolored. They are bent. They are a little bit not symmetrical anymore, definitely screws that had not come brand new out of a --

Q. Were all the screws in one place in zone 2?

A. No.

Q. Please describe what you mean by that.

A. Again referring to the bag method that we spoke about earlier, where like items are collected are like items, all the items in zone 2, because they are similar in nature, we

**A000311**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page157 of 284

collected in one bag from different parts of zone 2.

Q. Can you please pull out Government Exhibit 115.

MS. DONALESKI: Mr. DeLuca, I'll ask you to publish Government Exhibit 115-2A.

Q. What is Government Exhibit 115?

A. Government Exhibit 115 is some green wire that we collected from the crime scene. There is some what appears to be stuffing from fabric in the crime scene, along with a piece of black material that we collected from the crime scene.

Q. Directing your attention to Government Exhibit 115-2A, what does this photograph addict?

A. Government Exhibit 115-2A depicts Government Exhibit 115, the items that we collected that is in my hand.

Q. Did you notice anything about the condition of the wires in Government Exhibit 115?

A. Yes. If you look closely at the wires, you will see that the cover ends are exposed from the green coating that's on there. They are frayed at the ends as well.

Q. Did you notice anything else in Government Exhibit 115-2A?

A. Yes. Besides the stuffing and that piece of bluish-black fabric that is in the pictures, there is a screw that is in the picture as well.

Q. I'll ask you to pull out Government Exhibit 116.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 116-2A.

A000312

Q.  What is Government Exhibit 116?

A.  Government Exhibit 116 is a metal pipe.

Q.  What zone was it collected in?

A.  This was collected in zone number 2.

THE COURT:  You pulled that out of what looks like a paint can.  Everything else has come out of a bag, right?

THE WITNESS:  Yes, your Honor.

THE COURT:  Why the paint can?

THE WITNESS:  Your Honor, when we collect items from a post-blast scene, items that the special bomb tech thinks contain explosive residue get put in a paint can to contain the vapors that will be tested at the lab.

THE COURT:  That's what happened here?

THE WITNESS:  Yes, your Honor.

THE COURT:  What you are holding in your hand is what was recovered at the scene?

THE WITNESS:  Yes, your Honor.

THE COURT:  Got it.

Q.  Did you notice anything about the condition of the pipe when you collected it?

A.  Yes.  Looking at this pipe, you can see that it is not cylindrical, it is jagged.  It is sharp at the top.  It appears to be torn apart.  It appears that something happened to this pipe.  It almost looks like it's a knife blade at the top too.

MS. GATTO:  Objection.  Move to strike the last

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000313**

portion, your Honor.

THE COURT:  That it almost looks like there was a knife blade, is that what you said?

THE WITNESS:  Your Honor, I said it almost looks like it's a knife blade.

THE COURT:  Almost looks like that.  I guess the objection is what that means, to almost look like something.  It is what it is.  It looks like what it looks like.  Maybe there will be questions about what caused it to look like that.  Go ahead.

MS. DONALESKI:  Your Honor, can we publish that to the jury in the paint can?

THE COURT:  Okay.  Can they touch it?  Are they allowed to touch it?

MS. DONALESKI:  Yes.

THE COURT:  Is it sharp?

THE WITNESS:  Yes, your Honor, it is sharp.

THE COURT:  Then, jurors, be careful with it.  Nobody has to touch anything.  But if you wish to, you can.  Just be careful.  We don't have a nurse on premises, and these could be sharp.  There is a nurse in the other building, but not here.

Q.  Special Agent Vetrano, directing your attention to Government Exhibit 116-2A, can you please describe what is depicted in this photograph.

A.  Government Exhibit 116-2A is that piece of metal pipe that

A000314

is being passed around right now.  In the picture you can see that metal pipe, you can see some bluish piece of fabric toward the top of the picture, you can see some what appears to be stuffing material coming from a piece of clothing at the bottom of the metal object, and you can see a tiny piece of green plastic just above the metal object.

Q.  Would you please pull out Government Exhibit 121.

MS. DONALESKI:  Mr. DeLuca, I will ask you to publish Government Exhibit 121-2A.

Q.  What is Government Exhibit 121?

A.  Government Exhibit 121 is another piece of metal pipe that we found in zone 2.

Q.  Did you notice anything about the condition of the pipe when you found it?

A.  Yes.  Again this pipe, this piece of metal, is very jagged.  On the edges it is sharp at a point and it's discolored.

Q.  Can you describe what is depicted in Government Exhibit 121-2A.

A.  In Government Exhibit 121-2A is a picture of the metal pipe that you have in my hand.

Q.  Would you please pull out Government Exhibit 113.

A.  Can you repeat that, please.

Q.  Government Exhibit 113.

MS. DONALESKI:  Mr. DeLuca, I will ask you to publish Government Exhibit 113-2A.

**A000315**

Q.   What is Government Exhibit 113?

A.   Government Exhibit 113 is a Duracell 9-volt battery that we recovered within zone 2.

Q.   What is depicted in Government Exhibit 113-2A?

A.   In Government Exhibit 113-2A is a picture of the battery that I'm holding in my hand with red tape on top of it.

Q.   I'll ask you to please pull out Government Exhibit 118.

        MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 118-2A.

Q.   What is Government Exhibit 118?

A.   Government Exhibit 118 is a piece of green wire that we found within zone 2.  It's right where my finger is.  It's also a small piece of green wire.

Q.   What is depicted in Government Exhibit 118-2A?

A.   Government Exhibit 118-2A depicts the piece of green wire that I'm holding in my hand.

Q.   I'll ask you to pull out Government Exhibit 114, please.

        MS. DONALESKI:  Mr. DeLuca, you can publish Government Exhibit 114-2A.

Q.   What is Government Exhibit 114?

A.   Government Exhibit 114 are again green wires that we found in zone number 2.

Q.   Did you notice anything about the condition of the wire when you collected it?

A.   Yes.  The wires once again, the inner copper wires, are

**A000316**

exposed from the green coating and they are frayed at the ends.

Q. Directing your attention to Government Exhibit 114-2A, what is depicted in this photograph?

A. Government Exhibit 114-2A is a picture of one of the green wires that is in my hand.

MS. DONALESKI:  Mr. DeLuca, can you zoom in on the frayed end of that wire.

Q. What are we seeing here, Special Agent Vetrano?

A. We are seeing the ends of the copper wire coming out of the green coating that are frayed.

Q. I'll ask you to pull out Government Exhibit 122.  What is this government exhibit?

A. Government Exhibit 122 is another piece of green wire that we found within zone number 2.

Q. I'll ask you to pull out Government Exhibit 124.  What is Government Exhibit 124?

A. Government Exhibit 124 is a piece of green wire with some blue fabric.  It's hard to see where the green wire is.  It's at the bottom of the bag.

Q. What zone was this collected from?

A. This was collected from zone 2.

Q. I'll ask you to pull out Government Exhibit 123.  What is Government Exhibit 123?

A. Government Exhibit 123 is another piece of green wire collected from zone 2.

**A000317**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page163 of 284

Q.   I'll ask you to pull out Government Exhibit 120.  What is Government Exhibit 120?

A.   Government Exhibit 120 is again some more green wire that we found in zone number 2.

Q.   Did you notice anything about the condition of the wires when you collected them?

A.   Yes.  Again the copper ends of the wire are sticking out from the green coating, they are twisted together, and there appears to be some discoloration on the wire as well.

          MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 120-2A.

Q.   What does this photograph depict?

A.   Government Exhibit 120-2A depicts Government Exhibit 120, the pieces of green wires in my hand.  If you notice in the picture, there are pieces of white tape that was wrapped around the two green wires.

Q.   Again, what zone was this found in?

A.   This was found in zone number 2.

Q.   Remind us again the dimensions of each of the zones.

A.   Each of the zones were approximately 36 feet by 14 feet 7 inches.

Q.   If this is in zone 2, there is zone 1 on one end and zone 3 on the other end of zone 2, is that correct?

A.   Yes.

Q.   Looking at Government Exhibit 120-2A, do you notice

**A000318**

anything about the condition of the wires?

A.   Yes.   The wires, you can see that they are slightly discolored.   There is white tape that is wrapped around two ends of the wires, and there is a little piece of metal toward the right end of the wire.

Q.   I'll ask you to pull out Government Exhibit 117.   What is Government Exhibit 117?

A.   Government Exhibit 117 is a green little piece of plastic from a mini Christmas bulb.

Q.   What, if anything, did you notice about the Christmas bulb when you collected it, the end of the Christmas bulb?

A.   The end of the Christmas bulb, it's disfigured and cracked.

Q.   Is the bulb a part of it?

A.   The bulb is not present.

          MS. DONALESKI:   Mr. DeLuca, can you please publish Government Exhibit 117-2A.

Q.   What does this photo depict?

A.   Government Exhibit 117-2A depicts Government Exhibit 117, the piece of green plastic that I have in my hand.

Q.   I'll ask you to pull out Government Exhibit 130.   What is this government exhibit?

A.   Government Exhibit 130 is more green wire that we found in zone 2.

Q.   Did you notice anything about the condition of the wire?

A.   Again, the copper wire is coming out of the green coating

**A000319**

on each end, and the wire is frayed and the wire is discolored.

MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 130-2A.

Q.   What does this photograph depict?

A.   Government Exhibit 130-2A depicts Government Exhibit 130, the piece of green wire that I have in my hand.  Also, you can see in the picture there is yellow tape wrapped around the wire.

MS. DONALESKI:  Your Honor, now may be a logical stopping point.

THE COURT:  Let's break for today.  You have had a full day.  We will pick up tomorrow at 9:30.  Be ready to go. When you go home tonight, don't discuss the case.  You can say, yes, I got picked, it's a criminal case, it will go two weeks or so, the Judge asked me not to talk about it.  People should respect that.  Don't do any research, don't do any investigations, nothing like that, no media, no social media, no tweeting, blogging, anything like that, Facebook, on the case, no.

Have a good night, keep an open mind.  Don't discuss the case.  When you get back to the jury room, I want you to tell Mr. Brody what your Halloween plans were.  For those of you with small kids and you need to be leaving earlier than usual, tell him what you have in mind so we can discuss it and then we'll make arrangements.

**A000320**

Be here ready to go at 89:30.  Come straight to the room here.  We will make sure we have plenty of coffee.  We ordered double.  Whoever gets here first gets first crack at the doughnuts or pastries or whatever.  Thanks very much.

All rise for the jury.

(Jury not present)

THE COURT:  Agent Vetrano, you can step down or, if you want, start collecting stuff.

How much more do you have with this witness?

MS. DONALESKI:  About 20 minutes, your Honor.

THE COURT:  Then we will have cross.  The next witnesses are all lined up?

MS. DONALESKI:  They are, your Honor.

THE COURT:  You have shared that with defense counsel?

MS. DONALESKI:  We have, your Honor.

THE COURT:  Anything we need to discuss tonight?

MS. GATTO:  Not tonight.  Your Honor, we owe you a proposed limiting instruction for when the videos may come in, which could potentially be tomorrow.  We have conferred with the government and we have agreed somewhat, but there is a dispute.  It is back at the office, but I can email you later what is basically a red-lined version that indicates what we propose and what the government proposes.

THE COURT:  That's good.  I teach on Tuesday nights, so I'll be leaving here in probably 20 minutes or so.  I'll be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000321**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page167 of 284

back.  I always come back after.  Maybe I won't turn to it substantively until 9 o'clock or so.

MS. GATTO:  I don't know if we will get to that witness tomorrow.  I don't know how urgent it is.

MR. TURNER:  Judge, we do intend the play the video clips during the testimony of Dr. Aaron Zelin.  He will not be going on until after the lunch break at the earliest tomorrow.

THE COURT:  I'll look at it tonight.  How are we doing otherwise?  Does the government still say they are likely to rest on Thursday?

MS. DONALESKI:  Yes, your Honor.

THE COURT:  At what point in the day?

MS. DONALESKI:  Probably around lunch or the early afternoon, again depending on the cross.

THE COURT:  Then we have to talk about a charge conference and defense case and what the following week will look like.  We will talk more about that tomorrow.  I'll see you tomorrow.  Let's have the lawyers and everybody ready here around 9:15 just in case there are issues.  Especially if we have that in limine instruction, we want to have time to talk about it before the jury gets here.  I really want to have the jury out in that box at 9:30 if they are here, and I expect they will be.  If you want to wait, I'll find out what the story is on Halloween.  Sit tight.

(Adjourned to 9:15 a.m., October 31, 2018)

**A000322**

INDEX OF EXAMINATION

Examinationof:                          Page

DAVID WALL

        Direct By Ms. Donaleski . . . . . . . . . .37

SEAN GALLAGHER

        Direct By Mr. Turner  . . . . . . . . . . .48
        Cross By Ms. Gallicchio . . . . . . . . . .72
        Redirect By Mr. Turner  . . . . . . . . . .93

STEPHEN FULLINGTON

        Direct By Ms. Crowley . . . . . . . . . . .95
        Cross By Ms. Gatto  . . . . . . . . . . . 115
        Redirect By Ms. Crowley . . . . . . . . . 128
        Recross By Ms. Gatto  . . . . . . . . . . 131


DOUGLAS A. VETRANO

        Direct By Ms. Donaleski . . . . . . . . . 135

**A000323**

174

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

1001 and 2001   . . . . . . . . . . . . . . . .41
501, 502, 503   . . . . . . . . . . . . . . . .44
102-01 through 102-24   . . . . . . . . . . . 140
105-2A; 106-2A; 111-2A; 112-2A; 113-2A; . . . 141
        114-2A; 115-2A; 116-2A;
        117-2A; 118-2A; 119-2A;
        120-2A; 121-2A; 125-2A;
        126-2A; 128-2A; 129-2A;
        130-2A; 131-2A; 131-2B;
        131-2C; 131-2D; 131-2E;
        131-2F; 131-2G; 131-2H;
        131-2I; 131-2J; 133-2A;
        134-2A; 134-2B; and 135-2A
104 through 109, 111 through 130, and . . . . 153
        132 through 136

1   . . . . . . . . . . . . . . . . . . . . . .49

102-26   . . . . . . . . . . . . . . . . . . 100

102-25   . . . . . . . . . . . . . . . . . . 106

103-1 through 103-5   . . . . . . . . . . . . .70

110   . . . . . . . . . . . . . . . . . . . . 105

140   . . . . . . . . . . . . . . . . . . . . .59

**A000324**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                   18 CR 16 (RJS)

AKAYED ULLAH,

                            Trial

          Defendant.

------------------------------x

                           New York, N.Y.
                           October 31, 2018
                           9:23 a.m.

