# 21-1058-cr

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 21-1058-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT AKAYED ULLAH
VOLUME III**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 Of Counsel

## TABLE OF CONTENTS TO THE APPENDIX
## VOLUME III

District Court Docket Sheet,
  S.D.N.Y. 18 Cr. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0004

Indictment, filed January 10, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0021

Defendant's Motion to Dismiss Counts,
  dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0030

Memorandum in Support of Motion to Dismiss,
  dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0031

Government's Memorandum in Opposition to Motion to Dismiss,
  dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0046

Defendant's Reply in Support of Motion to Dismiss,
  dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0084

Court Order Denying Motions, dated October 4, 2018 . . . . . . . . . . . . . . . . . . . . . . A 0104

Defendant's Motion in Limine, dated October 5, 2018 . . . . . . . . . . . . . . . . . . . . . . A 0110

Defendant's letter to District Court regarding Rule 29 and Jury Charge
  Issues, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0126

Government's letter to District Court regarding Jury Charge on Attempt,
  dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0133

Defense Letter in Support of Rule 29 Motion and in Opposition to
Government Charge Requests, dated November 3, 2018 . . . . . . . . . . . . . . . . . . . A 0135

Government's Letter re Jury Charge and Rule 29 Motion,
  dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0142

Defendant's Objections to Proposed Jury Instructions, dated November 4, 2018 . . . . . . A 0147

Trial Transcript, dated October 29, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0151

Trial Transcript, dated October 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0159

Trial Transcript, dated October 31, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0325

Trial Transcript, dated November 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0575

Trial Transcript, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0833

Trial Transcript, dated November 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0925

Trial Transcript, dated November 6, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1136

Defendant's Post-trial Motion for Acquittal, dated December 6, 2018 . . . . . . . . . . . . . . . A 1154

Memorandum in Support of Motion, dated December 6, 2018 . . . . . . . . . . . . . . . . . . . . . A 1155

Government's Memorandum in Opposition to Motion for Acquittal,
      dated December 20, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1186

Reply Memorandum in Support of Motion for Acquittal,
      dated January 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1214

Court's Order for Supplemental Briefing,
      dated July 25, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1223

Defendant's Supplemental Memorandum in Support of Rule 29 Motion,
      dated September 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1224

Government Memorandum in Opposition to Supplemental Motion,
      dated October 22, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1248

Defendant's Reply Memorandum,
      dated November 5, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1275

District Court's  Opinion & Order,
      filed January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1295

Sentencing Memorandum with Exhibits A-I,  dated March 25, 2021 . . . . . . . . . . . . . . . A 1313

Pimentel Letter, dated September 18, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1370

Sentencing Transcript, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1375

Judgment in a Criminal Case, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1420

Notice of Appeal, dated April 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1428

Government Exhibit 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1429

Government Exhibit 1001-02 (Submitted in attached DVD) . . . . . . . . . . . . . . . . . . . . . . A 1430

(In open court)

BY MS. DONALESKI:

Q.   Detective Byrne, you were asked numerous questions on cross-examination about the two cellphone videos that Inspector Mauro took during a ten-minute portion of a four-hour interview.  Do you recall those questions?

A.   Yes.

Q.   And you testified that you reviewed those two videos prior to coming to court today.

A.   Yes.

          MS. DONALESKI:  Your Honor, Government Exhibit 802 and 803 are those two videos that Detective Byrne has viewed.

Q.   And Detective Byrne, in viewing those videos, do they fairly and accurately represent what happened during those ten minutes of the four-hour interview that you discussed?

          THE COURT:  Well, wait.  I mean, I think you're testifying about what 802 and 803 are.  Are you going to show him?  Are you going to give him something?  Is there a disc?

          MS. DONALESKI:  Your Honor, they're loaded onto a laptop.

          THE COURT:  Well, did you see videos this morning?

          THE WITNESS:  Yes, I did, your Honor.

          THE COURT:  Do you know what the numbers of those things were?

          THE WITNESS:  The exhibit numbers?

THE COURT: Yes.

MS. DONALESKI: Your Honor, we could show him screenshots of the first second of each of the videos.

THE COURT: Okay. Let's do that.

MS. DONALESKI: Thank you.

We're going to play it for the witness only, without sound.

BY MS. DONALESKI:

Q. And this is Government Exhibit 802, Detective Byrne.

A. Yes, I recognize it.

Q. Okay. Thank you.

MS. DONALESKI: And Mr. DeLuca, could you please play the first few seconds of Government Exhibit 803 for the witness only, without sound.

THE WITNESS: Yes, I recognize that.

MS. DONALESKI: Thank you.

Q. And these two videos, Government Exhibit 802 and 803, do they fairly and accurately represent, again, what took place during those ten minutes of the four-hour interview?

A. No.

THE COURT: No, you said?

A. I'm sorry. What was the question?

Q. Do the videos fairly -- are they fair and accurate representations of what happened in the hospital room during those ten minutes of the four-hour interview?

**A000440**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page6 of 297

A.   During those ten minutes, yes.

MS. DONALESKI:  Government offers 802 and 803.

THE COURT:  Okay.  All right.  Received.

(Government's Exhibits 802 and 803 received in evidence)

THE COURT:  So Government Exhibits 802 and 803 are in evidence.  Do you want to show them?

MS. DONALESKI:  Yes, your Honor.  At this time we'd like to publish Government Exhibit 802.

THE COURT:  802?  Okay.  How long is 802?

MS. DONALESKI:  It's 3 minutes and 27 seconds.

THE COURT:  Okay.  Go ahead.

(Video played)

THE COURT:  Is that the end?

MS. DONALESKI:  That is the end, your Honor.

THE COURT:  Okay.

MS. DONALESKI:  At this time we'd like to play Government Exhibit 803.

(Video played)

MS. DONALESKI:  If we could pause here.

BY MS. DONALESKI:

Q.   Detective Byrne, did you see how long the second video was?

A.   Four minutes, approximately?

Q.   And in each of the videos did you hear a cellphone ringing at the end of the video?

A000441

A.   Yes.

Q.   And the video ended at that point, is that correct?

A.   Correct.

Q.   And again, this video is four minutes, Government Exhibit 802 was three and a half minutes.  How long was the entire interview?

A.   Approximately four hours.

Q.   Did you go over each of the topics you discussed in what we just heard multiple times with Mr. Ullah?

A.   Yes, I did.

          MS. GALLICCHIO:  Objection.

          THE COURT:  Overruled.  You can answer.

A.   Yes, I did.

          MS. DONALESKI:  No further questions, your Honor.

          THE COURT:  Okay.  Recross?

          MS. GALLICCHIO:  Yes.

          THE COURT:  Yes.

RECROSS EXAMINATION

BY MS. GALLICCHIO:

Q.   So Detective, you indicated, or you were asked a question about the fact that there were four quotes in your spiral notebook, right?

A.   Yes.

Q.   Three of them were the direct words of Mr. Ullah, right?

A.   Correct.

**A000442**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page8 of 297

Q. That fourth quote is you put in quotes what was written on Facebook, "Trump, you failed to protect your nation," right?

A. Correct.

Q. That was not something Mr. Ullah told you; that was the quote from Facebook, right?

A. That was something he told me he posted to Facebook.

Q. Right. But you weren't quoting his words, you are quoting what was on Facebook, right, the exact words on Facebook?

A. I was reporting the -- I was reporting what he was telling me. I put in quotes his Facebook posting, according to what he told me he posted.

Q. Okay. And so --

THE COURT: Wait a minute. Can I ask, at the time you prepared your notes, had you seen the Facebook posting?

THE WITNESS: No.

THE COURT: Okay.

Q. So you said it was a chaotic scene when you got there.

A. Correct.

Q. And you said on redirect that it was not feasible to pause the interview to set up a video, right?

A. Right.

Q. But it was feasible to have brought a video to the location at the beginning of the interview, right?

A. I don't know how they would go about it, if there was a video production unit that would do it or -- I don't know. In

**A000443**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page9 of 297

that type of situation, I don't know what policy would dictate.

THE COURT:  Whose policy?

THE WITNESS:  The FBI's policy.  I don't know if there would be -- that would be a separate unit that would come and set that up, officially, with -- or -- so --

Q.  Okay.  But you work for them.

A.  Yes.

Q.  And so but you don't know how that works, how a video gets brought to a location.

A.  I haven't experienced it, no.

Q.  Okay.  But again, you didn't request it, right?

A.  I did not.

Q.  And it certainly would be feasible for someone else to take out their phone during an interview and record, right?

A.  That could have been done.

Q.  And obviously it was done.

A.  Right.

MS. GALLICCHIO:  That's all I have.  Thank you.

THE COURT:  Okay.  Nothing else?

MS. DONALESKI:  Nothing further, your Honor.

THE COURT:  Okay.  You can step down, Detective. Thank you.

THE WITNESS:  Thank you, your Honor.

(Witness excused)

THE COURT:  Okay.  Government's next witness?

**A000444**

MR. TURNER:  Judge, the government calls Andrea Estok.

THE COURT:  Okay.  And just collect the accumulated evidence from the witness box.

(Witness sworn)

THE COURT:  Okay.  Ms. Estok, keep your voice up nice and loud.  That microphone is awkwardly situated.  It might be easier if -- can we move it, raise it up, hold it?  I'm not sure what's best.  We want you to be seen.  Can you lower that chair?  Does that help?  I don't know.

THE WITNESS:  I don't mind.

THE COURT:  We'll manage.

Go ahead.

MR. TURNER:  Thank you, your Honor.

ANDREA ESTOK,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TURNER:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Where do you work?

A.  I work for the Federal Bureau of Investigation.

Q.  Which FBI office do you work out of?

A.  I work at the 26 Federal Plaza location.

Q.  Is that here in Manhattan?

**A000445**

A. Yes.

Q. What is your position at the FBI?

A. I'm a special agent.

Q. How long have you been a special agent at the FBI?

A. I've been a special agent for almost nine years.

Q. Are you assigned to a particular squad at the FBI?

A. Yes, I am.

Q. Which squad?

A. I'm on a healthcare fraud squad.

Q. Are you also assigned to any other teams or squads at the FBI?

A. Yes.

Q. What other team or squads?

A. I'm on the evidence response team.

Q. Is that sometimes referred to as the ERT?

A. Yes.

Q. What is the ERT?

A. The ERT is a collateral duty at the FBI where we go out and help on searches.

Q. Have you received training at the FBI relating to your work for the ERT?

A. Yes, I have.

Q. What sort of training?

A. We -- anybody who's on the evidence response team has to go to ERT basic, and we've also -- there's other training that we

**A000446**

can go to.  For example, there's postblast, there's advanced sketching, advanced photography, all sorts of things related to searching.

Q.  What is postblast training?

A.  Postblast training is where -- it's a one-week training where we go and learn about searching a scene after a blast or a bomb has gone off.

Q.  Have you received postblast training?

A.  I have.

Q.  Let's turn to December 11th of 2017.  Did you participate in a search for the FBI that day?

A.  Yes, I did.

Q.  Please tell us how that came about.

A.  I was driving down to 26 Federal Plaza that morning, and I got an email from our team leader saying that there had been a incident up near Port Authority bus terminal.

Q.  And did that lead to you participating in a search?

A.  Yes.

Q.  Please explain how that came about.

A.  I immediately drove up to the area and went into the bus terminal and waited for guidance from them.

Q.  What guidance did you receive?

A.  We were just waiting to see where I was needed and the capacity for the search.

Q.  Did you ultimately participate in a search that day?

A000447

A.   I did.

Q.   What was the address of the location that you searched?

A.   I searched 679 Ocean Parkway in Brooklyn, New York.

Q.   Any particular apartment or address at that location?

A.   Yes, Apartment 3J.

Q.   And was that a residence?

A.   Yes.

          MR. TURNER:  Mr. DeLuca, if we could publish just for the witness what's marked for identification as Government Exhibit 3.

Q.   Special Agent Estok, do you recognize what you're looking at?

A.   Yes.

Q.   What is it?

A.   That is a map of the street view of the location that we searched.

Q.   Does this fairly and accurately depict the area around the location that you searched?

A.   Yes.

          MR. TURNER:  Your Honor, the government offers Government Exhibit 3.

          THE COURT:  Any objection?

          MS. GATTO:  No objection.

          THE COURT:  All right.  Government Exhibit 3 is received.

**A000448**

(Government's Exhibit 3 received in evidence)

MR. TURNER:  Mr. DeLuca, if we can publish that, please.

BY MR. TURNER:

Q.  Do you see on this map the location that you searched on December 11, 2017?

A.  Yes.

Q.  Please describe where you see that on the map.

A.  It's in the upper right-hand corner of the map.  It's the furthest blue triangle.

Q.  679 Ocean Parkway, correct?

A.  Yes.

MR. TURNER:  Thank you, Mr. DeLuca.

Q.  Approximately what time of day did you arrive at the search location?

A.  Early afternoon.

Q.  What did you do when you arrived?

A.  A group of us that was there to do the search, we were waiting outside for the okay to come into the apartment building.

Q.  When you say you were waiting for the okay, what do you mean by that?

A.  There was a team that was going through the apartment to make sure it was safe for us to go inside and conduct the search.

**A000449**

Q.   What team was that?

A.   A SWAT team and the bomb techs were in there.

Q.   What's a bomb tech?

A.   A bomb tech is another collateral duty at the FBI where they're trained in how to make bombs, how to recognize bomb components, all sorts of things bomb related.

Q.   Did you receive the okay for the search?

A.   Yes.

Q.   And at that point did you begin searching the apartment?

A.   At that point we went inside and we waited until pictures were taken and then we went in to do the search.

Q.   Who participated in the search that day?

A.   Members of the ERT team, and there was a bomb tech there for guidance.

Q.   Which bomb tech was there?

A.   It was Special Agent Brian Murtagh.

Q.   Generally speaking, what type of evidence were you looking for in the apartment?

A.   We were looking for bomb components; we were also looking for cellphones and laptop computers and anything related -- that could be related to the incident.

Q.   With respect to bomb components, how did you go about determining what should be collected as evidence?

A.   Special Agent Murtagh described to us what was the bomb that they collected at the subway, what the components were, so

**A000450**

that's what we were looking for.

MR. TURNER:  Mr. DeLuca, please publish for the witness what's marked as Government Exhibit 201.

Q.   Special Agent Estok, do you recognize what this is?

A.   Yes.

Q.   What is it?

A.   It's a sketch of Apartment 3J, 679 Ocean Parkway.

Q.   Who prepared the sketch?

A.   I prepared the sketch.

Q.   When did you prepare it?

A.   I prepared it while we were doing the search.

MR. TURNER:  Your Honor, the government offers Government Exhibit 201.

THE COURT:  Any objection?

MS. GATTO:  No objection.

THE COURT:  Okay.  Government Exhibit 201 is received in evidence.  And you can publish it.

(Government's Exhibit 201 received in evidence)

MR. TURNER:  Please publish it, Mr. DeLuca.

BY MR. TURNER:

Q.   Special Agent Estok, could you generally describe the apartment, the layout that you searched that day.

A.   It was an open apartment.  The front door was at the bottom center of the sketch.  There was -- that door, along with the bathroom door, were the only doors, other than closet doors,

**A000451**

that were in the apartment, but all the rooms were pretty much open.

Q.   How many bedrooms or sleeping areas were there?

A.   There was what we labeled three bedrooms, because there was a bed in each of those sections of the apartment.

Q.   How many bathrooms in the apartment?

A.   There was one bathroom.

Q.   How many kitchens?

A.   One kitchen.

Q.   Special Agent Estok, I'm going to hand you what's been marked for identification as Government Exhibit 210.

MR. TURNER:  And your Honor, this disc contains what's been marked as Government Exhibits 210-01 through 210-28.

Q.   Special Agent Estok, do you recognize this disc?

A.   Yes.

Q.   How do you recognize it?

A.   My initials are on it.

Q.   Did you have a chance to review the contents of the disc before testifying?

A.   Yes.

Q.   What's on the disc?

A.   Photos of Apartment 3J.

Q.   When were the photos taken?

A.   The day of the search, during the search.

Q.   Do the photographs fairly and accurately depict the search

**A000452**

location that day?

A.   Yes.

MR. TURNER:  Your Honor, the government offers Government Exhibit 210 as well as 210-01 through 28, the photographs on the disc.

THE COURT:  Any objection?

MS. GATTO:  One question, your Honor.

THE COURT:  Okay.

VOIR DIRE EXAMINATION

BY MS. GATTO:

Q.   Did you take the photographs or did someone on your team take the photographs?

A.   Someone else on my team took the photographs.

MS. GATTO:  Thank you, your Honor.  No objection.

THE COURT:  No objection.  So Government Exhibits 210 and 210-01 through 28 are in evidence.

(Government's Exhibits 210 and 210-01 through 210-28 received in evidence)

THE COURT:  I assume we'll see some of them now?

MR. TURNER:  Yes, your Honor.

THE COURT:  Go ahead.

MR. TURNER:  Mr. DeLuca, if we could pull up both 201 and 210-01.

BY MR. TURNER:

Q.   What do we see in the photograph on the right side?

**A000453**

A.   That's the front door into the apartment.

Q.   Is that how you entered the apartment?

A.   Yes.

          MR. TURNER:  And if we could pull up Government Exhibit 210-03.

Q.   What do we see here on the right side?

A.   That is the kitchen.

Q.   Where is that in relation to the entryway that we just saw?

A.   So it is to the right of the sketch, all the way to the right, just to the right of the entryway.

          MR. TURNER:  Please pull up Government Exhibit 210-04.

Q.   What's depicted in this photograph?

A.   That's Bedroom 1, which is labeled on the sketch.

Q.   Is that in the bottom left area of the sketch?

A.   Yes.

Q.   Let's move to Government Exhibit 210-06.

          What does this photo show?

A.   That is the hall closet.

Q.   Just to orient us on the sketch, where is the hall closet on the sketch?

A.   It's in the middle of the sketch, towards the bottom.

          MR. TURNER:  Mr. DeLuca, Government Exhibit 210-07.

Q.   What do we see here?

A.   The bathroom.

Q.   Where is the bathroom in relation to the hall closet that

**A000454**

you just described?

A. Just to the right of the hall closet, on the sketch.

Q. Now let's turn to Government Exhibit 210-09.

What do we see in this photo?

A. That's Bedroom No. 3, which is on the top half of the sketch.

Q. And what did you observe in Bedroom 3?

A. There are -- there is a like cupboard, bed in the right-hand corner, there's baby clothes in the window, and a baby chair on the bottom left-hand corner.

MR. TURNER: Mr. DeLuca, Government Exhibit 210-08, please.

Q. Which room is this in the photo on the right?

A. It's taken from Bedroom 2.

Q. What furniture was in Bedroom 2?

A. There's a bed in the left-hand corner and then a couch and then a -- some cupboards.

Q. What, if anything, did you collect as evidence from this bedroom area?

A. I collected a laptop computer.

MR. TURNER: Mr. DeLuca, if we could pull up just Government Exhibit 210-10.

Q. What do we see here?

A. We see the laptop computer underneath the couch that was in Bedroom No. 2.

**A000455**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page21 of 297

Q. Special Agent Estok, I'm going to hand you what has been marked for identification Government Exhibit 601. Do you recognize what I've handed you?

A. Yes.

Q. What is it?

A. It's the laptop computer from -- that is depicted in the photo.

Q. There also appears to be a brown bag there. What's that?

A. That is the bag that I put the laptop computer in.

Q. How do you recognize the bag?

A. It's my handwriting on the bag, and I initialed next to my name, so I know that I put it in the bag.

         MR. TURNER: Your Honor, the government offers Government Exhibit 601.

         THE COURT: Any objection?

         MS. GATTO: No objection.

         THE COURT: All right. So Government Exhibit 601, the laptop, is received in evidence.

         (Government's Exhibit 601 received in evidence)

         MR. TURNER: Now, Mr. DeLuca, if we could pull up both Government Exhibit 201, the sketch, again, as well as Government Exhibit 210-02, another photograph.

BY MR. TURNER:

Q. What area do we see in the photograph on the right?

A. That's the hallway just to the right of the front door.

A000456

Q. Is that in the bottom right portion of the sketch?

A. Yes, it's right between the kitchen and Bedroom 1.

Q. Did you collect any evidence from this hallway area?

A. Yes.

Q. What did you collect?

A. I collected pieces of Christmas tree lights.

Q. Where did you find those?

A. I found them in -- you see in the picture, the bottom right-hand corner of the picture, there's a mesh bin. I found them in there.

Q. What else was in the mesh bin?

A. Socks.

Q. What, if anything, did you notice about the Christmas light strands that you found in that bin?

A. The bulbs were missing and the wires were stripped at the end.

Q. What color were they?

A. They were green wire, but copper was sticking out of the bottom.

Q. What did you do when you found those strands?

A. I stopped for a moment and called over Special Agent Murtagh to look at them, and then I collected the evidence.

Q. When you collected the evidence, how did you collect it?

A. I put it in a plastic bag or a brown bag.

Q. I'm going to hand you what's been marked for identification

**A000457**

as Government Exhibit 203.  Do you recognize what I've handed you?

A.  Yes.

Q.  What is that?

A.  These are the pieces of light that I found during the search.

Q.  How do you recognize the exhibit?

A.  The bag that I put them in, it's my handwriting again, and my initials are next to my name.

MR. TURNER:  Your Honor, the government offers Government Exhibit 203.

THE COURT:  Any objection?

MS. GATTO:  No objection.

THE COURT:  All right.  Government Exhibit 203 is received.

(Government's Exhibit 203 received in evidence)

THE COURT:  But not the bag, right?  Just the lights?

So for the laptop and this exhibit -- well, this one, the bag is with it, but the laptop, the bag is separate, right?

MR. TURNER:  Your Honor, we're offering just the laptop, which is separate from the bag.  The other exhibit, 203, it's all part of the same exhibit.

THE COURT:  Okay.  That's fine.

MR. TURNER:  Mr. DeLuca, can we please pull up Government Exhibit 210-27.

BY MR. TURNER:

Q.   What's shown in this photograph, Special Agent Estok?

A.   The lights that I found.

          MR. TURNER:  Mr. DeLuca, can we please zoom in on the area of the strands.

Q.   And please describe what we see here.

A.   There's two strands of part of a Christmas tree light, bulbs are missing, again, the wires are stripped at the end.

Q.   Special Agent Estok, other than your role in the search of Apartment 3J on December 11th of 2017, did you have any other involvement in the investigation of this case?

A.   No.

          MR. TURNER:  Nothing further, your Honor.

          THE COURT:  Okay.  Cross-examination?

CROSS-EXAMINATION

BY MS. GATTO:

Q.   Good afternoon.

A.   Afternoon.

Q.   Agent Estok, you testified that before you conducted the search, photographs were taken of the scene.  Do I have that right?

A.   Yes.

Q.   Are those called entry photos?

A.   Yes.

Q.   And is the purpose of those to record what the scene looks

A000459

like before law enforcement enters and searches?

A.  Yes.

Q.  Based on your observations during your search, was it clear to you that there were multiple people living in that apartment?

A.  There were many beds, so it seemed like there were more than one person.

Q.  You also looked in the closets, right?

A.  Yes.

Q.  And you saw multiple sets of different types of clothing, correct?

A.  Yes.

Q.  It was clear that there were multiple adult women living in the apartment?

A.  I don't know how many adult women were living there.

Q.  You saw adult women clothing?

A.  Yes.

Q.  You saw children's clothing?

A.  Yes.

Q.  Okay.  Turning your attention to the laptop, which is Government Exhibit 601, you testified that you recovered that from under a couch, is that right?

A.  Yes, yes.

Q.  In what you labeled Bedroom 2?

A.  Yes.

A000460

Q. That was the only couch in that apartment, correct?

A. I don't remember.

Q. Okay. Would it help if you looked at your sketch?

A. It could.

Q. Yes.

MS. GATTO: Could we put up Government Exhibit 201, please.

Q. Was that the only couch out of those three bedrooms or the whole house? Do you remember?

A. It's the only couch that I drew.

Q. Fair enough.

And that bedroom, Bedroom 2, fair to describe that as in the middle of the apartment, correct?

A. Yes.

Q. And the only way to get to Bedroom 2 would be to go through Bedroom 1 and Bedroom 3, correct?

Let me say it this way: If you were entering the house and you had to get to Bedroom 3, you would have to go through Bedroom 2, correct?

A. Correct.

Q. And if you were leaving Bedroom 3 and you wanted to get out of the house, you'd go through Bedroom 2 and Bedroom 1, correct?

A. Correct.

Q. You labeled it Bedroom 2 because there was a bed in it,

**A000461**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page27 of 297

correct?

A.   Yes.

Q.   But it could easily be a living room, correct?

A.   Correct.

Q.   Okay.  And in that room, in Bedroom 2, there was a closet, is that right?

A.   It was like an armoire or dresser.

Q.   Armoire.  And in that were ladies' handbags, right?

A.   I don't remember.

Q.   Would it help if you looked at one of your photographs?

A.   Yes.

Q.   Let me show you --

        MS. GATTO:  Can we publish, just for the witness, Defendant's Exhibit E.

        No, E, like elephant.

        Technology doesn't like me.

        THE COURT:  Do you have something on your screen?

        THE WITNESS:  No.

        MS. GATTO:  I'm sorry, your Honor.  One minute.

        Your Honor, I'm going to hand up an exhibit that's marked as Defendant's Exhibit E.  I'm going to show it to counsel.

        THE COURT:  Yes.

BY MS. GATTO:

Q.   Agent Estok, do you recognize that photograph?

**A000462**

A.   Yes.

Q.   Does it fairly and accurately depict a portion of Bedroom 2 in the apartment?

A.   Yes.

MS. GATTO:  Your Honor, I'd offer Defendant's Exhibit E.

THE COURT:  Any objection?

MR. TURNER:  No objection.

THE COURT:  Okay.  Defendant's Exhibit E is received.

(Defendant's Exhibit E received in evidence)

THE COURT:  Do you want to show it?

MS. GATTO:  I do, if we can.

THE COURT:  Otherwise there's the Elmo.

MS. GATTO:  I don't know how to use the Elmo.

THE COURT:  That's easy, I think.  Pull it out, pull it up, turn it on, and just switch over from computer to Elmo.

I think Mr. DeLuca will have to shift over from the end.

Maybe you can get at it more easily yourself.  But actually, is it on the screen?  No.  Let's just go with the Elmo.  Go ahead.

I think you may need to adjust the camera because it's picking up the rug, just at the top.

No, the other way.

I think that light is blinding the witness.

**A000463**

MS. GATTO:  Oh.

THE COURT:  Yes.

BY MS. GATTO:

Q.  Can you see that there are women's handbags in the bureau that's next to the couch?

A.  Yes.

Q.  And there's also some other bags in there?

A.  Yes.

Q.  And the couch that's depicted in Defendant's Exhibit E, to the left, that's underneath where you found the laptop?

A.  Yes.

Q.  Okay.  And underneath there where you found the laptop, to the left of where you found the laptop, there was a bin?

A.  Yes.

MS. GATTO:  Okay.  If we could put up Government Exhibit 210-10.

Q.  And that's the bin that you were referring to to the left?

A.  Yes.

Q.  And there's some ladies' handbags in there as well?

A.  It appears to be.

Q.  And the laptop itself, it didn't indicate a name to whom it belonged or anything like that.

A.  No.

Q.  And in addition to the laptop, you recovered other forms of electronic devices throughout the apartment, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000464**

Case 21-1058, Document 41, 10/04/2021, 3186340, Page30 of 297

A.   Yes.

Q.   Multiple cellphones were recovered, right?

A.   Yes.

Q.   IPhone -- iPads, correct?

A.   I don't remember.

Q.   Okay.  But do you recall that some devices were recovered sitting on beds?

A.   I don't remember that.

Q.   But you do recall that there were multiple devices in the apartment that were recovered.

A.   Yes.

Q.   And that they were in multiple rooms in the house, correct?

A.   Yes.

Q.   And none of those devices indicated to whom they belonged, correct?

A.   I don't remember if they did or not.  Sorry.

        MS. GATTO:  No further questions.

        THE COURT:  Okay.  Any redirect?

        MR. TURNER:  No, your Honor.

        THE COURT:  Okay.  You can step down.  Thank you, Agent.

        (Witness excused)

        THE COURT:  All right.  We're starting a witness or should we break for lunch now and then come back here 1:15?  Does that sound like a plan?

A000465

All right. Don't discuss the case. Keep your notebooks in there. You're certainly free to come back and eat here. You have a free soda; might as well. But you can use as much time outside as you want. That's fine. But we'll pick up at 1:15, all right?

All rise for the jury.

(Continued on next page)

A000466

(Jury not present)

THE COURT:  Okay.  Have a seat.

So the lineup for this afternoon is?

MS. DONALESKI:  Reginald Donaldson, who's about 20 minutes.

THE COURT:  Okay.

MS. DONALESKI:  And then Dr. Aaron Zelin, who's about 45 minutes on direct.

THE COURT:  Okay.

MS. DONALESKI:  And then after that, if we get to him, is Special Agent Andrew Bennett.

THE COURT:  Who?

MS. DONALESKI:  I'm sorry.  Andrew Mitchell.

THE COURT:  And that should take us through the afternoon.

MS. DONALESKI:  Yes.  And I'm sorry.  I misspoke. It's Brian Murtagh would be after Dr. Zelin today.

THE COURT:  Brian Murtagh.

Did you know all this?

MS. GATTO:  We do.

THE COURT:  All right.  Anything else we should chat about?

MR. TURNER:  Your Honor, one item, which is, we do intend to play the video clips that your Honor has ruled admissible during the testimony of Dr. Zelin, so your Honor

A000467

might want to take up the *in limine* instruction.

THE COURT: Oh, we should talk about that.

So candidly, I thought what you sent me was just more than is needed. I mean, what I intend to basically say is, this is being shown to you for the limited purpose of X and for no other purpose, and I'll give you further instructions at the end, but I don't know that I'm going to need a full-blown instruction on the need for impartiality, etc.

So Peter left. Why don't we come back a little before 1:15 and we'll go over the *in limine* instruction. We meant to do that this morning.

MS. GATTO: When you say X, what do you plan on the X being?

THE COURT: Well, I think it's for the elements of the causes of action that involve either knowledge of ISIS being a terrorist organization -- and it's not clear to me. There are multiple theories. Is the government proceeding on all these different theories? Are you relying on just one? So that's a question I had. And then others relate to his knowledge of ISIS, that it shows his affiliation or I guess warm feelings towards ISIS.

So let me do this. I've been working on this, but I want to collect my thoughts again on this, so let's come back a little earlier, before 1:15, and then we can go over this.

MS. GATTO: Okay. What time? Should we come at 1?

**A000468**

THE COURT:  1:00, yeah.  Is that enough time for you guys to get a bite?

MS. GATTO:  That's fine.

THE COURT:  Okay.  Let's do that.  Thanks.

(Luncheon recess)

AFTERNOON SESSION

1:00 p.m.

(Jury not present)

THE COURT: When are we going to get to these videos?

MR. TURNER: Your Honor, our first witness is in the range of a half hour, and Dr. Zelin will testify after that, and it will be during his direct.

THE COURT: Candidly, what I intended to do is much more limited than you folks agreed on. I don't envision saying that these videos are not being admitted for the truth of the matters asserted. Would anybody think that I need a hearsay warning on these videos? That struck me as strange.

MS. GATTO: Your Honor, they are not being offered for the truth of the matter asserted, and we would ask that that be included.

THE COURT: What is the truth being asserted in these videos?

MS. GATTO: The truth, there are various videos.

THE COURT: What is the truth of the matter? There is a cannon shooting; what is the truth of that? That the cannon actually shot?

MS. GATTO: Yes. That's not what they are being introduced for.

THE COURT: I know they are not being introduced for that. To lead with that will leave the jury confused. All I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000470**

intended to say was "At this point the government intends to show you a number of video clips. I instruct you that these videos are being admitted for the limited purpose of showing that (1) the defendant intended to provide material support or resources to ISIS and/or (2) that he had knowledge that ISIS engages in terrorist activity or terrorism as I will define those terms for you. You should not consider this evidence for any other purpose."

That's the limited use, right? Those relate to elements of material support claim and definitions that are actually in other provisions of the code related to terrorist activity and terrorism.

MS. GATTO: Your Honor, that instruction to me sounds like it is instructing the jury that this is establishing an element.

THE COURT: It is being offered to do that. Whether it does or not is for the jury to decide.

MS. GATTO: By specifically referencing the counts to which it goes --

THE COURT: I'm not referencing the counts.

MS. GATTO: The titles of the charges in those counts.

THE COURT: Yes.

MS. GATTO: It directs the jury to come to a conclusion that these are being offered, that they are establishing that fact. I think it is marshaling evidence in a

A000471

way that is completely misleading and unlike any instruction that has been given when videos similar, if not identical, have been introduced.

Our instruction comes from, I listed my sources, including Abu-Jihaad, which was a limiting instruction given in the district court that then went up to the Second Circuit. I think that is probably why the government has adopted so much of our language, because it comes from an instruction that has been endorsed by the Second Circuit. So we would object to the language and ask that you consider our language.

I understand the point about that it also goes to the element relating to whether Mr. Ullah knew that the organization was involved in terrorism or terrorist activities, but I think there is probably a way to word that to capture that without marshaling evidence the way it does.

THE COURT: Mr. Turner?

MR. TURNER: Your Honor, we think that the Court's proposed instruction does make sense. There are a couple of points I would like to make. With respect to the language that the parties disagreed on, the defense's proposed language really tries to read out that we are offering this evidence with respect to Count One, with respect to providing material support or attempting to provide material support to a terrorist organization. That's why we agree with that aspect of the Court's instruction.

A000472

Just two points.  First, we also agree with the assertion the defense has made that the videos cannot be considered for the fact that they may have belonged to or been accessed by the defendant.  Clearly, the jury can draw that inference based on the fact and content of the videos just as the defense can argue the contrary inference to the jury.

THE COURT:  Right.

MR. TURNER:  The last thing I would note is that we see these videos as relevant to motive and intent on all counts in the indictment.  In other words, carrying out a terrorist attack for and in the name of ISIS being the motivation here for all of these acts.

THE COURT:  They don't go to the elements of any count.  They don't go to the elements of all counts, right?

MR. TURNER:  They do go to the elements of Count One and they go to certain of the intent elements with respect to the other counts.  But that is a motive and intent issue on the other counts.

