# 21-1058-cr

**United States Court of Appeals
for the Second Circuit**

—————————————

Docket No. 21-1058-cr

—————————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

—————————————————

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT AKAYED ULLAH
VOLUME IV**

FEDERAL DEFENDERS OF NEW YORK, INC.
 APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 Of Counsel

**TABLE OF CONTENTS TO THE APPENDIX**
**VOLUME IV**

District Court Docket Sheet,
    S.D.N.Y. 18 Cr. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0004

Indictment, filed January 10, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0021

Defendant's Motion to Dismiss Counts,
    dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0030

Memorandum in Support of Motion to Dismiss,
    dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0031

Government's Memorandum in Opposition to Motion to Dismiss,
    dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0046

Defendant's Reply in Support of Motion to Dismiss,
    dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0084

Court Order Denying Motions, dated October 4, 2018 . . . . . . . . . . . . . . . . . . . . . A 0104

Defendant's Motion in Limine, dated October 5, 2018 . . . . . . . . . . . . . . . . . . . . . A 0110

Defendant's letter to District Court regarding Rule 29 and Jury Charge
    Issues, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0126

Government's letter to District Court regarding Jury Charge on Attempt,
    dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0133

Defense Letter in Support of Rule 29 Motion and in Opposition to
Government Charge Requests, dated November 3, 2018 . . . . . . . . . . . . . . . . . . . A 0135

Government's Letter re Jury Charge and Rule 29 Motion,
    dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0142

Defendant's Objections to Proposed Jury Instructions, dated November 4, 2018 . . . . . . A 0147

Trial Transcript, dated October 29, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0151

Trial Transcript, dated October 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0159

Trial Transcript, dated October 31, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0325

Trial Transcript, dated November 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0575

Trial Transcript, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0833

Trial Transcript, dated November 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0925

Trial Transcript, dated November 6, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1136

Defendant's Post-trial Motion for Acquittal, dated December 6, 2018 . . . . . . . . . . . . . . . A 1154

Memorandum in Support of Motion, dated December 6, 2018 . . . . . . . . . . . . . . . . . . . . . A 1155

Government's Memorandum in Opposition to Motion for Acquittal,
        dated December 20, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1186

Reply Memorandum in Support of Motion for Acquittal,
        dated January 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1214

Court's Order for Supplemental Briefing,
        dated July 25, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1223

Defendant's Supplemental Memorandum in Support of Rule 29 Motion,
        dated September 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1224

Government Memorandum in Opposition to Supplemental Motion,
        dated October 22, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1248

Defendant's Reply Memorandum,
        dated November 5, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1275

District Court's  Opinion & Order,
        filed January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1295

Sentencing Memorandum with Exhibits A-I,  dated March 25, 2021 . . . . . . . . . . . . . . . A 1313

Pimentel Letter, dated September 18, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1370

Sentencing Transcript, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1375

Judgment in a Criminal Case, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1420

Notice of Appeal, dated April 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1428

Government Exhibit 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1429

Government Exhibit 1001-02 (Submitted in attached DVD) . . . . . . . . . . . . . . . . . . . . . . A 1430

Q. Approximately how many explosive-related cases have you worked on in your time at the FBI lab?

A. I have worked on hundreds of cases.

Q. How long have you worked for the FBI?

A. I have been a special agent with the FBI for over 21 years.

Q. What did you do before that?

A. Prior to the FBI, I was a gunnery sergeant in the United States Marines Corps. I was serving at Austin, Tennessee. I did that for approximately 13 years. I was also a deputy sheriff in the Knox County sheriff's department working patrol in Knox County. Besides that, I was also a captain with the Rural Metro Fire Department, which is a county fire department which serves the population in that area. I managed two fire stations and all the firefighters and all the operations that went with that to provide public safety to our citizens.

Q. When did you enlist in the Marine Corps?

A. The joined the Marine Corps in 1983, when I was 17.

Q. What, if any, explosive-related training did you receive in the Marines?

A. In the Marines Corps my title, my job, was a combat engineer. Combat engineers in the Marine Corps are designed as Marines, and in the infantry, who would remove obstacles that might be in the way of an attack. With that, we had explosives training on how to remove obstacles. We also had land mine training in placing land mines and taking them out. But our

A000732

bread-and-butter work was doing demolition procedures in a marine type environment.

Q. Did you hold any supervisory positions in the Marines?

A. I did. Ultimately, I was a gunnery sergeant. My platoon under me, I was their platoon sergeant as well.

Q. When did you leave the Marine Corps?

A. I left the Marine Corps in 1997, when I got my appointment to be a special agent with the FBI.

Q. What was your first assignment with the FBI?

A. My first assignment was in Philadelphia. I was assigned the carjacking squad. We also did the chop shops. So it was interstate theft of government property, things of that nature.

Q. How long were you on the carjacking and chop shop squad?

A. Approximately nine months.

Q. What was your next assignment over that?

A. My next assignment was in a resident agency in Camden/ Cherry Hill, New Jersey. My assignment there was pretty much whenever the phone rang, we would interview the caller and take the information and open up the investigation. It was a smaller office, so it could be anything from bank robbery to a computer fraud.

Q. How long were you at Camden, New Jersey?

A. I was in that office for approximately six months.

Q. Where did you go after that?

A. After that I was assigned to the joint terrorism task force

A000733

in Philadelphia and the domestic terrorism squad.

Q.   What was your role on the joint terrorism task force?

A.   My role on the joint terrorism task force was as special agent and as an investigator for terrorism crimes.  That included taking on other responsibilities that the squad pitched to me at that time.

Q.   Could you describe some of those.

A.   Certainly.  I became a special agent bomb technician for the FBI in 1999.  That included going to the hazardous devices school in Redstone arsenal in Huntsville, Alabama.  That position allowed me as a special agent, as an investigator, to investigate crimes involving bombs or explosive devices.

The job of a bomb technician is to make that evidence in a safe condition because a bomb is evidence involved in a crime.  We would do that type of work and we would make the evidence safe, and then we would forward it to the explosives unit in Quantico, Virginia, for further explication.

Q.   Did you have any further responsibilities or roles while you were at the Philadelphia joint terrorism task force apart from special agent bomb tech?

A.   I did.  I was also the primary weapons of mass destruction coordinator.  In that position you would be the liaison with the local public safety, the fire departments, emergency medical services, all the public emergency management agencies. Our territory would be 44 counties in Pennsylvania that we

A000734

managed under our umbrella. We would make liaisons and relationships with some of those individuals in case there was a nuclear, chemical, biological type of attack, then we could respond with our resources to enhance their global response.

Q. Approximately how many explosive-related cases did you work on when you were a special agent bomb technician in the field?

A. I would say several.

Q. Did some of those investigations involve pipe bombs?

A. They did.

Q. Were those both pre-blast and post-blast investigations?

A. They were.

Q. Could you explain what that means.

A. Pre-blast means the bomb has not gone off, it's still intact, and in that sense from my description it's still dangerous, it could still hurt somebody. Part of our response in those types of incidents is to ensure public safety and hopefully remotely take that bomb and put it in its component pieces so it could be analyzed without hurting anybody.

Post-blast means the bomb has gone off. Now that improvised explosive device is in potentially thousands of pieces. There is a very specific way we collect that type of evidence that we learn how to do. So we submit it to the laboratory for further analysis. So the post-blast is another way that we will approach a bomb scene.

Q. About how long were you a bomb tech in Philadelphia?

A000735

A.   I was in Philadelphia approximately nine years.

Q.   What did you do after that?

A.   After that position, I took a promotion to the explosive unit in Quantico, Virginia, as a supervisory special agent for the business I described as an explosives and hazardous device examiner.

Q.   What, if any, training did you receive in order to become a explosives and hazardous device examiner?

A.   The training involved examining explosives and hazardous devices.  The training for hazardous devices includes chemistry classes, theory involving physics.  It involved touring factories that make explosives or components that they might use, to understand what we are looking at as we are looking at pieces and parts from an IED.  It also involved oral boards regarding explosives, oral boards regarding our administrative procedures because the details are so important in our forensic examinations.

We also had evidence training which involved post-blast, and then we would do teaching at schools in the field to the FBI field offices as well.

Q.   Have you trained others in the analysis of explosive-related items?

A.   I have.

Q.   Have you investigated bombing scenes outside the United States?

A000736

A.   Yes, I have.

Q.   Could you describe some of them.

A.   Serge.  Some bomb scenes I have responded to include Nairobi, Kenya, where our embassy was attacked in 1998.  I have also conducted investigations in Turkey for a suicide bomber in Ankara, a mall bombing in Greece, a suicide bomber in Stockholm Sweden.  I have also done two assassinations on two separate occasions in Beirut, Lebanon.  I have responded to a mall attack, Westgate Mall, another one in Kenya, as well as scores of responses in Iraq as a bomb technician in Baghdad.

Q.   Have you been involved in the investigation of bombings inside the United States?

A.   I have.

Q.   Could you describe a couple of them briefly.

A.   There were multiple bombings in the United States or pre-blast events also.  One, as an example, would be the Aurora theater shooting, the case in Aurora, Colorado, where the subject had a bomb wired up in his apartment to cause damage, inflict death, in the residence of that apartment that he lived in.  I responded to that scene to help make it safe, break it down into component parts, and examine those pieces.  There are also other cases involving other explosive devices that we have responded to and collected and brought back to the laboratory for further examination.

Q.   Have you testified in court before?

A000737

A.    I have.

Q.    When?

A.    I've testified in federal court in Tucson, Arizona; Anchorage, Alaska; here in New York, Long Island; as well as Boise, Idaho; and in state court in Aurora, the theater shooting subject.

Q.    Have you been qualified as an expert witness before?

A.    Yes, I have.

Q.    How many times?

A.    In all those cases I just cited.

          MS. CROWLEY:  Your Honor, the government offers supervisory Special Agent Christopher Rigopoulos as an expert in the field of explosives analysis.

          THE COURT:  Any objection?

          MS. GALLICCHIO:  No objection.

          THE COURT:  Agent Rigopoulos is recognized as an expert in the field of explosives analysis.  You may proceed.

Q.    What is an IED.

A.    An IED is an improvised explosive device.  It's a device that's been manipulated.  It's not commercial, it's not military.  It's been altered to cause an explosion.

Q.    What are the components of an IED?

A.    The typical components we see in an IED could be an electrical fusing system, which might have a power source, wires, switches, and initiator, and then the main explosive

A000738

charge.  Or it could be a nonelectric system, in which it might have a explosive charge, perhaps a main charge container, and it may have a fuse you might light to provide heat for the explosives.

Q.  Let's talk each of the components.  What is an explosive main charge?

A.  An explosive main charge is typically either high or low. High explosives are things you might be familiar with like TNT, dynamite, C40 that you might have seen in films or television shows.  Low explosives are typically powders that we see that are designed to burn.  Those could be like black powder, smokeless powder, flash powder, or other improvised mixtures that fall into that category.

Q.  Can you explain how low explosives work in an IED.

A.  Low explosives, as I mentioned, are designed to burn.  If you burn them in the open, their gases will be released in the atmosphere, the path of least resistance.  But in an improvised explosive device, I mentioned the term "main charge container," which the powders would be put in.  Because of that container, as those powders are initiated, they start burn.  When they burn, they are releasing gases, releasing energy.

And it happens at a very fast rate.  Because of the confinement of that container, the rate increases even faster and the pressure rises.  When that container fails because it is not designed to hold that pressure, it causes an explosion.

A000739

That explosion will have the container now potentially moving out in pieces flying in all directions.

Q. What causes the low explosive to begin to burn?

A. The main charge container holding those low explosives has to be initiated by something. I mentioned electrical fusing system and a nonelectrical fusing system. A common denominator for both of those is heat. If you light the fuse, that burning fuse may move into that container and ignite the powders. If it's an electrical fusing system, the initiator system will provide the heat to that powder as well.

Q. What is an electrical fusing system comprised of?

A. An electrical fusing system has a power source. It could be a battery you might find at home in your smoke detector. It has wires. The wires allow current to flow. It has switches. Switches allow control of that current. Ultimately it's terminating in an initiator. The initiator is the component that provides the heat whenever the circuit is closed. That heat is what's going to provide the energy required to initiate that explosive material.

Q. You also mentioned a main charge container. What is that?

A. A main charge container, once again, is a container which is containing that low explosive material, which is powder. It could be anything that would hold it and allow a level of confinement when that initial energy is fed to that explosive material causing it to burn. That main charge container is

A000740

Case 1:18-cr-00681-RJS Document 420 Filed 03/15/18 Page 13 of 283

designed in the IED to hold that powder.

Q. Could anything besides initiation through a fusing system cause a low explosive to burn within an IED?

A. Certainly. Different types of low explosives are made with different things, but the common practice that we are making sure everyone is aware of when they work with these materials are low explosives are typically sensitive to heat, shock, friction, impact, and electrostatic discharge.

Q. When you say shock, what do you mean?

A. A shock, like if there is an explosion that is causing a shock wave, that shock wave could transmit into this material, causing it to react.

Q. When you say friction, what do you mean?

A. Friction, that's when there are two surfaces that are rubbing together. That contact as those surfaces are moving across each other generates heat, and that heat could be enough to potentially ignite that material.

Q. You discussed main charge containers. Are you familiar with the term "concealment container"?

A. Yes, I am.

Q. What is that?

A. A concealment container is a container or a type of material that is purposed to hide from public view the improvised explosive device. If the public saw the concealment container, it would like benign. It would look like it

A000741

Case 1:12-cr-00816-RJS Document 42 Filed 11/15/18 Page 14 of 283

belonged there or look normal, so to speak. With the lack of a concealment container, you would see potentially the IED out in the open all the time, and that might defeat part of the employment purpose.

Q. What are some examples of concealment containers that you have seen used in IEDs?

A. Examples that we have seen frequently are backpacks, they could be a lunch box, they could be boxes or toolboxes, it could even be a car. A vehicle itself could be concealing the IED on the inside, so that could act as a concealment container.

Q. Are you familiar with the term "fragmentation"?

A. I am.

Q. What is it?

A. Fragmentation, there are two ways to look at this. If we looked at a metal pipe, if the metal pipe fragmented and went out in all directions, that fragmented pipe is now fragmentation. There is also fragmentation that could be added to the IED as enhancement. That could be something that is added to make the IED more dangerous, more lethal as a weapon.

Q. Is fragmentation a necessary component for an IED to function?

A. No, it is not.

Q. What are some examples of fragmentation that you have seen added to IED?

A000742

A. Examples could be ball bearings, BBs from a child's pellet rifle. It could be nails, it could be washers, screws, nuts, bottles. Anything with some type of mass would be potential fragmentation utilized in an IED.

Q. Agent Rigopoulos, were you involved with the FBI analysis in this case.

A. I was.

Q. What was your role?

A. I was what we call a request coordinator. That entails receiving the evidence as I briefly mentioned earlier. It involves setting up the lab plan, coordinating with all the examiners in this investigation the movement of the evidence, ensuring that the correct order occurred, and closure and communication with the case agent and the contributing field office.

Q. Over the course of this investigation, did you review explosive-related evidence relating to a particular crime scene?

A. I did.

Q. What was that crime scene?

A. The crime scene was the Port Authority in New York.

Q. Did you also review evidence collected pursuant to a search of a residence?

A. Yes, I did.

Q. What was the address of that residence?

A000743

A.   The address was on Ocean Parkway, apartment 3J.

Q.   Can you walk us through just generally the procedure that you followed in conducting your analysis.

A.   Yes.  As the evidence comes in, once again we would review the document that accompanied the evidence.  Is everything in this box that they sent?  If it's not, we could talk to the contributor and say we don't see this piece that's missing.  We want to ensure that it is accurate.  Accuracy is very important in our line of work.

We are also focusing on chain of custody.  As it comes in, we sign for everything and everything is accounted for.  Once we identify that inventory, we take inventory photographs.  We photograph each item to get the condition that it's in when it arrives in the laboratory before the examinations occur, if the exams allow for that.

Once we complete that step, then we make a lab plan, as I mentioned.  We will contact different examiners in a certain order and we will provide them the evidence for their forensic explication.

Q.   Did you review every piece of evidence that was received at the FBI lab in connection with this investigation?

A.   Yes.

Q.   Was every piece of evidence that was received at the FBI lab photographed?

A.   Yes.

A000744

Q.  Have you reviewed those photographs?

A.  I have.

Q.  I'm handing you Government Exhibit 900.  Do you recognize this?

A.  Yes, I recognize this.

Q.  What is it?

A.  This is a CD with a label Government Exhibit 900, and it has my initials on it.

Q.  Have you reviewed the contents of this disc?

A.  I have.

Q.  What does the disc contain?

A.  The disc contains inventory photographs that we took when evidence came into our lab report.

MS. CROWLEY:  Your Honor, the government offers Government Exhibit 900 as well as the photographs it contains which I am going to read right now.  It's a rather lengthy list.  Government Exhibit 104-1A, 105-1A, 105-1B, 106-1A, 106-1B, 106-1C, 107-1A, 107-1B, 108-1A, 108-1B, 109-1A, 109-1W, 109-1C, 109-1D, 109-1E, 110-1A through 110-1E, 111-1A, 113-1A, 114-1A, 115-1A, 116-1A, 117-1A, 118-1A, 119-1A, 120-1A, 121-1A, 122-1A, 123-1A, 124-1A.  Halfway through.

124-1B, 125-1A, 126-1A, 126-1B, 127-1A, 128-1A, 129-1A, 129-1B, 130-1A, 130-1B, 131-1A, 131-1B, 131-1C, 131-1D, 131-1E, 131-1F, 131-1G, 131-1H, 131-1I, 132-1A, 132-1B, 133-1A, 134-1B, 135-1A, 135-1B, 136-1A, 137-1A, 138-1A, 139-1A, 203-A,

A000745

204-A, 205-A, 205-B, 206-A, 207B, 207B, 207D, 207-E, 207-F, and 302-1A.

THE COURT: Could you say that again once more. The court reporter it had down. We will confirm those numbers. That's what's on 900, right?

MS. CROWLEY: That's correct, your Honor.

THE COURT: You are seeking to introduce that now?

MS. CROWLEY: Yes. Then we will publish them.

THE COURT: Any objection?

MS. GALLICCHIO: No.

THE COURT: Government Exhibit 900 and its contents which the numbers we read into the record received. Go ahead.

(Government's Exhibits 104-1A, 105-1A, 105-1B, 106-1A, 106-1B, 106-1C, 107-1A, 107-1B, 108-1A, 108-1B, 109-1A, 109-1W, 109-1C, 109-1D, 109-1E, 110-1A through 110-1E, 111-1A, 113-1A, 114-1A, 115-1A, 116-1A, 117-1A, 118-1A, 119-1A, 120-1A, 121-1A, 122-1A, 123-1A, 124-1A, 124-1B, 125-1A, 126-1A, 126-1B, 127-1A, 128-1A, 129-1A, 129-1B, 130-1A, 130-1B, 131-1A, 131-1B, 131-1C, 131-1D, 131-1E, 131-1F, 131-1G, 131-1H, 131-1I, 132-1A, 132-1B, 133-1A, 134-1B, 135-1A, 135-1B, 136-1A, 137-1A, 138-1A, 139-1A, 203-A, 204-A, 205-A, 205-B, 206-A, 207B, 207B, 207D, 207-E, 207-F, 302-1A, and 900 received in evidence)

Q. What was the analysis you performed with respect to the evidence collected at the Port Authority crime scene?

A. The analysis I personally performed was to examine the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000746

components in the post-blast related event and determine and determine how they functioned, what the components were, and to render and opinion on the condition of the evidence and the potential.

Q. Did you prepare a report in connection with your analysis?

A. I did.

Q. Did you come to any conclusion from your analysis?

A. I did.

Q. Generally speaking, what conclusion did you reach?

A. In general, submitted to me for examination were the disassembled remains of an improvised explosive device. That device properly initiated could potentially cause property damage, personal injury, or death.

Q. Did you come to any conclusion about how the improvised explosive device in this case likely functioned?

A. In my opinion, this device functioned with an electrical fusing system as I described before, which was also command initiated.

Q. Were you able to identify the components of this device?

A. We were.

Q. What were they?

A. The components of this specific IED were a power source, a 9-volt battery. It also included wires. Wires conduct the current. It also had what we call plastic wire nuts. These wire nuts are designed to connect two separate wires together

A000747

to allow the current to flow.  There were also the remains of an initiator.  This initiator was specifically pieces of a Christmas tree lightbulb, which you may be familiar with. There was also a main charge container and the residue of the explosive main charge.

Q.  What was the explosive main charge in this device?

A.  In my discipline as an explosives and hazardous device examiner, I rely on our explosive chemists to provide the results from their examination, what the charge is.  In this case it was a potassium chloride based low explosive material per his reporting.

Q.  Who is "his"?

A.  The examiner is Robert Gillette.

Q.  What, if any, evidence did you examine that was consistent with that of a main charge container?

A.  The evidence that consisted of a main charge container in this case was a metal type pipe called pipe nipple.  It also had a metal end cap which would be screwed on one end and another metal component fixture which was attached to the other end of the pipe.

MS. CROWLEY:  Mr. DeLuca, please public Government Exhibits 116-1B, 121-1B, and 134-1B, which are in evidence.

Q.  What are the items depicted in these photographs?

A.  The items depicted in the photographs include pieces of the main charge container that are in a disassembled state.

A000748

Case 1:12-cr-00016-RJS Document 42 Filed 03/20/17 Page 21 of 283

Q. Do these photographs depict the condition that these items were in when you examined them?

A. They do.

Q. What did you notice about the condition of these items?

A. One of the things I noticed regarding this evidence is it has been exposed to an explosive event. What that means is an explosion happened very close to the surface of this material. You can see the jagged edges involved. You can see the ripping of the metal. This is the result of that explosion.

MS. CROWLEY: Please publish, Mr. DeLuca, what is in evidence as Government Exhibits 126-1A and 126-1B.

Q. What are we looking at in these photographs?

A. Exhibit 126-1A and 1B are the same item. It's just we photographed one end of it and then we turned it over for the other. It's a metal component which served as an end cap to this main charge container and pipe nipple.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibits 105-1A and 105-1B.

Q. What are we looking at in these photographs?

A. 105-1A and 1B are a metal end cap which in this case is designed to be screwed on to the end of the pipe nipple. If you notice closely, in the center of that metal end cap is also what is called a priming hole that is drilled in the center.

Q. What is a priming hole?

A. A priming hole is something we see in IEDs of this nature

A000749

which allows the fusing system to be inserted into the main charge container, in this case the metal pipe. Also, in this case an electrical fusing system, the wires themselves would go through this hole into that pipe, allowing the initiator, that Christmas tree lightbulb, to have access and be exposed to that explosive material.

Q. You mentioned that this end cap was designed to be screwed onto the metal pipe nipple. How do you know it was designed to be screwed on?

A. If you look at the exhibit on 105-1B, you can see the inside of the end cap. It has threads. These metal threads would be screwed onto the metal threads of the metal pipe.

MS. CROWLEY: Mr. DeLuca, please publish what is in evidence as Government Exhibits 107-1A and 129-1A.

Q. What are these items?

A. The items you see in 107-1A include a fragmented piece of the threading of the metal. There is also a square piece with a hole in it that came from that metal component, that piece of the end cap. In Exhibit 129-1A you see the fragmented remains of the threading which came from that metal pipe.

Q. You mentioned that you examined evidence from the Port Authority crime scene consistent with an electrical fusing system.

MS. CROWLEY: Mr. DeLuca, could you please pipelines Exhibits 109-1B and 109-1C.

A000750

Q. What are these items?

A. The items we see in Exhibit 109-1B and 109-1C include wiring and the disassembled remains of the initiating component, the Christmas tree lightbulb. Because of the fragmented nature of the wires -- you see they are ripped, they are torn, and the plastic is basically smashed -- that tells me it's in close proximity to that explosive event.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 111-1A.

Q. What is this item?

A. This is item is also electrical wire. If you note, in this case there is no damage. You can see the black plastic insulation that you see in the photograph. This wire was logically attached to the power source which was providing the current for the fusing system.

Q. What was the significance of the fact that this wire was not damaged?

A. The significance is it's not close to the explosive event so there's distance between the explosion and this exhibit. Also, from further examination of evidence and photographs, this wire was under the concealed garments that were utilized in the employment of this IED.

Q. What is the orange item attached to the black and green wires?

A. The orange item is an insulated what is called a plastic

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000751

wire nut. Once again, it is designed to connect two separate wires together so current can flow through them.

Q. Did you analyze any other wire nuts collected from the Port Authority crime scene?

A. Yes, I did.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 119-1A.

Q. What's this?

A. This is the other plastic wire nut that was submitted as evidence from the crime scene.

MS. CROWLEY: Mr. DeLuca, please publish what is in evidence as Government Exhibit 113-1A.

Q. What is this item?

A. This item is a Duracell brand 9-volt battery. In this instance it would be utilized in the IED as a power source.

Q. Can you explain how it was used as a power source.

A. There is potential energy stored in this battery. When the wires are attached to those open terminals that you can see in the photograph, it allows the current to flow. We say it closes the circuit. As that current flows from this power source, it goes to the initiator, which is a Christmas tree lightbulb. Those lightbulbs have a very thin wire that's on the inside of it. That wire, when the electrical current is applied, generates heat because of its resistance. That heat is what is sufficient in this heating system to cause the

A000752

explosive material to function.

MS. CROWLEY:  Mr. DeLuca, please publish what is in evidence as Government Exhibit 117-1A.

Q.   Do you recognize this item?

A.   I do.

Q.   What is it?

A.   117-1A are the fragmented remains of a Christmas tree light, or the initiator, in the electrical fusing system.

Q.   Did you identify any other pieces of Christmas tree lights in your analysis of the items collected at the Port Authority scene?

A.   Yes, I did.

MS. CROWLEY:  Mr. DeLuca, please publish Government Exhibit 109-1C, which is in evidence.

Q.   You talked before about the green wires in this photograph. What other items were you able to identify that are depicted in this photograph?

A.   If you look at the photograph, there is also some smashed remains of the Christmas tree lightbulb component.  There is a curved plastic piece, which is the housing for the fitting. Then there is also a smashed piece of plastic which would have housed the wires which would have had the thin wire I described a moment ago.

Q.   You said a curved piece of plastic.  Where in the photograph is the curved piece of plastic?

A000753

A.   In the upper right quadrant, the piece of wire sitting on top of it.

          MS. CROWLEY:   Mr. DeLuca, can you circle that.

Q.   Agent Rigopoulos, does this capture the piece of Christmas tree light that you just discussed?

A.   It does.   Right below it is pieces, remains of the lightbulb remnants itself.

Q.   In your experience as a bomb technician and as a forensic examiner, have you seen Christmas tree lights used in IEDs before?

A.   Certainly I have.

Q.   How have you seen them used?

A.   I have seen them utilized as initiators because they are easily obtainable.   They are easy to get.   They are very efficient as far as an IED to provide the energy required to set up powders that might be used in low explosives.

Q.   I'm sorry?

A.   To set off the powders that may be utilized in a low explosive in these cases.

Q.   When used in IEDs, are Christmas tree lights modified in any way?

A.   They are.   Christmas tree lightbulbs, if you look at it, they have a glass covering.   What I typically see in the cases that I have experience with, the glass will be tapped away, it will be broken, so now that thin wire that's inside that

A000754

Christmas tree lightbulb is now is exposed. That exposed wire can be in close proximity or touching the explosive material when the current is applied.

MS. CROWLEY: Mr. DeLuca, if you could please put up on the green Government Exhibits 105-1A, 109-1C, 111-1A, 113-1A, 116-1B and 126-1A.

Q. Agent Rigopoulos, using these items that we have just discussed, could you please describe how the fusing system in this device likely functioned.

A. Certainly. These photographs are in a fashion that you look at them at the top left with the battery. That is the power source. Go to the center top photograph. That is the initial wires that were attached to that battery causing the circuit to close. Those wires were then attached to the ones that are fragmented in the top right photograph.

Those wires in that photograph would have terminated with the Christmas tree lightbulb. As I mentioned, that's where the heat would have been generated. Those wires would have been inserted through the priming hole of the end cap that you see in the lower right photograph.

Imagine the Christmas tree lightbulb and the light and the wires inside of this pipe now. The powders could be put inside the main charging container, which is the pipe in the center photograph on the bottom. Then the metal component on the left would cause confinement when it was applied to that

A000755

main charge container at the end. And you have your components wired for this IED.

Q. You testified before that electrical fusing systems also contain what is called a switch. What is that?

A. A switch is a component that we would see typically that is designed to close the circuit. It allows the current to flow on demand so to speak.

Q. What are some examples of switches that you have seen used in IEDs.

A. Switches I have seen might include a light switch like you have in your house. It could also be one like a pull fan that one would pull causing the circuit to open or close or the power to go on or off. It could even be something a little more exotic, like bare wires that are going to loop. If it is pulled together and those bare wires touched, the circuit could close.

Q. Did you review any physical evidence of a switch recovered from the Port Authority crime scene?

A. I did not.

Q. What, if anything, did you conclude about what was used as a switch in this device?

A. Based on the totality of the evidence that I examined in this investigation, I determined that an individual was the switch, taking the bare wires and physically touching them to the terminals which you can see on the 9-volt battery.

A000756

MS. CROWLEY: Mr. DeLuca, please publish what is in evidence as Government Exhibit 106-1B.

Q. What are these items?

A. Exhibit 106-1B shows the fragment remains of miscellaneous fabric and also has metal type of sheet metal screws. It has a small piece of plastic in the center.

Q. Did you examine the metal sheet screws as part of your analysis in this case?

A. I did.

Q. Why?

A. The metal sheet screws in my examination performed a function in this IED. They were an enhancement. They were added to this IED, which adds an enhanced level of lethality. It makes it more deadly than it not being there. These metal sheet screws as we described earlier would be fragmentation added to this device.

Q. What did you notice about the condition of the screws when you examined them?

A. The condition of the screws showed that they were in close proximity to an explosive event.

Q. How do you know that?

A. The damage that I observed on these screws is indicative of being involved in a post-blast.

MS. CROWLEY: You can take that down, Mr. DeLuca.

Q. Did you also review evidence from the Port Authority crime

A000757

scene consistent with a concealment container?

A. I did.

Q. What evidence was that?

A. The evidence involving a concealment container more specifically was concealment garments, clothing that was worn to hide the IED from view.

MS. CROWLEY: Mr. DeLuca please publish what is in evidence as Government Exhibits 131-1B and 131-1E.

Q. What are these items?

A. Exhibit 131-1B is a shirt. 131-1E is another shirt with blood on it and some sooting.

Q. I'm sorry. You said blood and?

A. Blood and some sooting, like soot.

Q. How are these items relevant to your analysis in this investigation?

A. Based on the damage to the concealment garments in the proximity of the IED in this instance, it shows that they were just under it when the explosion occurred.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 131-1G.

Q. What is this item?

A. This item in 131-1G is a type of underpant or long underwear type of garment.

MS. CROWLEY: Mr. DeLuca, if you could put Government Exhibit 131-1G on the left-hand of the screen and H on the

A000758

right-hand side of the screen.

Q. What is the item depicted in Government Exhibit 131-1H?

A. 131-1H is another sheet metal screw.

Q. What did you notice about the screw when you examined it?

A. One thing I noticed was the color of material that was pretty much wrapped around that item itself.

Q. What color was it?

A. It's one that is similar to the item in 131-1G.

Q. What did you notice about the condition of the screw?

A. The condition of the screw, it also was exposed to an explosive event.

MS. CROWLEY: Mr. DeLuca, please publish what is in evidence as Government Exhibit 131-1F.

Q. What is this?

A. This is a pair of pants.

Q. What, if any, observations did you make when you examined these pants?

A. As these pants came into our evidence and we conducted an inventory and inventory photographs such as the one you are seeing here, I noticed on the front right pocket that there is a hole cut in the corner of that pocket where the material was separated from the pants.

MS. CROWLEY: Mr. DeLuca, could you zoom in on the front right pocket.

Q. Could you explain where the hole was that you located,

A000759

Agent?

A.  If you look at the pocket itself, there is an area in the lower left part of the pocket which has material that is cut away.

Q.  Can you explain how you located that hole in these pants.

A.  From my background and my experience, I've seen a tactic and procedure where a suicide bomber has had a hole in the right pocket --

THE COURT:  There is an objection.  I didn't hear what it was to.

MS. GALLICCHIO:  Relevance.

THE COURT:  Overruled.  I believe it is relevant.  Go ahead, you may answer.

A.  The case in question is the underwear bomber case where the subject had a pair of trousers, and a hole was cut in that right pocket, and the fusing system in this case was put through that hole, where it couldn't be seen from public view but where the bomber himself could have his hand in the pocket to deploy the function of the device.  I personally examined that evidence prior to going to Yemen to begin that investigation.  I observed that hole in that pocket.  So when this evidence came in, one of the first things I did, I went right to this point and I observed a similar type of TTP, tactic-technique-procedure.

Q.  Could you explain to the jury what TTP means.

A000760

A.   TTP is a tactic, technique, and a procedure.  It's pretty much what's going to happen when you try to deploy an IED event.  It's how it's employed, how you're hoping it would function.  They can be very similar on many different types of different bombings systems.  Those things would be recognized in our investigation.

MS. CROWLEY:  Mr. DeLuca, please publish what is in evidence as Government Exhibits 125-1A and 127-1A.

Q.   What are these items?

A.   These items in 1251A and 127-1A are white zip tie type material.

Q.   Did you review any video collected from the Port Authority crime scene?

A.   I did.

Q.   What was the video you viewed?

A.   The video was an individual walking through the tunnels and ultimately amongst people inside an enclosed area.  At the end of the video, there was an explosion involving that individual around those people inside the tunnel.

Q.   Why did you review that video?

A.   It gave me a perspective of the scene, of the surroundings, of the explosion itself when the explosion occurred.  In the video you could see the gases were expanding, you could see a visual flame area inside when that happened and the proximity of those around it.

A000761

Q.   Did you create any still shots from that video?

A.   I did.

MS. CROWLEY:  Mr. DeLuca, please publish for the witness and the court and the parties what has been marked for identification as Government Exhibits 918 and 919.

Q.   Do you recognize these photographs?

A.   I do.

Q.   What are they?

A.   Exhibit 918 is an individual walking --

Q.   Just one second.  Are these the still shots that you created from the video you reviewed?

A.   Yes, they are.

MS. CROWLEY:  Your Honor, the government offers Government Exhibits 918 and 919.

THE COURT:  Any objection?

MS. GALLICCHIO:  No objection.

THE COURT:  918 and 919 are received.

(Government's Exhibits 918 and 919 received in evidence)

THE COURT:  You can show them to the jury.

MS. CROWLEY:  Thank you.

Q.   What are we looking at in Government Exhibit 918, the photograph on the left?

A.   918 shows an individual walking in the tunnel among other people.  It's December, so it's cold outside, so the individual

A000762

has long pants and a jacket and a warm hat. The individual also has hands in his pockets as he's walking.

In Exhibit 919, that's the instant where the explosion occurs involving this IED and this individual. If you look carefully at 919, you can see the gases expanding, physically see the flames in two portions of this photograph where the gases are igniting and the pressure is expanding in the proximity of the individual and those around him in this instance.

Q. Are the flames the orange in the middle of the photograph on 919?

MS. GALLICCHIO: Objection: leading.

THE COURT: Overruled. You can answer.

A. Repeat the question, please, ma'am.

Q. Could you explain where the flames are in Government Exhibit 919.

A. The flames are physically in the center of the photograph. At the bottom is one. You see the red area. Then there is one that is a little bit above it to the left.

MS. CROWLEY: Mr. DeLuca, could you circle what was just described.

Q. Do these circles accurately depict or indicate where the flames are that you identified?

A. They certainly do, yes.

Q. Thank you. You mentioned on Government Exhibit 918 that

A000763

you observed the individual walking with his hands in his pockets. How, if at all, was that significant in your analysis?

A. It's significant based on, once again, the totality of the evidence and the fact that, as I mentioned initially, this is a command-initiated IED, which means it would be initiated on command. The fact that that individual has his hands in his pockets means he has positive control over the battery and the wires. So when those wires are touched to those two open terminals, the circuit would close, causing the explosion you see in Exhibit 919.

Q. Agent Rigopoulos, what, if anything, did you notice about the location where the bomb exploded?

MS. GALLICCHIO: Objection. Beyond the scope.

THE COURT: Beyond the scope of what?

MS. GALLICCHIO: Notice provided.

THE COURT: I'm going to allow that question. We'll see where it goes from there. What, if anything, did you notice about the location where the bomb exploded.