Before:

        HON. RICHARD J. SULLIVAN

                           District Judge,
                            and a Jury

        APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
    Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
    Attorneys for Defendant
BY: AMY GALLICCHIO
    JULIA GATTO
    COLLEEN P. CASSIDY

Also Present:

    JOHN MAURER – Special Agent, FBI
    MICHAEL DELUCA – Paralegal, U.S. Attorney
    JASON T. FISCHER – Paralegal, Federal Defenders
    CHIRAAYHU GOSRANI – Paralegal, Federal Defenders

A000325

(In open court; jury not present)

THE COURT:  Good morning.  We're still getting some jurors, which is fine.  They're not late.  But I wanted to know what I should tell them in terms of lunch.  So what is the right time?  I think we'll stop at 3:30.

MS. GALLICCHIO:  Okay.

THE COURT:  I think that makes sense, considering we're going to have to take a break then anyway.  So lunch at noon?  Lunch at 12:30?  What do you think?

MS. GALLICCHIO:  Well, noon is fine.

MS. DONALESKI:  That's fine with us, your Honor.

THE COURT:  Okay.  All right.  So that means no breaks this morning, absent emergencies, and then we'll pick up again at 12:45.  So 45 minutes, do you think that's enough time?  And then 12:45 to 3:30 with no breaks.  We'll see how that goes.

Okay.  All right.  Is there anything else going on that we should chat about today?

MS. GALLICCHIO:  Yes.  I just want to address something.  I want to address something with the Court that I raised with the government this morning that we can either address now or at the lunch break.

There are, this afternoon, I believe three witnesses who searched the Pret a Manger, which is a work site of Mr. Ullah.  We don't, in principle, object to the exhibits that the government intends to offer.  However, we would object on

**A000326**

relevance grounds if the government does not establish that that was indeed Mr. Ullah's work site.  So at this point I don't believe it has been established, but I just want to let the Court know, in the event, or when witnesses testify, we do have an objection with respect to relevance, unless there is a connection established.

THE COURT:  Yes, I assume there's going to be a connection.  Otherwise, I don't want to know about every search of every restaurant in New York.

MR. TURNER:  Judge, there is a connection, and actually, just to clarify, there is only going to be one witness who will testify about the work site, Special Agent Bennett, and Special Agent Fullington actually already testified yesterday that the FBI conducted a search at a work site at 601 8th Avenue at 39th Street, where the suspect was believed to have worked.

Judge, you'll hear testimony today from Detective Byrne, where the defendant admitted that he worked as an electrician at 39th Street and Eighth Avenue.  You'll also hear that the FBI searched that location, found a tool that was later forensically examined and found to have been used to build a piece of the bomb.  All of that provides ample connection, and any argument that the defense has that the government hasn't established that the defendant worked at that particular construction site at 39th Street and Eighth Avenue

**A000327**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page173 of 284

is -- it goes to weight.  It's a jury argument, not admissibility, Judge.

THE COURT:  Right.  All I've heard so far is that they believe that was the location that he worked.  You need more than what I've heard so far, right?

MR. TURNER:  Yes, Judge, and there will be additional evidence today, as I described.

THE COURT:  Okay.  So I think that's all Ms. Gallicchio is saying is that you have to establish that, and so I assume you will.  Okay.

MS. GALLICCHIO:  Yes.  That's it.

THE COURT:  All right.  So we have five minutes then, so just do what you were doing.  I'll do the same.

MS. GALLICCHIO:  Oh, your Honor, can I have one moment.

THE COURT:  Yes.

MS. GALLICCHIO:  So, your Honor, Mr. Ullah has indicated that he would like a break to pray from 12:45 to 1:00.  So perhaps we should take a 12:30 break.

THE COURT:  Wait.  We've been breaking at 1 the last couple of days, right?  We're not adding more prayer time all day long.  This is trial.

MS. GALLICCHIO:  Let me just clarify, your Honor.

THE COURT:  I just feel like I'm being taken advantage of, perhaps.

**A000328**

MS. GALLICCHIO:  So, your Honor, sorry.  As the Court may know, there are five prayer times during the day.  And he's been able to -- and the prayer times last for a few hours.  He can pray during the period of time that lasts a few hours.  They've been coinciding with our lunch breaks.

THE COURT:  Okay.

MS. GALLICCHIO:  But because our lunch breaks have been at 1 and generally speaking, from 12:45 to 3:00 is an acceptable period of time in which to exercise that prayer time --

THE COURT:  Okay.

MS. GALLICCHIO:  And then another period of time starts at about 3:30 until 6, and he can exercise his prayer any time during that period, which is why we asked for a 3:45 break.

THE COURT:  Okay.  So then a later lunch.  So I asked, do you want to do 12 to 12:45 and you guys said yes.  So it sounds like you want to do 12:30 to 1:15.

MS. GALLICCHIO:  Yes, I'm sorry.  It's our error.  I didn't consult with Mr. Ullah on that issue.

THE COURT:  Okay.  Any objection to that?  I mean, it means a longer morning, but I'm still going to see if we can get through it without a break.

MS. DONALESKI:  That's fine with the government, your Honor.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000329**

THE COURT:  Okay.  All right.  Let's see how we're doing with the jury.

THE LAW CLERK:  Yes.

(Pause)

THE COURT:  All right.  Let's bring in the jury.

(Continued on next page)

(Jury present)

THE COURT:  Okay.  Have a seat.

Good morning, ladies and gentlemen.  I hope there was enough coffee.  Enough?  All right.  Good.

Okay.  So I want to first chat about scheduling. Today's Halloween.  Some of you have small children and have expressed the desire to end early today.  And I get that.  I've been there.  I remember what it's like.  And you only have a small number of years, and it doesn't last forever.  So in light of that, we're going to have a different kind of day today.  So we're going to end at 3:30.  But it means we're going to go straight through to 12:30, all right?  We're going to try and, unless somebody's really dying, I really want to see if we can get through the morning without a break.  If you're really uncomfortable, then let me know.  I'm not trying to make people in agony.  But I am going to try to sort of make up time with that 15 minutes.  We'll then take a shorter lunch. So what I'm going to suggest is you go out and get something, bring it back, eat here relatively quickly.  I don't want you to get indigestion, but I think I'm hoping we can manage lunch in 45 minutes.  We'll then pick up again at 1:15 and then go till 3:30-ish.  We'll see if we can do it without a break. That's the plan, okay?  So stay focused.  But if that is a problem and you do need a break, let me know.  I don't want you to be not paying attention because you're so uncomfortable.

A000331

Okay?

We're now going to resume the direct examination by Ms. Donaleski.

Go ahead.

MS. DONALESKI:  Thank you, your Honor.

Mr. DeLuca, can you please publish Government Exhibit 106-2A.

DOUGLAS A. VETRANO, resumed.

DIRECT EXAMINATION CONTINUED

BY MS. DONALESKI:

Q.  And Special Agent Vetrano, I'll ask you to pull out Government Exhibit 106, please.

Remind us again, what is Government Exhibit 106?

A.  Government Exhibit 106 are the screws that I collected from Zone 2 as well as some fabric from Zone 2.

Q.  Directing your attention to Government Exhibit 106-2A, what does this photograph depict?

A.  Government Exhibit 106-2A depicts the pieces of evidence I have in my hand right now.

Q.  Can you describe anything you noticed about what's depicted in the photograph, Government Exhibit 106-2A.

A.  Yes, you see a bunch of screws on the ground, as well as a scale to the right.  You see some material that looks like it's been charred as well.  There's a green piece of plastic in there.  Toward the middle of the picture, you might see a white

A000332

Case 21-1058, Document 40, 10/04/2021, 3186339, Page178 of 284

button that has some strings coming out of it.

Q. What did you notice about the condition of the screws?

A. The screws look like they've been altered in some way. They're not exactly straight. Some are bent and charred.

Q. And again, were all the screws found in the same location within Zone 2?

A. Not within the same location.

Q. Please describe what you mean by that.

A. What I mean by that is Zone 2, again, approximately 36 feet by 14 feet, 7 inches, so all the screws that we did find within Zone 2 were scattered around the whole zone.

MS. DONALESKI: Mr. DeLuca, I'm going to ask you to please publish Government Exhibit 131-2A.

Q. Special Agent Vetrano, what does Government Exhibit 131-2A depict?

A. Government Exhibit 131-2A depicts a white T-shirt.

Q. Can you please describe the condition of the T-shirt.

A. Yes. The T-shirt -- obviously, it's in tatters. Toward the left side of the T-shirt, you can see there's a red stain there of sorts; and also on the right side of the T-shirt there's some red staining there as well; and it looks like the T-shirt is discolored, charred slightly.

MS. DONALESKI: Mr. DeLuca, can you please publish Government Exhibit 131-2B.

Q. Describe what we're seeing in this photograph, please.

**A000333**

A.   Government Exhibit 131-2B depicts the same white T-shirt, and you can see toward the top of the picture the red staining on the shirt that is there.

          MS. DONALESKI:   Mr. DeLuca, please publish Government Exhibit 131-2C.

Q.   Describe what we're seeing here.

A.   Government Exhibit 131-2C is a pair of blue boxer shorts with white polka dots.  You can see that it is shredded on the side there and there's some shredding toward the middle of the boxer shorts as well.

          MS. DONALESKI:   Mr. DeLuca, please publish Government Exhibit 131-2D.

Q.   Describe what we're seeing here.

A.   Government Exhibit 131-2D is a blue jacket.  It says Industrial Electric Supply in white lettering.  You can see that the jacket has been shredded to pieces and there's a lot of white stuffing within the blue jacket.

          MS. DONALESKI:   Mr. DeLuca, please publish Government Exhibit 131-2E.

Q.   Describe what we're seeing here.

A.   Government Exhibit 131-2E is a closer-up picture of the blue jacket.  You can see the Industrial Electric Supply writing on the jacket.  You can see the zipper on the jacket. And it's a close-up shot.  You can see the stuffing that was inside the jacket.

**A000334**

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 131-2F.

Q.  Describe what we're seeing here.

A.  Government Exhibit 131-2F is a blue and white plaid button-down shirt.  You can see toward the left of the shirt that it's torn at the side there, and in addition, on the right side of the shirt, there's some red staining there.  And it's torn up buy the shoulder area as well.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 131-2G.

Q.  Describe what we're seeing here.

A.  Government Exhibit 131-2G is a blue garment.  You can see that it's shredded as well.  There's a white zipper there, and it appears to be in tatters.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 131-2H.

Q.  Describe what we're seeing here.

A.  Government Exhibit 131-2H is a picture of a white T-shirt. Toward the bottom of the picture, you can see the red staining again and you can see the discoloration, the black discoloration of the T-shirt as well.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 131-2I.

Q.  Describe what we're seeing here.

A.  Government Exhibit 131-2I is a pair of khaki pants that appears to be in -- cut open, and you can see there's a -- kind of some tearing on the left-hand side of the picture, as well

**A000335**

as the right-hand side of the picture, towards the top of the khakis.

Q.   And finally, Government Exhibit 131-2J.

Describe what we're seeing here.

A.   Government Exhibit 131-2J is a blue garment.  You can see toward the bottom left-hand corner there's a bunch of holes in it, looks like it's been charred, and it's kind of tattered as well.

Q.   Special Agent Vetrano, for each of the photographs of clothing that we looked at, 131-2A through 131-2J, did you collect each of those items of clothing?

A.   Yes.

Q.   I'd like to ask you to pull out Government Exhibit 132.

MS. DONALESKI:  And Mr. DeLuca, please publish Government Exhibit 102-16.

Q.   Special Agent Vetrano, what is Government Exhibit 132?

A.   Government Exhibit 132 is a screw that we collected from Zone No. 3.

Q.   And remind us again, where is Zone No. 3 situated, using Government Exhibit 102-16 for reference?

A.   Looking at Government Exhibit 102-16, you can see the yellowish-greenish cones that I pointed out yesterday on the left side of the tunnel, on the right side of the tunnel, and that is the beginning of Zone No. 3, and then in the distance, where you see the next greenish-yellowish cones on the

**A000336**

left-hand and right-hand side, that depicts again Zone No. 3.

Q. I'll ask you, Special Agent Vetrano, to pull out Government Exhibit 133.

MS. DONALESKI: And Mr. DeLuca, can you publish Government Exhibit 133-2A, please.

Q. What is Government Exhibit 133?

A. Government Exhibit 133 is some more screws that we collected and a piece of black Velcro that we collected from Zone No. 4.

Q. Directing your attention to Government Exhibit 133-2A, the photograph on the screen, please describe what this shows.

A. Government Exhibit 133-2A shows the evidence in my hand, which are the five screws that you see there and the piece of black Velcro.

Q. Did you notice anything about the condition of the screws?

MS. DONALESKI: And Mr. DeLuca, I'll ask you to zoom in on them, please.

A. Yes. As you can see in the picture, the screws, again, they seem to be altered, they're not straight, they're bent slightly, and they're not whole.

Q. Special Agent Vetrano, could you please pull out Government Exhibit 134.

MS. DONALESKI: And Mr. DeLuca, I'll ask you to publish 134-2A.

Q. What is Government Exhibit 134?

**A000337**

A.   Government Exhibit 134 is a piece of metal that we found in Zone 4.

Q.   Can you please describe the piece of evidence you have in your hand.

A.   The metal is jagged, again, the metal is discolored, and the metal is not whole.  It's been torn apart from something.

Q.   Directing your attention to Government Exhibit 134-2A, what are we looking at in this photograph?

A.   Government Exhibit 134-2A is a picture of the piece of metal in my hand.

Q.   Remind us again, what zone was this found in?

A.   This was found in Zone No. 4.

        MS. DONALESKI:  Your Honor, could we publish this piece of evidence to the jury in the paint can.

        THE COURT:  Okay.  And the jury can touch it, that's okay?

        MS. DONALESKI:  Yes.

        THE COURT:  All right.  You don't have to touch it, but if you want to examine it, you can.

        Now of course, in the jury room, during deliberations, you can ask for any of this stuff and it will be sent to you if you'd like, okay?

        All right.  Go ahead.  You can hand it to the jury.

        MS. DONALESKI:  And while this is being published, Mr. DeLuca, please pull up Government Exhibit 134-2B.

**A000338**

BY MS. DONALESKI:

Q.   And what does this photograph show, Special Agent Vetrano?

A.   Government Exhibit 134-2B is that piece of metal that's being passed around to the jury right now.

Q.   Is this a different view of the same piece of metal?

A.   This is a different view of the same piece of metal.  It's just the opposite side of the piece of metal from the previous picture.

Q.   Did you notice anything about the condition of this piece of metal?

A.   You can see that the metal is bent and it appears to be jagged.

Q.   I'll ask you to pull out Government Exhibit 135, please.

          MS. DONALESKI:  And Mr. DeLuca, you can publish Government Exhibit 135-2A.

Q.   What is Government Exhibit 135?

A.   Government Exhibit 135 is a metal screw head that we found in Zone No. 5.

Q.   What is Government Exhibit 135-2A, the photograph in front of us?

A.   Government Exhibit 135-2A is a picture of the screw head that is in my hand right now.

Q.   And remind us again, which zone was this found in?

A.   This was found in Zone No. 5.

Q.   I'll ask you to please pull out Government Exhibit 136.

A000339

What is Government Exhibit 136?