THE COURT:  Motive maybe.  What other cause of action requires as its intent knowledge of the terrorist activity or terrorism goal of ISIS?

MR. TURNER:  That's relating to Count One, your Honor.

MS. GATTO:  Your Honor, may I propose the counteroffer to your proposal?

THE COURT:  Sure.

A000473

MS. GATTO: It would say they are being admitted for you to -- can you read me back the language that you had? I will adopt it from there.

THE COURT: "I instruct you that these videos are being admitted for the limited purpose of showing that the defendant intended to provide material support or resources to ISIS and/or that he had knowledge that ISIS engages in terrorist activity or terrorism as I will define those terms to you." I can print it out and give it to you.

MS. GATTO: That's fine, your Honor. The second portion, saying that it goes to whether he had the knowledge that ISIS engaged in terrorist activities, seems appropriate. But the first portion does not, your Honor.

THE COURT: The first portion does not what?

MS. GATTO: The jury should not be instructed on that. That is not the limited purpose it is being admitted for.

THE COURT: Can I interrupt? I think it is. They are offering it, so I assume that is the reason they are offering it, to show that these are ISIS videos which reflect an affiliation with and agreement with ISIS. Right?

MS. GATTO: Yes, your Honor. What it should say, then, is that it is being offered to establish, according to the government, Mr. Ullah's statement as it relates to Count One, instead of saying it's being offered to establish that he provided material support in the form of personnel or services

A000474

to ISIS, that's capturing his state of mind. That's what it's coming in for, his state of mind.

THE COURT: What you just said is true. It's at a level of generality that may be useful, may not be useful. It's his state of mind with respect to two different things, right?

MS. GATTO: Right.

THE COURT: One is whether he intended to provide support to ISIS. It wasn't just him venting, it's not just him blowing up people or attempting to kill people for private reasons, it's connected to something else.

MS. GATTO: It should come in so they know it is for state of mind, and then the government can argue on their closing, as I'm sure they will, that his state of mind was as follows. But for us to instruct the jury that his state of mind is providing material support in the form of personnel and services, we are doing the government's closing in our instruction.

MR. TURNER: The way the Court has put it is squarely one piece of why this is being offered. It goes to more than just state of mind. We heard directly from Detective Byrne that he watched videos that had the message of carrying out attacks here for and in the name of ISIS.

One of these video clips will show, just by way of example, a montage of other attackers who carried out attacks

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000475

of ISIS to inspire, encourage, and direct its followers to provide the service of carrying out terrorist attacks. This goes directly to whether the defendant provided or at least attempted to provide material support to a terrorist organization.

MS. GATTO: That's in closing. That's totally appropriate for closing. It is not appropriate for a limiting instruction.

THE COURT: We are going to have to get to this also as a final instruction too. I'm looking at the Abu-Jihaad instruction now. This is the closing instruction. No, this is a limiting instruction. But it gets into the elements of the offense.

MS. GATTO: I don't have the case in front of me, your Honor. I'm happy to look at it. Or you could read it into the record since you have it, and I can address it.

MR. TURNER: Your Honor, the way we read the Abu-Jihaad instruction, it does support some of the language the defense has proposed on the 403 issue on the back end of the instruction, which is why we agreed to that. It does not support the idea that the videos cannot be considered to establish the elements of Count One. Abu-Jihaad was in many respects a very different case.

THE COURT: Very different facts.

MS. GATTO: Your Honor, I also draw from El-Gamal,

A000476

which was Judge Ramos' case. He also had a limiting instruction that used the general state of mind as opposed to specifically saying that this goes to providing material support in the form of personnel and services. El-Gamal is more akin to this case.

THE COURT: State of mind with respect to ISIS, state of mind as to what?

MS. GATTO: With respect to Count One.

THE COURT: Count One. I don't think the jury is going to have memorized what Count One is.

MS. GATTO: All they need to know is it's coming in for state of mind. That's all they need to know.

THE COURT: You want me to give a limiting instruction that says this goes to state of mind, nothing more, Count One. I don't think that is going to have any impact on the jury at all. I don't think they are going to know what that means.

MS. GATTO: When evidence comes in, they are not told that this is going to Count One, Two, Three, Four, Five, or Six. The evidence comes in and they listen to it.

THE COURT: If you don't want a limiting instruction, that's fine too.

MS. GATTO: I do want a limiting instruction.

THE COURT: Right. The limiting instruction is designed to tell them it can only be used for a particular purpose. That purpose I think has to be at least articulated

A000477

in a way that will have some meaning to them. If it's meaningless, then I don't think there is any point in doing it.

If it's only with respect to Count One, I don't think they are going to say, oh, it's only to Count One, great. That would have some meaning in a final set of instructions, but unless they have memorized what this indictment has as Count One, I don't think it is going to be particularly useful.

MS. GATTO: Your Honor, to reiterate, we don't have an objection to the second portion of your proposed instruction.

THE COURT: I know. You said that.

MR. TURNER: Your Honor, one additional point if I may?

THE COURT: Yes.

MR. TURNER: This is not just state of mind. We heard this in the defense opening, we expect we will hear it again, the argument that the defendant did not provide material support or attempt to do so because he was not acting in concert with the organization, he was acting entirely independent of it.

In establishing the first element of Count One, that the defendant actually did provide material support or attempted to do so, these videos are directly relevant to establishing that element because these videos are exemplars of how ISIS encourages followers to take the very actions that the defendant did.

A000478

So it is not just a state of mind, knowledge of a terrorist organization.  It is by acting at its beck and call, at its encouragement, and taking the very actions he attempted to provide or provided material support to ISIS.  So limiting it just to his state of mind does not actually capture everything it is being offered for on Count One.

THE COURT:  So it is being offered to show that is how ISIS operates, that's what you are saying?

MR. TURNER:  The way you initially had it, which does reference the material support aspect of it --

THE COURT:  That goes to his intent.

MR. TURNER:  Your Honor, we submit that that is closer to what it is being offered for.  Before the lunch break your Honor alluded to that it is going to establish other elements of the charged offenses.  It is directly relevant to the first element, by way of example, for Count One.

THE COURT:  I'm thinking how I could rework that as a compromise: limited purpose of showing the defendant's intent in the conduct that he engaged in on December 11th and that he acknowledged that ISIS engages in terrorism and terrorism activities.

MS. GATTO:  Your Honor, that's making the government's argument for that.

THE COURT:  They are offering this for a limited purpose.  That's the only reason I'm allowing them to do it.

A000479

If they had Mickey Mouse cartoons, that would not be shown here.  If they had snuff flicks, that wouldn't be shown here either.

They are going to be allowed to show these videos for the limited purpose of establishing these two elements.  If you don't want a limiting instruction, then I won't do a limiting instruction.  My goodness, we are summing up next week is what it sounds like, so I'm not sure that this will have been lost on anybody.  Go ahead.

MS. GATTO:  I do want a limiting instruction.  But I certainly don't want a limiting instruction that instructs on their theory, the theory of the government's prosecution.  They are telling you they believe because they were going to show --

THE COURT:  That's what a limiting instruction is.  Ladies and gentlemen, you may only consider this as it demonstrates the defendant's intent on Count One.  That's what a limiting instruction is.

MS. GATTO:  That's right, and I don't have a problem with that.  What I have a problem with is the additional language, which is language coming from the government's theory.  It's not just saying --

THE COURT:  It's language coming from the elements of Count One.

MS. GATTO:  But the way it reads, it sounds like you're instructing the jury as to that element.  That's why

A000480

limiting instructions typically refer to generalities, state of mind, not truth of the matter asserted. So I object.

THE COURT: I disagree with that. I would never give a limiting instruction that said this just goes to state of mind.

MS. GATTO: Of the individual.

THE COURT: Of the individual as to what? As to the weather conditions? As to the geopolitical situation? No. It's his state of mind as to something more specific.

MS. GATTO: That's what they get to decide, what portion of the state of mind. They are the ones who get to determine that. We don't get to determine that for them.

THE COURT: I'm inclined not to give a limiting instruction at this point. We can talk about this again. I told the jury to be back here at 1:15. I don't think this really serves any purpose other than that. I don't think it is that complicated. I don't think this is close to the other cases where limiting instructions have been given.

Here it is very clear that the issue is whether or not this was done for ISIS, in support of ISIS, whether he even understood or knew what ISIS was. I think that fault line has been well developed and it will be developed in a couple of days in summations. I'll then give fuller instructions, and at that point maybe it will be worth developing a little more as I go through the individual elements of the causes of action. So

A000481

I think that might be an easier way to do it.  That's what I'm leaning towards.

Let's now get the witness on the stand and get the jury.

(Continued on next page)

A000482

(Jury present)

THE COURT: I'm sorry. We are getting a late start. We have been working. If this can be attributed to anybody, it's me. I wanted to resolve something before you took the box. I figured it's more comfortable for you in there than it is out here when we're at the sidebar. Thanks. We are going to stick with the schedule. The lunch went longer than I had hoped, but we will be okay.

You don't have to worry about time. I'll make sure we get done on time and that you will not be here more than two and a half weeks or whatever it was I said.

The government is going to call its next witness.

MS. DONALESKI: The government called Reginald Donaldson.

REGINALD DONALDSON,

    called as a witness by the government,

    having been duly sworn, testified as follows:

THE COURT: State your name and spell your name, first and last, for the record.

THE WITNESS: Reginald Donaldson, R-E-G-I-N-A-L-D, D-O-N-A-L-D-S-O-N.

THE COURT: Mr. Donaldson, you're tall and that mic is low, and I'm not sure why but that's just the way it goes. Try to keep that microphone close and speak directly at it. You don't have to eat it, but if you're over here, the sound won't

A000483

get picked up.

You may proceed, Ms. Donaleski.

MS. DONALESKI:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. DONALESKI:

Q.  Good afternoon, Mr. Donaldson.

A.  Good afternoon.

Q.  Where do you work?

A.  The U.S. Attorneys here in the Southern District of New York.

Q.  How long have you worked for the U.S. Attorney's office?

A.  A little over 8½ years.

Q.  What is your title there?

A.  I'm an investigative analyst.

Q.  What are your duties and responsibilities as an investigative analyst?

A.  My major duties, I perform cell phone forensics; call, cell site, and GPS analysis.

Q.  Mr. Donaldson, have you reviewed any of the surveillance video in this case?

A.  Yes, I have.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 2001, which is already in evidence, and zoom in on paragraph 1(f).  I will ask that you publish it side by side with Government Exhibit 3, which is also in evidence.

A000484

Government Exhibit 2001 paragraph 1(f) reads:

"Government Exhibits 1001-11 through 1001-16 are excerpts of surveillance videos that fairly and accurately reflect events in the vicinity of 679 Ocean Parkway, Brooklyn, New York, on the morning of December 11, 2017."

Q.   Mr. Donaldson, can you appoints out 679 Ocean Parkway on Government Exhibit 3.

A.   It's the triangle to the upper right.

MS. DONALESKI:  Mr. DeLuca, please play.  Government Exhibit 1001-11, and I'll ask you to pause it at 7 seconds.

(Video shown)

Q.   Mr. Donaldson, what does the video say on the top left of the screen?

A.   FL3, which I guess is the third floor.

Q.   Can you describe what we are seeing and what the man in the video is wearing.

A.   The subject in the video has a dark jacket with something on the left-hand side, or his left, light-colored pants, a skullcap, and a beard.

MS. DONALESKI:  Mr. DeLuca, please continue playing the video.

(Video shown)

Mr. DeLuca, please Government Exhibit 1001-12 and pause at 6 seconds.

(Video shown)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000485**

Q. What does the video say in the upper left-hand side corner?

A. FL2.

Q. What do you notice about the man in this video?

A. Seems to be the same subject with the skullcap, beard, dark jacket with writing on the left-hand side, and light-colored pants.

MS. DONALESKI: You can continue, Mr. DeLuca.

(Video shown)

Mr. DeLuca, please play Government Exhibit 1001-13 and pause at 7 seconds.

(Video shown)

Q. What does it say on the top left of this video?

A. FL1.

Q. What do you notice about the man in the video?

A. It's the same subject, wearing a skullcap with a beard, a dark jacket with writing on the left, and light-colored pants.

MS. DONALESKI: Thank you. You can continue, Mr. DeLuca.

(Video shown)

Mr. DeLuca, can you please play Government Exhibit 1001-14.

(Video shown)

Q. Mr. Donaldson, please describe what we just saw on this video.

A. It says "lobby" on the left top side of the video. That

A000486

was the same subject walking across the lobby.

MS. DONALESKI:  Mr. DeLuca, please play Government Exhibit 1001-15.

(Video shown)

Q.  Mr. Donaldson, please describe what we just saw?

A.  On the upper left-hand side says "VES," which I believe is "vestibule."  The same subject we saw on the previous video just exited the building.

MS. DONALESKI:  Mr. DeLuca, Government Exhibit 1001-16 and pause at 6 seconds.

(Video shown)

Q.  Mr. Donaldson, please describe what we just saw on this video.

A.  That appears to be the same subject, wearing the same items, walking outside the building, walking towards the sidewalk.

Q.  In which direction does he turn?

A.  He turns right.

MS. DONALESKI:  Mr. DeLuca, you can continue.

(Video shown)

Mr. DeLuca, please publish Government Exhibit 2001 and zoom in on paragraph 1(c) and publish that side by side with Government Exhibit 3.  This paragraph reads:

"Government Exhibit 1001-4 is an excerpt of a surveillance video with an accurate date and time stamp that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000487

fairly and accurately reflects events in the vicinity of 4311 18th Avenue, Brooklyn, New York on the morning of December 11, 2017."

Q.  Mr. Donaldson, can you please point out on Government Exhibit 3, 4311 18th Avenue.

A.  4311 18th Avenue was the triangle to the lower left.

MS. DONALESKI:  Mr. DeLuca, can you please play go back to the stipulation.  We'll go one paragraph up, which is (b).  Thank you.

"Government Exhibit 10001-3 is an excerpt of a surveillance video with an accurate date and time stamp that fairly -- scroll down please -- and accurately reflects events in the vicinity of 3917 18th Avenue, Brooklyn, New York, on the morning of December 17th."

Q.  Mr. Donaldson, can you please point out on Government Exhibit 3, 3917 18th Avenue.

A.  It's the triangle to the top of the map.

MS. DONALESKI:  Mr. DeLuca, please play Government Exhibit 1001-3 and pause at 2 seconds.

(Video shown)

Q.  Mr. Donaldson, please describe what we are seeing here.

A.  That appears to be the same subject to the right walking past looks like a store.

MS. DONALESKI:  Continue, Mr. DeLuca.

(Video shown)

A000488

Mr. DeLuca, please publish Government Exhibit 2001 paragraph 1(a).  1(a) reads:

"Government Exhibits 1001-1 and 1001-2 are excerpts of surveillance videos that fairly and accurately reflect events in the vicinity of 4225 18th Avenue Brooklyn, New York, on the morning of December 11, 2017."

Q.  Mr. Donaldson, on Government Exhibit 3, can you please point out 4225 18th Avenue.

A.   This is the third triangle from the left.

MS. DONALESKI:  Mr. DeLuca, please play Government Exhibit 1001-1.  I'll ask you to pause at 4 seconds.

(Video shown)

Q.  Mr. Donaldson, please describe what we have just seen.

A.   That appears to be the same subject walking on the street.

MS. DONALESKI:  You can continue the video, Mr. DeLuca.

(Video shown)

Mr. DeLuca, please publish Government Exhibit 2001 and zoom in on paragraph 1(f) and place it side by side with Government Exhibit 33.  I'm sorry.  (e) is the paragraph.

"Government Exhibits 1001-9 and 1001-10 are excerpts of surveillance videos that fairly and accurately reflect events in the vicinity of 4227 18th Avenue, Brooklyn, New York, on the morning of December 11, 2017."

Q.  Mr. Donaldson, can you please point out on the Government

A000489

Exhibit 3, 4227 18th Avenue.

A.   It's the second triangle from the left.

      MS. DONALESKI:  Mr. DeLuca, can you please play Government Exhibit 1001-9 and pause at 9 seconds.

      (Video shown)

Q.   Mr. Donaldson, please describe what we just saw.

A.   That appears to be the same subject, again walking on the street.

      MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 2001 paragraph 1(c), which reads:

      "Government Exhibit 1001-4 is an excerpt of a surveillance video within an accurate date and time stamp that fairly and accurately reflects events in the vicinity of 4311 18th Avenue, Brooklyn, New York, on the morning of December 11, 2017."

Q.   Mr. Donaldson, can you please point out 4311 18th Avenue on Government Exhibit 3.

A.   It's the first triangle from the left.

      MS. DONALESKI:  Mr. DeLuca, please play Government Exhibit 1001-4 and pause at 10 seconds.

      (Video shown)

Q.   Mr. Donaldson, first I will ask you please read aloud the date and time-stamp on the top right-hand corner of the screen.

A.   December 11, 2017, 6:23:32 a.m.

Q.   Please describe what we have just seen in the video.

A000490

A.   That appears to be the same subject walking along the street.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 2001 paragraph 1(d) and publish it side by side with Government Exhibit 3.  Paragraph 1(d) reads:

"Government Exhibits 1001-5 through 8 are excerpts of surveillance videos with accurate date and time stamps that fairly and accurately reflect events in the vicinity of the 18th Avenue subway station located at McDonald Avenue and 18th Avenue, Brooklyn, New York, on the morning of December 11, 2017."

Q.   Mr. Donaldson, can you please point out the 18th Avenue subway station on Government Exhibit 3.

A.   It's the little circle at the bottom of the map that says "F."

MS. DONALESKI:  Mr. DeLuca, can you please play Government Exhibit 1001-5 and pause at 6 seconds.

(Video shown)

Q.   Mr. Donaldson, can you please read the date and time-stamp aloud?

A.   December 11, 2017, 6:25:50.

Q.   Please describe what we have seen in this video.

A.   This is the same subject entering the train station.

MS. DONALESKI:  Mr. DeLuca, you can play through the end.

A000491

(Video shown)

Mr. DeLuca, please play Government Exhibit 1001-7 and pause at 32 seconds.

(Video shown)

Q.  Mr. Donaldson, please read the date and time-stamp aloud.

A.  December 11, 2017, 6:26 and 53 seconds.

Q.  Please describe what we've seen in this video.

A.  We saw the subject purchase a fare and is now entering the turnstile.

MS. DONALESKI:  Mr. DeLuca, you can play through the end.

(Video shown)

Mr. DeLuca, can you please play Government Exhibit 1001-6.

(Video shown)

Pause it there, please.

Q.  Mr. Donaldson, please read the date and time stamp aloud.

A.  December 11, 2017, 6:27 and 3 seconds.

Q.  Please describe what we just saw on the video.

A.  The subject entered through the doors of the subway and headed up the stairs.

MS. DONALESKI:  You can play it through the end, Mr. DeLuca.

(Video shown)

Please play Government Exhibit 1001-8 and pause at 19

**A000492**

seconds.

(Video shown)

Q. Please read the date and time stamp aloud.

A. December 11, 2017, 6:27 and 16 seconds.

Q. Please describe what we just saw in the video.

A. Same subject heading up the stairs.

MS. DONALESKI: Mr. DeLuca, play it through the end.

(Video shown)

Your Honor, at this time I would like to read a stipulation. It is signed by the parties, so I would ask that we be able to publish it so the jury can read along. It's Government Exhibit 2004.

THE COURT: Okay.

MS. DONALESKI: "It is hereby stipulated and agreed by and among the United States of America, by Jeffrey S. Berman, United States Attorney for the Southern District of New York, Sean G. Crowley, Rebekah Donaleski, and George D. Turner, Assistant United States Attorneys, of counsel, and defendant Akayed Ullah, by and through his attorneys, Amy Gallicchio Esq. and Julia Gatto Esq., that:

"1. Government Exhibit 1101 is a true and accurate copy of business records maintained by the New York City Transit Authority (NYCTA).

2. Government Exhibit 141 is an NYCTA subway fare card recovered by law enforcement from Akayed Ullah, the

A000493

defendant, in the course of his arrest on December 11, 2017.

3.  Government Exhibit 1001 contains the fare card use history for Government Exhibit 141 between August 27, 2017, and December 11, 2017.

4.  Government Exhibit 1001 reflects, among other things, that on December 11, 2017, at approximately 6:24 a.m., Government Exhibit 141 was used at the 18th Avenue subway station which is located at the intersection of 18th Avenue and 64th Street in Bensonhurst, Brooklyn.

"It is further stipulated and agreed that Government Exhibit 141 and 1101 and this stipulation may be admitted in evidence at trial."

I have Government Exhibit 141 right here.  We ask that those exhibits and the stipulation be admitted.

THE COURT:  141 and 1101, correct?

MS. DONALESKI:  And 2004.

THE COURT:  2004 is the stipulation.

MS. DONALESKI:  Yes.

THE COURT:  Those are received.

(Government's Exhibits 141, 1101, and 2004 received in evidence)

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 2001.  Zoom in on paragraph 1(g).  Make that larger, please.

"Government Exhibit 1001-17 is an excerpt of a

A000494

surveillance video with an accurate date and time stamp that fairly and accurately reflects events in the vicinity of the northbound subway platform located within the Port Authority Bus Terminal in the vicinity of 42nd Street and Eighth Avenue New York, New York, on the morning of December 11, 2017."

Mr. DeLuca, can you please play Government Exhibit 1001-17 and pause at 3 seconds.

(Video shown)

Q.   Mr. Donaldson, first, can you please read aloud the date and time stamp of this video.

A.   December 11, 2017, at 7:17:09.

Q.   Do you notice anything about this video?

A.   Yes.

Q.   What do you notice?

A.   I see a subject, who I believe is the subject, about to go up the stairs, stairway.

Q.   When you say "the subject," is that the same man we have seen in each of the videos up until now?

A.   Yes.

Q.   Can you please point out on the video -- and, Mr. DeLuca, I'll ask you to use your cursor to point out -- Mr. Donaldson. Please describe where you see this individual?

A.   Just about to enter into the stairway.

MS. DONALESKI:   Mr. DeLuca, please place your cursor over that.

A000495

Q.   Mr. Donaldson, does that fairly and accurately depict what you are pointing out?

A.   Yes.

     MS. DONALESKI:   Mr. DeLuca, if you can continue playing the video.

     (Video shown)

     Mr. DeLuca, please publish Government Exhibit 2001 and zoom in on paragraph 1(h).

     "Government Exhibit 1001-18 is an excerpt of a surveillance video with an accurate date and time stamp that fairly and accurately reflects events in the vicinity of booth N62K located within the Port Authority Bus Terminal in the vicinity of 42nd Street and Eighth Avenue, New York, New York, on the morning of December 11, 2017."

     Mr. DeLuca, please play Government Exhibit 1001-18 and pause at 3 seconds.

     (Video shown)

Q.   Mr. Donaldson, please read aloud the date and time stamp of this video.

A.   December 11, 2017 at 7:17:58 a.m.

Q.   Please describe what we have just seen in the video.

A.   We see the subject about to across in front of the turnstiles.

Q.   Are you familiar with the Port Authority subway station?

A.   Yes.

**A000496**

Q. How are you familiar with it?

A. I use it to get to work.

Q. Can you please describe the camera angle that we are seeing here in Government Exhibit 1001-18?

A. The angle?

Q. Situate us within the subway terminal.

A. If you go out to the right through the turnstiles, you go right into the Port Authority, you go right into the where the bus station is.

Q. Where is the subway itself that we just saw in the previous video in relation to this?

A. It's in front and behind, but it's below it. It's below this photo rather.

MS. DONALESKI: You can continue, Mr. DeLuca.

(Video shown)

Please publish Government Exhibit 2001 and zoom in on paragraph 1(i).

"Government Exhibit 1001-19 is an excerpt of a surveillance video with an accurate date and time stamp that fairly and accurately reflects events in the vicinity of the south end of the mezzanine located within the Port Authority Bus Terminal in the vicinity of 42nd Street and Eighth Avenue New York, New York, on the morning of December 11, 2017."

Mr. DeLuca, please play Government Exhibit 1001-19.

(Video shown)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000497**

You can pause there.

Q.  Please read aloud the date and time stamp?

A.  December 11, 2018, 7:18:17 a.m.

Q.  Please describe what we have just seen in the video.

A.  We just saw the subject approach and now is in the middle of the frame.

Q.  What are we looking at in terms of what is shown in terms of the space on the video?  What area of the subway station does this depict?

A.  He's passed the turnstiles.  He didn't go through the turnstiles.  He passed through it, walking towards the south end of the station.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 2001 and zoom in on paragraph 1(j).

"Government Exhibits 1001-20 and 1001-21 are excerpts of surveillance videos with accurate date and time stamps that fairly and accurately reflect events in the vicinity of the north end of the mezzanine located within the Port Authority Bus Terminal in the vicinity of 42nd Street and Eighth Avenue New York, New York on the morning of December 11, 2017."

Mr. DeLuca, please play Government Exhibit 1001-21.

THE COURT:  Are all these in or are they only in by virtue of this stip?  I'm not sure if I should be receiving in evidence 1001-21.

MS. DONALESKI:  Your Honor, yesterday you received

A000498

into evidence 1001, which contains 1001-1 through 1001-24B.

THE COURT:  So any of the 1001 series is in.

MS. DONALESKI:  That's correct, your Honor.

THE COURT:  Okay.

MS. DONALESKI:  Mr. DeLuca, I'll ask you to play this and pause at 3 seconds.

(Video shown)

Q.  Mr. Donaldson, can you please read aloud the date and time stamp on this video.

A.  December 11, 2017, 7:18:29 a.m.

Q.  Please describe what we just saw and what we are viewing in terms of the camera angle that this depicts.

A.  The subject just crossed the path to the left.  He's in the tunnel now.  What that is is he's walked through from the A line.  Now that tunnels heads over to the IRT line, which is the 7 train.

MS. DONALESKI:  Mr. DeLuca, can you please replay starting at zero.

(Video shown)

Q.  Mr. Donaldson, where should we be looking to locate the subject?

A.  To your left.

MS. DONALESKI:  Mr. DeLuca, please play Government Exhibit 1001-20.

(Video shown)

A000499

I'll ask you to replay that so we can see the time stamp.

(Video shown)

Pause here.

Q.  What is the time stamp?

A.  December 11, 2017, 7:18:43 a.m.

Q.  Please describe what we have just seen in the video.

A.  That's the subject walking through the tunnel, and that's the subject right in the middle of the frame.

(Continued on next page)

A000500

MS. DONALESKI:  If you can continue, Mr. DeLuca.

Mr. DeLuca, please publish Government Exhibit 2001 and zoom in on paragraph 1K.

I'm sorry.  The next paragraph down.  L.

"Government Exhibit 1001-23 is an excerpt of surveillance video that fairly and accurately reflects events in the vicinity of the passageway from 42nd Street and Seventh Avenue located within the Port Authority bus terminal, in the vicinity of 42nd Street and Eighth Avenue, New York, New York, on the morning of December 11, 2017."

Mr. DeLuca, can you please play Government Exhibit 1001-23.  And read the time stamp aloud.

(Video played)

I'll ask you to pause there.

I'm sorry.  Just continue playing the video.

(Video played)

BY MS. DONALESKI:

Q.  Mr. Donaldson, other than viewing the videos we've seen today, did you have any other involvement in this case?

A.  No.

MS. DONALESKI:  No further questions.

THE COURT:  All right.  Cross-examination?

MS. GATTO:  No cross-examination.

THE COURT:  Okay.  Thank you, Mr. Donaldson.  You can step down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000501**

(Witness excused)

THE COURT:  All right.  Next witness.

MR. TURNER:  Your Honor, with the Court's permission, may the government read a stipulation, which is Government Exhibit 2005, prior to calling our next witness.

THE COURT:  Yes, that's fine.

MR. TURNER:  May Mr. DeLuca publish that to the jury so they can follow along.

THE COURT:  Yes, that's fine.

MR. TURNER:  "It is hereby stipulated and agreed between [the parties] that Government Exhibit 700 is a disc containing Government Exhibit 701, which is a true and correct copy of a report generated by a forensic examiner with the Federal Bureau of Investigation.

"The report marked Government Exhibit 701 accurately reflects certain contents of the laptop computer marked as Government Exhibit 601.

"The laptop was seized by law enforcement from 679 Ocean Parkway, Apartment 3J, Brooklyn, New York, on December 11, 2017, and subsequently searched by the FBI.

"The disc marked Government Exhibit 700 also contains Government Exhibits 702 through 710-B, which are true and correct copies of video files located on the laptop.

"It is further stipulated and agreed that the stipulation may be admitted in evidence at trial."

A000502

So your Honor, the government offers Government Exhibits 700, 701, 702 through 710-B, and the stipulation, which is Government Exhibit 2005.

THE COURT: Okay. Does 702 through 710-B mean that there's a 710-A and --

MR. TURNER: There is a 710-A and B, your Honor.

THE COURT: But there's no other As and Bs in that series?

MR. TURNER: That's correct.

THE COURT: Okay. All right. So 700, 701, 702 through 710, and 710-A and B are received, along with the stipulation, which is 2005.

(Government's Exhibits 700, 701, 702 through 710, 710-A and 710-B, and 2005 received in evidence)

MS. GATTO: Your Honor, I just want to note our standing objection.

THE COURT: Standing objection?

MS. GATTO: Yes. I don't want to waive our objection that we made at the beginning.

THE COURT: Okay. Yes.

MR. TURNER: And your Honor, with that, the government calls Aaron Zelin.

THE COURT: Yes.

(Witness sworn)

THE COURT: Okay. Just keep your voice up nice and

A000503

loud, Mr. Zelin. Use that microphone because without it, we're lost.

MR. TURNER: Your Honor, I believe one juror may have had difficulty hearing the witness' name.

THE COURT: Oh, is that right? Well --

THE WITNESS: Is there a way to lower the seat, maybe?

THE COURT: Yes, there is. Better men than you have tried. Actually, I don't know that they're better than you and I don't know that it's always been men, but we've had trouble.

THE WITNESS: I'll hold it then. Is that better?

THE COURT: That's better.

AARON ZELIN,
     called as a witness by the Government,
     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TURNER:

Q. Is your last name Zelin, Z-E-L-I-N?

A. Yes.

Q. Good afternoon.

A. Good afternoon.

Q. Where do you work?

A. I work at the Washington Institute for Near East Policy.

Q. What is the Washington Institute for Near East Policy?

A. It's a research center based in Washington, DC that focuses on the Middle East and North Africa.

A000504

Q.   How long have you worked there?

A.   About six and a half years.

Q.   What is your position at the Washington Institute?

A.   I'm the Richard Borow fellow.

Q.   What sort of work do you do at the Washington Institute?

A.   I primarily focus on jihadi groups like Al Qaeda and ISIS, or Islamic State, in Syria, Libya, and Tunisia.

Q.   We'll talk more about your work in a few minutes, but taking a step back, what is your educational background?

A.   I received my BA from Indiana University – Bloomington in political science and Near Eastern languages and cultures; I got my MA from Brandeis University in Islamic and Middle Eastern studies; and I have my PhD from King's College of London in war studies.

Q.   Did you prepare a dissertation to obtain your PhD?

A.   Yes, I did.

Q.   What was the subject of your dissertation?

A.   It was on the history of the Tunisian jihadi movement.

Q.   What does the term "jihadist" refer to generally?

A.   In this particular context, it's talking about the movement that primarily is the groups Al Qaeda and the Islamic State and the followers and ideologies that are part of it.

Q.   When did you graduate from Brandeis?

A.   In 2010.

Q.   After graduating, where did you work?

A000505

A.  I worked for two and a half years with a professor at the Department of Politics at Brandeis University.

Q.  What did you do working with that professor?

A.  The professor, she had a project looking at westerners who at the time had joined up with Al Qaeda, either abroad or attempting to conduct attacks domestically.

Q.  After finishing your work with that professor, where did you work next?

A.  That's when I then got the job at the Washington Institute in mid-2012.

Q.  And have you been affiliated with the Washington Institute since then?

A.  Yes.

Q.  Besides the Washington Institute, are you affiliated with any other research or academic institutions?

A.  Yes.  Currently I'm a visiting research scholar at Brandeis University in the Department of Politics.

Q.  What are you doing as a research scholar at Brandeis?

A.  I'm currently preparing my book manuscript, which will come out next year.

Q.  What's that book based on?

A.  It's based off of my PhD dissertation.

Q.  Now you testified that you study ISIS and other jihadist groups.  Please describe your research methods for studying these groups.

A000506

A. For me personally, I like to go to the source directly first, like go to the documents and messages that these groups release themselves, primarily in Arabic, but in English as well. And that's where I get a lot of the basis of my information, so you can see sort of the strategies and ideas that they're putting out. And then from there I'll then triangulate that with any other information, whether it's from local Arabic press, whether it's from Western press accounts about what's going on, and then if there's any other relevant documents out there.

Q. Have you conducted field work as part of your studies?

A. Yes, I did field research in Tunisia as part of my PhD.

Q. What did that entail, generally?

A. I met with members of a local group, they're called Ansar al-Sharia, which was espousing Al Qaeda's ideology, as well as some individuals that had gone to Syria to fight and then returned back to Tunisia.

Q. Have you also conducted field work online?

A. Yes, I have.

Q. What sort of online field work?

A. I've talked to some members of ISIS and Jabhat al-Nusra based in Syria.

Q. Do you speak and read Arabic?

A. Yes.

Q. Do you do that with native fluency?

A000507

A.   No.

Q.   Do you maintain any websites?

A.   Yes.  I run the website jihadology.net.

Q.   Please tell us about that.

A.   It's a website that collects primary sources or essentially statements, audio messages, video messages, magazines, etc., that come from these movements, Al Qaeda, ISIS followers and their ideologues in the movement as a way to study it and then a way to provide access to other academics in the field so they can study it and have a better understanding of these movements so they can know more about what they're up to.

Q.   Have you written about ISIS and other jihadist groups?

A.   Yes.

Q.   Approximately how many articles have you published?

A.   More than a hundred.

Q.   What are some of the places your writings have been published?

A.   They've been published in my company's website as well as more policy-oriented places like Foreign Policy, Foreign Affairs, the Atlantic, as well as academically peer-reviewed journals.