A. The location where the bomb exploded was in a confined area, i.e., the tunnel itself.

Q. Why was that significant in your analysis in this case?

A. In my analysis, when an explosive event such as this occurs post-blast, as the gases expand, they try to go on the path of least resistance. In the an enclosed area, the potential to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000764

increase the damage is enhanced because the gases have nowhere to go. So the deployment of an IED of this nature in this tunnel increases the potential of further damage.

MS. CROWLEY: Mr. DeLuca, please publish for the witness, the Court, and the parties what's been marked for identification as Government Exhibit 917.

Q. Do you recognize this photograph?

A. I do.

Q. Was this photograph submitted as a piece of evidence that you analyzed in this case?

A. Yes.

Q. Did you create the drawings and the text on this photograph?

A. I did.

MS. CROWLEY: The government offers Government Exhibit 917.

MS. GALLICCHIO: No objection.

THE COURT: 917 is received.

(Government's Exhibit 917 received in evidence)

THE COURT: Are you going to show it?

MS. CROWLEY: Yes.

Please publish it to the jury.

Q. Could you describe what we are looking at in this photograph.

A. In this photograph you see an individual lying on the deck.

A000765

I mentioned the concealment garments earlier to hide the IED from public view. They are now ripped and torn based on the explosive event. If you look carefully at the lower left corner, in that box reading "wire leading to pocket," that is that black electrical wire that is going under the concealment garments into the area of the right front pocket where in my opinion the wires were terminated, where the battery is.

If you look towards the right of that, I have another text box that says "end of wire and wire nut." That shows where the wires are joined in this case with the wire nut.

The other text box says "zip ties," and the arrows are pointing to two white color zip ties which are damaged based on this post-blast event.

You will also notice a laceration on the individual. In my opinion it indicates --

MS. GALLICCHIO: Objection. Beyond the scope and notice.

THE COURT: I think it is a going to ask you to rephrase the question and make it something that can be answered in two sentences.

MS. CROWLEY: Your Honor, I think he is finished with the answer.

THE COURT: Are you done with the answer?

THE WITNESS: Yes, your Honor.

THE COURT: In the transcript I don't think it

A000766

reflects that. Whatever you want. Next question.

MS. CROWLEY: You can take that down, Mr. DeLuca.

BY MS. CROWLEY:

Q. Agent Rigopoulos, did you come to a conclusion about what caused the explosion in the Port Authority?

A. Yes, I did.

Q. What was your conclusion?

A. My conclusion was that this IED was command-initiated.

Q. What is that mean?

A. Command-initiated, once again, is where an individual on command determines when the circuit would close in this case: when those two wires were touched to the power source, the 9-volt battery, and then the device would function as designed.

Q. In conducting your analysis and preparing your report, how, if at all, did you characterize the device that caused explosion in the Port Authority on December 11th?

A. In my report I described it as an explosive device, also known as a destructive device. It is designed with an electrical fusing system, and properly initiated and assembled, it could cause property damage, personal injury, or death.

Q. Besides ignition through the electrical fusing system that we just discussed, could anything else have caused this device to have exploded?

A. Yes.

Q. Could it have exploded if it was dropped or propelled?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000767**

Case 1:12-cr-00616-RJS Document 42 Filed 11/15/18 Page 40 of 258

MS. GALLICCHIO: Objection: leading.

A. It's possible.

THE COURT: It is leading. He has already answered the question. Next question.

Q. What else besides ignition through the electrical fusing system could have caused this device to have exploded?

A. It's possible, if the end dap was unscrewed, the friction might have initiated the powders.

THE COURT: Friction between what?

THE WITNESS: Friction of the metal threads on the end cap and the metal threads on the pipe itself. The powders were inserted inside that pipe. Turning that end cap then ignites it.

THE COURT: I see.

(Continued on next page)

A000768

BY MS. CROWLEY:

Q.   You mentioned that the device that you examined was capable of causing damage to property.  How?

A.   So, as you can see in the one exhibit with the explosion, the gases were expanded.  Expanding gases by themselves could damage property.  The main charge container fragmented and propelling out from all directions can also cause damage as well as fragmentation with a high velocity.  When it strikes a surface, it also causes damage.

Q.   How is the device capable of causing injury to humans?

A.   So, human beings, explosive gases in close proximity could injure them.  The main charge container and fragmentation propelling out in all directions, that can injure anyone it would hit.

Q.   And how is this device capable of causing death?

A.   Once again, close proximity to this device, the gases itself could kill somebody.  The proximity of those fragmentations flying out, if it hits anybody it could kill them, depending on where they are in that area.

Q.   I'd like to turn now to the evidence you reviewed from Ocean Parkway residence.

MS. CROWLEY:  Mr. DeLuca, please publish what's in evidence as Government Exhibit 203A.

Q.   What is the item?

A.   This item is the housing and wires of two separate

**A000769**

Christmas tree lightbulb assemblies. And in this photograph exhibit 203A, you can see where those two wires were stripped and joined together in this instance.

Q. And is this an item of evidence that you examined that was collected from the Ocean Parkway residence?

A. Yes, it is.

Q. Did you compare this item to any items found at the port authority crime scene?

A. Yes, we did.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 203A on the left-hand side of the screen and Government Exhibit 109-1C on the right-hand side of the screen.

Q. And can you remind the jury what we're looking at on the photograph on the right-hand side of the screen?

A. It shows wires, and an explosive, as well as the disassembled remains of Christmas tree lightbulbs and the fragmented pieces that you can see. There's also fragmented cloth and a piece of white colored zip tie.

Q. Did you compare any of the items in Government Exhibit 109-1C to the items in Government Exhibit 203A?

A. Yes.

Q. How did they compare?

A. The wires were dimensionally consistent in measurement. The plastic Christmas tree lightbulb, the housing itself was also consistent to the ones from the search. And the Christmas

**A000770**

tree lightbulb housing, the one that holds the wires, a

fragment remain of that, and it was also similar to the

evidence collected from the search.

Q.   Did you examine any other items collected from the Ocean

Parkway residence?

A.   I did.

MS. CROWLEY:   Mr. DeLuca, if you could leave 109-1C on

the right-hand side of the screen and publish Government

Exhibit 204A on the left.

Q.   Agent Rigopoulos, does Government Exhibit 204A depict other

items collected from the Ocean Parkway residence that you

examined?

A.   Yes, they do.

Q.   And what are they?

A.   The green insulation you see in the photograph on the left

is similar in color and design to the wires that were collected

from the bombing scene on the right.   The metal wire that was

inside, the wire on the left was similar in dimension also to

the wire that was collected on the right.

Q.   And now I'm going to hand you what's in evidence as

Government Exhibit 206.   Do you recognize this item?

A.   Yes.   I recognize Exhibit 206.

Q.   What is it?

A.   It's a cardboard box, rectangular shape with a manufacturer

print on it.

**A000771**

Q.  Did you examine this box as part of your analysis?

A.  I did.

Q.  When Government Exhibit 206 was received at the FBI laboratory, was it empty or were their objects inside?

A.  There were objects inside.

Q.  And what was inside?

A.  Inside of this box were miscellaneous metal-type hardware, such as screws, nuts, washers, other types of metal pieces that were stored in there.

        MS. CROWLEY:  Mr. DeLuca, please publish Government Exhibit 207A.

Q.  What are we looking at in this photograph?

A.  In 207A you can see the metal washers, the nuts, the screws, the nails I was describing momentarily.  And they're all stored inside of this cardboard box.

Q.  Did you analyze these items?

A.  Yes, we did.

        MS. CROWLEY:  Mr. DeLuca, please publish Government Exhibit 207D and 207E.

Q.  Are these photographs of some of the items that you examined from the cardboard box?

A.  Yes, they are.

Q.  What if any analysis did you do of these screws that were contained within the cardboard box?

A.  The analysis that we did was to segregate them so we would

**A000772**

be allowed to do dimensional measurements of each type of screw, because there are multiple different types as you saw on that earlier picture. And from that we did comparative exams to what we have from the search of the residence, to the crime scene to the post-blast.

MS. CROWLEY: Mr. DeLuca, please publish 207B on the left-hand side of the screen and 106-1B on the right-hand side of the screen.

Q. And just remind us, what are we looking at in Government Exhibit 106-1B?

A. 106-1B shows fragmented remains of the cloth. And also metal type screws shown in the last photograph.

Q. And Government Exhibit 106-1B depicts items recovered from the port authority crime scene?

A. That is correct.

Q. What if any comparison did you do of the screws recovered from the Ocean Parkway residence to the screws recovered at the port authority crime scene?

A. We found through comparative analysis that there were some screws that were consistent in the measurement and shape from the crime scene as well as from the apartment.

Q. Did you analyze any of the other items that were in that cardboard box?

A. Yes.

MS. CROWLEY: Mr. DeLuca, please publish Government

**A000773**

Exhibit 207F.

Q. What are the items in this photograph?

A. Well, what you see in 207F is a variety of different kind of plastic nuts, which I described earlier, that were joining the two bare wires.

Q. And were these items that were found in the cardboard box that we've been discussing?

A. Yes, they are.

MS. CROWLEY: Mr. DeLuca, please publish Government Exhibit 207F on the left-hand side of the screen and Government Exhibit 111-1A on the right-hand side.

Q. Agent Rigopoulos, what if any comparison did you perform of the wire nuts recovered from the residence to the items recovered at the port authority crime scene?

A. If you'll notice, the evidence from 111-1A has that plastic wire and nut. It's orange in color. I found that to be a similar dimension in size and in color itself to the ones that we found inside that cardboard box, as you can see in 207-F.

Q. I'd like to turn now back to Government Exhibit 206, which is the cardboard box you have in front of you.

What, if anything, did you notice when you emptied the contents from the box?

MS. GALLICCHIO: Objection.

THE COURT: Is that relevant to his expert testimony?

MS. CROWLEY: I can lay a foundation, if you'd like,

**A000774**

your Honor.

THE COURT:  Well, okay.  If you're telling me it's relevant to his expert testimony, okay.

Go ahead.  You can answer the question.

THE WITNESS:  So, once we removed all the hardware components from evidence in Exhibit 206, I noticed that there was handwriting inside that box.  And as this case was unfolding, you know, I communicated that information to the case agent in New York, what we found inside there.

Q.  And why did you do that?

A.  Because --

MS. GALLICCHIO:  Objection.

THE COURT:  You can answer. Go ahead.

THE WITNESS:  This is an investigation of a bombing scene.  And as we investigate bombing scenes, we're trying to identify where things may have come from so we can get resolution to the investigation.  The handwriting here and the words that were written were very unique.  Never seen them before in a bombing event where I worked.  And I thought it maybe relevant to an investigator in New York.

MS. CROWLEY:  Please publish Government Exhibit 207B.

MS. GALLICCHIO:  Objection.

THE COURT:  I mean you passed that on; right?

THE WITNESS:  Yes.

THE COURT:  This is what you're talking about, what's

**A000775**

on the screen?

THE WITNESS:  Yes.  This is part of my expertise to identify these things and pass them on to the investigator.

THE COURT:  Well, that doesn't require a science degree to do that.

THE WITNESS:  No, sir.

THE COURT:  Okay.  Next question.

MS. CROWLEY:  Nothing further, your Honor.

THE COURT:  All right.  You want to take a break here or do you want to --

MS. GALLICCHIO:  Yes.

THE COURT:  We can take our afternoon break now and then do our cross after that.

MS. GALLICCHIO:  Your Honor, we have no questions for this witness.

THE COURT:  All right.  Then let's take an afternoon break.  We'll swap up witnesses and then we'll start again in about 15 minutes or so.

(Jury not present)

THE COURT:  Anything else we need to chat about before break?  Who's our next witness?

MR. TURNER:  Gerard Quelch.

THE COURT:  How are we doing time wise?

MR. TURNER:  Just two more witnesses after that.

THE COURT:  You think you'll finish today, or are you

A000776

not sure?

MR. TURNER:  We're optimistic that we'll finish today, your Honor.  Yes.

THE COURT:  All right.  So, let's take a break.

(Recess)

THE COURT:  Okay.

MS. GALLICCHIO:  So, Your Honor, I understand that one of the witnesses requires an interpreter.  And I understand that the government is using an interpreter employed by their office.

THE COURT:  Right.  Usual.

MS. GALLICCHIO:  We would object to that.  We would ask that another interpreter be used.  I also understand the interpreter prepped this witness on one occasion.  And so, that just raises some concern to us with regards to impartiality.

THE COURT:  Well, in your experience the Court supplies interpreters?

MS. GALLICCHIO:  I have not had that experience in federal court.  In state court it's done all the time.  So, I can't speak to federal court.  But that would be our --

THE COURT:  Well, the way it works here is that the Court would supply an interpreter for a party who requires interpreter services.  Obviously, Mr. Ullah speaks English, so he doesn't require that.  To the extent that there are witnesses speaking in a different language and the government

**A000777**

or whoever calls the witness needs to have that testimony translated for the benefit of the jury, that's on the party calling the witness. So, that's the way it's always been done as far as I know. Not something I'm going to change now. I don't think the Court interpreters would do that at all.

Who would be paying them?

MS. GALLICCHIO: We don't have interpreters on our staff that we call to do interpretations in court. So, I don't think that applies to defense witnesses. I think we use certified interpreters.

THE COURT: Well, I think you would use interpreters that you would be paying for that purpose.

MS. GALLICCHIO: No. We call the court interpreter's office.

THE COURT: Maybe that's an arrangement between your office and the court interpreters. But I think anybody that a private attorney would, I don't think, be doing it that way. So, in any event, that's the objection?

MS. GALLICCHIO: Yeah.

THE COURT: All right. So, let's get the jury.

Government will now call its next witness.

MR. TURNER: Yes, your Honor. The government calls Gerard Quelch.

GERARD QUELCH,

        called as a witness by the Government,

**A000778**

having been duly sworn, testified as follows:

THE COURT:  State your name and spell your name for the record.

THE WITNESS:  My name is Gerard Quelch.  Last name is Q-U-E-L-C-H.

THE COURT:  Okay.  Pronounced Quelch?

THE WITNESS:  Yes.

THE COURT:  Keep your voice up nice and loud.

DIRECT EXAMINATION

BY MR. TURNER:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Where do you work?

A.  I work at the port authority of New York-New Jersey at the port authority bus terminal.

Q.  Is that sometimes referred to as the PABT?

A.  It is, yes.

Q.  Where is the port authority bus terminal located?

A.  It's in midtown New York.  It's between 42nd Street and 40th street between 8th and 9th Avenues.

Q.  Generally speaking, what is the port authority bus terminal?

A.  It's the primary bus terminal that the port authority operates.  It provides customer services, interstate commutes, as well as long distance intercity operations.

A000779

Q.   How long have you worked for the port authority?

A.   I've been with the port authority for 38 years.

Q.   What is your current position?

A.   I am manager and post-operations at the bus terminals.

Q.   How long have you held that position?

A.   That position has been four years.

Q.   What are some of your responsibilities as the manager of bus operations at the PABT?

A.   My primary responsibility is running the PM operation, which is the operation in the evening from 4:00 to 7:00 p.m. My normal work hours are a bit staggered.  I start about 10:00 and leave 7:30 in the evening.  Before that point, I also provide analyses and data collections on port authority traffic followings, travel times, queue analysis, delay information. Things of that sort.  I provide usually a series of reports on a quarterly basis.

Q.   What are some of the ways in which you monitor those factors you described, such as travel time and bus operations?

A.   Well, particularly, two tools that we use specifically at the Lincoln tunnel are the toll registration systems.  And that's the system that you see when you come into the toll itself.  The toll would register the vehicle.  That information is then fed into the essential database, which I have access to.  And from that you're able to get actual volumes that go through the Lincoln tunnel.

A000780

In terms of travel time, we use a third party provider. And this is basically using readers placed out over the roadway. And as vehicles pass underneath these readers, it reads the time and is able to calculate the virtual travel time from one point to another.

Q. The sorts of data that you've described, how frequently do you use that data in your role as a manager of bus operations?

A. Well, travel time I actually use every evening because I need to know what the delays are and how fast the traffic is coming in or how slow. And I can make arrangements of changes. In terms of the traffic data and the toll system, that's something I also use quite frequently, not on a daily basis but on a monthly basis.

Q. If I can ask you just to slow down a little bit for the benefit of the court reporter?

A. Okay.

Q. Thank you. Based on the data, on an average weekday, about how many buses come in and out of the port authority bus terminal?

A. On average the port authority bus terminal has about 7800 buses, that's arrivals and departures over a 24-hour period.

Q. And about how many passengers come in and out every day on those buses?

A. On average it's about 260,000.

Q. What's passenger movement?

**A000781**

A.  The same person would normally arrive in the morning and go back home in the afternoon.  So, distinguish between individuals.  So, it's not 260,000 individual people but rather, 130,000 coming in, in the morning as arrival and the same 130,000 people exiting or going home in the afternoon.  So, we can apply it as a passenger movement as opposed to an individual.

Q.  Typically, what are the busiest times of day for bus traffic at the port authority bus terminal?

A.  There are essentially two peak periods, one in the morning from 6:00 to 10:00 a.m.  That will be days Monday through Friday.  And then also on the week days we have an afternoon peak, which I'm responsible for, and that typically runs from 4:00 p.m. to 7:00 p.m.

Q.  What is typically the busiest time of day for arrivals of buses into the port authority bus terminal?

A.  Without a doubt, the busiest portion is in the morning between 6:00 and 10:00 a.m.

Q.  Approximately how many different carriers or bus lines use the port authority bus terminal?

A.  There are currently about 20 different bus companies.

Q.  What is an interstate bus?

A.  An interstate bus is the bus that carries the passenger from one state to another.  In terms of the port authority bus terminal, the vast majority of interstate passengers coming

**A000782**

from the state of New Jersey into New York state.

Q. And what percentage roughly of buses serviced by the port authority bus terminal are interstate buses?

A. Approximately about 65 to 70 percent of those buses are interstate buses.

Q. What are just a few examples of the interstate bus carriers that use the port authority bus terminal?

A. By far the largest carrier would be New Jersey transit. That is the primary public, the transit agency in the state of New Jersey. They have both of the buses that come in through the port authority bus terminal.

Another one would be a long distance carrier, which we call intercity buses. The best known would be Greyhound. They leave out of the north wing.

Q. What is the most common route into and out of Manhattan for buses serviced by the PABT?

A. By far, the biggest and popular route would be through the Lincoln tunnel. It connects directly into the port authority bus terminal. So, when you exit in midtown, you travel a very short distance and then access ramps that lead to the terminal.

Q. On an average day, about what percentage of buses coming into Manhattan through the Lincoln tunnel are bound for the PABT, the bus terminal?

A. Over a 24-hour period?

Q. Yes.

A000783

A.   Over a 24-hour period it's about 60 percent.

Q.   And in the morning rush hour period?

A.   In the morning rush hour, it's considerably higher, about 70 to 75 percent.

          MR. TURNER:  Mr. DeLuca, if we could pull up Government Exhibit 1, please, which is in evidence.

Q.   Mr. Quelch, do you see the port authority bus terminal on this map?

A.   I do.

Q.   Is that on the right side of the map?

A.   It is.  It's the upper blue arrow.

Q.   And do you see the Lincoln tunnel on this map?

A.   I do.  It's highlighted in yellow.

Q.   And where in relation to the port authority bus terminal?

A.   Just west of the bus terminal.

Q.   What is located underneath the port authority bus terminal?

A.   It's the New York City subway.

Q.   Any particular station?

A.   There is a station, the port authority bus terminal station.  It's basically fed by the A, U, C and E lines.

          MR. TURNER:  Mr. DeLuca, please pull up Government Exhibit 140 also in evidence.

Q.   Mr. Quelch, do you recognize what we're looking at here?

A.   I do.  What's depicted in this diagram?  In the upper right-hand corner is the Times Square station for 42nd Street.

**A000784**

On the lower left-hand side it depicts, as I mentioned, the port authority station for New York, the subway feeding the A, C and E lines.

Q.  So, what extent at all is the port authority bus terminal to the port authority subway station that we see on the left side of the diagram?

A.  There is a direct connection through, a flow that connects directly.  There's actually a small foyer or hallway that runs from both the west -- the north wing and the south wing, directly into the New York City subway station.

Q.  Now, let's turn to December 11th, 2017.  Did you work at the port authority bus terminal on that day?

A.  I did.

Q.  Was it a typical work day for you at the PABT?

A.  No, it was not.

Q.  Why not?

A.  There was an explosion that took place in the north wing subway level.  And this took place around 7:30 in the morning.  And as a result of that, the terminal had to be actually closed.  It was evacuated.  And all the traffic at that point could no longer access to terminal.  It caused significant delays.

Q.  Let's break that down.  In your role as manager of bus operations, what if any steps did you take in response or as a result of the incident you've described in the subway station?

**A000785**

A.  Well, as I mentioned earlier, my day begins about 10:00 o'clock.  I got into the office about 10:00 that day.  At that time obviously it was past the incident.  However, the terminal was closed at that time.  And the frontage of 8th Avenue, which is the main frontage for the bus terminal, that was closed.  That remained closed for quite some time.  So, anybody that was coming down the stairs from the amount of activity we had, had to be directed out to the 9th.  And everyone was kind of pressed into service to be able to communicate to the people that were in the terminal at the time.

In addition to that, we also sent out several public alerts, which alerted the general public as to the status of the bus terminal.

Q.  You mentioned that the bus terminal closed as a result of the incident.  For approximately how long was the bus terminal closed that day?

A.  It was about an hour and a half.  It was about from 7:30 till about 9:00.  After that point.  It began to reopen in stages.

Q.  Generally speaking, how did the closure of the bus terminal affect bus operations?

A.  It was a tremendous direct effect.  The buses when they leave the Lincoln tunnel proceed directly to the bus terminal.  With the bus terminal then being closed, obviously they couldn't enter the building.  And as a result of that, they had

**A000786**

to be detoured or find other means to discharge their passengers.  It had a direct result of bringing significant delays and what we call queuing.

MR. TURNER:  Your Honor, may I read a stipulation at this time?

THE COURT:  Yes.

MR. TURNER:  This is Government Exhibit 2007.

"It is hereby stipulated and agreed between the parties that Government Exhibits 101-1 and 101-2 are summary charts of data maintained by the port authority of New York and New Jersey in the regular course of its business.  It is further stipulated and agreed that Government Exhibits 101-1 and 101-2 as well as the stipulation are being admitted into evidence at trial."

Your Honor, we offer Government Exhibits 101-1 and 101-2 as well as the stipulation that is Government Exhibit 2007.

THE COURT:  Okay.  2007, 101-1 and 101-2 are received.

(Government's Exhibits 101-1, 101-2 and 2007 received in evidence)

MR. TURNER:  Mr. DeLuca, publish Government Exhibits 101-1 and 101-2 side by side, please.

Q.  Mr. Quelch, do you recognize these charts?

A.  Yes, I do.

Q.  Generally what are they?

**A000787**

A.   The chart on 101-1, that is a rendition of the weekday bus lines that travel through the Lincoln tunnel in the eastbound direction.  And eastbound is from New Jersey into New York.

The second chart is depicting travel times.  And travel times are also comparing a typical day with the day in question, which was December 11th.

Q.   Who prepared these charts?

A.   I prepared these.

Q.   Why did you prepare them?

A.   There was a request made by the FBI to provide some information regarding typical day versus the one we experienced that particular day.

Q.   That particular day being December 11th of last year?

A.   That's correct.

Q.   Okay.  Let's take these one at a time.  Mr. Quelch, what does this chart show?

A.   Again, this chart is looking at weekday bus lines.  On the far left, you have a table that displays actually roll data. In the can column to the right, which starts with zero and goes down to 23, those records are hours in military-type time. Where it says zero, that means from midnight to 1 o'clock in the morning.  The last one, where it says the 23, that's 11:00 at night to 11:59.  So, the data is expressed in hourly increments.

The next column over, this data is actually the

A000788

volumes that went through the Lincoln tunnel toll plaza on the day of December 11th, 2017. And, again, this is taken from the system that I mentioned in my testimony regarding the toll system that the port authority uses.

Q. Let me just ask you, by volume do you mean number of buses?

A. This is the number of buses actually processed through the bus terminal.

Q. And the buses reflected in this chart are traveling eastbound. So, that's from where to where?

A. The eastbound direction would actually be from New Jersey into New York.

Q. Now, you mentioned that you used October as a typical week day. Why did you choose October as the typical day?

A. For planning purposes, the port authority typically uses two months. They use the month of May and the month of October. And the reason for that is because, during those two months, it's devoid of any kind of extreme weather, no snows, sleets or heavy rain. Not a lot of vacation. People normally don't take vacation during those times. And it's also apparent by which the traffic is fairly normal. So, we typically use the months of October and of May to depict a typical day for the year.

Q. Looking at the bar graph on the right side of this chart, what do the blue bars represent and what do the orange bars represent?

A000789

A.   The bars here represent the information that was presented earlier on the left-hand side.  The blue bars represent the bus volumes -- again, by hour -- for December 11th of 2017.

The orange bars adjacent to them are for an October typical day.  So, it's a graphic representation of what is experienced on that day versus what we consider a typical day at the Lincoln tunnel with regard to bus volume.

Q.   What does this chart show as far as bus volume coming across the Lincoln tunnel on December 11th, 2017, as opposed to a typical week day?

A.   Well, starting from the left, where you see zero, that represents the hour, zero being midnight to 1:00 in the morning.  As you go across the bottom row, you'll see that the bars are very closely aligned.  And that means that the volumes are very similar.  One is not exceeding the other.

As you start to get into the early morning, which is what we call the peak period, the bars diverge and start around 7:00, which is actually 7:00 to 8:00, and then continue on 9:00 to 10:00, and 10:00 to 11:00.  And these two bars would indicate that the volumes on December 11th, was much more than what we normally see.

Q.   Starting around 10:00 a.m., what do you see happen?

A.   Around 10:00 a.m., it's beginning to stabilize, and the volumes tend to be equalized between the two periods.  So, the December 11th volume day is becoming more normal and matching

**A000790**

what we would consider a typical day.

Q.   Now, you mentioned the 7:00 to 10:00 a.m. period?

A.   Yes.

Q.   If we could take a look at the row in the bottom left, which starts with 7:00 to 10:00 a.m.  What does the 7:00 to 10:00 a.m. row -- what does the data in that row show us?

A.   This is a cluster of different hours we put together.  The 7:00 to 10:00 is separated out because we consider the 7:00 to 10:00 period in the morning the peak of the peak.  Between 6:00 and 7:00, the volume's a lot higher and much lower later on.  So, the critical area of the morning operation.

          And what it shows is that between those three hours, from 7:00 to 10:00, 1,505 buses were processed by the toll plaza at the Lincoln tunnel.  And when you go across to the right, the 2,350 that represents the typical day.  So, normally we would experience between those three hours, 2,351 buses and in reality process 1,505 for a difference or variance of 846 buses below what we normally experience.

Q.   846 buses fewer on December 11th of 2017?

A.   That's exactly right.

Q.   About how many passengers are there per bus on average?

A.   On average it's about 42 passengers per bus at this time in the morning.

Q.   So 846 buses, that's tens of thousands of people; is that right?

**A000791**

MS. GATTO:  Objection, your Honor?

THE COURT:  Because he's doing the math?

MS. GATTO:  He's doing the math.  He's leading.

THE COURT:  This is not a math exam.

Do you have a sense as to what the math is here?

THE WITNESS:  Well, I can say on a normal day in the morning, between 6:00 and 10:00 a.m., the Lincoln tunnel actually serves about 127,000 people.  And that's the buses, cars and trucks moving by.  Buses are the largest people carriers, so to speak.  And out of that 127,000, 110,000 are on buses.

(Continued on next page)

**A000792**

MR. TURNER:  Mr. DeLuca, lets turn please to Government Exhibit 101-2.

Q.  What does this chart reflect, Mr. Quelch?

A.  This depicts travel time between a link that is from the New Jersey Turnpike, which is representing the far western portion of the Lincoln Tunnel corridor, to the New York exit of the south tube of the Lincoln Tunnel.  This represents all traffic generally, not just buses.

It's represented in a similar format in the sense that on the left-hand side of the screen you have raw data actually in whole numbers.  What you see is the time beginning at 6:00 a.m., again time beginning, and it goes to 11:45 to noon. These are in 15-minute increments.  So when you see 6 o'clock, it actually represents 6:00 to 6:15, and where you see 11:45, that's 11:45 to 12:00 noon.

Q.  This is traffic traveling through the Lincoln Tunnel?

A.  This is a link that is connected from the New Jersey Turnpike eastbound, meaning to New York, through New Jersey Route 495 and into the Lincoln Tunnell into New York City. It's a distance of about 4½ miles.

Q.  What does the orange line represent and what does the blue line represent?

A.  The orange line is the annual average.  What I was able to do was I was able to tally 244 days, which were the weekdays in 2017, and that would give you a composite travel time for this

A000793

particular period of the morning.  The blue line, as before, represents the actual travel time for the day in question for all traffic, and that was December 11th of 2017.  The two lines together give a comparison and a divergence.

Q.  What does the chart reflect for the period of 6:00 a.m. to about 7:30 a.m. on December 11th of 2017?

A.  What it tells us is that the December 11th day actually began quite well.  When you see the blue line below the orange line, what that is telling us is that the travel time was actually quicker, people were getting into New York City a little bit faster than normal.  However, that changes rather quickly.

Q.  What happened starting at about 7:30 with respect to travel time?

A.  From 7:30, from the diagram you can see there is a great change.  There is a divergence between the two lines.  What that would simply mean is that the travel time exponentially went up.  Therefore, traffic traveling on that day, December 11th, from 7:30 on experienced a much higher delay and congestion than they normally would have experienced on a typical day.

Q.  Please remind us, approximately when was the bus terminal closed on December 11th?

A.  It was approximately from 7:30 to about 9 o'clock.

Q.  What is the average maximum travel time reflected here

A000794

through the Lincoln Tunnel during this morning period on a typical weekday?

A. The average maximum we experience, again averaging all of those days together, comes out to about 33 minutes from one point to the other.

Q. What was the maximum travel time on December 11th of 2017 during this morning period?

A. The maximum travel time was one hour and 8 minutes. That occurred at 9:15 in the morning.

Q. What is the average travel time on a typical weekday at 9:15 a.m. in the morning?

A. Normally about that time the travel time usually tends to diminish as traffic is processed. At this time it shows that it normally should be about 28 minutes at that time.

Q. Mr. Quelch, in your four years as the manager of bus operations at the bus terminal, how many times has the entire bus terminal closed like it did on December 11th, 2017?

A. In my experience, it has not close at all.

          MR. TURNER: Nothing further, your Honor.

          THE COURT: Cross-examination?

          MS. GATTO: No questions. Thank you, your Honor.

          THE COURT: Thank you very much.

          (Witness excused)

          THE COURT: Next witness.

          MR. TURNER: Your Honor, the government's next witness

**A000795**

is Barry Greenblatt.  If we may, your Honor, while Mr.

Greenblatt is getting situated, read another stipulation.

THE COURT:  That's fine.

MR. TURNER:  This is Government Exhibit 2003.

It is hereby stipulated and agreed between the parties that:

1.  Deoxyribonucleic acid, or DNA, is the genetic material found in cells in the human body.  Each person, with the exception of identical twins, has unique DNA.  DNA is generally found in body fluids like blood and saliva and can also be found in skin cells.

2.  A DNA profile is a numerical representation of a person's DNA.

3.  Law enforcement officers lawfully collected swabs from the defendant's cheeks.  A forensic examiner employed by the Federal Bureau of Investigation with training and experience in the area of DNA analysis created a DNA profile of the defendant using the swabs from the defendant's cheeks.  The forensic examiner conducted a forensic analysis by comparing the DNA present on Government Exhibits 105, 111, 121, 125, 127, 128, 134, and 203, with DNA profile for the defendant.

The FBI's forensic analysis established that for each of those exhibits, it is at least 79 quadrillion times more likely than not that the defendant contributed to the DNA present on the exhibit.  The table below specifies for each

A000796

exhibit how many times more likely than not it is that the defendant contributed to the DNA on the exhibit.

Then there is a table reflected in the stipulation, your Honor.

Finally, paragraph 7. The laptop computer marked as Government Exhibit 601 was not tested for the presence of DNA.

It is further stipulated and agreed that this stipulation may be admitted into evidence at trial.

Your Honor the government offers the stipulation which is 2003.

THE COURT: 2003 is received.

(Government's Exhibit 2003 received in evidence)

Next witness.

MS. DONALESKI: The government calls Barry Greenblatt.

BARRY GREENBLATT,

THE COURT: State your name and spell your name for the record.

THE WITNESS: My name is Barry Greenblatt, B-A-R-R-Y, G-R-E-E-N-B-L-A-T-T.

THE COURT: Thank you, Mr. Greenblatt. Keep your voice up nice and loud like that and speak into the microphone.

DIRECT EXAMINATION

BY MS. DONALESKI:

Q. Good afternoon, Mr. Greenblatt. Where do you work?

A. I work for MTA, New York City Transit.

**A000797**

Case 21-1058, Document 42, 10/04/2021, 3186341, Page70 of 283

Q. What does the MTA stand for?

A. Metropolitan Transportation Authority.

Q. How long have you been with the MTA?

A. 32 years.

Q. What is your current title?

A. I'm the vice president and chief officer of service delivery.

Q. What are your duties and responsibilities in that capacity?

A. I have executive charge of the division of service delivery, which has everything to do with the movement of trains. In my position I handle all strategic long-term decision-making, short-term issues, and day-to-day operations of the subway system.

Q. Can you describe the types of positions that you have had at the MTA over the past 32 years.

A. I started as a bus operator. I was a train operator. I moved to supervision as a train service supervisor. I was a superintendent, a line superintendent, a general superintendent. I moved to the Staten Island railway, and I was the assistant chief officer of operations.

Came back to the subway side and was the assistant chief transportation officer for the numbered lines, which we refer to as subdivision A, the lettered lines later that we refer to as subdivision B. I was the chief officer of field operations, and I have been in my current position for

A000798

approximately three years.

MS. DONALESKI:  Mr. DeLuca, can you please publish for the witness, counsel, and Court only Government Exhibit 2.

Q.  Mr. Greenblatt, do you recognize what is depicted on Government Exhibit 2?

A.  I do.

Q.  What is it?

A.  It's a map of the New York City subway system.

Q.  Does it fairly and accurately depict the New York City subway system?

A.  It does.

MS. DONALESKI:  The government offers Government Exhibit 2.

THE COURT:  Any objection?

MS. GATTO:  No objection.

THE COURT:  Government Exhibit 2 is received.

(Government's Exhibit 2 received in evidence)

MS. DONALESKI:  Could we please publish it to the jury, Mr. DeLuca.  Mr. DeLuca, I will ask you to zoom in on the south part of Brooklyn.

Q.  Mr. Greenblatt, can you please point out the 18th Avenue subway stop.  Can you describe where it is.

A.  It's on the F line.  It's the station stop between Ditmus Avenue and Avenue I on what we call the Culvert Avenue line.

MS. DONALESKI:  Thank you, Mr. DeLuca.

Q. What train lines service the 18th Avenue stop?

A. The F line.

MS. DONALESKI: Mr. DeLuca, can you please zoom out and zoom in on central Brooklyn.

Q. Mr. Greenblatt, I'll ask you to point out the Jay Street Metrotech subway station in Brooklyn. Please describe where it is. There is no touch screen.

A. It is the station stop where the A, the C, and the F all come together, and there is also a transfer to the R.

MS. DONALESKI: Mr. DeLuca, can you please zoom in on the western end of midtown Manhattan.

Q. Mr. Greenblatt, I will ask you to point out the Port Authority subway station.

A. It's the station stop along the Eighth Avenue line where the A, the C, and the E specifically stop at.

Q. Can you please point out the Times Square station.

A. It would be the station immediately to the east of the Port Authority Bus Terminal, where the 1, 2, 3, number 7 line, and the N, Q, R, and W lines also stop.

Q. Are the 42nd Street Port Authority station and the Times Square station considered a single complex?

A. They are.

Q. Why is that?

A. They are all accessible from many different station entrances. Once you swipe and enter the paid area, the

**A000800**

different station stops are accessible by passageways, stairways.

Q.  How does the 42nd Street subway station complex rank in terms of passenger volume?

A.  It's the single busiest station in the subway system.

Q.  How many stations are there in the New York City subway system?

A.  472.

MS. DONALESKI:  You can take that down, Mr. DeLuca.

Q.  What are the peak travel times on the New York City subway?

A.  During the a.m. what we refer to as the rush hour, it's generally between 7:00 a.m. and 9:00 a.m., and then in the evening it's generally between 4:00 p.m. and 7:p.m.