A. Government Exhibit 136 is a metal screw that we found within Zone No. 6.

Q. Did you notice anything about this screw?

A. Yes, the screw is discolored and it is bent.

Q. What did you notice about this screw in relation to the other screws you testified about finding in Zones 2, 3, and 4?

A. The screw seems to be similar.

Q. Other than your role in the search at the Port Authority that you just described, did you have any other involvement in this case?

A. No.

        MS. DONALESKI:  No further questions.

        THE COURT:  All right.  Cross-examination?  Ms. Gatto?

        MS. GATTO:  Yes, your Honor.

CROSS-EXAMINATION

BY MS. GATTO:

Q. Good morning, Agent Vetrano.

A. Good morning.

Q. Agent Vetrano, you arrive at the blast scene at 9:00; do I have that right?

A. Approximately.

Q. And you're debriefed when you first get there, correct?

A. Yes.

Q. And then your role is to record the evidence and collect

**A000340**

the evidence properly, is that right?

A.   Yes, my role is to collect the evidence.

Q.   And so is it a different department or different agency that's in charge of actually recording where the evidence is?

A.   No, it is still the FBI, FBI's job to record the evidence.

Q.   So was it someone on your team who was in charge of recording evidence?

A.   Yes.

Q.   And who was that?

A.   I do not know.

Q.   Okay.  Were you also working with NYPD, their CSU unit?  Do I have that right?

A.   Yes.

Q.   And do you know what CSU stands for?

A.   Stands for crime scene unit.

Q.   And you've worked on other bomb sites where the FBI actually is the one taking the photographs of the evidence that's being recorded, correct?

A.   Yes.

Q.   This one, the NYPD is the one who takes the photographs, correct?

A.   Yes.

Q.   And they're the ones who we've seen some photographs -- you've seen photographs of the evidence from the scene, correct?

A.   Yes.

Q.   And there was a blue kind of placard on a lot of those pictures; do you recall that?

A.   Yes.

Q.   That's an NYPD instrument, right?

A.   Correct.

Q.   When you get to the scene, you are kind of the third team to arrive -- actually, withdrawn.

     You know, when you get to the scene, the first responders have already been on the scene, correct?

A.   Yes.

Q.   They've already arrested and removed Mr. Ullah, correct?

A.   Mr. Ullah was not there when I arrived at the scene, so I can only assume that's what happened.

Q.   But when you get there, you're debriefed, correct?

A.   Yes.

Q.   And you learn certain details about the investigation, about what's happened, correct?

A.   Yes.

Q.   And you need to know that so that you can do your job, right?

A.   Yes.

Q.   Okay.  And so you know that Mr. Ullah has been arrested. Let me -- withdrawn.

     You know that somebody has been arrested from the

**A000342**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page188 of 284      193

scene, correct?

A.   Correct.   Somebody's been taken away from the scene.

Q.   You know that NYPD has been there, correct?

A.   There was NYPD officers there, yes.

Q.   You know that the Port Authority police have been there?

A.   Yes.

Q.   Okay.   You know that a bomb squad has been there?

A.   Yes.

Q.   But you're told that the area is safe, correct?

A.   Yes.

Q.   It's been searched for any what's called secondary devices, correct?

A.   Yes.

Q.   And that would involve bomb-sniffing dogs going through the area, correct?

A.   I'm not sure if bomb-sniffing dogs were used in this case.

Q.   But it requires a team to go through and search for secondary devices, correct?

A.   Yes.

Q.   And the whole length of the passageway would be searched, correct?

A.   I would assume so, yes.

Q.   Okay.   And also, when you get there, there have been MTA and Port Authority officials there, correct?

A.   I'm not sure if MTA officials were there.

**A000343**

Q. Well, when you do your search, the area has been sealed off, correct?

A. Yes.

Q. They put up those boards that we looked at yesterday?

A. Yes.

Q. Is crime scene tape put up?

A. Yes.

Q. And so that was done by some law enforcement, correct?

A. It was done by workers for the MTA, not just law enforcement.

Q. Someone preserved the scene at that point?

A. I'm sorry?

Q. Someone -- the purpose was to preserve the scene at that point.

A. Yes.

Q. Those barriers were put up after the blast, correct?

A. Yes.

Q. After the EMTs had been there, correct?

A. Yes.

Q. And after Mr. Ullah had been removed from the scene, correct?

A. Yes.

Q. And after the area had been searched and secured for any secondary devices, correct?

A. Yes.

A000344

Q.  By the time you start your process, it's at least an hour and a half after the blast, right?

A.  Approximately.

Q.  You said you got there at nine, right?

A.  Approximately.

Q.  And the blast was somewhere between 7:15 and 7:30?

A.  I'm not completely sure.

Q.  Well, when you got there, you were told so that you knew how to do your task, correct?

MS. DONALESKI:  Objection, your Honor.

THE COURT:  Form or substance?

MS. DONALESKI:  It's eliciting hearsay.

MS. GATTO:  His state of mind, your Honor.

THE COURT:  Yes, state of mind.  So overruled as to substance.  You can answer.

A.  Can you repeat the question.

Q.  When you got to the scene, you were debriefed, we already discussed; that you remember.  You remember that?

A.  Yes.

Q.  And you were told when the blast happened, correct?

A.  I don't recall if we were told exactly when the blast happened.

Q.  But you agree it's at least an hour, if not longer, when you arrived?

A.  Approximately.

A000345

Q. And by the time those photographs that we looked at are taken, that's even an hour after you've arrived, right?

A. Approximately, yes.

Q. Because the things you have to do after you get there include walking through the scene, right?

A. Yes.

Q. Mentally assessing where things are, correct?

A. Yes.

Q. Putting down markers, correct?

A. Yes.

Q. After the markers are put down, then photographs are taken by NYPD, correct?

A. Yes.

Q. And then you're responsible for actually picking up the items, putting them in bags, and removing them from the scene.

A. Yes.

Q. Those are the steps, right?

A. Yes.

Q. When you get there to the scene, you are told where the seat of the blast is, correct?

A. Yes.

Q. And by seat of the blast, it means where the center of the blast was, correct?

A. Yes.

Q. Where the device actually went off, right?

A000346

A. Yes.

Q. That's in Zone 2, correct?

A. Yes.

Q. And when we looked at the pictures, you recall that there were clothes strewn about in Zone 2, correct?

A. Yes.

Q. You know that those clothes were cut off from Mr. Ullah by EMT workers, correct?

A. Yes.

Q. And then thrown to where they land, correct?

A. Wherever I saw where they landed.

Q. And in that area is the seat of the blast, correct?

A. In Zone 2 is the seat of the blast.

Q. Where the clothes are strewn about, correct?

A. The clothes were also in Zone 2.

Q. Yes. So the clothes are in Zone 2, correct?

A. Yes.

Q. And Zone 2, you said it was 36 feet lengthwise, right?

A. Approximately, yes.

Q. And a little less than 15 feet wide, right?

A. Yes.

Q. And so within Zone 2, there are clothes somewhere in that space, correct?

A. Yes.

Q. And the seat of the blast is near where the clothes are,

A000347

correct?

A. Yes.

Q. But you don't know exactly where in Zone 2 they are as you sit here today, meaning you can't tell me it's X number of feet into the beginning of Zone 2, correct?

A. No, I cannot.

Q. You didn't take any measurements like that?

A. I did not.

Q. Did anybody else on the team take measurements like that?

A. The New York City Police Department had their scanner out on the scene that would take those measurements.

Q. Okay. So the NYPD has some sort of instrument that can tell you where exactly within Zone 2 certain debris was found, correct?

A. Yes.

Q. And then they take that data, right, and they make a map; do I have that right?

A. I would assume so. I've never operated a scanner so I don't know the whole scientific piece behind it.

Q. But you've worked on other bomb sites, correct?

A. Yes.

Q. And in other bomb sites, you're familiar with a map that indicates where exactly within each zone debris is found, right?

A. Yes.

**A000348**

Q.   And such a map was generated here, correct?

A.   I would assume so.

Q.   Well, you just said you were working with NYPD, correct?

A.   Yes.

Q.   And NYPD took out their scanner, right?

A.   Yes.

Q.   And NYPD recorded where exactly within each zone material was found, correct?

A.   Yes.

Q.   And then they used that data to generate a map, correct?

A.   Yes.

Q.   Okay.  Let me show you what I'll mark as Defendant's Exhibit J.

          Agent Vetrano, will you please take a look at that.

A.   Yes.

Q.   Do you recognize that as the scene of the blast?

A.   This picture depicts the scene of the blast.

Q.   And you recognize that as a map of where evidence was located at this time of the scene of the blast?

A.   Yes.

          MS. GATTO:  Okay.  Your Honor, I offer Defense Exhibit J.

          MS. DONALESKI:  Your Honor, could I have a brief voir dire.

          THE COURT:  I don't think on the basis of that it's

**A000349**

coming in.  So yes, you may.

VOIR DIRE EXAMINATION

BY MS. DONALESKI:

Q.  Special Agent Vetrano, did you prepare this map?

A.  No.

Q.  Did you do anything to ensure that the items on the map are accurate?

A.  No.

Q.  Do you know, sitting here today, whether this is an accurate map of the crime scene?

A.  No.

        MS. GATTO:  Your Honor, I still offer it.

        THE COURT:  You're offering it still?

        Okay.  Are you objecting?

        MS. DONALESKI:  We are, your Honor.

        THE COURT:  Yes.  Sustained.

        MS. GATTO:  Okay.  Your Honor, I'm just going to grab the exhibit from him.

        THE COURT:  Yes, you can.

        There might be another witness who can do this.  I don't want to overstate it, but this is not the witness.

BY MS. GATTO:

Q.  So Agent Vetrano, you did not prepare a map, correct?

A.  No, I did not.

Q.  You did not prepare any document that indicates where

**A000350**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page196 of 284

exactly within each zone each item was found, correct?

A. Correct.

Q. And you were shown an exhibit that had collected screws from Zone 2. Do you remember that?

A. Yes.

Q. Okay. You don't know where within Zone 2 exactly each of those screws were found.

A. They were scattered about Zone 2.

Q. Okay. But you don't know, for example, five were found 6-inches from where the blast site was, six were found 12 inches; you don't have those details, correct?

A. No. The important thing was that it was at the scene.

Q. I'm asking a different question. You don't have the exact location, correct?

A. No.

Q. You said it was important that it was on the scene, correct?

A. Yes.

Q. But it's also important to know where on the scene, right?

A. Yes.

Q. I mean, in fact, that's why you zone out the locations, correct?

A. You zone out the locations to make it more manageable for us to collect evidence, to make sure that we do a thorough processing of the scene.

Q.   Agent Vetrano, I think on your direct yesterday you discussed some of the training you've had, correct?

A.   Yes.

Q.   You would agree you've had extensive training on how to search, record, and collect evidence properly, correct?

A.   Yes.

Q.   And included in that training has been that it's important to record exactly where evidence is before it is moved by law enforcement or any other individual, is that fair to say?

A.   In a postblast scene it's important to collect evidence to document where the evidence was collected within the zone itself.

Q.   Right.  But it's important to know where, correct?

A.   As long as it was collected within the zone, that's what's important for a postblast scene.

Q.   Fair enough.  But the idea in recording evidence is to show where it was before law enforcement came on the scene, as close to humanly possible as that can be, correct?

A.   We can only record the scene as we see it once we come upon it and the scene is turned over to us.

Q.   Right.  And before you got to this scene, it's easy to say that dozens of law enforcement had been through it, correct?

A.   Yes.

Q.   And you know that there's a passageway, right, with entry from both sides, right?

**A000352**

Case 21-1058, Document 40, 10/04/2021, 3186389, Page198 of 284

A.   Yes.

Q.   And before you got there, law enforcement had come from both sides into the blast center, correct?

A.   I would assume so.

Q.   You said it was important to indicate which zone the evidence came from, right?

A.   Yes.

Q.   You would agree that the large majority of evidence you collected came from Zone 2, correct?

A.   Yes.

Q.   And you testified about some other items that you recovered from zones outside of Zone 2; do you recall that?

A.   Yes.

Q.   You have no idea of knowing whether those pieces of evidence had been moved by the law enforcement who came before you, correct?

A.   Again, we only document the scene as we come upon it.

Q.   But the answer is yes, right?

A.   I'm sorry.  Can you repeat.

Q.   The answer is yes, you have no way of knowing, when you record the evidence, whether it had been moved by law enforcement before you got there?

A.   Right.

Q.   I'd like to show you what's in evidence as Government Exhibit 116-2A.

A000353

Do you recall this photograph?

A. Yes.

Q. And do you recall what zone this item was recovered from?

A. I would have to look at the evidence itself to make sure.

Q. Okay. Do you have the evidence with you?

A. Yes.

Q. Okay. I have to look at my chart to find out what --

THE COURT: Do you know which one it is in your --

THE WITNESS: Yes.

Q. Would you mind taking a moment and finding it.

THE COURT: One of the ones in a pail? Okay. Yes.

MS. GATTO: Your Honor, can I have a moment to confer with co-counsel.

THE COURT: Yes, that's fine.

BY MS. GATTO:

Q. Have you had a chance to look at the exhibit?

A. Yes.

Q. And do you recall where that was found?

A. This was found within Zone 2.

Q. And again, this exhibit, you don't know how it got to the corner there, correct?

A. Correct.

Q. Do you agree with me that the photograph was taken up against the wall, correct?

A. It appears so, yes.

**A000354**

Q. In Zone 2, correct?

A. Yes.

Q. And you don't know if the blast propelled it to that space, correct?

A. Again, I only know what I -- when we come upon the scene, what we see.

Q. You don't know if it was kicked into that space?

A. I don't know.

Q. Okay. If you could please look at Government Exhibit 134-2A.

Do you recall looking at that exhibit today, earlier this morning?

A. Yes.

Q. Okay. And you testified that this had been found in Zone 4?

A. Again, I would have to look at the container.

Q. Please do. I think it's right there for you.

A. Zone 4.

Q. Thank you. Let me show you what's been marked as Defendant's Exhibit A1 and A2.

        MS. GATTO: Your Honor, may I approach.

        THE COURT: Yes. You don't have to ask.

Q. Mr. Vetrano, could you take a look at Defendant Exhibits A1 and A2.

A. I only see A1 on the screen.

Q.  Why don't you take a look at Defendant's Exhibit A1.

          MS. GATTO:  And then your Honor, if I could publish to the witness and to the government Defense Exhibit A2.

          Oh, there you go.

          THE COURT:  It's on the screen.

          MS. GATTO:  Yes.

          THE COURT:  But not on the jury's screen --

          MS. GATTO:  No.

          THE COURT:  -- because it's not yet in evidence.  But the witness and the lawyers have it.  So go ahead.

BY MS. GATTO:

Q.  Agent Vetrano, you agree that these are photographs from the blast scene, correct?

A.  The photograph -- I've never seen the photograph on the right-hand side.  That's Defendant Exhibit A1.

Q.  I'm not asking you if you've ever seen it.  I'm asking you, as you look at it now, do you agree with me that it's a photograph from the blast scene, correct?