Q.   What's a peer-reviewed journal?

A.   A peer-reviewed journal is when you submit an article to the journal and then it's anonymously reviewed by two other people that are experts in the field, and then if they deem it

A000508

good enough, they'll then provide edits and then feedback and then you resubmit it and then they publish it. If not, they don't publish it.

Q. Have you given lectures relating to ISIS and other jihadist groups?

A. Yes.

Q. In what sort of context?

A. I've done it at research centers and other think tanks in Washington, DC, as well as at universities, and I've briefed people in governments all over the world.

Q. Have you ever testified before Congress?

A. Yes.

Q. How many times?

A. Twice.

Q. What was the general subject matter of your testimony?

A. One of them was related to jihadism in Tunisia and one of them was related to jihadism in Libya.

Q. Did your testimony touch on ISIS?

A. Yes, parts of it did for both.

Q. Have you ever been qualified in court as an expert witness on ISIS and other jihadist groups?

A. Yes, I have five times.

Q. Is that in state or federal court?

A. All of them were in federal court.

Q. And in those cases did you testify for the government or

A000509

the defense?

A.  The government.

Q.  Are you being paid for your time here today and the time you spent preparing to testify?

A.  Yes.

Q.  How much?

A.  $400 an hour.

Q.  And how does that compare to the range or the going rate for such preparation and testimony?

A.  It's the normal rate.

MR. TURNER:  Your Honor, the government offers Dr. Aaron Zelin as an expert in militant jihadist groups, including ISIS.

THE COURT:  Okay.

MS. GATTO:  No objection.

THE COURT:  All right.  So that's fine.  He's acknowledged as an expert.

Go ahead.

BY MR. TURNER:

Q.  Dr. Zelin, let's turn to the jihadist group ISIS.  What does ISIS stand for?

A.  ISIS stands for the Islamic State of Iraq and al-Sham.

Q.  And if I can just remind you to speak into your microphone.

A.  Yes.

Q.  What is al-Sham?

A000510

A.   Al-Sham is the historical region of Syria, Lebanon, Jordan, Israel, and Palestine.

Q.   Is ISIS known by any other names?

A.   Yes.  It's sometimes also referred to as ISIL or the Islamic State of Iraq and the Levant, or just IS, the Islamic State, as well as al-Dalwa, or the state.

Q.   What does Dalwa mean?

A.   It means "the state" in Arabic.

Q.   You also mentioned the Levant.  What does that refer to?

A.   The Levant is the same thing as al-Sham.  It's just a French word that's sometimes also used in English.

Q.   When was ISIS created?

A.   Most recent iteration of ISIS was formed in 2014, but the group has earlier iterations that go all the way back to 1999.

Q.   What, if anything, did ISIS do in June of 2014?

A.   In June 2014 the organization announced that it was re-establishing the caliphate.

Q.   What is the caliphate?

A.   The caliphate is a historical form of Islamic governance prior to 1924.

Q.   And where is ISIS based?

A.   ISIS is primarily based in Iraq and Syria, but it claims to control areas in other places in North Africa, the Middle East, and South Asia.

Q.   What are ISIS's primary stated goals?

A000511

A.   The primary goals of the Islamic State is to take over territory in Iraq and Syria and to continue to eventually everywhere around the globe and institute its form of Islamic governance based on its particular interpretation, as well as to of course defeat its enemies, whether locally, including what they describe as apostate Arab regimes or so-called crusader Western governments.

Q.   What are those crusader Western governments, from ISIS's perspective?

A.   Primarily the U.S., Canada, European countries, Australia, and New Zealand.

Q.   How, if at all, do ISIS's goals relate to U.S. policy in the Middle East?

A.   They want the U.S. to be driven out of the Middle East so that the U.S. has no interests there and that they're able to take on a more important and larger role, since their goals are to take over the whole region.

Q.   In seeking to achieve its goals, what sort of methods has ISIS used?

A.   The methods that they've used include normal military operations in the areas they operate; they also use terrorist attacks abroad, as well as intimidating locals so that they don't go against them, by beheading people or by drowning people live or lighting them on fire.

Q.   Did ISIS promote any particular message in approximately

A000512

September of 2014?

A. Yes, they did. At that time the group's official spokesperson, Abu Muhammad al-Adnani, released an audio message calling for inspired attacks in areas outside of the places that they're operating, which was Iraq and Syria, and primarily focusing on Western countries.

Q. When you say an inspired attack, what are you referring to?

A. I'm referring to an individual that tries to conduct some type of attack in the country that they're from originally and they didn't necessarily go abroad to gain training or necessarily to talk to an individual in the group online to get guidance.

Q. Did Adnani's speech that you've referred to provide any guidance about how supporters could carry out attacks?

A. Yeah, there were a variety of things mentioned, but he noted that anything from bombing or shooting type of attacks, anything as small as hitting somebody on the head with a rock or even spitting them in the face was legitimate in their view.

Q. How, if at all, did ISIS disseminate Adnani's speech?

A. At the time they primarily were disseminating their propaganda on Twitter.

Q. Did you observe any changes through your work in the activities of ISIS supporters following Adnani's speech in September of 2014?

A. Yes. After the speech, we saw a large pace in the number

A000513

of attacks that have occurred from inspired individuals in late 2014 and 2015 through the last year.

Q.   Where did you see that, generally?

A.   Primarily they were in the U.S. and Europe.

Q.   Through your work are you familiar with the phrase "suicide attack"?

A.   Yes.

Q.   What does that refer to?

A.   Suicide attack is when somebody has some type of bomb attached to them and they blow it up intending to kill civilians.

Q.   Through your work are you also familiar with the phrase "lone wolf attack"?

A.   Yes.

Q.   What does that refer to?

A.   The lone wolf attack is when one individual commits an attack by themselves.

Q.   Has ISIS claimed responsibility for inspiring attacks in the United States?

A.   Yes.

Q.   What's an example in the past few years?

A.   One case in particular is Omar Mateen, who shot --

        MS. GATTO:  Objection.

        Objection, your Honor.

        THE COURT:  Ground?

A000514

MS. GATTO:  Irrelevant.

THE COURT:  Okay.  Overruled.  Go ahead.

A.  Omar Mateen, who shot up a nightclub in Orlando, Florida, a couple of years ago.

Q.  Now for ISIS to inspire an attack in America, do ISIS members based in the Middle East need to have direct contact with the supporter in -- or the attacker?

A.  Not necessarily.

Q.  Why is that?

A.  Because the Islamic State puts out messages calling for their supporters to conduct these attacks, as well as literature which provides guidance on how to do some of these attacks, and it's a way for them to sort of show support broadly, that they don't need that force multiplier for them.

Q.  When you say "force multiplier," what are you referring to?

A.  Essentially the group gets the same amount of media attention, as well as the possibility for them to recruit more people based off of this attention, than they would have if they planned it themselves, so they're getting just as much bang for their buck, essentially.

Q.  What sort of messaging has ISIS used in its propaganda materials to encourage supporters to carry out suicide attacks in particular?

A.  They've had English language magazines that have provided directions on how to fill bombs, as well as having operational

A000515

security related to technology so that law enforcement doesn't necessarily catch them ahead of time.

Q. What does the phrase "martyrdom operation" refer to?

A. Usually in the context of ISIS and groups like it, suicide bombing.

Q. Please do continue to speak into your microphone, Doctor.

A. Sorry.

Q. What sort of message, if any, has ISIS used to promote martyrdom operations in particular?

A. They've used different video messages they put out highlighting different suicide attacks that have been conducted by the organization in Iraq and Syria or sort of retrospective on attacks that have occurred in Western countries to illustrate that it's, you know, something that's good and seen as something that's for their cause and in line with what they believe god desires.

Q. How does ISIS generally view supporters who carry out attacks in its name?

A. Pardon me?

Q. How does ISIS typically view supporters who carry out attacks in its name?

A. They view them as martyrs, as part of their cause, as well as soldiers of the caliphate.

Q. What does that mean, soldiers of the caliphate?

A. Essentially individuals that are fighting on behalf of the

A000516

Islamic State and what their cause is.

Q. Now you've described some of the messaging and propaganda materials that ISIS disseminates. Approximately when did ISIS begin disseminating those sorts of materials?

A. The group in its earlier iteration started posting content online in around 2002 and 2004.

Q. Did the volume of those materials remain steady over time or did it change?

A. We saw an increase in the number of products put out by the organization between 2012 and 2014 in particular.

Q. Do you review materials disseminated by ISIS as part of your work?

A. Yes.

Q. How often do you do that?

A. Every day.

Q. In what language does ISIS disseminate its propaganda?

A. It's primarily in Arabic, but they also put out content in English, French, in Russian, and then many of their supporters online translate that content into a lot of other -- dozen or so languages.

Q. Through your work are you familiar with the term "radicalization"?

A. Yes.

Q. What does that mean, generally?

A. Generally speaking, it's when an individual gets interested

A000517

in a particular extremist ideology and then decides they need to act upon it in a particular fashion, in some cases in a violent fashion.

Q. How, if at all, has ISIS sought to radicalize individuals living in the United States?

A. They've done this through their video messages and other media releases they put online, they've done this through attempting to contact people privately to recruit them to fight abroad, as well as to inspire potential attacks.

Q. You mentioned that ISIS's propaganda materials have included information about how to conduct attacks. To what extent have the materials disseminated by ISIS included information about where supporters should conduct attacks?

A. Yes, on a number of occasions it's mentioned places like, in this country in particular, Washington, DC and New York, since they're representative of the political and economic capitals of this country.

Q. Now let's switch gears for a moment. Are you familiar through your work with an individual named Anwar al-Awlaki?

A. Yes.

Q. Who is that?

A. He's the former head -- or he was the former senior ideologue in Al Qaeda, as well as external operations planner in the Arab peninsula.

Q. What is AQAP?

A000518

A.  AQAP is Al Qaeda's official branch in Yemen.

Q.  Generally speaking, what are the goals of AQAP?

A.  The goals of the organization is to defeat its enemies locally in Yemen, to set up some form of Islamic governance based off of their interpretation of Islam locally, as well as to conduct attacks against the U.S. and U.K.

Q.  What is the relationship, if any, between Al Qaeda and ISIS?

A.  The two groups used to be together, but since 2014 they've been enemies, essentially, over strategy and power dynamics between the leaders.

Q.  What is Inspire?

A.  Inspire is a English language magazine that AQAP has put out over the last seven or eight years online.

Q.  That's an AQAP publication, not an ISIS publication?

A.  Correct.

Q.  Now you mentioned that al-Awlaki is a senior, or was a senior ideologue for Al Qaeda in the Arabian peninsula.  What do you mean by that?

A.  He put out messages promoting the group online.

Q.  What sort of messages did al-Awlaki put out?

A.  Part of the messages were linked to supporting the organization, what they're doing in Yemen; others were in relation to calling people to come to Yemen to join the group; and others were related to extorting certain individuals to

A000519

conduct inspired attacks.

Q. When you say extorting, do you mean encouraging individuals?

A. Yes.

Q. What significance, if any, does al-Awlaki have in the context of ISIS?

A. For English-language supporters of ISIS, they do have an important figure within the broader jihadist movement, and since al-Awlaki was killed prior to sort of the split between Al Qaeda and ISIS, he's not seen as sort of sullied or dirtied by everything that's happened since then.

Q. How, if at all, has ISIS disseminated or used al-Awlaki's messages and features?

A. They've reproduced some of his video messages as their own publications online.

Q. Let's talk for a second about those online publications.

You've talked about videos that ISIS disseminates. How does ISIS go about generating and producing these videos?

A. The Islamic State has a media department within its organization that sends out crew members and cameramen in areas that they're operating and they film fighting scenes, daily life, and executions that they're conducting in their territory, they then have a team that helps edit and produce this, which then uploads it online. Originally they usually did this on Twitter, but in the last couple of years it's been

A000520

more on this private encrypted application called Telegram.

Q. Does ISIS also rely on any unofficial methods for spreading its propaganda materials?

A. Yes. Whether it's in the organization or supporters outside of the area they control, these individuals will republish this content, to try and give a stage to a broader audience so that people will get involved in the movement as well.

Q. You testified that you watch materials disseminated by ISIS as part of your work. About how many ISIS videos would you say you've watched as part of your work?

A. Probably hundreds, if not more than a thousand at this point.

Q. And generally speaking, please describe the sort of content that ISIS puts in the videos that it disseminates.

A. Usually the videos include footage of them fighting their enemies locally, it shows them executing their enemies, it shows daily life in the areas that they control in terms of governance, it has messages against its enemies, as well as trying to talk about inspiring people to conduct attacks on its behalf in areas outside of the territory they control.

Q. Are you familiar with a particular video titled The Flames of War II?

A. Yes.

Q. What is that?

A000521

A. It's a video released by IS about a year ago in which they sort of narrate the status of the war between them and the United States, the coalitions fighting them at the time, as well as threatening the United States by showing images of bombs over U.S. territory.

Q. Does it convey any other messages relating to the United States specifically?

A. That individuals should conduct attacks against the U.S.

Q. Now did the government ask you to review some of the evidence in this case in preparation for your testimony here today?

A. Yes.

Q. Did you in fact do that?

A. Yes.

Q. Have you reviewed all the government's evidence?

A. No.

Q. Did the evidence that you reviewed include videos from a laptop found in the defendant's residence?

A. Yes.

Q. How many videos did you review from that laptop?

A. About ten.

Q. Let's take a look at a few of those videos.

MR. TURNER: So Mr. DeLuca, please publish the video clip that is in evidence from the laptop at Government Exhibit 704 and please pause it seven seconds in.

A000522

(Video played)

Q. Dr. Zelin, do you recognize the flag shown in this video?

A. Yes, it's the official flag of the Islamic State.

Q. When you say the Islamic State, you're referring to what?

A. ISIS.

Q. What do the symbols on the flag represent?

A. It's the Muslim testament of faith, as well as the Muslim prophet Muhammad's seal, what they used when he was in power.

Q. How has ISIS used this flag?

A. They use it in their propaganda, as shown here, but also they put it on flagpoles in areas they control, as well as in administrative documents. They're essentially trying to show that they're a state like any other state that has a flag.

MR. TURNER: Mr. DeLuca, please play and pause at 14 seconds.

(Video played)

Q. Please explain what's depicted here.

A. It's a military commander of ISIS talking to a group of recruits that are in a training camp.

Q. Do you recognize the hand gesture being made by the leader at this training camp?

A. Yes. It's called *iisbae tawhid*, which means the finger of monotheism, showing that they believe in one god and that they're part of that cause.

Q. How, if at all, is that gesture used by ISIS supporters?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000523**

A.   You see it in their propaganda often.

Q.   Is it exclusive to ISIS, the gesture?

A.   No, not necessarily.

        MR. TURNER:  Please continue, and let's pause at 27 seconds.

        (Video played)

Q.   Do you recognize this person who appears on the video from the laptop?

A.   Yes, it's Osama bin Laden.

Q.   Very briefly, who is that?

A.   He's the founder of Al Qaeda and he planned the 9/11 attacks.

        MR. TURNER:  Let's continue, and please pause at 31 seconds.

        (Video played)

Q.   Do you recognize this person?

A.   Yes, it's Abu Omar al-Shishani, former senior commander of the Islamic State.

        MR. TURNER:  And let's pause now at 36 seconds.

Q.   Dr. Zelin, through your work, are you familiar with any of the individuals shown here?

A.   Yes.

Q.   Let's start with the top left corner, and if you could please explain to the jury what we're looking at.

A.   On the top left corner is Omar Mateen, individual mentioned

A000524

earlier who conducted the attack in Orlando, Florida;

Below him is Anis Amri, who conducted a truck-driving attack over civilians in Berlin at a Christmas market;

Next to him on the bottom level is Amedy Coulibaly, who kidnapped a bunch of Jewish people at a kosher supermarket in Paris and killed some of them;

And on top of him is Larossi Abballa, an individual who attacked some police outside of Paris.

Q. And more generally, who are these individuals?

A. They're people that have conducted inspired attacks.

Q. Just remind the jury, what is an inspired attack?

A. An attack that an individual decides to take on behalf of say the Islamic State but not necessarily having gone to their territory to train or been in communication with them.

Q. What is ISIS's purpose in showing images of supporters who have carried out inspired attacks like this in its propaganda videos?

A. As an example that other people should follow.

Q. Now how does inspiring these attacks fit into ISIS's broader strategy?

A. It's a way to deter their enemies, show support; it's also to try and terrorize the local population where it happens.

MR. TURNER: Mr. DeLuca, you can play to the end.

(Video played)

MR. TURNER: Now let's turn, please, to Government

A000525

Exhibit 705, another video.  And Mr. DeLuca, please pause it two seconds in.

(Video played)

BY MR. TURNER:

Q.  Dr. Zelin, first, do you recognize the image on the top right portion of this video?

A.  It's the Islamic State's flag.

Q.  Do you recognize this particular video?

A.  Yes.

Q.  What is it?

A.  It's a video of two deaf members of the Islamic State, putting out a message in sign language.

Q.  What is the broad message of this video?

A.  They're attacking the Islamic State's enemies in the Middle East as well as in Western countries.

MR. TURNER:  Let's go ahead and play it, please, and pause at 18 seconds.

(Video played)

Q.  What does the term *"khilafa"* mean at the beginning of the English message on the screen?

A.  It's the Arabic term for caliphate.

MR. TURNER:  Mr. DeLuca, you can continue playing, please, and let's pause at 49 seconds.

(Video played)

Q.  Dr. Zelin, please read the English message at this portion

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000526

in the video.

A.  "And we will surely come and slaughter you by Allah's," or god's, "permission."

Q.  Please explain the "we" and the "you" in this message.

A.  "We" being, in their context, the Islamic State, "you" being their enemies, whether locally or globally, including Arab states, the U.S., Europe, etc.

MR. TURNER:  Mr. DeLuca, you can play through the end, please.

(Video played)

MR. TURNER:  Now, Mr. DeLuca, please turn to the video clip in evidence from the same laptop as Government Exhibit 708, and please pause at two seconds in.

(Video played)

BY MR. TURNER:

Q.  Dr. Zelin, again, do you recognize the image in the top right of this video from the laptop?

A.  It's the Islamic State's flag.

Q.  What do we see depicted in this footage?

A.  Fighters on a technical vehicle fighting in the desert.

Q.  Do you recognize the hand gesture being made by the fighters?

A.  They're using the *iisbae tawhid* symbol that we discussed earlier.

Q.  Do you recognize this video?

A000527

A. It's from scenes from Breaking of the Borders.

Q. Please do keep your voice up, if you don't mind.

A. Okay. Sorry.

Q. You mentioned this is from the video Breaking of Borders. What is that?

A. It's a video that the Islamic State put out after it took control of territory on both sides of the border in Iraq and Syria in June 2014.

Q. How does a scene such as this fit into ISIS's propaganda efforts?

A. It shows them from their perspective looking like they're victorious and having fun.

MR. TURNER: Let's play, please, Mr. DeLuca, and pause at nine seconds.

(Video played)

Q. What do we see in that clip?

A. A member of the Islamic State shooting an Iraqi soldier in a Humvee.

MR. TURNER: Please play, and let's pause at 16 seconds.

(Video played)

Q. Do you recognize this person?

A. Yes. It's Abu Bakr al-Baghdadi.

Q. Who is that?

A. He's the leader of the Islamic State.

A000528

MR. TURNER: Now, Mr. DeLuca, let's turn to Government Exhibit 706, another video from the laptop, and please pause at four seconds in.

(Video played)

MR. TURNER: Actually, let's pause there for a second, if you don't mind.

Q. Dr. Zelin, what's this flag?

A. It's the Islamic State's flag.

MR. TURNER: Now let's go forward and pause at four seconds, please.

(Video played)

Q. Do you recognize this person on the video?

A. Yes. It's Anwar al-Awlaki.

Q. Please remind the jury, who is that?

A. He's the former senior ideologue and external operations planner for Al Qaeda in the Arabian peninsula.

Q. Is he known for disseminating any particular message?

A. Yes, to support the group, to join the group, and to do inspired attacks abroad.

MR. TURNER: Let's go ahead and play and please pause at 14 seconds.

(Video played)

Q. What have we seen in the prior two clips?

A. Two suicide car bombings.

Q. What is ISIS's purpose, stated purpose in depicting bombing

A000529

attacks like this?

A. To show that its members are willing to do anything for victory.

MR. TURNER: Thank you, Mr. DeLuca.

Q. Now, Dr. Zelin, you testified that you watched about ten videos found on the laptop. Please just very generally describe the other videos that you reviewed.

A. They primarily were fighting scenes that the Islamic State published, as well as some individuals that were talking to the camera about various themes related to issues that have been talked about here as well.

Q. The content was similar or not similar to the video clips we've seen here today?

A. It had the same themes overall.

Q. Now in addition to the videos on the laptop, did you review any social media evidence provided by the government?

A. Yes.

Q. What did you review?

A. A Facebook post.

MR. TURNER: Mr. DeLuca, could we please pull up what is in evidence as Government Exhibit 401, and please turn to page 3 of that exhibit.

Q. Dr. Zelin, please read the Facebook post for the jury.

A. "Oh, Trump, you failed to protect your nation. *Baqiya*."

MR. TURNER: And Mr. DeLuca, if we could highlight the

**A000530**

term *"baqiya,"* please.

Q. Dr. Zelin, are you familiar with this term, *"baqiya,"* through your work?

A. Yes.

Q. What language is that?

A. Arabic.

Q. What does the word mean?

A. Remaining.

Q. Does the term have any significance in the context of ISIS?

A. Yes. In around 2007, 2008, its former leader used this term as a rallying cry when it was not doing too well militarily against the U.S. and its allies locally in Iraq, and it was a way to show that the group was going to remain and that it wasn't going to be defeated. But then this term took on more relevance in the last few years when it began to do well again militarily and took over territory, and they added another term to this, *"tatamaddad,"* meaning expanding, so the slogan was then *"baqiya wa tatamaddad,"* and it's been a part of their propaganda since as a way to show their staying power.

Q. How, if at all, has ISIS used the term in its propaganda materials?

A. It's been used in some of the speeches by its leaders as well as video messages, and supporters at the time when they were on Twitter were using it in hashtags to promote the group and as a rallying cry.

**A000531**

Q.  A rallying cry for ISIS?

A.  Yes.

MR. TURNER:  Nothing further, your Honor.

THE COURT:  Okay.  Cross-examination?

MS. GATTO:  Yes, your Honor.  Is it possible to take a quick break, for a restroom break?

THE COURT:  Okay.  Let's do it, a quick restroom break.  I see some nodding, so we'll do that, yes.  Real quick, but just to be safe.

All right.  All rise for the jury, please.

(Continued on next page)

A000532

(Jury not present)

THE COURT:  This witness will take us the rest of the day, do we think?

MS. GATTO:  I don't think we'll be finished.

THE COURT:  Okay.  That's fine.  We'll break at 3:30, right?

MS. GATTO:  Yes.

THE COURT:  Because your kids are all dressed up.

MS. GATTO:  They're all dressed up and ready to go.

MS. CROWLEY:  So your Honor, we'll dismiss our next witnesses who are waiting?

THE COURT:  That's okay, right?

MS. GATTO:  That's fine.

THE COURT:  So go ahead, use the restroom, we'll come back here in about five or ten minutes.  Thanks.

(Recess)

(In open court; jury not present)

THE COURT:  All right.  Anything anybody needs to discuss before we bring in the jury?

And we'll talk about the lack of a limiting instruction when we finish.  So let's get the jury in here, okay?  I thought you were going to jump up, but --

MS. GATTO:  I was confused.  Did you make a ruling?

THE COURT:  I didn't sort of explicitly, but it does seem to me, given the lack of consensus as to what this

A000533

instruction ought to be, given, from my perspective, the lack of even a need for one -- we're not looking at videos where people are getting heads lopped off or some of the types of videos that were at issue in the other cases -- I mean, what's been shown to this jury and what will be shown to this jury is, seems to me, consistent with what's on the BBC every night. So, you know, I don't know that there's a need for it. So I don't think there's a need for a limiting instruction at the time the videos have been shown. And we're going to be having final jury instructions I think in a relatively short period of time, so we can deal with that then. We'll talk more.

MS. GATTO: Yes.

(Continued on next page)

A000534

(Jury present)

THE COURT:  Okay.  Have a seat.  Thank you.

All right.  So we're going to go till 3:30.  So I think we'll see how far we get with this witness and then we'll break for Halloween, okay?

Great.  All right.  Ms. Gatto, you may proceed.

MS. GATTO:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. GATTO:

Q.  Good afternoon, Dr. Zelin.

A.  Good afternoon.

Q.  Nice to meet you.

A.  Nice to meet you.

Q.  Dr. Zelin, the title of doctor is new for you, correct?

A.  Yes.  I finished my PhD like ten months ago.

Q.  Congratulations.

THE COURT:  When?

THE WITNESS:  Ten months ago.

Q.  Congratulations.

A.  Thank you.

Q.  Your designation for that PhD was focused on the area of Tunisia; do I have that right?

A.  Correct.

Q.  Is it fair to say that since 2012 that's been your focus in this area that you're testifying about, correct?

A000535

A. You mean right now or just my research in general?

Q. Your main area of focus is the area of Tunisia and the surrounding areas, correct?

A. I mean, it's one of the areas I focus in. Obviously my PhD was on it so a lot of time was spent on it, but I have written and researched on Syria and Libya primarily as well.

Q. And your book is about that area.

A. The book is on Tunisia and Tunisians in Tunisia and Tunisians that fought in Syria and Libya.

Q. Okay so. That's your main focus, correct?

A. Sure.

Q. And, I mean, the umbrella of your research is jihadi, jihadist organizations, correct?

A. Yes.

Q. But you spend your time focusing on Tunisia, correct?

A. Yes, part of the time.

Q. And then so you draw from other social scientists and researchers in your area when you testify about more Western jihadists, correct?

A. Well, as I noted, I have worked with a professor at Brandeis from 2010 to 2012, looking at Westerners' involvement, and it's something I keep up with just, you know, as anybody in any field does.

Q. When you were doing your primarily work on Western jihadists, that was from 2010 to 2012, was that after college?

A. That was after I completed my master's.

Q. So after your master's, in 2010 to 2012 you worked with a professor at Brandeis, is that right?

A. Yes.

Q. And that was on Western jihadists, right?

A. Yes.

Q. And then from 2012 until now, you've kept abreast of research and analysis of Western jihadists, correct?

A. Yes.

Q. But your main focus is the area of Tunisia.

A. Yes.

Q. And you testified about this terminology "lone wolf." Do you recall that testimony?

A. Yes.

Q. And that's a kind of known term in your academic universe, right?

A. Yes.

Q. You defined it as someone who acts alone, right?

A. Yes.

Q. And then other people in your academic sphere sometimes use the phrase "personal initiative attack," is that right?

A. They could. It's not something I've really heard of, but --

Q. But it would make sense, right? It would explain the definition of a lone wolf attack, a personal initiative attack.

A000537

Is that a fair way to describe it?

A.  I can't speak for other academics.

Q.  Well, you're part of the academic community that's analyzing lone wolf attacks, right?

A.  Yes.

Q.  Okay.  And others in your community use this phrase lone wolf -- or "personal initiative attack," right?

THE COURT:  Do they?  Do you know that?

THE WITNESS:  I mean, I haven't heard it specifically, but it could be somebody that's more from a psychological perspective, but I'm more from a political science and history perspective.

THE COURT:  I'm just asking, have you heard it before?

THE WITNESS:  I can't say I have.

THE COURT:  Okay.

BY MS. GATTO:

Q.  But even your own experience, "personal initiative attack" seems like a fair way to describe a lone wolf attack; those words put together make sense, right?

MR. TURNER:  Objection.  Asked and answered.

THE COURT:  I think we did go over the "makes sense" point, so yes.

A.  I mean, yes, it could, but it's kind of random.

Q.  A lone wolf is someone who acts alone.

A.  Yes.

A000538

Q.  Okay.  And when there is an attack that is somehow affiliated with a jihadist organization, you and others who are analyzing those attacks, they put them on a spectrum, right?

A.  Yes.

Q.  And the spectrum relates to the factor of how involved the terrorist organization was in that attack, correct?

A.  Yes.

Q.  And so there's two sides of that spectrum, okay?  Correct?  And on one side of the spectrum, to the left of it, are -- and we'll use ISIS for this example.

A.  Sure.

Q.  -- ISIS-inspired attacks.  That's on the left side of the spectrum, correct?

A.  Mm-hmm.

THE COURT:  Wait a minute.  You can't say "mm-hmm."  You have to say yes or no.

A.  Yes.

MS. GATTO:  Thank you, your Honor.

Q.  And on the far side, the right side, are ISIS-directed attacks, correct?

A.  Yes, along with some variations in between.

Q.  Well, it's a spectrum, right?

A.  Yes.

Q.  It's a continuum.

A.  Yes.

A000539

Q. So I'm just focusing on the two extremes. ISIS-inspired on the left, and ISIS-directed on the right, correct?

A. Yes.

Q. And then in the middle of this continuum there is ISIS-enabled attack. Is that a phrase you're familiar with?

A. Yes.

Q. Okay. So let's talk about ISIS-directed attacks, okay?

A. Yes.

Q. An ISIS-directed attacks, ISIS, the organization, the leadership, has directed the attack, right?

A. Yes.

Q. They have planned every detail of the attack, right?

A. Yes.

Q. They have funded the attack, right?

A. Yes.

Q. Both monetarily and with manpower?

A. Yes.

Q. Every last operational detail has come through leadership at ISIS, right?

A. Yes.

Q. An enabled attack, moving now towards the left of that spectrum, is where -- let me give you an example. You tell me if this is an enabled attack. ISIS has provided the attacker with some support or some resource for them to be able to then initiate the attack, correct?

A000540

A. Yes.

Q. So by way of example, someone, say a Westerner, who has traveled to ISIS in Syria or Iraq, received training from ISIS, right, and then they've come back and they've attacked in the west, that's an ISIS-enabled attack.

A. Yes.

Q. There are other examples, right, of how ISIS can enable attacks, right?

A. Yes.

            (Continued on next page)

**A000541**

Q. They can provide money, right?

A. Yes.

Q. There could be someone on the inside of ISIS who is providing details or manpower, correct?

A. Yes.

Q. Now let's focus all the way on the left side, ISIS-inspired. In an ISIS-inspired attack, the ISIS organization has not directed that attack?

A. Correct.

Q. There is no one inside the organization who has planned the attack?

A. Correct.

Q. The ISIS-inspired attacker has no operational ties to ISIS. That's what an ISIS-inspired attack is, right?

A. Yes.

Q. There has been no money to given to them, right?

A. Yes.

Q. No manpower?

A. Yes.

Q. No direction?

A. Well, maybe through messages, but not like a specific person talking to them. I was just saying not like physical direction necessarily. But as I noted earlier, in their messages they have provided some guidance sometimes.

Q. You talked about some of those messages. One message you

A000542

talked about was where ISIS will talk about all various types of attack that could be done, correct?

A.   Yes, as well as some of the magazines where they provided instructions on how to build weapons.

Q.   Focusing on the materials you talked about where ISIS might say you can do stoning or spitting, do you recall that testimony?

A.   Yes.

Q.   If it was an ISIS-inspired attack, the attacker, he decides what type of attack he does, nobody tells him what to do from ISIS, correct?

A.   Yes.

Q.   In the ISIS-inspired attack, ISIS, the actual organization and representatives, would have no idea who the individual is before the attack, correct?

A.   Yes, mostly.

Q.   If the media publicized the attack, only then would ISIS maybe know that there had been an attack, right?

A.   Yes.

Q.   So before the attack, ISIS could not count on a purely ISIS-inspired attacker as a member of ISIS, correct?

A.   Correct.

Q.   After the attack, ISIS may or may not claim credit for the attack?

A.   Yes.

A000543

Q. ISIS has a very specific way of claiming credit for attacks, right?

A. Yes.

Q. Can you tell the jury a little bit about it.

A. They are usually in Arabic. They put out these graphic statements. It's a blue and red one, and it has writing talking about how sources close to the Islamic State say that a soldier of the caliphate has conducted some level of attack. Then sometimes also if the person ahead of time, before he conducts the attack, records some type of video will, the individual will then send it to ISIS, and they will maybe release that as well.

Q. You testified about some lone wolf attackers like Omar Mateen, do you recall that testimony?

A. Yes.

Q. ISIS took credit for Mr. Mateen's attack?

A. Yes.

Q. And Anis Amri?

A. Yes.

Q. ISIS took credit, correct?

A. Yes.

Q. Amedy Coulibaly, correct?

A. Yes.

Q. ISIS has not taken attack for Mr. Ullah's attack, correct?

A. Not as far as I'm aware.

A000544

Q. I want to go back to Omar Mateen. I want to focus Omar Mateen on that spectrum you were talking about. Omar Mateen is not on the left of that spectrum, right?

A. No. It was not a directed attack.

Q. No, no, the left. He's to the right of the left. Let me ask it another way. Omar Mateen was not solely ISIS-inspired, correct?

A. What do you mean by that?

Q. He had contact inside of ISIS?

A. He spoke with some individuals.

Q. Right. He had communicated directly with a man named Moner Mohammad Abu-Salha, correct?

A. Yes.

Q. That man is a known ISIS member?

A. I don't know off the top of my head.

Q. You know who Mr. Salha is, correct?

A. Yes.

Q. Who is he?

A. He is a member of ISIS.

Q. Omar Mateen and the member of ISIS were speaking before Mr. Mateen's attack, correct?

A. Yes.

Q. On that spectrum, if the left side is inspired and the middle is enabled, Omar Mateen is to the right of ISIS-inspired, correct?

**A000545**

A.   Yes.   But people have also described enabled attacks as inspired as well because the level of direction is fluid.  So it's unsure on what level it is at certain points.  People have described attacks like Omar Mateen's as an inspired attack.

Q.   But he has communication with an ISIS member, correct?

A.   Yes.

Q.   Also, Omar Mateen, he pledged allegiance to a very specific person, al-Baghdadi, correct?

A.   Yes.

Q.   Al-Baghdadi, for the jury, is the head of ISIS, as you testified on direct, right?

A.   Yes.

Q.   He is the leader of ISIS?

A.   Yes.

Q.   If you want to be a member of ISIS, you have to pledge allegiance to al-Baghdadi, correct?

A.   Yes, technically speak.

Q.   Technically speaking, if you want to be a member of ISIS, you need to pledge allegiance to the individual known as al-Baghdadi?