Q.  In your time at the MTA have you become familiar about how the MTA tracks train movements?

A.  I am familiar.

Q.  Is it the same for every single subway line?

A.  They are not the same.

Q.  Let's start with the A, C, E.  Generally speaking how does the MTA track train movements for the ACE?

A.  We track train movements for the system we refer to as ITRAC, which refers to integrated train register activity console.  That's used to track train movement to all of the lettered lines.

Q.  How does it track when a train is in and out of a station?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000801**

A.   There is manual entry at certain stations along the line terminals, but it also use a system with an onboard Bluetooth transmitter, and there are Bluetooth receivers at every train station.  It records the first time a train speaks to a receiver at a train station and the last time that a train speaks to a receiver at the train station.  In between you know that the train is in the train station.

Q.   Let's talk about the N, Q, R, W lines.  How does the MTA track train movement on that line?

A.   It uses the same system, ITRAC.

Q.   What about the 1, 2, and 3 lines?

A.   The 1, 2, and 3 lines use a different system.  We refer to it as ATS, or automatic train supervision.

Q.   How does the ATS track whether a train is in or out of the station.

A.   ATS uses track occupancy as determined by track circuits. We know for certain when the track circuits that are within the station are actually occupied by a train.

Q.   On each of the train lines we have discussed, the A, C, E, N, Q, R, W, and 1, 2, 3, is a train operator required to operate the train?

A.   Yes, a train operator is required.

Q.   What is a train operator?

A.   The train operator is the employee that operates the train and moves the train from station to station.

**A000802**

Q.   If a train is operating, a train operator is on board?

A.   Absolutely.

Q.   Were you asked to collect MTA records for December 11, 2017?

A.   I was.

Q.   What types of records were you asked to compile?

A.   I was asked to compile train movement records for all trains that were at the 42nd Street Port Authority Bus Terminal between 7:00 a.m. and 7:30 as well as similar records for the Times Square station on the N, Q, R, W and also the 1, 2, and 3 lines.

          MS. DONALESKI:  Mr. DeLuca, can you please publish for the witness, Court, and counsel only Government Exhibits 1102, 1103, and 1104.

Q.   Sir, did you review these records before coming to court here today?

A.   I did.

Q.   Were the records made in the normal course of business?

A.   They were.

Q.   Were they created at or around the time of an event?

A.   They were.

          MS. DONALESKI:  At this time the government offers Government Exhibits 1102, 1103, and 1104.

          THE COURT:  Any objection?

          MS. GATTO:  No objection.

**A000803**

THE COURT:  1102, 1103, and 1104 are received.

(Government's Exhibits 1102, 1103, and 1104 received in evidence)

MS. DONALESKI:  You can take that down, Mr. DeLuca.

Q.  Approximately how many train records did you review before coming here to testify today from Government Exhibits 1102, 1103, and 1104?

A.  46.

Q.  46 separate train records, is that correct?

A.  Yes, correct.

MS. DONALESKI:  Mr. DeLuca, can you please publish for the witness, counsel, and Court only Government Exhibit 1105.

Q.  Sir, do you recognize this document?

A.  I do.

Q.  Is it a fair and accurate representation of certain information from Government Exhibits 1102, 1103, and 1104?

A.  Yes.  It's a table that specifies all trains that arrived at the 42nd Street Port Authority Bus Terminal on the A, C, and E and also at the Times Square station on the 1, 2, 3, N, R, Q specifically between 7:15 a.m. and 7:30 a.m.

MS. DONALESKI:  The government offers Government Exhibit 1105.

THE COURT:  Any objection?

MS. GATTO:  No, your Honor.

THE COURT:  Government Exhibit 1105 is received.

**A000804**

(Government's Exhibit 1105 received in evidence)

MS. DONALESKI:  Mr. DeLuca, can you please publish the first page of 1105.

Q.  Mr. Greenblatt, starting from the left, can you please describe what type of information is included on the columns of this chart.

A.  The first column contains the individual trains, northbound or southbound, that were at the 42nd Street Port Authority Bus Terminal station on the A, C, and E lines.  The center column is the arrival time for each individual train.  And the right column is the departure time.

Q.  Were you able to determine whether there were any A, C, and E trains in the Port Authority station between 7:15 and 7:30 a.m. on December 11, 2017?

A.  There were.

Q.  How many?

A.  There were 10.

Q.  Were train operators present on those trains?

A.  Yes, there were train operators present.

Q.  How do you know that?

A.  The train arrived at the station, and for it to arrive, it had to be operated by a train operator.

Q.  Were there passengers present on those trains?

A.  There were passengers on board those trains, yes.

Q.  How do you know that?

A000805

A. Those trains were listed as being in revenue service in the records I reviewed.

Q. What does it mean to be in revenue service?

A. They are picking up passengers at each station.

Q. How many passengers would you expect to be on an average A, C, and E train at this time of a weekday?

A. It varies on the train, but somewhere between a thousand and 1500.

Q. Per train?

A. Per train, yes.

Q. Focusing only an 7:18 a.m., were there any A, C, and E trains in the Port Authority station?

A. There were. There were two.

Q. Which trains?

A. The train listed as train number 1 that arrived at 7:16 and 16 seconds and departed 7:18 and 1 second. The second train was a southbound A train that arrived at 7:17 and 32 seconds and departed at 7:19 and 51 seconds.

        MS. DONALESKI: Mr. DeLuca, can you please turn to the next page of Government Exhibit 1105.

Q. Sir, what does this page show?

A. This page shows similar information at the Times Square station for the 1, 2, 3, N, R, Q, and W lines.

        MS. DONALESKI: Mr. DeLuca, can we publish side by side pages 2 and 3 of this exhibit.

**A000806**

Case 21-1058, Document 42, 10/04/2021, 3186341, Page79 of 283

Q. Mr. Greenblatt, were you able to determine whether there were any 1, 2, 3, N, Q, R, W trains in the Times Square subway situation between 7:15 and 7:30 a.m. on December 11, 2017?

A. There were.

Q. How many?

A. There were a total of 20 trains.

Q. Were train operators present on those trains?

A. There were.

Q. How do you know that?

A. Those trains arrived at the station, and the only way for them to arrive is if they were operated by a train operator.

Q. Were there passengers present on those trains?

A. There were.

Q. How do you know that?

A. Because all of these trains were in passenger service.

Q. How many passengers would you expect to be on a 1, 2, 3 train at this time of a weekday?

A. Somewhere in the area of about a thousand.

Q. How many passengers would you expect to on an N, Q, R, W train at this time of a weekday?

A. Somewhat higher, closer to 1500.

Q. Focusing only on 7:18 a.m., were there any 1, 2, 3, N, Q, R, W trains in the Times Square station?

A. There were.

Q. Which trains?

**A000807**

A.   The train listed as train number 2, a northbound Q train that arrived at 7:16 and 41 seconds and departed at 7:18 and 26 seconds.   There was a northbound N train that arrived at 7:16 and 26 seconds and departed at 7:18 and 31 seconds.   Then there was a southbound number 2 train that arrived at 7:17 and 4 seconds and departed at 7:19 and 28 seconds.

MS. DONALESKI:  You can take this down, Mr. DeLuca.

Q.   Mr. Greenblatt, were you at work on December 11, 2017?

A.   I was.

Q.   Did anything unusual happen that day?

A.   Yes.

Q.   What happened?

A.   In my office in lower Manhattan on an interdivisional intercom that I had in my office, I heard a transmission from our rail control center that there had been a confirmed explosion at the 42nd Street Port Authority Bus Terminal.

Q.   What did you tell as a result of returning that information?

A.   I immediately notified the senior vice president, who was in the office next door, and I responded to the rail control center in midtown Manhattan.

Q.   What happened when you got to the rail control center?

A.   We were in the process of making service adjustments throughout the system, having been directed by the NYPD to do so.

**A000808**

Q.   What service changes did you make to your system initially?

A.   Initially, somewhere between 7:23 and 7:25 -- the first transmission came over around 7:20.  We were directed to bypass the 42nd Street Port Authority Bus Terminal station on the A, C, and E and also bypass the Times Square station on the 1, 2, 3, the 7, and the N, Q, R, W and on the 42nd Street shuttle.

Q.   What does it mean to bypass a station?

A.   Trains are continuing to run from end to end; however, they are not stopping at that station.

Q.   Did you make any other changes to subway service that morning as a result of learning about the explosion?

A.   We did.  Not knowing what was going to happen next, we went on an extended head wait of several of the lines to reduce the frequency of service.

Q.   What does that mean?

A.   It means that trains that would normally operate every four or five minutes apart instead would operate somewhere between 8 and 10 minutes apart.

Q.   Did you make any other changes to subway service?

A.   As the incident progressed and again as directed by the NYPD, we eventually had to suspend service on the A, C, and E lines at approximately 8:00 a.m.

Q.   What does it mean to suspend service?

A.   It means that no service can run through the station at all.

**A000809**

Q. What effect does bypassing the station, suspending service, and going on extended head waits have on subway service?

A. As I said, 42nd Street Times Square is the busiest in the system. All of our riders had to be diverted to station stops either north or south of 42nd Street or onto a neighboring lines. When we suspend service on the A, the C, and the E lines, it was between two points where we could divert service to other lines, so we actually had to suspend service along the Eighth Avenue corridor from 59th Street Columbus Circle to West 4th Street. We diverted the A and the E service over to the Sixth Avenue line, where the B, the D, the F, and the M normally operate. As a result of that, we suspended service on the B and the C trains.

Q. Cumulatively, what effect did that have on subway service that morning?

A. It was exceptionally disruptive to the morning rush hour.

Q. In your 32 years at the MTA, do you recall a time at the Times Square 42nd Street complex where service was suspended during rush hour?

A. Not in it's entirety, no.

          MS. DONALESKI: No further questions.

          THE COURT: Cross-examination?

          MS. GATTO: No questions, thank you.

          THE COURT: Thank you very much, Mr. Greenblatt.

          (Witness excused)

**A000810**

THE COURT:  Next witness.

MS. CROWLEY:  Your Honor, the government calls its final witness, Veronica Chavez.

THE COURT:  Let me first swear the interpreter.  Let's have the interpreter state her name for the record.

INTERPRETER ILIACOSTAS:  Elizabeth Iliacostas, United States certified interpreter.

INTERPRETER AVALOS:  Mercedes Avalos, federally certified Spanish interpreter.

(Interpreters sworn)

VERONICA CHAVEZ,

     called as a witness by the government,

     having been duly sworn, testified as follows:

THE COURT:  State your name and spell your name for the record.

THE WITNESS:  (Through the interpreter)  Veronica Chavez, C-H-A-V-E-S.

THE COURT:  Are you spelling in English or in Spanish?

THE WITNESS:  In Spanish.

THE COURT:  Say it again.

THE WITNESS:  C-H-A-V-E-X.

THE COURT:  Ms. Crowley.

DIRECT EXAMINATION

BY MS. CROWLEY:

Q.  Good afternoon, Ms. Chavez.  How old are you?

**A000811**

THE COURT:  Wait.  Is it Chavex or Chavez?

THE WITNESS:  Chavez.

THE COURT:  Z or X?

THE WITNESS:  No, it's Z.

THE COURT:  Thank you.  Go ahead.

Q.  Good afternoon, Ms. Chavez.  How old are you?

A.  47 years old.

Q.  Where do you live?

A.  In Queens.

Q.  Are you currently employed?

A.  No.

Q.  When was the last time you had a job?

A.  December 11th of '17.

Q.  Is that 2017?

A.  Yes, 2017.

Q.  Where did you work at that time?

A.  On 247 and 270 -- I'm sorry.  Excuse me.  Okay.  I'm sorry.
270 West 38th Street between Seventh and Eighth Avenues.

Q.  What was located at that address?

A.  It was a clothing factory.

Q.  What kind of work did you do at the clothing factory?

A.  I was a seamstress.  I sewed by hand.

Q.  For how long did you work at the factory as a seamstress?

A.  14 years.

Q.  I'd like to direct your attention to December 11th, 2017.

**A000812**

Q. Did you travel to work that morning?

A. Yes, that's correct.

Q. How did you get there?

A. Well, as I do every day, but that day I left my house a little earlier because I had to go to the bank. I took the number 7 train on junction boulevard.

Q. Is that in Queens?

A. Yes, in Queens.

Q. Where did you take the 7 train to?

A. On Junction Boulevard.

Q. Where did you travel to on the 7 train?

A. To Manhattan.

Q. Where did you get off?

A. On 42nd Street where the thing with the bomb occurred on 42nd Street.

Q. Is that the same route you took every day to get to work before December 11, 2017?

A. No, that's the same route that I take every day.

Q. Did you make it to work on time on the morning of December 11, 2017?

A. No, I did not, because the thing with the bomb happened.

Q. What was the thing with the bomb?

A. Well, what happened in the tunnel. I was walking. In other words, I was walking. I arrived on the number 7 train. I went walking into the tunnel. I went up the stairs. We went

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000813**

walking into the tunnel. And then I got a text message, and that sort of stopped me from walking, because I was walking quickly. I stopped. The thing with the text message caused me to slow down my pace a little bit. And that's when the bomb went off or -- yeah, when the bomb went off. And that just confused me.

Q. Where were you when the bomb went off?

A. Well, I was walking out to go to 42nd Street because on 42nd Street, on the corner there is a bank, and that's where I was going.

Q. So you were walking through the tunnel in the Port Authority subway station?

A. Yes.

Q. Did you see the explosion when the bomb went off?

A. I tell you that I slowed down because I stopped to look down at my text message. And then the bomb went off. And then I looked up and there was dust and smoke and debris falling down.

Q. About how far away were you from the explosion?

A. About 20 feet away from the explosion.

Q. Can you describe what the explosion sounded like.

A. Well, it was such a great explosion that my ears started hurting. They were ringing. They were hurting.

Q. Were there other people present in the tunnel when the bomb exploded?

**A000814**

Case 21-1058, Document 42, 00/04/2021, 3186341, Page87 of 283

A. Yes, of course, there were a lot of people.

Q. What did they do after the bomb went off?

A. I'm telling you that I was like in shock. Everybody just kept running past me until someone just sort of like pushed me along, and that caused me to come back to reality.

Q. What happened after you came back to reality?

A. When I came back to reality, I looked down and I saw three people, three people on the ground.

THE COURT: What did you do next.

A. I came back to reality and I started doing what everybody else was doing. People were crying, they were running, so I started running too.

Q. Did you make it out of the tunnel?

A. Yes, I was able to get out, but I did not come out through the tunnel. The subway workers took us out through 40th Street and Seventh Avenue exit.

Q. What happened when you exited the subway station?

A. I was so out of it. I didn't know where I was. I was out of control. Then some time went by, and that's when I came back to and I started knowing what was happening. I have been walking through that tunnel for 20 years. Then I realized where I was, I came back to, and I started walking in the direction of my job.

Q. Did you go to work that day?

A. Yes. I went all the way to work, but I was not able to

A000815

stay because I really was doing very badly.

Q. What do you mean you were doing very badly?

A. I was crying, I was nervous, I was trembling, I couldn't concentrate. Two of my brothers work in that same place, and one of them said to me you can't continue being here because something can happen to you, it would be better if -- then he took me out of my job. We went and we found a police officer, and we told him everything that had happened.

Q. Where did you go after you spoke to the police officer?

A. The police officer did not allow me to move. He made me stay there. An ambulance was called, and I was taken to the hospital.

Q. What happened when you got to the hospital?

A. I was checked thoroughly. My ears were checked. Because I could not stop crying, they gave me pills to calm me down. They just checked me through completely, and I was given some pills to calm down.

Q. Could you hear normally when you were being checked in the hospital?

A. No. My hearing was not good. I could hear the words that were being spoken to me from very far away.

Q. When did you leave the hospital?

A. That same day but about 5 o'clock in the afternoon more or less.

Q. Did you receive additional medical treatment after you left

**A000816**

the hospital on December 11, 2017?

A.   Yes.  I'm going to a hospital that is near my house, which is Elmhurst Hospital.  My ears are being checked, and I'm also getting therapeutic counseling.

Q.   Ms. Chavez, did you return to work again after December 11, 2017?

A.   I went back to work two weeks after the explosion.  But because where I worked, right behind me are the machines, the sewing machines, those loud noises, they upset me, and I just don't -- it's not good for me.

Q.   Have you been back to work since then?

A.   I am not working.

        MS. CROWLEY:  Thank you, your Honor.  No further questions.

        THE COURT:  Cross-examination?

        MS. GATTO:  We have no questions for Ms. Chavez.

        THE COURT:  You can step down.  Thank you, Ms. Chavez.

        (Witness excused)

        THE COURT:  That concludes the government's witnesses?

        MS. CROWLEY:  Yes, your Honor.  The government rests.

        THE COURT:  The government rests.

        Ladies and gentlemen, let's do this.  I am going to excuse you for a couple of minutes, have you go back to the jury room while I confer with the attorneys.  Then I'll bring you back here and give you some instructions about what's next.

**A000817**

All rise for the jury, please.

(Jury not present)

THE COURT:  The government has rested.  The defense is not putting on a case, correct?

MS. GATTO:  That's, your Honor.  Your Honor, we have a motion.

THE COURT:  Yes.  Do you want to make your motion now?

MS. GATTO:  Yes.  Pursuant to rule 29, we move to dismiss all counts in the indictment because the government has failed to meet its burden for each count.  For the record, I am making that motion as it relates to all counts.  I do want to focus on Count One and Count Five, two subsections of Count Five.  Also, I continue to rely on our motion to dismiss Count Six, which was previously litigated, but I want to make clear that that is not being waived either.

THE COURT:  Do you want to do that now?

MS. GATTO:  I can do it whenever it is convenient.

THE COURT:  Let's figure out what we are doing for the balance of the day and going forward so I can excuse the jury with instructions as to what's next for them.

MS. GATTO:  That's fine.

THE COURT:  I do want to tell Mr. Ullah, which I'm sure you have already told him, Mr. Ullah, you have a right to testify if you wish.  You also have the right not to testify.  You have heard me instruct the jury that if you choose not to

A000818

testify, the jury can't draw any adverse inference against you from the fact that you chose not to testify. That is a bedrock principle of our system of justice. I think you understand that. But I want to make sure that you understand that if you would like to testify, that is certainly your choice. I am sure you have discussed this with your attorneys and I'm sure your attorneys have views as to the reasons to testify or not testify. But ultimately it is your decision. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You have discussed that with your attorneys, right?

THE DEFENDANT: Yes.

THE COURT: You choose not to testify, is that right?

THE DEFENDANT: Yes.

THE COURT: That's fine. I'm not surprised. I think it is always the best policy just to make sure. It saves trouble down the road once in a while.

What I would then propose to do is tell the jury to go home, come back here again Monday morning. At that point we will have summations Monday morning. 9:30, 10 o'clock?

MS. GATTO: Your Honor, we need to rest.

THE COURT: Right. You will do that. You can do that now or you can rest formally Monday morning, whenever you want. I assume you are not planning to put on a case. Do you want to

**A000819**

670

rest now before I excuse the jury?

MS. GATTO: Yes.

THE COURT: We will need to have a charge conference. I guess we will have before that or as part of that a conversation about the rule 29 motion. Those are the things we have to do. Let's bring jury back, have the defense rest, and then excuse the jury.

(Jury present)

THE COURT: Ladies and gentlemen, the government has rested. As I told you before, because of the presumption of innocence, the defendant has no obligation to put on any evidence at all. However, if the defendant wishes to, the defendant is entitled to put on a case.

Does the defense wish to put on a case?

MS. GALLICCHIO: Your Honor, on behalf of Mr. Ullah, the defense rests.

THE COURT: The defense rests. That concludes the evidence portion of this trial. We are moving pretty quickly.

Let me give you instructions as to what we are going to do now. I'm going to send you home. I told you we are not going to sit tomorrow. We still have some work to do. We are still going to do some work tomorrow and tonight and I'm sure over the weekend.

What you need to do is come back Monday morning at 9:30. We will then have closing arguments, or summations.

**A000820**

I'll explain a little more about those right before we do them. That, as I mentioned before, is the attorneys' opportunity to make their closing arguments, to argue to you what inferences you should draw, what conclusions you should draw from the evidence to help you organize the evidence in your mind. That's helpful. It is not evidence itself, it's argument, but obviously you should pay attention as you have throughout the trial. I will then instruct you on the law. After that, then you will deliberate.

We still have a lot to do Monday before we get there. In the meantime, I don't want you to discuss the case. I don't want you to do any research. I want you to do all of the things you have been doing so far, which is go home, keep an open mind, don't discuss the case. We will pick up again Monday morning at 9:30. If we are delayed a little bit, it might be we are fine-tuning some things, but I expect we will be ready to go.

Thank you for a week of hard work. I appreciate that. Have a great weekend.

All rise for the jury.

(Jury not present)

THE COURT: What is the best way to do this? I have to get you a charge. Does it make to sense to do the rule 29 in the context of the charge conference?

MS. GATTO: I think it does because a lot of issues

**A000821**

will overlap.

THE COURT:  I do too.  That is what I am inclined to do.  The wrinkle for me was I didn't realize this two- to three-week trial was going to wrap up so quickly.  I'm supposed to catch a plane at 9:40 tonight, so the charge conference will probably have to be telephonically probably in the neighborhood of 4:00 in the afternoon.  Is that okay?

MS. CROWLEY:  That's fine for the government.

MS. GATTO:  That's fine for us.

THE COURT:  In the meantime, I'll get you a copy of the charge so you can have time to look at it and you can make what objections you want to make and arguments you want to make on that.  Let's plan on that.  If something changes, I'll let you know.

In connection with the rule 29 motion, are you planning to submit anything or no?

MS. GATTO:  I was just going to orally argue.  I can talk to my colleagues about that.

THE COURT:  Whatever you think.  I'm not ordering you to.  If you want to, then getting it in tonight would be better than tomorrow.

MS. GATTO:  Yes.

THE COURT:  I'll be out of pocket for trial in the morning.  Is there anything else we should discuss?

MS. GALLICCHIO:  I'm wondering how we plan to do this.

A000822

THE COURT:  You should come here.

MS. GALLICCHIO:  Mr. Ullah needs to be produced.

THE COURT:  Mr. Fernandez is asking about the 8th of November.  I don't that is going to be a problem, but it partly turns on how long the deliberations go.  Let's hear what he has to say.  Let's bring him in.

(Juror present)

THE COURT:  Mr. Fernandez, Mr. Brody mentioned to me that you have a family issue.

JUROR:  Something came up I just learned about Tuesday night when I got home.  I have an emergency.  I need to fly out of the country on the 8th, Thursday.

THE COURT:  At what time?

JUROR:  I can't remember the booking that we got.  I believe in the morning.

THE COURT:  In the morning?

JUROR:  Yes.

THE COURT:  I don't want to pry, but what is the nature of the family emergency?

JUROR:  My dad is very ill and he might end up having a heart bypass.  I need to be there.

THE COURT:  You're traveling to where?

JUROR:  Mexico.

THE COURT:  I want to have an opportunity to discuss with the lawyers what is the best course here.  Do you want to

**A000823**

wait for a couple of minutes?

JUROR: Sure.

THE COURT: Thank you.

(Juror not present)

THE COURT: The 8th is Thursday, but that means he really can only be here, it sounds like, Monday, Tuesday, and Wednesday. I didn't expressly ask him that, but that's what it sounds like. That means if the jury gets the case midday Monday, they might reach a verdict certainly by Wednesday. That wouldn't surprise me.

On the other hand, I wouldn't shock me if they didn't. Then that would create a problem. If we are mid deliberation and one juror has to go because he has a family situation, that would mean we would either have to bring in another juror and have them start over, which seems not ideal, or agree to go with less than 12, which is also not ideal.

It seems to me the most obvious or at least perhaps the safest alternative is to excuse him. We have three alternates that I think are otherwise not going to be needed. You never know, but I do think that probably, given how short this trial has been, we have alternates to spare. Thoughts?

MS. GALLICCHIO: I don't anticipate that deliberations will go more than a couple of days. Obviously, we need to speak with our client about this issue. He has been focusing and concentrating during the trial, this juror. I want to be

**A000824**

assured that he will give the deliberations his attention. Obviously, he is dealing with a very difficult situation.

THE COURT: We can ask him that too. I also don't know that the fact that he is traveling on Thursday doesn't necessarily mean he is available Monday, Tuesday, Wednesday. But he didn't say anything about that.

MS. GALLICCHIO: I would ask if we could ask more questions about how preoccupied he is about that and whether it would affect his ability to focus and deliberate and communicate with others.

THE COURT: Does the government have a view?

MS. CROWLEY: Your Honor, we also think that it is likely that they will have reached a verdict by Thursday. But as your Honor noted, it is a risk, so we think it would be most appropriate to dismiss him now, probably the safest course to dismiss him now.

THE COURT: I think that is clearly the safest course. I wasn't sure if you had spoken to your client and now you were going to say something.

MS. GALLICCHIO: No.

THE COURT: Do you want to chat with your client first?

MS. GALLICCHIO: Yes.

THE COURT: Take a minute to do that.

(Pause)

**A000825**

THE COURT: Have you had a chance to speak with Mr. Ullah?

MS. GALLICCHIO: Yes. At this time we would like your Honor to question the juror about his ability to focus and to pay attention and if what is going on in his personal life will affect that ability. If he says it will not, we would ask that he remain.

THE COURT: What will we do if we get to Wednesday afternoon and the jury hasn't reached a verdict? Then what are we doing? Do I declare a mistrial or bring in Alternate Juror No. 1 at that point and start all over?

MS. GALLICCHIO: I know it is a concern.

MS. CROWLEY: I also think, your Honor, to that point, that there was at least one other juror who had issues the following week. If we are in a position where we are restarting next Thursday, that could create further problems.

THE COURT: Given how short the trial has been, it seems to me that it is unlikely deliberations will go longer than the trial, but you never know, particularly since are some real fault lines between the parties with respect to the applicability of certain statutes.

I'm going to excuse him, reluctantly. I think he is a good juror. He is obviously paying attention. But the way the trial has cracked up, I just think his family circumstances are going to compromise at least potentially his ability to serve

**A000826**

as a juror during deliberations.

MS. GALLICCHIO:  I understand, Judge.  I'm just registering our objection.

THE COURT:  Let's bring him in.

(Juror present)

THE COURT:  Mr. Fernandez, I have been chatting with the lawyers and the parties about this.  It is a difficult circumstance all around.  It is hard to predict how long deliberations will take.  Your traveling Thursday, correct?

JUROR:  Yes.

THE COURT:  You think you could sit Monday, Tuesday, Wednesday?

JUROR:  I can't definitely.

THE COURT:  The problem is I don't know if we are going to be done by then.  Deliberations can take longer.  If you need to leave and we haven't finished deliberating, that means we would have to bring in a new juror to start all over again.

JUROR:  I'm really sorry this is happening.

THE COURT:  You don't need to apologize.  I'm trying to think what the best thing to do is here.  I think the best thing to do is probably excuse you now.  We have three alternates.  My first choice would be to keep you, and I would keep you if your father weren't ill.  But this illness is not something you knew about and is not something you have ANY

**A000827**

control over, and that's your first priority, I understand that. So let me excuse you with the thanks of the Court, thanks of the parties.

JUROR: Thank you.

THE COURT: This hasn't been a long trial, but it is one you gave a lot of attention to and effort to, and that is really appreciated. Good luck to your family, good luck to your father.

JUROR: Thank you, your Honor.

THE COURT: We will rise one more time. Mr. Brody will give you further instructions, take your swipe card and take your notebook. Thanks a lot. Good luck.

(Jury excused)

THE COURT: That moves up Mr. Lopez, is that right?

MS. GALLICCHIO: Yes.

THE COURT: I'll tell him that Monday, and then we'll take it from there.

For a charge conference, let's plan on 4 o'clock here. If that changes, I'll let you know and I'll let the marshals know. We had trouble getting a phone hookup here for something else before. If we have to move to a different courtroom, I'll let you know. And there is a chance I may have to cancel this thing. That's just the way it goes.

Anything else we should cover tonight?

MS. GALLICCHIO: No, your Honor.

**A000828**

MS. CROWLEY:  No, your Honor.

THE COURT:  I'll send you the charge, a draft charge, sometime this evening.  See you tomorrow.

Actually, while I think of it, I would ask the parties generally but the government in particular to focus on what aspect of statutes you are really going to plan on arguing. Statutes are built for lots of purposes, but it is not clear to me that I need to be instructing the jury on every aspect of every sentence in the various counts, the statutes that are implicated in the various counts.  Think about that.  I'm going to be overinclusive in what I send you, but my expectation is I'm going to be shedding a lot of things when I ultimately instruct this jury.

MS. CROWLEY:  Understood, your Honor.

THE COURT:  Thanks a lot.

(Adjourned to 4:00 p.m., November 2, 2018)

A000829

INDEX OF EXAMINATION

Examinationof:                          Page

AARON ZELIN

    Direct By Ms. Gatto . . . . . . . . . . . 434
    Redirect By Mr. Turner . . . . . . . . . 437
    Recross By Ms. Gatto . . . . . . . . . 447
    Redirect By Mr. Turner . . . . . . . . 458


BRIAN MURTAGH

    Direct By Ms. Crowley . . . . . . . . . 460

ANDREW MITCHELL

    Direct By Mr. Turner . . . . . . . . . 477

ANDREW BENNETT

    Direct By Mr. Turner . . . . . . . . . 495

DERRICK MCCLARIN

    Direct By Ms. Donaleski . . . . . . . . 506

ROBERT GILLETTE

    Direct By Ms. Crowley . . . . . . . . . 538
    Cross By Ms. Gallicchio . . . . . . . . 571


CHRISTOPHER RIGOPOULOS

    Direct By Ms. Crowley . . . . . . . . . 579

GERARD QUELCH

    Direct By Mr. Turner . . . . . . . . . 629

BARRY GREENBLATT

    Direct By Ms. Donaleski . . . . . . . . 647

VERONICA CHAVEZ

    Direct By Ms. Crowley . . . . . . . . . 661

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000830**

681

GOVERNMENT EXHIBITS

Exhibit No.                                              Received

206, 207-1 and 207-2  . . . . . . . . . . . . . . 474
202    . . . . . . . . . . . . . . . . . . . . . . 482
209    . . . . . . . . . . . . . . . . . . . . . . 485
303    . . . . . . . . . . . . . . . . . . . . . . 498
134-1A, 116-1B and 121-1B  . . . . . . . . 570
2009 and 200  . . . . . . . . . . . . . . . . 579
104-1A, 105-1A, 105-1B, 106-1A, 106-1B, . . . 596
            106-1C, 107-1A, 107-1B,
            108-1A, 108-1B, 109-1A,
            109-1W, 109-1C, 109-1D,
            109-1E, 110-1A through 110-1E,
            111-1A, 113-1A, 114-1A,
            115-1A, 116-1A, 117-1A,
            118-1A, 119-1A, 120-1A,
            121-1A, 122-1A, 123-1A,
            124-1A, 124-1B, 125-1A,
            126-1A, 126-1B, 127-1A,
            128-1A, 129-1A, 129-1B,
            130-1A, 130-1B, 131-1A,
            131-1B, 131-1C, 131-1D,
            131-1E, 131-1F, 131-1G,
            131-1H, 131-1I, 132-1A,
            132-1B, 133-1A, 134-1B,
            135-1A, 135-1B, 136-1A,
            137-1A, 138-1A, 139-1A, 203-A,
            204-A, 205-A, 205-B, 206-A,
            207B, 207B, 207D, 207-E,
            207-F, 302-1A, and 900
101-1, 101-2 and 2007  . . . . . . . . . . . 637

2  . . . . . . . . . . . . . . . . . . . . . . . 649

100 and 2000  . . . . . . . . . . . . . . . . 506

204    . . . . . . . . . . . . . . . . . . . . . 488

205 and 208  . . . . . . . . . . . . . . . . . 472

302 and 302-1  . . . . . . . . . . . . . . . . 504

901    . . . . . . . . . . . . . . . . . . . . . 513

902 through 916 and 923  . . . . . . . . . . 522

917    . . . . . . . . . . . . . . . . . . . . . 615

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000831**

GOVERNMENT EXHIBITS

| Exhibit No. | | Received |
|---|---|---|
| 918 and 919 | . . . . . . . . . . . . . . . . | 612 |
| 922 | . . . . . . . . . . . . . . . . . . . | 555 |
| 924 | . . . . . . . . . . . . . . . . . . . | 443 |
| 1102, 1103, and 1104 | . . . . . . . . . . . | 654 |
| 1105 | . . . . . . . . . . . . . . . . . . | 655 |
| 2003 | . . . . . . . . . . . . . . . . . . | 647 |
| 2006 | . . . . . . . . . . . . . . . . . . | 460 |

DEFENDANT EXHIBITS

| Exhibit No. | | Received |
|---|---|---|
| P | . . . . . . . . . . . . . . . . . . . | 449 |

COURT EXHIBITS

| Exhibit No. | Marked |
|---|---|
| NUMSORT | |

Ib21ull1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                              18 CR 16 (RJS)

AKAYED ULLAH,

                             Trial

             Defendant.

------------------------------x

                           New York, N.Y.
                           November 2, 2018
                           4:01 p.m.

Before:

        HON. RICHARD J. SULLIVAN

                           District Judge

        APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
    Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
    Attorneys for Defendant
BY:  AMY GALLICCHIO
     JULIA GATTO
     COLLEEN P. CASSIDY

Also Present:

    JOHN MAURER – Special Agent, FBI
    MICHAEL DELUCA – Paralegal, U.S. Attorney
    JASON T. FISCHER – Paralegal, Federal Defenders
    CHIRAAYHU GOSRANI – Paralegal, Federal Defenders

**A000833**

Ib21ull1

(In open court; jury not present)

THE COURT:  Okay.  Good afternoon.  I'm still here.

So we sent out, a couple of times I think -- I'm being converted over from email and so I've had some issues between Southern District and Second Circuit email servers, but hopefully it's now been worked out.  So I sent out the proposed or the draft charge.  I've caught a few things since.  You probably have as well.  That's the nature of charges, I guess.  But that's what I've done.

In the meantime, I received a letter from defendant, which is a seven-page, single-spaced letter, addressing some of the issues that I know we're going to talk about now.

But government saw this letter, I presume, right?

MS. CROWLEY:  Yes, your Honor.

THE COURT:  And I don't have anything else from anybody else, right?

MS. CROWLEY:  That's correct.

THE COURT:  Okay.  So generally what I do at a charge conference is just go through, sort of page by page, and then whoever sort of has the low number, that's where we go and then we just keep going until we finish, and so maybe we should do that.

I think the points raised in defense counsel's letter are ones that I flagged where they come up or what they're related to so I don't think we'll miss it, and then in the

**A000834**

Ib21ull1

course of that conversation, we'll in essence I think also be having conversations that are relevant to the Rule 29 motion as well. So let's do that, and then if we need a formal argument on the Rule 29 after that, we can do it. But I think it's more efficient to probably do the charge conference first and then a Rule 29.

MS. GATTO: We agree, your Honor.

THE COURT: Oh, good. Okay.

So government, what's your first proposed change? What page?

MR. TURNER: Your Honor, it's in Count One, it's on page 16.

THE COURT: 16. Okay.

And Ms. Gatto or Ms. Gallicchio, or Ms. Cassidy, what's your first proposed change; what page?

MS. GATTO: Your Honor, this is a small change on page 13.

THE COURT: 13? Okay. Let's see. There are no small changes, only small lawyers; that's what I say.

MS. GATTO: Then I have a big change.

THE COURT: Okay. Go ahead.

MS. GATTO: The third paragraph, the first sentence, which reads, "If you have a reasonable doubt as to the defendant's guilt with respect to a particular count, then you must render a verdict of acquittal on that particular count."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000835**

Ib21ull1

And so we wanted it to read "a verdict of not guilty."

THE COURT: That's fine. Sure.

Okay. I don't know if that comes up again later, but I like "not guilty" better than "acquittal."

MS. GATTO: Your Honor, I'm sorry. If I could go back to page -- it's the top of page 10 but it's under G, Direct and Circumstantial Evidence.

THE COURT: Yes.

MS. GATTO: The very last sentence before you go on to a new topic, if you could have a balancing language. So right now what it reads is, "The law makes no distinction between direct and circumstantial evidence but simply requires that before convicting the defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, based on all of the evidence in this case." And then if you could include balancing language directing them that if they are not satisfied, then they must acquit the defendant.

THE COURT: But I'm not instructing them on the burden of proof, I'm instructing them on the difference between direct and circumstantial evidence, and that's I think apparent from the language. So I know how I'm going to read it and I'm going to read that sentence, "The law makes no distinction between direct and circumstantial evidence but simply requires that before convicting a defendant," I'm going to strike the capital D there, "a jury must be satisfied of a defendant's guilt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000836**

Ib21ull1

beyond a reasonable doubt, based on all of the evidence in the case." So it's all versus circumstantial and/or direct. So I get your point, but I don't need to I think constantly remind them of the burden of proof every time I'm talking about evidence.