A.  I would assume so.

Q.  I'm not asking you to assume.  Just take a look at it.  You were at the blast scene, correct?

A.  Yes.

Q.  You recorded and collected the evidence, correct?

A.  Yes.

Q.  And these are two photographs of the evidence, correct?

**A000356**

A.   Yes.

MS. GATTO:  Okay.  Your Honor, I offer Defendant's Exhibit A1 and A2.

MS. DONALESKI:  Objection.  May we have a brief voir dire on this.

THE COURT:  Okay.

VOIR DIRE EXAMINATION

BY MS. DONALESKI:

Q.   Special Agent Vetrano, did you take either of these photos?

A.   No.

Q.   Do you know when they were taken?

A.   No.

MS. DONALESKI:  Nothing further.

THE COURT:  You're opposing?

MS. DONALESKI:  Yes.

THE COURT:  I don't think this witness -- I mean, he can basically say it looks like a picture of the crime scene.

MS. GATTO:  Your Honor, if I may.

BY MS. GATTO:

Q.   Agent Vetrano, the exhibits that were shown to you on direct, did you take those photographs?

A.   No.

Q.   Do you know exactly when they were taken during the period of time you were on the scene?

A.   No.

A000357

Case 21-1058, Document 40, 10/04/2021, 3186339, Page203 of 284

Q. But they fairly and accurately depicted the evidence, correct?

A. Yes.

Q. And am I right that you didn't take these photographs, Agent Vetrano?

A. Right.

Q. But they are taken from the scene, correct?

A. I would assume so.

Q. Okay.

THE COURT: But what's your basis for saying that the first set that you reviewed before on direct examination fairly and accurately depicted the scene?

THE WITNESS: Yes, your Honor.

THE COURT: What was your basis for saying that?

THE WITNESS: Because those were photos that I've known to come from the crime scene from the New York City Police Department.

THE COURT: So you had an independent basis for knowing they were what they were purported to be.

THE WITNESS: Yes, sir.

THE COURT: Do you have a similar basis for the ones you see now on the screen for the first time?

THE WITNESS: I mean, I don't know where the scene -- the picture on the right-hand side came from, but the picture on the left-hand side does depict the NYPD placard, blue

A000358

placard with our evidence marker.

BY MS. GATTO:

Q.  Well, Agent Vetrano, they both indicate the identical floor, correct?

A.  Yes.

MS. GATTO:  Your Honor, I offer Defendant's Exhibit A2 and A1.

THE COURT:  So I'm going to sustain the objection.

Go ahead.

MS. GATTO:  Your Honor, I have no further questions.

THE COURT:  Okay.  Any redirect?

MS. DONALESKI:  No, your Honor.

THE COURT:  All right.  You can step down.  Well, take your paint cans with you, and whatever has accumulated up there, and then you can step down.

(Witness excused)

THE COURT:  Who's the government's next witness?

MS. DONALESKI:  The government calls Daniel Byrne.

THE COURT:  Okay.

(Witness sworn)

THE COURT:  Please have a seat.

Okay.  So Mr. Byrne, keep close to that mic, because the acoustics in this room are tricky.

Ms. Donaleski, you may proceed.

MS. DONALESKI:  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000359**

DANIEL BYRNE,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DONALESKI:

Q.   Good morning, Detective Byrne.

A.   Good morning.

Q.   Where do you work?

A.   Joint Terrorism Task Force.

Q.   And again, I know it's awkward.  I'll ask you to speak into the microphone, if possible.  Thank you.

    Do you work for the NYPD?

A.   Yes, I do.

Q.   What is your rank?

A.   Detective.

Q.   And how long have you worked for the NYPD?

A.   For 15 years.

Q.   You mentioned that you work at the Joint Terrorism Task Force.  What is that?

A.   It's the task force comprised of federal and local law enforcement agencies to combat terrorism.

Q.   Is that also called the JTTF?

A.   Yes, it is.

Q.   Are you assigned to a particular unit within the JTTF?

A.   Yes.

**A000360**

Q.   What unit is that?

A.   Squad CT10.

Q.   What are your duties and responsibilities as a detective on the squad CT10?

A.   To investigate ISIS-related threats in New York City.

MS. GALLICCHIO:   I'm sorry.   I'm going to ask the witness to slow down.

THE COURT:   Yes.   Slow down, nice and loud.   It's a tricky courtroom.

A.   To investigate ISIS-related threats to New York City.

Q.   Directing your attention to December 11, 2017.   Please describe what happened that morning.

A.   I was in the office when we heard of a -- an explosion that had taken place in the vicinity of 42nd Street in Manhattan.

Q.   What did you do after learning that information?

A.   I was tasked to respond to Bellevue Hospital to interview a suspect that they had in custody.

Q.   What did you do next?

A.   I interviewed the suspect.

Q.   Did you go to Bellevue Hospital?

A.   Yes, I proceeded to go to Bellevue Hospital.

Q.   What time did you get to Bellevue Hospital?

A.   Approximately 9:15.

Q.   Describe the scene at Bellevue Hospital when you arrived.

A.   It was a chaotic scene; there was a large law enforcement

**A000361**

presence within the emergency room area.

Q. What did you do when you got to the hospital?

A. I located the suspect who they had in custody and proceeded to begin our interview.

Q. And who did you interview?

A. Akayed Ullah.

Q. Generally speaking, what did Mr. Ullah tell you during that interview?

A. He told me how he filled the bomb, where he detonated the device, and that he did it on behalf -- he did it for the Islamic State.

Q. Do you see Mr. Ullah in the courtroom today?

A. Yes, I do.

Q. Can you identify him by where he's seated and an item of clothing that he's wearing.

A. He's seated at the table over there with the gray shirt with the dark-colored blazer.

        MS. DONALESKI:  Identifying the defendant, your Honor.

        THE COURT:  All right.  Let the record reflect that the witness has identified the defendant.

        Go ahead.

        MS. DONALESKI:  Thank you, your Honor.

Q. Where within Bellevue Hospital did the interview take place?

A. Inside of a hospital room off of the ER.

**A000362**

Q. Can you describe the hospital room.

A. Approximately about a 15 x 15 single bed space.

Q. What was your understanding of what the purpose of the interview was?

A. To try to ascertain what had happened, to try to see what the current threat picture looked like, if we -- if this was part of a larger, more coordinated effort, if there were other devices out there, and what the actual current threat was.

Q. Who was present when the interview began?

A. Myself, Detective Martin, and Inspector Mauro.

Q. Can you spell Inspector Mauro and Detective Martin's last names, please.

A. Mauro, M-A-U-R-O; Martin, M-A-R-T-I-N.

Q. Please describe where each of you was located or standing within the room.

A. Inspector Mauro and Detective Martin were on the right side of Mr. Ullah's bed, I was on the left side.

Q. Were you the only people in the room throughout the interview?

A. No.

Q. Who else was in the room?

A. There were other law enforcement personnel present, there were nurses, doctors.

Q. And were those other people in the room the whole time or coming in and out of the room?

**A000363**

A.   Coming in and out.

Q.   What was your understanding of why other law enforcement officers were coming in and out of the room?

A.   My understanding would be that they were trying to ascertain as much up-to-the-minute information as possible to push it out to supervision in the field.

Q.   How long did the interview last?

A.   Approximately four hours.

Q.   Did you take any breaks during the interview?

A.   We did.

Q.   Why?

A.   We offered Mr. Ullah water, we asked him how he was feeling.

Q.   And what did Mr. Ullah say when you asked him how he was feeling?

A.   He responded affirmatively, "good" or "fine."

Q.   Was any portion of the interview recorded?

A.   Yes.

Q.   Were you aware that that portion was recorded at the time of the interview?

A.   I was not.

Q.   When did you become aware that portions of the interview were recorded?

A.   Days later, after the interview.

Q.   And was the recording made by another law enforcement

A000364

Case 21-1058, Document 40, 10/04/2021, 3186339, Page210 of 284

officer?

A.  Yes, it was.

Q.  Have you reviewed that recording?

A.  I have.

Q.  Approximately how long is the recording?

A.  About ten minutes.

Q.  And how long was the interview?

A.  About four hours.

Q.  To the best of your knowledge, was the recording situated at the beginning, middle, or end of the interview?

A.  My guess would be the beginning.

MS. GALLICCHIO:  Objection.

THE COURT:  Well, is it a guess or more than a guess?

THE WITNESS:  I --

THE COURT:  You were there.  You've seen the video.

THE WITNESS:  Right.

THE COURT:  So generally speaking, at what point in the four hours did the recorded portion take place?

THE WITNESS:  I can't be certain, but my assumption would be towards the beginning.

THE COURT:  But when you say assumption, I think that's the objectionable term.  You have knowledge, actually, so based on your knowledge, or based on your recollection, do you believe it to have been at the beginning?

THE WITNESS:  Yes, that's correct.

A000365

THE COURT:  Okay.

MS. DONALESKI:  Thank you, your Honor.

BY MS. DONALESKI:

Q.  How did you begin the interview?

A.  By reading Mr. Ullah his *Miranda* rights from the advice of rights.

Q.  Please describe how you did that.

A.  Orally.

THE COURT:  Orally.  Do you have it memorized or you read it from a card?

THE WITNESS:  No, actually, I read it orally from an advice of rights form.

MS. DONALESKI:  Mr. DeLuca, can you please publish, for the witness and counsel and the Court only, Government Exhibit 801.

BY MS. DONALESKI:

Q.  Do you recognize this form, Detective Byrne?

A.  Yes, I do.

Q.  What do you recognize it to be?

A.  The advice of rights form that I read to Mr. Ullah that day.

Q.  How do you recognize it?

A.  My handwriting is on it.

Q.  Did you sign it as well?

A.  I did.

A000366

MS. DONALESKI:  Government offers Government Exhibit 801.

THE COURT:  Any objection?

MS. GALLICCHIO:  No objection.

THE COURT:  Okay.  So Government Exhibit 801 is received.

(Government's Exhibit 801 received in evidence)

MS. DONALESKI:  Could we publish it to the jury, please, Mr. DeLuca.

And Mr. DeLuca, can you please zoom in on the top portion up to your right.  Thank you.

BY MS. DONALESKI:

Q.  Whose handwriting is that, Detective Byrne?

A.  That is my handwriting.

Q.  Can you please read aloud the place, date, and time.

A.  Bellevue Hospital, December 11, 2017, at 9:25 in the morning.

MS. DONALESKI:  Mr. DeLuca, can you please enlarge the section entitled Your Rights.

Q.  Detective Byrne, did you read each of those rights aloud?

A.  Yes, I did.

MS. DONALESKI:  And Mr. DeLuca, I'll ask you to zoom in on the Consent section.

Q.  Whose signature is that?

A.  Akayed Ullah's.

**A000367**

Q.  Did you see him sign this document?

A.  Yes, I did.

MS. DONALESKI:  And Mr. DeLuca, I'll ask you to zoom in on the witness at the bottom.

Q.  Whose signatures are these?

A.  It's my signature, Detective Martin's signature.

Q.  Can you please read aloud the time.

A.  9:25.

Q.  Thank you.

MS. DONALESKI:  We can take this down, Mr. DeLuca.

Q.  So I'd like to talk about the interview itself.

What, if anything, did the defendant tell you about where he lived?

A.  He stated that he lived at 679 Ocean Parkway, Apartment 3J, in Brooklyn, New York.

Q.  Who, if anyone, did the defendant say that he lived with?

A.  He stated that he lived with his mother, younger brother, and sister at that location.

Q.  Did the defendant tell you what he did for a living?

A.  He did.  He stated that he was an electrician.

Q.  Where did he work?

A.  I said he was currently working at 39th Street and Eighth Avenue in Manhattan.

Q.  What did the defendant say about what had happened that morning, the morning of December 11, 2017?

**A000368**

A.   He said at approximately -- at 5:45 in the morning, he proceeded to attach two zip ties around his chest and -- at which point he proceeded to conduct his morning prayers.  Upon completion of his morning prayers, he stated that he went into the kitchen of his residence and retrieved a galvanized pipe.

THE COURT:  Retrieved a what?

THE WITNESS:  Galvanized pipe.

Q.   What did he do with the galvanized pipe?

A.   He attached it to his chest utilizing the zip ties that he previously had just put on.

Q.   What was inside the pipe?

A.   He stated that it was screws, sugar, match heads from approximately five to ten book of matches, and four Christmas lights.

Q.   What did the defendant say happened next after he had strapped the pipes to his chest?

A.   He stated that he walked to the 18th Avenue train station in Brooklyn, New York, at which point he boarded the F train. After boarding the F train, he took that to downtown Brooklyn, Jay Street Metrotech Station, where he transferred to the A train.  Once he got on the A train, he proceeded to take that into Manhattan to the 42nd Street train station.

Q.   What, if anything, did the defendant tell you happened while he was riding the subway on the way to the Port Authority that morning?

A000369

A.    He stated that he posted -- made a Facebook post to his
Facebook account.

Q.    I'll pause you right there.  What was the name of the
Facebook account?

A.    Abu.  A-B-U, A-Z-Z-A-M.

Q.    What was the message the defendant told you he posted?

A.    "Trump, you failed to protect your nation."  In addition,
he wrote an Arabic word meaning "long live."

Q.    Why did the defendant post that message?

A.    He stated that that's how the Islamic State would know that
it was done in their name.

Q.    How long before the attack did the defendant post the
message?

A.    He stated approximately 45 minutes prior.

MS. DONALESKI:  Your Honor, at this time I'd like to
read a stipulation.  It's signed by the parties, so I'd ask
that we be able to publish it so the jury can read along.

THE COURT:  All right.

MS. DONALESKI:  It's Government Exhibit 2002.

"It is hereby stipulated and agreed, by and among the
United States of America, by Geoffrey S. Berman, United States
Attorney for the Southern District of New York, Shawn G.
Crowley, Rebekah Donaleski, and George D. Turner, Assistant
United States Attorneys, of counsel, and defendant Akayed
Ullah, by and through his attorneys, Amy Gallicchio, Esq., and

**A000370**

Julia Gatto, Esq., that:

"Government Exhibit 401 is an excerpt from true and correct account records from the internet social media company Facebook, Inc.

"The times listed in Government Exhibit 401 reflect Coordinated Universal Time, or UTC.  In the month of December, UTC is five hours ahead of Eastern Standard Time, which is the time in New York City.

"It is further stipulated and agreed that the Government Exhibit 401 and this stipulation may be admitted in evidence at trial."

And it's signed and dated.

Your Honor, at this time we offer Government Exhibits 2002 and 401.

THE COURT:  Okay.  Any objection?

MS. GALLICCHIO:  No objection.

THE COURT:  All right.  So 2002 and 401 are received.

(Government's Exhibits 401 and 2002 received in evidence).

THE COURT:  Government Exhibits.  All right.

MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 401, the first page.

Mr. DeLuca, can you please enlarge the name, where it says First and Last.

BY MS. DONALESKI:

**A000371**

Q.   Detective Byrne, can you please read this aloud.

A.   Abu Azzam.

MS. DONALESKI:  Mr. DeLuca, can you please enlarge the email addresses that are registered to the account.

Q.   Detective Byrne, can you please read these aloud.

A.   Phonetically it's anom.ullah.37.  I'll spell it.  A-N-O-M dot U-L-L-A-H dot 37 @facebook.com.

The second email, anomullah@yahoo.com.

MS. DONALESKI:  Mr. DeLuca, can you please publish page 3.

Q.   Detective Byrne, please read the message aloud.

A.   "Oh, Trump, you failed to protect your nation.  *Baqiya*."

Q.   Detective Byrne, did the defendant tell you what *"baqiya"* meant?

A.   Yes, he did.

Q.   What did he say?

A.   "Long live."

Q.   And why did he post the word *"baqiya"*?

A.   He stated that that's how the Islamic State would know that he did this in their name.

Q.   Did he tell you what language *"baqiya"* is?

A.   Arabic.

MS. DONALESKI:  Mr. DeLuca, can you please enlarge the time and date.

Q.   Detective Byrne, can you please read that date aloud.

**A000372**

A. December 11, 2017.

Q. And the time?

A. 11:36:19 UTC.

Q. What is 11:36:19 UTC in Eastern Standard Time?

A. 6:36 in the morning.

Q. Thank you.

MS. DONALESKI: We can take that down, Mr. DeLuca.

Q. So just taking a step back, what were you physically doing during the interview?

A. I was asking Mr. Ullah questions.

Q. Were you taking notes?

A. Yes, I was.

Q. Were you taking down everything he said?

A. No.

Q. Why not?

A. It just wouldn't be feasible.

Q. What do you mean by that?

A. It just wouldn't be practical to write down everything somebody's saying while asking them questions at the same time.

Q. What did you do with the notes after you finished the interview?

A. I attached them to my report.

Q. When did you prepare your report?

A. The night of December 11th, later on that night.

Q. Why did you prepare it that same night?

**A000373**

A.   It was the time constraints that I had to finish the report.  There was a lot of people waiting for me to finish that report.

Q.   What information did you use to prepare the report?

A.   My memory and in addition to my notes.

Q.   Was every detail that Mr. Ullah said that was captured in your notes in the report?

A.   The vast majority of my notes made it into the report.

Q.   And you said the vast majority.  Why not put every single thing in your notes?

A.   I did the best I could to include everything, but I was under time constraints.

Q.   So let's get back to the interview.

        After the defendant posted that message that we just saw to Facebook, what happened next?

A.   He stated that he proceeded to walk up the stairs and that he -- he proceeded to detonate the device.

Q.   And you said "walk up the stairs."  Did the defendant tell you where he was when he walked up the stairs?

A.   Forty-second Street train station.

Q.   And how did he detonate the device?

A.   By placing a wire on a 9-volt battery.

Q.   Why did the defendant choose that location?

A.   He told me that he had watched a televised interview wherein a news reporter was interviewing passersby about a

**A000374**

recent threat put out by the Islamic State to Times Square.  He stated that the individual being interviewed did not feel threatened by the recent threat by the Islamic State and that his goal was to detonate the device in the precise location where he believed that that interview had taken place.

Q.   The precise location that that televised interview about the Islamic State threat to Times Square had taken place, is that correct?

A.   That's correct.

Q.   Why did the defendant choose a Monday morning for the attack?

A.   He stated that there would be more people to terrorize.

Q.   What did the defendant tell you about how he learned to make the bomb?

A.   He stated he began researching online and reading magazines approximately one year prior to December 11th on how to make a pipe bomb.

Q.   And you mentioned that he read magazines online.  Did he do anything else online to learn that?

A.   He stated that he watched various videos as well.

Q.   What did the defendant tell you about the videos that he watched online?

A.   He stated he watched videos by Anwar al-Awlaki.  In addition, he watched another video called Flames of War II, which conveyed a message that if you do not take the fight --

**A000375**

if you cannot come here, then to take the fight where you currently are.

Q. What was your understanding of what "here" and "where you currently are" meant in that context?

A. My understanding is that if you cannot travel overseas, then to take the --

MS. GALLICCHIO: Objection.

THE COURT: You can finish the answer. Go ahead.

A. -- is that if you cannot travel overseas, then to take the fight where you're currently located.

Q. What else did the defendant tell you about the types of videos he watched?

A. He stated he watched other videos on YouTube of various ways to terrorize Americans to include truck attacks, throwing people from rooftops, knife attacks, bombs, and nails.

Q. What, if anything, did the defendant say about any other recent terror attacks?

A. He stated that after the Manchester attack in England, that the media actually published how to build a pipe bomb.

Q. What, if anything, did the defendant say about why he committed the attack?

A. He stated that, "I did it on behalf of the Islamic State," and also he said, "I did it for Allah."

Q. Did he explain why he did it on behalf of the Islamic State?

**A000376**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page222 of 284

A. He did. He further explained that he did it on behalf of the Islamic State and not Al Qaeda because Al Qaeda is only a group and that the Islamic State is a state.

Q. What, if anything, did the defendant say about US foreign policy?

A. He stated that in 2014, Israel had bombed the Gaza Strip, he felt that the United States provided those bombs, and he stated that he believed that the -- America's foreign policies were the symptoms to the cause.

Q. Did he explain what he meant by that, the symptoms to the cause?

MS. GALLICCHIO: Objection.

THE COURT: Well, just did he describe. Did he explain what he meant?

THE WITNESS: He did.

THE COURT: What did say?

THE WITNESS: He stated that American foreign policies are the symptoms and that the people that took actions like he took that day are the cause.

BY MS. DONALESKI:

Q. Did he say anything more about the cause?

A. He stated that the cause will continue until America changes its foreign policy.

Q. What, if anything, did the defendant expect to happen when he detonated the device?

A000377

A.   He stated that he expected to die.

Q.   What was his intention?

A.   To terrorize --

THE COURT:   Well, what did he tell you his intention was?

THE WITNESS:   To terrorize people.

Q.   What, if anything, did the defendant say about whether he expected others to die?

A.   I asked the defendant if he expected others to die, and he responded, "Maybe."

Q.   What, if anything, did the defendant tell you about when he began building the bomb?

A.   He stated that he began collecting the components to build the bomb approximately 15 to 20 days prior to December 11, 2017.

Q.   How did he collect those materials?

A.   He stated that he retrieved from his work site the pipe, the screws, and the wiring.  In addition, he stated that he got the match heads, the book of matches and the Christmas lights from a 99-cent store located in the vicinity of the 18th Avenue train station, and he stated that he retrieved the sugar from his residence.

Q.   Where did the defendant assemble the bomb?

A.   Inside his residence.

Q.   Did he tell you when he had completed the assembly of the

**A000378**

bomb?

A.   He stated within one week prior.

Q.   Did he say anything other than one week during the interview?

A.   Initially he said three days, and then we went through it multiple times, his account, and then he further stated one week.  That's what I believe that he was more certain on.

Q.   Did the defendant tell you where he stored the bomb between the week prior to when he completed assembling the bomb and December 11, 2017?

A.   Inside of -- at his residence.

Q.   What, if anything, did the defendant say that investigators might find at his residence?

A.   He stated that investigators may find matches and wiring.

(Continued on next page)

A000379

Q.   Did the defendant tell you how he built the bomb?

A.   Yes, he did.

Q.   What did he tell you about how he built the bomb?

A.   He stated that he took a galvanized pipe and filled it with screws.  In addition to that, he put match heads from about 5 to 10 books of matches in sugar.  Also he put inside 4 Christmas lights.  From there, he put an end cap on the device and used a zip screw to make a hole in the metal.

Q.   What is a zip screw?

A.   A device that will make a hole into metal.

Q.   Continue, please.

A.   Then he ran wiring from the device to a 9-volt battery, only connecting one end.

Q.   How did the defendant detonate the device?

A.   By completing the circuit, by placing a wire onto the battery.

Q.   Why did the defendant use screws in the bomb?

         THE COURT:  These are questions you asked him and he answered?

         THE WITNESS:  That's correct, your Honor.

         THE COURT:  Okay.

Q.   What did the defendant tell you about why screws were used in the bomb?

A.   I asked the defendant why he believed that the instructions called for the screws, and he responded that the video stated

**A000380**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page226 of 284

that the nails were chosen to inflict maximum damage.

MS. DONALESKI:  No further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. GALLICCHIO:

Q.  Good morning.  Detective Byrne, you responded immediately to the emergency room, is that right?

A.  That's correct.

Q.  You didn't go to the train station before you went to the emergency room, right?

A.  That's correct.

Q.  Did you have any responsibilities on the site of the incident?

A.  No, I did not.

Q.  Did you at any time go to the location of the blast?

A.  Not till -- not that day.  Days after.

Q.  Your primary responsibility was to take a statement from Mr. Ullah, right?

A.  That's correct.

Q.  When you for the to the emergency room, Mr. Ullah was already there, right?

A.  He was.

Q.  At the time that you got there, was he in a room or in the floor of the emergency room?

A.  In a room.

**A000381**

Q. But part of the emergency room, right?

A. I believed it to be a room that was off of the emergency room. I entered the hospital into the emergency room, and he was separated in his own room.

Q. The room was an actual room with a door enclosure, right, not just a curtain enclosure?

A. I believe there was a door there, yes.

Q. Do you remember?

A. Definitively, no.

Q. You were there for hours, right?

A. Right. If I remember, as you asked me, I'm pretty sure there was a door there.

Q. When you got there, Mr. Ullah was lying on a hospital bed in this room, right?

A. Correct.

Q. He was handcuffed to this hospital bed, right?

A. Yes.

Q. Was he clothed at that time?

A. He was.

Q. He was clothed?

A. Well, he was covered with a hospital robe. I believe he had a hospital gown on him.

Q. He didn't have street clothes on him, right?

A. No, I don't remember him having street clothes.

Q. Do you specifically remember that he had a hospital gown on

**A000382**

or are you assuming that?

A. I'm trying to remember. My recollection, he had a hospital gown on him.

Q. I know you said you took notes that day, right?

A. Yes.

Q. Do you have any notes reflecting your observations of Mr. Ullah?

A. No.

Q. I would assume it's fair to say that you use your notes to help refresh your recollection about what happened last year, right?

A. Correct.

Q. If things aren't in your notes, it might be hard for you to remember it, is that right?

A. Sometimes, yes.

Q. Obviously, you have a lot of other responsibilities and duties other than this case, right?

A. That's correct.

Q. And you have been involved in various other investigations since this case, right?

A. Correct.

Q. So it's important for you to take detailed and copious notes to help you refresh your recollection if you're called to testify, right?

A. Correct.

A000383

Case 21-1058, Document 40, 10/04/2021, 3186339, Page229 of 284

Q. For example, things like whether there was a door to the hospital room or whether Mr. Ullah was in a hospital gown or not, those are details you can't remember because you didn't write them down, right?

A. That's right.

Q. When you got to the hospital, there were numerous police officers there by the time you already got there, right?

A. That's correct.

Q. Were there Port Authority Police Department officers there?

A. Yes, there were.

Q. Do you remember an Officer Sean Gallagher, for example?

A. No.

Q. Do you remember the names of any other Port Authority Police Department officers?

A. I don't.

Q. But you know that some of them were there, right?

A. Yes.

Q. They were the ones actually who had arrested Mr. Ullah, right?

A. That was my understanding, yes.

Q. You said there were numerous other agencies represented there other than Port Authority, right?

A. Yes.

Q. NYPD was there?

A. That's correct.

**A000384**

Q. And FBI of course?

A. Correct.

Q. Were there any other agencies there that you recall?

A. Those are the three that I remember.

Q. There were several officers from each of those agencies?

A. Yes.

Q. You said the space that you were in, this room, was about 15 by 15, right?

A. Yes.

Q. Fairly small enclosure, right?

A. I don't remember it being too constricting, but my estimate would be a 15-by-15 room.

Q. In that room, obviously, was the hospital bed, right?

A. Yes.

Q. And medical equipment, right?

A. Correct.

Q. And a variety of police officers, right?

A. Yes.

Q. During your investigation and your interrogation of Mr. Ullah, there were at least six other officers besides you, right?

A. Yes.

Q. They were in the room while you were interrogating Mr. Ullah, right?

A. Correct.

**A000385**

Q. So a total of at a minimum seven law enforcement officers surrounding Mr. Ullah, right, or in the room?

A. Yes.

Q. Were there more than that?

A. At times, yes, there were.

Q. So at times there were more than seven law enforcement officers in that room while he was being questioned, right?

A. That's right.

Q. Because there were law enforcement officers of various agencies coming in and out, right?

A. There were.

Q. Various agencies had different responsibilities as part of this investigation, right?

A. Correct.

Q. They were collecting information from you in order to perform other duties, right?

A. Yes.

Q. Not only were there officers inside the room, there were law enforcement officers outside of the room, right?

A. Yes, there were.

Q. That were guarding the room for safety, right?

A. Correct.

Q. They were armed, right?

A. Yes, they were.

Q. Were you armed?

A000386

Case 21-1058, Document 40, 10/04/2021, 3186339, Page232 of 284

A.  Yes, I was.

Q.  All the officers were armed, to your knowledge?

A.  Yes.  That would be a safe assumption.

Q.  The officers that were outside the room, do you know what agency they represented?

A.  I remember seeing the NYPD, FBI, PAPD.

Q.  They were armed with rifles, some of them, right?

A.  I can't say for certain.  I don't recall them.

Q.  You don't recall seeing like AR-15s, other large rifles?

A.  I don't specifically remember that, no.

Q.  During the four hours that you were interrogating Mr. Ullah, he remained handcuffed to that bed, is that fair to say?