A.   Yes.

Q.   And Omar Mateen did that?

A.   Yes.

Q.   Anis Amri, he also is to the right of that left side of the spectrum we are talking about, correct?

A000546

A. Yes.

Q. Because they had contact with a man named Abu Walaa, right?

A. Yes.

Q. Who is a known ISIS recruiter in Germany?

A. Yes.

Q. So the implication is that ISIS was recruiting Mr. Amri, correct?

A. Yes.

Q. I forget if I've asked this question. ISIS claimed credit for Amri's attack?

A. Yes, they did.

Q. And Amedy -- I'm terrible with the pronunciations, so you should correct me -- Coulibaly?

A. That's right.

Q. That individual, ISIS took credit for his attack, correct?

A. Yes.

Q. And he had contact inside ISIS organization, correct?

A. Yes.

Q. I'd like to focus a little on the various forms of propaganda that you testified about on your direct.

A. Okay.

Q. Let's be very clear. During the course of your testimony, I think you took us through four videos.

A. Yes.

Q. Those individual you say were shown to you by the

A000547

government in preparation for this case?

A. Yes.

Q. It was told to you in preparation for the case that they were relevant to this case?

A. Yes.

Q. I think you testified that you saw about ten videos?

A. Yes.

Q. Those are all case-specific, you were told that before?

A. Yes.

Q. In your direct testimony, though, separate from those videos, you talked about various forms of ISIS propaganda. I want to go over that. For example, you talked about magazines that promoted suicide attacks. Do you remember that testimony?

A. Yes.

Q. No magazine that is case-specific has been shown to you in preparation for your testimony here?

A. Correct.

Q. You talked about Inspire magazine. Do you remember that testimony?

A. Yes.

Q. A case-specific version of Inspire magazine was not provided to you?

A. Correct.

Q. You talked about something called Telegram?

A. Yes.

**A000548**

Q. Telegram is an encrypted messaging tool, right?

A. Yes.

Q. Sort of like email, but it's all coded?

A. It's like WhatsApp or Facebook Messenger.

Q. A messenger service?

A. Yes. But it also has a broadcast feature where people can join a channel. It's sort of a hybrid between a messaging application and Twitter.

Q. ISIS members communicate very frequently through Telegram. I think that was part of your testimony, but correct me if I am wrong.

A. Yes, they have.

Q. No Telegram messages were shown to you as case-specific evidence?

A. No.

Q. You talked at some length on your direct by an individual named Awlaki?

A. Yes.

Q. He was an Al Qaeda member, was that your testimony?

A. Yes.

Q. You talked about on your direct how his lectures have been used as propaganda by ISIS, correct?

A. Yes.

Q. Over the course of your preparation for this case, you have been shown some Awlaki material, am I right?

A000549

A.  Yes.  There are two audio files.

Q.  You would agree with me that the two audio files that were shown to you as case-specific have nothing to do with propagating jihad activity, right?

A.  Yes.

Q.  Awlaki has a complicated history, is that fair?

A.  Yes.

Q.  A lot of the material for Awlaki on the Internet are just sermons about nonviolent religious information of the Qur'an, right?

A.  I don't know the specific percentages, of course, but he did radicalize over time.  His earlier works were more just mainstream religious lectures.

Q.  What was provided to you here as case-specific Awlaki lectures was before that radicalization, right?

A.  Yes.

Q.  They were not in any way promoting in violence, correct?

A.  Correct, besides the picture of Awlaki in the video that was shown about 30 minutes ago.

Q.  Yes, but I'm asking you a very specific question.  You said you listened to two Awlaki lectures in preparation for this case.

A.  Yes.

Q.  Both of those were not promoting any violent jihadist activity?

**A000550**

A. Correct.

Q. They were ordinary religious lectures?

A. Yes.

Q. Another one. You testified about Mr. al-Adnani's 2014 speech. Is that the right word for it?

A. Yes, an audio message he released.

Q. Al-Adnani at the time was what in terms of the organizational structure of ISIS?

A. At the time he was a senior ideologue of the group and external operations planner.

Q. So in 2014 he released an audio recording calling for attacks, is that right?

A. Yes.

Q. You know about that 2014 speech from your work in this field?

A. Yes.

Q. That 2014 speech, whether an audio copy or a video copy, has not been provided to you as case-specific information here?

A. No.

Q. You spoke on direct about a video called Flames of War II.

A. Yes.

Q. This is again something you know about from your work independent here, your work as a social scientist, correct?

A. Yes.

Q. In fact, you have a website, right?

A000551

A. Yes.

Q. It's called Jihadology, do I have that right?

A. Yes.

Q. On that website you post the ISIS propaganda that you are studying, correct?

A. Yes.

Q. Flames of War II was posted on that website?

A. Yes.

Q. What is the purpose of that website as you see it?

A. The purpose of the website is educational so that people are aware of what is going on and for other researchers to have access to it so they can better understand the phenomenon.

Q. Is it restricted only to researchers?

A. No.

Q. Anyone can log on to it and watch Flames of War II?

A. Yes.

Q. Because Flames of War II is posted on there, right?

A. Yes.

Q. It was posted when it was released. Is that when you decided to post it?

A. Yes.

Q. Do you know the year?

A. I believe it came out in November 2017.

Q. Is it fair to describe it as a fairly long video?

A. It's about an hour maybe.

A000552

Q. Again, Flames of War II was not provided to you in preparation for your testimony here as case-specific material?

A. Correct.

Q. Flames of War II, per your direct testimony, included messaging, promoting attacks in the U.S., correct?

A. Yes.

Q. I think you testified that that was consistent with ISIS propaganda starting to be released in around 2014, correct?

A. Yes.

Q. So, before 2014 ISIS was putting out into the world propaganda, correct?

A. Yes.

Q. But the messaging was different?

A. It was anti-American, of course, but at the time they were more interested in people joining them to fight with them in Iraq and Syria.

Q. Promoting foreign fighters, right?

A. Yes.

Q. Can you define for the jury what a foreign fighter is.

A. It's an individual from outside of the area that the particular war zone is in. They travel to that war zone to join up with a group to fight.

Q. When did you say ISIS first began releasing propaganda?

A. An earlier iteration of the group started this in 2003-2004.

**A000553**

Q. Fair to say between, when it starts, the propaganda starts being produced and promoted into the world in 2014, the focus of those videos were to recruit foreign fighters?

A. Yes.

Q. In some of the videos that you saw on your direct and played on your direct, they have the imaging that is consistent with the message of ISIS trying to promote foreign fighters to come to them?

A. Some of it is.

Q. Right, because the videos we watched included images on the battle fields of Syria and Iraq, correct?

A. Yes, to know what they were doing.

Q. There was a training camp video, do you recall that video?

A. Yes.

Q. That clearly takes place in a training camp in Syria or Iraq or another conflict zone?

A. Yes.

Q. In it ISIS is promoting a sort of brotherhood in a picture of them all kind of huddling together with the one finger?

A. Yes. That's one of the messages that they pushed.

Q. The message is kind of come join us and we will all be brothers in the battlefield, is that a way to explain it?

A. Yes, that's part of the message.

Q. It's sort of glorifying what it would be like to fight on the front lines in the conflict zone, right?

A000554

A. Yes, a utopian message.

Q. Images like that, promoting the glory of going over there, it's included in a lot of the videos, if not all, that the government showed you in preparation for this case, correct?

A. Yes, they were, some of them.

Q. In fact, some of the videos they showed you predate that 2014 date when the propaganda changed, right?

A. Yes.

Q. You recall that you looked at a video, I don't think you played it, but you looked at a video that the government showed you in preparation for your testimony, and it was dated from 2006?

A. Yes.

Q. In 2006 ISIS was trying to recruit people to come and join them?

A. It's complicated. It's not the same kind of campaign as it was after 2012-13. But yes, on a lesser scale.

Q. What do you mean on a lesser scale?

A. They weren't promoting trying to get foreign fighters in the way that they did after 2012.

Q. What were they doing in 2006?

A. They were fighting the Iraqi government, local tribal militias, and the U.S.

Q. So it was more of a focus on issues local to them, meaning in the area of Iraq and Syria and those territories?

A000555

A. Yes. But of course they are fighting the U.S., so that was relevant too.

Q. But the images are in Iraq and Syria?

A. At the time it was just Iraq, but yes.

Q. Fair enough. Flames of War II, which is a post-2014 piece of propaganda, also includes these images that are promoting the brotherhood that would be on the front lines?

A. Yes. Doing attacks abroad and joining the group are not necessarily inconsistent. They use both messages. It's just that one has been larger than others at different times depending on the particular conditions and situation.

Q. Flames of War II is also a propaganda piece to recruit foreign fighters?

A. Yes.

Q. Let's talk a little bit about ISIS to get a better sense of its organization. It's a very hierarchical organization, correct?

A. Yes.

Q. There is someone on the top?

A. Yes.

Q. We talked about him. His name is al-Baghdadi?

A. Yes.

Q. Then under him there are leadership positions, right?

A. Yes.

Q. They are broken down into committees?

A000556

A. Yes.

Q. There is a military committee, right?

A. Yes.

Q. Security?

A. Yes.

Q. Finances?

A. Yes.

Q. And there is a committee of external operations?

A. Yes.

Q. External operations within ISIS are the ones who coordinate and direct attacks abroad?

A. Yes.

Q. The person who runs that, who is that? Do you know who it is?

A. It was Abu Muhammad al-Adnani who was also the official spokesperson.

Q. Is he still in that role?

A. No. He was killed two years ago, I believe.

Q. So we don't know who is in that role now?

A. There hasn't been a specific confirmation.

Q. Al-Baghdadi, al-Adnani are high-level ISIS people, right?

A. Yes.

Q. Then, just like any other organization, there are people below them and below them and below them?

A. Yes.

A000557

Q.   All the way down to the foreign fighters?

A.   Yes.

Q.   The foreign fighters are members of ISIS?

A.   Yes.

Q.   You agree, right, there is a difference between being a member of ISIS and supporting ISIS?

A.   You can be a supporter and a member.

Q.   Yes, but you could be a supporter and not a member?

A.   Yes.

Q.   In fact, there is a terminology used in your field called "fanboy."  Are you familiar with that term?

A.   Yes.

Q.   In your world, your academic world, fanboys are pro-ISIS nonmembers, right?

A.   Yes.  They are activists online trying to push the group's message and possibly recruit people too.

Q.   The word "fanboy" is because they are kind of like groupies of a band but not members of the band, right?

A.   Yes.

Q.   Fanboys consume the propaganda, right?

A.   Yes.

Q.   They share the propaganda?

A.   Yes.

Q.   But they are outsiders looking in, right?

A.   Yes.  But we have seen a number of cases where people that

A000558

have done that then decide to actually join the group. So it
is not necessarily a static position necessarily.

Q. We are going to get to that. I want to talk about the pure
fanboy. If the fanboy crosses the line, he's no longer a
fanboy.

A. Yes.

Q. I want to talk about the pure fanboy.

A. Okay.

Q. The one who hasn't crossed the line.

A. Okay.

Q. The one who is not a member of ISIS.

A. Yes.

Q. The one who consumes ISIS's material.

A. Yes.

Q. But is not operating under the direction or control of
ISIS. Okay?

A. Yes.

Q. That's the definition?

A. Yes.

Q. Fanboys, they are not officially sanctioned by ISIS?

A. Well, ISIS promotes people to support them online, provides
instructions on how to produce their messages even farther
abroad in terms of getting it out to a larger audience. Just
yesterday they released a video message providing instructions
on what people online should be doing. It's a complicated

A000559

dynamic.

Q. ISIS doesn't know the names of fanboys?

A. No, not necessarily.

Q. ISIS knows the names of their members?

A. Yes.

Q. When you become a foreign fighter, if you're from the West and you travel to the area to become a foreign fighter, you actually fill out a sign-in sheet, for lack of a better word?

A. Yes. They have border documents.

Q. When you go there to join, to become a member, you give them your name?

A. Yes.

Q. Other personal identifying information?

A. Yes.

Q. You give them your passport?

A. Yes.

Q. You tell them the list of skills that you have?

A. Yes.

Q. And then they train you?

A. Yes.

Q. Then, based on that training and the information they have about you, they direct what attack or what function you can have in the organization?

A. Yes.

Q. If you decide you get there but then you don't want to do

A000560

it, you can't leave, right?

A.  Yes.  Problem.

Q.  ISIS doesn't let members leave?

A.  No.  They usually will execute them.

Q.  You can't say no to them?

A.  Yes.

Q.  Because if you try to leave, they'll kill you?

A.  Yes.

Q.  ISIS controls these members?

A.  Yes.

Q.  If you don't do what they direct you to do, they are going to kill you?

A.  Yes.

Q.  That's the relationship of a member to the higher organization?

A.  Yes.  It's a totalitarian movement.

Q.  Fanboys haven't signed up to be members?

A.  Correct.

Q.  ISIS doesn't regard them as members, right?

A.  Correct.

Q.  ISIS doesn't have their information?

A.  Correct.

Q.  If a fanboy decides he no longer wants to share the information, ISIS is not going to kill them?

A.  Yes.

A000561

Q. Meaning correct?

A. Yes.

Q. Fanboys aren't communicating directly with ISIS leadership?

A. I can't speak for them. I'm not a fan of ISIS, so I don't know what they are doing in their private time.

Q. Fanboy is a concept, it's an academically studied concept in your field?

A. Yes. But I obviously don't know what somebody is doing when they are not showing something publicly, so it is hard to say.

Q. Right. But in social science -- is that the proper kind of super-umbrella of your field?

A. Yes.

Q. You have to make some generalizations when you are labeling groups, right?

A. Yes, but of course things are always more complicated in practice.

Q. Of course. But the concept of fanboy in your academic community means somebody who is pro-ISIS but not a member of ISIS?

A. Yes.

Q. Someone who does not communicate directly with ISIS membership necessarily?

A. Yes, not necessarily.

Q. The number of fanboys, that's a number that has actually

A000562

been estimated at various points in time, and the estimate is somewhere between 45,000 and 90,000 fanboys of ISIS?

A. Yes. That was I think in 2014 or '15, around.

Q. So within the last 3 or 4 years there has been a study to determine how many people are pro-ISIS but not members, right?

A. I mean within that number were members of ISIS who were online as well. It wasn't just people online that were not in Iraq or Syria, but also foot soldiers and commanders, and so on and so forth.

Q. Fair enough. But it's in the tens of thousands of online people who are propagating ISIS material?

A. Yes.

Q. Out of those 10,000 -- tens of thousands, you don't know, but they are not all ISIS members, right?

A. No.

Q. These fanboys or anyone who propagates ISIS material, they end up recycling ISIS logos and mottos, right?

A. Yes.

Q. Your website is not restricted, right?

A. Correct.

Q. So you don't have to be a social scientist to know that?

A. No.

Q. If I were a fanboy and I went and I downloaded Flames of War II and then I tweeted it out, I would be propagating an ISIS flag or an ISIS image, right?

A000563

A. Technically, that's true.

Q. That's what fanboys do?

A. Though I haven't seen anybody tweet out my website that's an ISIS member.

THE COURT: You have to speak louder.

A. I said I have never seen an ISIS member tweet out something from my website. I guess it's a scenario that is possible, but it's not something I've seen specifically.

Q. Maybe you misunderstood my question. I'm not talking about ISIS members. I'm talking about fanboys. They are not ISIS members.

A. I'm saying anybody that supports or is a member.

Q. Do you get some sort of tally of who visits your website?

A. It says how many people go to it.

Q. When you said I don't know if a fanboy has retweeted something from my website, you don't know the names of the people who view your website?

A. No, I don't.

Q. Put aside your website. A fanboy who is recycling ISIS material is recycling images of the ISIS flag, for instance?

A. Yes.

Q. And words that have been basically co-opted by ISIS, right?

A. What do you mean? Supporting messages that ISIS has used?

Q. No. Let's go back a little. ISIS takes concepts that are not violent, that are not controversial, and they use them for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000564**

themselves, right?

A. Such as?

Q. Religious things, for example, right? The caliphate, for example. Yes? The caliphate is a concept that dates to what century? I don't know. You would know.

A. 7th to 20th Century.

Q. It's just a concept from the -- you said 7th century?

A. Yes, that's the first one.

Q. Could you tell the jury what it is.

A. After the Muslim prophet Muhammad died, there was then the creation of a caliphate afterwards. There have been various iterations over the centuries depending on which dynasty has been in control. There has been the Umayyads, the Abbasids. And the last one, which ended in 1924, was the Ottomans.

Q. So it's a concept that doesn't necessarily involve violence, right?

A. Well, I mean the states that were caliphates, they did fight and were involved in wars. So there was violence, of course, human nature and all.

Q. Independence was achieved through war, right?

A. Yes.

Q. "Caliphate" is a word that has been taken on by ISIS to promote their violent ideology?

A. Yes. They are using it for their interpretation of Islam.

Q. It's a word that predates ISIS?

A000565

A. Yes.

Q. And it's a word that can be associated with something not violent in the way that ISIS associates it with, right?

A. Correct.

Q. "Baqiya" is another example of that type of word, right?

A. Yes.

Q. "Baqiya" is an Arabic word?

A. Yes.

Q. It's in an Arabic dictionary?

A. Yes.

Q. What was your definition of it?

A. It just means remaining.

Q. It's an Arabic word that translates into English as "remaining"?

A. Yes.

Q. It's a word that ISIS has taken on on its own and made it kind of a motto?

A. Yes. It's become a slogan and rallying cry for the group.

Q. Fanboys, when they are propagating ISIS material, they are recycling "baqiya," right?

A. Yes.

Q. You talked about hashtag baqiya.

A. Yes, that's one of the examples.

Q. Tell us a little bit more. Where do you see hashtag baqiya?

A000566

A. At the time when ISIS members and supporters were on Twitter, they would use it on Twitter because people use hashtags on Twitter. But they don't really use Twitter much more recently because Twitter has taken down their accounts, a lot of, over the last few years.

Q. You're talking about when ISIS members use hashtag baqiya, correct?

A. And supporters online.

Q. So fanboys use hashtag baqiya, correct?

A. Yes.

Q. Hashtag baqiya does not necessarily mean you're an ISIS member, right?

A. No.

Q. You alluded to this before. There are circumstances where fanboys cross the line over to become members, right?

A. Yes.

Q. In order to do that, you have to pledge allegiance to ISIS, right?

A. Yes.

Q. That's called a bay'ah, is that the right way?

A. Yes, bay'ah.

Q. How do you spell that?

A. It's B-A-Y-A, and it could either end in H or T depending if you're talking about the singular or plural.

Q. A bay'ah is an oath taken by an individual to obey the

A000567

authority of another individual?

A. Yes.

Q. To do what that person directs you to do?

A. Yes.

Q. For bay'ah to ISIS, you have to pledge to the authority off al-Baghdadi?

A. Yes.

Q. That's when a fanboy can potentially cross over to a member?

A. Yes, though there have been cases I think where some attacks have occurred and somebody doesn't necessarily pledge allegiance but the Islamic State calls that personal a soldier of the caliphate.

Q. When ISIS takes credit for --

MR. TURNER: May the witness finish his answer?

THE COURT: Are you done with your answer?

THE WITNESS: Yes.

THE COURT: I want to make sure that we have it. "Calls that person a soldier of the caliphate," that's the end of your answer?

THE WITNESS: Yes.

THE COURT: Go ahead.

Q. Joining ISIS by pledging allegiance to al-Baghdadi is different from the process that we talked about before when you join ISIS by becoming a foreign fighter, correct?

A000568

A. I mean, you could do both at the same time.

Q. Yes. But you are not doing both at the same time, if you are just pledging allegiance to al-Baghdadi, right?

A. Yes.

Q. It's different?

THE COURT: Different than what?

Q. Than if you join ISIS by becoming a foreign fighter.

A. When you join the group as a foreign fighter, you also pledge bay'ah to Abu Bakr al-Baghdadi as well.

Q. When you join as a foreign fighter, we discussed this already, you are giving all of your information to ISIS?

A. Yes.

Q. You are pledging to be under their direction, correct?

A. Yes.

Q. And if you're not, you're going to get killed?

A. Yes.

Q. That's different than the other form of pledging allegiance we talked about?

A. Yes. It's more informal.

MS. GATTO: Judge, it is 3:30.

THE COURT: Yes. I said we would end early today. For those of you who have little ones, enjoy it. It goes quick. For those of you who don't have little ones, make sure you give the little ones who come by a treat and not a trick.

We'll pick up tomorrow at 9:30 sharp. We will have a

A000569

normal day tomorrow. Don't discuss the case. Don't do any research. Don't go online. Leave your notebooks here. We'll see you tomorrow morning. Thanks very much. All rise for the jury.

(Jury not present)

THE COURT: Ballpark, how much more do you have with this witness?

MS. GATTO: 15 minutes.

THE COURT: We have to bring you back tomorrow, Doctor. I'm sorry. You can step down.

Since Ms. Gatto wants to get home early, I don't want to drag this out too long. What's next? How long does the government anticipate their case taking?

MS. CROWLEY: Your Honor, we are slightly behind where we thought we would be. We have nine witnesses left. The crosses have been a little bit lengthier than we had initially thought.

THE COURT: They haven't been terribly lengthy. I don't think anyone could accuse them of being long and drawn out. Nine more witnesses. What is your estimation?

MS. CROWLEY: We still think we will be able to get them all in tomorrow by mid to late afternoon, obviously subject to cross. In the event that we do, your Honor, to the extent the defense has a case that they are going to put on, we assume that the Court will move right to that case.

A000570

THE COURT: Yes, I'm assuming we will start a defense case. If not, I told you I wouldn't have anybody sum up. We are not going to sum up tomorrow. We won't sum up until Monday. We'll put on evidence including the defense case tomorrow, if there is going to be one.

MS. GATTO: Very good.

MS. CROWLEY: In terms of a charge conference, I don't know if your Honor --

THE COURT: We should consider doing that tomorrow afternoon. It depends on whether there is a defense case. If you rest by lunchtime or shortly after lunchtime --

MS. CROWLEY: We won't be resting by lunchtime. It will be 3:00 or 4:00.

THE COURT: Then we'll see where we're at. I'm going to try to turn around a charge and get you something tonight. That will be my plan, my trick.

MS. CROWLEY: I don't know what your Honor's availability is for Friday morning.

THE COURT: We'll talk more tomorrow. Let me see where we're at.

MS. CROWLEY: Thanks.

MS. GATTO: Judge, the limiting instruction has kind of set sail.

THE COURT: Yes.

MS. GATTO: I want to note our objection. We did ask

A000571

for a limiting instruction. I don't want the record to be perceived that we waived that.

THE COURT: I don't think it should be perceived that it was waived. Certainly it was the case that the parties couldn't agree on language. The language I proposed nobody seemed to like. I think the government liked it better than you did. The more I thought of it, the more it seemed to me there just really wasn't a need for one.

I didn't think that the videos were so inflammatory or so troubling that they would cause the jury to lose sight of what their role was. It seems to me it is much less inflammatory than what the jury had already seen in terms of the event that is the subject of the other counts, all the counts. The explosion itself is pretty graphic. The jury has seen that now three times.

MS. GATTO: To close the loop, the proposed limiting instruction, both the joint and the defense, was only emailed. I'm going to file this on ECF just so the record is complete.

THE COURT: What is the "this" you are referring to?

MS. GATTO: The proposed instruction that the government and defense agreed to that we submitted yesterday. I only emailed it to chambers. I'm going to file it on ECF so everything is in the record.

THE COURT: Very well. Thanks.

(Adjourned to 9:30 a.m., November 1, 2018)

**A000572**

INDEX OF EXAMINATION

Examinationof:                    Page

DOUGLAS A. VETRANO

     Direct By Ms. Donaleski . . . . . . . . . 182
     Cross By Ms. Gatto . . . . . . . . . . . 190


DANIEL BYRNE

     Direct By Ms. Donaleski . . . . . . . . . 210
     Cross By Ms. Gallicchio . . . . . . . . . 231
     Redirect By Ms. Donaleski . . . . . . . . 275
     Recross By Ms. Gallicchio . . . . . . . . 292


ANDREA ESTOK

     Direct By Mr. Turner . . . . . . . . . . 295
     Cross By Ms. Gatto . . . . . . . . . . . 309


REGINALD DONALDSON

     Direct By Ms. Donaleski . . . . . . . . . 334


AARON ZELIN
     Direct By Mr. Turner . . . . . . . . . . 354
     Cross By Ms. Gatto . . . . . . . . . . . 385

**A000573**

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

401 and 2002  . . . . . . . . . . . . . . . . . 221
802 and 803   . . . . . . . . . . . . . . . . . 291
210 and 210-01 through 210-28   . . . . . . . 303
700, 701, 702 through 710, 710-A and  . . . . 353
          710-B, and 2005

3  . . . . . . . . . . . . . . . . . . . . . . 299

141, 1101, and 2004   . . . . . . . . . . . . . 344

201  . . . . . . . . . . . . . . . . . . . . . 301

203  . . . . . . . . . . . . . . . . . . . . . 308

601  . . . . . . . . . . . . . . . . . . . . . 306

801  . . . . . . . . . . . . . . . . . . . . . 217


DEFENDANT EXHIBITS

Exhibit No.                                        Received

 E   . . . . . . . . . . . . . . . . . . . . . 313

A000574

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA

             v.                     18 CR 16 (RJS)

AKAYED ULLAH,
                                    Trial
              Defendant.

------------------------------x

                                    New York, N.Y.
                                    November 1, 2018
                                    9:30 a.m.

Before:

        HON. RICHARD J. SULLIVAN

                                    District Judge,
                                     and a Jury


        APPEARANCES


GEOFFREY S. BERMAN
United States Attorney for the
        Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
        Assistant United States Attorneys


FEDERAL DEFENDERS OF NEW YORK, INC.
        Attorneys for Defendant
BY:  AMY GALLICCHIO
     JULIA GATTO
     COLLEEN P. CASSIDY


Also Present:

        JOHN MAURER - Special Agent, FBI
        MICHAEL DELUCA - Paralegal, U.S. Attorney
        JASON T. FISCHER - Paralegal, Federal Defenders
        CHIRAAYHU GOSRANI - Paralegal, Federal Defenders

A000575

(Trial resumed; jury not present)

THE COURT: I got an email from Mr. Turner indicating there is some issue with respect to an exhibit that the government wants to play or produce today. What's up?

MR. TURNER: The government does intend to offer a brief individual clip during Dr. Zelin's redirect. We wanted to front that with the Court. The video excerpt consists of clips from the ISIS video the Flames of War II about which Dr. Zelin was cross-examined at some length yesterday. We expect that Dr. Zelin will authenticate that video. As your Honor may recall, he testified that he remembered when he came out --

THE COURT: I remember the testimony.

MR. TURNER: -- and posted it.

THE COURT: So this is a clip that is not on the computer or it is on the computer?

MR. TURNER: It is on the computer, Judge. We can play it for your Honor. I apologize, Judge. We have it teed up on our laptops, but it was not on the laptop that was recovered in the residence.

THE COURT: There is testimony about it, but it is not among the videos that were recovered from the defendant's laptop?

MR. TURNER: That's correct. Detective Byrne testified yesterday that during the post-arrest interview the defendant stated that he watched the video Flames of War II.

A000576

THE COURT:  What is the objection?

MS. GATTO:  Your Honor, the objection is that it was not on the laptop seized from the apartment.  Dr. Zelin testified it is an hour-long video, which is a significantly long video.

THE COURT:  We are not going to watch the whole thing.

MR. TURNER:  35 seconds, Judge.

MS. GATTO:  The point is this.  It's not on the laptop, so we don't know whether this is the version of Flames of War II that Mr. Ullah was referring to in the post-arrest statement, assuming you credit that.  Two, we have no idea what portion, if any, was new.  If it were on the laptop, we would have a different issue.  It's not on the laptop.

I would also like to note that the video has been an issue.  It's been a subject of the motions in limine.  We have worked very hard in this case to have an efficient trial.

THE COURT:  I don't think anybody can accuse us of not having an efficient trial.

MS. GATTO:  That's right, your Honor.  That it has gone so smoothly I would like to take a little credit for.  The defense has worked very hard to confront all issues.  But we get an email at 11:30 last night that they want to introduce a video which has been an issue in the case since December 11th.  We litigated and negotiated what videos, what portion of the videos, all so that at 11:30 at night we wouldn't have to do

A000577

this.  I have to make a note for the record about that particular issue in terms of court administration.

THE COURT:  Fair enough.  But I think we should stay focused on what the issue and standard is here.  You're saying there is a lack of notice.  They are offering it as rebuttal evidence related to something that came up on the cross.  That's not something they necessarily have to front before trial.  Arguably, they could have done it yesterday when we broke for the day instead of 11 o'clock or 11:30, so I take your point.  What is the prejudice is really the issue.  How are you prejudiced by this?

MS. GATTO:  It's a prejudicial video and its relevance is diminished incredibly by the fact that it is not on the laptop, it is an hour-long video, and we have no idea if any portion Mr. Ullah saw.

THE COURT:  Those arguments strike me as arguments that go to weight, not admissibility.  In terms of prejudice, I'm more focused on how the defense is prejudiced by how learned about this, when you learned about it.  What difference would it make whether you learned about it yesterday at 4:00 as opposed to yesterday at 11:30?  Is there any difference?  It doesn't seem to me much.

MS. GATTO:  It would have been the subject of our motion in limine, as every video they showed was.

THE COURT:  That's true.  Those are arguments.  This

A000578

is an inconvenience, I agree with that. But it is not clear to me that it is really altering the arguments made or the ability to make them.

MS. GATTO: Two things. One, the videos, were not only the subject of a motion in limine but subject of negotiation between the government and defense about what portions, how many minutes would be shown. That whole conversation changes when you add another video. We are only talking about 9 videos that are being introduced. This is the tenth video. It changes the scope of that. It might have changed the way we litigated the motions in limine. It might have changed the way we stipulated to certain things.

THE COURT: Again, I think we have to talk about at what point they could have or should have done something. It seems to me they don't have an obligation to front these things before your cross. The cross developed testimony about this video. This is a video they now want to show in light of the fact that your client has said he saw it. Things happen during cross, new exhibits come in on redirect. It's not clear to me how there is any prejudice.

MS. GATTO: I think that mischaracterizes the time line. The government elicited Flames of War II from Dr. Zelin on redirect. This isn't me opening up the door on cross. This is them eliciting it on their direct, choosing not to play it then, choosing not to notify us that they intended to play it

A000579

then when they were eliciting from Dr. Zelin this very testimony. So I don't think it is fair to say they were shocked and surprised.

THE COURT: I agree with that. I don't think anybody said they were shocked and surprised. I don't think that is the requirement either. There are things that can be held back depending on how the cross goes. I'm not faulting you. It's been a good cross. You would raise that on the cross, so they want to rebut or redirect with the actual video. That doesn't strike me as improper. I haven't seen anything or heard anything to suggest that there is something that is inflammatory or otherwise problematic about this video that will make this an unfair, late, eleventh hour drop of evidence.

MS. GATTO: If I could note one more thing. The video is edited. The way it is edited is the first couple of seconds of the Flames of War video, then a portion is cut out, and then there is like a 30-second portion.

THE COURT: Edited for purposes of the trial you mean?

MS. GATTO: Yes, your Honor. It says 39-second clip. It's not a continuous 29 seconds. I take it that they have edited it to make it more palpable, maybe is the word, for the jury. But it looks like the portion they want to show is up front at the top of the video. They have the kind of introduction, then they have a break, then they have the portion they want to show.

A000580

I add it to the conversation. I note it for the record. I don't want to beat a dead horse because I see where this ruling is going. But that's another 11:30 at night -- frankly, it was this morning because I was sleeping -- looking at the video, comparing it to the full, trying to figure out where the edits were. That's another reason why it is prejudicial.

THE COURT: These are points that can easily be brought out on cross. Or, if necessary, if you want to call a witness later or call somebody later, that's fine too. I think that is the way to overcome any problems caused by the late nights. When is this is come up at?

MR. TURNER: Judge, this was specifically teed up by the line of cross that the defense engaged in, and specifically the point argued through the cross questions that the defendant did not in fact watch this video notwithstanding his post-arrest statement. In light of that, the government made a decision to introduce through redirect in light of that cross a small portion of the video that was gone into at length during the cross-examination.

THE COURT: Why 11:30 and not 4:30, 5:30, 3:30 when we finished yesterday?

MR. TURNER: Judge, not splitting hairs, it was earlier than 11:30. It was I believe about 10:40. Judge, that's when we made the determination to introduce the video.

A000581

THE COURT:  I think it is fair game for the government to be able to do that.  I don't think there is anything unfairly prejudicial about it.  That's the ruling.

MS. GATTO:  Your Honor, I have one more note.  In light of the government working at 10:30 or 11:00 on new evidence for this witness, we would like a representation from the government that they didn't prep their witness while he was still on cross.

THE COURT:  I assume they didn't.

MR. TURNER:  Of course not, your Honor.

We would also note that we have received defense exhibits on the morning of the day they introduced their witnesses as well.  There was no effort here to hold anything back.  It was just where we reached the decision.

THE COURT:  I have ruled.  The jury I presume is all here.  Is there anything else we need to cover before we bring the jury in?

One of the jurors, number 2, Mr. Fernandez, approached my law clerk at the end of the day yesterday after the jury was leaving, after things were breaking up, indicating that he had a family emergency that required him to be someplace November 9th or 14th or something.  We didn't get into details.  I told him we'd talk more about it today.  That juror may be following up with my law clerk now.  I think that probably won't be a problem, but I don't know the details at all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000582

We are waiting on two jurors. We could bring Mr. Fernandez in and talked him about his issue or we could wait until later in the day to see in he reapproaches my law clerk.

MR. TURNER: Judge, we defer. We also agree with the Court's assessment that a November 9th issue is very unlikely to pose a problem with scheduling.

THE COURT: I guess we have to find out the exact dates. Did he say November 9th?

THE LAW CLERK: 8th.

THE COURT: If we are in the middle of deliberations and he has to go and the jury is still deliberating, that would pose a problem.

MS. GATTO: Was it a full day?

THE COURT: It sounds to me like he would have to travel for a funeral. It sounds like it's a family member funeral out of the country. That was the impression I had. We didn't get into any of the details. We just said sit tight, we'll talk tomorrow. My plan was to bring him in, have him tell us what's on his mind unless you want me to do that without you. But I really would rather have everybody here.