MS. GATTO: Okay.

THE COURT: Okay? But I will lower case those two Ds, because it's a general statement about the guilt of a defendant.

MS. GATTO: Yes, we agree with that.

And then that brings us to Count One as well.

THE COURT: That goes to?

MS. GATTO: That brings us to Count One as well.

THE COURT: Page 16, is that right? Or do you have something before 16?

MS. GATTO: Well, no. The first element of Count One, which begins on 15.

THE COURT: All right.

MS. GATTO: I think it might be easiest, when we talk about Count One -- I could do it page by page, but we have sort of broad objections. I've separated them into four categories of things we'd like to object to and talk about.

THE COURT: All right. However you want to do it. I just think sometimes it's easier to know what we're shooting at. But your first change is on page 15.

**A000837**

Ib21ull1

MR. TURNER:  That's right, Judge, and I suspect -- it does address one of the points raised in their letter.

THE COURT:  Okay.  So what is that?

MR. TURNER:  So that is towards the bottom of the page, it's where the Court has specified the type of material support or resources, the last full paragraph on page 16.

THE COURT:  Yes.  Well, the last full paragraph, right, mm-hmm.

MR. TURNER:  We agree that it will be appropriate for the two types of material support or resources to be specified there, which are the types specified in the indictment, to be personnel and services, so in other words, we believe that it could read something like, "defined by statute to include any service and any personnel," and then parenthetically what your Honor already has, "one or more individuals who may be or include one's self."

THE COURT:  Okay.  So --

MS. GATTO:  I'm sorry.  Could you say that again.

THE COURT:  Yes.  Read to me what you want that -- we're calling it a paragraph.  It's a sentence.  The term "material support or resources" is defined by the statute to include any service --

MR. TURNER:  Or personnel.

THE COURT:  Or personnel.

MR. TURNER:  And then in parentheses what is there,

**A000838**

Ib21ull1

the parenthetical at the end of the sentence currently.

THE COURT: Okay. And keep that in quotes or not in quotes? In other words, any service or personnel, one or more individuals who may be or include one's self.

MR. TURNER: It can remain in quotes, your Honor.

THE COURT: Okay. And then there's a definition of "personnel." But there's no comparable definition of "service." This was touched on in the letter. So are you proposing I include a definition of "service" too?

MR. TURNER: No, your Honor. We don't believe that a definition of "service" is necessary. It can be given its plain and ordinary meaning. For any number of reasons, a definition is not necessary. It would be a departure from prior charges for that particular term to be defined in addition.

THE COURT: And then so you had a broader set of concerns, I think.

MS. GATTO: Well, it certainly relates to how we're defining "material support or resources." We agree with the government that "services" must be included, and we agree with perhaps what the Court is alluding to, that we need a definition for "services." So that's our main thing we'd like to discuss. And then I think it leads into our second related topic, which is the inclusion of "material support or resources" such as -- and then these are properties,

**A000839**

Ib21ull1

facilities.

THE COURT: Well, that's coming out now, right? You're saying that should come out. My view is it should come out because nobody's talked about it and it's not in the indictment for the most part either. One could argue that providing a pipe bomb, maybe that's a service, maybe that's a weapon or an explosive. But anyway, just so I'm clear, the government's position is that the language "any property" all the way down to "personnel" is struck, right?

MR. TURNER: Except that it would be -- yes, but the service would be --

THE COURT: Yes. So you insert "any service" or strike from "any property" down to "personnel" and continue up with the rest of the sentence.

MR. TURNER: Yes, your Honor.

THE COURT: Okay.

MS. GATTO: So then that solves the problem.

THE COURT: You're not unhappy. You can live with that sentence. You just think you need more after that, right?

MS. GATTO: I think we're well supported on this. We need a definition of "services." Now I've provided that definition in our proposed instruction. That is drawn entirely from the Supreme Court case we reference, which is *Holder v. Humanitarian Law Project*.

THE COURT: Right. I know that. I know the case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000840**

Ib21ull1

Right.

MS. GATTO: So we would ask that -- the definition of "personnel" as provided by the Court is fine by us, and then a paragraph after that that says, a person provides services, or services as defined. I don't really care what the introduction is. And then to draw from our language in our proposal, which, again, comes from the Supreme Court case. And it's certainly important. It's as important and for the same reasons that we're defining "personnel."

THE COURT: Well, okay. I hear you. I mean, only work performed -- well, let's see. Commanded or paid for by another.

MS. GATTO: I'm sorry. What are you reading from, your Honor?

THE COURT: I'm reading from your proposed language.

MS. GATTO: Of what the definition of "services" is?

THE COURT: Yes. Commanded or paid for by another. That seems to be a narrow reading of service. There might be a lot of services that fall in between being commanded or paid for.

MS. GATTO: Well, your Honor, that comes from the Supreme Court case defining --

THE COURT: Well, totally different context, right?

MS. GATTO: But defining "services" in the context of material support.

**A000841**

Ib21ull1

THE COURT:  Well, yes, and distinguishing out certain things that wouldn't be covered, but I'm not sure that that language is the definition of "service" in all cases.

MS. GATTO:  Well, we can certainly talk about a different definition.

THE COURT:  Anyway, you've offered a proposal.

You've not.  So you're okay with their proposal?

MR. TURNER:  No, your Honor.

THE COURT:  So why not?

MR. TURNER:  First, the proposal that's been made is in fact cherry-picked from the language of that decision, the *HLP*, or *Humanitarian Law Project* case.  The definition is far broader.

Second, those cases are an entirely different context.  They are a civil case, and a First Amendment advocacy case, a very different context than what we're dealing with here.

The defense has not cited a single precedent for a jury charge in a criminal case where "service" has been defined.  It can be simply given its ordinary meaning by the jury, as with any number of other terms in the statute, like "concealed," "disguised," "nature," and so forth.  So the various charges that we've cited -- *El Gammal*, for example, other cases in this district -- have not defined the word "service," and there's no need to do so here.

I would point your Honor to a recent case, it's

**A000842**

Ib21ull1

actually the *Georgescu* case, it's 14-CR-799, in which there was a 2339B charge. It actually involved an alleged provision of weapons brokering services to the FARC. It was before Judge Abrams. No formal definition of "service" was given. The charge simply noted that weapons brokering services were alleged, just as the indictment here notes that there's an allegation of a terrorist attack. There's no need for the importation of that definition.

THE COURT: Okay. But what's your theory of the services provided here?

MR. TURNER: The defendant provided a service to ISIS by carrying out a terrorist attack for ISIS, an attack in the name and in furtherance of its cause. That was the service on December 11th of 2017.

THE COURT: So there's not much disagreement as to what the service is. It's not that he engaged in different money lending, knitted a sweater for the soldiers, there's none of that. It's just what he did was in service of ISIS is what you're saying, right? So the language proposed here is "work performed in coordination with or at the direction of ISIS" meets the definition of service. Do you agree with that or disagree with that?

MR. TURNER: We disagree with the need for any definition.

THE COURT: I'm not asking about the need. I'm saying

**A000843**

Ib21ull1

is that accurate?  Do you agree that work performed -- never mind the only -- just "work performed in coordination with or at the direction of ISIS" meets the definition of service?

MR. TURNER:  Your Honor, we don't agree that there is support in the existing law for that definition of service.  It overly narrows the term.

THE COURT:  Okay.  So I'm defining "personnel," right?

MR. TURNER:  Yes, your Honor.

THE COURT:  But I'm not defining "service."

MR. TURNER:  And your Honor, we would point out that "personnel" is specifically defined, as your Honor is aware, in the statute.  The language that's being drawn on the direction and control and you can't act entirely independently, that is in 2339B(h).  It is specifically defined in the statute, which is why we see that term defined in these charges.  There is no need for a corresponding definition for "service."

MS. GATTO:  Your Honor, I obviously disagree.  We're drawing from the Supreme Court case for the definition, and for the same reasons that it would be included for "personnel," it should be included here.

I will also note that the government said that "services" hasn't been defined in any of the list of cases.  I just happened, right before we got here, to look at the *el Gammal* indictment.  The *el Gammal* indictment charged only personnel; charged defendant with providing material support,

**A000844**

Ib21ull1

namely, personnel.  So I'm not surprised that "services" wasn't defined to the jury there.  The government here has elected to charge services.  That's what the grand jury evaluated and that's what they returned the indictment on.  The definition of "services" in this context is not going to be known.  The Supreme Court --

THE COURT:  Well, it's not defined by the statute, right?

MS. GATTO:  Yes, it's interpreted --

THE COURT:  What makes you think it's something other than just the ordinary definition of the term?

MS. GATTO:  The Supreme Court case.  That answer is easy to me, which I don't think it matters whether it was in the civil context, a constitutional claim or not.  The Supreme Court case is determining what is the definition of "services" for this exact statute.  This isn't me analogizing another statute that uses the same words or something that's comparable.  This is the statute.  That is the definition.  And it should certainly be provided to the jury.  And it was what the grand jury returned the indictment on.  And the government's theory, in order for that to be in violation for the jury to interpret it and view the evidence in the light most favorable to them and to convict, they must know that it has to be in coordination; otherwise, it doesn't violate the statute.  According to the Supreme Court.

**A000845**

Ib21ull1

THE COURT: Well, "in coordination with."

MS. GATTO: Yes, that's the language of the Supreme Court.

THE COURT: Okay. So it seems to me, maybe this is really now the time then to get to Rule 29 argument, because it seems to me what you're saying is that a person who heeds, who basically takes direction from ISIS and takes the battlefield to the country where he's living, in the United States, by doing a lone wolf attack is not providing material support by definition. That's what you're saying, right? Because they didn't know about him in advance and they didn't coordinate with him.

MS. GATTO: No. You used the word "direction," if they do it at the direction.

THE COURT: I'm saying, well, we've seen the video, right? We've heard the testimony about what ISIS has called its followers to do. And so having done that and then someone saying, well, I'm going to do that, I'm going to detonate a pipe bomb on a bus, that is uncoordinated with ISIS, right? ISIS didn't tell him --

MS. GATTO: That's correct.

THE COURT: So is that material? Is that by definition not material support, according to the definition that you're offering?

MS. GATTO: Yes, your Honor. Under my Rule 29, a lone

**A000846**

Ib21ull1

wolf attack, according to the government's expert, is done alone. And the statute and the Supreme Court case makes clear that actions done entirely independent of the foreign terrorist organization do not violate the statute.

THE COURT: But "entirely independent" ignores the fact that there was a invitation or directive -- I mean, I think you can call it one or the other, but the testimony is what it is -- on the part of ISIS encouraging people to do acts like this, and so you're saying that that's not material support by definition.

MS. GATTO: Yes, encouraging online just a general population to which they have no contact is not direction, control, or coordination. That's --

THE COURT: Says who, anybody?

MS. GATTO: Well --

THE COURT: I would be the first.

MS. GATTO: I'll tell you, this is the first case of its kind. There have been many lone wolf attacks prosecuted in federal court. The government has never chosen to test the statute in this way. They are testing the statute in this way here. I think there's a reason they never chose to charge material support in a lone wolf attack, because the statute doesn't support it. So yes, you're right. I don't have a case on it because the government has never charged a purely lone wolf attack, which is what we have here.

A000847

Ib21ull1

THE COURT: Wait. A purely lone wolf attack as opposed to what, a semi-lone wolf attack?

MS. GATTO: No. We talked about the spectrum with Dr. Zelin, right? There's an ISIS-inspired attack -- I'm using the term, and that is my term, I'm certainly not a social scientist -- a pure lone wolf attack, where there is no communication with a single person in ISIS. The communication, if you call it that, is the internet, some propaganda disbursed out there. There's no factual dispute on what the government's version of events are, right? The version, the government's theory, is that Mr. Ullah consumed ISIS propaganda that propagated doing various things, including lone wolf attacks, and the question really is, is that direction, control, or coordination. I think it's legally insufficient.

THE COURT: All right.

MR. TURNER: May I try to make four --

THE COURT: Are you breaking now ground here? Is this the first of its kind?

MR. TURNER: It is one of at least a few lone wolf attack cases to go to trial with a material support count, your Honor.

THE COURT: So this is not the first.

MR. TURNER: I can't cite you right now another one, your Honor.

THE COURT: Another one in this district?

**A000848**

Ib21ull1

MR. TURNER:  We are not aware of one.

THE COURT:  Okay.

MR. TURNER:  Your Honor, we have charged it, certainly.  There is the pending Sayoc case as well, the mail bomb attack that occurred in the Tribeca neighborhood.

First, the defense is conflating "personnel" and "services," because there is a statutory definition of "personnel"; there is not for "service."

THE COURT:  We've already made that point.  That point's been made.

MR. TURNER:  Your Honor, with respect to "coordination or in concert with," yes, the attack here was certainly in coordination with and in concert with ISIS, because the defendant consumed this propaganda.  We've seen it through the testimony and the videos that are specifically instructing and encouraging supporters to do exactly what the defendant did.

THE COURT:  That seems to me then you're saying that their definition works and you can work with it.  Is that what you mean to say?

MR. TURNER:  The last point, your Honor, is that, in getting to precisely that point, if we are going to use a definition of "service," we ask that it be the entirety of the definition that's set forth in the case the defense is citing, the Supreme Court case *Humanitarian Law Project*, and we note, your Honor, that the last part of that definition is "or an act

**A000849**

Ib21ull1

done for the benefit or at the command of another."  In other words, the definition includes an act done for the benefit of another.  Clearly that encompasses the attack and the act that was undertaken here for the benefit of ISIS.

Very briefly, your Honor, finally, this "entirely independently" language is important, and again, it comes from the personnel context, but the notion that there has to be direct one-on-one contact or some sort of oath or formal membership, that's a strawman.  This action here was not entirely independent of ISIS.  It was done at the behest and at the direction of all the propaganda and the videos that we've seen.  So this was not entirely independent of the organization.  The defendant was not just of his own accord handing out flyers in supermarkets.  He was responding to messages put out by the organization central, the organization itself.

THE COURT:  All right.  Well, I mean, that's the argument.  That's certainly what you're going to argue to the jury.  They're going to argue, no.  The jury I think is going to, as happens, in the absence of a definition of "service," say, well, who's right?  What's enough?  I mean, does it need to be in coordination with or is it enough that it's done for the benefit of or at the behest of more generally?  And seems to me that I'm either going to have to answer that before or I'm going to have to answer it after, but I think the question

**A000850**

Ib21ull1

is going to come.  You guys are planning to argue this regardless, right, each of you?  So we'd better nail this down. It is a fact that the statute doesn't define "service"?  And "service" is a term that has a broad meaning.

But I guess I'd ask you to respond, Ms. Gatto, to the part that you left out, that Mr. Turner just referred you to.

MS. GATTO:  That's fine, your Honor.

There's two parts of the Supreme Court's definition of service, and I don't have an issue with including all.  The first part is Webster's definition of service.  That's what the government is citing from.  So Webster, the international dictionary, defines "service" to mean, and then there's a list, including the things we have included and what the government included.

THE COURT:  Wait.  You're talking about in that case, you're saying.

MS. GATTO:  I'm saying, yes.  So Supreme Court defines "services" looking at two things.  One, they're talking about this common sense definition of "service," meaning the dictionary, which is part of the definition, and then in the context of the material support statute, they add the language, which is absolutely necessary here, saying that, we interpret "services" along the same lines as "personnel," right?  They're comparable, there's overlap, there's something similar but not identical in every circumstance, but they're interpreting

**A000851**

Ib21ull1

"services" using the dictionary and the statutory definition of "personnel," and that's where the coordination language comes in.  I have no objection to including the clause that the government wants included.  And the second sentence, which is about the coordination, which, again, comes from the Supreme Court case.

THE COURT:  All right.  I'm going to tinker with that.  I will get something to you shortly, by tomorrow, certainly.  Okay?

MS. GATTO:  Yes.  Thank you.

THE COURT:  Anything else with respect to Count One?

MS. GATTO:  Yes.  I have three more things.  Maybe we'll do them in order of complexity.

THE COURT:  Okay.

MS. GATTO:  Unless you want to do the more easy, I think less controversial things first.

THE COURT:  I have at page 17 this language then you need to be unanimous with respect to which form of material support was provided, and I used an example, personnel, and then weapons.  I would presume to switch that out for service, or services.

MS. GATTO:  Absolutely.  That was our next point.

MR. TURNER:  That's the only other proposal we had for Count One, your Honor.

THE COURT:  Okay.  So that's an easy one.

A000852

Ib21ull1

And then you have two more?

MS. GATTO:  Yes.

THE COURT:  Okay.

MS. GATTO:  So we would ask that the language regarding attempt --

THE COURT:  Okay.  Let me just see.

MS. GATTO:  So that's on page 16.  It's two paragraphs, starting at the third -- first full paragraph, which starts, "A person attempts to provide material support."

THE COURT:  Right.

MS. GATTO:  I don't think the jury should be charged on attempt here.

THE COURT:  Well, I wanted to ask that question.  So are you going with an attempt theory?

MR. TURNER:  Yes, your Honor.  That is certainly included in our theory.

For example, with respect to personnel, there is a substantive provision of personnel responding to these calls in the propaganda providing himself to the organization, and we heard from Dr. Zelin that when someone, a supporter, carries out an inspired attack like this, that person becomes a soldier of the caliphate, a part of the organization, but at the very least, if the jury weren't to find that, there is an attempt to provide that sort of personnel, namely through martyring one's self for the cause.

**A000853**

Ib21ull1

THE COURT:  But wait a minute.  What you charged is that the defendant provided and attempted to provide material support, right?  And the material support was, your theories are, personnel in the form of himself, and it was services in the form of this attack.  Right?

MR. TURNER:  Yes, your Honor.

THE COURT:  And so where's the attempt?  What did he attempt to do?  What different proof do you have for attempt that's different from provided here?

MR. TURNER:  Well, your Honor, the basket of proof is, it's the same for both.

THE COURT:  They mean the same thing.  The attempt was the providing?  Why do I want to confuse the jury on this?  I keep wondering why this jury charge seems to be instructed at this metaphysical approach to the charged conduct.  The jury sat through a little over two days of evidence.  It wasn't a lot.  I think they remember it pretty well.  So you're asking me to charge them on attempt, but I have a feeling you're going to get up here and argue none of it and I'm just going to sit here like an idiot instructing them on something that you're not arguing and nobody's arguing, and why do I want to do that?

MR. TURNER:  We fully understand your Honor's point, but I can tell you we do intend to argue --

THE COURT:  What do you intend to argue on attempt?

MR. TURNER:  We intend to argue primarily on

A000854

Ib21ull1

personnel, your Honor.

THE COURT:  That he attempted to do what?

MR. TURNER:  If the jury does not believe that he actually succeeded --

THE COURT:  In providing himself?

MR. TURNER:  Himself.  And let me try to --

THE COURT:  This is purely metaphysical, right?

MR. TURNER:  It is not, your Honor.

THE COURT:  So what did he do?  He didn't come out of his body, he didn't actually put himself into his head?  At what point did his attempt become a providing of personnel?

MR. TURNER:  Well, your Honor, one way a jury could reach that conclusion is, we've heard testimony about how suicide operations in particular, martyrdom operations on behalf of ISIS, that when an attacker succeeds in martyring himself for ISIS, that he becomes part of the group.  A jury could conclude here --

THE COURT:  You think the statute is about that.  In other words, his attempts did not come to fruition until he succeeded in obliterating himself.  That's when the attempt became the providing of material support.

MR. TURNER:  Killing himself in the name of the cause. Your Honor, we're arguing both.

THE COURT:  And that's when the attempt became actual providing material support?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000855**

Ib21ull1

MR. TURNER: Well, your Honor, we're arguing that he succeeded as well, but we do think it is reasonable to instruct the jury on an attempt theory here, particularly with respect to personnel.

THE COURT: So, again, I want to make sure that I understand your theory. Your theory is that providing personnel is only realized when the person is dead. That's what you're saying.

MR. TURNER: I'm saying that a jury could reach that conclusion, your Honor, in --

THE COURT: Really. And you're going to argue that to them?

MR. TURNER: We're going to argue that at the very least he attempted to provide himself to ISIS by martyring and trying to kill himself for ISIS. Even if he didn't succeed in that effort, he certainly attempted to --

THE COURT: But providing himself is the element of the offense. Whether he succeeds in martyrdom, whether he fails in martyrdom and only injures himself or whether the whole thing just goes off with a fizz, what difference does it make? He provided himself.

MR. TURNER: Your Honor, we agree that he did provide himself.

THE COURT: Right. You're not arguing attempt, I don't think, and again, I'm going to be the only one who's

**A000856**

Ib21ull1

arguing attempt and the jury's going to look at me plaintively like, what are you talking about? And I'm going to say, well, a day ago Turner was very passionate about this, and although he isn't now, that's why it's here. That's really what you're saying.

MR. TURNER: Judge, I'm representing to the Court that we do intend to argue both the successful offense and attempt with respect to personnel. We do.

THE COURT: So it was an attempted murder and a successful murder, that's what you're going to argue. It's akin to that.

MR. TURNER: It's not akin to --

THE COURT: We're charging him with murder, we're also charging him with attempted murder, because they're really the same.

MR. TURNER: We don't see that's akin to a murder.

THE COURT: Why not? Why not? Providing material support or attempting to provide material support. Here, material support to my clerk. Boom, he got it. This is attempted material support. Whoops. Didn't make it. Those are different. You're saying what? What was the attempted material support that's different than the successful providing the material support?

MR. TURNER: Perhaps I can try to put it this way. We do believe there is testimony in the record, principally from

A000857

Ib21ull1

Dr. Zelin, that could lead a jury to have different conclusions about when exactly a supporter succeeds in providing himself, providing the personnel to the organization.

THE COURT:  So it really is metaphysical and subjective.  It turns on when he clicks his heels three times and really feels that he's become a soldier.  That's really what it is.  And we're going to argue that to the jury, and I'm going to instruct them that when, in his own consciousness, he has reached this metaphysical level, then it's not an attempt anymore.  I want to get an instruction from you on that, because again, I just think there's such a hunger to keep open options that you don't really plan to argue, and I don't know why that is.

All right.  Anything with respect to the second element or any of the other elements on Count One?

MS. GATTO:  Did you rule on the attempt?  I'm sorry.  I don't mean to --

THE COURT:  It's charged attempt, right?  Attempt --

MS. GATTO:  But the evidence is very clear that this is a completed action, and I think what may be happening --

THE COURT:  No, I don't know.  Look, I don't know what the action was supposed to be.  Maybe it was to take out a subway car and he detonated early because he struck his zipper.  I don't know.

MS. GATTO:  But that's not what they're arguing.  We

A000858

Ib21ull1

know that.  They're not going to stand up there and say the bomb was a substantial step in some other form of providing material support.  I mean, this is a completed act.  What they have charged is that he provided material support by attacking, by bombing.  That's the charge.  It's not that complicated. It's as simple as can be.  If we add attempt to the mix, one, we're going to confuse the jury, and it's going to be some sort of end run around the definition of personnel, where they're going to argue that his attempt was to have ISIS direct him, right?  His attempt is the providing of the services, right? It's not an attempt.  He provides what they think is personnel and services.  That's it.  That's what the jury heard.

THE COURT:  Well, the services are a terrorist attack. The services may have been to kill a bunch of people and that didn't happen because it went off early.  I don't know if it was intended to be detonated in that hallway or someplace else. I don't know that anybody has heard evidence.  I'm not sure what the jury is going to be asked to believe on that.  But it seems to me you could make an attempt argument based on the evidence developed so far.  I just don't like what Mr. Turner is trying to argue, that it turns on the subjective religious and metaphysical beliefs of the defendant.

I can't believe that's right, and I wouldn't know where to begin on instructing the jury about that.  So you're saying it should just be he provided.  So at what point did it

**A000859**

Ib21ull1

become complete, in your view?

MS. GATTO:  Well, accepting the government's version of events, that it's completed, it's certainly completed by the time the bomb goes off.

THE COURT:  When he leaves his apartment, is it completed then?

MS. GATTO:  I don't think we need to get there because the bomb explodes, and there's absolutely no question that this is a case about a completed crime.

THE COURT:  Okay.  But I'm not --

MS. GATTO:  Listen, if the case was he left his house with a bomb strapped to his chest, then yes, I think an instruction on attempt would make sense and I think we'd have a legitimate summation on that point.

THE COURT:  And if the bomb went off as he was going down the stairs of his apartment building, then we would have an attempt?

MS. GATTO:  I think when the bomb goes off, your Honor, again, it doesn't matter.  What you have here is the most completed of all offenses, like you said.  To compare it to a murder, this is as completed of an offense as you can get. There was two and a half days' worth of testimony on it.  As you said, it's just not that complicated.  I don't know why we're complicating things, and I can't imagine that Mr. Turner is going to stand up and make the argument that it's only

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000860**

Ib21ull1

completed when he actually achieves martyrdom.

THE COURT:  I've never heard that theory before today. So --

MS. GATTO:  Anyway, we object to it, and we ask that the jury not be instructed as to attempt on Count One.

THE COURT:  Look, it seems to me that there could be attempt with respect to services, because the service may be something, he intended to do a service, that it went off early, it went off prematurely.

MS. GATTO:  Your Honor, that's not what they're arguing.

THE COURT:  I don't know if they're arguing that.

MS. GATTO:  You just asked their theory on attempt and they gave you their theory, which was personnel.  That's why we have charge conferences, so we can figure out whether it's needed or not.  They gave you their theory on attempt.  Their theory on attempt is he attempted to provide personnel but didn't die, and --

THE COURT:  Well, personnel and services, they're two different things, right?  They're two different approaches or theories with respect to material support.

MS. GATTO:  Correct.

THE COURT:  So personnel are the only ones that Mr. Turner spoke to.  He didn't talk to services, I don't think.

**A000861**

Ib21ull1

MS. GATTO:  He didn't.

THE COURT:  So what are the services that were offered or being provided, or attempted?

MR. TURNER:  The service here, your Honor, is the carrying out of a terrorist attack.

THE COURT:  Any terrorist attack?

MR. TURNER:  The terrorist attack that was carried out by the defendant at the beckoning, at the instruction of --

THE COURT:  I understand the motivation.  The point is, what is the difference between an attempt and an actual providing of services?  In other words, if his plan was, I will get on the shuttle, which is packed to the gills, and then I will detonate and I will take out as many people as possible and I will also paralyze as many train lines as possible, if the bomb went off before then, that would probably be an attempt, it would seem to me, because he didn't achieve his goal.  The service was at least intended to be something different.  I'm not sure what the goals were here.  Four hours of an interview and all I know is that he watched a couple of videos.  So I don't know what the goal was or what the objective was or where that bomb was supposed to be detonated, whether it was intended to be detonated in that hallway or someplace else.  The jury doesn't know; that's for sure.

So what's your argument of an attempt on the services?

MR. TURNER:  Well, first, your Honor, we do submit

**A000862**

Ib21ull1

that he actually did provide the service, the attack, but particularly --

THE COURT:  That was the intended attack, in the hallway there.

MR. TURNER:  Yes.

THE COURT:  That's where he wanted to detonate.

MR. TURNER:  That is our theory, your Honor, yes. With respect to the definition --

THE COURT:  So how is it an attempt?  So he carried out the attack, he provided the service that he intended to provide.

MR. TURNER:  Your Honor, as we said, we do see the attempt theory primarily with respect to personnel, but particularly if you're incorporating the definition that we've talked about today, for example, which requires an act done for the benefit of another, there could be a finding here that this was an attempt to do an act that benefited ISIS but that it didn't succeed because no one was killed.

THE COURT:  Well, that could be, but you're not planning to argue that, are you?

MR. TURNER:  Your Honor, we are intending to argue that the defendant at least attempted to provide a service and personnel and that he also succeeded in doing so.

THE COURT:  And that they're the same.  But in case you don't think they're the same, you should convict anyway;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000863**

Ib21ull1

that's what you're saying.  We think they're the same.  All our proof for attempt is identical to our proof for providing, but if you don't think so, ladies and gentlemen, you should still convict because the judge used some big language about attempt.

MR. TURNER:  Not big language.  The language that your Honor has.  And again, it's a service in an attempt to kill people.  He ultimately did not succeed in killing people, as the Court is aware.  And that was the ultimate benefit and goal of the service.

THE COURT:  So it seems to me then you've backtracked from your argument about your attempt theory, which is that the goal was something other than what he achieved here.  The goal was something bigger and grander, and the fact that he didn't achieve it doesn't mean that he didn't attempt it.  That's really your argument, right?

MR. TURNER:  Your Honor, with respect to the personnel point, there was so much cross on whether the defendant did or did not join ISIS or become a member of ISIS, a jury could certainly conclude that the defendant attempted to join ISIS by providing himself to the cause through this attack but that he didn't ultimately succeed because he did not kill himself and/or others.

THE COURT:  All right.  So you're seeking attempt on something other than personnel?

MR. TURNER:  Yes, your Honor.  We do believe it's

**A000864**

Ib21ull1

properly charged on service as well.

THE COURT: All right. I'd like a letter on this tonight, because I don't understand what you're saying. And they wrote me one, you didn't. So I don't know. I'm still trying to figure out what your guys' theory of these charges is.

MR. TURNER: We'll submit a letter, your Honor.

THE COURT: Okay. What else do you have on Count One?

MS. GATTO: Your Honor, right now Count One reads as the state of mind is only knowing, should be knowing and intentional, which is what was charged in the indictment.

THE COURT: And so if the government says because it's in the indictment, not because it's in the statute, is that what you're saying?

MS. GATTO: That's correct, yes.

THE COURT: So that was in your letter. And so why is intentional in the indictment? It's not in the statute, is it?

MR. TURNER: It's not in the statute, your Honor. It is baked into your Honor's definition of "knowingly" in the charge.

THE COURT: Well, I know I define "knowingly." I haven't defined "intentionally." Normally, where there's a statutory provision of "intentional," then I define "intentional"; normally, when there isn't a statutory definition of "intentional," then I don't. But normally, it

**A000865**

Ib21ull1

seems to me the grand jury and the prosecution doesn't add things that aren't in the statute. So I'm not sure why it's there. So they're saying because you guys threw it in, because you added an extra element for yourselves, that I have to instruct the jury on it. And so I don't know that that's the case, but you haven't responded.

MR. TURNER: Your Honor, we don't have any objection to including "intentionally" in the charge.

THE COURT: Okay. And the definition they provide is one you're okay with? Page 6 of their letter.

MR. TURNER: We don't have any objection to that, your Honor, which comes from Sand, your Honor.

THE COURT: Okay. Anything else? Ms. Gatto? On Count One?

MS. GATTO: Yes, one more point.

In our proposed charge on Count One, I think it's the second element, let me just --

In our proposed charge on the second element, which relates to the foreign terrorist organization, so this would be starting at page 17 --

THE COURT: Right.

MS. GATTO: -- at the conclusion of this charge, we had asked that the following language be included: "It is not enough for the government to prove that Mr. Ullah provided personnel or services to some terrorist organization in

**A000866**

Ib21ull1

general.  Rather, the government must prove that Mr. Ullah provided personnel or services to ISIS in particular."  That's not in your charge.  That was in our request, and we would ask that it be in the charge.

THE COURT:  I mean, there's been no testimony about any other organization besides ISIS, right?

MS. GATTO:  No, your Honor.  There was testimony about Al Qaeda.

THE COURT:  Yeah, which he said he wasn't doing.  Nobody suggested he was doing Al Qaeda.

MS. GATTO:  There was testimony that lectures by al-Awlaki, who is an Al Qaeda operative, were found on his computer.

THE COURT:  If they argue that Al Qaeda is sufficient, then I'll certainly add that.  I'll add that at the end.  But nobody's arguing that.

MS. GATTO:  Your Honor, those were our points on Count One.

THE COURT:  Okay.  Do you have anything else?

MS. GATTO:  I'm sorry.  Thank you.  I'm sorry.  There was one other point I had forgotten.  Ms. Gallicchio helped me.

THE COURT:  Sure.

MS. GATTO:  This is on page 16.

THE COURT:  Yes.

MS. GATTO:  It actually is the very end of 15.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000867**

Ib21ull1

word "To," it standards the sentence at the end of 15.  It says, "To be clear, the law does not prohibit advocating the political goals of ISIS," which is language we asked for and we're happy it's in there, but we also asked for the additional language we had, which was, we would ask that it read, "To be clear, the law does not prohibit advocating the political goals of ISIS or harboring extremist views, religious or political."

THE COURT:  All right.  I mean, I don't think that's necessary.  That's why I took it out.

All right.  Anything else?

MS. GATTO:  Let me double-check before I -- that's it on Count One, your Honor.

THE COURT:  Okay.  All right.  Mr. Turner, what's your next proposed changes or modifications?

MS. CROWLEY:  Your Honor --

THE COURT:  Ms. Crowley?

MS. CROWLEY:  I'm sorry, your Honor?

THE COURT:  Go ahead.  What?

MS. CROWLEY:  Okay.  Our next proposed change is not until Count Five, which is on page 30.

THE COURT:  Okay.  How about the defense, do you have things before then?

MS. GATTO:  We do.  We have something in Count Two.

THE COURT:  Right.

MS. GATTO:  It's a similar objection to the one we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000868

Ib21ull1

made in Count One.  Again, we don't think that attempt should be here.  I think the argument is even stronger here, where the charge is use of a weapon of mass destruction.

THE COURT:  All right.

MS. GATTO:  Again, I just don't think that this is a case -- the jury is going to be so confused by that.  This is not a case about an attempt; it's a completed action, under the government's theory.

THE COURT:  Okay.  I understand that point.  I mean, I have a concern about the fourth element, which is, we've given them four different versions, four different ways to get there, and are you arguing all four, Mr. Turner?  Or Ms. Crowley?

MS. CROWLEY:  Your Honor, we think that we could probably strike C, the defendant traveled in interstate commerce in furtherance of the crime.

THE COURT:  Is there any evidence -- I guess he traveled under a river.

MS. CROWLEY:  We're not going to be arguing that, your Honor.

THE COURT:  You're not going to be arguing that. Okay.  But you are going to be arguing that facilities of interstate commerce were used, property affected was used in interstate commerce, and the offense or the result of the offense affected interstate or foreign commerce.

MS. CROWLEY:  We likely won't argue A either, your

**A000869**

Ib21ull1

Honor.

THE COURT: So am I taking that out? The goal is to streamline this. The goal is to only instruct the jury on theories that people are actually pursuing. It's not to give them a primer so that the next time they'll have a better insight as to how to do jury charges.

All right. I'm happy to take out A and C because it really didn't seem to me that that is the focus of anything. I assume you have no objection, right, Ms. Gatto?

MS. GATTO: No objection.

THE COURT: All right.

MS. CROWLEY: Your Honor, we do intend to argue attempt though.

THE COURT: Okay. So the attempt is what?

MS. CROWLEY: Well --

THE COURT: What is the attempt? So attempt should be distinguishable then from the completed goal, or the completed activity.

So this charge, right, Count Two is for use of a weapon of mass destruction, right?

MS. CROWLEY: That's correct, your Honor.

THE COURT: And so what makes it both the use and the attempted use?

MS. CROWLEY: Well, your Honor, our argument is that he used a weapon of mass destruction. We do expect the defense

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000870**

Ib2rull2

to argue, as they did in their opening, that either the device wasn't properly assembled so that it constitutes a weapon of mass destruction, or that it detonated or exploded in a way that the defendant did not intend.

THE COURT:  All right.  And so it's for the lesser included then.

MS. CROWLEY:  Exactly.

THE COURT:  Okay.  Ms. Gatto, why are they not free to argue that?

MS. GATTO:  Your Honor, we didn't argue in our opening to the first point, which was that the bomb didn't go off, or it wasn't as -- I don't remember exactly the language Ms. Crowley just used, but it was nowhere in our opening.  And the statute just requires the explosion.  That's the completed offense.  Now we're just going to argument.  The question is not whether -- I'm not quite sure I follow completely what the government is saying, but for the government, and for the statute, the question on that is whether the bomb exploded. The bomb exploded.  That was the testimony from several experts.

(Continued on next page)

A000871

Ib2rull2

THE COURT: It's not just that it exploded. It's that it exploded and was used to affect interstate commerce.

MS. GATTO: Right.

THE COURT: Or had the effect on interstate commerce. At least conceivably something could have exploded but not have had the effect on interstate commerce but still therefore be an attempt because that was the goal. The goal was to get to the place where it would affect interstate commerce.

MS. GATTO: The attempt goes to the use of the weapon of mass destruction: did he use the weapon of mass destruction or he attempted to use the weapon of mass destruction. The government's theory is that he used the weapon of mass destruction.