A.  Yes.

Q.  In this investigation, your interview began really within a half an hour, 25 minutes after you arrived, right?

A.  It was fairly quickly after I arrived, yes.

Q.  Are you aware that Mr. Ullah had just arrived to the hospital at about 8:30, right?

A.  I was not aware of what time he arrived at the hospital.

Q.  You were aware of time of the blast, right?  About 7:20?

A.  That's my understanding.

Q.  You got that information, right?  You received it?

A.  Yes.

Q.  You were briefed about the incident, about what was known about the indent before you began your interview, right?

**A000387**

A. There wasn't much information when I got assigned to respond to Bellevue Hospital.

Q. You knew the location, right?

A. I knew 42nd Street, Manhattan.

Q. You knew approximately what time, right?

A. Yes, I did.

Q. I think the rights form indicated that you read Mr. Ullah his Miranda rights at approximately 9:25, right?

A. Correct.

Q. You concluded your interrogation at about 1:30 that afternoon, is that right?

A. Yes, it is.

Q. You also indicated that there were a lot of medical professionals coming in and out of the room, right?

A. Yes. I remember nurses coming in. I remember there was a doctor.

Q. So medical staff, while you were trying to conduct your interview, were also trying to treat Mr. Ullah?

A. That's correct.

Q. They were trying to assess his injuries and the degree of his injuries, right?

A. They would come in from time to time to check on him.

Q. Do you know at that point when you began your interview whether he had any medical treatment?

A. I do.

**A000388**

Q. You do?

A. Yes.

Q. Was he getting medical treatment during the 4 hours of your interrogation?

A. He was just -- a nurse would come in, check on him, and then they would leave.

Q. And then what?

A. They would come in, check on him, and then walk away.

Q. Were his wounds being attended to?

A. Not while I was interviewing.

Q. You saw his wounds, right?

A. Yeah.

Q. He had severe burns on the right side of his body, right?

A. He did. His skin was burned.

Q. You also spoke to medical -- you spoke to a doctor, right?

A. I did.

Q. You wanted to get an assessment of what his physical condition was, right?

A. That's correct.

Q. You learned that he had a laceration, he had internal injuries, right?

A. Laceration to his liver.

Q. At that point, though, he had not had any surgeries or any other medical intervention, right?

A. Not that I'm aware of, no.

**A000389**

Q. Was he taken at any point from the room during the 4 hours? For testing, for example?

A. No.

Q. No?

A. No.

Q. Do you have any record, do you know whether he received any medication during the 4 hours that you interviewed him?

A. I do not know.

Q. Or whether he received medication before you got there?

A. I'm not aware of that as well.

Q. You are familiar with Bellevue Hospital, right?

A. A little bit.

Q. It's well-known, has a well-known psychiatric department, right?

A. Okay.

Q. I'm asking you. Are you familiar with it?

A. I'm not that familiar with it, no.

Q. At the time that you interrogated Mr. Ullah, though, he had not been seen by a psychologist or a psychiatrist?

A. Not to my knowledge.

MS. DONALESKI: Objection.

THE COURT: Overruled. Not to his knowledge is what he said. Go ahead.

Q. To your knowledge, there was no assessment done by medical professionals of his mental health, right?

**A000390**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page236 of 284

A.   No.

Q.   Did you request one?

A.   No, I did not.

Q.   You did know what just happened, right?

A.   Yes.

Q.   You did know that he had an explosive device attached to his body?

A.   Correct.

Q.   You did know that he intentionally detonated that explosive device, right?

A.   Yes.

Q.   And you didn't think it was important at that time to ask for a mental health evaluation to determine if he was mentally sound to be interrogated?  Did you?

A.   No.  These are all things that I found out throughout my interview.  I did not stop the interview to request that.

Q.   You learned that he had exploded the device on his body before you actually got to the hospital, right?

A.   I knew that somebody was in custody for a suspected a bomb just went off on 42nd Street and they had somebody in custody.

Q.   Right.  Before you got to the hospital, you consulted with other officers that were at the scene, right?  I'm sorry. Other officers that were at the hospital.

A.   Did I consult with them?

Q.   Yes.

**A000391**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page237 of 284

A. No.

Q. You didn't go in there cold to talk to Mr. Ullah, right?

A. No. I did.

Q. You did. You had no idea whether he was the person who had the bomb on him or he was injured by someone else who had the bomb on him?

A. I assumed he was -- I was the person that was assigned to go interview the person they had in custody. He was the person in custody.

Q. This was a coordinated operation, right, the investigation?

A. Coordinated? What do you mean by that?

Q. Attention was put toward this investigation, right?

A. I'm sorry. What's the question?

Q. It was important for you to interview Mr. Ullah, right?

A. Yes, it was.

Q. You're part of the joint terrorism task force, right?

A. Correct.

Q. Your job is to investigate -- your squad's responsibility is to investigate ISIS-related threats in New York City, right?

A. That's right.

Q. You trained for this?

A. That's right.

Q. You trained on how to interview suspects, right?

A. Yes.

Q. So when you walked in to conduct your interview, what I'm

**A000392**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page238 of 284

asking you is, did you believe that this was the gentleman who had the explosive device on him?

A.   I knew that he was the suspect in custody that was transported from the 42nd Street scene to the hospital.

Q.   In any event, during your interview you learned from him that he had the explosive device on him and that he ignited it, right?

A.   Yes.

Q.   You learned from him that he wanted to die, right?

A.   That's correct.

Q.   My question is:  At that time when you learned about his suicide wish, did you request medical attention for mental health evaluation?

A.   No.

Q.   Your task was to get a statement from him, right?

A.   And to find out if there's any other current threats that we were facing.

Q.   Understood.  You were also investigating, right?

A.   Yes.

Q.   Obviously, it was important for security and safety to determine whether there was another threat, right?

A.   Yes.

Q.   Your investigation determined that there was not another threat, right?

A.   That's correct.

A000393

Q. In doing your investigation, as you said, you were in communication with other officers from other agencies, right?

A. Yes.

Q. And other officers in your agency?

A. Correct.

Q. You wanted to identify where he lived, right?

A. Yes.

Q. The plan was to search his home, right?

A. I would assume so.

Q. That's why you asked for his residence information, right?

A. Correct.

Q. You were consulting with other agencies who were discussing searching his home, right?

A. Yes.

Q. You also were discussing with other people to find out where he worked, to search his workplace, right?

A. I wouldn't make that leap to search it. I was trying to ascertain, yes, where his residence was, where he was currently working.

Q. Also, you asked him, I believe, whether you or others in your presence asked him whether he had used any electronic devices, right?

A. Yes, at some point in the interview I did.

Q. In fact, his phone was confiscated as evidence, right?

A. Yes.

A000394

Q. His cell phone, right?

A. Correct.

Q. That was taken from him at the scene, at 42nd Street, right?

A. I'm not sure when it was taken from him.

Q. But you know it was taken from him, right?

A. I was made aware of that, yes.

Q. You made notations of that in your notebook, right?

A. I do remember asking about his phone.

Q. With respect to his phone, he gave you the pass code for his phone, right?

A. He did.

Q. His phone was searched, of course, right?

A. It was.

Q. It was, right?

A. I believe so. I didn't conduct that search, but I believe at some point the phone was searched.

Q. Obviously, you're looking to see whether he has any contacts or communication with anyone else, right?

A. That's what a normal investigation would be, yes.

Q. Based on the search of that phone, you discovered that he did not have any contact or communication with anyone else involved in this incident, right?

          MS. DONALESKI:  Objection.

          THE COURT:  I'm not sure why his state of mind on that

A000395

is relevant.  Sustained.  Next question.

Q.  You testified earlier that Mr. Ullah talked to you about some of the videos that he watched, right?

A.  Yes.

Q.  You asked him where he watched those videos, right?

A.  Online he watched news videos.

Q.  He told you that he went online with his phone, and that's when he viewed those videos, right?

A.  I don't know if he specified his phone.

Q.  You know that he used Facebook, right?

A.  He stated to me that he made a Facebook posting that morning.

Q.  You were able to access the Facebook, his Facebook page, right?

A.  Me personally, no.

Q.  Did somebody in your presence access the Facebook page?

A.  In my presence, no.

Q.  Did you at some point see the Facebook posting that he made?

A.  Yes.

Q.  So Facebook would have been searched as a result of the investigation, right?

          MS. DONALESKI:  Objection.

          THE COURT:  "Would have been" I guess is the objection.  Sustained as to form.

**A000396**

Q.  Facebook was searched?

A.  I believe at some point Facebook was searched, but it was not done by myself.

Q.  You were in possession at some point of screenshots from Facebook, right?

A.  I was via email.

Q.  I'm sorry?

A.  Via email, yes.

Q.  They were emailed to you from someone else or you were emailing them?

A.  No, from somebody else.

Q.  So, to your knowledge, Mr. Ullah's Facebook was searched and screenshots were taken, right?

A.  That is my understanding, yes.

Q.  The screenshot that we saw as a government exhibit was a Facebook posting, right?

A.  Yes, ma'am.

Q.  Was Mr. Ullah, while he was in the hospital, did someone show him the Facebook post and ask him to identify it?

A.  No.

Q.  In the search of his Facebook, Detective, the search of his Facebook revealed that he didn't have communication with anyone in ISIS, right?

          MS. DONALESKI:  Objection.

          THE COURT:  I don't think this is the witness for

that.  Sustained.

Q.  The search of his Facebook revealed that he did not have any ISIS propaganda on his Facebook account?

MS. DONALESKI:  Objection.

THE COURT:  You didn't do the ISIS via Facebook search, right?

THE WITNESS:  No, your Honor.

THE COURT:  Go ahead.

Q.  You have already said, I think, that investigation revealed that he did this alone, right?

A.  Yes.

Q.  Obviously, part of your investigation was to determine if there was anyone else involved, right?

A.  Part of my interview investigation, yes.

Q.  The investigation, in the end you were satisfied that there was no one else involved, right?

MS. DONALESKI:  Objection.

THE COURT:  The end of the investigation when?

Q.  The entire investigation, right?

A.  I can speak to the interview.  At the end of the interview I ended up thinking he acted alone.

Q.  You testified on direct examination that he told you that, amongst other things, he did it for Allah, right?

A.  That was one of the things he stated, yes.

Q.  "Allah" meaning God?

**A000398**

A. That was my understanding.

Q. He also said that he did it for the Islamic State?

A. That's correct.

Q. As you testified on direct examination, he made a clear distinction between al-Qaeda, right?

A. Correct.

Q. And what he was talking about, right?

A. Yes, he did.

Q. And his distinction was that al-Qaeda is a group, right?

A. That's right.

Q. And he wasn't doing it for a group, right?

A. No.  He specified that he did it for the Islamic State because it is a state.

Q. Right, as opposed to a group, right?

A. That's correct.

Q. I might have missed it.  You said you have been how long with the NYPD?

A. Approximately 15 years.

Q. You have been assigned to the joint terrorism task force since 2016, is that correct?

A. That's correct.

Q. Before you were at the joint terrorism task force, you were a detective at NYPD, right?

A. Correct.

Q. You in your career as a detective have been involved in

**A000399**

Q.  many arrests, right?

A.  Correct.

Q.  Would it be fair to say that you have interrogated a lot of people?

A.  Yes.

Q.  And you have taken a lot of statements?

A.  No, not a lot.

Q.  No?

A.  I wouldn't say a lot.

Q.  Can you give me an estimate of how many?

A.  A handful, 5.

Q.  In your career as a detective, you've taken maybe about 5 statements from suspects, right?

A.  Statements as in --

Q.  Written statements.

A.  Yes.

Q.  Any more than that?

A.  Any more than 5 written statements?

Q.  Right.

A.  I'd say approximately 5.

Q.  Okay.  Taking a statement is a very important part of your job as a detective, right?

A.  Yes.

Q.  You have extensive training on how to question a suspect, right?

A000400

Case 21-1058, Document 40, 10/04/2021, 3186339, Page246 of 284

A.   Extensive?  A lot of it is on-the-job training.

Q.   You did have some training in the police academy, right?

A.   Yes.

Q.   Did you have subsequent training throughout your career?

A.   Yes, I do.

Q.   So methods of interrogation is part of your training, right?

A.   Yes.

Q.   The police department, NYPD, for example, has certain policies on how to interrogate or take a statement from a suspect, right?

A.   Yes.

Q.   As does the FBI, right?

A.   Correct.

Q.   As part of your job, you're required to keep abreast of those policies, right?

A.   Yes.

Q.   Ultimately, your goal in taking a statement from a suspect is to be as accurate as possible, right?

A.   Correct.

Q.   And to be as complete and possible, right?

A.   Yes.

Q.   And as thorough as possible?

A.   Correct.

Q.   You want to record as many details that you get as you can,

**A000401**

right?

A.   Yes.

Q.   The statement that you prepare in a case is something that is preserved, right?

A.   Correct.

Q.   Your ultimate goal is that your work is upheld in court, right?

A.   My goal is to take a statement and record it accurately.

Q.   Because you know it's going to be relied upon, right?

A.   Correct.

Q.   You know that it may be critical evidence against someone in court?

A.   It could be, yes.

Q.   Taking the statement from Mr. Ullah in this case was a serious undertaking, right?

A.   Yes.

Q.   You were under a lot of pressure to do that, right?

A.   Yes.

Q.   There were a lot of people, a lot of eyes on you.

A.   Yes, there were.

Q.   And a lot of people waiting for your interview, right?

A.   Yes.

Q.   You were the one person who was responsible for this interview, right?

A.   Correct.

A000402

Case 21-1058, Document 40, 10/04/2021, 3186339, Page248 of 284

Q. And the one person who was responsible to write up the report related to his statement, right?

A. Correct.

Q. That statement, that report that you prepared, I'll talk about it in a minute, it's referred to as a PD or FD-302, right?

A. Correct.

Q. I'll refer to it as a "302" if that's okay?

A. Yes.

Q. That 302 is going to be passed around to a lot of different law enforcement agencies, right?

A. Yes.

Q. It's going to be turned over to the prosecution, right?

A. Correct.

Q. And ultimately to the defense?

A. Yes.

Q. You would have to be called upon to testify in court, right?

A. Correct.

Q. It would be fair to say that you testified fairly accurately today about what was in your 302?

A. Correct.

Q. You did your best not to make any mistakes, right?

A. Correct.

Q. Before you arrived, you were at your office, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000403**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page249 of 284

A. That's right.

Q. You were told that you were going to go to the hospital to take a statement from a suspect, right?

A. Correct.

Q. So you knew, leaving your office, that your job was to take a statement, right?

A. Yes.

Q. You would agree with me, Detective, that the best way to provide a suspect's statement is to record it?

A. To video record it?

Q. Yes.

A. That would be an ideal way.

Q. The best way, right?

A. Yes.

Q. If you can't video record it, you could audio record it?

A. I'm not certain what the policy is as far as if you can't video record it, if you can rely on audio or not.

Q. You are required to keep abreast of the policies, right?

A. Correct.

Q. You don't know what the NYPD or FBI policy is on audio recording?

A. I was told to respond to the hospital and take a recording. My supervisor on the FBI side never mentioned anything to me about recording this interview.

Q. You said you were called to report to take a recording?

**A000404**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page250 of 284

A. I stated that I was tasked to go conduct an interview. It was never mentioned that I was to be recording this interview.