MS. GATTO: We would like to be there. It was the 8th?

THE COURT: That's what he said to the law clerk, yes, Mr. Brody. That could pose an issue in terms of mid deliberations. I don't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000583**

(Pause)

(Jury present)

AARON ZELIN, resumed.

THE COURT:  We are getting a late start today.  That is unfortunate.  One or two people mean we all have to wait.  There are a lot of people waiting.  Please be mindful of that.

We are going to resume now of the cross-examination of Dr. Zelin by Ms. Gatto.

Ms. Gatto, you may proceed.

MS. GATTO:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. GATTO:

Q.  Good morning, Dr. Zelin.

A.  Good morning.

Q.  Yesterday you will remember we were chatting about various terms that ISIS has co-opted for their own purposes.  Do you remember that testimony?

A.  Yes.

Q.  We talked about the concept of the caliphate, remember that?

A.  Yes.

Q.  The caliphate, to put this in context, is this concept of a Muslim State, right?

A.  Historically.

Q.  A kind of Muslim Brotherhood that transcends national

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000584**

Q. A group -- not a group. Withdrawn. A nation made up of people who are Muslims?

A. Yes.

Q. A state of Islamic people?

A. Yes.

Q. The terminology "Islamic State," that can refer to the organization we have been talking about, ISIS, right?

A. Yes, that's what they call themselves.

Q. They have various names, right?

A. That's what they call themselves now. As I mentioned yesterday, they have had various names over the years. But this is the current name.

Q. When people in your academic community are writing about or speaking about the Islamic State, "Islamic State" is one name that academics will use, right?

A. Yes, it's the primary one.

Q. "ISIS" is another one, correct?

A. Yes. It's an earlier iteration of the group's names, but people still use it because it is easier to say.

Q. ISIL is another one?

A. Yes.

Q. I've lost it in my head, but there is an Arabic?

A. It's Daish.

A000585

Q. If you could spell it for the court reporter.

A. D-A-I-S-H.

Q. But Islamic State can also be a concept, right?

A. Yes.

Q. And there are organizations that are anti-ISIS that support the notion of a Muslim Brotherhood, correct?

A. Yes.

Q. Al-Qaeda in its current iteration is one such organization, correct?

A. Yes.

Q. Al-Qaeda supports the concept of an Islamic State, correct?

A. Yes.

Q. But they do not support the group known as ISIS?

A. Correct.

Q. Al-Qaeda and ISIS are enemies, correct?

A. Yes, since 2013.

Q. Since 2013 al-Qaeda, one of their main goals is to destroy ISIS, correct?

A. I wouldn't say it's actually destroy. They have had more of a reconciliatory approach, whereas ISIS has been more wanting to destroy al-Qaeda.

Q. But al-Qaeda is anti-ISIS?

A. Yes, of course.

Q. But pro the concept of the Islamic State?

A. Yes.

A000586

Q. There are other people or organizations that are anti-ISIS but pro the concept of the Islamic State, correct?

A. Yes.

Q. Sheikh Abu Muhammad al-Maqdisi, correct?

A. Yes.

Q. He is an anti-ISIS proponent, right?

A. Yes.

Q. And a pro Islamic State concept proponent?

A. Yes.

Q. These groups support the concept of the Islamic State, correct?

A. Yes.

Q. But do not promote ISIS?

A. Correct.

　　　MS. GATTO:  I have no further questions, your Honor.

　　　THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. TURNER:

Q. Good morning, Dr. Zelin.

A. Good morning.

Q. Do you recall Ms. Gatto asking you questions about the propaganda videos that ISIS spreads online?

A. Yes.

Q. In its propaganda videos, does ISIS ask its supporters in the United States to do anything for ISIS?

A000587

A. Yes. It asks supporters to conduct attacks on its behalf.

Q. How can an ISIS supporter based here in the United States serve ISIS?

A. They can serve them, as we discussed yesterday, by being a force multiplier for the organization. They don't necessarily have to pour resources into it, but they get the same level of information in the public, which then provides them a greater way to recruit more people in the future.

Q. By doing what? How does the supporter become a force multiplier for ISIS?

A. By doing some sort of an attack.

Q. When an ISIS supporter answers the call in ISIS's videos and carries out an attack in the name of ISIS, does that affect how ISIS views the status of the supporter?

A. Yes. Usually, they view that person as a supporter and a martyr within their cause.

Q. You used the term yesterday "soldiers of the caliphate," is that right?

A. Yes.

Q. What does that mean?

A. It just means somebody that is fighting on behalf of the Islamic State and their cause and what they are attempting to do.

Q. To carry out an attack for ISIS, does an ISIS supporter need to take any particular oath or pledge?

A000588

A. No, not necessarily.

Q. To carry out an attack for ISIS, does an ISIS supporter here in the United States need to travel anywhere?

A. No.

Q. To carry out an attack for ISIS, does an ISIS supporter need to have direct contact with any ISIS members who are based in the Middle East?

A. No, not necessarily.

Q. You testified that these sorts of inspired lone-wolf attacks in the United States are part of ISIS's global strategy, is that right?

A. Yes.

Q. Does ISIS rely on members based in Syria or Iraq to actually execute these inspired attacks here in the United States?

A. No.

Q. Who does it rely on?

A. Americans or American residents.

Q. You also testified on cross-examination about fanboys, right?

A. Yes.

Q. Please remind us, what is a fanboy?

A. Essentially somebody that is a supporter, activist, for the Islamic State online primarily.

Q. You testified that as of today there are thousands of

A000589

fanboys online, is that right?

A. Yes.

Q. Maybe even tens of thousands?

A. Yes, it's possible.

Q. In the last year, roughly how many attacks inspired by ISIS have occurred in the United States?

MS. GATTO: Objection.

THE COURT: Ground?

MS. GATTO: Relevance and beyond the scope.

THE COURT: Overruled certainly on relevance. I'll allow it. You can answer. If you know. Yes or no, do you know?

THE WITNESS: I don't know the specific number off the top of my head.

THE COURT: Next question.

Q. When a fanboy takes the step of actually carrying out an attack for ISIS, how, if at all, does that change the status of the fanboy to ISIS?

A. He's viewed as part of the movement and broader cause of the group.

Q. You have also testified about suicide attacks or martyrdom operations inspired by ISIS. Do you recall that testimony?

A. Yes.

Q. What is the goal of such attacks?

A. The goal of the attack is to kill other people.

A000590

Q. Through your work are you aware of any ISIS supporter ever carrying out a martyrdom operation in the name of ISIS where the goal is only to kill himself and no one else?

MS. GATTO: Objection, your Honor.

THE COURT: Overruled. You can answer.

MS. GATTO: Your Honor, it goes to the ultimate question.

THE COURT: I don't think that question goes to the ultimate question for the jury. Overruled. You can answer.

A. No.

Q. Would such an operation be consistent or inconsistent with ISIS's goals?

A. It would be inconsistent.

Q. Why?

A. For one, suicide in and of itself is considered legal within Islam, and of course this group holds dear these rules. Then, two, the whole point of the attacks is to kill people and to cause casualties and, in turn, create a media event in some respects for them.

Q. Dr. Zelin, you testified on cross-examination that you are not aware of ISIS formally claiming responsibility for the bombing of the Port Authority on December 11th of last year, is that right?

A. Yes.

Q. Based on your work, do you have an opinion as to why ISIS

A000591

didn't claim responsibility for the attack?

A. Yes. There are a few reasons why people have said within the academic field why this happened. Usually, the Islamic State hasn't claimed responsibility for where individuals haven't died in the attack or have been arrested afterwards in part because they don't want to be seen as having been part of some failed attack and therefore sullying their brand and name. Also they don't want to be viewed as selling out a potential supporter of the group when they are in some kind of form going to a court case.

Q. In the areas you described where ISIS doesn't formally claim responsibility for a particular attack, does that mean the attack wasn't carried out for ISIS?

A. No.

MS. GATTO: Objection.

THE COURT: No or not necessarily?

THE WITNESS: No.

THE COURT: No? Okay. Go ahead. Overruled. The objection is overruled.

Q. Dr. Zelin, do you recall Ms. Gatto asking you a number of questions about the particular ISIS video called Flames of War II?

A. Yes.

Q. You testified that the ISIS video Flames of War II instructs supporters to carry out attacks here in the United

A000592

States, is that right?

A.  Yes.

MR. TURNER:  Mr. DeLuca, if we could pull up just for the witness, Court, and counsel what's been marked for identification as Government Exhibit 924.  If we could please play the video, again just for the witness.

(Video shown)

Q.  Dr. Zelin, do you recognize what these video clips are from?

A.  Yes.  It's from the Flames of War video.

Q.  Is this the Flames of War II video you testified about yesterday?

A.  Correct.

Q.  How do you recognize it?

A.  By the scenes and the fact that the title on the screen says "Flames of War II."

Q.  Have you watched this video as part of your work?

A.  Yes.

Q.  In fact, you actually posted it on your website, is that right?

A.  Yes.

MR. TURNER:  Your Honor, the government offers Government Exhibit 924.

THE COURT:  Government Exhibit 924 is received.

(Government's Exhibit 924 received in evidence)

**A000593**

MR. TURNER: Mr. DeLuca, let's play the video and let's pause at 5 seconds in.

(Video shown)

Q. Dr. Zelin, what is Alhayat Media Center?

A. It is one of the official media outlets, primarily putting out content in English language or another language besides Arabic.

Q. When you say "the Islamic State," what are you referring to?

A. The group based in Iraq and Syria.

Q. ISIS?

A. Yes.

MR. TURNER: Mr. DeLuca, please play and pause at 22 seconds.

(Video shown)

Q. What have we seen in these clips, Dr. Zelin?

A. The U.S. military coalition forces bombing the Islamic State's positions in Iraq or Syria.

MR. TURNER: Mr. DeLuca, please play and pause at 33 seconds.

(Video shown)

I apologize, Mr. DeLuca. We need to go back and pause a little bit earlier. Pause it there. Thank you.

Q. Dr. Zelin, please read the English language statement at the bottom of this screen.

A000594

A.   "So die in your rage," comma, "America."

Q.   Did you notice in the prior clip what was in the background?

MR. TURNER:  Can we rewind just for a second, Mr. DeLuca, please.

A.   The U.S. Congress.

Q.   Again, the statement at the bottom of the screen?

A.   "So die in your rage, America."

Q.   What message is ISIS conveying here?

A.   That they are fighting the United States.

MR. TURNER:  Mr. DeLuca, let's move forward, and I'll tell you when to pause.

(Video shown)

Lets pause there.

Q.   Please read the English statement now at the bottom of this screen?

A.   "Die in your rage."

MR. TURNER:  You can play through the end, Mr. DeLuca.

(Video shown)

Pause it, please.

Q.   Dr. Zelin, what does this screen say here?

A.   "Flames of War II until the final hour."

MR. TURNER:  Now through the end, Mr. DeLuca.  Thank you.

(Video shown)

A000595

Q. Dr. Zelin, the Port Authority bombing attack that we have been talking about occurred on December 11th of 2017, right?

A. Yes.

Q. When did ISIS release this video Flames of War II?

A. It's definitely November 2017. If I remember correctly, it was towards the end of the month.

Q. Do you recall the specific date in November of 2017 that it was released?

A. Not the specific date off the top of my head. I believe it was towards the end of the month.

MR. TURNER: Your Honor, permission to hand the witness, and of course I will show the defense, what is been just marked for identification as Government Exhibit 931 for purposes of refreshing the witnesses recollection.

THE COURT: 931 you said?

MR. TURNER: Yes, your Honor.

Q. Dr. Zelin, please take a look at that and let us know when you are done looking at it, and then I'll ask you a question.

A. Okay, I'm good.

Q. Does that refresh your recollection as to the date in November of 2017 that Flames of War II was released?

A. Yes.

Q. What is that date?

A. November 29, 2017.

Q. ISIS released this video about how long before the attack

A000596

Case 1:18-cr-00328-JSR Document 402 Filed 08/14/18 Page 23 of 58

at the Port Authority last December?

A.   About a week and a half.

          MR. TURNER:  Nothing further, your Honor.

          THE COURT:  Recross?

          MS. GATTO:  Yes, your Honor.  Thank you.

RECROSS-EXAMINATION

BY MS. GATTO:

Q.   Dr. Zelin, in your work studying jihad organizations, you have had occasion to look at the Qur'an, correct?

A.   Pardon me?

Q.   As your work in your field of expertise, you had occasion to look at the Qur'an?

A.   Yes, at times.

Q.   The Qur'an is the religious text for all Muslim people, right?

A.   Yes.

Q.   ISIS has co-opted certain things from the Qur'an to promote their own goals, right?

A.   Yes.  They have their own interpretations, as anyone else might.

Q.   But they use what is a religious text for nonviolent people and they pull it out and they corrupt it for their own means, right?

A.   Yes, on some level.

Q.   We talked about the word "baqiya" yesterday?

A000597

A. Yes.

Q. That was an example of a word that has no nonviolent meaning in its everyday use, correct?

A. Correct.

Q. But that ISIS has co-opted?

A. Yes.

Q. So somebody can use the word "baqiya" and not be an ISIS member?

A. Yes.

Q. This phrase "die in your rage," that's from the Qur'an, isn't it?

A. Yes.

Q. Let me show you what I'll mark as Defendant's Exhibit P.

MS. GATTO: Your Honor, I've handed this to the government. If I could approach the witness?

THE COURT: Okay.

Q. That's chapter 3 verse 119 from the holy text the Qur'an?

A. Yes.

Q. You said you were fluent in Arabic?

A. I don't have a native fluency, but I can understand it when I do research. Obviously, I'm not from Arabic background or the Middle East.

Q. When you review the Qur'an, do you review it in Arabic or in English?

A. Both, just to make sure I understand it, since I is

A000598

classical, not modern, Arabic.

Q. This is an Arabic and English version of chapter 3-119 from the Qur'an?

A. Correct.

MS. GATTO: Your Honor, we offer Defendant's Exhibit P.

THE COURT: Any objection?

MR. TURNER: No objection, your Honor.

THE COURT: Defendant's Exhibit P is received.

(Defendant's Exhibit P received in evidence)

Q. Could you read the portion of the Qur'an from chapter 3, 119, please.

A. Yes. "Here you are loving them, but they are not loving you, while you believe in the scripture, all of it. And when they meet you, they say 'we believe.' But when they are alone, they bite their fingertips at you in rage, say 'die in your rage. Indeed, Allah or God is knowing of that within the breast."

Q. Thank you. This video Flames of War II that you watched on your redirect, that video is on your website, Jihadology, correct?

A. Yes.

Q. You remember looking at Government Exhibit 931 to refresh your memory? Do you remember that?

A. Yes.

A000599

Q. That was a picture of your website, correct?

A. Yes.

Q. If I or an Internet browser came to your website, it would be quite easy to share this speech, right?

A. Yes, conceivably.

Q. On the page it has the primary source of the video, right?

A. Yes.

Q. It has an HTTP address, it has a website address?

A. Yes.

Q. You can just highlight that, put it in an email, forward it to your friends, and anyone can watch it, right?

A. Potentially.

Q. Anyone can come to your website, right?

A. If they know about it.

Q. There are no restrictions on it?

A. No.

Q. If I Google "Flames of War II," your website is right there on the top of the Google search, correct?

A. I've never Googled it, but I trust that that's correct.

Q. If you Google "ISIS propaganda," your website is in the top of the Google search, correct?

A. Like I said, I've never specifically Googled that, but I'll take your word for it that that's correct.

Q. Yesterday you said you get a tally of how many people come to your website, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000600**

A.   Yes.

Q.   How many people come to your website?

A.   It depends on a day-to-day.  But maybe like 10, 12,000 people a day.

Q.   10, 12,000 people a day, did I get that right?

A.   Yes.

Q.   Your website has been banned in India, is that right?

A.   I believe so.

Q.   Would you think if a website user, an Internet user, went to your website and viewed this, that you have directed them to view them?

A.   No.

Q.   You have a Twitter account?

A.   Yes.

Q.   Do you have a professional and personal Twitter account?

A.   Yes.

        MR. TURNER:  Objection.  Beyond the scope of the recross.

        THE COURT:  I'll allow it.  Go ahead.  You can keep going.

Q.   On your professional Twitter account, what kinds of things do you tweet?

A.   Usually stuff related to my work or sometimes sports.

Q.   When its related to work, it's related to ISIS on occasion?

A.   Yes, ISIS, al-Qaeda, anything usually related to the

**A000601**

jihadist movement in general since I like posting new academic journal articles.

Q. What about ISIS propaganda? Do you tweet about ISIS propaganda?

A. I don't know on my AZelin account, when is my primary Twitter account.

Q. You have a thing called Follow Friday?

A. Yes. That's on Twitter in the earlier years. I haven't done that in a while though.

Q. I'm having trouble hearing you. You said you haven't done it in a while?

A. Yes.

Q. But you used tweet a thing called Follow Friday?

A. Yes.

Q. What that was was it was encouraging people to follow you on Twitter, to follow other people?

A. Yes.

Q. One person you encouraged your followers to follow was a man who used the name Shammy Witness?

A. Yes.

Q. Shammy Witness, it turns out he was a jihadist, right?

A. Yes. Later on, like we talked about yesterday in relationship to the radicalization process, the guy wasn't a jihadist when he first started going on Twitter, but he got radicalized over time by events going on in Egypt and Syria.

A000602

Q. But you encouraged your Twitter followers to follow Shammy Witness, correct?

MR. TURNER: Objection, scope again. This is well beyond the scope.

THE COURT: I assume it is going to come back to a point in a minute. So I'm going to let her develop that. Go ahead.

MS. GATTO: Thank you, your Honor.

A. Yes, I did, before it was quite obvious that he had become fully radicalized.

Q. So pre-radicalization you asked your followers to follow him?

A. Yes. He was a good source of information related to what was going on in the region and the movements.

Q. I say you asked your followers to follow him. It wouldn't be fair for me to say you directed your followers to follow him, correct?

A. Yes.

Q. You just posted it, right?

A. Yes.

Q. Then it was up to them, right?

A. Yes. I can't control anybody else.

Q. You don't know the names of your followers?

A. It depends if they have their real names or if they are anonymous.

A000603

Q. Most of them are anonymous, aren't they?

A. I don't know. I've got like 35,000-plus followers. I haven't done a census.

Q. There was some testimony on your redirect about what an ISIS supporter would be thinking if they were doing an attack. Do you recall that testimony?

A. Yes.

Q. First, you would agree with me it's impossible to know what individual people are thinking, right?

A. Yes.

Q. It's even more complicated when you are in the mind of someone who supports, not a member, supports certain tenets of terrorist organizations, correct?

A. I can't speak for anybody in particular.

Q. I'm looking for something. I apologize for hesitating in our flow. You are familiar with an academic colleague of yours named Clint Watts, right?

A. Yes, I am.

        THE COURT: Clint Watts?

        MS. GATTO: Clint, C-L-I-N-T, last name Watts, W-A-T-T-S.

A. Yes.

Q. He is an academic in your academic community?

A. Yes.

Q. You rely on various publications that he puts out into the

A000604

universe, right?

A. Yes.

Q. You have relied on a article he submitted called "Inspired, Networked, and Directed"?

A. Yes, I am aware of it.

Q. It's a reliable authority?

A. Yes, it's a good article.

MS. GATTO: I will mark as Defendant's Exhibit R for identification Clint Watts' article.

THE COURT: You can approach. You don't have to ask.

Q. That's the article we were just discussing?

A. Yes.

MS. GATTO: Your Honor, I offer Defendant's Exhibit R.

MR. TURNER: Objection, your Honor.

THE COURT: It is not clear to me the relevance of this or where we are going with this. Without more of a foundation, I don't see why this is coming in.

MS. GATTO: Fair enough, your Honor.

Q. Dr. Zelin, Mr. Watts, is he a doctor, by the way?

A. No, I do not believe so.

Q. Mr. Watts writes on what we are talking about, right, the intent of individuals who support ISIS, correct?

A. Yes, that's one of the things he does.

Q. He believes, as do others in the academic community, true or false, that you really can't get into the head of people who

A000605

Q. say they support jihadivist movement, correct?

A. Yes, unless they are talking about it publicly, and then you will have a better idea of what they are thinking.

Q. What he says is many, if not most, western jihadis are deeply troubled souls --

MR. TURNER: Objection, your Honor. Hearsay.

THE COURT: I don't know if it is coming in as evidence for the witness to be crossed by other texts in the field. This is a text in the field of an expert witness, correct?

MS. GATTO: One that he said is a reliable authority, your Honor.

THE COURT: I am going to allow the question. Keep going.

MS. GATTO: Thank you.

Q. What he said is, "We analysts and followers of jihadi activity sometimes give terrorists too much credit. Many, if not most, western jihadis are deeply troubled souls, at times more confused about their intentions and motivations than we are."

A. It depends on the particular individual.

THE COURT: That's a statement you just read. Are you asking if he agrees with it?

MS. GATTO: I'm asking him if that's what this reliable authority says and whether he --

A000606

A.  I think it's a --

THE COURT:  Whoa.  I don't need an expert to tell me whether you have read something correctly.  If that's the question, then the objection is sustained.  If you're asking him to say whether he agrees or disagrees with some other person in the field, that's a fair question.

Q.  Then I will ask you, do you agree or disagree with Mr. Watts, the statement he made in the article that you have relied on in the past when you have submitted things for the government?

A.  I think it is correct, but it is also important to note that that is a general statement he is making.  Each individual is different.  So I can't speak on a specific individual without knowing the particular case.

Q.  Exactly.  Dr. Zelin, when an ISIS supporter says something, we don't know what's in their mind, correct?

A.  If they say it, I trust that they believe it.  I don't see why somebody would be lying.

Q.  Somebody can support al-Qaeda and ISIS at the same time, but that would be impossible in your academic field, correct?

A.  Well, it's complicated, because usually supporters may not know as much, like the deep theological debates between the high-level ideological stuff.  So sometimes you will see people supporting both groups.

Q.  Yesterday I asked you a series of questions about

A000607

ISIS-inspired attacks.

A.  Yes.

Q.  You agreed that an ISIS-inspired attack does not necessarily have to have any direction from ISIS, correct?

A.  Correct in terms of direct contact.  But as we noted yesterday, they do have these messages and instructional things.  So indirectly there is that connection at someplace.

Q.  Guidance, not direction, correct?

A.  Yes.

Q.  That's your position, right?

A.  Yes.

Q.  Those were your answers when the government asks you those kinds of questions, correct?

A.  Yes.

Q.  The government is paying you $400 an hour today?

A.  Yes.

MS. GATTO:  No further questions, your Honor.

THE COURT:  Thanks.  Any reredirect?

MR. TURNER:  Very briefly, your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. TURNER:

Q.  Do you recall Ms. Gatto asking you questions about the phrase "die in your rage"?

A.  Yes.

Q.  How has ISIS used that phrase?

A000608

A. They have used it as sort of a slogan and rallying cry against their enemies, to fight them essentially.

Q. How have ISIS supporters used that phrase?

A. They have used it as a way of supporting the group and to show that they believe in the cause.

Q. The phrase that we saw in the video Flames of War II "Die in your rage, America," is that in the Qur'an?

A. Obviously "America" isn't, since the U.S. was not founded until a thousand years after the Qur'an happened.

MR. TURNER: Nothing further, your Honor.

THE COURT: Any rerecross?

MS. GATTO: No, your Honor.

THE COURT: You can step down, Doctor. Thank you very much.

(Witness excused)

THE COURT: The government will call its next witness. Who is that?

MS. CROWLEY: Special Agent Brian Murtagh. We would like to read a brief stipulation.

THE COURT: Go ahead.

MR. TURNER: Government Exhibit 2006. With the Court's permission, we will pull it up for the jury as well so they can follow along. The stipulation is:

It is hereby stipulated and agreed between the parties that the Islamic State of Iraq and al-Sham, including its

A000609

aliases the Islamic State of Iraq and the Levant, the Islamic State of Iraq and Syria, ad-Dawlah al-Islamiyah fi al-'Iraq was-sh-Sham, Daesh, Dawla al Islamiya, Al-Furqan Establishment for Media Production, Islamic State, ISIL, and ISIS, is a designated foreign terrorist organization as determined by the United States Secretary of State and published in the Federal Register on May 15, 2014.

It is further stipulated and agreed that this stipulation may be admitted in evidence at trial.

Your Honor the government offers Government Exhibit 2006, which is the stipulation.

THE COURT:  Government Exhibit 2006 is received.

(Government's Exhibit 2006 received in evidence))

BRIAN MURTAGH,

    called as a witness by the government,

    having been duly sworn, testified as follows:

THE COURT:  State your name and spell your name first and last for the record.

THE WITNESS:  Brian Murtagh, first name B-R-I-A-N, last name Murtagh, M-U-R-T-A-G-H.

THE COURT:  Mr. Murtagh, keep your voice up just like that.  It's a little awkward with the microphone, but that's the best we can do.

DIRECT EXAMINATION

BY MS. CROWLEY:

A000610

Q.  Good morning, sir.  Where do you work?

A.  I work for the Federal Bureau of Investigation.

Q.  What is your current title?

A.  Special agent bomb technician.

Q.  How long have you worked for the FBI?

A.  Over 8 years.

Q.  Are you assigned to a particular office or unit?

A.  Yes, the joint terrorism task force.

Q.  Is that also called the JTTF?

A.  Yes.

Q.  What is the JTTF?

A.  JTTF is a task force set up of multiple agencies that investigate counterterrorism investigations.

Q.  Where is it located?

A.  It's located in Chelsea, New York.

Q.  What did you do before you joined the FBI?

A.  I was in the U.S. Army as a paratrooper in the 2d Airborne Division.

Q.  You mentioned that you are a special agent bomb technician. How long have you been a bomb technician?

A.  Approximately three years now.

Q.  Can you explain what it means to be a special agent bomb technician.

A.  To be a special agent bomb technician, basically the role of a special agent bomb technician is to respond to

A000611

investigations and calls of service relating to improvised explosive devices. In responding to these calls, you will conduct render safe procedures, conduct render safe procedures in conjunction with our local county, state, local police bomb squads. We will also maintain and collect evidentiary material related to the bombing investigation, and we will coordinate with our FBI explosives unit down at Quantico, Virginia, for the lab.

Q. What, if anything, do you have to do to become a special agent bomb technician?

A. In order to become a special agent bomb technician, you have to be selected by your local field office program coordinator. Once you are selected, you will be then sent down to hazardous device school, which is located in Huntsville, Alabama. It's a 6-week course designed for law enforcement officers to be certified as public safety bomb technicians.

Q. Did you attend hazardous device school?

A. Yes.

Q. Approximately how long does it last?

A. Hazardous device school lasts 6 weeks long.

Q. What sorts of things do you learn there?

A. You learn everything from basic IED components, improvised explosive device components. You learn circuitry of IEDs. You get into homemade explosives as well as anything related to render safe procedures.

A000612

Q. Apart from hazardous device school, what, if any, additional explosive-related trainings have you received?

A. Additional trainings that we receive, we do go down to either Quantico or Huntsville, Alabama, again, to receive advanced training which would be in vehicle-borne IED countermeasures. It would also be in hand entry courses as well as post-blast instructor courses.

Q. Have you also received training in evidence collection?

A. Yes.

Q. As a special agent bomb technician, have you responded to bombing sites?

A. Yes, I have.

Q. Where?

A. I responded both in the United States and overseas.

Q. Where in the United States?

A. I respondent here in New York to the New York-New Jersey bombing, the Chelsea bombing which occurred in September of 2016. That was on 23rd street. That was a post-blast investigation that occurred. I also responded in July of 2016 -- I'm sorry, July 2017 to a Queens device that exploded out in Queens and killed one individual. I also responded as well to the Port Authority explosion.

(Continued on next page)

A000613

Q. What is a bomb technician's role in a post blast response?

A. As far as a bomb technician's role in a post-blast response, basically they will get on scene once the explosion occurs and they will search for secondary devices or any other devices that could potentially be out there waiting to hurt other first-responders or other civilians in the area that are being evacuated.

Upon completing your secondary search and making sure the area is safe, it will be secured and turned over to the evidence respond team units.  The special agent bomb technician, or the local Bomb Techs, will remain on the scene until the evidence respond units has completed their search in case they find anything that comes up during their search.

Q. As a special agent bomb tech, have you also participated in searches of residences or premises?

A. Yes, I have.

Q. What is the role of a special agent bomb tech in search of a residence?

A. The role of a special agent bomb tech in the search of a residence basically is to advise on anything that comes up that could be related to devices that actually explode.

Q. I'd like to direct your anticipation to December 11th, 2017.  Did you do any work for the FBI that day?

A. Yes.

Q. Where did you start?

A000614

A. I started from Long Island and responded into the city, to the port authority explosion.

Q. Did you go to the port authority explosion?

A. Before I got to the port authority explosion, I was contacted by my colleague, special agent bomb technician, James Lyle, who coordinated with me to actually go over to the residence of the subject.

Q. And where was the residence?

A. The residence was located in Brooklyn, at 679 Ocean Parkway, Apartment 3J.

Q. Was that on the third floor of the building?

A. Yes.

Q. And why were you directed to go to the residence?

A. I was directed to go to the residence in order to conduct protective sweeps of the area for any sort of hazardous devices or items that could be in the apartment.

Q. What did you do when you got there?

A. I linked up with the NYPD bomb squad members and NYPD emergency service unit.

Q. What do you mean by linked up?

A. We met outside originally. And once we had a group together, we went upstairs to the third floor.

Q. What did you do on the third floor?

A. Once we got to the third floor, we noticed a woman exit the apartment 3J and then run back inside. Upon her running back

A000615

inside, she closed the door, and members of the NYPD ESU ended up going and knocking on the door announcing who they were.

Q. Were you present for that?

A. Yes.

Q. What happened next?

A. After they knocked on the door, the emergency service unit, no one ended up exiting the door or answering the door. After that, we actually contacted the joint terrorism task force operation center because the search unit wanted to go in and secure the residence of that apartment.

Q. And what happened next?

A. As they went in to secure the -- well, we got authorization from the operations center to go in and secure the residence of that apartment for the fact of safety of potential hazardous devices that could be in there and for the potential for destruction of evidence.

Q. Was the apartment secured?

A. The apartment was secured. The occupants were secured outside.

Q. Why was it important to get the occupants outside of the apartment?

A. Well, we had an explosion that just occurred and potentially could have been the spot where devices were made. So that's why, we didn't know if there were any hazardous devices within that apartment.

A000616

Q. What did you do after the occupants were removed from the apartment?

A. After the occupants were removed from the apartment, we waited for a warrant. Once we received the warrant, we went in as bomb techs and did a protective sweep.

Q. What is a protective sweep?

A. A protective sweep is a search of the immediate area where we were going into for any sort of hazardous devices or hazardous materials that could potentially harm anyone coming in to do a search of the residence later on.

Q. Could you describe generally the layout of the apartment as you observed it when you went in?

A. Yes. As you enter the apartment off to your left-hand side there was a semi-bedroom. Looking straight on, there was a living room that was acting as a bedroom with a half wall past there. Past that half wall was another bedroom. Off to the right-hand side there was a closet along with a bathroom. And if you went to the right, as you entered there's a long hallway that led into the kitchen.

MS. CROWLEY: Mr. DeLuca please publish as evidence Government Exhibit 201?

BY MS. CROWLEY:

Q. Do you recognize this diagram?

A. Yes.

Q. What is it?

A000617

A.   It's a diagram of 679 Ocean Parkway Apartment 3J.

Q.   Does it accurately depict the layout of the apartment?

A.   Yes, it does.

Q.   During the protective sweep, did you observe any explosive-related materials?

A.   No.  During the protective sweep, we did not observe any explosive-related materials or devices.

Q.   After the protective sweep was completed, did you participate in any searches of the apartment?

A.   Yes.  I stood by once the evidence response team was on scene.

Q.   What was your role during the search of the apartment?

A.   My role during the search of the apartment was to provide any information in regards to the components that could potentially be used to make the device, as well as to stand by and wait as they were searching through and potentially coming across any hazardous devices or items not seen.

Q.   And what factors did you consider in determining what sorts of items to collect or instruct the evidence response team to collect?

A.   As I mentioned before, contact over the phone with SABT James Lyle, who was on scene at the explosion for the port authority as well as on scene for the subject's work address as well.  I was in contact with him.  He was describing to me what was found at those sites.

A000618

Q. And you said SABT. Is that special agent bomb technician?

A. Yes.

Q. And Agent Lyle was at the port authority?

A. Yes.

Q. I'm going to hand you now what's been marked for identification as Government Exhibit 205. Do you recognize these items?

A. Yes, I do.

Q. What are they?

A. They're pipes.

Q. How do you recognize them?

A. These were the pipes that were located in the kitchen above the cabinets.

Q. Did you participate in the collection of these items?

A. Yes, I did.

Q. Could you show the jury -- or indicate to the jury using Government Exhibit 201 approximately where these items were located?

A. Yes.

Q. You have to actually describe it for the jury.

A. Okay. It was located in the kitchen off on the right-hand side, halfway down on top of the kitchen cabinets, out of sight.

MS. CROWLEY: Mr. DeLuca, please publish what's in evidence as Government Exhibit 210-20.

A000619

Q.   Do you recognize what's depicted in this photograph?

A.   Yes, I do.

Q.   What?

A.   These were the galvanized pipes that were located on top of the cabinet.

Q.   And does this photograph accurately depict where the pipes were when you found them?

A.   Yes.

Q.   Why did you collect these items?

A.   We collected these items based on the information that I was getting from the SABT James Lyle, who was on scene at the port authority explosion.

          MS. CROWLEY:  Let's please publish Government Exhibit 210-23.

Q.   Do you recognize what's depicted in this photograph?

A.   Yes, I do.

Q.   What is it?

A.   This is a piece of loose leaf paper that contained a red in color substance.

Q.   Did you collect this item in a search?

A.   Yes, I did.

Q.   Why?

A.   Because this item was entered because of the fact it could be used for energetic material in the device.

Q.   And where in the apartment was this item located?

A000620

A. This item was located in the trash bin located in the bathroom.

Q. Were there any other items of significance to you in the trash bin in the bathroom?

A. Yes. There were some wires and also some sheet metal screws.

Q. You testified that you collected this crumpled piece of paper; correct?

A. Yes.

Q. I'm going to hand you what's been marked as Government Exhibit 208 for your identification. Go ahead and look inside that.