THE COURT: Right. Your argument is going to be that he didn't. They want to be able to respond to you that, well, if you think he didn't achieve his goal, then it was an attempt. We have this long video or this series of videos which show him leaving the apartment and detonating the bomb and everything in between. If the bomb had gone off in his own stairwell, that would not have been the use of a weapon of mass destruction, would it? It would have exploded but it wouldn't have been the use?

MS. GATTO: Are you saying the interstate commerce element?

THE COURT: Yes. The intent was to have detonated at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000872**

Ib2rull2

42nd Street, not in his apartment building. That would be an attempt, it would seem to me.

MS. GATTO: Your Honor, I don't think we are going to be arguing anything that the government needs to respond with, okay, it's an attempt, not a use. I'm not prepared to go through our closing right now, so what I will say is if we want to table it, obviously we hear summations before we charge, and if the government wants to then make an application that it makes some sort of sense based on some argument by us, we are happy to quickly discuss it.

THE COURT: I don't see it as terribly confusing or troubling. I just don't like arguments out there or instructions out there that are designed to inform arguments that aren't being made. That's what I don't like about generally having attempt language when you are not arguing attempt.

MS. GATTO: I think that is one that is going to fall into that concern.

THE COURT: The problem is they want me to hang onto it case you argue something. If you do and it's necessary, then it's very hard on the fly to fix a jury instruction when I'm giving it minutes after everybody's stopped talking in argument.

MS. GATTO: I appreciate that, and I'm not suggesting to make more words or make the administration of this more

**A000873**

Ib2rull2

confusing. But it would be just a matter of crossing out one paragraph and repaginating.

THE COURT: I don't see that it is prejudicial necessarily to have it in there if they are not arguing it. I don't see that it will mislead the jury into convicting on something when an element hasn't been met. I'm going to reserve on that one. Let's keep going.

I'm striking two of the four interstate commerce theories, which I view as a victory.

I'm now moving to Count Three. Is there anything else on Count Two?

MS. GATTO: No.

THE COURT: Count Three, bombing a place of public use and the public transportation system. This one in the language of the statute and the indictment as well, delivering, placing, discharging or detonating. Then it uses language to describe the explosive that includes gun powders, powders for blasting, all forms of high explosives, blasting materials, fuses other than electric circuit breakers, detonators and other detonating agents, smokeless powders, chemical compounds, mechanical mixtures or a device that contains any oxidizing or combustible units.

MS. CROWLEY: Your Honor, this is a proposed change that we have in light of your Honor's suggestion yesterday that we try to narrow the charge. I can we can strike several of

**A000874**

Ib2rull2

the definitions of "explosive."

THE COURT:  So do I.

MS. CROWLEY:  I'll read what I think you can strike, your Honor: gun powders, all forms of high explosives, blasting materials.  Then in the second sentence it reads, "also included within the statute's definition of explosive is," and then I think we can strike "dynamite and all other forms of high explosives, grenade, missile," and then after "any incendiary bomb or grenade fire bomb."

MS. GATTO:  Where are we striking from?  I'm sorry.

THE COURT:  "Any explosive bomb."  And then it will go "or similar device" and what?  Then where are we going after "or similar device"?

MS. CROWLEY:  I'm sorry.  I've lost where we are.  "Or similar device and any incendiary bomb."

THE COURT:  I'm striking "any incendiary bomb," right?

MS. CROWLEY:  Yes.  So you go right to "including any device which consists of," and then we would keep the rest of that.

THE COURT:  Any objection to that, Ms. Gatto or Ms. Gallicchio?

MS. GATTO:  There is no objection to that.

THE COURT:  Then we have the second element, tending to cause death, serious bodily injury, or extensive destruction.  We don't have to find extensive destruction.  So

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000875**

Ib2rull2

just let the jury sort of figure out what that means?

MS. CROWLEY: Yes, your Honor. It's not defined in the statute. We don't think a definition is necessary.

THE COURT: Okay. What is your proposed next change, Ms. Gatto?

MS. GATTO: Your Honor, on the one we were just on, Count Three, element 2, included here should either be reference to the definition of "intentional" or the definition of "intentional."

MS. CROWLEY: Since your Honor will have already defined that, I think we can just refer back to it.

THE COURT: Where are we talking about adding it? What element?

MS. GATTO: We talked about intent in Count One. We added that language.

THE COURT: I know that. Element 2, intent to cause death, serious bodily injury.

MS. GATTO: What I would propose is after the first paragraph that discusses the second element broadly, which references "intended," the definition. I'm comfortable with referring back, but just some reference to what "intentional" means.

THE COURT: "I have already defined the word 'intentional,' and you should apply that definition here," something like that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000876**

Ib2rull2

MS. GATTO:  Something like that, as long as they are instructed on the definition of "intentional."

THE COURT:  Anything else in Count Three?

MS. GATTO:  No.

THE COURT:  Anything else from the government in Count Three?

MS. CROWLEY:  No, your Honor.

THE COURT:  Then we are in Count Four.  As I recall, there was a Count Four, an Apprendi argument.  It didn't strike me as an Apprendi argument.  Apprendi is basically where the court imposed a higher sentence based on facts not found by the jury.  It seems to me what you are really arguing is that there is a notice problem or a failure of the grand jury to charge an enhancement or the language that would trigger an enhancement.

MS. GATTO:  That's exactly right.  The grand jury was not charged with the enhancement, so it can't go to the jury.

THE COURT:  What is your authority for that?  I don't think it is Apprendi.

MS. GATTO:  I don't think it is Apprendi, your Honor.

THE COURT:  Why?

MS. GATTO:  Because it is an element of the offense.  It is also just the constitutional right to be tried on what the grand jury --

THE COURT:  Right.  The jury is going to find it.  Apprendi says basically if the jury finds it, jury has to find

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000877**

Ib2rull2

all elements, so no one is saying the jury wouldn't have to find these elements.  What you are saying is jury shouldn't be allowed to find these elements because there wasn't sufficient notice in the indictment, right?  That's what you're saying?

MS. GATTO:  What I'm saying is he is charged based on an indictment and that's what he is tried on.  The grand jury did not return an indictment that charged this aggravating factor.  It raises both the minimum and the maximum.  So it cannot be sent back to the jury because the grand jury didn't return an indictment that includes what is an essential element.

THE COURT:  I have not heard the government's response on this.  You didn't charge the language that triggers the enhancement, right?  That's not in the indictment, correct?

MR. TURNER:  That's true, your Honor.

THE COURT:  Is that a problem?  Or do you think it is not a problem?

MR. TURNER:  Your Honor, we don't see as an issue nor an Apprendi issue.  The jury will be asked to make a reasonable doubt finding on this issue.  Nor is there any notice issue given that at multiple times during the case the defense has been on thorough notice that this injury is being alleged, and specifically with respect to David Wall.

THE COURT:  The aggravating factor is that personal injury resulted to a person as a direct or proximate result of

A000878

Ib2rull2

the conduct, right?

MR. TURNER:  Yes, your Honor.

THE COURT:  That increases the minimum penalty.  It also doubles the maximum penalty, right?

MS. GATTO:  Yes.

THE COURT:  I'd like to see some authority.  This is the first time it was raised.  I don't think Apprendi is the best authority for this, if it is authority at all for this. This is done in one paragraph, which doesn't even give a jump start to Apprendi or where in the opinion it stands for the proposition that it can't properly be submitted to the jury.  I don't think Apprendi stands for that proposition at all, about what can properly be submitted to the jury.

MS. GATTO:  Your Honor, I'm happy to supplement.

THE COURT:  I think both sides will have to supplement this.

MS. GATTO:  I don't think it is that controversial. The grand jury returned an indictment that didn't include this element.  The jury just doesn't get it.  It would be a whole new charge.  But I'm happy to supplement.

THE COURT:  I think you will need to.  I think the government will also need to explain why they are not worried about this.  This is like charging a 924(c) and asking the jury to find brandishing when you didn't charge brandishing.  It seems to me that is similar to what it is.  Right?

A000879

Ib2rull2

MS. GATTO:  Yes.

THE COURT:  You charge possess in furtherance of. That is what is in the indictment.  It tracks the language of the statute.  But then in the jury charge and in summations you're asking the jury to consider whether the defendant brandished, which carries a 7-year mandatory minimum as opposed to the 5 that comes with possession, or that he discharged. There is a lot of case law on this, but so far nobody has cited me any.  So I would like to see that.  Okay?

MR. TURNER:  Yes, Judge.

THE COURT:  That really goes to the special interrogatory as to whether there should be one, right?

MS. GATTO:  Right.

THE COURT:  Then Count Five.  I assume we are going to talk about this one for a while.

MS. CASSIDY:  Your Honor, I will address Count Five.

THE COURT:  Wait.  Maybe she is going to short circuit it.

MS. CROWLEY:  I am going short circuit it to some extent.  We actually do not intend to proceed on --

THE COURT:  (a)(7)?

MS. CROWLEY:  No, we intend to proceed on (a)(7).  We don't intend to proceed on (a)(4)(B), which is theory two.

THE COURT:  That helps a little bit.  You are one-third of the way there, Ms. Cassidy.  Nice work.

**A000880**

Ib2rull2

MS. CASSIDY:  On theory one, the theory that charges placement of the device upon, we have suggested a change to define the word "near" because "near" is a vague term.

THE COURT:  It's a relative term, that's for sure. How do I define it?

MS. CASSIDY:  There is a definition from Oxford American Dictionary that defines it as "at or to or within a short distance."  We suggest the term "at or close to," which is a definition that comes from the Webster's dictionary.

THE COURT:  Then I have to define "close to"?

MS. CASSIDY:  At as in close to, close to or at.

THE COURT:  "At" is easy.  Nobody has trouble with "at," I don't think.  But "close to" and "near," what does that get us?

MS. CASSIDY:  "Next to" would be a better definition, "at or next to."  Because the cannon of instruction the Latin term *noscitur a sociis,* I know that pronunciation probably isn't accurate, but a word that has a flexible meaning or range of meanings is to be defined by the words in the series with it.

THE COURT:  I get all that.  But it seems to me it is a relative term.  It is not a vague term, it's a relative one. What it turns on in some ways is the power of the device that you've got.  In other words, if it's a 2 megaton device, then being a hundred yard away is near.  If it's a cap gun, then

**A000881**

Ib2rull2

being 200 yards away is not near.  That it would seem to me is really the key here.  That doesn't seem to be a definitional problem.  It seems to be a factual one.

The parties are free the argue based on the evidence that came in -- there was no cross on this, I was surprised -- about the power of this pipe bomb to do damage to structures 200 yards away.  Nobody asked that.  Nobody asked that.

So I don't know what the jury is supposed to make of it, but I would think that a jury could conclude that this wasn't going to affect a vehicle anyplace.  And there has been no testimony that the plan was to get on a vehicle at some point.

Someday you guys will tell me what went on in that hospital room for four hours and what they talked about, because there was nothing about it, about what the goal was.  Was the goal to get on a subway that was chock full of people?  Was the goal to detonate in a hallway when there is nobody within 10 feet of you?  People around, but within 10 feet of you?  I don't know.  You seem to think it was the latter, in fact you plan to argue that it was the latter, that he thought this is a great spot to do this.

MS. CROWLEY:  Yes, your Honor.

THE COURT:  Nobody is too close, so how is that going to affect a subway vehicle?

MS. CROWLEY:  Two things, your Honor.  I guess this

**A000882**

Ib2rull2

gets to the rule 29 as well.  First of all, I believe that there was testimony from Detective Byrne that the defendant said that he pitched this exact location in the subway tunnel because he had seen it on a news report a week or so before and that the reporter was interviewing someone about ISIS attacks, and the person didn't seem sufficiently afraid of ISIS.  That's why he chose that specific location in the tunnel to commit the attack.

THE COURT:  How is that going to affect a vehicle?

MS. CROWLEY:  With respect to (a)(2), your Honor, we plan to --

THE COURT:  Let's stick with (a)(2), upon or near a mass transportation vehicle.

MS. CROWLEY:  The statute requires that the defendant place a destructive device in, upon, or near a mass transit vehicle.

THE COURT:  Right.  He didn't put it on.

MS. CROWLEY:  He did.  He got on a subway and he was carrying a bomb while he was riding a subway.

THE COURT:  Your view is that taking the subway to detonate someplace else is sufficient?

MS. CROWLEY:  Yes, your Honor.  There was testimony in the record from our explosives expert that the bomb could have exploded in a number of ways.  We intend to argue that by taking the subway while carrying a bomb, he placed a bomb on a

**A000883**

Ib2rull2

mass transit vehicle.

THE COURT:  That wasn't obvious to me.  This is helpful.

MS. CASSIDY:  Our response to this, this brings us to our rule 29 argument on this count, which is just exactly what your Honor was discussing earlier, which is there is no evidence that this was placed anywhere near the subway car.  It was quite a ways away.

THE COURT:  Wait.  Their theory is that he got on a subway with a bomb.  Isn't that placing it on a subway?

MS. CASSIDY:  We would argue no, that's not what the statute is directed toward.  If that was what the statute covered, it would say "carrying or transporting."  Instead it says "placing."  The placing of the bomb was the deflagration which was, as their expert testified, an intentional act that was called a command initiation.  The bomb was actually disconnected and couldn't go off while the wires weren't connected.

So the placement of the bomb is different from carrying.  "Carrying" is used in the code.  Congress knows how to use the word "use or carry."  They use it in 924(c) and 924(c) charges that term.

THE COURT:  Clearly.  But the issue is whether "place" is sufficiently encompassing to cover this conduct.  Why do you think it is not?  Do you think it requires him to take it off

**A000884**

Ib2rull2

and put it down, that's what it means?

MS. CASSIDY:  Yes, or to deflagrate it.

THE COURT:  So a suicide attack could never be this, ever, unless he takes it off his person and puts it down?

MS. CASSIDY:  No.  Or deflagrates it, sets it off.

THE COURT:  It could never be placing unless it's taking it off his person.

MS. CASSIDY:  We are not contesting that he placed it by deflagrating it.  When the device was connected, it was placed.  That would be our argument.  We didn't realize this was the government's theory.

THE COURT:  I didn't either.

When did you disclose this theory?  Did I miss it?

MS. CROWLEY:  When did we disclose it?

THE COURT:  Yes.  Is this something you have been operating on the whole time?

MS. CROWLEY:  Yes, your Honor.

THE COURT:  Was it in the opening?  Did I miss that?

MS. CROWLEY:  We talked extensively in the opening about how the defendant rode the subway with a bomb, an unstable bomb that could have gone off at any time.

THE COURT:  It wasn't obvious to me that that was what you were proposing as your theory for 1992(a)(2).  I want to go and look at the language.

MS. CASSIDY:  I take it the government's theory is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000885**

Ib2rull2

that the bomb was placed in or upon, not near?

MS. CROWLEY: That's wrong, your Honor. The entire time that the defendant had the bomb from when he got onto the subway to while he rode the subway to when he got off the subway and walked through the tunnel, he was placing the bomb in, upon, or near a subway train.

THE COURT: Now you know the argument. Maybe this is really the rule 29 argument now. Why is that not sufficient under the statute? Your argument, I think, is that "place" doesn't mean carry and that the language can't support such a broad view of 1992(a)(2).

MS. CASSIDY: Our argument in response to that theory would be simply carrying it on the subway, there was no evidence of his intent to endanger anyone on the subway.

THE COURT: What was the intent to --

MS. CASSIDY: He intended to intentionally deflagrate it in the tunnel.

THE COURT: It's a reckless disregard for the safety of others. Would carrying a bomb on a subway be a reckless disregard for safety?

MS. CASSIDY: The evidence was that he was an electrician and had the bomb disconnected.

THE COURT: I'm hoping that the electricians I see on the subway are not carrying pipe bombs. Look, this is the first it's dawning on me that this is the theory. It seems to

**A000886**

Ib2rull2

me that it is not a crazy theory. It's a linguistic argument that you are making primarily, right, that "place" must mean something other than carry?

MS. CASSIDY: Yes.

THE COURT: I am going to think about that. I'm not sure. Anything else with respect to the first theory?

MS. CASSIDY: Not with respect to the first theory. Our next main point is that the aggravating element --

THE COURT: I want to now get to the second theory. We have two theories now. That's (a)(7). That is that the defendant committed an act with intent to cause death or serious bodily injury to any person who is on or in a garage, terminal, structure, track, etc., of a mass transportation vehicle. Is the argument really the same here as before?

MS. CROWLEY: No.

THE COURT: Here he didn't intend to detonate it, according to you, until the hallway, right?

MS. CROWLEY: Right.

THE COURT: How is the hallway a garage, terminal, structure, track, electromagnetic guideway, supply, or facility used in the operation of a mass transportation vehicle?

MS. CROWLEY: Your Honor, two things. First, we have a proposed definition for "mass transportation provider" which I believe your Honor asked for, going back to the first theory, on page 30.

A000887

Ib2rull2

THE COURT: I do think it is interesting that we haven't defined that, right.

MS. CROWLEY: "Mass transportation," I believe we did provide a definition for that. It is actually defined in the statute by reference to 49 U.S.C. 5302(a)(7).

THE COURT: You're saying I should use that?

MS. CROWLEY: That is the definition of "mass transportation."

THE COURT: "Mass transportation"?

MS. CROWLEY: Yes.

THE COURT: So "mass transportation provider."

MS. CROWLEY: Yes.

THE COURT: I think they are going to want to know are we talking about the MTA? New Jersey Transit? What are we talking about? What is your theory? What are we talking about? It seems to me what you are saying is that it is the MTA, right?

MS. CROWLEY: That's correct, your Honor, or the Port Authority Bus Terminal.

THE COURT: Wait a minute. This is your first theory. Your first theory is that by riding a subway, right?

MS. CROWLEY: With respect to, yes, (a)(2), that is our theory.

THE COURT: It would probably just be the MTA then, wouldn't it?

**A000888**

Ib2rull2

MS. CROWLEY:  The statute reads "affecting a mass transportation provider."  Certainly there was substantial testimony about how the attack affected --

THE COURT:  You're not talking about the attack here. You're talking about him carrying a bomb on a subway.  That is your (a)(2) theory now, that he carried it on the subway.

MS. CROWLEY:  And that he detonated it in a tunnel.

THE COURT:  A tunnel is not a mass transportation vehicle.  I think you can't have it both ways.

MS. CROWLEY:  Why can't we argue both?

THE COURT:  Because the statute has words, and the words have to be -- you have to meet the various elements.

MS. CROWLEY:  Your Honor, for purposes --

THE COURT:  You're saying that he meets element one at one point in his journey and he meets element three at a different point in his journey?

MS. CROWLEY:  What we are saying is that the defendant violated (a)(2) in two ways: first by carrying a bomb on --

THE COURT:  This is the first I'm hearing he did it in two ways here.  Guys, this is what I'm worried about.  I'm worried that we are Friday at 5:15 and you are now spinning theories as to why it is that this guy is guilty on certain counts.  The jury is getting the summation on Monday.  I just don't think this is the time to do it and I don't think this is the way to do it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000889**

Ib2rull2

You have now got two theory ones. That's what you are saying. The one is that he carried it on a subway. What is the second?

MS. CROWLEY: That he detonated the bomb near a subway.

THE COURT: Where the element is that he placed the destructive substance or destructive device in or near a mass transportation vehicle, how do you meet that element on the second theory?

MS. CROWLEY: We would argue he was near a mass transportation vehicle.

THE COURT: That's where we started, and you short-circuited that by saying no, no, no, when he got on the subway, that's enough. Now you're saying when he detonated it in the hallway, that that was a design, that was him basically attempting to destroy the vehicle, right?

MS. CROWLEY: I think that the intent is to endanger the safety of any person or with reckless disregard for human life.

THE COURT: In the hallway is when he placed the destructive device near a mass transportation vehicle.

MS. CROWLEY: With the intent to harm others, yes.

THE COURT: But not any intent to harm a vehicle? Or are you suggesting that there is in evidence that you could point to to this jury to say that detonating a pipe bomb in the

**A000890**

Ib2rull2

hallway is going to affect the mass transportation vehicle that is a subway car?

MS. CROWLEY:  Your Honor, that is not a requirement for this provision.

THE COURT:  So that the defendant placed or attempted to place a destructive substance or destructive device in, upon, or near a mass transportation vehicle, you're saying that he had just gotten into the subway and gone to the hallway, he hadn't gotten on a car, he just got in, went to that hallway between Seventh and Eighth Avenues, that is sufficiently near a mass transportation vehicle?

MS. CROWLEY:  We would argue that, yes.

THE COURT:  I am going to, I think, grant a directed verdict on that one here.  You are making good law here.

MS. CROWLEY:  You are going to grant a directed verdict --

THE COURT:  That that is not sufficiently near a mass transportation vehicle.  This is a pipe bomb that is hundreds of yards from a subway.  There has been no testimony that any of the materials from this blast came anywhere close to a subway or a mass transportation vehicle.  Is there?

MS. CROWLEY:  Your Honor, he detonated it in the tunnel in between two major subways lines.  There was testimony.

THE COURT:  Right.  The point is whether he did it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000891**

Ib2rull2

near a mass transportation vehicle.

MS. CROWLEY:  Which is a subway, right?

THE COURT:  It is a subway car.

MS. CROWLEY:  Right.

THE COURT:  He was in the station.

MS. CROWLEY:  He was in a subway station connected to two subways.

THE COURT:  Do you think I don't get that?  Do you really think I was not here and watching this trial?  Do you?  I'm at the point where I just don't know what to think.  You guys are spinning out theories as we sit here.  This all started with whether there is sufficient evidence to support "near" or whether we need to define "near."  You're saying that we don't need to do that, that anyplace, what, in the four boroughs is sufficiently near a subway line?

MS. CROWLEY:  No, your Honor.

THE COURT:  Are we near a subway line right now?

MS. CROWLEY:  Your Honor, we are fine with the defense's proposed definition of the term "near."

THE COURT:  I'm asking a question now.  If you walked in here with a bomb strapped on you, are you sufficiently near a mass transportation vehicle?

MS. CROWLEY:  No, because I'm not walking in a tunnel between two subway lines in the busiest subway station in New York City.  I'm in a courtroom.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000892**

Ib2rull2

THE COURT: Thank you for making that so clear, Ms. Crowley. The sarcasm is really helpful. Thank you. What are you doing? You don't seem to take this as a serious point. You seem to think we are going to get up there and be able to argue anything we want and the jury is going to be told you can get there one way or another. I guess I'm not being sufficiently cooperative. Sorry for that.

MS. CROWLEY: Your Honor, that is not at all what I'm attempting to convey, and I --

THE COURT: You're saying that he committed this crime when he got on the subway, he committed this crime when he entered into the hallway, at any point he is sufficiently near a mass transportation vehicle. It doesn't matter how big the weapon is or how small the weapon is or how far or near in the context of a subway system he is from the actual vehicle, that's what you're saying? It doesn't matter?

MS. CROWLEY: I don't think I'm saying it doesn't matter, your Honor.

THE COURT: In, upon, or near doesn't give any guidance as to whether or not being 200 yards from a subway vehicle, subway car, is sufficient. You're saying that is near. It's not in, right?

MS. CROWLEY: It's not in.

THE COURT: It's not upon, is it?

MS. CROWLEY: When he detonated the bomb, he was not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000893**

Ib2rull2

in or upon a transit vehicle, no.  When he got on the subway with a bomb, then he was in or on a mass transit vehicle.

THE COURT:  Now you are falling back to your other theory.  You're saying there are two ways here.  You are going to argue this two ways to the jury.  I'm going to be expected to instruct the jury, then, on these two ways, on (a)(2).

MS. CROWLEY:  Understood, your Honor.

THE COURT:  I am going to articulate it for them.  I am going to tell the jury what your theories are.  I think one of them is not going to get to the jury.  The other one may.  But I don't want to spend any more time on this now.

(a)(7).

MS. CASSIDY:  Your Honor, (a(7) is the special interrogatory.  It is the aggravated element that increases this offense from a 20-year maximum to a life.

THE COURT:  You have no problem with the language of the instruction.  You're just objecting to the application of the special interrogatory for the aggravating fact to that subsection?

MS. CASSIDY:  Exactly, your Honor.  Our argument is that it does not apply to theory three because theory three does not address any particular subway car.

THE COURT:  I want to address that in a minute.  Before we do that, I want to see if we can narrow or parse or eliminate some of the language that I have in gray.

A000894

Ib2rull2

Garage.  Are we in a garage?  This is for the government.

MS. CROWLEY:  No, your Honor.

THE COURT:  Terminal.  Yes?

MS. CROWLEY:  Yes.

THE COURT:  Structure.  Yes?

MS. CROWLEY:  Yes.

THE COURT:  Track?

MS. CROWLEY:  Yes.

THE COURT:  Electromagnetic guideway?

MS. CROWLEY:  No, your Honor.

THE COURT:  Supply?

MS. CROWLEY:  No, your Honor.

THE COURT:  Facility?

MS. CROWLEY:  Yes, facility.  We would include facility.  We would also add, your Honor --

THE COURT:  What?

MS. CROWLEY:  -- from 4(a), tunnel or in station.

THE COURT:  Does the defense have any objection to that modification?

MS. CASSIDY:  No.

THE COURT:  But your argument is principally one as to whether or not the aggravating special interrogatory even applies here?

MS. CASSIDY:  Yes.  And our argument is that it

**A000895**

Ib2rull2

doesn't apply to theory three because theory three does not involve a specific subway car, it doesn't involve an attack on a subway car. The other two theories do. Those are clearly the sections that it applies to, that that particular aggravator applies to, because it refers to the subway car, not just any subway car anywhere. It refers to the subway car referenced in one of the offenses that involved an attack on a particular subway car.

THE COURT: The language is that the mass transportation vehicle was carrying at least one passenger at the time. For (a)(7) what do you intend to argue to the jury?

MS. CROWLEY: Your Honor, with respect to (a)(7), we intend to argue that when the defendant detonated the bomb, he used a dangerous weapon, a destructive device, with the intent to cause death or serious bodily injury to the people in the terminal or tunnel.

THE COURT: That's not the language of the provision, right? It's that the mass transportation vehicle was carrying a passenger, isn't that the language?

MS. CROWLEY: Yes. I'm sorry, your Honor. I thought you asked me with respect to (a)(7).

THE COURT: (a)(7). That is the aggravator for the entire count, right?

MS. CROWLEY: That's correct.

THE COURT: For (a)(7), how do you meet that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000896**

Ib2rull2

aggravator?  What are you going to argue to the jury would establish this aggravating fact on an (a)(7) violation?

MS. GALLICCHIO:  For (a)(7), that provision said that when the defendant uses a dangerous weapon, detonates a bomb essentially against any person in these places that are used, such as a terminal or tunnel, that are used in support of or in the operation of a mass transit vehicle, and then the aggravating offense is that the mass transit vehicle have at least one person or employee on it.

THE COURT:  Right.  What is the mass transit vehicle that you are referring to for your (a)(7) violation?

MS. CROWLEY:  The subway cars that were in the station when the defendant detonated the bomb against people who were in the tunnel.

THE COURT:  Who were not in the car.

MS. CROWLEY:  No.  Who were in the tunnel or terminal that supported the operation of the subway cars.  I don't think that the aggravator limits its application only to attacks against or in subway cars.  That would mean that it just doesn't apply at all to certain of subsection (a)'s provisions. There is nothing in the statute that suggests that it is so limited.

MS. CASSIDY:  If I could respond.  There is a very specific word in the statute that so limits it.  It doesn't refer to any subway car that was anywhere near or anywhere

**A000897**

Ib2rull2

around or even in the whole system.  It referred to the subway car, the mass transportation vehicle, and that can only refer to a specific car that is referenced in one of the subsections of subsection (a).

Two sections refer to specific vehicles.  One is (a)(2), which requires that the device be placed in, upon, or near a subway car.  That is a particular subway car.  It is not in a tunnel anywhere between subway cars.  The government put in evidence that it is somewhere in Times Square station.

There was the N and R station which is connected by that tunnel.  I guess under their theory anybody under their train, even on the N and R, would be covered there.  If you look at the breadth of the statute, that makes no sense whatsoever.

(a)(7) would punish anybody who attacks an individual, just punches somebody down and commits an ordinary assault in the subway station, and then would subject that person to a life sentence if there was a subway car anywhere in the station or anywhere near there carrying a passenger.  This interpretation makes no sense whatsoever.  It doesn't say any railroad car or any mass transportation vehicle.  It couldn't.  It would be so broad that it would take in any assault in the station.

It has to refer to the subsections that prohibit an attack on a car either through intent to derail the car or

**A000898**

Ib2rull2

through placing the device in, upon, or near the car.

THE COURT:  The language you are referring to is now what?  That's (a)(2)?

MS. CASSIDY:  That's (a)(2) and (a)(4), (a)(4)(B). What I'm arguing is those are the two sections to which the (a)(7) aggravator applies.

THE COURT:  I don't think that is a crazy argument. The statute doesn't say whoever commits an offense under section (a)(2) or (a)(4).  It says section (a), a circumstance in which the railroad on-track equipment or mass transportation vehicle was carrying a passenger.  It implies a particular set of railroad on-track equipment or mass transportation vehicle that (a)(7) doesn't seem to contemplate.  On the other hand, the language of (a)(7) just refers back to property described in subparagraph (a) or (b) of paragraph 4.

MS. CASSIDY:  It refers back to the general facilities, tunnels, and those properties.  It doesn't refer to a subway car.  There are other sections, too.  There are other sections in subsection (a) that don't refer to a car and to which this section also would not apply.  I think it is (a)(3).

THE COURT:  Are you saying it doesn't apply to (a)(4) either?

MS. CASSIDY:  It doesn't apply to the subsection (a)(4)(B) that the government charged but now says it is not charging.  That charge is being withdrawn.  It would apply to

**A000899**

Ib2rull2

that. I'm sorry. I'm saying it would apply to that. We are conceding that that aggravator can apply to (a)(2) and (a)(4)(B) but not to (a)(7) because (a)(7) does not refer to any specific subway car. It does not involve attacking a subway car. This is clearly an aggravator for an attack on a subway car that is carrying a passenger.

THE COURT: On-track equipment is referenced in (a)(6). It might be referenced elsewhere, but I don't see it elsewhere. It seems to me it's only in (a)(6). No, I'm sorry, on-track equipment. So (a)(2) and (a)(6). Mass transportation vehicle is referenced in (a)(1), (2).

MS. CASSIDY: (a)(3) and (a)(9) do not refer to a subway car either or on-track equipment. There are subsections of subsection (a) to which this aggravator simply does not apply. It does not apply to everything in subsection (a). It only applies to the sections of subsection (a) that refer to a specific vehicle. That only makes sense. It doesn't say any railroad on-track mass transportation vehicle. It doesn't. Which one would you point to? Anything coming anywhere within the whole agglomeration of stations?

THE COURT: I hear the point. I have not heard a response from the government on this. Your argument is that on-track equipment and mass transportation vehicle are not prerequisites?

MS. CROWLEY: No, that is not our argument.

**A000900**

Ib2rull2

THE COURT:  Okay.

MS. CROWLEY:  First of all, I think the defense's argument would essentially say that the aggravator does not apply to (a)(3), (a)(5), (a)(7), (a)(9) when, as your Honor knows and has articulated, the statute says whoever commits an offense under subsection (a) of this section.

THE COURT:  Right.  But then it uses other language that tracks language that doesn't appear in all of the other subsections.  It appears in some and not others.  I'm asking you to respond to that.  Why is it not the case that only those provisions that involve railroad on-track equipment or mass transportation vehicles can be covered by this?

MS. CROWLEY:  Your Honor, I think I can respond to this again by walking through our theory on (a)(7).

THE COURT:  All right.

MS. CROWLEY:  The defendant used a dangerous weapon with the intent to cause death or injury to any person in a tunnel or terminal.  Now I'm looking at (4)(A) and (C).

THE COURT:  Why do you need the language?  It seems to me that anybody who violates (a)(7) should get this enhancement as far as you are concerned.

MS. CROWLEY:  Used in the operation of or in support of the operation of a mass transit vehicle and that mass transit vehicle that the terminal or tunnel was used in support of or the operation of was carrying a passenger or employee.

**A000901**

Ib2rull2

The tunnel in which the defendant detonated the bomb was used to support the operation of subway lines.  We proved that when the defendant detonated the bomb, there were subway trains in those subway lines that were carrying a passenger and employee.

THE COURT:  But there is no connection between the two, right?

MS. CROWLEY:  I think there is a connection, your Honor.

THE COURT:  It is not going to have any impact on the vehicle itself.  It's not going to have any impact on the on-track equipment, right?  It's not going to physically affect those things.

MS. CROWLEY:  Correct, your Honor.  But it has an impact on a transportation system.  1992 prescribes terrorist attacks against mass transportation systems.  The aggravator (b) provides for enhanced penalties when there is a train carrying a passenger within that mass transit system.

THE COURT:  So you think they were concerned that they didn't want to overcriminalize, so that nanosecond of a day when there is no train coming through a mass transportation system, we don't want that person to be covered by the enhancement, but otherwise anybody who sets off a bomb I guess on the main floor of Grand Central or on any subway platform or any hallway connecting the two is covered by this?

MS. CROWLEY:  Your Honor, I believe so.  Perhaps it

A000902

Ib2rull2

seems silly with respect to the Port Authority or Grand Central, where there are always subways going in and out. But if we were considering a train station way out in wherever, in Vermont or something, where there is a train coming every hour, if there is a train in the system or in the space --

THE COURT: You are not saying this is designed so that if fortuitously there is a train coming through that is not going to be affected by any of this, it is just plowing through, that's enough to cover this?

MS. CROWLEY: That's correct, your Honor.

THE COURT: I don't think that seems consistent with the language, which is specifically referencing the on-track equipment and the mass transportation vehicle.

MS. CROWLEY: That was in the system --

THE COURT: It doesn't say that was in the system at the time. You're suggesting that any assault that takes place in a mass transportation system is going to be subject to this enhancement as long as there were trains coming in and out?

MS. CROWLEY: Yes, your Honor. I don't think there is any requirement in the enhancement that the subway car or that the train be affected or damaged.

(Continued on next page)

**A000903**

Ib21ull3

THE COURT: Well, I mean, I think the use of the language, you know, there were other provisions in this section that talk about exactly that, right?

MS. CROWLEY: The other provisions?

THE COURT: There are several ways to get an enhancement under the aggravator.

MS. CROWLEY: Correct.

THE COURT: Okay. And that goes to where the train was, it was a track or carrying radioactive waste, nuclear fuel, right?

MS. CROWLEY: Correct, your Honor.

THE COURT: So you think the same would make sense then, if you assault somebody in a tunnel, 200 yards from a track where a person was, train is going by with radioactive material, that would be --

MS. CROWLEY: Yes, your Honor.

THE COURT: -- the same reason for the enhancement would be applied.

MS. CROWLEY: Yes, your Honor. When you set off a bomb in a subway station where there is a train with a passenger or radioactive waste, I believe that the aggravator should apply.

THE COURT: All right. And so 3 would be utterly superfluous then, wouldn't it?

MS. CROWLEY: No, your Honor, because --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000904**

Ib21ull3

THE COURT:  Why not?

MS. CROWLEY:  Because 1 is limited by where the person is.

THE COURT:  Where what person is?

Any person?  I'm asking about 3.

I mean, it seems to me that under your theory, 1 and 3 cover the same ground.

MS. CROWLEY:  1 is about a passenger or employee; I think 3 requires that the transit vehicle be carrying hazardous material at the time of the offense, and then it specifies certain things about the hazardous materials.  I don't think those are the same.

THE COURT:  Okay.  All right.  I guess I'm going to reserve on that one too.

All right.  Then Count Six.  I mean, there's something at the top of 35 that just was a vestige of language that got cut, so that's out.  I hope that was clear.

MS. CROWLEY:  I'm sorry, your Honor.  Just one more thing with respect to 34.  On page 34, element 3.

THE COURT:  Right.  Yes?

MS. CROWLEY:  Element 3, location of victims, we would just ask that the same modification --

THE COURT:  Yes.  That's going to track what you told me before for page 32.  Tunnel, station, cutting, garage, electromagnetic guideway, etc.  Yes.  All right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000905**

Ib21ull3

MS. CASSIDY: Your Honor, I just had one specific on the intent element of that section, Section 7, if we think it only could be applicable, as you said, that -- Section (a)(2), not (a)(7). If the aggravator is charged -- I'm sorry. This is with respect to subsection 7. Use of a dangerous weapon with the intent to cause death or serious bodily injury, that this Court instruct the jury that this requires a specific intent to cause death or serious bodily injury. The person, the defendant acted with the purpose of bringing those about, bringing about either death or serious bodily injury.

THE COURT: Right. I think I've covered that. I don't think there's any confusion. Committed the act with the intent to cause death or serious bodily injury to any person.