Q. So no one ever said to you let's videotape or audiotape this very important interview?

A. No.

Q. No. You didn't take it upon yourself to say to someone, guys, I think we should videotape this?

A. No, I didn't.

Q. You certainly have the ability to do that, right? The FBI has the ability to do that, right?

A. Yes, I would assume the FBI would have the ability.

Q. And the NYPD has the ability to do that, right?

A. Yes. In normal situations, yes.

Q. It wouldn't have been hard to take in a video recorder into the hospital room, right?

A. In my opinion?

Q. Yes.

A. No.

Q. But it wasn't done in this case, right?

A. No, it was not.

Q. We did hear, though, that there was some recording made, right?

A. Yes.

Q. Not by you?

A. Correct.

**A000405**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page251 of 284

Q.  In fact, it would have been hard for you to question and videotape at the same time, right?

A.  Yes.

Q.  But not for the others that were standing in the room; they could have done it?

A.  They could have done it.

Q.  Is it Detective or Officer Mauro?

A.  Inspector.

Q.  NYPD inspector, right?

A.  Correct.

Q.  He is a high-ranking officer, right?

A.  That's correct.

Q.  He was the one that took out his cell phone and started taking a video of a portion of this interview, right?

A.  Yes.

Q.  But you didn't know it at the time?

A.  I did not.

Q.  He didn't even tell you?

A.  He did not.

Q.  I imagine you had a cell phone, right?

A.  Yes.

Q.  Others in the room had a cell phone, right?

A.  I would assume they would, yes.

Q.  People were communicating, the other officers in the room were communicating with the outside world, other people in

**A000406**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page252 of 284

their agencies, via their phones, right?

A. I would assume so.

Q. But only Inspector Mauro was the one, to your knowledge, that took out his phone and started videotaping, right, from his phone?

A. I found that out after the fact, yes.

Q. You have had an opportunity to review those videotapes, right?

A. Correct.

Q. There are two clips, right?

A. Yes.

Q. They are each about maybe 5 minutes long, 3, 4, 5 minutes long?

A. Yes.

Q. But the whole interview lasted 4 hours?

A. Correct.

Q. In your training in the joint terrorism task force, you learned that it's actually FBI policy to videotape an interview of a suspect in custody, right?

A. When feasible. That's the policy.

Q. It was feasible on December 11th, right?

A. In my opinion, it could have been.

Q. Certainly a video recording would create a clear record of what an individual said?

A. Correct.

**A000407**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page253 of 284

Q.  We wouldn't have to rely on your notes or your testimony, right?

A.  Correct.

Q.  But what you did as part of your investigation was take notes, right?

A.  Yes.

Q.  You took them in your own hand?

A.  Correct.

Q.  These are handwritten notes, right?

A.  Yes, they are.

Q.  You took them in a spiral notebook?

A.  Yes.

Q.  You wouldn't happen to have a spiral notebook with you today, would you?

A.  No.

Q.  Can you describe the dimensions of that book?

A.  The dimensions as far as what?

Q.  How big is it?

A.  Say like this.

Q.  Maybe about 6 inches, 6 by 4?

        THE COURT:  Ms. Coleman, hold up your notebook.

A.  Similar to that book right there.

Q.  So similar to what the jurors are using?

A.  Yes.

Q.  You are required to take notes, right?

**A000408**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page254 of 284

A.   I don't believe I'm required to, no.

Q.   But you do it because you need those notes to prepare a report, right?

A.   That's right, yes.

Q.   So you are careful to take down as much as you can while you're talking to someone, right?

A.   That's correct.

Q.   Obviously, listening and writing notes at the same time is not the bet way to remember something, right?

A.   Right.  That's why I wrote them down.

Q.   I'm sorry.

A.   Yes.  That's why I was writing notes as well.

Q.   So part of the interview of Mr. Ullah was done by you, right?

A.   Yes.

Q.   And part of it was done by -- would it be Detective Martin?

A.   Correct.

Q.   He was also asking questions?

A.   Yes, he was.

Q.   During the whole time were you the only person who was taking down notes in your spiral notebook?

A.   No.

Q.   Were there other people taking notes in spiral notebooks?

A.   There were other people taking notes, yes.

Q.   Did anyone else prepare a 302 of Mr. Ullah's statement, to

A000409

your knowledge?

A.   No.

Q.   That was your responsibility?

A.   Right.

Q.   Now, it's fair to say that in the spiral notebook during the 4 hours, you approximately used up about 5 or 6 pages of that spiral notebook?

A.   Yes.

Q.   Sometimes not even a full page?

THE COURT:  I didn't hear that.

Q.   Sometimes not even a full page?

A.   Sometimes I did not use up even a full page?

Q.   Right.

THE COURT:  I'm not sure I understand that question. In the entire time you used 5 pages or 6 pages?  How many pages, do you remember?

THE WITNESS:  I agree with about 5 or 6.  If they were all from top to bottom, I don't know.  I'd have to look.

Q.   You don't know?

A.   Can I look at the notes to answer that question?

Q.   Sure, if you would like to.

MS. GALLICCHIO:  If we could have 3502.

Q.   Detective, I'm going to hand you a document.  Take a look at it.

A.   To answer your question, no, I did not use up the entirety

**A000410**

of each page.

Q.  So 3502, what I have shown you, is a copy of your notes, right?

A.  Correct.

Q.  That refreshes your recollection, right?

A.  It does.

Q.  Let me get that back.  Not all of the notes relate to your interview with Mr. Ullah, right?

A.  No.

Q.  Sometimes you didn't fill the page, right?

A.  Correct.

Q.  You certainly didn't write down full sentences?

A.  Right.

Q.  Mostly you wrote down single words or phrases, right?

A.  Correct.

Q.  You didn't record the questions you asked, right?  You just recorded answers?

A.  Right.

Q.  For example, you didn't write verbatim what Mr. Ullah said to you?

A.  No.

Q.  But there were times when you actually did put certain things in quotes, right?

A.  Yes.

Q.  Those were the times when you were writing down his exact

A000411

Case 21-1058, Document 40, 10/04/2021, 3186339, Page257 of 284

words?

A.   Correct.

Q.   In your 5 to 6 pages of notes you wrote down approximately I think 3 quotes, is that correct?

A.   I believe I remember at least 2.

Q.   I'm sorry?

A.   I remember at least 2.  It could be 3.

Q.   These were things that you identified as Mr. Ullah's exact words, right?

A.   Yes.

Q.   So during the 4 hours of your interview, there were only 3, 2 or 3, places where you wrote down his exact words in quotes, right?

A.   Correct.

Q.   Those were number one being "I did it for the Islamic State," right?

A.   That's right.

Q.   You used the word "I," his words, right?

A.   Correct.

Q.   You wrote in quotes "I did it for Allah," right?

A.   That's correct.

Q.   You also put in quotes "American politics are the symptoms to the cause," right?

A.   Yes.

Q.   Those are the only things that you put quotes around in

**A000412**

your notes, right?

A. Correct.

Q. I'm going to get to the 302 that we have already been talking about. That is an official FBI form, right?

A. Yes, it is.

Q. That is a form that documents your interview with Mr. Ullah, right?

A. Correct.

Q. This is, of course, is something you have trained on how to do, right?

A. Yes.

Q. You were trained by the FBI on how to fill out their forms?

A. Yes.

Q. They are different forms than the NYPD, right?

A. That's correct.

Q. So you had to have renewed training on how to fill this form out?

A. Yes.

Q. In this form, of course, is another statement. You're trying to be as thorough as possible, right?

A. Correct.

Q. You know that this is being relied on by a lot of people?

A. I knew that a lot of people were looking, anticipating reading the 302, yes.

Q. Of course, it is important for you to help refresh your

**A000413**

memory before you testify, right?

A. Yes.

Q. So you prepared this 302 hours later, right?

A. Yes.

Q. Your interview concluded at about 1:30 in the afternoon, right?

A. Correct.

Q. I believe you said that you prepared this 302 in the evening, right?

A. Correct.

Q. Do you know approximately what time it was that you prepared it?

A. Approximately around 8 o'clock at night.

Q. 8 o'clock at night?

A. Yes.

Q. The report itself, the 302, does not have an indication about what time it was completed, right?

A. I'm not sure if it does or does not.

Q. Would it help to take a look at it to refresh your recollection?

A. If it's there, sure.

Q. I show you a copy of your 302.

THE COURT: Does that have a number, an exhibit number?

MS. GALLICCHIO: It doesn't have an exhibit number,

A000414

Case 21-1058, Document 40, 10/04/2021, 3186339, Page260 of 284

your Honor.

THE COURT: Let's give it a number. Defense Exhibit Z.

MS. DONALESKI: Your Honor, it is 3502-03.

THE COURT: Z was a lot easier. 3502-03?

MS. DONALESKI: Yes.

A. To answer your question, ma'am, I do not see a time.

Q. How many pages is this statement?

A. Four.

Q. Actually, fourth page, the last page, really doesn't have content of what Mr. Ullah told to you, right?

A. Just the beginning, the top of the page.

Q. OK. You don't have a record about the time, but you think it's about 8 o'clock, is that right?

A. Yes.

Q. It's typed, right?

A. Yes.

Q. You typed it?

A. Yes.

Q. The way you prepared the 302 is in a narrative form, right?

A. Yes.

Q. It's different from your handwritten notes, which is just phrases and words that you reflect, right?

A. Correct.

Q. So, in preparing this report you rely on your memory, of

**A000415**

course, right?

A.   Yes.

Q.   You also rely on the notes that you took in your spiral notebook?

A.   Correct.

Q.   This contains full sentences, right?

A.   It does.

Q.   In this 302 you also reflect those 3 quotations from Mr. Ullah, right?

A.   Yes.

Q.   Those are the only quotes from Mr. Ullah that you have in the 302?

A.   The 3 quotes that I had in my notes were in the 302 as well.

Q.   You just transcribed them onto your 302, right?

A.   Yes.

Q.   Today you testified that Mr. Ullah stated to you that in making the device he used match heads from 5 to 10 books of matches, right?

A.   Yes.

Q.   Those are his words, right?

A.   Yes.

Q.   Part of that, that conversation that you had with Mr. Ullah was actually captured on the cell phone video, right?

A.   Yes.

**A000416**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page262 of 284

Q. You have heard that, you have listened to it, right?

A. Yes.

Q. In listening to that video, in fact, Mr. Ullah never actually said those words, did he?

A. He was asked how many matchbooks, and he said yes.

Q. He was asked by Detective Martin how many matches, and he said a few of them, right?

A. Yes.

Q. It was Detective Martin who suggested to him in a question form a number, right?

A. Yes.

Q. Detective Martin said, "5? 10?" Two questions, "5? 10?" right?

A. Yes.

Q. Detective Martin didn't say "5 or 10," did he?

A. No.

Q. He didn't say "5 to 10," did he?

A. No.

Q. He said 5 question mark 10 question mark, right?

A. Correct.

Q. Mr. Ullah's response was "Something like that"?

A. Yes.

Q. The words "5 to 10" never came out of Mr. Ullah's mouth?

A. We went over his account of the day on numerous occasions and numerous times either he answered 5 to 10 or we asked 5 to

A000417

10 and he was affirmative with that answer.

Q. That's different from saying those are his words, right?

A. If I asked him a question and he answers yes to it, then --

Q. He didn't answer yes. You asked him how many matches, he said a few of them, right?

A. We went over it on multiple occasions. We went over his day's account.

Q. I'm sorry?

A. On multiple times we went over his day's account of what happened, and he agreed that it was 5 to 10.

Q. But only one time it was caught on video, right?

A. Right.

Q. During the time it was caught on video, his response was a few of them, right?

A. Yes.

Q. During the time that it was caught on video, when he was asked, "5? 10?," his response was "Something like that," right?

A. Right.

Q. Right?

A. Yes.

Q. The part that is caught on video, Detective Martin asks him whether he used the whole matchbook or just the matches, and Mr. Ullah said just the matches, the heads, is that right?

A. Yes.

A000418

Q.  You then later wrote in your 302 that Mr. Ullah stated that he used 5 to 10 books of match tips in the pipe, right?

A.  Yes.

Q.  This is your interpretation of Mr. Ullah's words, right?

A.  Again, we went over his account of what happened numerous times, and he seemed pretty solid that 5 to 10 was an accurate account of how many matchbooks he used.

Q.  I'm not asking you about whether he seemed solid.  I'm asking you whether those were his exact words or those were your words?

A.  He was asked a question, and he said, yes, 5 to 10.

Q.  Is that recorded anywhere?

A.  No.

Q.  We only know that he said "a few of them" because it's recorded, right?

A.  Correct.

Q.  You testified earlier that Mr. Ullah stated that he was asked whether he thought other people would die?

A.  Yes.

Q.  Your testimony is that he said maybe?

A.  Yes.

Q.  That's not captured on any cell phone video, right?

A.  No.

Q.  That's not written in your 302, is it?

A.  It's not.

**A000419**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page265 of 284

Q. You also testified that he said that he chose screws for the purpose of inflicting maximum damage, right?

A. He corrected me, and he said the video stated nails. I said screws, he said nails. He stated that nails were chosen to inflict maximum damage.

Q. In a video that he watched, right?

A. In a video, yes.

Q. I thought you testified earlier that he does that he, Mr. Ullah, chose screws to inflict maximum damage. Is that not correct?

A. I asked Mr. Ullah, why do you believe that the instructions called for screws? His answer was that the video stated that nails were chosen to cause maximum damage.

Q. So he never said to you the reason why he chose screws, right?

A. He just stated what the video stated.

Q. And this conversation is not captured on the cell phone video, right?

A. Correct.

Q. You asked him at some point about where he learned how to make this device, right?

A. Yes.

Q. I think you testified that he said that, amongst other things, after the Manchester incident the media described how to build a bomb, right?

A000420

A.   That's correct, ma'am.

Q.   You also asked him whether he learned it or read a magazine called Inspire, right?  He was asked that question?

A.   He was asked that question.

Q.   Inspire is an ISIS-controlled magazine, right?

A.   That's my understanding.

Q.   Mr. Ullah did not know what Inspire was, right?

A.   Yes, he stated that he did not.

Q.   As a matter of fact, what he said was, "What's Inspire"?

A.   Right.

Q.   That's captured on the video, right?

A.   Correct.

Q.   You also testified that Mr. Ullah indicated to you that he used sugar in the device, right?

A.   Yes.

Q.   You asked him, why sugar, right?

A.   Right.

Q.   He said he didn't know why, right?

A.   Right.

Q.   You also questioned him about the Facebook post, "Trump, you failed to protect your nation," right?

A.   Correct.

Q.   As you testified to on direct examination, Mr. Ullah talked at length about his opinion about American foreign policy, right?

A.   Yes.

Q.   It was obvious to you that he was very disturbed by American foreign policy overseas, right?

A.   Yes.

Q.   Particularly in the Middle East?

A.   That's correct.

Q.   He was troubled by the treatment of Muslims around the world, right?

A.   Yes.

Q.   He was disturbed by bombings in Gaza, for example, right?

A.   Correct.

Q.   And he mentioned to you that he was upset about the fact that the bombs had struck hospitals and killed children, right?

A.   Correct.

Q.   And that he blamed -- he said the problem was Donald Trump's foreign policy, right?

A.   I believe he stated America's.  I don't remember him specifying Donald Trump.  He stated American foreign policy was the problem.