Do you recognize this item?

A. Yes, I do.

Q. What is it?

A. This is the loose leaf paper with the red substance that was in the trash bin.

MS. CROWLEY: Your Honor, the government offers Government Exhibit 208.

THE COURT: Any objection?

MS. GATTO: No objection.

THE COURT: I don't think you offered 205. Are you intending to do that?

MS. CROWLEY: I'm sorry, your Honor. We do offer Government Exhibit 205.

A000621

Case 1:18-cr-00016-RJS Document 46-2 Filed 11/15/18 Page 48 of 58

THE COURT: Any objection to that?

MS. GATTO: No objection.

THE COURT: Okay. 205 and 208 are received.

(Government's Exhibit 205 and 208 received in evidence)

BY MS. CROWLEY:

Q. Can you remove the red bag from the paint can and describe what we're looking at?

A. This is a piece of loose leaf that has some red powder, which was suspected energetic material.

Q. What did you do with the red powder after you collected this paper?

A. We did a field-testing on it, flame susceptibility test, to see if it would have some sort of reaction that occurs.

THE COURT: I can interrupt? You said it was suspected something.

THE WITNESS: Energetic material.

THE COURT: Energetic material. Okay.

Q. What's the flame susceptibility test?

A. Basically what we do is we take a wooden dowel and if we can get any residue off it, we will take a little residue off of it, enough where we can put a flame to it. And if the flame will react to it in a certain way, we can suspect it as being energetic in nature.

Q. Meaning it will burn?

A000622

A. Yes.

Q. What happened when you performed the flame susceptibility test on this item?

A. It sparked.

Q. It sparked?

A. Yes.

Q. What did you do with the paper and residue after you performed the flame susceptibility test?

A. There wasn't a lot of residue on there, so I put it into a non-static bag, then put that into a paint can in order to take it down to the FBI laboratory.

Q. You can put that aside.

Now I'm going to hand you what's been marked for identification as Government Exhibits 206, 207-1 and 207-2. Do you recognize these items?

A. Yes, I do.

Q. What are they?

A. This was different hardware we found in a box in the closet.

Q. And is that the box that you found in the closet?

A. Yes, it is.

MS. CROWLEY: Your Honor, the government offers Government Exhibits 206, 207-1 and 207-2.

THE COURT: Any objection?

MS. GALLICCHIO: No objection, your Honor.

A000623

THE COURT: Okay. Government Exhibits 206, 207-1 and 207-2 are received.

(Government's Exhibits 206, 207-1 and 207-2 received in evidence)

MS. CROWLEY: Mr. DeLuca, please publish what's in evidence as Government Exhibit 201.

Q. Can you indicate on Government Exhibit 201 where in the apartment you located this item?

A. Yes. It was in the hall closet next to the bathroom.

Q. When you located the box, did you open it?

A. Yes, I did.

MS. CROWLEY: Please publish, Mr. DeLuca, for the witness, the Court and the parties, Government Exhibit 210-12. We can publish it to the jury.

Q. Do you recognize what's in this photograph?

A. Yes, I do.

Q. What is it?

A. It's the same hardware that we found in the box.

Q. Does this accurately depict the box when you found it and opened it?

A. Yes.

Q. What did you do with the items inside the box?

A. The items inside the box, we ended up dumping the box out and actually separating the different pieces of hardware in the box.

A000624

Q. Why did you do that?

A. To see actually what was in the box and also to -- if we were going to send everything to the lab, make it easier for the lab to identify the different pieces of hardware.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 210-16.

Q. What is the item next to the ruler on the left-hand side of the screen?

A. It's a drill bit.

Q. And did that item come from the box?

A. Yes, it did.

MS. CROWLEY: Please publish, Mr. DeLuca, Government Exhibit 210-18.

Q. What are the items we're looking at here?

A. These are different style sheet metal screws. And to the right are twist wire caps.

Q. Why did you separate the screws and wire caps at the scene?

A. Because both of these were seen by SABT James Lyle at the port authority explosion. And he described to me what sizes they were.

MS. CROWLEY: Mr. DeLuca, you can take that down.

BY MS. CROWLEY:

Q. Agent Murtagh, you said that when you examined the items in the box, you emptied it; correct?

A. Yes.

A000625

Q. Can you remove the items from the box on the witness stand?

Do you see anything written on the bottom of the box?

A. Yes, I do.

Q. What does it say?

A. "Die in your rage."

MS. CROWLEY: May I publish it, your Honor.

THE COURT: Yes, you may publish.

Q. Agent Murtagh, apart from the scene search that we just discussed, did you have any other involvement in the investigation in this case?

A. No. The only other involvement was taking the case team down to the laboratory.

Q. In Qauntico?

A. Yes.

MS. CROWLEY: No further questions, your Honor.

THE COURT: Cross-examination?

MS. GATTO: No questions for the agent.

THE COURT: You can step down, Detective. Somebody else will collect all of that stuff.

THE WITNESS: Thank you, your Honor.

THE COURT: Thank you.

Government's next witness.

MR. TURNER: Your Honor, the government calls Special. Agent Andrew Mitchell.

THE COURT: Remain standing. Raise your right hand.

A000626

ANDREW MITCHELL,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

         THE COURT:  Please have a seat.

         THE WITNESS:  Andrew Mitchell.

         THE COURT:  Keep your voice up nice and loud.

         Mr. Turner, you may proceed.

DIRECT EXAMINATION

BY MR. TURNER:

Q.  Good morning, sir.

A.  Good morning.

Q.  Where do you work?

A.  I work at the FBI.  I'm a special agent.

Q.  Are you assigned to a particular FBI office?

A.  Yes, I am.  I'm assigned to the New York division.

Q.  You said you're a special agent.  How long have you been a special agent at the FBI?

A.  Approximately seven years.

Q.  Were you assigned to a particular squad?

A.  Yes.  I work on a counterintelligence squad.

Q.  Are you assigned to any other squads or teams at the FBI?

A.  I have an ancillary duty as a member of the ERT.

Q.  What's the ERT?

A.  ERT is the evidence response team.

Q.  Have you received training at the FBI in relation to your

A000627

work for the evidence response team?

A. Yes, I have. I received basic training and some post-blast evaluation training.

Q. Does the training involve training relating to evidence collection?

A. Yes, it does. Some of that training would include crime scene photography, latent print collection and physical evidence collection.

Q. Let's turn to December 11th of 2017. Did you participate in a search for the FBI on that day?

A. Yes, I did.

Q. How did that come about?

A. That came about, I recall, on the morning of December 11th. I was in transit to my place of business or work, which is at 26 Federal Plaza, not far from here. While I was driving down, I recall seeing an email indicating that there had been an incident in the area at the port authority in Manhattan. At that, I turned around and drove back to my apartment to get into clothes more suitable for possible response to that scene.

Q. What happened after that?

A. After that I left my apartment and made my way back down to 26 Federal Plaza and waited for word to respond to any possible scene. That word did come later. And I made my way over to Brooklyn, where there was to be a search of a residence.

Q. What was the address of the residence that you the

A000628

searched?

A.   The address of that residence was 679 Ocean Parkway, Apartment 3J; Brooklyn, New York.

Q.   The apartment on the third floor of that building?

A.   That's correct.

Q.   Who participated in the search?

A.   As I recall, participants in that search included members of the New York ERT team as well as special agent bomb techs.

Q.   Approximately what time of day did you arrive?

A.   I arrived at the search location I recall shortly after noon.

Q.   And when you arrived, what was going on at that point?

A.   So, at that NYPD had secured the area in which the residence was located.  I recall we were staging our evidence truck which contains materials and tools that assist us in collecting evidence at crime scenes.  It was at that point I entered the apartment building and made my way to the third floor, which is where the residence to be searched was located.

Q.   And when you made your way to the third floor, did you immediately conduct the search?

A.   We did not immediately conduct the search.  We staged -- the ERT members staged our gear, which included the materials I spoke about before, which would be evident-collection materials and tools, in the hallway outside of the apartment.  In this case we had a potential for a risk to the search team of

A000629

harmful materials in the place that we searched, so we awaited

for special agent bomb techs to arrive to initiate a safety

sweep.

Q.   Do you remember the special agent bomb technicians who were

on the scene?

A.   I recall Special Agent Bryan Murtagh being there.

Q.   After the protective sweep was completed, what did you do?

A.   After the protective sweep was completed, I recall putting

on protective equipment -- we call it PPE, personal protective

equipment -- that would include gloves and what would be akin

to like a hazmat sort of suit, to prevent any contamination of

the scene.  At that point before any physical search was

conducted, me and another member of the ERT team swabbed

certain areas of the place to be searched.

Q.   When you said "hazmat," what are you referring to?

A.   Hazardous materials.

Q.   Did you in fact collect swabs inside the apartment for

explosives residue?

A.   Yes, we did.

Q.   Please explain how you went about doing that?

A.   The practice of swabbing a search area would be taking a

cotton ball and rubbing it against surfaces in the areas of the

place to be searched, placing those cotton balls into sterile

containers or vials for transport for further evaluation at our

laboratory in Qauntico, Virginia.

**A000630**

MR. TURNER: Mr. DeLuca, please publish what is in evidence as Government Exhibit 201.

Q. Special Agent Mitchell, do you recognize this?

A. Yes, I do.

Q. What is it?

A. This would be a sketch of the floor plan of apartment 3J that I referenced earlier.

Q. Looking at this diagram, where in the apartment did you collect the swabs for explosives residue that day?

A. Swabs were collected in every major area indicated here on this sketch.

Q. What are those areas?

A. Those areas would include three bedrooms, a hallway, a hall closet, a bathroom and kitchen.

Q. A total of seven areas?

A. Yes.

Q. What did you do with the swabs after collecting them?

A. After collecting the swabs from those areas, we placed those swabs in sterile containers to prevent contamination of those swabs from any outside elements during their transit to Qauntico for more thorough evaluation.

Q. Did you label the containers that you put the swabs in?

A. Yes, I did.

Q. What sort of information did you put on the labels?

A. Those labels would include my initials or signature as the

A000631

collector and the location from which those swabs were collected.

Q. Special Agent Mitchell, I'm going to hand you what's been marked for identification as Government Exhibit 202.

Do you recognize what I've handed you?

A. Yes, I do.

Q. What is it?

A. These would be the vials I spoke about earlier that contained the swabs from the scene we searched.

Q. How do you recognize them?

A. I recognize them because on these labels this is my handwriting.

Q. How many vials are there?

A. There are seven.

Q. And if you can see, how are the vials labeled?

A. The vials are labeled with the initials of the collector, the case ID and the location from which they are collected.

MR. TURNER: Your Honor, the government offers Government Exhibit 202.

THE COURT: Any objection?

MS. GATTO: No objection.

THE COURT: Government Exhibit 202, which consists of seven vials in one single bag, is received in evidence.

(Government's Exhibits 202 received in evidence)

Q. Special Agent Mitchell, what is a control swab?

**A000632**

A.   A control swab is taken by a similar process as described as the other swabs that were collected; however, these swabs are collected in an area that is not expected to contain any evidence of hazardous materials, like your gloves and the area in which you're collecting this evidence and packaging it.

Q.   Did you collect any control swabs that day?

A.   Yes, I did.

Q.   Where did you collect those?

A.   We collected those outside of apartment 3J.

Q.   How many control swabs?

A.   Two.

Q.   After you swabbed the apartment for explosives residue, what did you do next?

A.   So, after that, the rest of the ERT team made entry and initiated a physical search of apartment 3J.

MR. TURNER:   Mr. DeLuca, please pull up both Government Exhibit 201 and Government Exhibit 210-6, both of which are in evidence.

Q.   What do you we in the photograph on the right there?

A.   This photograph is a photograph looking at the hall closet in apartment 3J.

Q.   And looking at the sketch on the left, just orient us where is the hall closet.

A.   The hall closet is adjacent to the bathroom shortly after you make entry on the right.

A000633

Q. There were clothes hanging in the closet?

A. That's correct.

MR. TURNER: Mr. DeLuca, please pull up Government Exhibit 210-24.

Q. What do we see here, Special Agent Mitchell?

A. So, in this photo there's a jacket, or blazer, that was found inside the hall closet. Inside the breast pocket of blazer were two passports that were affixed together.

Q. Is that the breast pocket in the center of this photograph?

A. Yes.

Q. You said they were affixed together. When you found the passports, did you open them?

A. Yes, I did.

Q. What if anything did you notice when you opened the passports?

A. After opening the passports, I recall there being handwritten notes in the passports.

Q. What did you do with the passports?

A. We collected them as evidence.

Q. Special Agent Mitchell, I'm going to hand you what's been marked for identification as Government Exhibit 209.

Do you recognize Government Exhibit 209?

A. Yes, I do.

Q. What is it?

A. These are the passport booklets that were found inside the

A000634

jacket in the hall closet of apartment 3J.

Q. How do you recognize these as the passports you recovered?

A. I recognize these because I collected them, and this is the bag in which they were collected, and the bag indicates my initials.

MR. TURNER: Your Honor, the government offers Government Exhibit 209.

THE COURT: Any objection?

MS. GATTO: No objection.

THE COURT: Government Exhibit 209 is received.

(Government's Exhibits 209 received in evidence)

MR. TURNER: Mr. DeLuca, please pull up when's in evidence as Government Exhibit 210-25.

Q. What do we see in this photograph?

A. This is looking inside the cover of one of those passports that was collected in the hall closets.

Q. One of the passports marked as Government Exhibit 209?

A. Yes.

Q. Looking at the passport, what is the country of issuance?

A. The country of issuance here is Bangaladesh.

Q. What is the name?

A. The name on this passport is Akayed Ullah.

Q. What is the nationality?

A. Bangladeshi.

Q. Do you see any handwritten statements on this passport?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000635**

A. Yes, I do.

Q. Where do you see that?

A. I see these handwritten notes on the upper page of the passport.

MR. TURNER: Mr. DeLuca, please highlight the statement on the top page.

Q. Special Agent Mitch, what's written in this passport?

A. The text reads, "Oh, America, die in your rage."

MR. TURNER: Now, Mr. DeLuca, let's turn to Government Exhibit 210-26.

Q. What do we see in this photograph?

A. This is another page found in the passport documents found in the blazer in the hall closet of apartment 3J.

Q. What is the name on this document?

A. This particular document here, the name is Akayed Ullah.

Q. Nationality?

A. Bangladeshi.

Q. Do you see any handwritten statements in English on this passport check?

A. Yes, I do.

Q. On the top page?

A. Yes.

MR. TURNER: Mr. DeLuca, please highlight the statement.

Q. Please read that statement to the jury.

A000636

A.   Statement here reads, "Die in your rage."

MR. TURNER:   Now, Mr. DeLuca, if we could pull up both Government Exhibit 201 and Government Exhibit 210-7, both of which are in evidence.

Q.   What are we looking at in the photograph on the right?

A.   This is a photograph of the bathroom adjacent to the hall closet in apartment 3J.

Q.   Adjacent to the hall closet where you found the passports we just saw?

A.   That is correct.

Q.   What, if anything, did you recover as evidence from the bathroom?

A.   I recall recovering evidence in this bathroom which included segments of wire and a screw.

Q.   Where were the segments of wire and screw located in the bathroom?

A.   They were found in the trash can located in this bathroom picture.

Q.   I'm going to hand you what's been marked for identification as Government Exhibit 204.  Do you recognize what I've handed you?

A.   Yes, I do.

Q.   What is it?

A.   These are the segments of wire that I previously mentioned found in the apartment 3J in the bathroom trash can.

**A000637**

Q.  How do you recognize them?

A.  I recognize these because my initials are on this bag as collecting them, and I recall it from the search that day.

MR. TURNER:  Government offers Government Exhibit 204.

THE COURT:  Any objection?

MS. GATTO:  No objection.

THE COURT:  Government Exhibit 204 is received.

(Government's Exhibit 204 received in evidence)

MR. TURNER:  Mr. DeLuca, please publish Government Exhibit 210-21.

Q.  What's depicted in this photograph?

A.  In this photograph you're looking at the top view of the trash can in the bathroom in apartment 3J.  And in the center of this photograph is a segment of wire that is green in color.

Q.  Is that one of the segments that you recovered?

A.  Yes, it is.

MR. TURNER:  Mr. DeLuca, please zoom in on that piece of green wire.

Q.  What if anything did you observe about the wire segment here?

A.  This wire segment appears to be cut from a larger wire. This is just a smaller section, and it's greenish in color.

Q.  Now, let's turn please to Government Exhibit 210-22.  And what do we see here?

A.  This is a picture of the same trash can in the bathroom of

A000638

apartment 3J.  Here pictured is multiple segments of wire, similar to the ones previously pictured.  In this picture, there is an exposed copper inside.  It appears the segments of wire were stripped from a larger wire as well.  In addition to that, there is a screw next to those segments of wire.

MR. TURNER:  Mr. DeLuca, please zoom in on the wire segments and screw.

BY MR. TURNER:

Q.  And is this the copper wiring that you were referring to?

A.  Yes, it is.

Q.  What did you do with these pieces of wire segments?

A.  We collected these as evidence.

Q.  And that's Government Exhibit 204 that we saw earlier?

A.  Yes, it is.

Q.  Why did you collect these wire segments as evidence?

A.  Based on my training and experience, and after consulting with Special Agent Bomb Tech Murtagh, these were indicative of possible explosive devices.

Q.  Other than the pieces of wire and the screw, did you find anything else in the trash can in the bathroom?

A.  Yes, I did.

Q.  What did you find?

A.  I recall finding a crumpled piece of paper, and within that crumpled piece of paper there was what appeared to be a powder that was red in color.

A000639

MR. TURNER:  Mr. DeLuca, please pull up Government Exhibit 210-24 --

Government Exhibit 210-23, your Honor.  I apologize.

Q.  What do we see here?

A.  Here, we see the item I previously discussed, which is a crumpled piece of paper containing powder that is reddish in color.

Q.  Did you collect the reddish powder that was in the trash can?

A.  No, I did not.

Q.  Did someone else?

A.  Special Agent Bomb Tech Bryan Murtagh.

Q.  Now, other than your role in the search of apartment 3J that day, did you have any further involvement in the investigation in this case?

A.  No, I did not.

MR. TURNER:  Nothing further, your Honor.

THE COURT:  Any cross-examination?

MS. GATTO:  No cross.  Thank you.

THE COURT:  Okay.  You may step down.  Thank you, Agent.

Government call its next witness.

MS. GATTO:  Can we take a small bathroom break?

THE COURT:  Okay.  We'll take a short bathroom break, ladies and gentlemen.  Don't discuss the case.  Keep an open

A000640

mind.  And we'll be back in about ten.

(In open court; jury not present)

THE COURT:  How are we doing time wise?

MR. TURNER:  We may have an estimate.

THE COURT:  What's the estimate now?

MS. CROWLEY:  We think it is still quite possible that we will be resting today.  We may go into Monday just for a little bit with our last witness.

THE COURT:  Okay.  I thought it was almost certain you were going to rest today.  But if you think it's more -- I'm not rushing you.  I mean, that's fine.

MS. CROWLEY:  We still think we may, your Honor.  After this next witness, we have three experts from Qauntico.  Their directs will be a little bit longer.  Subject to cross, we still may rest then.

THE COURT:  All right.

(Recess)

THE COURT:  Who's the next witness?

MR. TURNER:  Special Agent Andrew Bennett, who did the search of the construction site.

MS. GALLICCHIO:  Your Honor, we raised this objection earlier with connection to this witness.  This is a witness from the job site.  We have an objection as to relevance.  And it's our position still that the government has not proven to a satisfactory level that the location that they searched and

A000641

confiscated items from has been connected to Mr. Ullah, and it's been established that that wasn't Mr. Ullah's job site.

THE COURT: Well, I haven't heard any of the testimony. So, obviously you need to make a connection, right?

MR. TURNER: Well, your Honor, Detective Byrne had testified that he worked as an electrician at a work site at 39th Street and 8th Avenue. And a construction site on 39th Street and 8th Avenue was searched, and a tool was recovered that was forensically examined and found -- was used to build the pipe bomb that was recovered.

THE COURT: So, your objection would be that that's still not relevant?

MS. GALLICCHIO: Yes.

THE COURT: Overruled. I think it's relevant. If the argument was going to be that every tool at the construction site is traceable to the defendant because he worked at the site and there were screws at the site, that would be a stretch, I get it. But if there is a tool that was tested and has his DNA, well then --

What was the other part?

MR. TURNER: Not DNA, your Honor. It's a tool, a pair of pliers, that was tested and through a tool analyst found it was used to --

THE COURT: If the tool marks analysis would make a connection between this defendant, that tool and the bomb; is

A000642

that right?

MR. TURNER: Yes, your Honor.

MS. GALLICCHIO: Our argument is they haven't established that that work site was the work site that Mr. Ullah identified. I don't know how many work sites are there.

So, that's the connection that we're objecting to, the relevance of them confiscating, etc., and retrieving items from that location.

THE COURT: Well, sounds like that could have been a motion to suppress. I mean, if they have made the connection -- this is a witness who's going to connect that tool to the bomb; right? So, doesn't that, by inference, support that this was the site where he worked?

MS. GALLICCHIO: Well, yes. Yes. I understand what the Court is saying. But I think that tool -- I think it's that tool, that particular type of tool, yes, will be connected based on the evidence.

THE COURT: Type of tool. A specific particular tool.

MR. TURNER: Specific particular tool that we're talking about.

THE COURT: Well, that's what I assume the testimony is going to be, assuming you can go to this in cross. I think that goes to weight, not to admissibility.

MS. GALLICCHIO: Fine. If there's going to be

A000643

testimony that he went to the job site or work site for Mr. Ullah, I don't think there's been testimony that established that as a matter of fact. They can certainly say they went to this location and found a tool, describe the location, and then whatever the witness they're going to call, can --

THE COURT: Well, I assume the witness is going to say he went to a particular location. He may say why he went to that location. And he's going to say what he found at the location; right?

MR. TURNER: That's correct, your Honor.

THE COURT: So, his characterization of the location as the defendant's work location is going to be a conclusion that he draws or doesn't draw.

MR. TURNER: Judge, we're actually not planning to elicit that on direct. It's going to be a search of the location and the items recovered.

THE COURT: So, the objection on relevance grounds is overruled. The other concern you have seems to me not likely to materialize. But if it does, you can cross on that subject.

Okay. Can you bring in the jury.

MS. GALLICCHIO: The witness was in the courtroom.

THE COURT: Let's get the witness now.

All right. The government calls its next witness. Who is that?

A000644

MR. TURNER:  Government calls Andrew Bennett.

THE COURT:  Please stand and raise your right hand.

ANDREW BENNETT,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TURNER:

Q.  Good morning, sir.

A.  Good morning.

Q.  Where do you work?

A.  I work for the FBI in the New York office.

Q.  What's your position at the FBI?

A.  I'm a special agent.

Q.  How long have you been a special agent at the FBI?

A.  A little over four years now.

Q.  Are you assigned to a particular squad or team at the FBI?

A.  I am assigned to DC6 and I am on the evidence response team.

Q.  What is DC-6?

A.  DC-6 is our national administrative squad.

Q.  And you're also assigned to the evidence response team?

A.  Yes, sir.

Q.  Have you received training in the FBI in relation to your work on the evidence response team, or ERT?

A.  Yes, I have.

A000645

Q. What sort of training?

A. Basic evidentiary collection and procedure doing my new-agent training, and monthly trainings.

Q. Special Agent Bennett, let's turn to December 11th of 2017. Did you participate in a search for the FBI that day?

A. Yes, I did.

Q. Please tell us how that came about.

A. That morning I was made aware via email that there was an attack on the port authority and to respond. I responded to my team member Steve Fullington that I was available. Couple hours later he asked me to respond to a location in midtown Manhattan.

Q. What location was that?

A. 601 8th Avenue.

Q. Where is 601 8th Avenue located?

A. On 39th Street and 8th Avenue.

        MR. TURNER: Mr. DeLuca, please pull up what's in evidence as Government Exhibit 1.

Q. Do you recognize what this is?

A. Yes. It's a map of a portion of midtown Manhattan.

Q. Do you see the address of the location you searched on December 11th?

A. The bottom blue triangle: 601 8th Avenue.

Q. About how far is that from the port authority where the attack occurred?

A000646

MS. GALLICCHIO: Objection. Characterization; the question.

THE COURT: How far is that from the port authority?

THE WITNESS: It's approximately two blocks south on 8th Avenue.

THE COURT: Go ahead.

BY MR. TURNER:

Q. Approximately what time of day was the search of 601 8th Avenue conducted?

A. I believe I arrived at the location around 1:00 or 2:00 o'clock. And we conducted the search between 4:00 and 5:00.

Q. Who is the FBI team leader supervising the search?

A. Steve Fullington.

Q. What type of building was the search location at 601 8th Avenue?

A. It was Pret sandwich shop that was under renovation and construction.

Q. Please do keep your voice up for the court reporter.

A. It was a Pret sandwich shop under renovation and under construction.

Q. Thank you.

Special Agent Bennett, I'm going to hand you what's been marked for identification as Government Exhibit 303.

THE COURT: 303?

**A000647**

MR. TURNER: Yes, Judge.

BY MR. TURNER:

Q. Special Agent Bennett, do you recognize the disk I handed you?

A. Yes, I do.

Q. How do you recognize it?

A. My initials are on the top left.

Q. Did you have a chance to review the contents of the disk before testifying here today?

A. Yes, I did.

Q. What's on the disk?

A. Photos from the search we conducted.

Q. Which essentially?

A. At 601 8th Avenue.

Q. On December 11?

A. Yes.

Q. Do those photos fairly and accurately depict the location that you searched that day?

A. Yes, they do.

MR. TURNER: Your Honor, the government offers Government Exhibit 303.

THE COURT: Any objection?

MS. GALLICCHIO: No, Your Honor.

THE COURT: 303 is received.

(Government's Exhibits 303 received in evidence)

A000648

MR. TURNER:  Mr. DeLuca, please publish Government Exhibit 303-2.

BY MR. TURNER:

Q.   What do we see in this photograph?

A.   This is a photo of the inside of the Pret under construction.  He was standing at the front.  So, the back is to 8th Avenue.  39th Street is to the left.  And it's looking to the rear of the sandwich shop.

Q.   Generally speaking, what sort of materials did you find in the shop?

A.   It was full of construction materials, tools, ladders things used to renovate.

MR. TURNER:  Mr. DeLuca, please turn to Government Exhibit 303-9.

Q.   What's depicted in this photograph?

A.   Here is standing in the center of the Pret sandwich shop. To the right, in front of the store.  To the back, there is an orange construction container against the back wall, and several cardboard boxes to the right.

Q.   Did you ultimately do anything with that orange container?

A.   We searched that container.

MR. TURNER:  Mr. DeLuca, please turn to Government Exhibit 303-4.

Q.   What do we see here?

A.   This is a close-up of the container that we searched and

A000649

the cardboard boxes off to the right against the wall.

Q. Did you look inside the cardboard boxes on the right?

A. Yes, we did.

Q. What, if anything, did you find?

A. We found various constructions materials to do with electrical work.

MR. TURNER: Let's turn now to Government Exhibit 303-10.

Q. What's depicted in this photograph?

A. This is a box, the one that was against the wall, the interior of the box. Inside is the electrical materials, construction materials. There is wires of different colors, zip ties and screws.

Q. Is this one of the orange containers --

A. Yes. Directly to the right of the orange container.

MR. TURNER: Government Exhibit 303-11, please.

Q. What are we looking at here?

A. This is a box of the orange wire nuts that we pulled from that cardboard box.

MR. TURNER: Government Exhibit 303-12, please.

Q. What's depicted in this photo?

A. This is a box of small screws that we also pulled from the same cardboard box.

Q. What did you do with the wire nuts and the screws that we've seen in these photos?

**A000650**

A.   We seized them as evidence.

Q.   Why did you do that?

A.   We were looking for materials that could potentially be used in making a bomb.  So, we seized those items.  We also had two bomb techs on hand who had been at the scene that morning and advised certain items that we should seize.

Q.   The scene being the port authority?

A.   The scene being the port authority.  Yes.

          MR. TURNER:  Government Exhibit 303-4.

Q.   Again, what are we looking at here?

A.   This is the depiction of the orange construction container.

Q.   You testified that you searched this container; is that right?

A.   Yes, we did.

Q.   Was the container opened when you found it?

A.   No.  It was locked.

Q.   Did the search team obtain anything before searching it?

A.   They obtained keys to open it and waited several hours for a search warrant to search the container.

Q.   Was anything else done with the container before you actually searched it?

A.   The bomb techs that were on scene cleared it.

          (Continued on next page)

A000651

Q. What does that mean, clearing it?

A. It means when a person wants to look at it and ensure there was no explosive devices or anything that could harm the agent searching the container.

Q. When you searched the container after it was cleared by the bomb techs, what did you find?

A. We found several power tools, hand tools, various pieces of construction equipment.

MR. TURNER: Mr. DeLuca, please publish Government Exhibit 303-6.

Q. What is depicted in this photo?

A. This is the contents of the container all laid out: construction helmets, some power tools, various hand tools and other items as well as a white bucket in the center.

Q. What, if anything, was inside the white bucket?

A. Several hand tools inside the white bucket.

MR. TURNER: Let's pull up Government Exhibit 303-2, please.

Q. What do we see here?

A. These are the hand tools that we found in the container and in the white bucket.

Q. The white bucket that was inside the orange container?

A. Yes, sir.

Q. Please describe the tool that we see at the top of this photograph.

A000652

A.   It's a pair of Channellock pliers, the blue handle there.
They are Channellock because the ridges you notice at the top
there are able to lock the pliers for whatever size you need.

Q.   What did you do with the tool that you found in the white
pail?

A.   We seized them as evidence.

Q.   What does that mean?  What did you do?

A.   We collected all of them and placed them into a box, sealed
it up, and labeled it with the location that we found it, the
description of the item, the case file number, and the names of
the agents that seized it.

Q.   I am going to hand you what's been marked for
identification as Government Exhibits 302 and 302-1.  Do you
recognize what I have handed you?

A.   Yes.  This is the box that we used to contain the hand
tools that we seized.

Q.   Which hand tools?

        THE COURT:  What did you seize?

        THE WITNESS:  Hand tools.

Q.   Which hand tools?

A.   The ones in the photo that were in the white bucket.

Q.   If you could open the box, do you see an item that is
marked Government Exhibit 302-1?

A.   Yes.

Q.   Which item is that?

**A000653**

A. That is the Channellock pliers.

Q. The Channellock pliers that we see at the top of this photograph?

A. Yes.

MR. TURNER: The government offers Government Exhibits 302 and 302-1.

THE COURT: Any objection?

MS. GALLICCHIO: No objection.

THE COURT: 302 and 302-1 are received.

(Government's Exhibits 302 and 302-1 received in evidence)

MR. TURNER: With the Court's permission, if we could publish by having Special Agent Bennett stand up and open the box so the jury can see what's inside.

THE COURT: That's fine.

MR. TURNER: Thank you.

Q. Agent Bennett, other than the search of the work site at 39th Street and Eighth Avenue that you have described, did you have any other involvement in the investigation of this case?

A. I did not, no.

MR. TURNER: Nothing further, your Honor.

THE COURT: Cross-examination.

MS. GALLICCHIO: No questions.

THE COURT: You can step down. Thank you.

(Witness excused)

A000654

THE COURT: The government's next witness.

MS. DONALESKI: The government calls Derrick McClarin. Your Honor, while Mr. McClarin is getting situated, I would like to read a stipulation. It is signed by the parties. I would ask that it be published so that the jury may read along. It's Government Exhibit 2008.

THE COURT: That's fine.

MS. DONALESKI: It is hereby stipulated and agreed by and among the United States of America, by Jeffrey S. Berman, United States Attorney for the Southern District of New York, Shawn G. Crowley, Rebekah Donaleski, and George D. Turner, Assistant United States Attorneys of counsel, and defendant, Akayed Ullah, by and through his attorneys Amy Gallicchio, Esq. and Julia Gatto, Esq., that:

Government Exhibit 100 is a true and accurate chart listing certain items collected by law enforcement from the pedestrian tunnel in the Port Authority subway station on December 11, 2017. The left column of Government Exhibit 100 contains the FBI item lab number assigned to each item. The middle column on Government Exhibit 100 contains the corresponding government exhibit number assigned to each item. And the right column on Government Exhibit 100 contains the description of each item.

At this time the government offers Government Exhibit 2008 and Government Exhibit 100.

A000655

THE COURT: Government Exhibits 2008 and 100 are received.

(Government's Exhibits 100 and 2000 received in evidence)

DERRICK MCCLARIN,

    called as a witness by the government,

    having been duly sworn, testified as follows:

THE COURT: State your name and spell your name for the record, first and last.

THE WITNESS: My name is Derrick, D-E-R-R-I-C-K, McClarin, M-C-C-L-A-R-I-N.

THE COURT: You may proceed, Ms. Donaleski.

MS. DONALESKI: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. DONALESKI:

Q. Good morning, Mr. McClarin.

A. Good morning.

Q. Where do you work?

A. I work at the FBI laboratory in Quantico, Virginia.

Q. What is the FBI laboratory?

A. The FBI laboratory is the forensic laboratory utilized by the federal forensic bureau of investigation to analyze evidence.

Q. That is the Federal Bureau of Investigation?

A. Yes.

A000656

Q. What is your position there?

A. I am a physical scientist forensic examiner in the firearms and tool marks unit.

Q. What is the firearms and tool marks unit?

A. The firearms and tool marks unit is the unit that looks at various firearms and tool mark related evidence.

Q. What function does the firearms and tool marks unit perform?

A. The functions that the firearms and tool marks unit perform are things such as firearms identification, tool mark identification, gunshot residue determination, serial number restoration, shooting incident reconstruction, and other closely related firearms and tool mark related evidence.

After examinations, we put that information into records and then testify to those results in some cases.

Q. What is a tool?

A. A tool is a device that is designed to gain mechanical advantage over another object. In forensic science we consider the tool to be the harder of two objects that come into contact with a softer object. That softer object is called a work piece.