MS. CASSIDY: Okay, your Honor.

THE COURT: Count Six.

MR. TURNER: Your Honor, we did not have any objections or proposals. Just one question.

THE COURT: What's that?

MR. TURNER: Does your Honor intend to ask, on the verdict form, the question as to whether it is a crime of violence after each of the first five counts on the verdict form or how does your Honor intend to do that?

THE COURT: Yeah, that's what I intended to do.

MR. TURNER: And that's what we think makes sense, your Honor.

**A000906**

Ib21ull3

THE COURT:  I'm not sure it makes sense.  I'm not sure that the jury's going to have any idea what we're talking about, candidly.  We're basically saying that there are two counts that sort of get to there on the elements clause, they're not going to understand that, but Counts Three and Five, if you find the defendant guilty on those, those are enough.  But while you're at it, why don't you go through One through Five again, well, at least Three and Five again, do a different analysis, and then let me know if you think that this rose to the level of violence.  I think they're going to just look at me blankly and think that this is one of the more foolish exercises they've been asked to do.  At that point you guys are just in sort of veg mode and you're not even really paying attention other than to make sure I didn't misread something.  But take a look.  I do hope you'll look.  And I hope it makes you worry a little bit about whether or not you really think that they have any idea what I'm talking about and whether they're going to just do something that you can't predict.  I mean, there's a cost to clumsy, cluttered jury instructions.  I think inexperienced lawyers maybe don't understand that, but I sure think there is a cost to it.  And part of it goes to a juror's respect for the system.

I mean, I think, frankly, nobody's really talking to me.  This is not designed for me; this is designed for a bunch of people on the 17th floor.  It's got nothing to do with what

**A000907**

Ib21ull3

the jury is supposed to understand here.  You've got all these multiple theories that are all over the place, they're secondary, tertiary theories that are just designed in case you need them in a pinch, and you're not going to argue them to the jury in some cases.  So I hope you'll think about that between now and Monday.

Anyway, do you have anything else on Count Six?

MS. CASSIDY:  On Count Six, your Honor, we just reaffirm our objection to submitting this question to the jury at all on the theory that it's a categorical question and that it's, you know, going to further appeals.  But we also object, your Honor, to submitting it to the jury and telling them that you've already decided --

THE COURT:  Telling them?

MS. CASSIDY:  That you've already decided on two of these, that you've decided as a matter of law that two of them are crimes of violence.

THE COURT:  I'm not telling them I've decided; I'm telling them that's what the law is.

MS. CASSIDY:  It doesn't help, it doesn't really inform their fact finding, and so there's no way that they would come back and disagree with that, so if you're going to ask them to decide that --

THE COURT:  But the point is, if I don't instruct them on that and they don't agree with the Barrett line of inquiry

**A000908**

Ib21ull3

and so that element isn't met, then they're not going to have any basis to go to the second element on this count, right? I hear your point, but it seems to me that the first element is that there was a crime of violence and they don't get to the second element unless one of the counts gets them there, and so the government has multiple theories as to how to get there, and so on two of the counts there's that theory that if I don't tell them Three and Five, I've already met the first element, there's a chance they don't get to the second element, even when those two have been met. So I think I have to give that instruction. I think that's just the state of the law right now.

Anyway, anything else on Six?

MS. CASSIDY: No, your Honor.

THE COURT: No. Okay. And then anything else from the government on the substantive?

MR. TURNER: No, your Honor.

THE COURT: Then we have some general instructions.

MS. GATTO: Your Honor, I'm sorry. If we can just go back to Count Six, because I'm just confused about this.

THE COURT: Okay.

MS. GATTO: As I understand this -- and I think it's confusing because the law is so in flux, but you've decided under the elements clause, right, that Counts Three and Five qualify as a crime of violence.

**A000909**

Ib21ull3

THE COURT:  Right.

MS. GATTO:  And the jury is asked to decide under the residual clause --

THE COURT:  They're going to be asked to make a special finding on that.

MS. GATTO:  Right.  But in terms of the world that we live in, you've made a decision on the elements clause, they're making a decision on the residual clause.

THE COURT:  Right.

MS. GATTO:  I don't understand how your decision on the elements clause factors in or affects their decision.  They don't have to get -- they don't have to decide the elements clause to get to the residual clause, right?  Unless I'm missing something.  It sounded like -- I think I'm very confused.  Let's say they say it's not a crime of violence. You've already decided on Count Three it is a crime of violence, and so that's fine.  That's the way it's going to go.

THE COURT:  But they then have to find the second element, which is that the destructive device was used in furtherance of a crime of violence, right?  They have to find that.

MS. GATTO:  Right.  So --

THE COURT:  Right.

MS. GATTO:  I still am confused.  And maybe it's just me, but I think we're all a little confused.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000910**

Ib21ull3

You're saying that they can't get to the second inquiry unless they know that you decide under a different clause that it's a crime of violence?

THE COURT:  Well, under a potential scenario, if they reject the Barrett, in other words, if I just instruct them, you've got to go through these five to find out if this was a crime of violence, I use the Barrett instruction, they come back and say no, no, no, no, no, then that's it, as far as they're concerned.  Unless they're instructed that Three and Five are crimes of violence under a different theory, under a different analysis, they then still need to find, for at least Three and Five, that this destructive device was used in furtherance of one or both of those crimes of violence.

MS. GATTO:  So couldn't we -- there's a real concern that when a jury hears that a judge, as a matter of law, right -- matter of law, that sounds really important -- has already decided this is a crime of violence -- couldn't we word this differently to say --

THE COURT:  Maybe.  That's why we're here.

MS. GATTO:  -- as relates to Counts Three and Five, whether or not you determine it's a crime of violence, also determine whether it was in furtherance, or -- I'm thinking on the fly here, and I'm happy to submit language, but I think we would prefer that, because it doesn't direct them that this has already been determined.  I can't see any world where a jury

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000911**

Ib21ull3

comes back and says, well, he just told me as a matter of law. I don't even understand all the different clauses. They're not going to get it.

So I'm happy to submit language, but we would be open to some idea that, just as to Three and Five, if you don't find it's a crime of violence, then just let us know if you think it's in furtherance. Either way.

THE COURT: Okay. I'm open to language, but I think as a practical matter, that is the reality. The first element is a finding of a crime of violence, Three and Five, although any crimes of violence -- One through Five are also crimes of violence under a different approach. That's going to require special analysis and a special finding. And then they're going to get to the second element, which is whether it was used in furtherance. So I'm open. It's the one paragraph -- it's really two sentences -- on page 36 that you're talking about.

MS. GATTO: Yes.

THE COURT: So I'm open to softer language if you want to propose some.

Government, is that okay with you?

MR. TURNER: We are okay with the charge as written, your Honor. We think you've made very clear that you're dealing only with Three and Five in that paragraph.

THE COURT: Well, I don't know what's clear to the jury as to that point, but I do think it's unusual for them to

**A000912**

Ib21ull3

be sort of making findings about counts that the judge is going to tell them don't really matter anyway.  Right?  So what is the point in the jury doing this for Three and Five?  Just in the off chance that the law changes between now and when this goes up on appeal?  That's really it, right?

MR. TURNER:  Short answer is yes, your Honor, in light of the uncertainty in this area of law.

THE COURT:  I'm not faulting you.  I'm just saying I think the jury derives little satisfaction from that kind of CYA approach.  They're anxious to sort of figure out what they need to do, and anything that makes it confusing or distracting is I think something that frustrates them.

Okay.  All right.  Any proposed changes with respect to the general instructions?

Go ahead.  Ms. Crowley.

MS. CROWLEY:  Yes, your Honor.  With respect to experts, we would just ask that you add Robert Gillette.

THE COURT:  Oh, okay.  So I said, you heard from three experts.  The government says it's actually four experts, Gillette.  So that's fine.

All right.  Did we have stipulations of testimony?

MS. CROWLEY:  No, your Honor.

THE COURT:  I didn't think we did.  So I'm going to take that out.

Okay.  Any other changes to the general instructions?

**A000913**

Ib21ull3

MS. GATTO:  We had a change to page 40.

THE COURT:  Forty?

MS. GATTO:  D.

THE COURT:  D.  Uh-huh.

MS. GATTO:  Regarding defendant's statement.  And our proposal is that it be drawn from 18 U.S.C. 3501, which I'll give you the language from the statute and then tell you our proposal.

THE COURT:  Okay.

MS. GATTO:  That discusses when a confession is admitted, the court -- "the trial judge shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."

THE COURT:  Right.

MS. GATTO:  So we would like that exact language.  And we would also like the second sentence of the second paragraph.

THE COURT:  So change "evidence" to "circumstances"?

MS. GATTO:  Circumstances, that's correct.

THE COURT:  Okay.  I mean, I don't think it changes the meaning.

Does the government have a view?  I mean, in some sense you can't know the circumstances except for the evidence.  The circumstances are no broader than the evidence, but --

MS. GATTO:  But what it is really referring to, that provision of the statute, is that if a statement comes in,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000914**

Ib21ull3

there's been some motions to suppress and it comes in as voluntary, the jury can still weigh all the circumstances surrounding the taking of that statement.

THE COURT:  I think that's fair.  Do you disagree, Ms. Crowley?

MS. CROWLEY:  That's fine, your Honor.

MS. GATTO:  And we would ask that the sentence that says "whether you approve or disapprove of the use of these statements may not enter into your deliberations," that's the second sentence in the second paragraph, we would ask that that be deleted.

THE COURT:  It's a fairly standard instruction.  What is the concern you have?

MS. GATTO:  Well, I don't know, maybe I'm wrong, but it isn't a standard instruction, at least in my limited experience, whether you approve or disapprove of the use of these statements.  I think typically this might involve when there's been some more testimony elicited challenging like *Miranda*, using it really --

THE COURT:  But this is an instruction that is used when somebody signs a *Miranda* and gives a statement.  Some people don't like people being able to waive *Miranda*.  Some people don't like the idea that people should be allowed to speak without having a lawyer, or without having first been presented to a judge.  And so that's the purpose of it is to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000915**

Ib21ull3

make sure that people understand, look, whether you have philosophical disagreements as to whether this is good practice, I instruct you this is something that's permissible, it's allowed to come in, and it's admissible evidence. That's the reason for it. So I'm inclined to keep it, unless there's something specific here that I'm missing.

MS. GATTO: I think it would be more appropriate if the cross elicited some suggestion that the police officers had violated Mr. Ullah's rights, and that wasn't elicited --

THE COURT: I don't think that's even the point of it here. It's not to be used where there's some suggestion that rights were violated. It's where somebody might, notwithstanding the fact that no rights were violated, still have qualms about police officers being crafty or being, you know, entrepreneurial. So I'm going to leave that.

Okay. Anything else?

MS. CROWLEY: Not from the government.

THE COURT: All right.

MS. GATTO: Yes, your Honor. Page 42.

THE COURT: Forty-two? Uh-huh. Preparation of witnesses?

MS. GATTO: Yes. I don't think there was any testimony elicited discussing preparation. I could be wrong. The government can correct me if I am, but --

THE COURT: I thought there was some.

**A000916**

Ib21ull3

MS. CROWLEY:  I think with respect to Dr. Zelin there was, your Honor.

MS. GATTO:  I don't think so, but --

THE COURT:  But in any event, the point is, all I said is, you've heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

MS. GATTO:  Right.  I just don't think that that testimony was elicited.  And I share in the Court's concern that we sometimes throw too many words at a jury.

THE COURT:  I guess I'll go back and take a look.  I thought that there was some discussion about how many times certain witnesses met with the government, but you did the crosses so you know better than I.

MS. GATTO:  I don't think we did that kind of cross in this case.  I know we didn't.

MS. CROWLEY:  I believe, your Honor, with respect to Dr. Zelin, there were questions about preparing, being with the government, reviewing videos that the government asked him to watch.

THE COURT:  Yes, there certainly was, with Zelin.  I don't remember about the others.  I'm inclined to keep it, but I'll go back and take another look.  All right?

And then the final instructions, which is just the basics of picking a foreperson, writing notes, deliberating,

**A000917**

Ib21ull3

you guys are okay with that?

MS. GATTO: Yes.

MS. GALLICCHIO: Yes.

THE COURT: I'm going to then make some changes. I'm still hoping then for some submissions from the parties on a couple of points, and then I also want to do a verdict form so you know what the verdict form is before Monday. So I'll turn that around, but I would like to get, especially on the -- what I'm referring to is the *Apprendi* point, although I don't think it's an *Apprendi* point, on Count Four in particular. All right? So can you get me something by tomorrow?

MS. GATTO: Yes.

MR. TURNER: Yes.

THE COURT: The sooner we have certainty, the better for you so you can really focus on your summations.

MS. GATTO: I think we also owe you a definition of economics damage. So we can work together on that. Did we say that?

MS. CROWLEY: I think we said we don't believe one is necessary.

THE COURT: I think that's right. I don't remember anybody saying I think it's a question or it's a question I might get from the jury. I'm often looking at these things thinking, okay, here's the instruction, what's the jury going to do with this, and it's just a matter of time before I get a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000918**

Ib21ull3

note that says, terrific, we read your instructions, what exactly does that mean?  And even if I'm not putting it in the main charge, I'd like to have a sense as to what the answer is going to be.

MS. GATTO:  So I think it makes sense, whether it's in the main charge or not, for us to work on that, so I'm happy to draft something and talk to the government about it.

THE COURT:  Or think about it.  But like a lot of things, I mean, reasonable doubt, these are all in some ways terms that we let juries more or less figure it out for themselves.  It's a doubt that a reasonable person would have -- you know the definition of reasonable doubt.  I'm not sure it helps juries much either.  We just have to trust their understanding of words and concepts.

But I've got some work to do, so I'll do it now, and we'll see where we are over the weekend.

Anything else?

MS. CROWLEY:  Yes, your Honor.  Just to be clear, your Honor would like a submission from the parties on the Count Four Apprendi issue and also Count One, our attempt theory, correct?

THE COURT:  Yes.  I just think I'm still puzzled by it, and I'm not sure how to instruct the jury on it.  It seems to me if the argument is that, you know, the jury could conclude that this thing went off prematurely or it went off

A000919

Ib21ull3

not according to plan, then that would be sort of an alternative, lesser included or alternative basis on a services theory, not so much personnel theory. I found Mr. Turner's explanation on the personnel theory to be highly metaphysical and requires extensive knowledge of the Koran, and I don't think that it should turn on that.

MS. CROWLEY: We'll put in a letter, your Honor.

THE COURT: Okay. All right. Anything else?

MS. GATTO: Did you reserve decision on the directed verdict as it relates to Theory 1 of Count Four?

THE COURT: On Theory 1 of Count Four. No, the alternative basis for Theory 1 of Count Four, which was whether or not I would conclude that no reasonable jury could conclude that the explosion in the hallway there was near a subway car, or mass transportation vehicle?

MS. GATTO: I'm sorry. Count Five.

THE COURT: That's Count Five.

MS. GATTO: I just want to know what assignments we have.

THE COURT: So I think the government should probably address that in their letter as well. I mean, the government has two theories on (a)(2) of Count Five. The first is that by getting on a train, he endangered others, and that's sufficient. That one, although I haven't heard it before, seems to me to be consistent with the language of the statute.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000920**

Ib21ull3

MS. CROWLEY:  Your Honor --

THE COURT:  Yes.

MS. CROWLEY:  -- pursuant to your Honor's feedback earlier, we will only be proceeding on that theory with respect to (a)(2).

THE COURT:  Oh, you're giving up so easily, Crowley, after you pushed back so hard, you gave me a hard time, you rolled your eyes?

MS. CROWLEY:  I didn't mean to roll my eyes.  But we are attempting to limit it, we're attempting to follow your Honor's guidance here, and so we will only be proceeding on I think the first theory that we articulated, which is that by stepping on the subway with the bomb, he placed a device on or upon a mass transit vehicle.

THE COURT:  I think it's whatever the language is, and then the rest of the language is as to endangered.

MS. CROWLEY:  With reckless disregard.

THE COURT:  So that's the theory on (a)(2).

MS. GATTO:  Okay.  That's their theory.

THE COURT:  I think that's going to the jury.  If you think there's a reason why it shouldn't, then you can submit something, but it seems to me that that's consistent with the language of the statute.  It hadn't dawned on me before that that was the theory.  Maybe they said it in their opening.  Ms. Crowley said they opened on that.  Maybe I missed it.  I

**A000921**

Ib21ull3

have no reason to think they didn't if she said so.

MS. GATTO:  And I think Ms. Cassidy has argued this, but I want the record to be clear that we have made a motion pursuant to Rule 29 to dismiss all counts, but we argued more vigorously on Count One and Count Five as it relates to that theory as well.

THE COURT:  Right.  I'm not saying you have to do a submission.  I'm saying I think from what I've heard so far, I'm denying that motion and we're going to go forward, the jury is going to be allowed to hear argument on that, and I'm going to instruct them on that theory.

MS. GATTO:  All right.  I just want to make sure my motion isn't waived.

THE COURT:  No, not waived.

Okay.  All right.  So thanks.  It's been a sprint of a week.  So I'll see you Monday and then we'll see where we are, but I'll be in touch over the weekend and we'll get you a draft.  I guess as soon as I get something from you, then I'll turn around a draft quickly.

MS. GALLICCHIO:  What time does your Honor want us to be here Monday?

THE COURT:  I think I told the jury to be here 9:30, so I would say 9:15, make sure everything is working.

So let's talk about summations.  Who's giving the main summation?

A000922

Ib21ull3

MS. CROWLEY:  Mr. Turner is giving the main summation.  I'll be giving --

THE COURT:  How long do you think it will be, Mr. Turner?

MR. TURNER:  In the area of an hour and 15 minutes, your Honor.

THE COURT:  Are you using technology and screens?

MR. TURNER:  We do anticipate having a PowerPoint and perhaps clean up some of the exhibits.

THE COURT:  That's fine.

Who's giving the main summation?

MS. GALLICCHIO:  I am.

THE COURT:  How long do you think you'll be?

MS. GALLICCHIO:  I would say about an hour.

THE COURT:  That's fine.  Are you planning to use any technology?

MS. GALLICCHIO:  Yes.

THE COURT:  So just make sure you have time to make sure's all working.

And then a rebuttal summation from Ms. Crowley?

MS. CROWLEY:  Yes, your Honor.

THE COURT:  How long, more or less?

MS. CROWLEY:  Twenty to 30 minutes.

THE COURT:  Everything's 20 or 30.  I don't have a problem with 30 minutes, I don't have a problem with an hour,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000923**

Ib21ull3

hour and a half for summations, but my sense generally is that a rebuttal is about a third, at most, of a main summation.

MS. CROWLEY:  I'm going to try to keep it short, your Honor.

THE COURT:  Okay.  All right.  And then so technologywise, just make sure you have what you need, because there won't be a lot of margin for error there if it's the first thing Monday morning.

Maybe we'll take a break at some point.  We'll see how the jury looks.  My preference would be to have them go all the way and then take a break before the charge.  But that might be asking a lot for the jury, depending.  If everybody goes a little longer than what they anticipate, then maybe we need to take a break at some point.  So I reserve the right to do that. My hunch would be that once they get here, I'll have them order lunch first, and that way lunch will come to the jury room sometime between 12:30 and 1, and hopefully right after I finish the charge, then they'll eat.  But we'll see.

Okay.  All right.  Thanks.  Let me thank the court reporters as well.

(Adjourned to November 5, 2018, at 9:15 a.m.)

**A000924**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

         v.                           18 CR 16 (RJS)

AKAYED ULLAH,
                                      Trial
              Defendant.

------------------------------x
                                      New York, N.Y.
                                      November 5, 2018
                                      9:06 a.m.

Before:

         HON. RICHARD J. SULLIVAN

                                      District Judge,
                                        and a Jury


         APPEARANCES


GEOFFREY S. BERMAN
United States Attorney for the
     Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  AMY GALLICCHIO
     JULIA GATTO
     COLLEEN P. CASSIDY

Also Present:

     JOHN MAURER – Special Agent, FBI
     MICHAEL DELUCA – Paralegal, U.S. Attorney
     JASON T. FISCHER – Paralegal, Federal Defenders
     CHIRAAYHU GOSRANI – Paralegal, Federal Defenders

A000925

(In open court; jury not present)

THE COURT:  Good morning.

All right.  So I wanted to just chat a little bit about the charge.  I got some letters I guess Friday, Saturday, and Sunday.  So Saturday, I guess, and Sunday, we sent a revised charge and then I got some responses after that from the parties.

I'll just take them I think from the Saturday letter of the government, which is about the constructive amendment. I did want to talk about that, that the argument had been made on Friday that the government's first theory with respect to Count Five was a constructive amendment, that the "to wit" clause basically limits, or should limit the arguments that the government can make or the theories on which it's relying.  The government in its letter cited some authority for the proposition that a "to wit" clause is not binding.  I went and took a look at those, and I think that's correct.  I think the language of the statute, which is in the indictment, is broad, covers this conduct.  I went back and took a look at Ms. Donaleski's opening as well.  There was a reference at least to bringing things on the train.  It was not obvious to me, at least, as may statements on Friday reflected, but I think it's not a constructive amendment, so I'm going to allow that to go forward.  I think that was clear from the charge that I sent on Sunday, but just so the record is clear.

**A000926**

Then there was --

MS. CASSIDY:  Your Honor, can I just be heard on that.

THE COURT:  Sure.  Just get a little closer to the microphone.

MS. CASSIDY:  Yes.  I wanted to make the point that whether or not it's in the "to wit" clause is not the question.  The question is whether the indictment charges the core, the essence of the crime, in its factual recitation.  The jury charge and the government's theory at trial cannot broaden the basis of that crime it charged.  And where there's a single act charged, as in this case, they can't just change the act to another act that is never mentioned anywhere in the indictment.  The "to wit" clause cases say just because it's in the "to wit" clause, doesn't mean that -- nothing can be changed, unless it's small minor details that are changed, not the essence of the crime, the actual act charged.

THE COURT:  Okay.  All right.  I don't know if anybody wants to respond to Ms. Cassidy.  I think I understood that point, but go ahead.

MS. DONALESKI:  Your Honor, exactly as your Honor noted, there's case law saying that we're not constrained to what's in the strict laws.  And the language of the indictment put the defendant on notice.  This is part of the core criminality the government would be proving at trial, and for the reasons your Honor noted just a moment ago, we do believe

A000927

that the Second Circuit case law supports finding there was no constructive amendment.

THE COURT:  Well, look, everything happened on one day.  Ms. Cassidy's point is that she's at least interpreting the indictment to be focused on what took place sort of at the moment of or moments before the pipe bomb was detonated.  The first theory under Count Five really begins sort of when he leaves his apartment.  Well, really, when he gets on a subway.  That's what you said on Friday, right?

MS. DONALESKI:  Yes, your Honor.

THE COURT:  So she's saying that's a separate act altogether.  What's the response to that?

MS. DONALESKI:  And your Honor, again, for the reasons we set forth in our letter, as long as it's part of a single act, so getting on the subway, riding the subway with the bomb, and detonating the bomb in the Port Authority, that's the act that is charged in the indictment.

THE COURT:  Okay.

MS. DONALESKI:  I think I'm not speaking into the mic.

And so our argument would be that because the defendant is charged in Count Five with placing a destructive device on a subway, that places him on notice for the core criminality, which is carrying the bomb on the subway in connection with his attack that day.

THE COURT:  No, no.  I understand the theory now.  I

**A000928**

mean, I think the issue is whether or not that's what the indictment said and whether that's what the defendant was on notice of before.

So Ms. Cassidy, you wanted to be heard again?

MS. CASSIDY: Yes. I just want to point out, nowhere in the indictment are there any facts alleged about him placing the device on the subway or even taking the subway or even riding it. The act is simply the detonation of the device in the vicinity of the Port Authority. That's what was charged by the grand jury. And we have no basis to believe that the grand jury intended, because there's nothing in the indictment, to charge him with the prior act or with something that the government is now contending is some kind of continuous crime, which is not charged in the indictment.

THE COURT: Okay. Well, look, I don't think it's a frivolous argument, and it's one I expect that, depending on how the trial goes, would also be the subject of further posttrial briefing, perhaps, but I think, based on my review of the case law, based on my review of the indictment, and the statements in the opening, I'm going to allow it to go forward.

The other issue related to whether or not subsection (a)(7) applies for the aggravator. This is one that I did go back and forth a bit on Friday. As I pointed out then, I think the language of the aggravating section is quite broad. It doesn't make any distinction between the various subsections of

A000929

Section (a), and so I think the text itself I think supports the government's reading.  It's sort of a pretty broad reading.  The title of the statute has terrorism in it, but (a)(7) almost doesn't require anything like that, would seem to extend to somebody using a switchblade on a platform.  But I do think that the plain text is quite broad.  It increases the mandatory minimum from five to seven, so it's not like that's completely implausible that that would be the intent of Congress, but those are the words they used and so I'm going to instruct the jury on that section as a basis for the aggravator.  So there will be the special interrogatory applying to both (a)(2) and (a)(7).

All right?

MS. GALLICCHIO:  I just want to clarify.  Your Honor said it changes the mandatory minimum from five to seven.  That actually applies to Count Four.  It increases the maximum from 20 to life.

THE COURT:  Oh, I thought it was 40.  Is it life?

MS. GALLICCHIO:  To life.

THE COURT:  Oh, okay.  So in any event, I think that that's what the language supports.  I think a plain textual reading of the statute does support this theory.  If Congress wanted to limit it, they certainly could have, but I don't think they did.  So I'm going to allow that to go forward as well.

A000930

I did want to address a couple of the points that were then made yesterday in the letter from both parties.

So the government sent a letter in the morning. It was about the verdict form, and about a special interrogatory in particular with respect to Count Six. So the special interrogatory that you proposed is not a *Barrett* special interrogatory. You're asking just for the jury to determine which of the five underlying counts was the basis for concluding guilt on Count Six. And if that's the case, I don't know why I'm bothering to tell the jury about Counts Three and Five under *Barrett* and substantial risk. So what I had originally had in there was a special interrogatory just on the *Barrett* substantial risk of harm prong of the first element of Count Six. That's what I thought you had wanted. But now it looks to me like you want something different. So I'm confused.

MS. CROWLEY: Your Honor, I think --

THE COURT: It was your letter.

MS. CROWLEY: That's right. And we conferred with the defendants before sending it. They agreed. We do think it's important for the jury to know which predicate they found in connection with Count Six.

THE COURT: Why? I do that all the time. I charge 924(c)'s all the time. It's not required that a 924(c) have a special interrogatory with predicates. RICO cases, there's no

**A000931**

requirement that the jury identify which predicate. But I'm just not sure why I would be doing then a separate instruction on Counts Three and Five under *Barrett* as well when I'm already instructing them that Three and Five get you to the first element of the sixth cause of action.

MS. CROWLEY: That's correct, your Honor. We understand that point certainly. But we do think that given the standard of the law that's sort of in flux right now, it is important that we know, for the appellate record, whether they found him guilty of Count Six with respect to the elements clause or with respect to *Barrett*.

THE COURT: But your special interrogatory doesn't do that. I'll read you your special interrogatory. All it says is, "If, and only if, you found the defendant guilty of the offense charged in Count Six, please indicate whether you found the defendant guilty during and in furtherance of Count One, Two, Three, Four, or Five." You don't make any distinction between one or the other, between the elements clause or *Barrett*, right?

MS. CROWLEY: That's correct, your Honor. However, obviously what we're asking them with the special interrogatory is not whether they found that Count One, Two, Three, Four, or Five constitutes a crime of violence but whether they found that that was the predicate for Count Six.

THE COURT: Right. But you just said it was important

**A000932**

that we distinguish between which theory they went on.  I thought that's what you just said.

MS. CROWLEY:  That's correct.

THE COURT:  So how does that special interrogatory tell you which theory they went on for Counts Three and Five?

MS. CROWLEY:  It may not for Counts Three or Five, your Honor, but it certainly does for the remaining counts.

THE COURT:  Well, why then am I instructing them on Three and Five for *Barrett* as well?  All along I had said it made sense to me to say, Three and Five are crimes of violence under the law.  You should separately then consider whether One, Two, and Four qualify because they pose a substantial risk of harm.  You said, no, no, I have to tell them about Three and Five also.  What is the point of doing that?

MS. CROWLEY:  So your Honor, if they find for Three and Five, if they check Three or Five in the special interrogatory, necessarily those are elements clause.  But if they --

THE COURT:  Not necessarily.  Not necessarily.  I'm instructing them, as currently written in the charge, I'm instructing them two ways to get to yes on Counts Three and Five.

MS. CROWLEY:  Right.  And we fully appreciate that it's confusing, your Honor.  It was not our intent to make it more confusing than the state of the law right now, but we do

**A000933**

think it's important to know whether they found the predicate of Count Six was based on one of the counts, one of the residual clause counts.

THE COURT:  Let me hear from the defendants on this.

MS. GATTO:  Your Honor, we took no position regarding the government's proposed change.  Our real issue is the language that we're alluding to, the language in the instruction as it is now, where the Court directs the jury as to Counts Three and Five being, as a matter of law, a crime of violence.  Now if this verdict form -- I agree with the Court.  With this verdict form, you don't need to instruct them the way they're currently instructed, so --

THE COURT:  Right.

MS. GATTO:  -- that would push me from taking no position to joining.

THE COURT:  Well, I'm not sure I'm following.  Push you from taking no position to joining what?

MS. GATTO:  We took no position on the government's changed Count Six.

THE COURT:  Oh, I thought you joined it.

MS. GATTO:  We really took no position.  I think that last night we were going back and forth with a thousand emails with a million different issues, but -- so it's not our application.  We take no position to it one way or the other.

THE COURT:  So I was --

A000934

MS. GATTO:  We don't object to it.

THE COURT:  So what I had thought everybody wanted all along was a special interrogatory with respect to basically *Barrett* on Counts One through Five.  "If, and only if, you found the defendant guilty of the offense charged in Count Six, please indicate which, if any, of the offenses charged in Counts One through Five, of which you have found the defendant guilty, involved, as committed, a substantial risk that physical force might be used against the person or property of another.  Remember that you may not consider for purposes of this question any of Counts One through Five for which you did not return a guilty verdict."  But this would be a *Barrett* interrogatory.  And that would tell you whether or not the first element of Count Six, they found that there was a substantial risk that force would be used against the person or property of another.  So is that what you really want?  I'm not --

MS. CROWLEY:  Yes, your Honor, we want that instruction, but we also would like the jury to note, to make clear which of the counts they found the predicate on, they found as a predicate for Count Six.

THE COURT:  And why?

MS. CROWLEY:  Your Honor --

THE COURT:  Why?  I'm just curious.  That would seem to me to be then the policy of the office in every case

A000935

involving a 924(c), but it's not.

MS. CROWLEY:  Well, I think, your Honor, it is now, post *Barrett*.  I do think, your Honor, that it's important if, you know, we are wrong, for example, on Counts Three and Five being elements clause offenses.  We think it is important for the appellate record that we know whether the jury also found that Counts One, Two, Four --

THE COURT:  No, no.  But this special interrogatory allows you to consider whether or not or which of the counts they found met the *Barrett* test for the first element.  You're saying you need another interrogatory as to which of the counts also met element 2, and I'm not sure why you need that.

MS. CROWLEY:  Your Honor, I was going to say the same thing, and I apologize if it's not answering your Honor's question, apparently, but we think that it's important to know which count they found was the predicate for Count Six.

Or, your Honor, we had proposed in the joint verdict form that we had sent in a couple weeks ago that after each of the counts, there be included a special interrogatory as to whether the jury finds that each count constitutes a crime of violence.

THE COURT:  No.  I think you asked just whether it involved a substantial risk.

MS. CROWLEY:  Yes, that's what I mean.

THE COURT:  So that's a separate *Barrett* interrogatory

A000936

after each count.  I thought it made more sense to do it when we get to Count Six.  Otherwise I think it's somewhat confusing for the jury in the verdict form.  There's a good chance they're going to be going through the verdict form while they're looking at the charge, and the charge lays out the elements for Count One, and then they're going to see this special interrogatory that is not in the section of the charge that relates to Count One because it's really tucked away in Count Six, and so I thought it just made more sense to do that at the end.  But your special interrogatories only related to *Barrett*, risk of substantial harm, not to what the predicate was for Count Six.

MS. CROWLEY:  Your Honor, yes, your Honor, that's why we proposed both.  I think we attached to our letter yesterday the verdict form used by Judge Seibel in *United States v. Blanco*, which that was a pre*Barrett* trial.

THE COURT:  Right.  That's fine.  I'm not saying that it can't be done.  I'm just not sure why it needs to be done.  And the articulations as to why you think it needs to be done post *Barrett* I don't think hold up.  Seems to me you're only interested really in the special interrogatories related to the *Barrett* test, for substantial risk.

So I don't want to eat all our time on this, but that does seem to me to be overkill and more confusing to the jury, given the instructions.  So I'm inclined to, frankly, just do

A000937

the special interrogatory that I talked about as part of Count Six.

Do you have a view on that?

MS. GATTO:  That's fine.  We agree with your proposal, the special interrogatory as relates to Count Six.

THE COURT:  And just with respect to *Barrett*, right?

MS. GATTO:  Yes.

THE COURT:  Yes.  Okay.

All right.  So then there was also a proposed instruction, limiting instruction with respect to the videos, and we had a lot of talk about that at the time, and I ended up not giving a limiting instruction at the time the videos were played.  I did say that if the defendant wanted me to include some language in the charge, I would, but you don't want it, right?

MS. GATTO:  We're not asking for that language.

THE COURT:  Okay.  Are you objecting to it?  Do you care one way or the other?

MS. GATTO:  Since we're not asking for it, I guess we care.  We're not asking for it.

THE COURT:  So I don't see the point in doing it.  It seems to me I've already concluded that I didn't think it was particularly prejudicial.  It strikes me as not of the sort that merits such instructions in other cases.  So if they're not asking for it, I don't see any point in doing it now.

**A000938**

Okay?

All right.  Then I want to get to the letter from defendant yesterday.  Hold on.

Okay.  The first related to a strong objection to the definition of "services."  And so couple of things I want to be clear about.  The mention of the discussion of attorneys, that's a reference to summations.  I assume that in summations there's going to be discussion about that.  So I'm happy to be explicit with respect to that.  "In this case there has been much discussion by the lawyers in summations about whether ISIS invited attacks such as the one alleged here."  I could say "conduct," "invited the conduct such as alleged here."  And whether defendant was motivated by such an invitation.  I'm now inclined to add language that says, "It is for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such as the conduct alleged here, whether the defendant carried out the conduct alleged here, and if you find that he did, whether the defendant was motivated by such an invitation."  I do nonetheless think it's appropriate as a legal instruction to include the following: "If you find that ISIS did in fact invite its followers and sympathizers to engage in such conduct and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of 'services' in the statute."  I think that's a

**A000939**

legal instruction about services. I'm not looking to take the facts away from the jury; I'm just looking to make sure that they're not operating under a misapprehension of law.

Ms. Gatto.

MS. GATTO: Several points, your Honor.

THE COURT: Okay.

MS. GATTO: First of all, an invitation is not a direction. That word "invitation" is a word that appears nowhere in the statute, appears nowhere in the Supreme Court definition. And "invitation" and "direction" are two separate things. If I invite you to my party, your Honor, you might respond yes, no, or maybe. If your Honor directs me to the court --

THE COURT: But I'm disagreeing with you that it requires direction. I think that clearly "for the benefit of" is one of the things that the case law that you've cited to me draws -- commanded, paid for, or done -- let me just use the quote.

"Commanded or paid for by another or done for the benefit of another." Right?

MS. GATTO: That's right, your Honor, and the jury should be directed that that's the definition, and they get to interpret whether the facts have satisfied the definition. That's what a jury trial is.

THE COURT: No, no. It's not then to guess what --

A000940

MS. GATTO: They're not guessing. They have the evidence in front of them and they have the definition in front of them. Your Honor, these two sentences are directing the jury to return a guilty verdict.

THE COURT: I disagree.

MS. GATTO: It marshals the evidence and then it tells them exactly where to go with it.

THE COURT: How does it marshal the evidence?

MS. GATTO: It tells them, it makes the government's summation argument, it puts it right in here, and then it tells them, find him guilty. And it doesn't even say if the ISIS propaganda videos directed Mr. Ullah. What the sentence says, if the ISIS videos directed its followers and sympathizers. So if there's just, somewhere in cyberspace, a message to other people in cyberspace and then he's motivated in whole or in part, which is what this direction to the jury is, then find him guilty.