Q.   He talked a lot about the hypocrisy of the American foreign policy, right?

A.   Correct.

Q.   He also made it clear to you that he didn't have any problem with you, right?

A.   Right, no.

**A000422**

Q.  I want to go back to the 302 for a minute.  Again, the 302 is written in your words, right?

A.  The phrasing was my account of the interview.

Q.  It's not written in the first person, in other words, in Mr. Ullah's voice?

A.  Right.

Q.  But for those three quotes?

A.  Correct.

Q.  You didn't put quotes around, for example, the statement that he chose a workday to terrorize more people, right?

A.  I did not put quotes around that.

Q.  You didn't put quotes around the statement that he intended to terrorize -- I'm sorry -- that he chose a Monday to terrorize more people, right?

A.  Correct.

Q.  You didn't put a quote around the word "terrorize" at all, right?

A.  No.

Q.  That word "terrorize" was not captured on that 10 minutes of cell phone video, right?

A.  I don't believe so, no.

Q.  The words "maximum damage" I think you talked about earlier, right?

A.  Yes.

Q.  Those words were not put in quotes at all in your 302,

**A000423**

right?

A.    Correct.

Q.    Or that he wanted anyone other than himself to die, right?

A.    Correct.

Q.    So the 302 is actually not Mr. Ullah's statement, it's yours?

A.    I wrote the 302 based on my interview with Mr. Ullah.

Q.    You had Mr. Ullah sign the Miranda rights form, right?

A.    Correct.

Q.    This statement, your 302, your statement, after you typed it and prepared it, you didn't go back to the hospital and review it with Mr. Ullah to make sure it was accurate, right?

A.    I'm sorry.  What was the question?

Q.    After you prepared the 302 and you typed it, you didn't go back to the hospital to review it with Mr. Ullah to make sure it was accurate about what he told you, did you?

A.    No.

Q.    You didn't ask him to sign it, right?

A.    No.

Q.    Asking him to review it would have been the best practice, right?

A.    No.

Q.    That would be the way we would know it's accurate, right?

A.    No.

Q.    No, we have to rely on your word, right?

**A000424**

A. Correct.

Q. Other than the 7 minutes of the cell phone video or 10 minutes of cell phone video, there is no other recording, to your knowledge, audio or video or stenographic, of your interrogation of Mr. Ullah, right?

A. Correct.

MS. GALLICCHIO: No other questions, your Honor.

THE COURT: Redirect.

MS. DONALESKI: Yes, your Honor.

REDIRECT EXAMINATION

BY MS. DONALESKI:

Q. Detective Byrne, you were just asked some questions by Ms. Gallicchio about whether this was a normal interview. Do you recall those questions?

A. Yes.

Q. Was this a normal interview?

A. No, it was not.

Q. Why not?

A. It was a chaotic scene. It wasn't in a controlled setting post-arrest inside of a police department or FBI facility. It was inside of a hospital room.

Q. Was it feasible for you to ask to pause the interview so that you could set up camera equipment?

A. No.

Q. Why not?

A.   Because we needed to find out what the current threat picture was, and the sooner the better as far as when we could find out, get answers to that.

Q.   You testified that you went into the interview cold.

A.   Yes.

Q.   Why is that?

A.   We just didn't have many facts at the time.

Q.   Did you have the opportunity to research Mr. Ullah before you went to conduct interview?

          MS. GALLICCHIO:   Objection: leading.

A.   No, I did not.

          THE COURT:   Overruled.   You can answer.

A.   No.

Q.   Why not?

A.   It was chaotic, and I just responded as told.

Q.   You were asked questions about the circumstances of the interview and the officers that were in the room.   Do you recall those questions?

A.   Yes.

Q.   You testified that when the interview began, it was you, Inspector Mauro, and Detective Martin at the bedside, is that correct?

A.   That's correct.

Q.   Were the other officers that were coming in and out of the room standing over the bed or were they in a different part of

A000426

the room?

A.   No, they were towards the back of the room.

Q.   During the 4-hour interview, was the defendant talking consistently throughout the interview?

A.   Yes.

Q.   Did he ever ask to stop talking?

A.   No.

Q.   Did he ever say he was uncomfortable?

A.   No.

Q.   What was his demeanor throughout the 4-hour interview?

A.   He was cooperative.

Q.   Did he ever seem scared?

A.   He did not.

        MS. GALLICCHIO:  Objection, move to strike.

        THE COURT:  How would you assess whether he was scared or not?

        MS. DONALESKI:  I can rephrase, your Honor.

        THE COURT:  Okay.

Q.   Based on what you saw of his demeanor, did he appear to be scared or frightened to you?

        MS. GALLICCHIO:  Objection.

        THE COURT:  That was the same question.

        Did you observe anything that led you to think that he was scared or frightened?

        THE WITNESS:  No.

**A000427**

Q.  Did any of the law enforcement officers in that room have their guns drawn?

A.  No.

Q.  You were asked questions about Mr. Ullah's mental health. Do you recall those questions?

A.  Yes.

Q.  Again, based on what you saw, did Mr. Ullah appear to be of clear mind?

MS. GALLICCHIO:  Objection.

A.  Yes.

THE COURT:  Did you see anything to make you doubt that he was able to understand what was going on?

THE WITNESS:  He was able to understand what was going on.

THE COURT:  That was your conclusion, right?

THE WITNESS:  Yes.

Q.  Did he tell you he was depressed?

MS. GALLICCHIO:  Objection.

THE COURT:  Overruled.  Did he tell you that?

A.  No.

Q.  Did he tell you why he committed the bombing that morning?

A.  He did.

Q.  What did he say?

A.  He stated that he did it for the Islamic State, that he did it for Allah.

A000428

Q.  You were asked questions about whether you took notes about what Mr. Ullah was wearing.  Do you recall those questions?

A.  Yes.

Q.  Were you sent to the hospital to find out what Mr. Ullah was wearing?

A.  No.

Q.  Why were you sent to the hospital?

A.  To find out what happened and to find out if there was any threats that we were facing.

Q.  You were asked about whether you took notes about what Mr. Ullah was wearing.  Did you take notes about what Mr. Ullah was wearing?

A.  I did not.

Q.  Did you take notes about what Mr. Ullah said about why he committed the bombing?

A.  Yes, I did.

Q.  You were asked about the notes that you took during the interview.

MS. DONALESKI:  Your Honor, I would ask that we publish for the witness only what is part of the 3500, 3502-02 page 2.

THE COURT:  All right.

(Continued on next page)

A000429

BY MS. DONALESKI:

Q.  Detective Byrne, looking at this page of your notes, does it refresh your memory about whether you wrote something down in quotations?

A.  Yes.

Q.  And what did you write down in quotations?

MS. GALLICCHIO:  Objection.

THE COURT:  I think you opened the door to all this. There's already been testimony about it.

MS. GALLICCHIO:  Not for this question.

THE COURT:  Well, I think it's already been elicited. You already elicited that there was a quotation, right?

MS. GALLICCHIO:  Yeah, if he remembered it, yes.

MS. DONALESKI:  Your Honor, I can explain at sidebar where I'm going with this.

THE COURT:  It's a direct question.  You already testified on cross that he used words, "I did it for the Islamic State," correct?

THE WITNESS:  Correct, your Honor.

THE COURT:  Okay.  Next question.

BY MS. DONALESKI:

Q.  Ms. Gallicchio asked you whether, if you wrote something down in quotation marks, that was Mr. Ullah's exact words, is that right?

A.  That's correct.

**A000430**

Q.  Sitting here today, do you remember other exact words Mr. Ullah used?

A.  Yes.

Q.  Did he use the word "terrorize"?

A.  Yes, he did.

Q.  Did he use the words, "I did it for the Islamic State"?

A.  Yes, he did.

Q.  Did he use the words "maximum damage"?

A.  Yes.

Q.  Ms. Gallicchio asked you how many exact quotations you wrote down in your notes, and I believe she asked you if there were three.

A.  Correct.

Q.  I'd like you to review your notes and see if that refreshes your memory about whether there were four exact quotations you wrote down.

        MS. GALLICCHIO:  Objection.  He didn't say he didn't remember.

        THE COURT:  I think she's challenging your question, which assumed the fact that --

        MS. GALLICCHIO:  But that was his answer.

        THE COURT:  Overruled.

        Go ahead.

BY MS. DONALESKI:

Q.  So Detective Byrne, I'll place this in front of you.  I'd

**A000431**

just like you to review your notes and determine how many things you wrote in quotation marks.

A.   Okay.

Three.

I see three things here that I have quotes on.  Is that the question?

Q.   Can you review that again, Detective Byrne.

MS. GALLICCHIO:  Objection.

THE COURT:  You can point him to what you want to point him to.

Q.   Detective Byrne, I've placed Post-it notes next to the pages I'd like you to focus on.

A.   Four.  Sorry.

Q.   So for the record, you wrote four things in quotation marks in your notes, is that right?

A.   That's correct.

Q.   And again, just because you didn't write it in quotation marks, does that mean you don't remember what Mr. Ullah said?

A.   No.

Q.   Do you remember, sitting here today, what Mr. Ullah said?

A.   Yes.

MS. GALLICCHIO:  Objection.  Asked and answered.

THE COURT:  Well, about what?

MS. DONALESKI:  I can move on, your Honor.

THE COURT:  Go ahead.

**A000432**

Q.   Ms. Gallicchio asked you whether the defendant had provided the pass code to his phone.  Do you recall that question?

A.   Yes, I do.

Q.   Did he provide the correct password to his phone?

A.   No.

Q.   It was the wrong password, is that right?

A.   That's correct.

Q.   Was law enforcement required to then obtain a search warrant for his phone because law enforcement didn't have the password?

          MS. GALLICCHIO:  Objection.

          THE COURT:  Well, were you involved in that?

          THE WITNESS:  No, your Honor.

          THE COURT:  Okay.  So, next question.

          MS. DONALESKI:  Your Honor, we'd like to introduce two videos through this witness, and in order to do so, in order to authenticate it, we'd like to play it for the witness only.

          MS. GALLICCHIO:  Objection.  Your Honor, could we have a sidebar.

          THE COURT:  Well, I don't generally like sidebars, if you haven't noticed.  But I guess maybe just so I understand what's going on, we'll do that, okay?

          So Khris, come over here.

          (Continued on next page)

**A000433**

(At the sidebar)

THE COURT:  All right.  So this is now redirect. We're looking to show him videos that were referenced in the cross how?

MS. DONALESKI:  Yes.  So we have the two videos in court.  We have them on a laptop.

THE COURT:  I don't care about that.  But why is this proper redirect?

MS. DONALESKI:  Because the defense introduced the concept of this video, that it was partially recorded, and what they're trying to do with that --

THE COURT:  Which video?  I don't know what video you're talking about.

MS. DONALESKI:  So the defense elicited on cross, we elicited on direct, that there were portions of the video recorded, and the defense elicited it on cross that this was portions of a cellphone video.  And she had extensive questioning about what's on the video, what's not on the video, and she used it in order to make it look like there are things that are on the video that are not in the report and vice versa.

THE COURT:  You want to get the phone video in through him?

MS. DONALESKI:  Exactly.

THE COURT:  Why can't she do that?

**A000434**

MS. GALLICCHIO: No, your Honor. He answered the question. I asked him, was this captured in the video? I didn't impeach him at all. I refreshed his recollection, and he admitted it. It doesn't allow that then everything else that's on the video, that's in that recording, comes in. To what point?

THE COURT: Why wouldn't it, though? I don't understand.

MS. DONALESKI: It's the defendant's statements. We're entitled to introduce them.

THE COURT: No, no. There's two questions. One is, is it hearsay or is it some other out-of-court statement being offered for the truth that isn't permissibly admitted; the other is whether this is improper redirect.

MS. GALLICCHIO: Right.

THE COURT: You don't have a hearsay objection.

MS. GALLICCHIO: No.

THE COURT: You can't.

MS. GALLICCHIO: No, I don't.

THE COURT: But you referred to this video repeatedly in your cross. So why isn't it now fair game to say, great, folks, knock yourself out, look at the video? Why can't they do that?

MS. GALLICCHIO: I just don't think that's how it works.

**A000435**

THE COURT:  Why doesn't it work that way?

MS. GALLICCHIO:  Because it's improper redirect is my point -- your Honor's right -- because just for example, I also referred him to things that were in his 302.  It doesn't mean his entire 302 gets introduced.

THE COURT:  That's not your client's statement, that's his statement.  That's why.  So the point is, his 302 could come in.  It could come in.  If there was a prior consistent statement that's in the 302, it would come in.  The 302 doesn't come in not because it's improper redirect; 302 doesn't come in because it's an out-of-court statement that doesn't otherwise meet the exception to the hearsay rule.  That's why that doesn't come in.

MS. GALLICCHIO:  Okay.  Well, it's our position it's beyond the scope of the cross-examination, your Honor.

THE COURT:  It is not.  We talked about it.  That was a large percentage of your cross.

MS. GALLICCHIO:  Right, those portions can come in.  If they want to introduce those portions that I discussed with him, that's --

THE COURT:  No, no, no.  You made the point repeatedly, fairly -- I'm not criticizing you, it was a good cross -- you made the point repeatedly that it was only ten minutes, only ten minutes, only the ten minutes that we saw, and then you pointed out differences between what's on the

**A000436**

Case 21-1058, Document 40, 10/04/2021, 3186339, Page282 of 284

video and I think the fact that the ten minutes are only the ten minutes.

MS. GALLICCHIO:  But why the entire contents of those videos are relevant on redirect is what I'm trying to understand.  The government had the opportunity on their direct to play those videos.

THE COURT:  They could have.

MS. GALLICCHIO:  They could have.  And they raised it in their direct.  They talked about the cellphone videos.  So I'm entitled to question about those cellphone videos and what is captured and what isn't captured.

THE COURT:  No, it wasn't an improper cross.

MS. GALLICCHIO:  Thank you, but --

THE COURT:  I just don't think that is an improper redirect.  I think they're allowed to now introduce it.  Maybe they should have done it in their direct, maybe they should have, or maybe they should do it with a different witness.  I don't know.  But I don't think it's improper to try to introduce it now.

So it's ten minutes.  We can do it.  Okay?

MS. GALLICCHIO:  Note my objection.

THE COURT:  Yes.

MS. DONALESKI:  Your Honor, in order to authenticate them, we have them on a laptop.  We can play it for the witness.  He's already seen it.

A000437

Case 21-1058, Document 40, 10/04/2021, 3186339, Page283 of 284

THE COURT:  He needs to watch ten minutes of this thing?  That's a waste of time.  Has he not seen it before?

MS. DONALESKI:  He's seen the video before but he hasn't seen the discs that it's on.  So we have it loaded into a laptop.  He has seen it.  I can ask him:  Government Exhibit 102, I will represent to you that is the video you saw this morning.  Is that sufficient?

THE COURT:  Look, you're going to have to authenticate it so he can do it, but I think it's coming in.  I don't think it's an improper redirect.  Okay.  Thanks.

(Continued on next page)

**CERTIFICATE OF SERVICE**

I certify that a copy of this six volume appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.**, Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
       October 4, 2021

                               /s/
                               **COLLEEN P. CASSIDY**