Q. Can you provide an example of a tool and a work piece.

A. Yes. An example of a tool could be a screwdriver, a flat-head screwdriver that is designed to turn a screw. That forcible contact between the screwdriver and the screw puts

A000657

torque another the screw, and that screw is the work piece.

Q. What is a tool mark?

A. A took mark are the resultant marks from the forcible contact with a tool. When a tool hits the work piece, the softer object, there are marks left from that harder object or the tool.

Q. What is tool mark identification?

A. Tool mark identification is the analysis of tool marks to determine if they did or did not come from a particular tool.

Q. Why are firearms and tool marks analysis joined together?

A. They are joined together because firearms identification is in fact a tool mark identification. A firearm is a tool. It is actually a collection of many tools. Those collection of tools come into contact with various ammunition components during the firing process. Those ammunition components are the work pieces, the softer objects, and there are tool marks that are left on those ammunition components from the firearm or the various tools of the firearm.

Q. When you are undertaking a firearms examination, that is a tool marks examination, is that correct?

A. Yes, it is.

Q. It's the same science?

A. Yes, it is.

Q. Approximately how many years have you worked at the FBI laboratory?

A000658

A.   It will be four years later this monthly.

Q.   What did you do before working for the FBI laboratory?

A.   Prior to working with the FBI laboratory, I worked with the Alabama department of forensic sciences in the Birmingham regional laboratory for 11 years.

Q.   Can you describe your educational background.

A.   I have a Bachelor's of science in chemistry from Lambuth, L-A-M-B-U-T-H, University in Jackson, Tennessee.  I also have a Master's of science in forensic sciences from the University of Alabama at Birmingham.

Q.   Have you received training in firearms and tool marks analysis?

A.   Yes, I have.

Q.   Can you describe that training, please.

A.   I have received first training in firearms and tool marks analysis through the Alabama department of forensic sciences or ADFS.  That training included the completion of an internal training manual and portions of two external training program manuals.

     The training consisted of looking at thousands upon thousands of comparisons in order to understand what kind of agreement I would have to see in order to make an identification.  It also looked at what is called known nonmatches, which means two marks known to have been created by different tools, so that I understand what the disagreement is

A000659

between two tools.

It also incorporated understanding the science and the mechanics of how tool marks are created.  Also had practical examinations, written examinations, oral examinations and moot courts that I had to complete.

Q.   Did you receive additional training at the FBI laboratory in firearms and tool marks analysis?

A.   Yes, I did.

Q.   Can you describe that training.

A.   That training was much like the training that I received at ADFS, but it was more exhaustive, and it was kind of teaching me the way that FBI does things.  That training did incorporate the same concepts: thousands upon thousands of comparisons, maybe a deeper understanding of mechanics of how tools are made and those tool marks, how they are created.  I also had to have a competency test, written tests, written examinations, and moot courts.

Q.   Are you a member of a professional organization?

A.   Yes, I am.

Q.   Which organization?

A.   I am a member of the Association of Firearms and Tool Marks Examiners, or AFNE.  That is the international organization for firearms and tool marks examiners.

Q.   Have you testified before as an expert in firearms and tool marks analysis?

A000660

A.  Yes, I have.

Q.  How many examinations have you conducted as a firearms and tool marks analyst?

A.  Tens of thousands.

MS. DONALESKI:  At this time the government offers Derrick McClarin in the field of firearms and tool mark analysis.

THE COURT:  Any objection?

MS. GALLICCHIO:  No objection.

THE COURT:  Mr. McClarin is recognized as an expert in that field.  You may proceed.

Q.  Mr. McClarin, what does tool marks analysis consist of?

A.  Tool marks analysis is essentially a two-phase process. Whenever an item comes in that is suspected to have come into contact with a tool, we would evaluate that particular item to see if there are any tool marks on it.  If there are tool marks on those items, we would then try to in the first phase look at the class characteristics.  Class characteristics are design features determined by the manufacturer prior to the manufacture of a particular item.

In the case of a tool marks, you would look at the width of the tool marks and what the action of that tool mark may be, such as a cutting action or a slicing action or even a compression action.  If tools are submitted, we would also take the class characteristics of those tools to determine if there

A000661

are consistencies between the tool marks that I see on items and the tool.

Any time that I see consistencies between the tool mark and a particular tool, I then go to the second phase of the analysis, which is comparison of the microscopic characteristics. That's looking at individual characteristics between the tool mark and test marks that I create using a particular tool to determine if they have sufficient agreement to say that they have the same source.

Q. Focusing on the phase 1 of your analysis that you just described, can you provide an example of a class characteristics that you might find in a tool mark.

A. Let's use the screwdriver example again. If a screwdriver is used in a manner such as scraped over a surface or hit onto a surface, which are two different types of tool marks there, there would be some width to the tool mark. That width of that tool mark is a classic characteristic.

If I have that screwdriver submitted as a possible tool, I could also measure the width of that tool. If the width of the tool mark and the tool are similar, those are class characteristics in the phase 1 that would prompt me to go to the second phase of analysis.

Q. Are you familiar with terms "impressed" and "striated" tool marks?

A. Yes, I am.

A000662

MS. DONALESKI:  Mr. DeLuca, can you please publish Government Exhibit 901 for the witness, counsel, and Court only.

Q.  Sir, do you recognize Government Exhibit 901?

A.  Yes, I do.

Q.  Would these graphics aid you describing to the jury the two types of tool marks you just mentioned?

A.  Yes, it would.

Q.  Do these graphics fairly and accurately depict the concept you are going to be discussing today?

A.  Yes, it does.

MS. DONALESKI:  The government offers Government Exhibit 901 as a demonstrative aid, your Honor.

MS. GALLICCHIO:  No objection.

THE COURT:  You are going to publish it to the jury, but it's not going go back to the jury room?

MS. DONALESKI:  That's correct.

THE COURT:  This is 901.  An aid is something that might be useful while a witness is testifying.  This exhibit is going to be used for that purpose, but it is not something that you are going to go back and look at in the jury room later.

(Government's Exhibit 901 received in evidence)

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 901.

Q.  Mr. McClarin, please explain what an impressed versus

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000663**

striated tool mark is.

A.  In tool mark identification, there are two types of tool marks that we would see.  These are impressed and striated.  This graphic here kind of gives a representation of how the tool marks are created.

An impressed tool mark is a result of force in motion when the motion of the tool is approximately perpendicular to the work piece.  In this case you see that the tool goes down into the work piece.  And whenever the tool comes back out of the work piece, you have what is called an impression that is left.

The image that you see here is an example of a slotted screwdriver that was pressed down into the surface and it result in the impression we see.

A striation is a result of force in motion when the motion of the tool is approximately parallel to the surface.  As the tool drags across, you have scratches, or striations, that are left on the surface, such as what you see here.  That same screwdriver drug across the surface leaves these striations.  Those are the two types of school marks that we see.

MS. DONALESKI:  Thank you, Mr. DeLuca.

Q.  Mr. McClarin, you were explaining the two phases of analysis that you undergo as a tool marks examiner.  Remind us again, what is the phase 1?

A000664

A.  Phase 1 is the evaluation of the class characteristics to determine what the class characteristics are of the tool marks and also the tools.  Any time there is consistency, I would go from phase 1 into the second phase.

Q.  Describe for the jury what the second phase of your analysis is?

A.  The second phase of that analysis is looking at the individual microscopic characteristics to determine if the tool mark has the source of the particular tool.

Q.  How do you undertake a microscopic comparison of two tool marks?

A.  The microscopic comparison of two tool marks is done by first evaluating each of those tool marks individually to determine if I have marks of value.  I am looking for quality and quantity of tool marks, either striations or impression marks.

In between two tool marks, I'm looking at both of them, looking at the quality of those tool marks, and then I put them side by side using the tool that we in firearms and tool marks use which is called a comparison microscope.  A comparison microscope is essentially two compound microscopes connected with an optical prism.  That allows me to look at two items side by side at the same time.

Phase 2 uses that comparison microscope, and it looks at the agreement of the two tool marks to determine if there is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000665**

sufficient agreement to create an identification.

Q.   Are you familiar with the term "test mark"?

A.   Yes, I am.

Q.   Can you describe for the jury what a test mark is.

A.   A test mark is a mark that I as an examiner actually create in a controlled environment.  Any time I have a tool mark with a certain class characteristics and I have a tool that has similar class characteristics, I would want to create test marks using that tool.  That means I take a softer material and actually use the tool in a manner similar to how the tool may have been used on the unknown item.

Q.   What do you do after you have created a test mark?

A.   After I have created the test mark, I then take those known test marks that I created, put it on one of the stages of my microscope, and I put the unknown item on the other stage. That allows me to look at my unknown item versus my known item.

Q.   Are you familiar with the AFTE, or the AFTE theory of identification?

A.   Yes, I am.

Q.   Please explain what that is.

A.   The AFTE theory of identification is essentially the standard that firearms and tool marks examiners use in order to effect an identification.  It outlines the criteria that have to be met.  In brief, it states that a qualified examiner can determine that a particular tool mark came from a particular

A000666

tool.

That's done by looking at the surface contours, that quality and quantity of the tool marks, and determine that the agreement between the two is sufficient. To be sufficient, it has to meet two things. It has to be consistent with the amount of agreement you have seen between the two tool marks known to have been produced by the same tool, and it has to far exceed the agreement between two tool marks known to have been created by different tools.

Q. Can you provide an example of what you were just explaining.

A. Certainly. Let's use the screwdriver example again being scraped over the surface. You saw the striations in that graphic. If that same tool mark or, excuse me, same tool would be used again to scrape over another surface, you can compare those striations to one another side by side and you would see a certain level of agreement between those striations. That is consistent with what we would call a known match. That's something that our training has done. We look at thousands upon thousands of known match samples. There is a level of agreement you would expect to see.

If I were to take a second screwdriver with the same width but a different screwdriver and drag it over a separate surface, I could still compare those two tool marks that were created by different tools. There might be some level of

A000667

agreement, but there would also be more disagreement. So in order to effect the identification, I would have to see agreement much greater than that.

Q. Are you familiar with the term "consecutively manufactured tools"?

A. Yes, I am.

Q. Can you please explain what that means and why it is important.

A. Consecutively manufactured tools are tools that are made one after another using the same tooling process, the same manufacturing process. What is important about that is our discipline has taken part in many studies to evaluate the differences that a consecutively manufactured tool creates and to determine can examiners readily distinguish between different tool marks.

This sort of puts the examiner in a worst-case scenario. Oftentimes in these studies there are ten tools that are consecutively manufactured. Those tools are used to make tool marks, and those are unknowns that are submitted to the examiners.

An examiner is able to look at those and been accurately able to distinguish the tool marks created by different consecutively manufactured tools. That suggests that even though these tools were consecutively manufactured, on a microscopic level they change enough so that it produces

A000668

different individual tool marks for each tool.

Q. Have you traveled to tool manufacturers to examine this yourself?

A. Yes, I have.

Q. What did you learn in the course of that examination?

A. In the course of taking these tours, there are various manufacturing procedures, such as cutting procedures, that some of these manufacturers use. I have actually asked operators how often they change those particular tools out. As in the case of some tools, there is a thing called a gang broach. It's a multitooth cutter which makes one pass, and it leaves the final shape of the tool that is desired. Then it would do the same pass on a second tool and third tool, and so on and so forth.

I have asked how often they have to change that particular cutting broach. It could be anywhere from two to 3,000 tools that are created. That shows to me that on a microscopic level it is constantly changing because it has to be constantly changed out because it is worn out.

Q. Are you familiar with the term "fracture matching"?

A. Yes, I am.

Q. Please explain what fracture matching is.

A. Simply put, fracture matching is to look at two pieces that have been broken apart by some manner to determine if they were at one time joined together.

A000669

Q. How do you go about performing a fracture match?

A. It could be a couple of different ways in which you would do that. In some cases you are able to take the ends of the break and put them together much like a puzzle piece. As long as the puzzle pieces fit together and the informational top of that puzzle piece agrees, then you could determine that they were at one time joined.

In some cases you may not have that puzzle piece that you can put together, but you can look at the very edge of the break in a microscopic fashion, and then you can look to make certain that the characteristics are the same. Well, actually it would be the opposite. You would have a peak on one side and a valley on the other because of the way it breaks. But that's an analysis you can do for fracture matching.

Q. At the FBI laboratory are your results peer-reviewed?

A. Yes, they are.

Q. Please explain what that means.

A. There are actually several different peer reviews that our cases undergo. Any identification that is made has to be verified by a second qualified examiner. That means another examiner qualified to do the same things that I do has to take the evidence and has to actually analyze it under a comparison microscope and come to the same conclusion I did before it can be reported. That's the first peer review.

After I'm done with my analysis, I take all of my

A000670

notes and put them into a report.  All of that information is then technically reviewed by another signing scientist.  That individual makes sure proper SOPs were followed, that the design was sound, and that my results are correct.  After that is done, it will go through what is called administrative review.  That is looking at the administrative policies and making sure that they are all followed as well.

Q.  Mr. McClarin, did you perform any tool marks analysis in this case?

A.  Yes, I did.

Q.  Generally speaking, what types of analysis did you perform?

A.  I did, of course, all of the phase 1 analysis, which is evaluating each item of evidence to determine if there were tool marks and, if there were tool marks, what those class characteristics were.  I also received multiple tools.

I evaluated each of those tools to determine what the tools were and what their class characteristics were.  Then I saw a couple of times in which there are some consistencies between the tool mark and some tools, so I did a tool mark identification comparison.  I also was able to do some fracture matching based on some items that had fractures on them.

Q.  Mr. McClarin, I'm handing you a disc marked for identification as Government Exhibit 923.  Do you recognize that disc?

A.  Yes, I do.

A000671

Q. Did you review it before coming to court today?

A. Yes, I did.

Q. What do you recognize the disc to contain?

A. This disc contains images that I took as part of my examination, both general photographs and comparison photographs.

Q. As part of you examination in this case?

A. Yes.

MS. DONALESKI: Your Honor, the government offers Government Exhibit 923, which contains Government Exhibit 902 through 916.

THE COURT: Any objection?

MS. GALLICCHIO: No objection.

THE COURT: 923 and 902 through 916 are received in evidence.

(Government's Exhibits 902 through 916 and 923 received in evidence)

MS. DONALESKI: Mr. DeLuca, can you please publish what is already in evidence as Government Exhibit 100 and highlight the row with lab item 36.

Q. Mr. McClarin, what is a lab item number?

A. A lab item number is a unique identifier given to a particular item of evidence or items of evidence.

Q. I am handing you Government Exhibit 105. Can you please read aloud the lab item number for Government Exhibit 105 as

A000672

well as the description.

A.   Yes.  This is lab item number 36, which is Government Exhibit number 105, and the description is a metal end cap.

THE COURT:  This is 105 in evidence.  It's already in, right?

MS. DONALESKI:  That's correct, your Honor.

THE COURT:  Just to be clear.  Go ahead.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 908.

Q.   Mr. McClarin, please describe what Government Exhibit 908 shows.

A.   This is a general photograph, a top-down view of the end cap laboratory item number 36.

Q.   Which is Government Exhibit 105, is that correct?

A.   That's right.

Q.   What type of analysis did you perform with respect to Government Exhibit 105?

A.   I evaluated Government Exhibit 105 for the presence of tool marks.  I noted that there were tool marks on the sides of this end cap and also I noted that there were two holes on the top of this end cap.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 909.

Q.   Mr. McClarin, what does this photograph show?

A.   This photograph shows a close-up and at an angle of the two

A000673

holes that were present on the top of Government Exhibit 105. In particular, I'm trying to show that the smaller of the two holes has a threading characteristic inside.

Q. Describe what threading is.

A. Threading is a helical structure on a rod or a cone such as what you would see on a screw.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 910.

Q. What does this photograph show?

A. This photograph shows a silicone cast that I took of the two holes present on the top of Government Exhibit 105. On the right side you can see the smaller hole and the threading that exists.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 911.

Q. Mr. McClarin, please describe what this photograph shows and the conclusion that you reached with respect to Government Exhibit 105.

A. The top left image is the top-down view of Government Exhibit 105. The top right image is a side view of it, and there are actually a few tool marks that I can see on the side. The determination I was able to make is that the threading inside of Government Exhibit 105 is 18 threads per inch, which is similar to a wood spade laboratory item number 83, but I couldn't say conclusively whether it came from that particular

A000674

bit or not.  The other thing I was able to determine is that the tool marks on the side of the end cap were insufficient to make an identification.

Q.  I'd like to focus you on what you have referred to as the smaller hole that we are looking at on Government Exhibit 911.  What type of tool made that smaller hole?

MS. GALLICCHIO:  Objection.

THE COURT:  Were you able to determine what kind of tool made that?

THE WITNESS:  In a general sense.

THE COURT:  In what general sense were you able to determine it?

THE WITNESS:  Just that it was some sort of drill bit with a thread on it.

THE COURT:  Some sort of drill bit with a thread.

THE WITNESS:  Right.  There was a particular drill bit that was submitted, a wood spade, that had a threaded bit on the tip.

THE COURT:  Overruled.  That's the testimony.  Next question.

BY MS. DONALESKI:

Q.  You mentioned that there were tool marks on the side of Government Exhibit 105.  Were you able to determine what type of tool marks those were?

A.  Yes.  Those are gripping type tool marks.

A000675

Q. What type of tool creates a gripping tool mark?

A. It would be some sort of gripping tool, such as a tongue and groove pliers, that would produce these type of marks.

Q. Would it be possible to screw an end cap into a pipe using only your hands?

MS. GALLICCHIO: Objection: leading.

THE COURT: I'll allow it. You can answer.

A. I would think it would be possible, but I don't know that it would be sufficient enough to make it tight.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 100. Highlight the row with lab item 1.

Q. Mr. McClarin, please read aloud the government exhibit number and the description.

A. This is lab item number 1, Government Exhibit number 134, and the description is a piece of metal pipe.

MS. DONALESKI: Mr. DeLuca, please highlight the rows for lab item 21 and 24.

Q. Starting with lab item number 21, Mr. McClarin, can you please read the government exhibit and description aloud.

A. Lab item number 21, Government's Exhibit number 129, it's a piece of metal pipe. Then you have lab item numbers 24 and 24-1, Government Exhibit 107, the description is metal fragments.

Q. Mr. McClarin, I'm handing you what is already in evidence as Government Exhibits 129, 107, and 134. I'll ask you to

A000676

please take out the piece of evidence in the paint can.

MS. DONALESKI:  Mr. DeLuca, you can take this down.

Q.  Please explain what type of analysis you did with respect to these three pieces of evidence.

A.  As I said before, in my phase 1 analysis I went to look at this particular item of evidence to determine if there are any tool marks on it.  In this case I didn't note any tool marks of value other than the edges potential for doing a fracture match.

THE COURT:  A fracture match?

THE WITNESS:  Yes, sir.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 915.

Q.  Mr. McClarin, please describe what this photograph shows.

A.  The bottom three images are general photographs that I took of each of these items of evidence.  The top two photographs are the comparison images that I took to document my fracture match comparison.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 912.

Q.  What does this photograph show?

A.  This is a photograph that I took from my comparison microscope to show the fracture match, the microscopic analysis that I did of two items of evidence.

Q.  Were you able to come to a conclusion with respect to

A000677

Government Exhibits 129, 134, and 107?

A. Yes, I was.

Q. Please describe that conclusion.

A. I was able to determine that those items were at one time joined together.

Q. Can you please demonstrate that using Government Exhibits 129, 134, and 107.

A. On the end of this pipe, there are threading on the edge here. Government Exhibit number 129 has a piece of threading. I looked at the edge, at the break, of this particular item to determine that it came from this area of the Government Exhibit 134 pipe. I was then able to take this smaller thread from Government Exhibit number 107 and determine that it was at one time joined with Government Exhibit 129.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 100 and highlight the row with lab items 1, 2, and 45.

Q. Mr. McClarin, starting with Government Exhibit 134, which is lab item 1 -- you have that in front of you, is that correct?

A. That's correct.

Q. Can you please read aloud the government exhibit number and description for lab item number 2.

A. Lab item number 2 is Government Exhibit 116 and the description is a metal pipe. Lab item number 45 is Government Exhibit number 121, and it is a metal pipe fragment.

A000678

Q.   I'm handing you Government Exhibits 116 and 121, which are already in evidence.

MS. DONALESKI:   You can take that down, Mr. DeLuca.

Q.   Mr. McClarin, please describe what type of analysis you did with respect to these pieces of evidence.

A.   What I was able to do with these three pieces of evidence was in the phase 1 analysis determine that there was potential for doing a fracture match or end match, which is looking at that puzzle piece and putting it back together.

MS. DONALESKI:   Mr. DeLuca, please publish Government Exhibit 903.

Q.   Explain what we are seeing here.

A.   These are three general photographs of these three items of evidence that I took in the lab.

MS. DONALESKI:   Mr. DeLuca, Government Exhibit 904, please.

Q.   What are we seeing here?

A.   These are photographs I took of the end matching or fracture match comparison that I did to show that these were at one time joined together.

Q.   Did you come to a conclusion with respect to Government Exhibit 116, 121, and 134?

A.   Yes, I did.

Q.   What was that conclusion?

A.   I was able to determine that these three pieces were at one

A000679

time joined together.

MS. DONALESKI: With the Court's permission, I would like to ask the witness to demonstrate that for the jury using the ELMO so that everyone can see it.

THE COURT: No objection?

MS. GALLICCHIO: No objection.

THE COURT: You can step down. It is going to be tight back there, but it might be easier for the jury to see on their screens, so there is some benefit.

Q. Mr. McClarin, I will ask you to please demonstrate that fracture matching you performed for the jury and narrate while you go.

A. As stated before, doing a fracture match in this case, an end match is looking at the puzzle pieces to see if they fit together. In this case there is some warping of the part, so it took a little extra work. You look at the characteristics.

What I'm doing is I'm looking at the characteristics of the break. I'm looking to see that those pieces go together, as they do here. Also, I'm looking at that information on top of that puzzle piece. I'm looking at the seam inside the pipe to make certain that they line up. Here I'm able to determine that these two pieces were at one time joined.

Then, taking this piece, I saw that this piece goes together here, lab item number 45 and lab item 1, and you see

A000680

how those characteristics go together to include the seam that continues. Therefore, I was able to determine that these pieces went together like this.

Q. Thank you, Mr. McClarin. Mr. McClarin, taking the two sets of fracture matching that you have just testified about, were you able to reach a conclusion with respect to whether Government Exhibits 134, 116, 129, 107, and 121 were ever joined together?

A. Yes, I was.

Q. What was that conclusion?

A. The conclusion was that items Government Exhibits number 107, 129, 121, 134, and 116 were at one time joined together.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 100 and highlight the row with lab item 27.

Q. Mr. McClarin, please read that government exhibit number and description aloud.

A. Lab item number 27 going to exhibit number 126. The description is a gray metal end cap.

Q. Mr. McClarin, I believe you already have Government Exhibits 116 and 107 in front of you. I'm going to hand you Government Exhibit 126. Please describe the type of analysis you performed with respect to these three exhibits.

A. The examinations that I performed on these three exhibits was I noted that there were some marks that were consistent as being created by one of the pieces of metal, Government Exhibit

A000681

107.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 914.

Q. Describe what we are seeing here.

A. In the top right image you see what looks like a metal nut. It's a piece of metal that is square-shaped. That's lab item number 24. The two images on the bottom are lab item number 27, Government Exhibit number 126. It is this end cap.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 916.

Q. Mr. McClarin, describe what we are seeing here.

A. These are a series of photographs that I took to demonstrate the consistencies that I saw between these items of evidence. The top left image is a top-down view of the item 2, Government Exhibit 116 pipe. You can note that there are four little areas on the top. An angled view, that is the top middle, just to show those four areas. That is consistent with the shape of the item 107 piece of metal.

The bottom left is actually a silicone cast that I took of the end of Government Exhibit 116 compared to the edge of Government Exhibit 107. You kind of see those angles, how they are consistent. The bottom middle is looking down into the item, Government Exhibit 126 end cap. The image on the bottom right is a silicone cast that I took of the inside of this end cap. You can see again the angle, the kind of square

A000682

shape.  That is comparing back to Government Exhibit number 107.

I was able to determine that there are characteristics that are consistent with Government Exhibit 102 resting inside of Government Exhibit 116 and then Government Exhibit 126 being over the top, but I couldn't state anything conclusive.

Q.  You mentioned that your conclusion was that it was consistent with that piece of metal resting in between the 116 pipe and the end cap, is that correct?

A.  That's correct.

MS. DONALESKI:  We can take this down, Mr. DeLuca. Thank you.

Q.  Mr. McClarin, focusing on Government Exhibit 116, can you please hold that up for the jury.  Did you perform any other analysis on this piece of evidence?

A.  Yes, I did.

Q.  What type of analysis?

A.  I performed tool mark identification on this piece of evidence.

MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 905.

Q.  Explain what this shows.

A.  The top image is a general photograph of the item of evidence you see here, Government Exhibit number 116.  The red circles are highlighting a few areas where I noted tool marks

A000683

to be.  The bottom images are zoomed in the area so you can see the tool marks a little more.

Q.  Were you able to determine whether there were any class characteristics for the tool marks we see on Government Exhibit 116?

A.  Yes, I was.  I was able to determine, based on the width of those tool marks and the fact that on the opposite side of the pipe the same type of marks are there, that these marks were created by some sort of gripping tool.

Q.  Did any of the tools submitted to you fit those class characteristics?

A.  Yes.  There were actually two potential tools that were submitted that could have produced these.

        MS. DONALESKI:  Mr. DeLuca, please publish Government Exhibit 902.

Q.  What does this photograph show?

A.  They are general photographs of two of the tools that were submitted in this case, both of which are tongue-and-groove pliers.  That would have been lab item 67, the top image, and lab item number 74, which is the bottom image.

Q.  After narrowing it down to these two tongue-and-groove pliers, what did you next in your analysis?

A.  I then created test marks using both of these tools because I have to do a comparison back to the questioned item.

Q.  I'm handing you what's been marked for identification as

A000684

Government Exhibits 920, 921, and 921-1.  Do you recognize those pieces of evidence?

A.  Yes, I do.

Q.  What do you recognize them to be?

A.  These are test marks that I created in the laboratory during my examination.

Q.  Explain again what a test mark is.

A.  A test mark is a process where we create marks using particular tools.  We have to create known standards to look back at our questioned item.  I take a took and I create tool marks onto a softer material, in this case lead, to do a comparison.

Q.  I'm handing you Government Exhibit 302, what is already in evidence as Government Exhibit 302.  Do you recognize this?

A.  Yes, I do.

Q.  What do you recognize it to be?

A.  I recognize this to be a box containing various tools that were submitted in this case.

Q.  Located within that box, do you see any of the tools that created the test marks that are in Government Exhibit 921?

A.  Yes, I do.

Q.  Which of those tools?

A.  Government Exhibit 302-1.

Q.  Can you please hold that up.

A.  (Witness complied)

A000685

Q. Using Government Exhibit 302-1 and 921, the test marks, can you please demonstrate and explain for the jury how you created test marks using 302-1.

A. Government Exhibit 921 has multiple test marks that I created. Again, this is trying to mimic the type of tool marks that I saw on the Government Exhibit 116 pipe. I took a softer material, which is lead in this case, and I made several tool marks by first taking a flat piece and trying to press it against the teeth of the tool and then moving the tool in various directions, and then analyzing each of those tool marks back to my unknown item.

Ultimately, what I wound up doing was taking a piece of lead and wrapping it around a bar in order to mimic the same or similar diameter that the item 2 pipe had, or Government Exhibit 116. Once I had that diameter, I would then move the tool to the appropriate slot, grab it onto the lead, and then twist the tool. Then I would take the tool marks that were created and compare back to my unknown item.

MS. DONALESKI: Mr. DeLuca, please publish Government Exhibit 906.

Q. Mr. McClarin, describe what we are seeing here.

A. This is a photograph that I took using my comparison microscope to document the identification I was able to make in this case. It's looking at the agreement of those individual characteristics.

A000686

Q.  Describe which image is on the left and which image is on the right.

A.  The image on the left is a tool mark from the item 2 pipe, which is Government Exhibit 116, and the image on the right is a test mark that I created using Government Exhibit 302-1.

Q.  Which have the tool mark test pieces in Government Exhibit 921 are we viewing on the screen on 906 right now?

A.  We are actually looking at Government Exhibit 921-1.

Q.  Using Government Exhibit 302, the tongue-and-groove pliers, and Government Exhibit 921-1, can you please demonstrate the motions that you made to create that tool mark.

A.  Yes.  Again, I would have taken this piece of lead, I would have wrapped it around the bar to mimic the same or similar diameter as Government Exhibit 116.  I put my tool on, gripped the tool onto the led, and then twisted the tool.

Q.  What conclusion were you able to reach with respect to which tool created the tool marks you see on Government Exhibit 116?

A.  I was able to determine that tool marks present on Government Exhibit 116 were created by Government Exhibit 302-1.

Q.  What conclusion were you able to reach with respect to the type of motion that would have made the tool marks on Government Exhibit 116?

A.  The type of motion would have been movement of the jaws

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000687**

approximately parallel to the surface of the pipe.  That could have been done in one of two ways.  It could either have been gripping of the tool onto the pipe and then the tool moving, or the tool station stationary and the pipe being moved against the teeth.

MS. DONALESKI:  No further questions.

THE COURT:  Cross-examination.

MS. GALLICCHIO:  No.

THE COURT:  You can step down.  Thank you.

(Witness excused)

THE COURT:  Who is the next witness?

MS. CROWLEY:  Your Honor, the government called Robert Gillette.

ROBERT GILLETTE,

    called as a witness by the government,

    having been duly sworn, testified as follows:

THE COURT:  State your name and spell your name for the record.

THE WITNESS:  My name is Robert Gillette. R-O-B-E-R-T, Gillette spelled G-I-L-L-E-T-T-E.

THE COURT:  You may proceed, Ms. Crowley.

MS. CROWLEY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. CROWLEY:

Q.  Good afternoon.  Where do you work?

A000688

A. I work for the Federal Bureau of Investigation, specifically in the laboratory division's explosives unit.

Q. Where is the laboratory division located?

A. The laboratory division is located in Quantico, Virginia.

Q. What is your title?

A. My title is chemist forensic examiner.

Q. How long have you worked at the FBI lab?

A. I've worked at the FBI lab since 2009.

Q. Generally speaking, what are your duties and responsibilities as a chemist forensic examiner in the FBI lab?

A. My primary job duty as a chemist forensic examiner is the examination of evidence for the presence of explosives or explosive residue.

Q. What did you do before you began working at the FBI lab in 2009?

A. Before 2009 I worked for a company called Midwest Research Institute, where I was a chemist.

Q. What kind of work were you doing there?

A. For Midwest Research Institute, the majority of my work was method development, so the development of analytical methods, using specific instruments within the laboratory to identify and detect certain compounds.

Q. What is your educational background?

A. I received a Bachelor of Science in chemistry from George Mason University in 2001, and I received my Master of science

A000689

in chemistry from George Mason University in 2007.

Q.  Mr. Gillette, if you could speak right into the microphone. Thank you.  Have you received training in collecting and analyzing explosives and explosives residue?

A.  Yes, I have.

Q.  Could you describe that training.

A.  The majority of my training for the collection of explosives dealt with post-blast crime scene analysis and the proper collection of residues, as well as packaging -- collection, packaging, and contamination prevention.

Q.  What about analyzing explosives and explosives residues?

A.  For the analysis of explosives, I have had a couple of classes, again both from within the laboratory division, concerning different types of techniques used to analyze explosives.

Q.  What, if any, training did you undergo to become a forensic chemist examiner?

A.  In order to become a qualified forensic examiner within the explosives unit, I had to go undergo a training program which primarily consisted of various oral boards examinations on topics such as explosives and chemistry, and I also had to complete three moot court exercises.

Q.  Have you trained others in the collection and analysis of explosives and explosives residue?

A.  Yes, I have.

A000690

Q. Can you estimate how many times over course of your career you have examined items for explosives and explosives residue.

A. I would estimate several hundred times.

Q. Approximately how many explosive-related cases have you worked on in your time at the FBI laboratory?

A. Total, I would estimate about probably 150 total cases.

MS. CROWLEY: Your Honor, the government offers Robert Gillette as an expert in the field of explosives chemistry.

THE COURT: Any objection?

MS. GALLICCHIO: No.

THE COURT: The witness is recognized as an expert in that field. You may proceed, Ms. Crowley.

Q. Mr. Gillette, what is an explosive?

A. An explosive is either a single pure substance or mixture of substances that when they are mixed together properly, you put the right amount of energy into it, it explodes.

Q. What do you mean by "energetic material."

A. Energetic material is typically an explosive.

Q. What are some examples of explosives?

A. Common examples of explosives include black powder, smokeless powder, nitroglycerin.

Q. Are you familiar with the term "improvised explosive device"?

A. Yes, I am.

Q. Is that also sometimes called an "IED"?

A000691

A.  Yes, it is.

Q.  What is an IED?

A.  An IED is an explosive device that isn't commercially manufactured.

Q.  That is not commercially manufactured?

A.  Right, not commercially manufactured.

Q.  So it's like a homemade bomb?

MS. GALLICCHIO:  Objection: leading.

THE COURT:  Let's watch the leading.  I guess that's right.

Q.  How would you characterize an IED?

A.  Noncommercially made explosive device.

Q.  As a chemist in the explosive unit at the FBI lab, have you examined explosives used in IEDs?

A.  Yes, I have.

Q.  Are you familiar with the terms "high explosives" and "low explosives"?

A.  Yes, I am.

Q.  Can you explain what they are.

A.  Yes.  The difference between a low explosive and a high explosive is the rate at which it explodes.  It is the rate of that explosion.  For a low explosive, that rate is slower than the speed of sound, and for a high explosive, that rate is greater than the speed of sound.

Q.  What are some common examples?

A000692

THE COURT:  What is the speed of sound?

THE WITNESS:  The speed of sound right now is -- I can't recall.

THE COURT:  Right now?  Is it getting faster?

THE WITNESS:  I apologize, your Honor.  No.  I can't recall the exactly value.

THE COURT:  Okay.