THE COURT: It doesn't say that. It says, "It's for you to decide whether or not the conduct was invited by ISIS, whether the defendant engaged in the conduct, and what his motivation was." Those are the factual questions. The legal instruction --

MS. GATTO: But --

THE COURT: Let me finish. -- is that work performed in coordination with, at the direction of, or for the benefit

**A000941**

of ISIS meets the definition of "service."  That's the legal instruction.  You want me to tell them it's only at the direction of, and that's not accurate.

MS. GATTO:  No, that's not what I want you to tell them.  I want you to tell them the definition of "service" is provided by the Supreme Court, and then I want them to go back and in their deliberations sort it out.  What I don't want is a directed verdict, which is what is happening.

THE COURT:  You keep saying that as though it makes it so, that calling it a directed verdict makes it that.  It's not that.  I don't see how anybody could read the language that I just recited and call that a directed verdict.

MS. GATTO:  It tells them how to interpret the facts in light of the definition.  That is their factual question.  Your Honor, he wanted a jury trial.  Mr. Ullah wanted a jury trial.  He wanted 12 people to sit in a room and discuss the evidence and then determine whether or not it satisfies the legal standards.  He didn't want a bench trial, your Honor, he wanted a jury trial.

THE COURT:  Okay.  I think we're becoming sort of polemic in that.

MS. GATTO:  And I also want to make note of the idea, the start of this language, that there's been much discussion by the lawyers.  There's going to be much discussion by the lawyers in summation on many elements.  It seems odd, to me --

**A000942**

and I'm sure it will seem especially alerting the jury to something -- that out of all the issues that we're talking about in summations, all the elements of six counts of crimes, the only one the judge refers the jury to is on this count. There's much discussion on a lot.  There's going to be much discussion on intent, there's going to be much discussion on postarrest statements, there's going to be much discussion -- it's going to be three hours of summations.  Why, out of every count, is it this count, we're telling the jury there's much discussion about an issue.  And then when we tell them what the discussion is, we articulate the government's argument to a tee.

THE COURT:  Well, I think it's not really articulating the government's argument.  It's teeing up for the jury what the issue is as to whether or not there was a service provided or attempted to be provided here, to instruct them as to what that means.  I don't want this to become -- and I'm afraid it's going to become, really -- lawyers arguing law to the jury.

MS. GATTO:  Your Honor --

THE COURT:  If he acted independently -- I mean, I worry that there's going to be attorneys effectively instructing the jury on the law.

MS. GATTO:  Just if I can finish this point.

THE COURT:  Yes.

MS. GATTO:  The argument will be, the law says that an

A000943

individual cannot act entirely independent of ISIS and break this law. That's what the law says. We didn't make it up. We're not arguing that. That's the law. Then we're going to say, look at this evidence, right?

THE COURT: All right. But --

MS. GATTO: The evidence showed you that he was not working at the direction, under the control, or in coordination with ISIS. That's the law. Then they get to go back and they say, well, I don't know, did you see the videos? Well, I don't know, were there videos directing? I don't know. And then they come up with a decision, just like any other element they have to decide. It seems really unusual that out of all the elements they have to decide, we have these two sentences that use language I've never seen in a jury instruction.

THE COURT: Really?

MS. GATTO: I have never seen in a jury instruction, "You've heard much discussion by the lawyers." I have not. I mean, you certainly have more experience than me, your Honor. I'm just a lowly trial attorney. But I have never seen that. And I can't see how it will not spark their ears, and to me, it has real potential, if not guaranteed, for them to say, okay, the judge is telling us that this evidence, marshaled in this way, is a conviction on Count One.

THE COURT: Again, I don't think that's an accurate characterization.

**A000944**

You want to be heard, Mr. Turner?

MR. TURNER:  Briefly, your Honor.

We believe the Court's language, as just conveyed, is appropriate.  The Supreme Court case law, the Supreme Court case law that the defense argued to this Court does not require direction.  As your Honor just pointed out, it includes an act done for the benefit of another.  Your Honor has drawn on that language and provided a definition of "service," and we believe it's appropriate.  It's a legal instruction.

THE COURT:  All right.  What about the sentence which I think draws the particular ire of Ms. Gatto, which is, "In this case there's been much discussion by the lawyers in summations about whether ISIS invited the conduct alleged here and whether the defendant was motivated by such an invitation"?

MR. TURNER:  Your Honor, we have no objection to that language.  We think it's perfectly appropriate.  We don't see the jury interpreting it as anything other than the fact that there will have been much discussion about this point in the summations.  And we don't also view it as terribly uncommon, your Honor.

THE COURT:  Okay.  I guess I'm going to reserve and see what I hear.  I mean, I will tell you, candidly, that I often, in jury instructions, where there's been a particular focus among the lawyers about an issue that could lead to confusion as to what the legal instruction is, I will say,

**A000945**

you've heard discussion about this in the summations, and then use that as a way to pinpoint my instructions on a particular point.  So I don't think there's anything improper about it.  I don't think it's a directed verdict.  But I guess I'll wait to see what you guys argue.  I think the way I envision this going is, we'll have summations, and then probably the jury's lunch will come, and then I'll give them a half an hour and then I'll do the charge.  So I'll have an opportunity to tweak a little, but I don't want to do a lot of tweaking so that you know what's coming, but don't quote that line, okay?  Don't quote a lot.  I don't generally like lawyers quoting from the jury instructions, okay?

MR. TURNER:  Your Honor, just one question and one request.  I mean, given that the definition of "service" could have an impact on the parties' closing, we would request, if at all possible, for the Court to rule on that issue.

THE COURT:  Well, I've ruled on the issue.  The only question I'm holding off on is my reference to the fact that there's been much discussion.  So this much is happening.

MR. TURNER:  So just --

THE COURT:  Well, I'll start from the top.  "A person provides or attempts to provide services, as that term is defined in the statute, when a person performs work commanded or paid for by another or done for the benefit of another -- here, ISIS.  Only work performed in coordination with, at the

**A000946**

direction of, or for the benefit of ISIS meets the definition of service.  It is for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such as the conduct alleged here or that the defendant carried out the conduct alleged here, and, if you find that he did, whether the defendant was motivated by such an invitation.  If you find that ISIS did in fact invite its followers and sympathizers to engage in such conduct and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of 'services' in the statute."

Okay?  So what I'm holding off on is the reference to the summations and the argument as joined by the parties.

MS. GATTO:  Your Honor, just so I'm --

THE COURT:  Wait a minute.  He's got the floor now.

MR. TURNER:  Thank you, your Honor.

And so the parties can take it that what your Honor just read will be part of the Court's instructions.

THE COURT:  That's right, yes.

MS. GATTO:  Just so I'm abundantly clear, I have a lot of objections.  Certainly the reference to the discussions of the lawyers is one of them, but that is not my main objection.  Because you had referenced that what I most object to is the language saying that there's been much discussion of the

A000947

lawyers.

THE COURT: I think I said you were particularly unhappy with that language.

MS. GATTO: Whatever the word was. But your Honor, what I most object to is the language about, if you determine that ISIS invited -- again, a word that appears nowhere in the definition either provided by the statute or the Supreme Court -- if you determine that ISIS invited the conduct and the defendant was motivated -- again, another word that doesn't appear as part of the definition -- whether in whole or in part, then convict him. That's what I object to, your Honor.

THE COURT: Okay. I understand the objection. But that's the instruction. Okay?

Peter, maybe it makes sense to give the jurors menus now so that we'll keep doing this while they're picking their lunch order.

THE LAW CLERK: Yes.

THE COURT: Okay. So the next point I wanted to get to was an objection about -- I've taken the word "attack" out. I've taken the word "attack" and changed it and substituted it with "conduct," or "alleged conduct," so I think that covers your concern on that.

With respect to Count Five, I think there's an objection to the characterization of the first theory. I thought that was important to do just because I want the jury

**A000948**

to be very clear as to what the theories are. I'm giving them special interrogatories on two theories under Count Five. So I think the language that Ms. Gatto or the defense objected to was, "Under this theory, the government contends that the defendant violated the statute when he boarded and rode the subway with a destructive device." In the alternative, defense asked to add a sentence that says, "The defense contends that the government has failed to meet its burden of proof on this element because carrying a disconnected device under one's clothes on a mass transportation vehicle is not placing a device in, upon, or near a mass transportation vehicle." I think that's really a legal argument about what "place" means, what it means to place. And that's for me, not for the jury to be deciding. So I'm certainly happy to add the language, "The defendant argues that the government has failed to prove this theory beyond a reasonable doubt," because I think that's the sort of bookend to the government's theory. I just think it's necessary to articulate what the theory was so the jury is not confused by it when they're doing the special interrogatories.

That is the theory on Count Two?

MS. CROWLEY: It is, your Honor.

MS. GATTO: Your Honor, why don't we just borrow your language from Count Five and include our language we proposed and say, "It's up to you to decide whether 'carrying' and 'placing' are the same thing." I don't understand why in Count

**A000949**

One we can tell them what the definitions are, but on Count

Five, we're not allowed to direct them.

THE COURT:  Wait.  I'm not sure what --

MS. GATTO:  In Count One, you tell them that what the direction means, could mean an invitation, right?  And you tell them if it's an invitation and he was motivated by it, it's sufficient.  Here you're going to say to them, what their understanding is, that "carrying" is "placing."  That's what they're arguing, right?  And then period, nothing else.  If I were a juror, I would interpret that as, the Court has told me that "carrying" is "placing."  We need additional balancing language.  The government is going to argue, the government is going to have a two-hour summation, where they can argue whatever they want.  Why in the jury instruction are we cherry-picking what we remind the jury about and why do we do it only in terms of what the government is arguing?

THE COURT:  Again, I don't think that's a fair characterization.  My goal is just so the jury understands what these two theories are for Count Five.  There were three, now we're down to two.  But I think it's important that they understand what the theories are and then they're instructed on each, because there are different elements for each of these theories.  So that's the reason for doing it.

MS. GATTO:  The government's theory is that "carrying" means "placing."  The defense's theory is that "carrying" does

**A000950**

not mean "placing."

THE COURT:  Well, I mean, that may be a legal argument, though.

MS. GATTO:  But the first part is a legal argument as well.

THE COURT:  You made this Rule 29 motion, right, and "placing," you said, means that you have to basically put it down, and I don't think that's an accurate description or definition of "placing."  "Placing" means to put in place.  And whether the bomb is on you or in a briefcase or something that you can separately place down I don't think is dispositive on whether one has placed a bomb on a mass transportation vehicle.  So to the extent you're going to argue otherwise to the jury, then I'm going to need to correct that.

MS. GATTO:  They're going to argue that he violated the statute by carrying a bomb onto a subway car.

THE COURT:  Right.  They're going to argue that he placed it on the subway car when he put his person with a bomb attached to it, to himself, on the subway platform, or on the subway car.

MS. GATTO:  And we're going to argue that he didn't violate the statute when he carried a bomb on the subway car.

THE COURT:  Because he had to have placed it down; that's what you're saying.

MS. GATTO:  No.

**A000951**

THE COURT: Okay. So I want to be clear as to what you're going to be arguing, because if you're going to be arguing that that's not sufficient to establish "place," that strikes me as a legal argument; that's not a factual argument.

MS. GATTO: Your Honor, it is a factual argument. Their question is, did he violate the statute based on these facts. They can argue based on the evidence in any way they want, and we can argue on the evidence, or the lack of evidence, in any way we want. It is the core of the factual question they have to decide, based on the evidence --

THE COURT: But you're really saying you plan to argue to the jury that "place" means something different, right?

MS. GATTO: Depending on how they articulate their argument, certainly.

THE COURT: But again, I think that's a legal argument that you lost on Rule 29. I ruled that he doesn't have to have placed it down on the floor in a separate box, that if it's on his person and he gets on the subway and sits down, he's placed the bomb on the subway. Right? That's sufficient. So if you're going to be arguing the definition of "place," then I think that's a legal argument. That's not what the summation is for.

Do you think the summation is for legal argument? Maybe I'm confused.

MS. GATTO: Your Honor, that is a word or phrase we're

A000952

not defining for the jury.  It's not in your jury instruction.

Just like any other element, they're going to have to go back

and determine what things mean.  It seems unclear to me, why

out of, again, a million different issues that are coming up

between the parties, about which we will dispute in summation,

why this one gets this added endorsement from the Court,

directing the jury that the government --

THE COURT:  How is it an endorsement from the Court?

I mean, look, if the jury asked me, is it enough to have it on

your person when you get onto a train, what is the answer that

I would give to that question?

MS. GATTO:  Well, then we would both propose a

definition.  Our definition would not include carrying.

THE COURT:  Okay.

MS. GATTO:  It wouldn't.

THE COURT:  But I've already ruled on that.

MS. GATTO:  We have support by the law for that.

THE COURT:  I don't think so.  I've already ruled on

that.  That was the basis for your Rule 29 motion, right?

MS. GATTO:  Your Honor, if you think "carrying" is

included in "placing," that's a different question than what

you just --

THE COURT:  But you can, I think --

MS. GATTO:  What you're articulating now is you

believe that they're allowed to argue that it doesn't require

A000953

it to be placed down, right?

THE COURT:  That's right.

MS. GATTO:  That doesn't necessarily mean "carrying" is "placing."

THE COURT:  It doesn't necessarily mean "carrying" is "placing."  My concern is simply that if you're going to instruct the jury on the definition of "place," that's a legal instruction.  That's a legal argument.  You're going to argue that he didn't place this thing on there because it was not operational, it was not intended to be operational, didn't put anybody at risk, that that wasn't his intent, those are things you can argue.  Those are factual arguments.  But they're not legal arguments or definitional arguments.

And so that's the only reason I included this language, just so the jury understands what this theory is. I'm not looking for a directed verdict or any attempt to make a directed verdict.

So in any event, I will add that additional language, that the defendant argues that the government has failed to prove this theory beyond a reasonable doubt.

MS. GATTO:  And your Honor, we'd also ask that the language that, "It's up to you to decide whether or not the government met its burden regarding whether the defendant placed the destructive device in the --"

THE COURT:  I just think the next sentence is, "To

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000954**

satisfy its burden of proof with respect to this theory, the government must establish," then I lay out the elements. This is all pre-elements, so I think that the additional language you just proposed is superfluous when I haven't got to the elements yet, and the next sentence is about what the government must do to satisfy its burden of proof.

MS. GATTO: So then remind them at the end of that paragraph, your Honor.

THE COURT: Well, then, no, at the end of that paragraph, then I go to the specific elements. I list the elements, then I go to the elements.

Look, there's consistency throughout the instructions about what I instruct on the elements, then I describe the elements. There's no question as to who has the burden. So I'm not going to add a separate reminder about the burden for the first theory under Count Five.

MS. GATTO: Your Honor, and I don't mean to beat a dead horse, but there is an inconsistency. There are two counts where we're reminding the jury what the government's argument is without balancing language.

THE COURT: No. It's where I'm trying to instruct the jury as to what the issue is because the language of the statute is broad and the government's theory is narrow, and I want them to focus on the narrow, which I would think would be in everybody's interest. That's the whole point. I don't want

**A000955**

them going off on some other theory besides the two that are offered in Count Five. Okay?

And then I guess with respect to the Count Six interrogatory, I'm adding language now at the end of that section, at the end of the section for the first element that says, "To ensure that you are unanimous as to which count or counts, if any, involved a substantial risk that physical force might be used against the person or property of another, you must indicate in the space provided on the verdict form which count or counts you concluded involved a substantial risk that physical force might be used against the person or property of another."

MS. GATTO: I'm sorry. Where are you reading from?

THE COURT: That would be at the end of the first element for Count Six.

MS. GATTO: So this is not currently in the charge that was circulated or --

THE COURT: No. This is an addition, because in light of the emails, the letters yesterday saying add the interrogatory, this is just to explain to the jury what they're doing with the interrogatory.

MS. GATTO: And I'm sorry. I missed it. Where will that be inserted in our current version?

THE COURT: So at the end of Count Six, element 1, so G(1)(ii) -- which I really think it should be (a) -- at the end

**A000956**

of (ii) --

MS. GATTO:  After you complete telling them what element 2 of Count Six is, right?

THE COURT:  No.  Before I get to element 2.  Right before element 2.  So the last sentence now, at the end of element 1, I can read it again if you'd like, or I can show it to you, if you want.

MS. GATTO:  That's fine.  We'll just take a look at it.

THE COURT:  Yes, I'll show it to you.  But it's just an instruction as to what they're supposed to do with the verdict form.  Okay?  So that's all I had.  All right?

So the jury is filling out menus.  Anything else in terms of logistics?

MS. CROWLEY:  Just on the verdict form --

MS. GATTO:  I'm sorry.  Before we reach the verdict form, I'm still confused about one more thing in the charge.  So are you keeping the language about as a matter of law, Counts Three and Five are crimes of violence?

THE COURT:  Oh, yes.  I'm sorry.  Yes.  You proposed some additional language.  I think that it was much more confusing, what you proposed.

MS. GATTO:  Right.  I'm proposing that you just take it out and then it shouldn't be necessary for alternative language.  My first proposal is that the language directing the

A000957

jury that as a matter of law two counts are a crime of violence is unnecessary.

THE COURT:  I don't think it is unnecessary.  That's the first element is that the underlying crime was a crime of violence.  There's two ways to get there.  One is, you know, as a matter of law, Three and Five are, so they don't need to do any special additional inquiry beyond having convicted on Counts Three and Five.

For the *Barrett* theory, everybody's been very hot for me to tell the jury to do all five counts with a special interrogatory, so I guess I'm going to do that.  But the first element, with respect to Counts Three and Five, has already been met by virtue of a conviction on those counts, if there is a conviction on those counts.

MS. GATTO:  Your Honor, if you thought my language was confusing, that's fine, but the point is, I think the jury can be instructed without being told that as a matter of law that they have to, no matter what they find on Count Three or Five as relates to element 1 of Count Six, they got to go on to Count Six, element 2.  Which is the purpose of my language.  If it's too confusing, I can pare it down.  But the point being that for Counts Three and Five, regardless if you find for the first element, you must go on to the second element.

THE COURT:  Right.

MS. GATTO:  For all other counts, if you answered no

**A000958**

to the first element, then you don't have to bother with the second element.

THE COURT: No. That's accurate. I think that that's --

MS. GATTO: Juries will hear "as a matter of law" and it will --

THE COURT: So if you want to take out "as a matter of law." "I instruct you that Counts Three and Five qualify as crimes of violence within the meaning of this count, so if you find the defendant guilty of either or both of Count Three and Five, then the government has satisfied the first element of Count Six."

MS. GATTO: But think about how confusing that is for them. They're told, you get to determine whether there is a crime of violence, here's the definition of a crime of violence, but by the way, it is a crime of violence.

THE COURT: But that's true, right?

MS. GATTO: It is true.

THE COURT: They have to find guilt beyond a reasonable doubt. That's what they have to have found.

MS. GATTO: It doesn't matter for their determination one way or the other whether this also is a crime of violence under the elements clause. It will not change their determination. The only reason we have it in there is because they have to get to the second element regardless of how they

**A000959**

find under the first element for Three and Five alone. So instead of telling them that separately, independent of your job, it already is a crime of violence, which, if I were a juror, I would have hardly put in the work when the judge has already told me that this is a crime of violence, if you just tell them not the whole history of *Johnson* for why they have to --

THE COURT: I'm not giving them the history of *Johnson*. Nobody objected to this. "The first element that the government must prove beyond a reasonable doubt is that the defendant committed a crime of violence for which he might be prosecuted in a court of the United States." That's the element.

MS. GATTO: And I don't object to that. What I object to, and I've always objected to, since the first charge, since our requests to charge, is anything telling the jury that this is a crime of violence.

THE COURT: But the jury should then have to go back and make a separate finding about Three and Five?

MS. GATTO: No. They should just go on to the second element for Three or Five regardless of how they find on the first element. That's all. They're told first find to element 1, is it a crime of violence, here's the definition of crime of violence.

THE COURT: But you don't have to find. Here's the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000960**

element.

MS. GATTO:  You're not telling them they have to find -- you're telling them they have to find; you're just letting them know they can go on to the second question, that's all.

THE COURT:  Overruled.  What you proposed I think is less clear than what I have here.  I don't mind taking out "as a matter of law," if that's part of what you find objectionable.  I'll just instruct the jury that Counts Three and Five qualify as crimes of violence within the meaning of this count.  So, "If you find the defendant guilty of either or both of Counts Three and Five, then the government has satisfied the first element of Count Six."  And then I do a lengthier discussion about what we all know to be *Barrett*, or what the jury will just understand as a substantial risk that physical force might be used against the person or property of another, and then after that, we get to element 2.  So I'm going to otherwise leave the instruction intact.

All right.  Do you have something, Ms. Crowley?

(Continued on next page)

A000961

MS. CROWLEY: On the verdict form, your Honor. We sent in mostly joint post-edits to the verdict form.

THE COURT: I'll go through them. Most of them I had already changed and for some reason they didn't get sent to you. You're talking about the red-line that you sent?

MS. CROWLEY: Yes, your Honor.

THE COURT: I think the defense joined in our edits, all of our edits, except for question 9.

I changed T-W-O to 2 the number. There was I think one typo. It says 5, it should have been 3.

Question 6 you have now cut out "destructive substance" and "railroad on-track equipment" which I had already struck, but it seemed to me that you had not agreed to that as of Friday. In any event, that's fine.

"Mass transportation vehicle" instead of "passenger train," that's fine.

In question 8 I'm going to say "the defendant" rather than "Mr. Ullah," which conforms with other secondary questions.

Then question 9, this is a change I had made that didn't get apparently passed along. That tracks the language of the statute and it tracks the language of my instructions. So I will make that change.

Then I'm doing a different interrogatory from what you have asked for. My is limited to Barrett. Okay?

A000962

MS. CROWLEY:  Thank you, your Honor.

THE COURT:  We are still missing a juror or two.

We are going to switch out the juror.  Mr. Lopez will now become Juror No. 2.  Mr. Coates is not here as of a couple of minutes ago.

Is there anything else we need to do before we bring in the jury?  If he is here, can I bring them in?

MS. GALLICCHIO:  Your Honor, after your initial instructions and the government's summation, will we take a break after that?

THE COURT:  It depends on how long it goes.  I think probably we will.  How long are you going to be?

MR. TURNER:  About an hour and 15, Judge.

THE COURT:  That is a little shorter than usual, but I don't want them squirming during yours.  We'll see how it goes. I'm happy to.  If you think we need one, just signal.

MS. GALLICCHIO:  Can we take a five-minute now?

THE COURT:  Yes, you can take a couple of minutes now.

(Recess)

(Jury present)

THE COURT:  Thanks, ladies and gentlemen.  Sorry to keep you waiting.  We were handling a couple of logistical things.

Also, you may notice that Mr. Fernandez is not here today.  He had a family situation that I excused him for.  Mr.

A000963

Lopez, you are going to move up into seat 2. You will no longer be Alternate 1, you will be Juror No. 2. Then I will ask the other two alternates to move one over. With that, now we will resume.

We finished the evidence portion of the trial last week. We are now going to have the summations. As I told you before, the summations are also sometimes known as the closing arguments of the attorneys. Are the opportunities the lawyers have to make arguments, to tell you what they believe the evidence showed, and to ask you to draw inferences from it. It is important. You should listen to what they have to say.

Obviously, your recollection of the evidence is what governs. If any lawyer recites evidence or characterizes evidence that is different from the way you remember it, it is your recollection that controls. Also, in deliberations you will have access to the transcript if you want to refer to the testimony in transcript form, and you will have access to the exhibits as well.

Because the government has the burden of proof, the government will go first. Then the defense will go, and the government will get to give a relatively short rebuttal summation because they have the burden of proof beyond a reasonable doubt.

We will probably take a break mid-way through to make sure that everybody is comfortable and paying attention. So

**A000964**

sit back.  I know you're ready.  We will now begin the government's summation.  That is by Mr. Turner.

Mr. Turner.

MR. TURNER:  Thank you, your Honor.

"O, America, die in your rage."  That's what the defendant wrote before he did it, before he detonated a bomb in the heart of New York City.  He wanted to inflict maximum damage, to terrorize Americans, so he chose the busiest subway station in this city.  He chose a Monday morning rush hour.  He filled his bomb with screws, screws intended to rip into human flesh, to injure and kill.

And he detonated the bomb in a crowded tunnel full of innocent people just going about their daily lives.  For what?  For ISIS, the Islamic State, a sick, depraved terrorist group that instructs its followers, like the defendant, to attack America and Americans.  That is exactly what the defendant did.

He was angry at America for its policies in the Middle East.  As the defendant himself explained after the attack, he wanted to punish America, so he devoted himself to ISIS and its radical ideology of violence and hatred.  He became a terrorist.

For a year he plotted his attack.  He was cold and calculated.  He researched how to build a pipe bomb online, and then he carefully, methodically built the bomb at his Brooklyn apartment.  He chose his target and he chose his moment to

**A000965**

strike.

On December 11th of last year, the defendant strapped the bomb to his chest. He declared his allegiance to ISIS on Facebook. He rode the subway to the Port Authority. Then, as he walked through that tunnel, he detonated the bomb, with commuters all around him. His goals were to injure and kill innocent civilians, to terrorize and to send a message all in the name of ISIS.

Thankfully, incredibly, the defendant did not succeed in killing or maiming anyone that morning. He planned to die in his attack, to die for ISIS. He never thought he'd be sitting here in this courtroom charged with crimes for his attack. But he was wrong. Now it's time for him to be held responsible for what he did, for carrying out a terrorist attack in this city. It's time for the defendant to face justice.

During my time up here today, I plan to do two things. First, I'm going to go over some of the evidence you have seen and heard during the trial, the evidence showing the defendant is guilty as charged. I am going to focus on the evidence of who, how, and why.

We will start with who bombed the Port Authority subway station last December. We won't spend much time on it. You have seen the photos. You have seen the videos. You know who bombed the Port Authority. The defendant. There is no

**A000966**

dispute about that.

We will also go through some of the evidence showing how the defendant did it, how he plotted the attack, built the pipeline, and carried out the bombing. Then we will look at the evidence establishing why the defendant did it, the evidence that shows the defendant carried out the attack to support ISIS and its mission of terror and death.

The second thing I plan to do after we review the evidence is talk about the charges. As you know, the defendant is charged in the indictment with six crimes. All of those charges relate to the bombing at the Port Authority last December. There is no question that the defendant carried out the attack, and he is guilty of all six charges in the indictment. When we talk about those charges, I will explain how the evidence proves every element of the charged crimes beyond a reasonable doubt.

Let's start with the evidence showing who carried out the bombing. As Ms. Donaleski told you at the beginning of the trial, the bombing was caught on video. Surveillance cameras inside the subway station captured the defendant walking through the tunnel and detonating his pipe bomb. You saw that video. It's Government Exhibit 1001-23. Let's take another look. You will see a circle around the defendant.

(Video shown)

After the explosion, as smoke spread through the

A000967

tunnel, terrified commuters ran for safety. Courageous first responders rushed to the scene just doing their job. What did they find? Pieces of metal pipe, wires, screws sprayed across the tunnel, the remains of the bomb.

What else the they find? The defendant lying on the ground in the tunnel. You saw the photos. Parts of the bomb were still attached to his body. What did first responders find in the defendant's pocket? His driver's license, a driver's license identifying the bomber as Akayed Ullah, the defendant.

After the defendant was taken into custody, he confessed to carrying out the attack when he was interviewed by law enforcement. You heard about that interview from Detective Byrne. The defendant admitted he set off the bomb. He described how he did it and why he did it: for ISIS, to inflict maximum damage, and to terrorize as many people as he could. I'll talk more about the defendant's statements to Detective Byrne later.

So, you know from the video, the photos, and the confession that the defendant is the bomber. That's undisputed. I will just note there is also the DNA evidence. The defendant's DNA was found on numerous pieces of the pipe bomb recovered from the tunnel, the pieces you see here. That is not surprising. The defendant detonated the bomb while it was strapped to his chest.

**A000968**

Let's turn to how he did it. The evidence that shows how the defendant planned, prepared for, and executed this terrorist attack. Let's start with the bomb, the defendant's weapon. He explained to Detective Byrne how he built the pipe bomb and triggered the explosion. You heard from the FBI's explosives experts Chris Rigopoulos and Robert Gillette. They analyzed that evidence, pieced together the remains of the bomb, and explained how it worked.

The defendant's pipe bomb was an improvised explosive device, IED, a homemade bomb. The defendant used metal pipe to make the bomb with metal end caps to seal the ends of the pipe. The FBI found pieces of that pipe at the bomb scene. The defendant filled the pipe with explosive material. He told Detective Byrne what he used to make that explosive material: match heads mixed with sugar, which can act as a fuel in IEDs.

You know from forensic examiner Gillette that residue consistent with explosive material was found on several pieces of the shattered pipe. The defendant used Christmas tree lights as the heat source to ignite the explosive material in the pipe. He told Detective Byrne after the attack that he put broken Christmas lights in the pipe bomb. Sure enough, fragments of Christmas lights were found at the bomb scene. As we learned from Agent Rigopoulos, Christmas lights are commonly used as heat sources in IEDs.

The defendant attached those broken Christmas lights

**A000969**

to wires which he connected using orange wire nuts.  Remember, the defendant worked as an electrician, as he told Detective Byrne.  He knew how to work with wires.  What did the defendant use as a power source for his bomb?  Simple: a 9-volt battery.  It was found in the defendant's pocket at the bomb scene.

To detonate the pipe bomb, the defendant simply needed to touch the loose ends of the wiring to that battery.  That would close the circuit, causing the Christmas lights to heat up, the explosive material to burn, the pressure from the gases to build, and the pipe to explode, all in a split second.

And that's exactly what the defendant did.  He acted as the trigger, the switch.  He made himself part of the bomb.  Remember, this was a martyrdom operation.  He planned to die when he carried out this attack.  As he walked through the tunnel at the Port Authority station, surrounded by commuters, he took that final step in his deadly plan.  He touched the wire to the battery in his pocket, triggering the detonation.

When first responders found the defendant, they discovered wires running across his chest down to his front right pants pocket, where he had the battery.  When Agent Rigopoulos later examined those pants, he discovered that the defendant had cut a small hole in his pocket, a hole to allow the wires to run into the pocket and the battery.

Look at these images of the defendant from surveillance cameras inside the Port Authority shortly before

A000970

the attack.  Where was his right hand?  In the front right pocket of his pants.  He was getting ready to touch the wire to the battery in that pocket, to detonate his bomb.

We could be done talking about the bomb -- I have just covered all the parts that were necessary to make the device -- but we are not done.  We are not done because the defendant also filled the pipe with screws, screws like these.  Dozens of screws were found at the bomb scene.  The screws functioned as shrapnel or fragmentation.

The defendant knew that the explosion would cause the metal pipe itself to shatter and fly through the tunnel.  The shattered pipe fragments were sharp like a knife, as you heard from Agent Vetrano.  Pipe fragments like this, Government Exhibit 116, sharp like a knife, flying through the air.  But this, this wasn't enough for the defendant.  So he added screws to his bomb.  As he told Detective Byrne, he wanted to inflict maximum damage.  When he detonated his pipe bomb, the explosion sprayed screws through the air.

You know from Agent Rigopoulos and just from your common sense the screws were completely unnecessary to make this bomb explode.  They were a deadly enhancement, an enhancement designed to make the bomb more lethal.  The screws had one purpose: to maim and kill, period.  There was no other explanation, none, for why the defendant put screws in his bomb.

**A000971**

MS. GALLICCHIO: Objection.

THE COURT: Overruled. Ladies and gentlemen, I'll instruct you on the law later in terms of who has the burden of proof. The government has the burden of proof, as you know, for all the elements of all the counts.

Go ahead.

MR. TURNER: Not only did the defendant fill his bomb with screws, he chose to detonate it in a tunnel, the tunnel: narrow, underground, enclosed. You know from Agent Rigopoulos that detonating an IED in an enclosed space like a tunnel increases the power and the force of the explosion. You heard his testimony. In an enclosed area, he testified, the potential to increase the damage is enhanced because the gases have nowhere to go. So the deployment of an IED of this nature in this tunnel increases the potential damage. The defendant was trying to injure and kill as many people as he could.

When you watch the video of that explosion, when you consider the location of the blast and the make-up of the bomb, the screws, the pipe fragments flying through the air, it's a miracle that people weren't injured more severely or killed. The city was lucky that way. The defendant didn't succeed, thank goodness, in killing and maiming people.

But he did succeed in his goal of terrorizing innocent civilians, innocent folks like Veronica Chavez and David Wall, who were just feet from the defendant when he detonated the

A000972

bomb.  You remember the testimony of Mr. Wall and Ms. Chavez.
It was powerful.

David Wall, a construction project manager for city schools, rode the subway every day to work for years.  But now he struggles to walk into a subway station because of what happened that morning.  Mr. Wall was walking right in front of the defendant when the defendant detonated the bomb.  Shrapnel from the bomb sliced into his leg and he lost part of his hearing in the blast.

Veronica Chavez worked as a seamstress at a factory.  She was walking towards the defendant in the tunnel just on her way to work when he detonated the pipe bomb.  You heard the terror in her voice when she described the explosion.  You could tell it haunts her to this day.

These are two lives forever scarred by the defendant's attack.  Mr. Wall and Ms. Chavez were just two of the people in that crowded tunnel.  Take a second.  Based on the evidence you have seen and heard in this courtroom, you can picture what it was like in that tunnel when the bomb exploded.

MS. GALLICCHIO:  Objection.

THE COURT:  Overruled.  Go ahead.

MR. TURNER:  The impact of the defendant's attack reached far beyond even that tunnel.  You heard from Barry Greenblatt of the MTA.  As a result of the attack, the Times Square 42nd Street subway complex, a hub in the middle of

A000973

Manhattan, the single busiest subway station in the city, was shut down during the morning rush hour.

You also heard from Gerard Quelch, the manager of bus operations at the Port Authority Bus Terminal.  The defendant's attack shut down the buss terminal for part of the day. Hundreds and hundreds of buses delayed, diverted, canceled. The defendant struck, by design, during the morning rush hour. His attack wreaked havoc, chaos in the city's mass transit systems.  Tens of thousands of people were affected, people who were just trying to get to work.

We should spend a few minutes talking about the bomb, how it was built and how it worked.  Now let's turn to the evidence showing when and where the defendant built his bomb, evidence that shows this was a premeditated, calculated attack.

During his interview with Defendant Byrne, the defendant stated about a year before the attack --

MS. GALLICCHIO:  Objection.

THE COURT:  Overruled.  Go ahead.

MR. TURNER:  The defendant stated during his interview with Detective Byrne that about a year before the attack he began researching how to build a bomb online.  He started watching videos and reading magazines with instructions for making a pipe bomb.  So, for at least a year the defendant was researching, plotting, preparing to strike.

A few weeks before the attack, the defendant put his

**A000974**

plan into action. He started collecting the materials that he would use to build his bomb: the metal pipe, the wires, Christmas lights, matches, and screws.

We know where the defendant built the bomb: in his Brooklyn apartment, 679 Ocean Parkway, apartment 3J. The defendant told Detective Byrne that he lived in that apartment and that he built the bomb there. The FBI searched the apartment after the attack. You heard from some of the agents who conducted the search.

What did they find? Bomb-making materials, like these strands of Christmas lights found in a basket in the hallway, strands with no lightbulbs. Remember, what did the defendant use in its pipe bomb to ignite the explosive material? Fragments of Christmas lights that he removed from their strands, like the fragments shown here on the right which were found at the bomb scene.

What else did the FBI find in the defendant's apartment? Pieces of green wire in a trash can in the bathroom. Look familiar? It should. You know from Agent Rigopoulos that the green wire found in the apartment is consistent with the green wire found at the bomb scene, shown here. Some of the green wire found in the apartment had been stripped to expose the copper wiring just like some of the wire found at the bomb scene.

After the attack, the defendant told Detective Byrne

A000975

that if law enforcement searched his apartment, they would find wires from his bomb-making. Well, they did. And what did the FBI find next to the green wire in the bathroom trash? You see here on the left a screw just like the screws the defendant used in his bomb.

That's not all the FBI found in that trashcan. The agents also found a red powder. You see the residue from the powder in this photo. And you know from the testimony of forensic examiner Gillette that the powder consists of ground-up match heads, or potassium chlorate, a substance commonly used in IEDs. What did the defendant tell Detective Byrne he used to make the explosive substance in his pipe bomb? Match heads.

The FBI also found this shoebox in the defendant's apartment containing hardware, including screws and orange wire nuts, just like the screws and orange wire nuts the defendant used to build his bomb. Agent Rigopoulos compared the screws in the shoebox to the screws found at the bomb scene. Some of the screws are the same type.

Picture the defendant in his apartment methodically assembling his bomb. Think about some of the precise, deliberate steps he took to construct it: removing Christmas tree lightbulbs from their stands, stripping and collecting wires, grinding up match heads, drilling a hole in a metal end cap, even cutting a hole in his pocket for the wires. These

**A000976**

were the careful, deliberate, and terrifying actions of a man determined to kill.