(Continued on next page)

**A000693**

Q.   Is it fair to say it's very, very fast?

A.   Yes.

Q.   What are some examples of low explosives you've seen used in IEDs?

A.   The common explosives that I have seen are black powder and smokeless powder.

Q.   Are you familiar with the terms deflagration and detonation?

A.   Yes, I am.

Q.   What is deflagration?

A.   So, deflagration is that explosion that reaction brings what a low explosion undergoes; that is lower than the speed of sound.

Q.   And can you explain when a low explosive deflagrates?

A.   When a low explosion deflagrated, the energy it releases is typically in the form of depression.

Q.   And what is detonation?

A.   Detonation is the explosive reaction that highly explosives undergoes; that's when an explosion happens at a low rate of speed.

Q.   So, do low explosions detonate or deflagrate.

A.   Low explosions are designed to deflagrate.  High explosives are designed to detonate.

Q.   How does a low explosive deflagrate to cause an explosion in an IED?

A000694

A. In an IED what's typically found is that low explosion is put inside a container. And so, then some form of heat is put into that low explosion and produces a lot of heat and pressure very quickly. Since it's contained in that container, the energy builds up and builds up until that container can't hold that energy anymore and it ruptures that container, putting off all the energy from that deflagration.

Q. What are some examples of containers that you've seen used with IEDs?

A. Most commonly, I have seen plastic and metal pipes.

Q. You've mentioned the terms explosives residue. What is that?

A. Explosive residue would be the residues of the explosion that's left over after an explosion, or could also be the residues of explosives that are left on the surface that an explosive came into contact with.

Q. In the course of your duties as a chemist at the FBI lab, do you examine evidence for presence of explosive residue?

A. Yes.

Q. Can you see explosive residue with a human eye?

A. No. Not with naked eye.

Q. Are you familiar with the terms pre-blast and post-blast?

A. Yes.

Q. Just generally, what do they mean?

A. With respect to residues, pre-blast would be the actual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000695**

explosive that hasn't exploded yet but the residue would be something -- say, come into contact with the container. Post-blast residue would be after an explosion has happened and whatever remains after the explosion happens.

Q. How is explosive residue collected from a crime scene?

A. The most common way to collect explosive residue from a crime scene is by swabbing.

Q. Are you familiar with the term bulk explosives?

A. Yes.

Q. What is that?

A. So, bulk explosive is an amount of explosive that hasn't exploded and there's enough of it to be seen with the naked eye.

Q. And do you also examine both explosives as a chemist in the FBI lab?

A. Yes, I do.

Q. You mentioned that you're a chemist in the explosives unit. Can you explain what the explosive unit does at the FBI?

A. So, the primary role within the FBI laboratory is to manage all the evidence from explosive investigations that get sent to the lab.

Q. Are there other units at the FBI lab?

A. Yes, there are.

Q. What are some of them?

A. Chemistry unit, trace evidence unit, and DNA caseworker

A000696

unit.

Q. And how, if at all, do the explosive unit work with these other forensic units when conducting analyses at the FBI lab?

A. Since it manages explosive cases, there will be someone in the unit that determines where the evidence needs to go throughout the laboratory and basically what exams need to be done.

Q. How is evidence received at the FBI lab?

A. Evidence is typically received in either two ways: Either hand delivered, someone from the FBI or local or state police; or it is shipped. So, again, it would be sent in either by an FBI field office or local or state police typically.

Q. And what happens when evidence is received at the lab?

A. Once it's received at the laboratory, it's given a laboratory number, and then the evidence would be inventoried.

Q. You said it's given an inventory number?

A. A laboratory number.

Q. A laboratory. Can you explain what that is?

A. So, the laboratory number, the first four digits are the year that the evidence was submitted was received. And then it has a sequential number after that.

Q. And is each piece of evidence that's submitted also numbered?

A. Yeah. Upon inventory, the items of evidence within whatever is submitted to the laboratory is given item numbers

A000697

specific to that laboratory number.

Q. And are items of evidence sometimes taken apart when they're being examined?

A. Yes. They can be.

Q. And are the pieces of evidence numbered after they're taken apart?

A. If it is a preexisting item, then that item would get a sequential number after that for subdivided evidence.

Q. Okay. I'd like to talk about the analyses you performed. Could you please walk us through the procedures that you follow when you examine items for the presence of explosives or explosive residue?

A. For explosives residue, the first thing I'd have to do is prepare what we call a trace room, and that is basically a cleaning room. It's examination rooms that we use only for the examination of evidence that might have explosives residue on it, in order to minimize any amount of contamination of the evidence.

So, I would prepare that room by cleaning it, cleaning the work surface and putting down clean brown butcher paper before I would bring any actual evidence into the room. I don proper work equipment, clean disposal lab jacket and gloves. And then I would bring the evidence in and start my examinations after that.

Q. What's the first step in your examination?

A000698

A. The first step of my exams would be to visually inspect all of the evidence, one, to make sure all the containers and seals are intact, just to make sure I have all the proper evidence and nothing has been lost or contaminated. And then after that, I actually visually inspect all of the evidence.

Q. What are you looking for when you're conducting a visual examination of the evidence?

A. A few things. One, I need to see what the evidence looks like because I need to figure out how to extract or remove any possible explosives residue from that evidence. That's the primary thing, because I have to figure out whether or not the actual evidence is going to be amenable to the examination processes that I have.

Q. And what do you mean by, amenable to the examination process?

A. Whether or not the evidence may or may not be damaged in any way, or if I might affect any subsequent examinations that are planned for that evidence.

Q. What, if any, tools do you use in conducting a visual examination?

A. The only tool that I might use would be a microscope.

Q. What is the next step in your analysis after you perform the visual exam?

A. After I perform the visual exam, then I actually begin my process of residue extraction.

A000699

Q. What's residue extraction?

A. It happens in one of three ways, either I would directly extract the evidence with a solvent or I would vacuum the evidence in an attempt to remove any explosives onto a filter, or I would physically swab the evidence with something like a cotton swab.

Q. Let's start with the solvent rinse, I think you said. In what circumstances would you use a solvent to perform an extraction?

A. If it is nonporous, so something like glass or metal or plastic.

Q. And what solvents do you use?

A. I use acetone and water.

Q. What is acetone generally used to extract?

A. For explosives residue, acetone typically extracts high explosives.

Q. What about water? What is water typically used to extract?

A. Water would be used to extract primarily low explosives.

Q. You said swabbing is another way you extract for residues. When would you swab a piece of evidence instead of washing it or rinsing it with solvents?

A. I would swab the evidence in very limited situations, mostly when either the piece of evidence is really large and hard to directly solvent-wash the evidence, or if it's maybe porous like fabric or cloth.

A000700

Q.   And you mentioned that vacuuming is the third way that you perform an extraction.  Can you explain how vacuuming is used to extract explosives residue?

A.   Yes.  A commercial vacuum cleaner that has a special attachment on the end of it that has a filter within it.  Again, if it's a porous like cloth or fabric that's large, then I would vacuum that item of evidence and then actually extract the filter afterwards.

Q.   What's the next step in your analysis after extraction is complete?

A.   After the extractions are complete, I would filter those extractions, those liquids, in preparation for analysis using various instruments.

Q.   What are the instruments that you use in your analysis called?

A.   All of the instruments that I would use for residue analysis, they're call chromatographs.

Q.   Are there different types of chromatographs?

A.   Yes, there are.

Q.   What is the purpose of chromatographs?

A.   Ideally, a chromatograph would separate it into individual components so we can identify them.

Q.   Were you asked to analyze materials recovered in connection with the investigation in this case?

A.   Yes, I was.

A000701

Q. Where were the items that you analyzed collected from?

A. The first set of items came from the 42nd Street subway pedestrian tunnel, the scene of the explosion; and the second set of items were from Ocean Parkway, Apartment 3J.

Q. What analysis were you asked to perform?

A. Explosive chemistry examination.

Q. What does that mean?

A. I examine the evidence for purpose of explosive residue or bulk explosives.

Q. Generally speaking, what types of evidence were you asked to examine?

A. The types of evidence included metal pipe fragments, wires, cloth, swabs and powder samples.

Q. Did you prepare a report in connection with the analysis you conducted?

A. Yes, I did.

Q. We'll talk about this in more detail in a second. But just generally speaking, what did you conclude about the pieces of evidence that you examined?

A. The results of my examinations for evidence from both scenes indicated that the results were consistent with the presence of a low explosive.

Q. Okay. I'd like to begin with the items you analyzed from apartment 3J. Did you perform every step of the analysis of these items yourself?

A000702

A.   For the items in the apartment, the actual physical hands-on examinations were conducted by my coworkers.

Q.   And did you consult with your coworker as he or she performed the actual hands-on analysis?

A.   Yes.  I instructed him as to exactly what needed to be done.

Q.   And did you review his analysis and the results of his examination?

A.   Yes.  I reviewed all of his work.

Q.   Okay.  I'd like to hand you what's in evidence as Government Exhibit 208.  You can go ahead and open the paint can and look inside it.

Do you recognize this, Mr. Gillette?

A.   Yes, I do.

Q.   What is it?

A.   This is a powder sample that was received from the residence.

Q.   And was this powder sample analyzed as part of the examination of items in this case?

A.   Yes, it was.

Q.   Was this considered bulk material or explosive residence?

A.   This was considered bulk material.

Q.   Please explain the steps that were taken in analyzing this material.

A.   So, the first step of the analysis, again, starts with a

A000703

visual inspection of the material, both with the naked eye and then microscopically. Photographs were taken. And after the visual examinations were completed, then instrumental analyses were performed.

Q. So, let's start with a visual examination. Did you do a visual examination of the Government Exhibit 208?

A. Yeah. I did a visual exam. Not a microscopic, but visual.

Q. And what, if anything, did you observe when you looked at the powder contained in Government Exhibit 208?

A. Just using my naked eye, I could see it was a light red or red powder.

Q. And did you come to an initial conclusion about what that powder was or could be?

A. My first opinion was that it looked like ground match heads.

Q. Have you seen ground match heads used in IEDs before?

MS. GALLICCHIO: Objection?

THE COURT: Overruled. He can answer.

THE WITNESS: I have.

Q. How?

A. I have seen ground match heads as either the main charge of an explosive device or mixed with other materials.

Q. And was the powder substance in Government Exhibit 208 also examined microscopically?

A. Yes, it was.

A000704

Q. Were photographic images taken of the microscopic image of Government Exhibit 208?

A. Yes, they were.

Q. Have you reviewed the photographs?

A. Yes, I have.

MS. CROWLEY: Mr. DeLuca, can you please publish for the witness, the Court and the parties Government Exhibit 922.

Q. Do you recognize this photograph, Mr. Gillette?

A. Yes, I do.

Q. What is it?

A. These are microscopic images of the powder sample.

Q. How do you recognize it?

A. I recognize it by the laboratory number as well as an item number and my initials.

MR. CROWLEY: The government offers Government Exhibit 922.

MS. GALLICCHIO: No objection.

THE COURT: So, Government Exhibit 922 is received.

(Government's Exhibit 922 received in evidence)

THE COURT: Are you going to publish it?

MS. CROWLEY: Yes. Can we publish it please?

THE COURT: Go ahead.

BY MS. CROWLEY:

Q. Could you explain what we're looking at in these photographs.

A000705

A. So, the top picture gives sort of an overview of the majority of the sample. And then the photograph beneath shows both the powder within it as well as what appeared to be fibrous material that might have been woodchips.

Q. And how, if at all, was the presence of fibrous wood material significant to your analysis?

A. That could have come from the removal of the match head, composition from match sticks. So, it could be portions of the match stick.

THE COURT: What's the blue in this photo?

THE WITNESS: That's the background.

THE COURT: Background of the microscope?

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. CROWLEY:

Q. Mr. Gillette, apart from the visual examination, was there any other testing done on the powder contained in Government Exhibit 208?

A. Yes.

Q. And what was that testing?

A. There were a variety of what are called spectroscopic techniques performed.

Q. And we'll talk about that in a second. But was there any other testing done manually of the powder sample in Government Exhibit 208?

A000706

A. Yes. A thermal susceptibility test was performed on the sample.

Q. What's that?

A. Simply stated, a bird test. We take a small amount of material and expose it to a flame to see what the reaction is.

Q. And what was the result of the thermal susceptibility test?

A. The test was positive. It burned.

Q. It burned?

A. Yes.

Q. And what was the significance of the fact that the substance burned to your analysis?

A. At that step the significance wasn't very great. What we do a lot of times is, when we receive evidence that we really don't know what it is -- we deal with a lot of explosives, really dangerous explosives. That thermal susceptibility test is just an idea of how careful we have to be in handling it. So, something small could literally explode, we know we have to be really, really careful with how we handle it.

If we, again, put a small lamp and it burns rapidly, then we know that's the first indication that this mixture, this powder, is energetic.

Q. So, was the fact that the substance burned consistent or inconsistent with your preliminary conclusion that the material in Government Exhibit 208 was likely matches?

A. That would be consistent with it.

A000707

Q. You mentioned that instrumental analysis was also done on the powder in Government Exhibit 208. What did the analysis find with respect to this substance?

A. That the powder material was consistent with a potassium chlorate-based match head composition.

Q. And why was it consistent?

A. So, we use the terminology consistent with when we can't come to an identification. An identification means we have multiple instruments all pointing to the same conclusion, and that conclusion is backed up with the analysis of a material, consistent with -- we didn't quite make it to that step.

Q. Have you examined match heads composition in your work as a forensic chemist before?

A. Yes, I have.

Q. And what substances generally make up match heads?

A. Most commonly you'll find potassium chlorate mixed with something like glass.

Q. And were potassium and chlorate found in the substance contained in Government Exhibit 208?

A. Yes.

Q. And have you seen potassium and chlorate used in explosives in IEDs before?

A. I have seen potassium chlorate used as an oxidizer.

Q. What is an oxidizer?

A. The chemical source of oxygen for an explosive composition.

A000708

Q.   And what is the significance of an oxidizer with respect to an explosive composition?

A.   You need to have an oxidizer mixed with fuel, mix it the correctly, to produce an explosive composition.

Q.   And is potassium chlorate based oxidizers used in low explosives or high ones?

A.   Typically used in low explosives.

Q.   As part of your analysis, did you compare the powder contained in Government Exhibit 208 to any other materials?

A.   Yes.  During the examinations of the unknown powder, we compared it or analyzed a reference match head composition along with the unknown material.

Q.   And how did they compare?

A.   The instrumental results were nearly identical.

Q.   Nearly identical to?

A.   The unknown compared to the reference material.

Q.   Could you explain what unknown and reference are.

A.   So, unknown is the powder from the powder sample from the residue, and the reference material is an actual -- matches that we brought to remove the composition from and analyzed.

Q.   So, just to be clear, the powder contained in Government Exhibit 208 was nearly identical to the match heads that you compared them to?

A.   Yes.

Q.   In your experience as an explosive chemist, what if any

A000709

fuels have you seen combined with potassium chlorate in explosives?

A. Most commonly, I have seen aluminum, petroleum products such as petroleum jelly, as well as sugar.

Q. Can you explain how match heads and sugar can be combined?

A. You have to remove the material from the actual match stick. You can break it off using pliers. Then you would have to grind that match head material into a really fine powder and then mix that with the sugar. Again, that sugar would also have to be a really fine powder. Mix it very intimately and then you would have your explosive composition. That could then be placed in some sort of container and with some form of heat put into that to initiate the explosion.

Q. Did you analyze any other items collected from apartment 3J?

A. Yes.

Q. I'm going to hand you what's in evidence as Government Exhibit 202. Do you recognize Government Exhibit 202?

A. Yes, I do.

Q. What is it?

A. These are the swabs received from the residence.

Q. And were these items analyzed as part of the chemical analysis in this case?

A. Yes. They were examined for explosive residue.

Q. Okay. If you could please remove the vials from the bag

**A000710**

and place them on the witness stand.

Do these vials contain FBI lab item numbers?

A. Yes, they do.

Q. What are they?

A. They are item 97 and 97-1 through 97-6.

Q. Are there any other numbers on these vials?

A. Yes, there are.

Q. And what are those numbers?

A. They are three through nine.

Q. And do you know the significance of those numbers?

A. The three through nine are the contributory numbers. So, whoever collected the evidence, they labeled the jars with numbers.

Q. Could you describe the examination that was performed of these swabs?

A. So, for the swabs, they were examined, again, for explosives residue. The swabs are directly extracted with water. That water is collected and filtered and then analyzed using our chromatographs.

Q. Let's start with the vial marked with FBI lab number 97. What if any location is listed on that vial?

A. The location is listed as kitchen.

Q. And what did the analysis find with respect to this swab?

A. The residues were consistent with a potassium chlorate oxidizer.

A000711

Q. And is potassium chlorate the same substances you identified on the bulk material in Government Exhibit 208 that we just discussed?

A. Yes. I identified potassium chlorate within the powder sample.

Q. Now, if we could turn to the vial with FBI lab number 97.

THE COURT: You're going to go through each one of these I assume; yes?

MS. CROWLEY: Yes.

THE COURT: Why don't we break for lunch. We'll pick up again at 2:00.

Don't discuss the case. Keep an open mind. Have a good lunch. Leave your notebooks in the jury room. Looks like a pretty nice day, so enjoy it. And I'll see you at 2:00 o'clock.

(Jury not present)

THE COURT: Anything we should discuss before lunch?

MS. CROWLEY: Not for us, your Honor.

THE COURT: Timing wise, how are we doing?

MS. CROWLEY: I would say I have another ten to 15 minutes with this witness.

THE COURT: You think you'll rest today or you think Monday?

MS. CROWLEY: I think that we could rest today.

THE COURT: Could rest?

A000712

MS. CROWLEY:  Yeah.

THE COURT:  We'll see.  Do you know whether you're putting on a case?

MS. GALLICCHIO:  We do know.

THE COURT:  And?

MS. GALLICCHIO:  We're not --

THE COURT:  You're not going to put on a witness.  Okay.  So, we'll either wrap up today or we can expect to end on Monday.

MR. TURNER:  Does the Court have a sense of when it intends to hold the charge conference?

THE COURT:  If we're not going to finish until late today, it won't be today.  So, that gives us the choice of tomorrow.  But that's tricky.  I mean, I put over summations till Monday.  I had agreed to preside on a panel of a law school symposium out of town.  I can do this remotely.  We could do it probably by video conference or something with a court reporter, of course, and do it that way tomorrow.  I had thought you guys were going to rest around lunchtime that we would have time.

MR. TURNER:  Judge, we're happy to do it late today or tomorrow by phone if your Honor prefers.  The only reason we're asking is to have a sense of the charge before we prepare our summations.

THE COURT:  I get it.  Not my first rodeo.  I know why

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000713**

you want it. I would want to oblige. Of course, it makes easier for everybody to prepare their summations when they know what the charges are going to be. So, we'll have it at some point tomorrow. I wouldn't expect we could do it over the weekend, because it's harder to get court reporters and everything else. But I think we could probably find some time tomorrow. We'll chat about that towards the end of the day.

(Recess)

THE COURT: Okay. Great. Have a seat. Thank you. We're now going to resume the direct examination by Ms. Crowley.

You may proceed.

MS. CROWLEY: Thank you, Your Honor.

BY MS. CROWLEY:

Q. Before we broke for lunch, we were discussing the swabs that were analyzed from apartment 3J. Do you recall that?

A. Yes, I do.

MS. CROWLEY: Okay. Can we turn now to the vial with FBI lab number 97-1.

Q. What is the location listed on this vial?

A. The location is listed as hallway.

Q. And what did the analysis find with respect to this swab?

A. The residues were consistent with potassium chlorate.

Q. Let's turn now to the vial marked item 97-2. What's the location listed on this file?

**A000714**

A.   The location is listed as bedroom one.

Q.   What did the analysis find with respect to this swab?

A.   The residues were consistent with a chlorate-based compound.

Q.   Now, let's turn to the vials marked 97-3 and 97-5.  What are the locations listed on these vials?

A.   For item 97-3, the location is listed as hall closet.  And item 97-5 the location is listed as bedroom two.

Q.   And what did the analysis find with respect to these swabs?

A.   The residues were consistent with a chlorate-based oxidizer.

Q.   Okay.  Finally, let's look at lab numbers 97-4 and 97-6.  And what are the locations listed on these swabs?

A.   Item 97-4, location listed as bathroom.  Item 97-6, location is listed as bedroom three.

Q.   What did the analysis find with respect to these swabs?

A.   No explosives were identified on those swabs.

Q.   Mr. Gillette, how many total swabs from apartment 3J were analyzed in this investigation?

A.   A total of seven.

Q.   Of those seven swabs, how many tested positive for the presence of low-explosive residue?

A.   Five.

Q.   And how many of the swabs that tested positive for low explosive residue contained chlorate?

A000715

A.  All of them.

Q.  What is chlorate?

A.  Chlorate is one portion of a chlorate molecule. Specifically chlorates are oxidizers.

Q.  Is chlorate a substance that you would expect to find naturally in the environment?

A.  No.  I would not expect that.

Q.  Is chlorate used commercially?

A.  Yes, it is.

Q.  How?

A.  It's most common commercial uses are in fireworks and matches.

Q.  What are control swabs?

A.  Control swabs are swabs that are taken to show anything that the collection environment might contribute to the results.

Q.  And what is the purpose of a control swab?

A.  It's to show that the process that is used doesn't affect the results, or what effect that process has on the results.

Q.  And were control swabs submitted from apartment 3J?

A.  Yes, they were.

Q.  Were they analyzed?

A.  Yes, they were.

Q.  What did the analysis find with respect to the control swabs?

A000716

A. No explosives were identified on the control swabs.

Q. I'd like to turn now to the evidence examined from the port authority crime scene. What types of evidence were you asked to analyze from that location?

A. From the port authority scene, the evidence we received were metal pipe fragments as well as swabs, tape and I believe also some fabric and a battery.

Q. Did you analyze all of the items submitted to you from the port authority scene?

A. I performed a visual examination on all of the items. But for some of the items, I didn't perform any other exams because I did not want to interfere with any subsequent examinations that were intended for those pieces of evidence.

Q. How would your analysis interfere with subsequent examinations? Could you provide an example?

A. Specifically I was worried about the extraction process removing or destroying any latent fingerprints or DNA.

Q. Let's talk about the items you did analyze. I'm going to hand you what's in evidence as Government Exhibit 110. Do you recognize Government Exhibit 110?

A. Yes. These are the swabs from the explosion scene.

Q. And did you perform an analysis of these swabs?

A. Yes. I performed the explosives residue examinations.

Q. Okay. If you could remove the swabs and line them up on the witness stand.

A000717


All set?

A. Yes.

Q. Do these vials contain FBI lab item numbers?

A. Yes, they do.

Q. What are they?

A. They are items 40 through 44.

Q. Do they also contain contributor numbers?

A. Yes.

Q. What are they?

A. They are items three through seven.

Q. Please explain how the examinations of these items or these swabs was conducted?

A. For these swabs, again, I examined them for explosive residue. My first step was to cut each swab in half using precleaned scissors. One half was extracted with water and the other half with acetone. Those extracts were filtered and analyzed using instruments.

Q. What did the analysis find with respect to these swabs?

A. So, a couple of these swabs had residues consistent with a chlorate-based oxidizer, items 48 and 42.

Q. And what were the contributor numbers on items 40 and 42?

A. Items three and five.

Q. And what is an example of an explosive composition containing a chlorate-based oxidizer?

A. The most common commercial sources would be either

A000718

fireworks or matches.

Q. And what about with respect to the remaining swabs, four, six and seven, what did the analysis find with respect to those swabs?

A. No explosives were identified on those swabs.

Q. Did you also analyze control swabs collected from the port authority crime scene?

A. Yes, I did.

Q. And what did the analysis find with respect to the control swabs?

A. No explosives were identified on the control swabs.

MS. CROWLEY: Mr. DeLuca, please publish what's in evidence as Government Exhibit 134-1A.

Please publish for the witness and the Court what's been marked for identification Government Exhibit 134-1A, 116-1B, and 121-1B.

BY MS. CROWLEY:

Q. Mr. Gillette, do you recognize these photographs?

A. Yes, I do.

Q. What are they?

A. These are the metal pipe fragments submitted from the explosion scene.

Q. How do you recognize them?

A. I recognize them just by familiarity, as well as the laboratory number and item numbers associated with them.

A000719

Q. And do these photographs fairly and accurately depict the items as they were received in the FBI laboratory?

A. Yes.

MS. CROWLEY: The government offers, 134-1A, 116-1B and 121-1B.

MS. GALLICCHIO: No objection.

THE COURT: All right. So, those are 134-1A, 116-1B and 121-1B; correct?

THE COURT: All right. Those are received.

(Government's Exhibits 134-1A, 116-1B and 121-1B received in evidence)

MS. CROWLEY: May we publish them?

THE COURT: You may. Yes.

BY MS. CROWLEY:

Q. Mr. Gillette, did you analyze these items for explosive residue?

A. Yes, I did.

Q. How?

A. I extracted the interior portions of the pipe with acetone and then water.

Q. And what did your analysis find with respect to these items?

A. The results of those analyses indicated that the results were consistent with a potassium chlorate-based low explosive composition.

A000720

Q. And is that the same low explosive chlorate-based oxidizer that we discussed with respect to the items you examined from the residence?

A. I can't say it's the exact same, but the residue from the residence contained a combination of potassium chlorate that was identified as well.

Q. Of the items from the apartment 3J and the port authority tunnel that tested positive for explosives residue, how many contained chlorate?

A. All of them.

MR. CROWLEY: Nothing further.

THE COURT: Okay. Any cross-examination?

MS. GALLICCHIO: Yes.

THE COURT: All right.

CROSS-EXAMINATION

BY MS. GALLICCHIO:

Q. Good afternoon.

A. Good afternoon.

Q. So, Mr. Gillette, you have been -- I'm sorry. I missed it on direct. You've been with the FBI laboratory for how long?

A. Since 2009.

Q. And in 2009 when you started your job at the laboratory, I assume you received training?

A. Yes, I did.

Q. How extensive was that training?

A000721

A. The training that I initially received -- at that point I was a chemist, so the training that I received was supervised case work, training samples and I received competency tests for each standard operating procedure that we had.

Q. Throughout your employment and up to now, do you receive continuing training?

A. Yes, I do.

Q. Is that on a regular basis?

A. Yes, it is.

Q. So, as you said, the FBI has strict guidelines for its laboratory and its employees is; right?

A. Yes.

Q. And these guidelines are written down; right?

A. Yes, they are.

Q. They are written down in a quality assurance manual; right?

A. Yes.

Q. And that manual itself is a large volume, over 300 pages; right?

A. I believe so. Yes.

Q. And you also have standard operating procedures that are also written down in a volume?

A. Yes.

Q. And all of those policies and procedures and manuals, you are required to know them; right?

A. I do not know them by heart, but they are easily available

A000722

for reference when I need to refresh my memory.

Q.  So, if you have a question about what the policy is for a particular analysis or a procedure for a particular analysis, you know where to go to look for it; right?

A.  Yes, I do.

Q.  And you would do that as part of your job; right?

A.  Yes.

Q.  You wouldn't just guess what the policy or procedure is; right?

A.  No, I would not.

Q.  You also have policies and procedures for preparing reports; right?

A.  Yes.

Q.  And you have policies and procedures for, for example, documenting the evidence that you receive?

A.  Yes.

Q.  You have policies and procedures to document the chain of custody of items that you receive?

A.  Yes.

Q.  And by that I mean that, for example, every time a piece of evidence or property that's received by the lab, every time it's touched by a person, it's logged; right?

A.  Every time custodies change, it is logged.  Yes.

Q.  So, for example, after you analyze something and you give it to someone else's custody, that transfer is documented and

A000723

logged in a document; right?

A.   It's logged electronically, yes.

Q.   It's logged electronically?

A.   Yes.

Q.   It's not a handwritten log?

A.   Correct.

Q.   And this process is important to your work; right?

A.   Yes.

Q.   That process ensures the integrity and the accuracy of your work; right?

A.   It ensures part of it, yes.

Q.   And the documentation would also include, for example, the time and the date that you transfer custody of an item to someone else; right?

A.   Yes.

Q.   And it would also document who actually receives it?

A.   Yes.

Q.   And for example also, when an item is placed in storage, that would be documented; right?

A.   Yes.

Q.   And when it's removed from storage, it's also documented?

A.   Yes.

Q.   You also have communication logs; is that right?

A.   Yes.

Q.   And those are logs that document the communication, verbal

A000724

or otherwise, between employees of the lab; right?

A. Some of the communications, yes.

Q. So, for example, if while you're working on something you make a phone call to another employee about the item of evidence or about your examination, you have a record of that?

A. Within the communication logs, sometimes, yes.

Q. And if you had an email exchange with someone about your work, that would be documented in the communication log?

A. A contributor requesting an examination, or the laboratory suggesting a different type of examination, yes.

Q. So, those sorts of things are important to record; right?

A. Yes.

Q. And so, with respect to your analysis itself, your personal analysis, you have also policies and procedures that you must follow; right?

A. Yes.

Q. And you follow them to the tee; right?

A. Yes.

Q. You don't cut corners?

A. No.

Q. And while you're conducting your analysis, you take notes?

A. Yes.

Q. Right?

A. Yes.

Q. For example, in this analysis, this overall analysis that

A000725

you conducted for this case, can you estimate how long it took you, how many hours?

A. Total hours? I would have to look at my notes. I would guess maybe ten. Maybe. I don't recall honestly. It was a while ago.

Q. And so, during that ten hours or more of your analysis, you took notes of your work; right?

A. Yes. I took notes with respect to the examinations that I performed.

Q. And you didn't cut any corners, did you?

A. No.

Q. You took copious notes; right?

A. In my opinion, yes.

Q. And in fact, your notes were turned over to the prosecution; right?

A. Yes.

Q. And eventually turned over to the defense; right?

A. That's my understanding. Yes.

Q. And your notes of your analysis were over 300 pages; right?

A. Well, my case notes describing the process about the examinations that I performed, I call those my notes. My actual examination documents of the results from all the instruments that I used that would be over 300 pages. Yes.

Q. And you take notes while you're actually doing the examination; right?

A000726

A.   Yes.

Q.   You wouldn't wait to do that until later; right?

A.   Well, later in the sense of minutes.

Q.   Minutes.  Okay.  And it's important to take copious notes because then those notes have to be transcribed into a report; right?  A typed report?

A.   Yes.  So, again, speaking about my notes covering the examinations I performed, as opposed to all of the printouts from the instruments that I use, all of that data, those are the results of my examinations.  And the report that I write is based on those results.

Q.   And you personally prepare that final report; right?

A.   Yes.

Q.   And that report includes your findings; right?

A.   Yes.

Q.   And your conclusions?

A.   Yes.

Q.   And your opinions, of course?

A.   Yes.

Q.   And then after you prepare that report, that report is reviewed by someone else; do I have that right?

A.   Yes.  It is reviewed both administratively and technically.

Q.   So, does that mean it's reviewed by two other people?

A.   It can be two, but it's usually one person.

Q.   And the purpose of that due process is to ensure its

A000727

accuracy; right?

A. Yes.

Q. Obviously, the accuracy of your work is critical; right?

A. Yes.

Q. You know that your work and your opinions can be used as evidence in a criminal case; right?

A. Yes.

Q. You want to make sure you don't make any mistakes; right?

A. Correct.

MS. GALLICCHIO: I have nothing further. Thank you very much.

THE COURT: Any redirect?

MS. CROWLEY: No, Your Honor.

THE COURT: All right. You can step down. Thank you, Mr. Gillette. You can leave that stuff there.

Next witness for the government?

MS. CROWLEY: Yes, your Honor. The government calls Christopher Rigopoulos.

I'd also like to read a stipulation, your Honor.

THE COURT: Okay.

MS. CROWLEY: This is Government Exhibit 2009.

THE COURT: Okay. Raise your right hand, sir.

CHRISTOPHER RIGOPOULOS,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

**A000728**

THE WITNESS: My name is Christopher Rigopoulos.

MS. CROWLEY: "It is hereby stipulated and agreed between the parties that, one, Government Exhibit 200 is a true and accurate chart, listing certain items collected by law enforcement during the search of 679 Ocean Parkway, Apartment 3J; Brooklyn, New York, on December 11th, 2017. The left column on Government Exhibit 200 contains the FBI lab item number assigned to each item. The middle column on Government Exhibit 200 contains the corresponding government exhibit number assigned to each item, and the right column on Government Exhibit 200 contains the description of each item."

So, your Honor, at this time we would offer Government Exhibit 2009, which is the stipulation and Government Exhibit 200, which is the chart it references.

THE COURT: Okay. Any objection?

MS. GALLICCHIO: No objection.

THE COURT: So, Government Exhibits 2009 and 200 are received.

(Government's Exhibits 2009 and 200 received in evidence)

You may proceed with Mr. Rigopoulos.

MS. CROWLEY: Thank you.

DIRECT EXAMINATION

BY MS. CROWLEY:

Q. Good afternoon, sir. Where do you work?

A000729

A. Good afternoon. I'm an FBI special agent. I work at the FBI laboratory in Quantico, Virginia.

Q. And which unit do you work in at the FBI lab?

A. I work in the explosives unit.

Q. What's your position at the FBI lab?

A. I'm an explosives and hazardous device examiner.

Q. Do you have any other titles?

A. I do.

Q. What's the that?

A. I'm also a supervisor special agent bomb technician.

Q. For approximately how long have you been an explosive and hazardous device examiner at the FBI lab?

A. I've been an examiner for approximately 12 years.

Q. Briefly, what are your duties and responsibilities as an explosive and hazardous device examiner?

A. So, my duties include being what we call request coordinator. And that's a position when there's a bombing case or a case involving an explosive device, the evidence will come to our laboratory and it will come to myself and my technician. And we would check the evidence in. We make sure it matches what the field is sending us. We also check it for safety. Because, as a bomb or pieces of a bomb we have to make sure that the examiners looking at this are safe. So, we do safety checks on these items.

Once they come in, we'll take photographs and

A000730

documentation, inventory these items, and then we'll set a laboratory plan. This plan is how we move it through the lab, through all the different disciplines, fingerprints to DNA to tool marks. Ultimately we do the forensic reporting of how the bomb works, the components associated with it. And we will do a conclusion based upon our examination.

(Continued on next page)

A000731

**CERTIFICATE OF SERVICE**

I certify that a copy of this six volume appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.**, Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
          October 4, 2021

　　　　　　　　　　　　　　　　 /s/
                                        **COLLEEN P. CASSIDY**