Where did the defendant get the materials he needed to build his bomb?  He had easy access to those sorts of materials.  He worked as an electrician.  Where?  He told Detective Byrne: at a construction site at 39th Street and Eighth Avenue in Manhattan.  That's just a couple of blocks from the Port Authority, where the defendant carried out his attack.

After the attack, the FBI searched the construction site at 39th and Eighth where the defendant worked.  It was a Pret sandwich shop.  You heard from Agent Bennett, who participated in the search.  He found this cardboard box containing hardware, including screws and orange wire nuts, just like the orange wire nuts found at the bomb scene and the defendant's apartment.

That box of hardware was next to this locked orange container.  What did Agent Bennett find when he searched that container?  Various hand tools, including these Channellock pliers with blue handles.  You know from the FBI's tool marks expert Derrick McClarin that these Channellock pliers were used to build a pipe bomb.  Just like that, the FBI had found one of the tools the defendant used to construct his bomb just down the street from the Port Authority.

Let's talk some more about the day of the attack.

**A000977**

Remember, the defendant finished building his bomb about a week before the attack, as he told Detective Byrne.  That means for about a week the pipe bomb was sitting in the defendant's apartment.  But the defendant was biding his time, waiting for the right moment to strike.  What moment did he choose?  Rush hour on a Monday morning, because it would be busy, crowded.  The defendant was aiming for maximum damage, maximum terror.

So, it's the morning of December 11, 2017, Christmas just around the corner.  The Monday morning commute is under way.  New Yorkers are on their way to work.  But at his Brooklyn apartment the defendant is preparing to attack.  He described that to Detective Byrne.

At about 5:45 a.m. the defendant straps the pipe bomb to his chest using white zip ties, these white zip ties, which were later found at the bomb scene.  Then he sets out for his target with the pipe bomb strapped to his chest concealed under layers of clothes and with the battery in his pocket ready to trigger the explosion.  We know the route that he took.  He described it to Detective Byrne.

You saw the surveillance video and the MetroCard data capturing the defendant's movements.  Surveillance cameras at 679 Ocean Parkway in Brooklyn show the defendant leaving his residence.  He walks a few blocks to the 18th Avenue subway station, where surveillance cameras capture him entering the station.  He swipes his MetroCard at 6:24 a.m.

**A000978**

Then he rides the subway from Brooklyn to the Port Authority station at 42nd Street in Manhattan. On his way at 6:36 a.m., he makes this post on Facebook declaring his allegiance to ISIS: "O, Trump, you fail to protect your nation. Baqiya." "Baqiya" is a rallying cry, a slogan for ISIS. We will talk more about that Facebook post later.

The defendant arrives at the Port Authority station. Surveillance cameras capture his presence at the station as he strides towards the tunnel connecting the Port Authority and Times Square stations. This was a man on a mission with a bomb concealed under his clothes.

You know what happens next. With commuters all around him, people just going about their daily lives, he touches the wire to the battery in his pocket, detonating the pipe bomb in the tunnel. You can see the red flames bursting from the bomb as it explodes.

That's how the defendant carried out his attack. Let's turn to why he did it. The evidence showed you why. He did it for ISIS. The defendant confessed that he carried out the attack for ISIS. He wrote ISIS slogans in items found all over his apartment, and he publicly declared his allegiance to ISIS on Facebook. We will talk about all of them.

The defendant had been radicalized, building to this attack for years. He told Detective Byrne that around 2014 he became upset with U.S. policy in the Middle East and blamed

America for bombings in that region. So the defendant began seeking out and absorbing radical anti-American terrorist propaganda materials on the Internet.

For example, he watched videos of Anwar al-Awlaki. You saw this image off al-Awlaki. It is from one of the videos found on the defendant's laptop seized from his apartment. You heard about Awlaki from Dr. Aaron Zelin, the expert who testified about ISIS and terrorism. Awlaki was a leader of an al-Qaeda group. His video messages encouraged followers to carry out attacks against Americans, and Awlaki has inspired ISIS supporters around the world, like the defendant.

The defendant devoted himself to ISIS and its cause, inspired by the group's online propaganda videos. We learned about the videos that ISIS puts out from Dr. Zelin, videos that spew anti-American terrorist ideals and glorify ISIS's brutal violence: executions, beheadings, and bombings. These videos are specifically designed to recruit and radicalize new supporters and inspire them to commit terrorist attacks, just like the attack carried out by the defendant. The defendant described watching videos calling on followers to attack Americans using bombs, trucks, or even knives. He chose a bomb for his weapon.

You saw clips from several of the ISIS videos that the FBI found on the defendant's laptop. Those videos can be tough to watch. They promote ISIS and its cult of violence and

**A000980**

terror. Remember some of the things we saw in those clips: the black and white flag of ISIS, the icon of the group, it's all over those videos; ISIS's leader, Abu Bakr al-Baghdadi; bombing attacks; depictions of violence intended to intimidate ISIS's enemies and to inspire supporters like the defendant to carry out violence in the name of ISIS.

And this image glorifying ISIS supporters who carried out attacks in the name of ISIS, including Omar Mateen, at top left, who shot and killed scores of people at an Orlando nightclub. This image represents precisely what the defendant was striving to achieve: to kill Americans and join ISIS's army of lone wolf attackers.

How do you know those are the defendant's videos? It's not hard. He admitted to Detective Byrne that he watched ISIS videos online and that he carried out the attack for ISIS. Sure enough, a laptop containing ISIS videos was found in the apartment where the defendant lived. What else did the FBI find in that apartment? Bombing-making components.

Those videos are just a few examples of the ISIS videos the defendant consumed. Let's talk about another of the ISIS videos he watched, the video with the ISIS slogan the defendant adopted: "Die in your rage." You know what the video is called: the Flames of War II. The defendant specifically mentioned that video to Detective Byrne. The video is important. It provides a window into the defendant's hatred,

A000981

his rage in the days leading up to the attack. It is further proof that when he bombed the Port Authority, he was acting for ISIS.

We learned about this individual from Dr. Zelin. In the video, ISIS instructs supporters to carry out attacks here in America. You saw clips of the video showing U.S. military forces conducting operations in the Middle East followed by this statement "Die in your rage, America" with an image of the U.S. Congress in the background. This is ISIS declaring war on America, calling on its supporters to attack America and Americans.

ISIS released that video on November 29, 2017. The video calls on supporters to carry out attacks in America. And the defendant bombed the Port Authority just 12 days later. He was answering ISIS's call. The defendant wanted the world to know that he was acting for ISIS, so he wrote this in his passport: "O America, die in your rage," the same phrase we just saw in Flames of War II.

You know from Dr. Zelin that "Die in your rage" is a slogan, a rallying cry used by ISIS and its supporters. And you know the defendant was angry at America for its policies in the Middle East. He wanted to punish Americans on behalf of ISIS through his attack.

He didn't stop with the passport. He wrote this in his visa, "die in your rage," and on the bottom of the shoebox

A000982

you saw during the trial. You know what was in that shoebox when the FBI found it: screws, like the screws he used in his bomb.

Each of these items -- the passport, the visa, the shoebox -- was easily found during the search of the defendant's apartment following the attack. They weren't hidden. The defendant wanted these calling cards, these declarations of his support for ISIS to be found right alongside the materials he'd used to build his bomb because he was proud of the attack. He was proud of supporting ISIS.

The defendant also publicly declared his allegiance to ISIS on Facebook. Less than an hour before the attack, as he rode the subway to the Port Authority with the bomb strapped to his chest, the defendant posted this message on Facebook, ending with "Baqiya."

We learned from Dr. Zelin that "baqiya" is an Arabic term that literally means remaining, and that it's part of the slogan that ISIS uses in its propaganda videos to signify that the group is remaining and expanding, that ISIS is here to stay, that it will attack and defeat its enemies. Just like "Die in your rage," "Baqiya" is another slogan, another rallying cry for ISIS.

How do you know the defendant posted this message? He told law enforcement about it. After the attack, he told Detective Byrne that he made this post. He was proud of it,

**A000983**

just like he was proud of the messages he wrote in the passport, the visa, and the shoebox. And the defendant specifically explained to defendant Byrne why he posted this message with the term "Baqiya." So that ISIS would know that the defendant had carried out the attack for ISIS.

Shortly before the blast, the defendant proudly declared on Facebook that the attack was for ISIS. He did the same thing during his interview with Detective Byrne shortly after the bombing. The defendant's words were clear and chilling. You heard from Detective Byrne. The defendant told Detective Byrne, quote, "I did it for the Islamic State," that he intended to inflict, quote, "maximum damage," and to terrorize as many people as he could.

The defendant also told Detective Byrne that not long before the attack he had seen a TV interview where the reporter asked a commuter about a recent threat made by ISIS to attack Times Square. The commuter said he didn't feel threatened by ISIS. That was not acceptable to the defendant, so he chose to detonate his bomb in a crowded subway station where he believed the interview had occurred, to send a message in the name of ISIS.

All of this evidence -- the ISIS videos, the Facebook posts, the statements to Detective Byrne, and the handwritten messages all over the defendant's apartment -- make crystal clear why the defendant did what he did on December 11th of

A000984

last year: to serve and support ISIS, to kill and terrorize in its name.

Now that we have talked about the evidence, let's turn to the six charges in the indictment. All of those charges or counts relate to the bombing at the Port Authority last December. I'm going to explain how the evidence establishes the elements of all six counts beyond a reasonable doubt.

Before we start, let me remind you that Judge Sullivan will give you instructions on the law when we are done, and it's his instructions that control. He will also give you what is called a verdict sheet to help guide your deliberations, what you will be able to use as a roadmap.

Let's start with Count One. Count One relates to why the defendant carried out his attack. We just talked about why he did it: to support ISIS. Count One charges the defendant with providing material support to a foreign terrorist organization, ISIS. I expect Judge Sullivan will instruct you that the defendant its guilty of Count One if the government proves beyond a reasonable doubt each of these three elements:

First, that the defendant knowingly provided or attempted to provide material support or resources to ISIS;

Second, that the defendant had knowledge that ISIS (a) was a designated terrorist organization, (b) has engaged in or engages in terrorist activity, or (c) has engaged in or engages in terrorism; and

**A000985**

Third, that the offense occurred in whole or in part here in the United States.

Keep in mind the defendant is guilty of Count One if he either provided material support to ISIS or if he attempted to provide material support to ISIS. I expect Judge Sullivan will instruct you that the defendant is guilty of attempting to commit the crime charged if he intended to commit the crime and took a substantial step towards committing it even if he wasn't successful.

Let's talk about the first element, providing material support to ISIS. Put simply, material support includes any service or personnel. Providing personnel means providing ISIS with one or more individuals, which can include the defendant himself, to work under ISIS's direction or control. The word "service" includes work done for the benefit of ISIS.

Let me start with a few examples of what this element is not about. It's not about whether the defendant was a member of ISIS. It's not about whether he took some pledge or oath. And it's not about whether he spoke directly with ISIS members who are based in the Middle East. It's about whether he provided material support to ISIS.

The evidence overwhelmingly establishes that when the defendant attacked the Port Authority last December, he was acting to support ISIS. We have already talked about a lot of that evidence. The defendant was inspired by ISIS propaganda

**A000986**

videos, like Flames of War II. He declared his allegiance to ISIS on Facebook, and he proudly told defendant Byrne that he carried out the attack for ISIS. Through its online propaganda, ISIS can inspire supporters to carry out attacks without the need for ISIS members in the Middle East to speak directly with those supporters.

(Continued on next page)

**A000987**

MR. TURNER: To ISIS, that's part of the beauty of its strategy of inspiring lone wolf attacks. Through these attacks, like the defendant's attack, ISIS is able to reach, from its base in the Middle East, into distant places like New York City, to cause terror and destruction. As Dr. Zelin put it, lone wolf attacks like the defendant's function as forced multipliers for ISIS.

ISIS uses videos, like Flames of War II, to call for, inspire, and instruct its followers to carry out these lone wolf attacks. And when the defendant bombed the Port Authority, he was acting in response to that call, that direction, from ISIS.

One of the ways that ISIS inspires these attacks is by glorifying supporters who have carried out attacks in the past. That's what we saw in this ISIS video on the defendant's laptop, which glorifies four attackers, including the Orlando nightclub shooter. As Dr. Zelin explained, in the eyes of ISIS, when a supporter carries out an attack for ISIS, he becomes part of ISIS, part of the organization. He becomes a soldier of the caliphate, a soldier for ISIS. And that's exactly what the defendant did when he bombed the Port Authority. He became part of ISIS, an ISIS soldier. In other words, the defendant provided personnel, himself, to ISIS, by responding to ISIS's calls for attacks in America. And at the very least, he attempted to become part of ISIS, by attempting

**A000988**

to martyr himself, to kill himself, in the name of ISIS.

At the same time, the defendant clearly provided a service to ISIS. He carried out a terrorist attack to benefit ISIS, to advance ISIS's goals of terrorizing Americans. Dr. Zelin explained how ISIS supporters here in the United States can serve ISIS's global strategy, by carrying out an attack in its name, which is precisely what the defendant did. ISIS relies, it depends on supporters in the United States, like the defendant, to provide this service of lone wolf attacks, to answer ISIS's calls, in videos like Flames of War II, and the video on the defendant's laptop that warns Americans: We will surely come and slaughter you. When the defendant bombed the Port Authority last December, he was answering those calls. He was serving ISIS.

I expect Judge Sullivan will instruct you that if you find that ISIS did in fact invite its followers and sympathizers to engage in such conduct, and if you find that the defendant engaged in conduct that was motivated, in whole or in part, by such an invitation, that would be sufficient to meet the definition of "services" in the statute. You know from the evidence, that's exactly what happened here. The defendant was inspired by ISIS, and he carried out an attack, he provided a service, for the benefit of ISIS.

Just remember what the defendant told Detective Byrne after the attack: "I did it for the Islamic State." The first

**A000989**

element of Count One is satisfied.

The second element is met if the defendant knew that ISIS engaged in terrorism or terrorist acts.  There's no doubt that he did.  The evidence tells you that, including the defendant's statements to Detective Byrne and the violent ISIS videos on his laptop.  And so does your common sense.  The defendant himself carried out a terrorist act, a bombing, for ISIS.

The third element is not in dispute.  The bombing took place here in the United States.

And the defendant is therefore guilty of Count One.

Let's turn to Counts Two, Three, and Four.  I'll discuss these counts as a group, since they're all based on the defendant's use of an explosive device.  I expect Judge Sullivan will instruct you on the elements of these counts as you'll see in the next three slides, one for each count.  After these next three slides, we'll talk about the elements of these counts, and when we do, I'll put the elements back up on the screen so you have them in front of you.

As you'll see, many of these elements are not in dispute.  And as you'll also see, none of the elements of these counts require the government to prove anything about ISIS.  That's Count One, which we just discussed.

Count Two charges the defendant with using a weapon of mass destruction.  As you can see here, this count has four

**A000990**

elements.

Count Three charges the defendant with bombing a place of public use or a public transportation system. This count has four elements.

And Count Four charges the defendant with destroying or attempting to destroy property by means of an explosive. This count has the three elements shown here.

Now as you may have noticed, the first element of each of these three counts relates to what the defendant used to carry out his attack, a bomb, which is an explosive.

With respect to Count Two, a weapon of mass destruction is defined to mean any destructive device, and that includes any explosive bomb, like the defendant's pipe bomb. So these elements are easily met.

As you can see, some of the elements of these three counts relate to where the defendant detonated his bomb. He detonated it in the Port Authority, which is both a place of public use and a public transportation system. The Port Authority is also used in interstate commerce. It's a hub for this city's, and New Jersey's, mass transit system. And you know the defendant's attack clearly affected interstate commerce. It seriously disrupted interstate mass transit systems, including subway and bus operations at the Port Authority. So all of these elements are also met.

Each of these three counts also includes an element

**A000991**

related to the defendant's intent.  Now in her opening statement, Ms. Gatto suggested that the defendant didn't want to hurt anyone other than himself.  That's nonsense.  You know --

MS. GALLICCHIO:  Objection.

THE COURT:  Overruled.

Go ahead.

MR. TURNER:  You know from the evidence that the defendant intended to injure and kill, that he acted maliciously, with reckless disregard for the safety of human life.  The defendant built and detonated a bomb.

And let me just highlight a few facts we've already talked about.  He filled his bomb with screws.  He struck during a morning rush hour, at the busiest subway station in the city, in a crowded tunnel.  And he admitted to Detective Byrne that he wanted to inflict maximum damage, that he expected people might die.  And he did it for ISIS, a terrorist group that is devoted to the purpose of killing Americans.  The intent elements for these counts are satisfied.

Finally, let's take a look at the fourth element of Count Three.  We only need to prove one of the two prongs of this element, but we've proven both here.  The defendant was a national of another state, Bangladesh.  You know that from his passport, found in his apartment.  It's Government Exhibit 209.  You also know the defendant carried out the bombing in an

**A000992**

effort to compel the United States to do something, to change its policies in the Middle East. The defendant warned Detective Byrne that attacks like this will continue unless America stops conducting bombings in the Middle East. And what did he write in his passport? "Oh, America, die in your rage." And what did he post on Facebook just before the attack? That the president had failed to protect the nation, America.

So all of the elements of Counts Two, Three, and Four are satisfied, and the defendant is guilty of those three counts.

Remember that for each of those counts, the defendant is guilty if he committed the crime or if he attempted to commit it. Taking Count Four as an example, the defendant clearly attempted to damage property with an explosive, even if he wasn't successful, and he took a substantial step towards committing that crime -- he detonated a bomb.

Let's turn to Count Five. Count Five charges the defendant with committing a terrorist attack against a mass transportation system. The defendant bombed a subway station, part of this city's mass transportation system. And he did it for ISIS, a terrorist group. He's guilty of Count Five.

I expect Judge Sullivan will instruct you that the indictment alleges two different ways in which the defendant committed this offense. For the defendant to be guilty of Count Five, the government only needs to prove beyond a

**A000993**

reasonable doubt that the defendant committed the offense in one of those two ways. We've proven both ways. For each of those two ways, I'll explain how the evidence establishes the elements that we expect Judge Sullivan will provide in his instructions.

The first way that the indictment alleges the defendant is guilty of Count Five is by placing a destructive device in or upon a mass transportation vehicle.

Let's start with the first element. You already know from Count Two, which we discussed earlier, that the pipe bomb qualifies as a destructive device. And the defendant made himself part of that bomb. He strapped it to his body. The minute that he stepped onto the subway that morning, he placed the bomb in a mass transportation vehicle, a subway car. So the first element is satisfied.

And you already know the second and third elements are met. The defendant knew what he was doing, he didn't have lawful authority to do it, he intended to injure and kill people, and he acted with total disregard for the safety of human life when he rode a crowded A train from Brooklyn to Manhattan with a pipe bomb strapped to his body, a bomb that was unstable, that could have exploded at any time, as we learned from Agent Rigopoulos.

Finally, the fourth element is satisfied in multiple ways. For example, the defendant's conduct occurred in the New

**A000994**

York City subway system, a mass transportation provider.  And his conduct also affected mass transportation providers, including MTA subways and bus lines operating at the Port Authority bus terminal.

Now if you find the defendant guilty of Count Five in this first way, you'll be asked to answer an additional question on the verdict sheet, whether the mass transportation vehicle in which the defendant placed the destructive device was carrying at least one passenger or employee at the time of the offense.  That's easy.  Of course the subway that the defendant rode from Brooklyn to the Port Authority with the bomb strapped to his body was carrying passengers and employees.  It was rush hour.

The second way that the indictment alleges the defendant is guilty of Count Five is by using a dangerous weapon against a mass transportation system.  Now as you can see, the second and the fourth elements are the same as the second and fourth elements we just discussed, so we don't need to talk about those again.  And the first and third elements are easily met.  The defendant used a dangerous weapon, a bomb; he intended to injure and kill people located in a subway station, the 42nd Street station; and that station is of course used in the operation of mass transportation vehicles, subways.

If you find the defendant guilty of Count Five in this second way, you'll again be asked to answer another question on

A000995

the verdict sheet, whether a mass transportation vehicle, supported by the station where the device was set off, was carrying at least one passenger or employee at the time of the offense. Again, that's easy. You know from Barry Greenblatt of the MTA that when the defendant detonated his bomb in the Port Authority station, there were two A trains in that station, both carrying employees and passengers. The defendant himself had just exited an A train in that station.

So the government has established beyond a reasonable doubt that the defendant is guilty of Count Five in both of the two ways alleged in the indictment. Remember, we only need to prove that he committed the charged crime in one of those two ways, but we've proven both here.

That brings us to Count Six. Count Six charges the defendant with an additional crime relating to his possession, carrying, and use of the pipe bomb on December 11th of last year. The defendant's transportation of the pipe bomb on the street, in the subway, at the Port Authority, put people's lives in danger well before he actually detonated the device.

I expect Judge Sullivan will instruct you that this count has two elements, as you can see here. The first element requires that the defendant committed a crime of violence. I expect Judge Sullivan will instruct you that an offense qualifies as a crime of violence if by its nature it involved a substantial risk that physical force might be used against the

**A000996**

person or property of another. There's no question that each of Counts One through Five qualify as crimes of violence. They involved a bombing. These crimes didn't just involve a risk of force. The defendant used force against other people and property. He detonated a bomb in a crowded subway station.

The first element of Count Six is satisfied if you find that any of Counts One through Five qualify as crimes of violence. They all do.

The second element of Count Six requires that the defendant carried or used a destructive device during and in relation to a crime of violence or possessed a destructive device in furtherance of a crime of violence. You already know that the defendant's pipe bomb qualifies as a destructive device. And you know that on December 11th, the defendant possessed and carried that pipe bomb from Brooklyn to Manhattan in furtherance of the attack he was about to commit, in furtherance of the crimes of violence in Counts One through Five.

You know that from the surveillance video showing the defendant along his route and then detonating the bomb, from the photos of the defendant at the bomb scene with pieces of the device still attached to his body, and from his statements to Detective Byrne, describing how he traveled with the bomb from Brooklyn to the Port Authority for the purpose of carrying out his attack.

A000997

So the second element is satisfied and the defendant is also guilty of Count Six, the final count in the indictment.

I'm almost done. I'm about to sit down. But before I do, let me say just a few more words about what you've seen and heard over the last week. It probably hasn't been easy to sit through some of the evidence. It's hard to think about someone strapping a bomb on his chest and trying to kill people in the heart of this city. It's hard to think about what it was like in that tunnel and about how it could have been so much worse, how some of those screws and pipe fragments could have hit people instead of walls. And it's hard to think about how folks like Veronica Chavez and David Wall will never be the same because of what the defendant did that morning. But at the end of the day, the question for you, the question of whether the defendant is guilty beyond a reasonable doubt, that's easy. Of course he is. The evidence leaves no question that he's guilty of all counts in the indictment. You know the defendant is the bomber, you know how he did it, and you know why he did it. The defendant was proud, proud to carry out this attack. He was proud to attack this city in the name of ISIS. And now he must be held responsible. That will be justice. The defendant is guilty as charged.

Thank you.

THE COURT: All right. Thank you, Mr. Turner.

Why don't we take a short break. You can use the

**A000998**

restroom, stretch, get a drink or something, and then we'll pick up again in about ten minutes, all right?

Don't discuss the case.  See you in a bit.

All rise for the jury.

(Jury not present)

THE COURT:  Okay.  Have a seat.

Anything before we take a short break?  No?  Okay.

MS. GALLICCHIO:  No, your Honor.

THE COURT:  Okay.  So we'll pick up again in about ten minutes.  Thanks.

(Recess)

(In open court; jury not present)

THE COURT:  All right.  Let's bring in the jury.

Ms. Gallicchio, do you have everything where you need it?

MS. GALLICCHIO:  I do, yes, your Honor.

THE COURT:  All right.

(Jury present)

THE COURT:  Okay.  Have a seat.  Thank you.

We will now have the defense summation, by Ms. Gallicchio.

Ms. Gallicchio, you may proceed.

MS. GALLICCHIO:  He wanted to die.  He wanted to take his own life.  And only his life.  He never intended to harm or to hurt anyone else.  He rode two subway cars carrying a

A000999

thousand passengers per car.  He crossed two crowded subway platforms with hundreds of commuters waiting for their trains.  If harming anyone other than himself was his intention, he missed the perfect opportunity.  Instead, he left the train and the platform, he climbed up the stairs, onto the passageway, and chose the exact moment when he could take his own life without hurting anyone else.

Take a look at the photographs, 918 and 919.  These photos show the exact moment and the location when Mr. Ullah connected that wire.  These photos speak volumes.

It was a disturbing act by a disturbed man, a deeply troubled man, who was misguided by images and messages that distorted Islam.  He was disturbed by American foreign policy overseas, particularly in the Middle East.  He was troubled by the treatment of Muslims around the world.  He was disturbed by the bombings in Gaza.  He was upset by the fact that those bombs struck hospitals and killed innocent children.  He blamed the United States government for its policies toward Muslims.  He was upset about the hypocrisy of the United States foreign policy.  Mr. Ullah was a mentally unstable man, who, unlike the rest of us, could not turn off the noise in his head, could not turn off the TV, could not tune out the distressing and negative news we see every single day.

He was so disturbed that 45 minutes before he committed his act, he publicly called out Donald Trump on

**A001000**

Ib5... Case 21-1058, Document 42, 10/04/2021, 3186341, Page273 of 283

Facebook, before he took his life.  "Oh, Trump, you failed to protect your nation."  He wanted to make a statement, a public statement, by taking his own life.

This is not a suicide bombing.  This is not a terrorist attack.  This act is not about ISIS.  Mr. Ullah is not an ISIS operative in our midst.  This is not an attack at all.  This is a public suicide attempt; one that traumatized many people, I'm sure.  We saw two of them, David Wall and Veronica Chavez.

So let me begin by saying that there can be no doubt that what Mr. Ullah did was inexcusable, unacceptable, and intolerable.  But Mr. Ullah is not charged with trying to take his own life.  The government has to prove much, much more than that.

But as a juror, you must put aside your disapproval and your distaste for what he did.  You must put aside the sympathy that you will naturally and understandably feel for David Wall and Veronica Chavez and anyone else that was in that passageway on December the 11th.  You must examine the evidence objectively and dispassionately.

There are six counts for you to consider, and each count is made up of many elements, each of which the government must prove to you beyond a reasonable doubt.

The task of determining guilt or innocence on a particular count is not an easy one.  You should take your time

A001001

and carefully scrutinize the evidence and the charges.

We were up front with you from the beginning. Ms. Gatto stood before you in her opening statement and she told you that we are not going to ask you to excuse Mr. Ullah's conduct. She told you that we're not going to ask you to return a verdict from which Mr. Ullah will escape punishment. All of the counts in this indictment are extremely serious, as are the consequences. We expect that you will find Mr. Ullah guilty of one of these counts. And we'll discuss that momentarily. But the government will fail to prove beyond a reasonable doubt the rest of those counts, and when they do, you must find Mr. Ullah not guilty of those charges.

I want to talk to you briefly about the fundamental principles of law that should guide your deliberations. The most important of all of those principles is the presumption of innocence. This is a concept that is deeply embedded in our rule of law, in our criminal justice system in this country. It's a principle that protects every single one of us. It protects Mr. Ullah, it protects everyone in this courtroom, and anyone who has the misfortune to be seated where Mr. Ullah is seated. And intertwined with that protection is the principle that this presumption of innocence can only be overcome by proof beyond a reasonable doubt. And it is the government at this table, the prosecution, the accuser, that has the heavy burden of proving guilt beyond a reasonable doubt. Reasonable

**A001002**

doubt is something that you will be instructed on, but it can come from the evidence itself, and we will discuss that in a moment.

It can also come from the witnesses who failed to live up to your expectations. Reasonable doubt can also come from the absence of evidence that you would expect to see but didn't. In order to find Mr. Ullah guilty of any count in this indictment, you must be firmly convinced that he's guilty. The government's proof must be of such a convincing nature that a reasonable person would not hesitate to act in a decision of highest importance in their lives. We ask that you treat this case and your decision, your verdict, as one of the most important decisions in your life.

So let's dig in.

The analysis of the charges in this case will boil down to, and I'm going to focus on, three areas -- three essential things that the government must prove beyond a reasonable doubt and have failed to do.

No. 1. We're going to talk about the fact that the government has failed to prove that Mr. Ullah provided material support to ISIS. And I'm going to get to that first thing.

No. 2. We're going to discuss the fact that the government has failed to prove beyond a reasonable doubt that Mr. Ullah intended to do anything other than kill or harm himself.

**A001003**

And No. 3, that the government has failed to prove beyond a reasonable doubt that this device was intended to impact in any way an on-track mass transportation vehicle.

So let's turn to these three areas of focus and examine each carefully.

First, as I said, the government has woefully failed to prove beyond a reasonable doubt that Mr. Ullah provided material support to ISIS. Material support here, charged here, is services or personnel, and you will be instructed on those two and what they mean. The government's theory in this case requires them to prove beyond a reasonable doubt that Mr. Ullah acted at the direction of, under the control of, or in coordination with ISIS. What was their proof of that? Basically it boils down to some videos on a laptop that they say he watched and that they say inspired him to commit his action; and, of course, the testimony of Dr. Zelin, a highly-paid government witness.

But before we get to the videos, let's talk about the lack of evidence, what the government didn't bring you, what you would expect and you didn't see. Because without proof of direction, control, or coordination, you can't find Mr. Ullah guilty of this count.

So there's no connection to ISIS. I think everyone can agree on that. Mr. Ullah acted alone. I've already said that this is a public suicide attempt. This is not a lone wolf

**A001004**

attack.  This is not an attack at all.  Under the government's theory, an independent actor is what they're calling him, right?  They said he's a lone wolf.  He provided personnel as a lone wolf.  But an independent actor is not guilty of providing personnel.

Take a look at what you will be instructed by the judge.  You will be instructed that an individual who acts entirely independent of ISIS to advance its goals or objectives is not considered to be working under ISIS's direction and control.

MR. TURNER:  Objection, your Honor.

THE COURT:  Ladies and gentlemen, I'm going to give you instructions.  I'll give you full instructions, and I'll give you a copy of the instructions, so to the extent that any lawyer is giving you instructions that are different from what I'm giving, then my instructions control.  Okay?

MS. GALLICCHIO:  You heard from Dr. Zelin, right?  He told you that a lone wolf is someone who acts alone, and I think he said that some in his field call it a personal initiative attack.  Of course that makes sense.  We know that Mr. Ullah had no connection to ISIS.  He had no communication with ISIS leaders or ISIS supporters.  He didn't travel to join ISIS.  He didn't receive money or materials from ISIS.  ISIS didn't even know he existed.  He had no ISIS propaganda on his phone.  He posted no ISIS propaganda on Facebook.  They found

**A001005**

no ISIS flag.  There was no allegiance to al-Baghdadi that you heard testimony about.

And we know that Dr. Zelin was given videos in this case to discuss and to talk about, but they were case specific. But what do we know that he wasn't given?  What don't they have?  What didn't they find?  No ISIS-related magazines. Remember there was conversation about a magazine called Inspire, which was actually an Al Qaeda magazine.  But there was no evidence of any ISIS-related magazines.  No Telegram messages, Telegram being the ISIS messaging service.  No violent speeches by Anwar al-Awlaki, who we heard about.  The government talked about him in their opening statement, and they suggested to you that Mr. Ullah listened to his violent propaganda, right?  But remember the evidence in this case that Dr. Zelin was provided, certain videos that were found on a laptop, that were found in the apartment in which Mr. Ullah lived?  And he told you that the videos that he saw that were on the laptop about Mr. Al-Awlaki and his lectures were completely nonviolent, right?  So it's misleading to tell you that Mr. Ullah watched violent propaganda by al-Awlaki.  Those were nonviolent, mainstream religious lectures.

There was no al-Adnani audio message that was released in 2014.  Remember there was conversation about this guy who released an audio message so that people could commit attacks where they were located?  There were no Flames of War video on

**A001006**

the laptop, right? Now, yes, Mr. Ullah mentioned that he had seen Flames of War. He mentioned it in his statement to Detective Byrne, and it was released in November of 2017. But there's no evidence in this case of what part of that video, or how much of that one-hour video Mr. Ullah saw, or how much that video influenced what he did. We know that it's not a crime to possess or to view ISIS videos. It's simply not. It doesn't make you a lone wolf. It doesn't make you inspired to commit an offense on behalf of ISIS. You heard there were over 45,000 fanboys out there consuming ISIS propaganda and sharing ISIS propaganda. It's not a crime to do that. It's not a crime, obviously, to post ISIS videos on your website, like Dr. Zelin does on jihadology. If it were, one could argue that Dr. Zelin is providing material support to ISIS.

So that leaves you with videos, four of which you were shown and six of which are available to you.

And by the way, just as an aside, the government did not prove to you beyond a reasonable doubt that Mr. Ullah watched those videos. Right? So the metadata of those videos that's available to you in a government exhibit, 701, which is a laptop report about those videos, will show you that those videos were last accessed on that device by someone in June of 2017, five months before Mr. Ullah tried to take his own life.

And with all the resources of the United States government behind them, they didn't even bother to take a DNA

**A001007**

test of that laptop so they could come in here and tell you who accessed those videos. Take a look at the stipulation, because there was argument in the government's summation that they did DNA testing and they found Mr. Ullah's DNA on the items that were found at the scene. We're not disputing that. You saw the resources available to the government. All the 17 witnesses that took the stand, many of which we didn't even cross-examine, right? And not one of them thought it was important to DNA test this laptop. That's a lack of evidence, evidence you would expect, and that creates a reasonable doubt.

But even if they proved that Mr. Ullah accessed those videos, or he watched those videos, it's not proof beyond a reasonable doubt that he did his act at the direction of, under the control of, or in coordination with ISIS. Most of those videos that you saw that were discussed in the testimony of Dr. Zelin were produced long before ISIS was calling for lone wolf attacks. Most of those videos that you saw relate to the recruitment of foreign fighters, all right? Recruitment of people to come there, to come to their land, to Syria, to Iraq, Afghanistan, wherever it is, to be part of the fight, to be on the front lines. It was glorifying these martyrs, right, these foreign fighters and this idea of going there to fight. Those were the videos. They don't prove anything.

The government has also argued that the word *baqiya*, right, and "Die in your rage" are proof that Mr. Ullah acted

**A001008**

under the direction of, the control of, or in coordination with ISIS. And I think the government said in its summation to you that *baqiya* is a declaration of allegiance. Not according to Dr. Zelin. Dr. Zelin said if you wanted to declare allegiance, you declare it to al-Baghdadi. That doesn't exist here. *Baqiya*, yes, is a rallying cry. We accept Dr. Zelin, his word on that, but it's also a hashtag for fanboys, groupies. "Die in your rage," yes, it's a slogan, but it's also a verse in the Koran, with nonviolent meaning. We put that exhibit into evidence. It's Defense Exhibit P. You can see it if you wanted.

The significance of those words, *"baqiya,"* "Die in your rage," comes from the intent of the user. Right? Mr. Ullah used *baqiya* one time in his Facebook post, one time. And he scrawled "Die in your rage" in a passport and a visa that was in the pocket of a jacket hidden in the closet of his apartment. And he wrote "Die in your rage" in the bottom of a shoebox, in his apartment. This is not a message to ISIS. This is not proof of intent to provide material support. This is proof of mental illness.

The government also argues that his statement, "I did it for the Islamic State," is proof that he provided material support to ISIS. But remember the testimony on this. Mr. Ullah was very clear what he meant by those words. His concept of the Islamic State, as he described it to Detective

**A001009**

Byrne, was not of a group. He never told Detective Byrne that he did it for ISIS. We're going to talk about Detective Byrne in a minute, but he said he did it for the Islamic State. He never said ISIS. It wasn't in quotes. Mr. Ullah made a clear distinction when he was talking to Detective Byrne between a group like Al Qaeda, he identified, and the concept of an Islamic State, a caliphate, which is a concept that predates ISIS. An Islamic State is a concept of a Muslim state, right? It's a nation of Muslims, a state of Islamic people. It's a concept that's espoused by a lot of people, a lot of people that don't support ISIS, a lot of nonviolent groups that don't support ISIS. Clearly that's the concept Mr. Ullah was expressing, especially in light of everything else he expressed about the suffering and the treatment of Muslims around the world.

Don't get me wrong. ISIS is a brutal organization. There's no dispute about that. It does indeed direct attacks. And it takes credit for that.

(Continued on next page)

**A001010**

## CERTIFICATE OF SERVICE

I certify that a copy of this six volume appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.**, Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
      October 4, 2021

                        /s/
                        **COLLEEN P. CASSIDY**