# 21-1058-cr

---

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 21-1058-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**APPENDIX FOR DEFENDANT-APPELLANT AKAYED ULLAH
VOLUME V**

---

FEDERAL DEFENDERS OF NEW YORK, INC.
 APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 Of Counsel

---

## TABLE OF CONTENTS TO THE APPENDIX
### VOLUME V

District Court Docket Sheet,
S.D.N.Y. 18 Cr. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0004

Indictment, filed January 10, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0021

Defendant's Motion to Dismiss Counts,
dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0030

Memorandum in Support of Motion to Dismiss,
dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0031

Government's Memorandum in Opposition to Motion to Dismiss,
dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0046

Defendant's Reply in Support of Motion to Dismiss,
dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0084

Court Order Denying Motions, dated October 4, 2018 . . . . . . . . . . . . . . . . . . . . . A 0104

Defendant's Motion in Limine, dated October 5, 2018 . . . . . . . . . . . . . . . . . . . . . A 0110

Defendant's letter to District Court regarding Rule 29 and Jury Charge
Issues, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0126

Government's letter to District Court regarding Jury Charge on Attempt,
dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0133

Defense Letter in Support of Rule 29 Motion and in Opposition to
Government Charge Requests, dated November 3, 2018 . . . . . . . . . . . . . . . . A 0135

Government's Letter re Jury Charge and Rule 29 Motion,
dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0142

Defendant's Objections to Proposed Jury Instructions, dated November 4, 2018 . . . . . . A 0147

Trial Transcript, dated October 29, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0151

Trial Transcript, dated October 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0159

Trial Transcript, dated October 31, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0325

Trial Transcript, dated November 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0575

Trial Transcript, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0833

i

Trial Transcript, dated November 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0925

Trial Transcript, dated November 6, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1136

Defendant's Post-trial Motion for Acquittal, dated December 6, 2018 . . . . . . . . . . . . . . A 1154

Memorandum in Support of Motion, dated December 6, 2018 . . . . . . . . . . . . . . . . . . . . A 1155

Government's Memorandum in Opposition to Motion for Acquittal,
        dated December 20, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1186

Reply Memorandum in Support of Motion for Acquittal,
        dated January 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1214

Court's Order for Supplemental Briefing,
        dated July 25, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1223

Defendant's Supplemental Memorandum in Support of Rule 29 Motion,
        dated September 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1224

Government Memorandum in Opposition to Supplemental Motion,
        dated October 22, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1248

Defendant's Reply Memorandum,
        dated November 5, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1275

District Court's  Opinion & Order,
        filed January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1295

Sentencing Memorandum with Exhibits A-I,  dated March 25, 2021 . . . . . . . . . . . . . . . A 1313

Pimentel Letter, dated September 18, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1370

Sentencing Transcript, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1375

Judgment in a Criminal Case, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1420

Notice of Appeal, dated April 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1428

Government Exhibit 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1429

Government Exhibit 1001-02 (Submitted in attached DVD) . . . . . . . . . . . . . . . . . . . . . . A 1430

ISIS did not take credit for Mr. Ullah's actions, and we should not give it to them in this courtroom.

This brings me to Count One, provision of material support to a foreign terrorist organization. There are four elements that the government must prove to you beyond a reasonable doubt. You will examine all of those elements. You will find once you do that, that they have failed to prove beyond a reasonable doubt element number 1, that Mr. Ullah provided material or services to ISIS and acted at the direction under their control or in coordination with them. When you find that, you will find Mr. Ullah not guilty of Count One.

Let me turn to the second area of focus that I talked about. The second area describes the concept of whether the government has proved beyond a reasonable doubt that Mr. Ullah intended to do anything other than to kill or hurt himself. This relates to several of the counts in the indictment that require proof that Mr. Ullah acted knowingly and intentionally to cause death or serious bodily injury to others.

The judge is going to instruct you on the meaning of "intentionally," but it has a very important meaning. It is something that you need to focus on when you are examining the counts of the indictment that require intent. Briefly, I expect the judge will instruct you this way:

Before you can find that a defendant acted

**A001011**

intentionally with respect to a particular element, you must be satisfied beyond a reasonable doubt that the defendant acted deliberately and purposefully. That is, a defendant's acts must have been the product of his conscious objective decision.

Before we examine this question, I want to discuss one of the counts in the indictment that does not require this type of intent, and that's Count Four. It's a very serious offense, but it has a very different. Standard Count Four is destruction of property by means of an explosive. A person can be convicted under this count, Count Four, if he used an explosive device recklessly and without regard to the likelihood that the use of the explosive would result in damage or harm to property.

As I said earlier, we expect that you will find Mr. Ullah guilty of a count of this indictment, and that's Count Four. We are not going to tell you to acquit him of Count Four. And if you do find Mr. Ullah guilty of Count Four, you will be asked to consider another question when you get to Count Six. Judge Sullivan will give you detailed instructions on how to proceed.

In general, you will only consider Count Six if you have found Mr. Ullah guilty of any of Counts One, Two, Three, Four, Five. The question that you will be asked to answer yes or no on is whether the offense as committed involved a substantial risk that physical force may be used against the

**A001012**

person or property of another. We are confident that once you examine the evidence and this question, that you will answer that question no. When you do that, you must find Mr. Ullah not guilty of Count Six.

Let's turn back to the many reasons there are to doubt that Mr. Ullah intended to do anything other than to kill himself. We know his intent from his words. He said he wanted to die. Those are his words. We will discuss his statement to Detective Byrne, as I said, shortly. But in a four-hour interview in that hospital with Detective Byrne, Mr. Ullah never once said that he wanted to injure or kill others, not once.

What else do we know about Mr. Ullah's intent? The defense itself proves to you that his intent was nothing else but to take his own life. The device was small. You saw it. You saw the pieces. You saw the video. You saw the explosion. We know that Mr. Ullah could have built a bigger device. He had the opportunity. He had the material at work, and as an electrician he had the ability. It's a small amount of explosive material that was put inside of it, a few crushed-up match heads. And as it turns out for Mr. Ullah, it wasn't enough to take his own life.

The device was on his body, close to his body. It wasn't left on a train. It wasn't left unattended on a subway platform. Mr. Ullah waited until he got off the train, away

**A001013**

from the tracks, to be in the clear.

Go back to this picture Exhibit 918.  What is the end result?  We know the end result.  We saw the end result.  It had a low impact.  The vast majority of the parts were found in zone 2.  And you can't draw any conclusions from the location about this bomb from the location of any of the other debris.  Remember there was some discussion about some of the debris, a screw or a piece of metal that was found in another zone, not zone 2, which was the zone that Mr. Ullah was in.

But you heard from several witnesses, in particular Agent Vetrano, who came in and said he photographed the evidence.  He told you specifically that there is no way to know by the time he gets there, after law enforcement have been there, there is no way to know where whether the evidence was moved by the time he got there.  You saw on the video that there were people running after the explosion in all directions.  You saw that law enforcement had arrived at the location and they walked all over the scene.

There were questions asked of Officer Gallagher.  Do you remember Officer Gallagher?  He was the young man, the second witness who testified.  He is a pretty brave guy.  He was one of the first people, Port Authority police officer, on the scene amongst all of those people in the lead walking into that tunnel.  I asked him a lot of questions about the disruption of the evidence that was on the scene, and I think

**A001014**

he got a little defensive, but I think he maybe misunderstood my questions and my intent in asking those questions. I hope you didn't.

Yes, it's understandable that things were moved around. No one was expecting that scene to remain the way it was. It's understandable. No one was criticizing their actions. You saw the videotape. We can take a look at that right now. This is a portion of Government Exhibit 1024-B. If we could start at 54. It's playing.

(Video shown)

You can see Police Officer Gallagher. They are handcuffing Mr. Ullah there. You can see the military personnel. And you can see the pipe right behind Officer Gallagher, that piece of pipe. Soon you're going to see a police officer walk on it and step on it, by accident of course. Right there. You are also going to see these military gentlemen pointing to it. Then there you go, kicked it.

I'm sure that there was no bad intention in doing that, but that's how a scene gets disrupted. Thankfully, we have this video. Without this video, you would be left with the impression, as Mr. Turner said to you in his closing argument, that things were flying through the air, parts of this pipe went flying through the air and they landed at a distance away from Mr. Ullah.

That is simply not true. We know that because of the

**A001015**

video.  That pipe didn't fly through the air and land in the location it was found, where it was photographed by Agent Vetrano.  It was kicked there.  What we do know is that it landed right next to Mr. Ullah's body, which tells you about the power or the lack of power of that device.

We also some pictures of the evidence.  Christopher Rigopoulos testified.  He is the explosive expert.  This guy knows his stuff.  He said that items in close proximity to the device would be damaged if it was a powerful device.  Take a look at this item, which is Government Exhibit 111-1A.  This is a photograph of the black wire.  This wire was actually on Mr. Ullah's body, right next to the device.  It's not even damaged at all.  This tells you the power of that device.

We also know that there was no property damage in that subway tunnel.  The walls, there is no damage to the walls on either side of Mr. Ullah.  There was no damage to the floor.  There was no damage to the ceiling.  You heard that the tunnel was about 7 feet wide and you heard that there was absolutely -- you saw no damage.  You also saw those glass-enclosed iPhone ads that were there on the wall: no damage.  That tells you about the power of that device.

You also heard testimony about explosive material, gases that they tested for on the scene.  You know that there were no gases.  There was no explosive material found on the walls on either side of Mr. Ullah or that reached the ceiling.

A001016

Remember Agent Fullington, he was from the response team. He took swabs at the scene. He went to where you would expect there would be swabs. He is an expert in this area. He was very careful. He wore a protective suit. They took control swabs. Then they swabbed the areas around the site where they would expect to see explosive material: on the walls on either side, on the ceiling, and on the floor.

They packaged those swabs, sent them off to their lab at Quantico, and Mr. Gillette examined them. Mr. Gillette came in here and testified, and he told you that when he tested those swabs, the swabs on the walls, the swabs on the ceiling were negative for explosive material. The only place they found positive for explosive material was right next to Mr. Ullah's body. That tells you about the impact of that bomb.

I mentioned a minute ago the government's expert Christopher Rigopoulos. This guy certainly does know his stuff. But his testimony doesn't actually prove anything. He was asked about his opinion. He testified for a long time. You saw us asking the questions.

Really, I think you can boil his testimony down to two sentences. He was asked: "Generally speaking, what conclusion did you reach?" His answer: "In general, submitted to me for examination were the disassembled remains of an improvised explosive device. That device, properly initiated, could potentially cause property damage, personal injury, or death."

**A001017**

Look at his words very carefully, "could potentially." Anything's possible, right? But that is not enough in this courtroom. Could have, should have, would have, it's not enough. Possibilities, potentialities, it's not enough. This courtroom requires proof beyond a reasonable doubt. That's what his testimony left you with: it could potentially. It didn't.

Let me talk about the screws. The government has argued that Mr. Ullah put screws in the pipes because he intended to cause damage to property or to kill or injure others, right? Intended, deliberate, purposeful, conscious objective. Some of us maybe learned for the first time in this courtroom from Mr. Rigopoulos that that is the reason for putting screws in a pipe bomb. It is not common knowledge. Just like a lot of us learned in here that when you have a low explosive in a pipe, you don't call it detonating, which we have all been saying in this courtroom. That's wrong. It's deflagrate. We don't know that unless we are an explosives expert.

This guy, this is his job. He's been doing it for years. The only evidence offered about Mr. Ullah's knowledge or reason for using screws comes from Detective Byrne. You can read his testimony. You probably remember what he said. Like I said, I'm getting to him. It's clear from his testimony that Mr. Ullah did not know what screws were used for, that maybe he

A001018

Case 21-1058, Document 43, 10/04/2021, 3186342, Page12 of 288

saw some instruction, he saw it on the news. There is no evidence that Mr. Ullah, like any one of us, knew the reason for that.

Just like you heard the testimony from Detective Byrne that he had no idea why sugar was used inside a pipe, the screws are simply not proof beyond a reasonable doubt Mr. Ullah's intent.

As I said, the end result, what happened in that tunnel, speaks volumes toward what his intent was. The device went off exactly how and when Mr. Ullah planned it. This is not a case of a malfunction. There was no intent to damage property or to hurt anyone else and no property was damaged. Yes, people were hurt, but that was not the intent. Despite Mr. Ullah's best intention, he didn't build a bomb big enough to even kill himself. What happened to David Wall and Veronica Chavez is unforgivable, but the result was not intentional.

We know that this was, as described by one of the witnesses, a command-initiated device. It required Mr. Ullah to affirmatively connect the wire. He knew how to do it and he did it where he planned. There is no other conclusion that you can reach in this case other than that Mr. Ullah designed the device and initiated it with the intention of harming only himself. All of the evidence points in that direction. It was thoughtless, it was reckless and misguided, but that is not the intent that is required here.

A001019

The government has asked you to look at Mr. Ullah's statement to Detective Byrne as evidence of his intent, statements reported to you by Detective Byrne when he testified in this courtroom. For example, that Mr. Ullah intended to terrorize people, that he chose a Monday to terrorize more people, that he used screws to inflict maximum damage, that he thought others would die.

As a preliminary matter, before I talk about Detective Byrne, because it's been a while now, I want you to do a bit of a gut check. After his testimony, you remember him testifying, were you left with a good feeling about the competency of NYPD or of the joint terrorism task force? Their case relies heavily on the testimony of Detective Byrne. He was the guy responsible for taking Mr. Ullah's statement.

This was his one job. He had a lot of eyes on him. He was under a lot of pressure, as he told you. This is what he trains for, though. He works for the FBI. He works for the NYPD. He works for the joint terrorism task force in a squad that investigates ISIS-related threats. I suspect that squad that investigates ISIS-related threats in New York City has a huge budget.

MR. TURNER: Objection.

THE COURT: Don't speculate as to the budgets if there was no evidence. Just focus on the evidence.

MS. GALLICCHIO: You saw the work they did in this

**A001020**

case.  They have a lot of resources available to them.  I'm sure they hire the best and the brightest, the cream of the crop.

MR. TURNER:  Objection.

THE COURT:  Overruled.

MS. GALLICCHIO:  One would think their training prepares them for emergency situations, for chaotic situations. One would think they have a plan in place.  One would think that they coordinate with one another.  One would think that it was a well-oiled machine.  They are not going to fly by the their pants, are they?

Well, actually, he did.  He got a call, he showed up, and he went in cold.  Take a look at what he testified to.  I asked him -- and not expecting his answer, quite honestly -- "You didn't go in there cold to talk to Mr. Ullah, right?

His answer was, "No, I did.  I did."

Then I asked him, again not expecting his answer, which wasn't really much of an answer, "This was a coordinated operation, right, the investigation?
"A. Coordinated?  What do you mean by that?"

I think it is pretty obvious what is meant by coordination.

What do we get from this?  He basically winged it.  He asked questions without information, without direction, without planning.  But even if they stumbled their way through this

A001021

interrogation of Mr. Ullah, what is the one thing that they could have done, that they could have brought you, that would have given what Detective Byrne said some reliability, some integrity?  A videotape, a video recording of the interview.

Even Detective Byrne had to concede that has the best way, the ideal way to preserve someone's statement.  How hard would it have been?  You get the call, you grab a camera.  I'm sure the FBI has cameras.  They certainly took them to the scene and took photographs.  I'm sure the joint terrorism task force ISIS unit has video equipment.  Detective Byrne said that in his opinion it would not have been hard to have taken a individual recorder inside the hospital room.  But it wasn't done.  Nobody did it.  No one thought it was important enough.

At a minimum, they had cell phones.  We know that because we saw seven minutes of a recording, seven minutes of a four-hour interview with Mr. Ullah.  There is really no excuse here.  It's really unacceptable.

What we do know is that in fact it is actually the FBI policy to videotape interviews, a policy that they violated. Remember these questions and answers.

"Q. In your training in the joint terrorism task force, you learned that it's actually FBI policy to videotape an interview of a suspect in custody, right?

"A. When feasible, that's the policy.

"Q. It was feasible on December the 11th, right?

**A001022**

"A. In my opinion, it could have been."

Feasible. It should be mandatory.

So, what are you left with? What are we left with? Some scribbled notes, five pages of notes in a spiral notebook, and three and a half pages of typed report for a four-hour interview. Unacceptable.

What do we know about the handwritten notes, the handwritten notes that were then transcribed into the typed report called the 302? The notes didn't even fill the pages. They weren't full sentences. They were words or phrases. They didn't reflect the questions that were asked that related to the words or the phrases. They weren't verbatim but for three quotes, three quotes out of a four-hour interview.

Let's compare that with the scientists that you saw, the scientists that came in here. I think we questioned Mr. Gillette. What we learned from the questions I asked him was that they are careful and they follow procedure to the letter. They are a coordinated operation.

I think he would answer that question a little differently than Detective Byrne. They don't wing it. They don't go in cold. They take copious notes. They write in full sentences. I think Mr. Gillette said something like he had 300 pages worth of notes in some form from his examination in this case.

Their reports are then reviewed for accuracy to make

**A001023**

sure they got it right.  They don't make mistakes.  They are precise, they are accurate.  Their integrity is important to them because they know the importance of their opinions.  They know that their opinions come in here and are in a court of law and will be used in the prosecution of another person.

Back to Detective Byrne.  He transcribes his notes, as I said, into a typed report.  It's the official FBI report of the interview with Mr. Ullah.  But we know about his report.  He uses his reports, he said, and his memory the prepare to 302.

What do we know about his memory?  It's faulty at best.  Four hours in that hospital room, in that small hospital room with Mr. Ullah, and he didn't even know whether there was a door or a curtain to the room.  Four hours looking at Mr. Ullah, taking his statement, questioning him, interrogating him, and he didn't even remember if Mr. Ullah had a hospital gown on.  He couldn't remember if he put the time on his 302.  He couldn't remember, without looking at them, whether he filled a full page of his spiral notebook.

He relies on his notes and his memory of the report to testify.  Let's take a look at his testimony in this regard.  I asked him:
"Q. I would assume, it's fair to say, that you use your notes to help refresh your recollection about what happened last year, right?

A001024

"A. Correct.

"Q. If things aren't in your notes, it might be hard for you to remember it, is that right?

"A. Sometimes, yes."

That's what we are left with. In the end, the 302, the typed report, the official FBI report of Mr. Ullah's statement is not actually even in Mr. Ullah's words. It's not Mr. Ullah's statement. It's Detective Byrne's statement.

Remember what he said? "The phrasing is my account of the interview, not Mr. Ullah's." He never goes back with that report to review it with Mr. Ullah to make sure that he got it right, to make sure his phrasing is Mr. Ullah's phrasing. Wouldn't that be the best practice? The answer is yes. Detective Byrne didn't think so.

I asked him:

"Q. Asking him to review it would have been the best practice, right?

"A. No.

"Q. That would be the way we would know it's accurate, right?

A. No.

"Q. No? We have to rely on your word, right?

"A. Correct."

That's what you are left with, the word of Detective Byrne. He is not worthy of your belief. His methodology is deeply flawed and is the perfect recipe for a disaster and for

**A001025**

mistakes.  Mistakes in this context, in this courtroom, have dire consequences.  His methodology makes it very easy to distort the meaning of words and the expressions of intent, the expressions of intent that the government is asking you to rely on to return a verdict of guilty.  It's unacceptable.

We saw a very small but meaningful example of the distortion of Mr. Ullah's words.  Detective Byrne testified on direct examination that Mr. Ullah stated he used match heads from five to ten books of matches.  I asked him on cross-examination to clarify that.  I asked him:

"Q. Today you testified that Mr. Ullah stated to you that in making the device he used match heads from five to ten books of matches, right?

"A. Yes.

"Q. Those are his words, right?

"A. Yes."

We know that is not true, simply not true.  But we only know that because of a recording.  We only know that because, fortunately, that portion was captured on seven minutes of cell phone tape.  Those seven minutes are available for you to listen to should you decide to.

Remember, in those seven minutes I asked him -- it was Detective Martin I think that was questioning him -- if Mr. Ullah was asked how many matches did he use.  His answer actually was "a few."  A few.  Then he was asked by Detective

A001026

Martin posed numbers. He was asked, "5? 10?" Those are Detective Martin's words. And Mr. Ullah said "Something like that."The words "5 to 10" never came out of Mr. Ullah's mouth. We know that Detective Byrne mischaracterized and twisted Mr. Ullah's words into something he didn't say, into something Detective Martin said.

And the questions, if you didn't have that videotape, on direct examination would have left you with a misrepresentation. But for the recording, you would have been left with a completely false impression of what Mr. Ullah said.

By the way, he got matchbooks wrong as well. He said that he used match heads from five to ten books of matches. But we know that is not actually what Mr. Ullah said because it is caught on that video. Mr. Ullah actually said in response to the question whether he used the whole matchbook or just the heads, Mr. Ullah said, just the matches, the heads. This is important because the government has argued that the device was designed to kill others. There is a huge difference between five matchbooks and a few matches.

Small example. It might seem trivial but it's meaningful. I has meaning for the rest of what Detective Byrne has told you. It casts a dark shadow over everything that wasn't captured on video or may be put in quotes. It casts a dark shadow over what the government is asking you to believe Mr. Ullah said: that he answered maybe that he thought other

**A001027**

people would be killed; that he said he chose a workday to terrorize people; that Mr. Ullah even used the word "terrorize" or that he used the word "maximum damage." How do we know that for sure? How do you know beyond a reasonable doubt if it's not on that video? You can't rely on the word of Detective Byrne. It's too important.

We need to put the whole faulty process also of taking the statement in context as well. Mr. Ullah had just tried to take his life in a very public and disturbing way. He was an unstable man medically and mentally.

MR. TURNER: Objection.

THE COURT: Overruled.

MS. GALLICCHIO: Yet none of those eight detectives or any other detectives in that room surrounding him in that hospital room thought it necessary to have him evaluated. The government is asking you to find Mr. Ullah guilty of some of the most serious offenses there are. They have charged him with providing material support to a foreign terrorist organization, ISIS, and carrying out a suicide bombing in their name, and trying to kill and seriously injure others in the process.

They are asking you to base that decision in large part on the word of Detective Byrne. It's really quite shocking. And it's unacceptable. We should expect more from our government. We should demand more, especially in a court

**A001028**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page22 of 288

of law. Ask yourselves: Would you rely on Detective Byrne's words to make an important decision in your own lives? Would you trust his words if it wasn't recorded? If the answer is no, then you can't rely on it here. It's simply not good enough to prove anything beyond a reasonable doubt, let alone that Mr. Ullah had the intention of doing anything other than hurting himself.

That brings me to several counts of the indictment that speak to Mr. Ullah's intent, counts that require the government to prove beyond a reasonable doubt that he intended to do anything other than take his own life.

Let's look at Count Two. Count Two is the use of a weapon of mass destruction. Count Two has four elements, as you have already seen. I want to focus on element 2. Element 2 says that the government must prove beyond a reasonable doubt that the defendant intended that the weapon would be used against a person or property in the United States.

We have talked about that at great length. We talked about what Mr. Ullah's intention was and the evidence of that intention. The government has failed to prove beyond a reasonable doubt that that was Mr. Ullah's intention. He had no other intention but to take his own life. This is an intentional crime. It requires purpose and an objective decision. When you find that the government has failed to prove that element, you must find Mr. Ullah not guilty of that

**A001029**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page23 of 288

charge.

Let me move to Count Three. Count Three is the bombing of a place of public use and a public transportation system. There are four elements. I want to focus on element number 2. The government must prove beyond a reasonable doubt that the defendant intended to cause either death or serious bodily injury, which we have already talked about, or extensive destruction to a place of public use knowing it would result in major economic loss. We have already talked at great length about the government's failure to prove that Mr. Ullah intended to cause death or serious bodily injury to anyone other than himself.

Alternatively, the government can meet this element by proving beyond a reasonable doubt that he intended excessive damage to a place of public use, a public transportation system. You saw the testimony, I believe, of two witnesses -- from the Port Authority Mr. Quelch and from the MTA Mr. Greenblatt -- who talked about the delays to the bus station and to the MTA on that day.

I think it is clear from this as well, when we are talking about intention, that there is no evidence whatsoever that the government has offered to you that it was Mr. Ullah's intent when he tried to take his life in that passageway, that he intended to cause extensive destruction of a public transportation system that resulted in major economic loss.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001030**

When the government has failed to meet their burden of proof on this element beyond a reasonable doubt, you must find Mr. Ullah not guilty of this charge.

Then we move on to Count Five. As you have already heard, Count Five is going to be submitted to you under two theories. I want to talk about the second theory here. Count Five is charging terrorist attack against a mass transportation system. There are four elements. I want to focus on element number 1.

Element number 1 requires the government to prove beyond a reasonable doubt that the defendant committed an act including the use of a dangerous weapon again with the intent to cause death or serious bodily injury. I have talked about that many times. When you find that the government has failed to prove that beyond a reasonable doubt, you will find Mr. Ullah not guilty.

Now I want to move on to the third area of focus that we should talk about, and that is that the government failed to prove beyond a reasonable doubt that the device impacted an on-track mass transportation vehicle. Judge Sullivan is going to instruct you on this and I want you to listen very carefully.

One of the offenses requires that the government prove beyond a reasonable doubt that Mr. Ullah placed a destructive device in, upon, or near a mass transportation vehicle. When

**A001031**

Mr. Ullah carried the device on the subway, which we do not dispute, it was not a destructive device. It was disconnected intentionally, purposefully disconnected. And it was nonoperational. It was not capable of exploding. Therefore, it was not a destructive device until it was connected. And therefore the government has failed to prove that he carried a destructive device in, on, or upon a mass transportation vehicle, or near. That's a subway car.

But even if you accept that carrying a nonoperational device on the train constitutes placing a device on a train, the government must also prove to you beyond a reasonable doubt that he did so with the intent to endanger the safety of any person or with reckless disregard for the safety of human life. I think they failed to do this miserably.

If the device is disconnected, it does not create a substantial risk. The government is going to rely on or has relied on the testimony of Christopher Rigopoulos on this issue. Their argument fails. We know that it was a command-initiated device, we have heard that over and over again, meaning he had to take an action for it to function, for it to be operational, for it to be a destructive device. Mr. Ullah had to affirmatively connect a wire. Mr. Ullah knew how to do it and he did it where he planned.

The testimony from Christopher Rigopoulos on this is nothing but conjecture and speculation. Let's take a look at

**A001032**

what he says.  He was asked:

"Q. Besides ignition through the electrical fusing system that we just discussed, could anything else have caused the device to have exploded?

"A. Yes.

"Q. Could it have exploded if it was dropped or propelled?

"A. It's possible.

"Q. What else besides ignition through the electrical fusing system could have caused this device to have exploded?

"A. It's possible if the end" -- there it says "dap," but it think it should be cap" -- "if the end cap was unscrewed, the friction might have initiated the powders."

Let's focus on the words "it's possible."  It's possible, has the potential.  Again, possibilities, potentialities, are not enough in a court of law.  Anything's possible.  That's not the decision you are required to make. The government must prove to you beyond a reasonable doubt the elements of this offense.  There is no place for speculation or guesswork in this courtroom.  That's a far cry from proof beyond a reasonable doubt.

That brings me finally to Count Five, which is under the second theory that you will be asked to consider.  Again four elements.  The first element is the one you should focus on: that the defendant placed a destructive device in, upon, or near a mass transportation vehicle.  If that device was not

A001033

operational, then he failed and you must return a verdict of not guilty on the charge.

I am about to sit down.  This is the last chance I get to speak to you directly.  The government gets to address you again.  It's their burden of proof.  They have the opportunity to rebut what I just said.  I'm going to ask you to keep in mind my words, our words, when you listen to what the government says.

Let me conclude by saying that you are about to perform an essential function of our criminal justice system, the process of deliberation and returning a verdict.  This requires you to do a very difficult thing: to determine the guilt or innocence of another human being, of a complete stranger, of this man, Akayed Ullah.

You were all selected because we believed you were up to the task.  Some of you had reservations.  But you all promised us that you would follow the Court's instructions, that you would put aside your reservations and your personal experiences and listen to what the Court said.  We believed you.

You all promised to decide the fate of Mr. Ullah based only on the evidence presented in this courtroom, to do it impassionately, and without sympathy for any party, and we believed you.  You all promised to treat this case with great care, to presume Akayed Ullah innocent and to hold the

A001034

government to its heavy burden of proof, and we believed you.

We know this is a hard case. The testimony of Mr. Wall and Ms. Chavez was tough to listen to. The video of the explosion was tough to watch, especially as New Yorkers. We aren't asking you or expecting you to excuse Mr. Ullah for his actions. But you cannot let your disapproval interfere with your job. Our system of justice works only when it works for everyone, no exception. Dr. Martin Luther King said, injustice anywhere is a threat to justice everywhere.

If you follow the principles of law and if you do as you promised, you will do justice.

THE COURT: Thank you, Ms. Gallicchio. We will now hear from the government, for a rebuttal summation from Ms. Crowley.

MS. CROWLEY: Thank you, your Honor.

"We have only come to you with a slaughter, and we will surely come and slaughter you, by Allah's own permission." Remember those words? Those were spoken by two ISIS fighters on that video on the defendant's laptop, words he read as an eager student of ISIS, as he embraced their hate-filled KH-BG and dedicated himself to their deadly cause. He watched, he studied, he planned, and then he took action.

He took a metal pipe. He filled it with explosives. He connected it to wires and a battery. He added deadly screws. And he strapped it to his chest. Then he set out to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001035**

commit his attack, to punish Americans, to kill and injure New Yorkers, to terrorize this city. "O America, die in your rage."

This has not been a long trial. Despite what Ms. Gallicchio just said, it has not been complicated. Mr. Turner summarized the evidence for you earlier today, and you know what happened. Akayed Ullah committed a terrorist attack on December 11, 2017. And because he did that, he's guilty of every count in the indictment. He's guilty.

What Ms. Gallicchio just did, she tried to distract you from that.

MS. GALLICCHIO: Objection.

THE COURT: Overruled. This is argument. Go ahead.

MS. CROWLEY: She tried to focus you away from all of the evidence that you have seen in here.

Remember, it is the government's burden, it is our burden, to prove the crimes charged in the indictment. We embrace that burden. The defense doesn't have to say a single word. They don't have to question a witness. They don't have to make an argument. But when they do, when they do, as they have done today and throughout this trial, you should scrutinize what they are saying. You should listen carefully, the same way that we have asked you to scrutinize all of the evidence in this case.

There is a critical difference between evidence and

Ib5rahm1

argument.  We, the government, have presented you with evidence, facts, and reasonable inferences to be drawn from those facts.  What Ms. Gallicchio just did, she made arguments, arguments unsupported by the evidence, logic, or common sense. I'm not going to address all of her arguments right now.  I do not have time.  And, frankly, I don't think that I need to. You have been sitting here for a while this morning and you have paid close attention throughout this trial.  You know what happened in this case.  But I'm just going to take a moment to address a few of the things that she said.

Let's start with intent, the intent argument.  Ms. Gallicchio argued that the defendant didn't want to kill anyone else, he just wanted to kill himself.  I think she called it a public suicide.  Nonsense.  The defendant detonated a shrapnel-filled bomb in the middle of the busiest subway station in the United States during rush hour.  He did it to terrorize, to injure, and kill.  He did it intentionally.  He did it deliberately.

This wasn't just any bomb.  It was a metal pipe bomb, a device the defendant carefully designed and built to explode, to spray metal shrapnel everywhere.  You do not use a weapon like that if you are only trying to kill yourself.  You just don't.  And you definitely, definitely don't pack that bomb with screws like the defendant did, screws he knew would be propelled in every direction when the bomb exploded, screws he

A001037

knew would pierce of skin of everyone they hit. Remember, screws were found all over that tunnel.

What is the defense's answer to that? That the defendant didn't know what would happen when he put screws in an explosive device or that the defendant added dozens of screws to his bomb to make sure he killed himself? No. That doesn't make sense. Bombs explode out. The screws sprayed all over. They were not just aimed at himself. That's not how bombs work. By now you know that. More importantly, you know the defendant knew that when he designed his bomb, when he built it, when he set it off.

But Ms. Gallicchio just argued that if the defendant actually wanted to injure or kill others, he would have made a bigger bomb, a more lethal bomb, that he would have set it off in a more crowded place. Please, you should reject these arguments outright. It is absolutely no defense to the crimes the defendant has been charged with that the bomb could have been bigger, that the defendant could have detonated it with even more people around him.

Of course there are bigger bombs. Of course. And everything that you have seen and heard throughout this trial tells you that if the defendant had access to bigger and deadlier materials, he would have used them. But he didn't. So he used the tools he had. He used the tools he had, like the pipes, wires, and screws from his job site, like the

**A001038**

matches and sugar from his home, the Christmas tree bulbs from the 99 Cent store, his skills as an electrician, the lessons he learned watching his jihadist videos. He used the tools he had and he built from scratch a deadly weapon, a weapon he designed. He intended to injure and kill others.

Ms. Gallicchio just pointed to cherry-picked questions from the testimony of Special Agent Rigopoulos. She put up on the screen his examination of where he described the bomb components, and said things like if properly initiated and assembled, the bomb could cause death. S S okay, sure, he did say that when I asked him what the purpose was of each of the bomb's components, what each piece was designed to do. But what else did he say? She didn't show you that.he said the bomb did function, that it did initiate, that it did explode. That's what the agent said. But Ms. Gallicchio didn't show you that portion of the transcript.

Listen, it doesn't really matter. It doesn't really matter whether a more experienced bomb maker could have screwed the end caps on tighter or packed the bomb with even more explosive material or screws. What matters here is what the defendant wanted when he built that bomb and when he detonated it, what he intended: to injure, to maim, to kill.

Think about this. If, as Ms. Gallicchio just argued, the defendant only wanted to kill himself, he had other choices. He could have chosen any of the tragic ways that

**A001039**

people choose to take their lives without exposing others to danger. If the defendant really wanted to kill only himself, he would not have used a bomb.

But that is not what he wanted. The defendant's bomb wasn't about hurting just himself. It was about sending a simple message to his victims, ordinary commuters: no one is safe. Just like the message he posted on his Facebook page moments before his attack: "O, Trump, you failed to protect your nation." That wasn't about the president's treatment of Muslims, as Ms. Gallicchio just argued. It was a warning: you failed to protect your nation, America, and now I'm coming to attack you. That was his message.

Just like the message he wrote on his passports and on that box filled with screws and metal, "Die in your rage, America, die in your rage," words he adopted from that ISIS video that he watched just one week before his attack. These words tell you exactly what message the defendant wanted to deliver, the brutal lesson he wanted to teach.

He didn't say, I die in rage. He didn't say, I kill myself in rage. He said, "America, die in your rage." That was his message, that was his goal. And the bombing was his way, the way he chose to carry it out, to hurt and kill Americans.

Ms. Gallicchio just said a lot about mental illness. She argued that the defendant couldn't have wanted to hurt

A001040

others because he was mentally ill.  You heard no evidence at all through this trial about whether the defendant was mentally ill.

MS. GALLICCHIO:  Objection.

THE COURT:  Overruled.  Go ahead.

MS. CROWLEY:  Ladies and gentlemen, all of the evidence that you saw showed that this attack was carefully, meticulously planned and executed.  It was about martyrdom, not suicide.  No doubt, we agree, the defendant wanted to die in this attack.  He said that.  But remember what Dr. Zelin said.  He explained suicide is against the laws of Islam.  It's illegal.  You can't do it.  But when ISIS tells its followers, like the defendant, that suicide is justified, it's encouraged, so long as when you kill yourself, you kill others, so long as it's martyrdom.  That is what the defendant believed when he carried out this operation.

What about where he did it?  The busiest subway station in New York City during morning rush hour.  The defendant told Detective Byrne, admitted, he chose that specific location and time and that is further prove of the defendant's intent.  You saw the video.  You have seen it many times.

You saw the tunnel filled with people, people like David Wall and Veronica Chavez.  Ms. Gallicchio just showed you two photographs of still shots from that video.  She pointed to

**A001041**

those photographs and she said, look, the defendant didn't want to kill anyone else. There's no one around him. From two still shots.

Ladies and gentlemen, you saw the whole video and you can watch it again when you go back in the jury room to deliberate. You saw the defendant make his way through that tunnel with people all around him. You saw him detonate that bomb with people in front of him, people like David Wall, people next to him, people behind him. And you saw them run away in terror.

By some miracle, no one was seriously injured or killed, and in that sense the defendant's murderous plan was unsuccessful. But that stroke of good luck is not a defense to the crimes that he has been charged with. It is no defense that the shrapnel hit David Wall's legs instead of his throat. It's no defense that the jagged fragments of the metal pipe narrowly avoided impaling anyone nearby.

The defendant set off his bomb in the Port Authority intending to injure, kill, and terrorize. Those were his goals. Now he's asking you to let him off because he didn't --

MS. GALLICCHIO: Objection.

THE COURT: Overruled. This is argument. Go ahead.

MS. CROWLEY: He is asking you to let him off because he didn't accomplish all of them, didn't injure more people. Didn't inflict more terror. Don't do it. Don't let him run

from what he's done.

I'd like to talk for a minute about Count One.  That's providing material support for terrorism.  I'll be brief.  Ms. Gallicchio argued that the defendant isn't guilty of Count One because he wasn't a member of ISIS and didn't receive any direct commands from them.  That's been a big part of the defense's argument in this case.  They want you to believe that because the defendant was not an official member, because he didn't pledge, swear allegiance to ISIS, that he is not guilty of Count One.  Here are the problems with that argument.

It doesn't stand up to common sense.  Even more importantly, it is not the law.  Judge Sullivan is going to instruct you on the law in a couple of minutes, and what he says controls.  Pay attention to these instructions.  Pay attention to all of them, not just the cherry-picked portion that Ms. Gallicchio decided to put on the screen earlier today.

You will hear Judge Sullivan explain to you that the defendant is guilty of Count One if he provided material support to ISIS.  Guess what he is not going to tell you?  That the defendant has to be a member of ISIS to be guilty of Count One.  The judge will not tell you that because that is not the law.  Count One is about material support, not membership.

Judge Sullivan will explain to you that material support means services or personnel, and personnel can mean oneself, him, himself.  The defendant provided himself as

**A001043**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page37 of 288

personnel to ISIS. The judge will also tell you that the defendant provided a service to ISIS if he carried out his attack in response to the group's call or invitation to his followers. That is the instruction.

(Continued on next page)

A001044

MS. CROWLEY: That is the instruction. And that is exactly what the defendant did. No one is going to ask you to decide whether the defendant was a member of ISIS, whether he swore an oath to ISIS, whether he traveled overseas to fight for them in Syria. They're not going to ask you that because it's not the law. Services or personnel, that's what Count One is about.

And yet Ms. Gatto spent a lot of time in her cross-examination of Dr. Zelin, and Ms. Gallicchio has referenced it here today talking about membership, pledging by act, fanboys, a spectrum of attacks. That's all really interesting, but it's absolutely irrelevant. We agree, the defendant didn't travel to Syria or Iraq to fight there. We agree, he wasn't in direct communication with ISIS's leadership. But this does not matter one bit for Count One. The defendant is guilty of Count One if he provided ISIS with services or personnel, including himself. And he did both of those things. When he answered ISIS's call to take the fight to where you are, he provided himself as personnel to ISIS, he provided a service to ISIS. When he studied the different ways ISIS instructs its followers to carry out attacks, he did that so he could provide the best possible service to ISIS. When he taught himself how to build a pipe bomb, watching videos online, when he watched the Flames of War, which instructed him to take the attacks to America and declared that Americans

**A001045**

would die in our rage, when just days later, he strapped his pipe bomb to his chest, declared allegiance to ISIS on his Facebook page, rode the subway into Manhattan, walked into a tunnel packed with people and detonated his bomb, when he did those things, he provided a service to ISIS and he provided himself, period. Simple. Count One, guilty.

Now you might remember Ms. Gatto argued in her opening statement, and Ms. Gallicchio alluded to it again today, that the government, that we made this case about ISIS, that we chose to bring terrorism to this trial. The government did not make this case about ISIS; the defendant did. The government did not bring terrorism into this case; the defendant did. He wasn't a fanboy. He wasn't some wayward youth who watched videos online. He didn't sit behind his computer or retweet ISIS messages from his phone. He took action. He carried out an attack. He did it for and in the name of ISIS.

Services. Personnel.

We know now, we've learned, ISIS's goals are to establish a state, kill its enemy, and eventually take over the world. And to do those things, to accomplish these goals, ISIS needs to build a global army. So they recruit soldiers -- soldiers who will fight for ISIS in their territory in the Middle East, and soldiers who will take the fight to where they are; to America, to New York City, like the defendant did.

And Dr. Zelin explained that these soldiers, some of

A001046

these soldiers, the lone wolf attackers, ISIS relies on them to get their message out. ISIS tells these attackers, when you commit these attacks, make clear why you're doing it, and for whom you're doing it. Tell the world that you are killing and terrorizing on behalf of ISIS. Just like the defendant did, on his Facebook page, his passport, that cardboard box. When he told Detective Byrne that he did this for the Islamic State. Get the message out, ISIS tells its soldiers, so that when you die, your death will be glorified, you will become a hero, and you will inspire others to join our army. That's how ISIS works. That's how the defendant answered its call, its invitation. That's how he provided them with a service and that's how he provided them with himself.

But the defense argues, the defendant isn't guilty of Count One because he wasn't one of the soldiers who traveled overseas or he wasn't in direct contact with ISIS leadership. No. Distraction. He doesn't have to communicate with ISIS directly to provide the material support. That's not the law, and it doesn't make sense.

Think about it in your own life, okay? You're a sports fan. Or you want to get a candidate elected to office. You're a supporter of a charity. You don't have to meet the athletes on your favorite team to support them. You go to their games, you buy their jerseys and hats. You don't have to talk to or even meet your preferred candidates to get them in

**A001047**

office.  You visit their websites, knock on doors, sign petitions.  You don't have to travel to your charity's headquarters to provide them services.  You raise money.  In each example, you're providing a service to a person or group, and it does not matter at all that you've never met or communicated with them.

It's the same concept here, except the goal isn't to elect a candidate or support a charity.  It's to advance ISIS's deadly mission.  And the method isn't knocking on doors or raising money; it's committing a cold-blooded attack designed to kill.

Just one more point on this.  This claim of responsibility argument that Ms. Gallicchio just made, you've heard it actually a few times throughout this trial.  The defense seems to think it matters, that it's important that ISIS didn't claim responsibility for the defendant's attack, that it somehow means that he wasn't providing a service.  Again, not the law.  Listen to Judge Sullivan's instructions on this count.  Listen for whether he says anything at all about ISIS having to claim responsibility for the defendant's attack in order for him to be guilty of Count One.  You won't hear that instruction because it's not required.

Ladies and gentlemen, the defendant bombed the Port Authority for and in the name of ISIS.  He did it following their instructions, he did it in response to their command.  It

**A001048**

does not matter that he did it alone.  It does not matter that he was arrested and not killed.  He was a soldier in the Islamic State's war against the West.  He provided them a service and he provided them with himself.  He's guilty of Count One.

Now just a word about the interview, Detective Byrne's postarrest interview of the defendant.  Ms. Gallicchio just spoke at length about that.  She argued, basically, that you shouldn't believe everything Detective Byrne told you about what the defendant said in his confession because he didn't write down every word of it, because some of it was on video and the rest wasn't.  Ladies and gentlemen, it is easy for we as lawyers to stand up here in a courtroom and nitpick the way people, the way law enforcement responds to a terrorist attack. Detective Byrne was not sitting in a chemistry lab examining powder through a microscope.  He was interviewing someone who had just bombed New York City.  His focus was about finding out what had happened and whether there were any other imminent threats, whether there were any other bombs about to go off. His focus was on saving lives.  So no, it's true, Detective Byrne didn't take down 300 pages of notes like the chemistry expert did, but he paid close attention.  He took notes.  He wrote a detailed report, and he remembers everything the defendant said.

You heard Detective Byrne's testimony.  Does it make

A001049

any sense at all that he was making things up? No. No, it doesn't. Because everything the detective told you about what the defendant said was completely consistent, completely backed up by all of the other evidence that you saw, including that video from the hospital room.

Here are some examples. Detective Byrne testified that the defendant said he built the bomb with materials he took from his work site. You heard an expert tell you that a pair of pliers from the defendant's job was used to grip the pipe bomb. Detective Byrne testified that the defendant said he used Christmas tree lights, match heads, a metal pipe, zip ties, screws. You saw all of those items, all of them, collected from the bomb scene and the defendant's home. Detective Byrne testified that the defendant said he finished building the bomb in his home. And you heard the chemistry expert tell you that explosive residues were found all over his apartment. Detective Byrne testified that the defendant said he posted *baqiya*, ISIS's rallying cry, on his Facebook page on his way to the bombing. You saw that Facebook post. Detective Byrne testified that the defendant said he watched that ISIS video Flames of War II. And you saw the slogan used in that video, "Die in your rage," scrawled all over the defendant's things. Do you think Detective Byrne just pulled that video out of thin air? That he just coincidentally picked the exact title of the video the defendant watched just days before his

A001050

bombing? Remember, Detective Byrne was not at the bomb scene. He didn't search the defendant's house before the interview. He didn't see the defendant's Facebook page. He had no idea that there were strands of wire, ground up matches in the defendant's bathroom. He had no idea that just before his attack, the defendant posted ISIS's rallying cry. So it's just a coincidence then, Detective Byrne just got lucky and made up and wrote down a bunch of stuff that just so happened to match every other piece of evidence in this case? No. You don't need 300 pages of notes or a video to know that Detective Byrne told you the truth about the defendant's confession. Every single detail is completely consistent with all of the other evidence that you've seen in this case. Don't let the defense distract you.

Very briefly, I'd like to talk about Count Five. Ms. Gallicchio just mentioned it towards the end of her closing. And she said that the defendant isn't guilty of Count Five because he was far from the train when the bomb detonated and things like that. Really? Think about this. Think about this. Count Five charges the defendant with committing a terrorist attack on a mass transportation system. Can you think of anything that more accurately describes what the defendant did? He detonated a bomb in the middle of the biggest subway system in the biggest city in the US. That is Count Five, and he is guilty.

A001051

This is not hard. Mr. Turner explained to you -- and Judge Sullivan will explain the same thing -- that there are two ways the defendant can be guilty of this count. Two ways. First, he's guilty if he used a destructive device with the intent to cause death or serious bodily injury to anyone in a subway terminal or tunnel. That's easy. A destructive device is a bomb. The defendant used the bomb. He detonated it, in a subway tunnel. He clearly intended to kill or seriously injure everyone around him. Guilty. Count Five.

And the second way he's guilty, if he placed a bomb in a subway train, acting with reckless disregard for the safety of others. Well, you know he did that. The defendant was the bomb. Remember what Agent Rigopoulos told you: The defendant made himself the switch, the detonator. And the minute he stepped on that subway car, he placed that bomb there. Guilty. Count Five.

Now just to address one more thing that Ms. Gallicchio just said, we know that the defendant detonated the bomb when he attacked, when he touched the wires to the battery. We know that. That was in the middle of the subway tunnel. But we also know that that bomb could have exploded at any time. Agent Rigopoulos told you that, but it's also obvious. The wires and the battery were in the defendant's pocket. It's a Monday morning rush hour on the subway in New York City. We know what that's like. He gets jostled, the wires touch, the

**A001052**

bomb goes off. If the device is dropped or thrown, the bomb goes off in the subway car. Carrying a live, unstable bomb on a crowded subway train in the middle of rush hour, can you think of anything more reckless than that? Guilty. Count Five. Simple.

So let me say something about reasonable doubt. You heard a lot about it from the defense this afternoon. And the defense would have you believe that reasonable doubt is an impossible standard. Judge Sullivan will instruct you in a few minutes on the meaning of reasonable doubt. And you should of course listen to and follow his instructions. But also keep in mind that the standard is not beyond any doubt, it's beyond a reasonable doubt. From the time the U.S. Constitution was ratified until now, every person convicted of a crime in this country has been convicted on proof beyond a reasonable doubt. Reasonable doubt is a high standard. It should be a high standard. But it's not an impossible one. If it was, then no one would ever be convicted of a crime. Have we met that burden in this case? Absolutely.

I am done now. You have heard enough talking from lawyers today. You've paid careful and close attention throughout this trial. You've seen the evidence and heard the witnesses. So let me just leave you with this. Just because a case goes to trial doesn't make it hard. It doesn't make it close or complex. This is not a close case. You know what

**A001053**

happened. The defendant committed a terrorist attack for ISIS. You saw the testimony and the evidence, and you watched him carry out that attack on video. You saw the video. But the defendant, he never expected to see that video. He never expected to be here in a courtroom, facing the consequences of his actions. He expected to die and to kill others, to martyr himself in service of the terrorist group he idolized. But thankfully, mercifully, no one died, and neither did the defendant. He was arrested, and he sits before you today. And now it is time to hold him accountable for what he's done, to find him guilty of each and every count in the indictment.

THE COURT: Okay. Thank you, Ms. Crowley.

All right. So you folks must be starving. So your lunch should be here. We'll get you set up in your jury room. It's raining anyway. We'll have about a half hour for lunch. We'll eat pretty quick. Don't discuss the case, don't discuss the summations or the evidence or anything else. You're almost there but not there, so don't discuss the case.

We'll pick up in about a half an hour. At that point I'll give you my instructions on the law, and then you'll get to deliberate. All right?

So have a good lunch. Let us know if you didn't get what you order, I'll have Mr. Brody make sure that you got what you ordered, okay?

All rise for the jury.

A001054

(Jury not present)

THE COURT:  Okay.  So it's a pretty abbreviated lunch. Have a seat.

I want to give you folks a chance to get something to eat before we do the charge.

Anything we need to discuss before we break?

MS. GALLICCHIO:  No, your Honor.

MR. TURNER:  Not from the government, your Honor.

THE COURT:  All right.  So I'll see you back here about quarter to 2, all right, more or less.

(Luncheon recess)

**A001055**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page49 of 288

AFTERNOON SESSION

2:01 p.m.

(In open court; jury not present)

THE COURT: Apparently nobody wants to watch the charge.

Let's just make sure. Do we need to do anything before we bring the jury in?

MS. GALLICCHIO: No, your Honor.

MR. TURNER: No, your Honor.

THE COURT: All right. So let's go get them.

(Jury present)

THE COURT: Okay. Have a seat. Thanks.

Lunch came out okay? You got what you ordered?

THE JURORS: Yes.

THE COURT: Was it all right?

JUROR: Very good.

THE COURT: All right. Good. I'm glad to hear that.

All right. So I'm now about to give you instructions on the law. The nature of legal instructions is that they have to be kind of precise, so a lot of the legal instructions end up being read at you. I apologize in advance for reading these things. It makes it less dramatic and in some ways less compelling, but it is important.

I will give you a copy of these when you get to the jury room. I'll give you each a copy so you can refer to it.

A001056

If there are portions of it you want to refer to, that's perfectly fine. You're certainly welcome to take notes as you sit here now, but know that you'll have an entire set of the jury instructions, as well as the exhibit list, list of all the witnesses, and my verdict form. And I'll explain all that in a minute, okay?

So this will take a little while. This will take certainly over an hour. But hopefully it will have some flow and you'll be able to follow along. So sit back. Hope you're warm.

All right. So here we go.

So members of the jury, you've now heard all of the evidence in this case, as well as the final arguments of the parties. We've reached the point where you're about to undertake your final function as jurors. You've paid careful attention to the evidence, and I'm confident that you will act together with fairness and impartiality to reach a just verdict in this case.

My duty at this point is to instruct you as to the law. It is your duty to accept these instructions of law, along with the instructions that I've given you during the course of this trial, and to apply those instructions to the facts as you determine them, just as it's been my duty to preside over this trial and to decide what testimony and what evidence was proper under the law for your consideration. On

these legal matters, you must take the law as I give it to you. If anyone has stated a legal principle that is different from any that I state here in my instructions, it's my instructions that you have to follow. All right? You should consider these instructions together as a whole; in other words, you shouldn't isolate or give undue weight to any particular portion or part of the instructions.

As members of the jury, you are the sole and exclusive judges of the facts. You pass upon the evidence. You determine the credibility of the witnesses. You resolve whatever conflicts, if any, there may be in the evidence presented by the parties. You draw whatever reasonable inferences you believe should be drawn from the facts as you have determined them, and you determine the weight of the evidence. In doing so, remember that you took an oath to render judgment impartially and fairly, without prejudice or sympathy or fear, based solely on the evidence and the law.

It is your sworn duty, and you've taken an oath as jurors, to determine the facts and to follow the law as I give it to you. You must not substitute your own notions or opinions of what the law is or ought to be.

I remind you that in reaching your verdict, you are to perform your duty of finding the facts without bias or prejudice as to any party. You must remember that all parties stand as equals before a jury in the courts of the United

**A001058**

States.  You must also remember that it will be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process.

This case is important to the defendant, who is charged with serious crimes.  It is also important to the government, for the enforcement of criminal laws is a matter of prime concern to the public.

The fact that the prosecution is brought in the name of the United States does not entitle the government or its witnesses to any greater consideration than that accorded to any other party.  By the same token, the government is entitled to no less consideration.  The government and the defendant stand as equals before the bar of justice.  Your verdict must be based solely on the evidence or the lack of evidence presented here in court.

Now I want to instruct you on the presumption of innocence and the government's burden of proof in this case. The defendant has pleaded not guilty.  In so doing, he has denied every allegation charged against him.  As a result of the defendant's plea of not guilty, the burden is on the prosecution to prove the defendant's guilt beyond a reasonable doubt.  This burden never shifts to the defendant for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or

**A001059**

producing any evidence.

The law presumes the defendant to be innocent of all charges against him. I therefore instruct you that the defendant is to be presumed by you to be innocent throughout your deliberations. You must also consider each count separately.

The defendant began this trial with a clean slate. This presumption of innocence alone is sufficient to acquit a defendant unless you as jurors are unanimously convinced beyond a reasonable doubt of his guilt, after careful and impartial consideration of all the evidence in this case. If the prosecution fails to sustain its burden as to the defendant, then you must find the defendant not guilty on the charge you are considering. The defendant was entitled to this presumption when the trial began; it remains with him even now as I speak to you; and it will continue with him during your deliberations unless and until you are convinced that the prosecution has proven his guilt beyond a reasonable doubt.

So the next question naturally presents itself, what is a reasonable doubt? Well, the words almost define themselves. It is a doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her life. On the other hand, a reasonable doubt is not speculation or suspicion. It is not an

**A001060**

excuse to avoid the performance of an unpleasant duty, and it is not sympathy.

Proof beyond a reasonable doubt, therefore, does not require the government to establish proof of guilt as an absolute certainty, or beyond all possible doubt. That standard would be impossible. Instead, the government must establish guilt beyond a reasonable doubt, with proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

If after fair and impartial consideration of all the evidence, or the lack of evidence, you have a reasonable doubt as to the defendant's guilt on the count that you are considering, then you must acquit him on that count.

On the other hand, if after fair and impartial consideration of all the evidence you are satisfied of the defendant's guilt on a particular count beyond a reasonable doubt, it is your duty to convict the defendant on that count of the indictment.

In determining the facts, you must rely upon your own recollection of the evidence. Now what is evidence? I think I told you at the beginning of this case, evidence consists of the testimony of the witnesses, the exhibits that have been received in evidence by the Court, and the stipulations of the parties.

**A001061**

The statements and arguments by the lawyers are not evidence. Their arguments are intended to convince you as to what conclusions you should draw from the evidence, or lack of evidence. Those arguments are important. You should weigh and evaluate them carefully. But you must not confuse the arguments with evidence. As to what the evidence was at this trial, it is your recollection that governs, not the statements of the lawyers, or the parties.

With regard to this, you should also bear in mind that a question put to a witness is never evidence. It is the answer to the question that is evidence. One exception to that is that you may not consider any answer that I directed you to disregard or that I ordered to be stricken from the record. I don't recall if I did that. I don't think I did. But such answers shouldn't be considered.

Now there are two types of evidence that you may properly use in deciding whether the defendant is guilty or not guilty of the crimes of which he is charged.

One type of evidence is called direct evidence. The other is circumstantial. You probably heard those terms before. Direct evidence of a fact in issue is presented when a witness testifies to that fact based on what the witness personally saw, heard, or observed. In other words, when a witness testifies about a fact in issue on the basis of that witness' own knowledge -- by virtue of the witness' perception,

A001062

the witness' own five senses -- that is direct evidence of that fact.

The second type of evidence is called circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts. Now there's a simple example of circumstantial evidence that's been used as long as this courthouse has been open, probably a lot longer, and it goes like this. You may have heard it.

Assume when you came in today, it was a bright and sunny day. Assume also that while you were sitting here, the curtains were drawn so you couldn't look outside the window. Assume, as you were sitting here with the curtains drawn and the windows tightly shut, you saw somebody walk in the back of the courtroom with an umbrella that was dripping wet, and then a few minutes later, you saw somebody come in with a raincoat that was also dripping wet.

Now because you have no direct evidence -- you couldn't put your hand outside the window, you couldn't look outside the window -- you'd have no direct evidence of the weather conditions, but based on the assumptions I asked you to make about the raincoat and the umbrella, it would be reasonable for you to infer that it was raining outside from those other facts that I asked you to assume, the raincoat and the umbrella, all right?

That's all there is to circumstantial evidence. You

**A001063**

infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of another fact.

The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.

To be very clear, circumstantial evidence may be given as much weight as direct evidence.  Many material facts, such as state of mind, are not easily proven by direct evidence.  Usually such facts are established by circumstantial evidence and the reasonable inferences that you draw.  The law makes no distinction between direct and circumstantial evidence.  The law simply requires that before convicting a defendant, the jury must be satisfied of a defendant's guilt beyond a reasonable doubt, based on all of the evidence in the case.

Now on the topic of inferences, you should draw no inference or conclusion for or against any party by reason of lawyers making objections or by my rulings on those objections.  Counsel not only have the right, they have the obligation, the duty, to make legal objections when they think that those objections might be appropriate.

Nothing that I say is evidence.  So if I commented on the evidence at any time, don't accept my statements in place of your recollection or your interpretation of the facts.  It's

your recollection and your interpretation that governs.

Also, you shouldn't draw any inference from any of my rulings. The rulings I made during the trial are no indication of any view I may have as to the proper verdict in this case. You shouldn't seek to find from my rulings whether I have any such view or opinion, nor should you consider or otherwise speculate about what I might be thinking. You're the judges of the facts, not me. And so I'm just focused on the law. So you should just not worry about what I might be thinking or what my rulings suggest or anything like that.

Don't concern yourself with what was said at the sidebar conferences or when we were here and you were in the jury room. Don't worry about that. Those discussions related to rulings of law and they really are not relevant to your task as jurors.

At times I may have admonished a witness or directed a witness to be responsive to questions or to speak up a little louder. Occasionally, very occasionally, I may have asked a question. Any questions that I ask, any instructions that I gave were intended only to clarify the presentation of the evidence and to bring out something that I thought might be unclear or confusing. You shouldn't draw any inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party by reason of a comment, question, or instruction of mine. Nor should you infer that I might have

A001065

Case 21-1058, Document 43, 10/04/2021, 3186342, Page59 of 288

any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that's before you. Again, that's entirely your role.

Finally, the personalities and the conduct of counsel are not in any way in issue in this case. If you formed opinions of any kind about the lawyers in this case, favorable or unfavorable, whether you approved or disapproved of their behavior, those opinions shouldn't enter into your deliberations. It's not about the lawyers; it's only about the charges and the facts presented.

Now I want to give you a few general instructions as to how you can determine whether witnesses are credible and reliable, whether the witnesses told you the truth, and whether they knew what they were talking about. How do you determine that? Because you are tasked with assessing the credibility of witnesses. That's your role. So it's really just a matter of using your common sense, your good judgment, and your experience.

Consider how well the witness was able to observe or hear what he or she testified about. The witness may be honest, but mistaken. How did the witness' testimony impress you? Did the witness appear to be testifying honestly and candidly? Were the witness' answers direct or were they evasive? Consider the witness' demeanor, manner of testifying, and the strength and accuracy of the witness' recollection.

**A001066**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page60 of 288

Consider whether any outside factors may have affected a witness' ability to perceive events.

Consider the substance of the testimony. How does the witness' testimony compare with other proof in the case? Is it corroborated or is it contradicted by other evidence? If there is a conflict, does any version appear reliable, and if so, which version seems more reliable?

In addition, you may consider whether a witness had any possible bias or relationship with a party or any possible interest in the outcome of the case. Such a bias or relationship does not necessarily make the witness unworthy of belief. These are simply factors that you may consider.

If a witness made statements in the past that are inconsistent with his or her testimony during the trial concerning facts that are at issue in this case, you may consider that fact in deciding how much of the testimony, if any, to believe. In making that determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake. You may also consider whether the inconsistency concerns an important fact or merely a small detail, as well as whether the witness had an explanation for the inconsistency and, if so, whether that explanation appealed to your common sense.

If you find that a witness has testified falsely as to any material fact or if you find that a witness has been

A001067

previously untruthful when testifying under oath or otherwise, you may reject that witness' testimony in its entirety, or you may accept those parts that you believe to be truthful or that are corroborated by other independent evidence in this case.

It is for you, the jury, and for you alone -- not the lawyers, not the witnesses, not me as a judge -- to decide the credibility of witnesses who testified and the weight that their testimony deserves.

You do not leave your common sense, your good judgment, or your life experience behind you when you walk into a courtroom. You carry that background into the jury room during your deliberations. Please remember, however, that you may not use your experience and your common sense to fill in or create evidence that doesn't exist. Use your experience, your common sense, and your judgment only to draw reasonable inferences from proven facts or to weigh and evaluate the evidence provided during the trial.

Under your oath as jurors, you are not to be swayed by sympathy. You are to be guide solely by the evidence in this case, and as you sift through the evidence, the crucial question that you must ask yourselves for each count against the defendant is, has the prosecution proved each element beyond a reasonable doubt?

It is for you and you alone to decide whether the prosecution has proven that the defendant is guilty of the

**A001068**

crimes charged, solely on the basis of the evidence and subject to the law as I've instructed you.

It must be clear to you that once you let prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt with respect to a particular count, you must reach a verdict of not guilty on that particular count. On the other hand, if you find that the prosecution has met its burden of proving guilt beyond a reasonable doubt with respect to a particular count, then you should not hesitate, because of sympathy or any other reason, to render a verdict of guilty on that count.

I also caution you, under your oath as jurors, you cannot allow to enter into your deliberation any consideration of the punishment that may be imposed upon a defendant if he is convicted. The duty of imposing a sentence in the event of conviction rests exclusively with the Court, with the judge, and the issue of punishment may not affect your deliberations as to whether the government has proven the defendant's guilt beyond a reasonable doubt.

All right. So those are my kind of introductory comments. What I'm going to do now is instruct you on the counts of the indictment. There are six counts in this indictment. This part of the instructions I'll refer to as the

A001069

substantive instructions.

The defendant, Akayed Ullah, is formally charged in an indictment. As I instructed you at the beginning of this case, the indictment is only a charge or an accusation. It is not evidence. I will now summarize the offenses charged in the indictment, and then I'll explain in detail the elements of those offenses.

The indictment in this case contains six counts. I emphasize that you must consider the evidence separately with respect to each count. You'll be asked to render a separate verdict on each count, and I will provide you with a verdict sheet that will assist you in doing that.

Count One charges that, on or about December 11, 2017, the defendant provided or attempted to provide material support or resources to the foreign terrorist organization known as the Islamic State of Iraq and al-Sham, or ISIS.

Count Two charges that, on or about December 11, 2017, the defendant used or attempted to use a weapon of mass destruction, namely, a "destructive device" (as I will define that term) against persons and property within the United States.

Count Three charges that, on or about December 11, 2017, the defendant bombed or attempted to bomb a place of public use and a public transportation system.

Count Four charges that, on or about December 11,

**A001070**

2017, the defendant used or attempted to use explosives to damage and destroy a building, vehicle, or other property.

Count Five charges that, on or about December 11, 2017, the defendant committed or attempted to commit a terrorist attack against a mass transportation system.

And Count Six charges that, on or about December 11, 2017, the defendant used and carried a destructive device during and in relation to, and possessed a destructive device in furtherance of, crimes of violence, namely, Counts One through five in the indictment.

So those are the six counts. I'm now going to tell you about the elements for each. We'll start with Count One.

Count One of the indictment charges that, on or about December 11, 2017, the defendant knowingly and intentionally provided, and attempted to provide, material support or resources to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham, or ISIS, in violation of Section 2339B of Title 18 of the United States Code.

As relevant here, Section 2339B provides:

"Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts to do so," is guilty of a crime. "To violate [this section], a person must have knowledge [A] that the organization is designated a terrorist organization [by the Department of State], [B] that the organization has engaged or engages in

**A001071**

terrorist activity... or [C] that the organization has engaged or engages in terrorism."

(Continued on next page)

A001072

THE COURT:  In order to sustain its burden of proof with respect to Count One, the government must prove beyond a reasonable doubt:

First, that the defendant knowingly provided or attempted to provide material support or resources to ISIS;

Second, that the defendant had knowledge that ISIS (a) was a designated terrorist organization, (b) has engaged in or engages in terrorist activity, or (c) has engaged in or engages in terrorism."  I'll define those terms in a minute.

Third, that the offense occurred in whole or in part in the United States.

Those are the three elements for Count One.  I'll explain them now in greater detail.

The first element that the government must prove beyond a reasonable doubt is that the defendant knowingly and intentionally provided or attempted to provide material support or resources to ISIS.  To be clear, the law does not prohibit advocating the political goals of ISIS.  What is prohibited is the act of knowingly providing materials or support to ISIS.

To prove that the defendant acted knowingly, the government must simply prove that he acted voluntarily, not because of mistake or accident.  To prove that the defendant acted intentionally, the government must prove beyond a reasonable doubt that the defendant acted deliberately and purposefully, that is, a defendant's acts must have been the

A001073

product of his conscious objective decision.

A person provides material support or resources if he makes available, sends, or physically transfers the support or resources. A person attempts to provide material support or resources if he (a) intended to provide material support or resources and (b) willfully took some action that was a substantial step in an effort to bring about or accomplish the provision of that material support or resources. Thus, the mere intention to commit a specific crime does not amount to an attempt.

In determining whether the defendant's actions amounted to a substantial step toward the provision of material support or resources, you must distinguish between mere preparation to the one hand and the actual doing a criminal act on the other. Mere preparation is not enough.

On the other hand, some preparations, when taken together, may amount to an attempt. The acts of a person who intends to commit a crime will constitute an attempt when the acts themselves indicate an intent to willfully commit the crime and the acts are a substantial step in the course of conduct planned to culminate in the commission of a crime.

The term "material support or resources" is defined by law to include any service or personnel, one or more individuals who may be or include oneself. A person provides or attempts to provide services as that term is defined in the

Case 21-1058, Document 43, 10/04/2021, 3186342, Page68 of 288

statute when a person performs work commanded or paid for by another or done for the benefit of another, here ISIS.

Only work performed in coordination with, at the direction of, or for the benefit of ISIS meets the definition of service. It's for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such as the conduct alleged here, whether the defendant carried out the conduct alleged here, and, if you find that he did, whether the defendant was motivated by such an invitation.

If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of services in the statute.

A person provides or attempts to provide personnel as that term is defined in the statute if he provides or attempts to provide ISIS with one or more individuals who may be or include himself to work under that organization's direction or control. However, individuals who act entirely independently of ISIS to advance its goals or objectives are not considered to be working under ISIS's direction and control.

To find that the defendant provided or attempted to provide material support or resources to ISIS, you must unanimously agree that at least one of the forms of material

A001075

support alleged was provided or attempted by the defendant.  In other words, if some but not all of you find beyond a reasonable doubt that the defendant provided or attempted to provide personnel to ISIS, and if some but not all of you find beyond a reasonable doubt that the defendant or attempted to provide services to ISIS, then you must find the defendant not guilty on this count.  However, if you unanimously agree that the defendant provided one or more of the categories of support to ISIS, then this element would be satisfied.

That's the first count element of the first count.

The second element for Count One that the government must prove beyond a reasonable doubt is that the defendant had knowledge that ISIS (a) had been designated by the Secretary of State as a terrorist organization, (b) engaged in or engages in terrorist activity, or (c) engaged in or engages in terrorism.

I instruct you that ISIS has been designated by the Secretary of State as a terrorist organization and has been so designated since 2004.

The term "terrorist activity" includes hijacking or sabotage of an aircraft, vessel, vehicle, train, or other conveyance; seizing, detaining, or threatening to kill, injure, or further detain another person; to compel or coerce some third party, including the government, to do or abstain from doing some act; a violent attempt upon an internationally protected person, including employees and officials of

A001076

governments or international organizations; assassination; use of any chemical, biological, or nuclear weapons or device with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; use of any explosive, firearm, or other weapon or dangerous device other than for monetary gain, or with the intent to endanger directly or indirectly the safety of one or more individuals or to cause substantial damage to property; or a threat, attempt, or conspiracy to do any of the foregoing.

That's the definition of terrorist activity.

The term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents. The government has satisfied its burden of proof with respect to this element if you conclude beyond a reasonable doubt that the defendant had specific knowledge that ISIS had been designated by the Secretary of State as a terrorist organization or that ISIS engaged in or engages in terrorist activity of the types I listed for you, or that ISIS engaged in or engages in terrorism as I have defined that term. To find the defendant guilty of this count, you must unanimously agree as to at least one of the three categories of knowledge that the defendant had.

The third element. To satisfy the third element, the government must prove beyond a reasonable doubt that the offense occurred in whole or in part within the United States.

**A001077**

That's Count One.

Count Two of the indictment charges the defendant with using and attempting to use a weapon of mass destruction against persons or property within the United States in violation of section 2332(a) of Title 18 of the United States Code. In order to sustain its burden of proof with respect to Count Two, the government must prove beyond a reasonable doubt that:

First, the defendant knowingly used or attempted to use a weapon of mass destruction;

Second, that that use was against a person or against real property within the United States;

Third, that the defendant did not have lawful authority to use or attempt to use the weapon of mass destruction; and

Fourth, either (a) the property affected is or was used in interstate or foreign commerce or in activity that affects foreign or interstate commerce, or (b) the offense or the results of the offense affect interstate or foreign commerce. I'll address each of these elements now in more detail.

The first element that the government must prove beyond a reasonable doubt in Count Two is that the defendant knowingly used or attempted to use a weapon of mass destruction. "Knowingly" in this context, as in Count One,

**A001078**

means that the act was done voluntarily, intentionally, and not because of mistake or accident.

The government has charged that the defendant used and attempted to use a weapon of mass destruction. I instruct you that the government does not need to prove both the actual use and the attempted use of such a weapon. It need only prove one or the other. But you must be unanimous as to which, if either, you choose.

I have already explained the concept of attempts to you when I was explaining Count One. The same principles apply here. "Weapon of mass destruction" means any destructive device which is defined by the law to include, among other things, any explosive bomb. It is also defined to include any combination of parts, either designed or intended for use in converting any device into a destructive device and from which a destructive device can be readily assembled.

A device is considered a destructive device so long as it is capable of exploding even if the device did not explode the way its maker intended because, for example, it lacks some component. A device that is not designed for use as a weapon does not constitute a destructive device. That's the first element of Count Two.

The second element that the government must prove beyond a reasonable doubt for Count Two is that the defendant intended that the weapon of mass destruction would be used

**A001079**

against a person or against real or personal property within the United States.

I've already defined the term "knowingly" for you. The same definition applies in this count. As noted before, United States for purposes of this case includes the 50 states of the United States, the District of Columbia, and the commonwealths, territories, or possessions of the United States.

That's the second element of Count Two.

The third element that the government must prove beyond a reasonable doubt for Count Two is that the defendant did not have lawful authority to use or attempt to use the weapon of mass destruction related to this count. Lawful authority in this context would require that a person be expressly permitted and authorized by law to possess and use or attempt to use a weapon of mass destruction.

The fourth element that the government must prove beyond a reasonable doubt for this count is that either (a) the property affected is or was used in interstate or foreign commerce or in any activity that affects foreign or interstate commerce, or (b) the offense or the results of the offense affected interstate or foreign commerce.

The term "interstate commerce" means commerce which affects more than one state. It includes commercial activity between any place in one state and another place outside that

**A001080**

state.  It also includes commercial activity wholly within one state but which has a substantial effect on the commerce between or among states.  It also includes any movement or transportation of people, including the defendant, goods, or merchandise from one state into another state.

For an offense to have affected foreign or interstate commerce, it is only necessary that the government prove beyond a reasonable doubt that the crime had some minimal effect on interstate commerce.  It is not necessary to find that the defendant knew or intended to that his actions would significantly affect interstate commerce.

With respect to this fourth element, the government does not need to prove both of these two alternatives.  It need only prove one.  But you must be unanimous as to which one you choose.

Count Three of the indictment charges the defendant with bombing and attempting to bomb a place of public use or a public transportation system in violation of section 2332(f) of Title 18 of the United States Code.  In order to sustain its burden of proof with respect to Count Three, the government must prove beyond a reasonable doubt the following elements:

First, that the defendant knowingly and unlawfully delivered, placed, discharged, or detonated an explosive in, into, or against a place of public use or a public transportation system or attempted to do the same;

A001081

Second, that the defendant did so or attempted to do so (a) intending to cause death or serious bodily injury or (b) intending to cause extensive destruction of a public place or a public transportation system where extensive destruction resulted in or was likely to result in major economic loss;

Third, that the offense took place in the United States; and

Fourth, that the offense was committed either in an attempt to compel the United States to do or to abstain from doing any act or, second, that the defendant was a national of another state.

Let me explain those elements in a little more detail.

The first element that the government must prove beyond a reasonable doubt with respect to Count Three is that the defendant knowingly and unlawfully delivered, placed, discharged, or detonated an explosive or attempted to unlawfully deliver, place, discharge, or detonate an explosive in, into, or against a place of public use or public transportation system.

For this count the government must prove that the defendant knowingly delivered, placed, discharged, or detonated an explosive in, into, or against a place of public use or public transportation system or that he attempted to do so. The government does not need to prove both. It need only prove one or the other. But you must be unanimous as to which, if

either, you choose.

I have already defined the concept of attempt. I won't do it again here. I did that in Count One. I refer you to those instructions for this count as well.

The term "explosive" means any of the following items insofar as they are designed or have the capability to cause serious bodily injury or substantial material damage. They include powders used for blasting, fuses other than electric circuit breakers, detonators, other detonating agents, smokeless powders and any chemical compound, mechanical mixture or device that contains any oxidizing or combustible units or other ingredients in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture or device or any part thereof may cause an explosion. Also included within the statute's definition of explosive is any explosive bomb or similar device.

The term "place of public use" means those parts of any building, land, street, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally, and encompasses any commercial, business, cultural, historical, entertainment, recreational, or similar place that is so accessible and open to the public.

The term "public transportation" system means all

A001083

facilities, conveyances, and instrumentalities, whether public or privately owned that are used in or for publicly available services for the transportation of persons or cargo.

That is the first element of the third count.

The second element that the government must prove beyond a reasonable doubt for Count Three is that the defendant committed the crime or attempted to commit the crime either intending to cause death or serious bodily injury or intending to cause extensive destruction in a place of public use or public transportation system where extensive destruction resulted in or was likely to result in major economic loss.

I have already defined the words "intentional" for you. I won't do that again here. If you need to refer back to Count One, you can do that.

As you can see, there are two alternative ways the government may prove this second element: first, by proving that the defendant intended to cause death or serious bodily injury or, second, by proving that the defendant intended to cause extensive destruction to a place of public use or public transportation system where that destruction resulted in or was likely to result in major economic loss. The government doesn't need to prove both of these, it need only prove one. But again you must be unanimous as to which, if either, type of intent you find.

The term "serious bodily injury" means bodily injury

**A001084**

which involves any of one of the following: (1) a substantial risk of death, (2) extreme physical pain, (3) protracted and obvious disfigurement, or (4) protracted loss or impairment of a functioning bodily member, organ, or mental faculty.

The third element that the government must prove beyond a reasonable doubt for Count Three is that the offense took place in the United States.

The fourth element that the government must prove beyond a reasonable doubt for Count Three is that either the defendant committed the offense or attempted to commit the offense in an effort to compel the United States to do or abstain from doing any act or that the defendant is a national of another state. As you can see, once again there are two alternative ways that the government can prove this element.

First, the government may prove that the defendant committed the offense or attempted to commit the offense in an attempt to compel the United States to do or to abstain from doing any act. Or, second, the government may prove that the defendant is a national of another state. The government does not need to prove both of these alternatives, but you must agree unanimously that the government has proven at least one of them and you must agree on which one of them.

For purposes of Count Three, the term "national of another state" means, among other things, a citizen of another country. That's Count Three.

**A001085**

Count Four of the indictment charges the defendant with destruction or attempted destruction of property by means of explosive in violation of section 844(i) of Title 18 of the United States Code. The satisfy this burden with respect to the crime charged in Count Four, the government must establish:

First, that the defendant used an explosive to damage or destroy or an attempt to damage or destroy property;

Second, that the property was used in or affecting interstate or foreign commerce; and

Third, that the defendant acted maliciously.

Let me explain these in a little more detail.

The first element that the government must prove beyond a reasonable doubt for Count Four is that the defendant used an explosive to damage or destroy or in an attempt to damage or destroy property. For this element you must find that the government has proven beyond a reasonable doubt either that the defendant damaged or destroyed property or that he attempted to damage or destroy property.

I've already defined the concept of attempt in my prior instructions. Again, the government doesn't need to prove both, it need only prove one or the other. So damaged or destroyed property or attempted to damage or destroy property. You must be unanimous as to which, if either, you choose.

I have already defined "explosive" to you in my instructions on Count Three, so I won't repeat it here. The

**A001086**

same definition applies.

The second element that the government must prove beyond a reasonable doubt for Count Four is that the property that the defendant destroyed or attempted to destroy was used in or affecting interstate commerce. I have already defined "interstate commerce" for you in connection with my instructions on Count Two. I won't repeat it. The same definition applies here.

For purposes of Count Four, the government does not have to prove that the explosive was used in or affecting interstate commerce but only that the property that was damaged or destroyed or that the defendant attempted to damage or destroy was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. The government does not need to prove that the defendant knew that the property that the defendant destroyed or was attempting to destroy was actively used in some commercial purpose.

The third element that the government must prove beyond a reasonable doubt for Count Four is that the defendant acted with malicious intent. To act with malicious intent means to act either intentionally or with willful disregard for the likelihood that damage will result and not mistakenly or carelessly.

Thus, in order to find that the defendant acted maliciously, you must find that the defendant used the

**A001087**

explosive with the intent to cause damage or harm or that he did so recklessly without regard for the likelihood that such damage or harm would result.  That's Count Four.

Count Five.  Count Five of the indictment charges the defendant with committing a terrorist attack against a mass transportation system in violation of section 1992 of Title 18 of the United States Code.  The indictment charges the defendant with violating the statute in two different ways.  I will describe these to you shortly.

You may not find the defendant guilty on Count Five unless you conclude that the government has proven beyond a reasonable doubt all the elements of at least one of these two ways of committing this offense.  If you find that the government has proven beyond a reasonable doubt the defendant's guilt on Count Five, I am also going to ask you to identify in the verdict form which theory or theories you found the government has proven beyond a reasonable doubt.  It will be clear from the verdict form what I'm asking you to do.

I am now going to instruct you on these two theories.

The first theory is this one.  The indictment first alleges that the defendant violated section 1992 of Title 18 of the United States Code by placing or attempting to place a destructive substance, I guess it's really destructive device, destructive device in, upon, or near a mass transportation vehicle with the intent to endanger the safety of any person or

**A001088**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page82 of 288

with reckless disregard of the safety of human life.  Under this theory the government contends that the defendant violated the statute when he boarded and rode the subway with a destructive device.  The defendant argues that the government has failed to prove this theory beyond a reasonable doubt.

To satisfy its burden of proof with respect to this theory, the government must establish:

First, that the defendant placed or attempted to place a destructive substance -- we are not going to "substance," right, counsel?

MS. CROWLEY:  That's correct, you know.

THE COURT:  I think I struck that.  Let me make that clear.  Let me start over.

To satisfy its burden of proof with respect to this theory, the government must establish:

First, that the defendant placed or attempted to place a destructive device in, upon, or near a mass transportation vehicle;

Second, that the defendant acted knowingly and without lawful authority or permission;

Third, that the defendant acted with the intent to endanger the safety of any person or with a reckless disregard for the safety of human life; and

Fourth, that the defendant engaged or attempted to engage in that conduct in, on, against, or affecting a mass

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001089**

transportation provider.

Let me go through these elements for the first theory. The first element that the government must prove beyond a reasonable doubt as to that theory on Count Five is that the defendant placed or attempted to place a destructive device in, upon, or near a mass transportation vehicle.

The term "destructive device" means an explosive substance, flammable material, or matter of a combustible contaminative, corrosive, or explosive nature. As I previously defined for you in Count Two, the term "destructive device" is defined by the statute to include, among other things, an explosive bomb. It is also defined to include any combination of parts either designed or intended for use in converting any device into a destructive device and from which a destructive device may be readily assembled.

A device is considered a destructive device so long as it is capable of exploding even if the device did not explode in the way its maker intended because, for example, it lacked some component. A device which is not designed for use as a weapon does not constitute a destructive device.

The term "mass transportation" means transportation by a conveyance that provides regular and continuing general or special transportation to the public.

The term "vehicle" for purposes of this count means any carriage or other contrivance used or capable of being used

**A001090**

as a means of transportation on land, on water, or through the air.

That's the first element of the first theory of Count Five.

The second element that the government must prove beyond a reasonable doubt with respect to the first theory on Count Five is that the defendant acted knowingly and without lawful authority or permission.

As I have previously instructed you, "knowingly" in this context, as in others, means that the act was done voluntarily and not because of a mistake or an accident. As I have also previous instructed you, lawful authority in this context would require that a person be expressly permitted and authorized by law to possess and use or attempt to use a destructive device.

The third element that the government must prove beyond a reasonable doubt with respect to this first theory on Count Five is that the defendant acted with intent to endanger the safety of any person or with reckless regard for the safety of human life.

"Reckless disregard" in this context means that the defendant must have been aware of a substantial and unjustifiable risk of harm to the safety of human life and deliberately disregarded it.

The fourth element that the government must prove

A001091

beyond a reasonable doubt with respect to this first theory on Count Five is that the defendant engaged in a relevant conduct, that is, placing a destructive device, in, on, against, or affecting a mass transportation provider. I instruct you that the MTA and the Port Authority Bus Terminal are mass transportation providers within the meaning of the relevant statute.

That's the first theory under Count Five.

The second theory or the second way in which the indictment alleges that the defendant violated the statute at issue in Count Five is by committing an act with the intent to cause death or serious bodily injury to any person who was on or in a terminal, structure, track, tunnel, station, or facility used in the operation of or in support of the operation of a mass transportation vehicle.

For this theory the government contends that the defendant violated the statute when he set off a destructive device at Port Authority. The defendant argues that the government has failed to prove this theory beyond a reasonable doubt. To satisfy its burden of proof, the government must prove each of the following four elements beyond a reasonable doubt:

First, that the defendant committed an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person;

A001092

Second, that the defendant acted knowingly and without lawful authority;

Third, that at the time the defendant committed the act, the person or persons to whom the defendant intended to cause death or serious bodily injury was or were in a terminal, structure, track, tunnel, station, or facility used in the operation of or in support of the operation of a mass transportation vehicle; and

Fourth, that the defendant engaged in that conduct in, on, against, or affecting a mass transportation provider.

Let me go through these. The first element that the government must prove beyond a reasonable doubt with respect to the second theory on Count Five is that the defendant committed an act with the intent to cause death or serious bodily injury to some person.

The term "act" includes the use of a dangerous weapon.

The term "dangerous weapon" means a weapon, device, instrument, material or substance, animate or inanimate, that is used for or is readily capable of causing death or serious bodily injury.

As I explained to you in connection with Count Three, the term "serious bodily injury" means bodily injury which involves any one of the following: a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily

**A001093**

member or mental faculty.

The second element that the government must prove beyond a reasonable doubt with respect to the second theory of Count Five is that the defendant acted knowingly and without lawful authority or permission. I previously defined the terms "knowingly" and "lawful authority" to you. You should apply the same definitions here.

The third element that the government must prove beyond a reasonable doubt is that at the time the defendant committed the act, the person or persons to whom the defendant intended to cause death or serious bodily injury was or were in a terminal, structure, track, tunnel, station, or facility used in the operation of or in support of the operation of a mass transportation vehicle.

Again, I have defined "mass transportation" and I have defined "vehicle" for you. You should apply those same definitions here.

The fourth element that the government must prove beyond a reasonable doubt as to this second theory on Count Five is that the defendant engaged in the relevant conduct, that is, the act with the intent to cause death or serious bodily injury, in, on, against, or affecting a mass transportation provider. I have already defined that term above, and you should use the same definition here.

So there are the two theories on Count Five.

If and only if you find that the government has proven beyond a reasonable doubt either of those two theories set out above, then you must find the defendant guilty on Count Five. However, because you must be unanimous as to which of those two theories, if any, has been proven beyond a reasonable doubt, you must indicate as such as your verdict form. There will be a special question or special interrogatory I'm going to ask you to answer in that count.

So, if you find that the defendant is guilty of Count Five, you must also answer an additional question concerning whether the government has proven beyond a reasonable doubt the mass transportation vehicle in question -- I'm sorry. There are two possible interrogatories here. There is one about which of the theories you found beyond a reasonable doubt, one or the other or both. It's got to be at least one, and you must be unanimous.

In addition, I'm going to ask you to find another. If you find the defendant guilty on Count Five, I'm going to ask you to answer another special interrogatory. That is concerning whether the government has proven beyond a reasonable doubt that the mass transportation vehicle in question was carrying at least one passenger at the time of the offense.

So, with respect to the first theory, that the defendant placed a destructive device in, upon, or near a mass

**A001095**

transportation vehicle when he boarded and rode subway with a destructive device, you must determine whether the subway was carrying at least one passenger or one employee at the time.

With respect to the second theory, that the defendant set off a destructive device with intent to cause death or serious bodily injury, you must determine whether the mass transportation vehicle or vehicles supported by the terminal structure, track, tunnel, station, or facility where the destructive device was set off was or were carrying at least one passenger or employee at the time of the offense.

That sounds a little tricky. You will have the instructions if you need to go through them again. There are two separate interrogatories if and only if you find the defendant guilty on Count Five.

Now Count Six. Count Six of the indictment charges the defendant with using and carrying a destructive device during and in relation to a crime of violence or possessing a destructive device in furtherance of a crime of violence in violation of section 924(c) of Title 18 of the United States Code. To satisfy its burden of proof with respect to the crime charged in Count Six, the government must establish each of the following two elements beyond a reasonable doubt:

First, that the defendant committed a crime of violence for which he might be prosecuted in a court of the United States; and

**A001096**

Second, that the defendant knowingly used or carried a destructive device during and in relation to the commission of or knowingly possessed a destructive device in furtherance of that crime of violence.

Let me go through these in more detail.  The first element that the government must prove beyond a reasonable doubt as to Count Six is that the defendant committed a crime of violence for which he might be prosecuted in a court in the United States.  I instruct you that Counts Three and five qualify as crimes of violence within the meaning of this count. So, if you find the defendant was guilty beyond a reasonable doubt of either or both of Counts Three and Five, then the government has met, or satisfied, the first element of this sixth count of the indictment.

Additionally, an offense qualifies as a crime of violence prosecutable in a court of United States if the offense by its nature involved a substantial risk that physical force might be used against the person or property of another. Physical force means force capable of causing physical pain or injury to a person or injury to property.

If you have found the defendant guilty of any of Counts One through Five, you must next determine whether that offense or offenses involved a substantial risk that physical force might be used against the person or property of another. You must consider each count separately.  So only for those

A001097

Case 21-1058, Document 43, 10/04/2021, 3186342, Page91 of 288

counts where you found the defendant guilty beyond a reasonable doubt are you going to do this.

If you previously found that the government proved beyond a reasonable doubt that the defendant is guilty of any of Counts One through Five, and then you find that any of those counts for which you found him guilty qualifies as a crime of violence, then the government has satisfied this first element of Count Six. But you must be unanimous as to which count or counts, if any, involved a substantial risk that physical force might be used against the person or property of another.

To ensure you are unanimous as to which count or counts, if any, involved a substantial risk that physical force might be used against the person or property of another, I am going to ask you to indicate on the verdict form which count or counts you concluded involved a substantial risk that physical force might be used against the person or property of another. That's the first element of Count Six.

The second element that the government must prove beyond a reasonable doubt for Count Six is that the defendant knowingly used or carried a destructive device during and in relation to one of the specified crimes of violence or that the defendant knowingly possessed a destructive device in furtherance of the commission of one of the specified crimes of violence.

If you recall, the specified crimes of violence

A001098

include Counts Three and Five and any other counts that you find involved a substantial risk that physical force might be used against a person or property of another, provided that you have determined that the government proved that count or counts beyond a reasonable doubt.

If you acquit on Counts One through Five, then you don't engage in this analysis for Count Six. It's only for the counts where you returned a verdict of guilty beyond a reasonable doubt on Counts One through Five that you will engage in that analysis for the first element.

I have already defined the term "destructive device" in my earlier instructions. The same definition applies here.

In order to prove that the defendant used the destructive device, the government must prove beyond a reasonable doubt an active employment of the destructive device by the defendant during and in relation to the commission of at least one of the specified crimes of violence. This does not mean that the defendant must have actually detonated or deflagrated the destructive device, although that would obviously constitute use of the device.

In order to prove that the defendant carried the destructive device, the government must prove beyond a reasonable doubt that the defendant had the device within his control in such a way that it furthered at least one of the specified crimes of violence or that the destructive device was

**A001099**

an integral part of the commission of at least one of the specified crimes of violence.

To prove that the defendant possessed the destructive device in furtherance of a crime of voyages, the government must prove that the defendant had possession of the device and that such possession was in furtherance of at least one of the specified crimes of violence. Possession means that the defendant either had physical possession of the device on his person or that he had dominion and control over the place where the device was located and had the power and intention to exercise control over the device.

To possess a destructive device in furtherance of the crime means that the device helped forward, advance, or promote the commission of the crime. The mere possession of the destructive device at the scene of the crime is not sufficient under this definition. The device must have played some part in furthering the crime in order to for this element to be satisfied.

To satisfy this element, you must find that the defendant carried or used the destructive device knowingly. This means that he carried the device purposely and voluntarily and not by accident or mistake. It also means he knew that the weapon was a destructive device. However, the government is not required to prove that the defendant knew that he was breaking the law or a specific provision of law.

**A001100**

In addition to all of the elements that I have just described with respect to each count charged in the indictment, you must consider the issue of venue. Venue means simply whether any act in furtherance of the unlawful activity occurred within the Southern District of New York.

I instruct you that the Southern District of New York includes all of Manhattan, the Bronx, Westchester, Sullivan, Orange, Rockland, Putnam, and Dutchess counties; all of the waters that surround Manhattan, Brooklyn, Staten Island and Long Island, the air above these waters, the bridges over those waters, and the tunnels under those waters.

In this regard the government need not prove that any crime was committed in this district or that the defendant was present here. It is sufficient to satisfy this element if any act in furtherance of the crime that you are considering occurred within this district. If you find that the government has failed to prove that any act in furtherance of the crime occurred within this district, then you must acquit the defendant on that count.

The government need not prove venue beyond a reasonable doubt. Let me be clear about that. The venue provision is that some part of the crime or some act in furtherance of the crime took place in this district. That doesn't have to be proven beyond a reasonable doubt. It only has to be proven by a preponderance of the evidence.

**A001101**

A preponderance of the evidence is satisfied if you conclude for each count that it is more likely than not that some act took place in this district. That is preponderance of the evidence.

I remind you that the government must prove all the other elements that I have described for you in all the other charges in the indictment beyond a reasonable doubt. Venue is the only thing that has this lower standard, preponderance of the evidence. All the elements that I have described for you, proof beyond a reasonable doubt.

Further, if you find that the crime charged was committed in more than one district, venue is proper in any district in which the crime was begun, continued, or completed. Thus, venue will lie in this district, the Southern of New York, if you find that any part of the crime took place here.

Those are my substantive instructions. Again, you will have a copy you can review.

I am now going to give you some general instructions. You will note that the indictment alleges that certain acts occurred on or about December 11, 2017. It does not matter if the evidence you heard at trial indicates that a particular act occurred on a particular date so long as the charged crime took place sometime substantially similar to the time frame alleged in the indictment. The law requires only a substantial similarity between the dates alleged in the indictment and the

**A001102**

dates established by the evidence.

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the government's burden to prove the defendant's guilt beyond a reasonable doubt. That burden remains with the government throughout this entire trial and it never shifts to the defendant.

Because of the presumption of innocence, a defendant is never required to prove that he is not guilty. Accordingly, you may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against the defendant in any way during your deliberations

There are several persons whose names you have heard during the course of this trial but who did not appear to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses. Therefore, you must not draw any inferences or reach any conclusions as to what those witnesses would have testified to had they been called. Their absence shouldn't affect your judgment in any way. You should, however, remember my instruction that the law does not impose upon a defendant in a criminal case the burden of calling any witness or producing any evidence.

**A001103**

There has been evidence in this case that the defendant made statements to government and law enforcement authorities.  Evidence of these statements is properly admitted in this case and may properly be considered by you.  You are to give those statements such weight as you feel they deserve in light of all the circumstances.  Whether you approve or disapprove of the use of these statements may not enter into your deliberations.  I instruct you that no one's rights were violated and that the government's use of this evidence is entirely lawful.

You have heard testimony from four expert witnesses: Aaron Zelin, Derrick McClarin, Robert Gillette, and Christopher Rigopoulos.  An expert is a witness who by education or experience has acquired learning or experience in a specialized area of knowledge beyond the knowledge of the average juror.  Such witnesses are permitted to give their opinions as to relevant matters in which they prove to be an expert and to give their reasons for their views.

Your role in judging credibility applies to experts as it does to any other witness.  You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve.

You have heard the testimony of law enforcement witnesses.  The fact that a witness may be or has been employed as a law enforcement officer does not mean that his or her

A001104

testimony is necessarily deserving of more or less consideration, greater or lesser weight than any other witness.

In this context counsel may challenge the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case. It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witnesses and to give that testimony whatever weight, if any, you find it deserves.

We have among the exhibits received in evidence some documents that have been redacted, a couple of things taken out. Redacted simply means that part of the document was taken out. You are to concern yourself only with the part of the item that was admitted in evidence. Don't consider or speculate as to what other parts have been deleted or redacted. That is not your concern.

In this case you have heard evidence in the form of some stipulations of fact. A stipulation of fact, I'll just remind you, is an agreement between the parties that a certain fact is true. You must regard such agreed-upon facts as true, but it is for you to determine what weight, if any, to give to those facts.

You have heard reference in the arguments of defense counsel in this case to the fact that certain investigative techniques were or were not used by law enforcement

**A001105**

authorities.  There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the government prove its case through any particular means.

While you are to carefully consider the evidence presented, you should not speculate as to why law enforcement used the techniques they did or why they did not use other techniques.  The government is not on trial and law enforcement techniques are not your concern.  Your sole concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

For testimony during the trial, the witnesses have discussed the facts of the case and their testimony with the lawyers before the witness appeared in court.  Although you may consider that fact when you are evaluating a witness's credibility, I should tell you there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he will be questioned about, focus on those subjects, and have the opportunity to review relevant documents and exhibits before being questioned about them.

Such consultation helps conserve your time and the Court's time.  It would be unusual or surprising for a lawyer to call a witness without such consultation.  Again, the weight

**A001106**

you give to the fact or the nature of the witness's preparation or his or her testimony, what inferences you draw from such preparation are matters completely within your discretion.

The government has presented exhibits in the form of charts, tables, summaries. Those exhibits purport to summarize the underlying evidence that was used to prepare them and were shown to you to make the other evidence more meaningful and to aid you in considering the evidence. Those charts and tables are not direct, independent evidence. Such charts are only as good as the evidence on which they are based.

Therefore, you are to give no greater weight to the charts and summaries that you would give to the evidence on which they are based. It is for you to decide whether the charts and summaries correctly present the information contained in the testimony and in the exhibits on which they were based. You are entitled to consider the charts and summaries if you find that they are assistance to you in understanding and analyzing the evidence. If not, you don't have to give them any weight.

You have heard testimony about evidence seized in connection with searches that were conducted by law enforcement officers. Evidence obtained from these searches were properly admitted in this case and may properly be considered by you. Indeed, such searches are entirely appropriate law enforcement actions.

A001107

Whether you approve or disapprove of how the evidence was obtained therefore should not enter into your deliberations because I instruct you that the government's use of the evidence is lawful. You must therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven the defendant's guilt beyond a reasonable doubt. Once again, however, it is for you to decide the weight, if any, to give to this evidence or any evidence.

We are getting to the home stretch here.

Your verdict must be unanimous with respect to each count charged. Each juror is entitled to his or her opinion, but you are required to exchange your views with your fellow jurors. That is the essence of jury deliberation. I have been telling you for days don't talk to each other, don't even speak at the breaks. Now you get to talk to each other.

It is your duty to discuss the evidence with each other. If you have a point of view and if after reasoning with other jurors it appears that your own judgment is open to question, then of course you shouldn't hesitate in yielding your original point of view if you are convinced that the opposite point of view is really one that satisfies your judgment and your conscience.

However, you are not to give up a point of view that you can essentially believe in simply because you are

A001108

outnumbered or outweighed or outvoted.  You should vote with the others only if you are convinced on the evidence, the facts, and the law that it is the correct way to decide the case.

You are not to discuss this case unless all jurors are present.  9, 10, or 11 jurors together, that is just a group of individuals.  All 12 of you have to be present to deliberate.  It's only when all 12 of you are there that you constitute a jury, and only then do you deliberate.

When you get back to the jury room, you are going to be there for the rest of the day.  You can't just sort of go off if you need to let off steam or take a smoke or anything like that.  You have to stay in the jury room.  I will explain more about that.  Just keep that in mind.

You should by your own vote select one of your own members to sit as the foreperson.  The foreperson will send out any notes to me.  When the jury has reached a verdict, the foreperson will notify the court security officer.  Stand up. That's the court security officer.  It will be either him or someone dressed like him.  The court security officer will be outside your door to make sure that nobody interferes with your deliberations.  We have a court security officer in case, criminal and civil, while the jury is deliberating.  That will be the case here.

Any notes that you have should be handed to the court

**A001109**

security officer. When you come into the courtroom, the foreperson will then be asked to state out loud what the verdict is. Any notes from the jury should be signed by the foreperson. They should include the date and the time that they were sent. They should also be as clear and precise as possible. If you want some exhibits, if you want testimony, be as specific as you can.

Bear in mind that any notes from the jury to me, those will become court exhibits. They will be official exhibits in this proceeding. So there should be a certain formality. Just keep that in mind. They will be part of the record. You have to be as clear and specific as you can be in any notes that you send.

I am going to provide you with a list of witnesses who testified at trial. I will also provide you with a list of the exhibits that were received in evidence during the course of the trial. I am also going to give you a copy of my instructions on the law as well as a copy of the verdict form. So I'm going to send 12 binders that have tabs for each of those documents. Each juror will get a binder.

If you want to see any exhibit. If you want to hear or read any of the testimony during your deliberations, that can be arranged. You will just need to tell us what you want, be as specific as you can be. I recognize sometimes it takes a little time for us to pull it all together. We won't be

kicking our heels up, but sometimes it takes a little time. The more specific you are, sometimes the easier it is to get what you are asking for.

Any communication with the Court should be made in writing signed by the foreperson with the date and time indicated, given to the court security officer. I will also then respond to you in writing by a note which will also be a court exhibit or I'll bring you back here into the courtroom and speak to you on the record as I am now. Those are the only ways that you will communicate during your deliberations.

In any event, whenever you send a note, don't tell me how you stand on any particular count. Don't say we are deadlocked or we split 8 to 4, nothing like that. Don't tell me how you are doing. Don't give me a breakdown or anything until after the verdict is in. When you have reached a verdict, you will tell me we have reached a verdict, but don't tell me anything more than that.

Some of you have been taking notes throughout the trial in your notepads. That's fine. I again want to emphasize, however, that as you go into your deliberations, your notes are simply an aid to your memory. Notes that you may have taken should not be given any greater weight or influence than some other juror's memory with or without notes. The fact that one juror has it written down on a notepad doesn't mean it is entitle to extra weight.

**A001111**

If there really is a dispute as to what the testimony was or what the exhibits were, the way to resolve that is to have the testimony read back or provided to you or to get copies of the exhibits because that will enable you to take a look at it again. That's fine. But remember the fact that one juror has notes doesn't mean that they win the ties.

I'll tell you again your verdict must be based solely upon the evidence developed at this trial or the lack of evidence. In reaching your decision as to whether the government has sustained its burden of proof, it would be improper for you to give any personal feelings, positive or negative, that you may have about the defendant's race, religion, national origin, sex, or age. The defendant and the government are entitled to a trial free from prejudice, and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

As I said, we have prepared a verdict form for you to use in recording your decisions. Once you have reached your verdict, the foreperson should fill out the verdict form and then sign it, then give a note to the court security officer. Don't give the verdict form, just a note saying "we have reached a verdict." Don't say what the verdict is, just "we have reached a verdict."

I will then bring you in. At that point the foreperson will hand up the verdict form. I'll take a look,

**A001112**

Ib5... Case 21-1058, Document 43, 10/04/2021, 3186342, Page106 of 288

make sure it is properly filled out, signed, and dated. I will then hand it back to the foreperson, and then I will ask the foreperson to announce the verdict in court. Mr. Brody will ask the questions for each count and the foreperson will give the verdict on each count.

I want to stress again that each of you must be in agreement with the verdict that is rendered here in court. Once the verdict is announced by your foreperson in open court and once it is officially recorded, then it ordinarily can't be revoked. I will probably poll the jury to make sure that is each of your verdict.

You are reminded that you took an oath to render judgment fairly, impartially, without prejudice or sympathy, solely upon the evidence in this case and the applicable law. I know that you will do in reaching a fair and just verdict.

I am going to confer with the lawyers to make sure I didn't misread or confused something. Give us a minute. In just a short while we'll wrap this up.

(At the sidebar)

THE COURT: Does anybody have any omissions or errors or corrections?

MR. TURNER: Just one item, your Honor.

THE COURT: What page?

MR. TURNER: 27-28. You made this very clear orally, but a handful of references to "destructive substance."

**A001113**

964

THE COURT:  Should be out, right?

MR. TURNER:  Should be out.  We would propose deleting them.

THE COURT:  I'm going to correct that, take out "destructive substance."

MS. GATTO:  On that point there is included a definition of "destruct substance."

THE COURT:  Which I didn't read.

MS. GATTO:  You did.

THE COURT:  I did?

MS. GATTO:  Yes.

THE COURT:  What page is that?

MS. GATTO:  It's on 28.

THE COURT:  I'm going to take that out, take the other references to "destructive substance" out, and provide the jury with a clean version.  Sorry about that.

Anything else?

MS. GATTO:  Yes.  On page 20, the last sentence, I think that should read, "I have already defined the term 'intentionally' for you."

MS. CROWLEY:  Yes.

MS. GATTO:  The sentence before said "intended."

THE COURT:  The sentence before?

MS. GATTO:  Yes.  When you are describing the second element, your first sentence under the header.

**A001114**

THE COURT: "Intended."

MS. GATTO: Yes.

THE COURT: Okay.

MS. GATTO: Then just a typo on page 31.

THE COURT: What paragraph?

MS. GATTO: It's the last paragraph. It's the third sentence, a little more than halfway in. It says "in a in a," twice.

THE COURT: I noticed that, yes. I didn't read it, but I caught it. We'll make that correction too.

MS. GATTO: Then, your Honor, on page 43, this was off script, but when you were talking about the notes and you were making the point that they shouldn't send a note telling the count, I might have misheard but I thought you said you shouldn't send me a note saying you are deadlocked. You meant to say, I assume --

THE COURT: I'm going to leave what I have here.

MS. GATTO: That's fine. I'm just making a record of it.

THE COURT: We will send this back in and they will have it. Yes, I guess they will have to tell us that.

Let's chat briefly about what I am going to do with the alternates. I'm going to tell the alternates to get their stuff now, come back out. When the other 12 jurors go in, I will keep the alternates here, tell them to stay on ice for a

**A001115**

couple of days, don't discuss the case, don't do any research, don't do all the things I told them not to do before.

If we need them by some chance, I'll let them know. If we have reached a verdict and we don't need them, then I'll tell them we are going to call them and let them know that too. But for now they are still on call.

Anything else we should chat about?

MS. GATTO:  No.

MR. TURNER:  No, Judge.

(In open court)

THE COURT:  At this point we are going to swear the court security officer.

(Court security officer sworn)

THE COURT:  What we are going to do now is ask our two alternates to go to the jury room and get your stuff, if you have your stuff in there.  I am going to have some additional instructions for you in a minute.  For now, get everything out of there that's yours and then come right back.

(Pause)

Thank you.  We have a couple of extra instructions for you.  I'm going to finish on with our 12 jurors right now.

Ladies and gentlemen of the jury, that concludes my instructions to you.  I am going to now ask you to go back to the jury room with the court security officer.  Your function now is to weigh the evidence in this case and determine the

**A001116**

guilt or nonguilt of the defendant with respect to the charges in the indictment. You must base your verdict solely on the evidence, on these instructions as to the law. Again, you are oblige to follow my instructions on the law as I have given it to you, not based on any other views of the law that you think you might prefer or that you think the law is.

Your verdict must represent a considered judgment of each juror. In order to return a verdict, it is necessary that each juror agrees to it, so your verdict must be unanimous. In conclusion, I'm sure if you listen to the views of your fellow jurors, apply your own common sense, you will reach a fair and just verdict.

I am going to send back shortly a binder for each of you. Plus, I'm going to send you some paper and some envelopes. Once you have picked a foreperson, send a note saying the foreperson is, tell me the name. The foreperson should sign every note. The foreperson should put the date and the time on every note. You don't have to lick the envelopes. We will use the envelopes again and again. You will give them to the court security officer, he will bring them to me, and we will try to recycle some envelopes. I will give you a stack of paper and some envelopes. Then if you need anything, let us know. The first thing you should do is pick a foreperson.

Good luck. Thank you. All rise for the jury.

(3:23, jury deliberations commenced)

A001117

(Jury not present)

THE COURT: Ms. Johnson and Ms. Coaxum, you are not off the hook yet. There is a chance we could still need you. Sometimes it happens if a juror got sick in the middle of deliberations, then we might ask an alternate to come back, and you would resume or actually restart the jury deliberations with the alternate. That could happen. It doesn't happen often but it does sometimes happen.

What I am going to ask you to do for the time being is continued to be on call. You don't have to come back here, but don't do any research, don't do any investigations, don't talk about the case, keep an open mind. All of the things I have been asking you to do for the last week, continue doing them.

If it turns out, we need you, we will call you. If it turns out there is a verdict and we are not going to need you, we'll let you know, and at that point you can talk and write a book if you would like. For now, keep it just the way you have before. But since there is a good chance I won't see you again, I want to on behalf of all the parties and the employers thank you for your service.

It really is service what you did. You spent a week making this the most important thing that you were doing. That's really the strength of our system. It absolutely depend on people like you. So we are really grateful to you for it. We are not sure we are done with it, but if we don't see you

A001118

again, we are going to you our thanks. We will collect you are notebooks, not read them but safeguard them. We will be in touch one way or another, either because there is a verdict or because we need you.

For one last time, we will all stand for you. All rise for the jurors.

(Alternate jurors not present)

THE COURT: I think we should stick around in case we get a flurry of notes. They often come early. I have a violation of supervised release at 3:30 in my courtroom. I will slip away with the court reporter. I'll keep my law clerk here. If we get a note, if it is something innocuous, you can start collecting stuff.

I assume the first note is saying the foreperson. You may think about having the exhibits so they are ready to go. I am not going to send them back in unless they ask. If they do ask, you will have to do it on quick notice and not have them wait.

Let me commend the attorneys. I knew this going in. Really terrific lawyers who know what they are doing, are serious about what they are doing, always respectful, always prepared. It is a pleasure to preside over a trial with such excellent lawyers. Waiting is the hard part, Mr. Ullah, I'm mindful of that too, but thank you for being respectful throughout this trial as well.

**A001119**

970

THE DEFENDANT: Thank you.

THE COURT: If you need to use the restroom or something, you can. Just stay close.

(Recess)

(3:55 p.m., jury not present)

THE COURT: We have three notes. The first note which came in at 3:27, marked as Court Exhibit 1, simply says "Foreperson Elizabeth Frias." That's the first one.

The second one, which came in at 3:47, that I have marked as Court Exhibit 2, dated and signed by the foreperson, says, "We would like to see:

"- Two hospital videos with transcript

"- Detective Byrne handwritten notes and 302

"- List of videos found on laptop." That has sort of a squiggly line.

Then it says, "If we are not unanimous on all charges, what do we do?" Then it says, "We need regular sugar for our coffee." We'll get them the sugar.

Let's talk first about the exhibits, the two hospital videos with transcripts. Are there transcripts?

MS. GALLICCHIO: There were sort of transcripts shared amongst us.

THE COURT: But nothing in evidence?

MS. GALLICCHIO: No.

THE COURT: The videos in are in evidence. They can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001120**

have them.  I can send those in with a note that says there are no transcripts, here are the videos.

Detective Byrne's 302.  He was crossed on it, but they are not in evidence.

MR. TURNER:  Not in evidence.

THE COURT:  Then list of videos found on a laptop. That is not a separate piece of evidence I don't think.  Is it in the exhibit list that has a list of the videos?

MR. TURNER:  The exhibit list simply lists them as video 1, video 2, video 3.

MS. GALLICCHIO:  There is the laptop report that I referenced, but that doesn't have the names of the videos.

THE COURT:  But the videos themselves are in evidence?

MR. TURNER:  Yes.

MS. GALLICCHIO:  Yes.

THE COURT:  But there is no list of videos in evidence, right?  There was some testimony perhaps about the videos.

MS. GALLICCHIO:  Right, there is no list of videos in evidence.  It's on the exhibit sheet, I believe but just as counsel said, it just says video 1.

THE COURT:  I would be inclined to say videos have been received in evidence and are listed as X through Z, whatever, there is no list of videos in evidence.  However, was there testimony about it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001121**

MS. GALLICCHIO:  The videos?

THE COURT:  Was there a witness who said what the videos on the computer were?

MS. GALLICCHIO:  No.  There was Dr. Zelin who testified.  I don't think he named them.  I think one of them he maybe named.

MR. TURNER:  Dr. Zelin testified in substance about what the videos showed but not about a particular list.  Your Honor, it's Exhibits 702 through 710B.  Those videos, the jury does have access to the videos if they want to watch videos.

THE COURT:  They don't have access at this point.

MR. TURNER:  No, but they could.

MS. GALLICCHIO:  I don't think we should offer them. If they want to see them, they should ask to see them.

THE COURT:  I will say there is no list of the videos in evidence.  The videos themselves are in evidence as Government Exhibit 702 to Government Exhibit 710B, and if they want to see them, they'll let us know.

The last exhibit is Court Exhibit 3, 3:54 p.m., and it says, "We need dry erase markers and binders."  The binder are on their way.  We put dry erase markers in there.  Maybe they just can't find them.

MS. GALLICCHIO:  Judge, what about the question what do we do if we're deadlocked?

THE COURT:  It's a little premature to be answering.

**A001122**

I'm inclined to not do much of that until the end of the day. If they are no place, I'll say great, come back tomorrow. And I'll make a reference to it then unless you think I need to respond to it now.

MS. GALLICCHIO: If you would, send a note telling them that. I think there might have been some confusion. I think just simply saying if you are deadlocked, send us a note and tell us that.

MR. TURNER: Judge, we agree with your Honor's proposal though in the sense that we are just minutes into deliberations. Waiting also makes sense to the end of the day to see where we are at that point.

MS. GALLICCHIO: But you have to answer the question.

THE COURT: I will answer the question. It's just do I do it now or do I do it at 5:30, which is 90 minutes. I want to get them the other stuff fast. The binders are on their way, so they will have those. I'll send those right in. But I want to respond to the hospital videos with transcript notes, handwritten notes of the 302, and list of videos because that is requiring an explanation. I am going to compose something. I'll read it to you before I send it in.

MS. GALLICCHIO: One other option is with respect to the request for Detective Byrne's notes and 302, it was testimony that was elicited under cross-examination.

THE COURT: There was testimony.

**A001123**

MS. GALLICCHIO: Right. One answer would be is that we could give them the cross-examination questions on his 302s and his notes.

THE COURT: I'd be inclined both for the videos and for the Byrne testimony to let them ask. I'll just tell them that those are not in evidence right now. The notes and 302 are not in evidence, there is no list of videos, and there is no transcript. We are attaching you hospital videos which are going to be exhibits. What are they?

MR. TURNER: 802 and 803.

THE COURT: If you would like to see the other videos or review testimony, just let us know.

MR. TURNER: We agree with that, your Honor.

THE COURT: Let me compose, and then you will have a chance to read it.

The binders are in. We are just working on the sugar.

We have another note. "One jury binder is incomplete." This is Exhibit 4.

I have read the other three. What I would propose to send is a note that says the following.

"Thanks for your notes. You have now received copies of binders, copies of the witness list, the exhibit list, instructions on the law, and the verdict form. Real sugar is on its way, and you should have a brand new set of dry erase markers in the jury room but we can provide another set if

**A001124**

necessary.

"As for your request for 'two hospital videos with transcript,' the videos are Government Exhibits 802 and 083 and are attached. However, there are no transcripts of those videos in evidence, nor are Detective Byrne's handwritten notes or 302 in evidence.

"Finally, there is no list of videos on the laptop in evidence. Also, the videos themselves are in evidence at Government Exhibits 702 to 710B. If you would like to review any of those exhibits or any testimony relating to the subjects raised in your letter, just let us know.

"Finally, you inquired about what to do 'if we are not unanimous on all charges.' If, after a reasonable period of time you are unable to reach a unanimous verdict on all counts, you may indicate as much in a letter to the Court. At that point I will give you further instructions. However, since you have just begin your jury deliberations, it is premature to elaborate at this time."

Thoughts?

MS. GALLICCHIO: That's fine. I think you said "a letter to the Court." Perhaps just note.

THE COURT: Did I say "letter"? "Note," yes.

MS. GALLICCHIO: That's fine.

MR. TURNER: The government has no objection, your Honor.

**A001125**

THE COURT:  The sugar is in.

I have to explain what we are doing with the laptop too, right?

MR. TURNER:  Your Honor, in order for them to do the videos, yes, they would need to watch them on the laptop.

THE COURT:  I think I need to explain that to them, because I haven't yet.  "You may view them on the attached laptop."  Do I need to elaborate on that?

MS. CROWLEY:  Your Honor, just that there is a password on the two discs for the laptop, which is on a sticky note on the keyboard of the laptop.

THE COURT:  The password, is that what it is called?

MS. CROWLEY:  Yes, the password to get into the laptop.

THE COURT:  What is the password?

MS. CROWLEY:  Your Honor, it's on a sticky note.  I think it is "1 password exclamation point."

THE COURT:  I'm just going to say, "Password access to the laptop is on the laptop itself."  I'll read this again.

"Thank you for your note.  You have now received the binders, which include copies of the witness list, exhibit list, instructions on the law, and the verdict form.  Real sugar is on its way."  It's already in.  "And you should have a brand new set of Dry Erase markers in the jury room, but we could provide another set as necessary.

A001126

"As to your request of the two hospital videos with transcript, the videos of Government Exhibits 802 and 803 are attached.  You may view them on the attached laptop.  The password to access the laptop is on the laptop itself.

"However, there are no transcripts of those videos in evidence, nor are Detective Byrne's handwritten notes or 302 in evidence.  Finally, there is no list of videos found on the laptop in evidence, although the videos themselves are in evidence at Government Exhibits 702 to 710B.  If you would like to review any of those exhibits or any testimony relating to the subjects raised in your letter, just let us know.

"Finally, you inquired about what to do if we are not unanimous on all charges.  If after a reasonable period of time you are unable to reach a unanimous verdict on all counts, you may indicate as much in a note to the Court.  At that point I will give you further instructions.  However, since you have just begin your jury deliberations, it is premature to elaborate at this time."

MS. GALLICCHIO:  That's fine.

THE COURT:  This will be Court Exhibit 5.

My hunch is they may want to pretty quickly get a copy of that Byrne testimony, so it might be worth starting to look for that.

(Pause)

THE COURT:  The members of the press have indicated

**A001127**

that they would like to see the notes.  I'm just checking with the lawyers to make sure they have no objection, but I assume there is nothing objectionable about that.

MS. GALLICCHIO:  No objection.

MS. CROWLEY:  No objection.

THE COURT:  We'll docket them later.

(Pause)

(4:55 p.m.)

THE COURT:  We have a note that is dated today's date, the time 4:41 p.m., signed by the foreperson.  I'll mark it as Court Exhibit 6.  It says, "We would like to see Government Exhibits 700 and 701, 2010-1 through 2010-28, 2005 laptop stipulation, 2006 ISIS stipulation, transcript of Detective Byrne's testimony."

I could give it to you to take a look.  That's what they are asking for.  Some of it might be easy, some of it might take a little time, particularly the transcript.

(Pause)

THE COURT:  This is Court Exhibit 7 dated today's date, with the time 4:50.  It says, "We need a speaker for the computer.  Volume on computer not good."  I don't know whether the volume on the computer is good or not.  Do we have a speaker?

MS. CROWLEY:  We can get a speaker, Judge.

THE COURT:  It can be hooked up and I can give them

**A001128**

instructions on how to do it you think?

MS. CROWLEY:  I think so.

THE COURT:  All right.  Let's try that.

(Pause)

THE COURT:  Counsel I am going to send in all the stuff they asked for in the last ones except for Detective Byrne's testimony.  Let's get them what we can quickly.  I'll hand it to them, then they will get the transcript and the speaker as soon as we can.

(Pause)

MS. DONALESKI:  Your Honor, we have one point of disagreement between the parties on the testimony.  It's on page 248 of the transcript.

THE COURT:  You are referring to the testimony of Detective Byrne?

MS. DONALESKI:  That's correct, your Honor.

THE COURT:  What page?

MS. DONALESKI:  The bottom of page 247 for context, and then the point of disagreement is 248 lines 2 through 8.

Our position, your Honor, is that it is essentially a sustained objection.  Your Honor had previously sustained Ms. Gallicchio's question as to whether Detective Byrne searched the Facebook.  She asked it a different way on page 248.  The government objected.

The Court essentially confirmed with the witness that

**A001129**

this was not the appropriate witness through whom to ask these questions and directed the defense to move on.  Our position would be that although the Court didn't technically say the word "sustained," it is in essence a sustained objection and should be redacted.

MS. GALLICCHIO:  Judge, I see it differently.  There isn't a ruling on this objection.  The Court just followed up on my question and the witness answered.

THE COURT:  I think that you were asking him a question about the search his Facebook revealed that he didn't have communication with anyone at ISIS.  I don't think this witness did that search.

MS. GALLICCHIO:  You did sustain an objection for that question.  The ruling is on the top of 248.  But there was no ruling on the next question.  Your Honor just asked a follow-up question and then said go ahead.  The witness answered, and then your Honor said go ahead.

MS. DONALESKI:  The go-ahead was to Ms. Gallicchio to continue her questioning because it was in essence a sustained objection, that this was not the proper witness through whom she could ask those questions.

THE COURT:  I think that is clearly what's going on here.  I would redact that, 247 line 21 through 248 line 8.

MS. DONALESKI:  Thank you, your Honor.  We will prepare that right now.

A001130

THE COURT:  Anything else?

MS. GALLICCHIO:  There are other areas.  We agree on the others.

THE COURT:  No other disputes?

MS. GALLICCHIO:  No.

THE COURT:  You can do those redactions, print them out back at your office.

MS. DONALESKI:  That's correct, your Honor.

THE COURT:  That may take a little time.  In the meantime, this is the speaker.

MS. CROWLEY:  Yes.  You just plug in the two plugs, USB and the auxiliary.

THE COURT:  Simple enough that I don't need to explain it, if we just send it back they'll figure it out?

MS. CROWLEY:  I think they will figure it out.

THE COURT:  Do you guys think I need to explain it?

MS. GATTO:  No.

THE COURT:  I'm not sure I would have to.  Maybe a quick note that says here are the speakers requested and we are preparing the testimony that you requested from Detective Byrne.  I'm going to send a note Court Exhibit 8, 5:02, "Here are the speakers you requested.  We are in the process of collecting the testimony of Detective Byrne as requested and we will send it in shortly."

(Pause)

**A001131**

(5:20 p.m.)

THE COURT: This is the testimony, right?

MS. GALLICCHIO: Correct.

THE COURT: I think I'll send a note saying we have provided three copies of the testimony of Detective Byrne. It is now 5:25. Let us know if you would like to deliberate past 5:30 and see what they say.

MS. GALLICCHIO: Judge, do you want to address anything about tomorrow, Election Day, whether we want to start a little bit later?

THE COURT: I hadn't thought about it. I live close. Will you folks be affected?

MS. GALLICCHIO: Yes. I vote in the morning. No, I can vote after work.

THE COURT: They open at 7:00 or 6:00. The polls open very early and close pretty late. No juror has said anything about that I don't think. Let me get this note back. If they say they want to go past 5:30, that's an indication that they don't want to come back tomorrow at all. Are you available to stay a little later tonight? I generally let the jury decide if they want to.

MS. GALLICCHIO: Yes.

MR. TURNER: Yes, Judge.

THE COURT: Court Exhibit 9 will just say, "Attached are three copies of Detective Byrne's testimony. The time is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001132**

now 5:25 p.m.  Let us know if you would like to deliberate past 5:30 tonight."  Once we hear from them, we'll figure out what to do next.

(5:40 p.m.)

THE COURT:  I have received a note.  It's dated today's date signed by the foreperson, time 5:38.  It says, "We have all agreed to wrap up for tonight.  We will need all materials we asked for to be made available for tomorrow."

I don't think there is anything outstanding at this point.  Maybe it is just a concern that we will take everything back that we have already submitted.  I have marked this as Court Exhibit 10.  What I propose to do is bring the jury in, tell them, okay, go home for tonight, don't discuss the case, we'll pick up tomorrow at 9:30.

I'll ask them to send me a note when they are all here, not to begin deliberating until after they have sent me a note saying that and I send one back in saying resume your deliberations.  I will ask them if they think they have a problem with Election Day, let me know.  Nobody has said anything so far.

Let's ask the court security officer to bring them in.

(Jury present)

THE COURT:  I got your note.  That's fine.  We are going to break for today.  Tomorrow we will pick up again at 9:30 I think is the plan.  Tomorrow is Election Day.  The polls

**A001133**

open early and close late so I don't think that should be a problem. If you want to start a little later because of Election Day, let me know that. Otherwise, I presume we start at 9:30 as usual.

On the assumption that we will start at 9:30, come here, straight to the jury room. Everything in there will stay in there. The cleaning crew may come in and take out the garbage. But the exhibits, everything that is in there, will remain there. No one else is going in. So you don't have to worry about it. Any items that you already asked for will remain in the jury room. If you want other things, let us know. But I don't think we owe you anything at this point.

Don't discuss the case tonight. Continue to keep an open mind. Don't begin deliberating tomorrow until everybody is here, you send me a note to say we are all here, and you get a note from me saying you may resume your deliberations. Let's keep it formal like that. That way there is no temptation to start deliberating before everybody is there. No deliberations until you get a note from me saying you may resume, and I'll be waiting for you to send me a note saying we are all here.

I think that does it. If you want to huddle up back there and say Election Day, we need to change the plans, you can do that quickly and send me a note. Otherwise, we'll sit tight here and if we don't hear from you in five minutes, we will know that 9:30 tomorrow.

**A001134**

Thank you very much.  All rise for the jury.

(Jury not present)

THE COURT:  Let's give them a couple of minutes.  My sense from the body language was nobody wanted to start later, so 9:30 should be fine.  If you guys get here a few minutes before so we are ready to go with the exhibits and everything.  We are not going to talk about anything until the jury starts sending in more notes.

Anything else we should chat about tonight?

MS. GALLICCHIO:  No, your Honor.

MR. TURNER:  No, Judge.

THE COURT:  Thanks.  Have a good night.

(Adjourned to 9:30 a.m., October 6, 2018)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

            v.                   18 CR 16 (RJS)

AKAYED ULLAH,
                           Trial

          Defendant.

------------------------------x
                         New York, N.Y.
                         November 6, 2018
                         9:30 a.m.

Before:

       HON. RICHARD J. SULLIVAN

                        District Judge,
                          and a Jury

       APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
    Southern District of New York
SHAWN G. CROWLEY
REBEKAH A. DONALESKI
GEORGE D. TURNER
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK, INC.
    Attorneys for Defendant
BY:  AMY GALLICCHIO
     JULIA GATTO
     COLLEEN P. CASSIDY

Also Present:

    JOHN MAURER – Special Agent, FBI
    MICHAEL DELUCA – Paralegal, U.S. Attorney
    JASON T. FISCHER – Paralegal, Federal Defenders
    CHIRAAYHU GOSRANI – Paralegal, Federal Defenders

A001136

(Trial resumed; jury not present)

THE COURT: We are waiting on a juror or two. They are a minute late. Let's give them a couple of minutes. Anything else to chat about?

MS. GALLICCHIO: No, your Honor.

THE COURT: As soon as I get a letter from them saying they are all here, I am going to send this note that says good morning, you can resume your deliberations. That will be it. Do you want Mr. Ullah here for this?

MS. GALLICCHIO: No, your Honor, that's not necessary.

THE COURT: That's what I thought.

(9:45 a.m.)

THE COURT: I have a note from the jury which I will mark as Court Exhibit 11 dated, signed by the person, 9:41.

"Good morning, Judge Sullivan, counsel. All 12 jurors are present and we are ready to proceed."

I will send them a note which I will mark as Court Exhibit 12 and mark the time as 9:43. It says, "Good morning. You may resume your deliberations."

Let's stick around for a few minutes in case we get a flurry of notes about additional testimony or exhibits that they may want.

(10:45 a.m.)

THE COURT: I received a note from the jury. It's dated and timed 10:35, signed by the foreperson. I've marked

it as Court Exhibit 13. It simply says, "May we please have the testimony of Dr. Zelin." I shared that with the parties, and they are in the process of collecting that testimony. Are there any disputes about that?

MS. CROWLEY: We are going through it right now, your Honor.

THE COURT: I'll sit here. When we are at a point of either getting ready to send it in or, if there is a dispute, you will let me know. Thanks.

(10:55 p.m.)

THE COURT: We have another note. This one I'll mark as Court Exhibit 14. It's dated, doesn't have a time. The time is now 10:55, as I just got it this second from the court security officer. It says, "We need dry erase markers. The pack provided to us on day one has gone missing. Thank you."

We'll work on that, you work on the testimony, and we'll send it back along with lunch menus. I generally send those back between 11:00 and 11:30.

MR. TURNER: We're getting there.

(Pause)

THE COURT: I am going to send back what I marked as Court Exhibit 15, today's date time 11:08. It says, "Here are the try erase markers you requested. We are collecting the transcript of Dr. Zelin's testimony and will send copies to you shortly. I am including menus for your lunch. Once you have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001138**

finished out filling out the menu forms, give them to the court

security officer.  Lunch should arrive between 12:30 and 1:00."

(11:30 a.m.)

THE COURT:  In terms of the transcript, there is no disagreement about what's going back?

MS. GATTO:  No.

MS. CROWLEY:  That's right.  It looks like it's here.

THE COURT:  That's a couple of copies, right?  I'll take a quick look.  Assuming there are no problems, we'll send it back.  Has anything been redacted?

MS. CROWLEY:  There are a couple of redactions.

THE COURT:  What page?

MS. CROWLEY:  In the cross.  I believe they started in the cross.

THE COURT:  Just objections and things?

MS. CROWLEY:  Yes.  Starting at page 382.

MS. GATTO:  There is some discussion about my children's Halloween costumes.

MS. CROWLEY:  That is agreed to.

THE COURT:  This looks fine.  We'll send in three copies.

(12:23 p.m.)

THE COURT:  I have received a note which I have marked as Court Exhibit 16.  It's dated, signed by the foreperson. The time is 12:20.  It says, "Judge, may we please take a

**A001139**

Ib6Case 21-1058, Document 43, 10/04/2021, 3186342, Page133 of 288

15-minute break. We need brain space, a cigarette, and fresh air. Please," two exclamation points.

I'm inclined to bring them out and say I guess you can do that but you're going to be accompanied by a marshal, a CSO, and it's raining out. My hunch is this is really just for the cigarette smoker. It happens. I don't think they realize that this is not we are going to go for a walk and take a stroll. I would be inclined to bring them out and tell them. It is easier to do that in person than crafting a letter, faster. Then they can let us know what they want to do.

A CSO can take anybody who wants out, take them probably to the eighth floor. Right near the cafeteria there is an open space. Oh, that's the other building. I don't know where they would go here.

MS. GATTO: They can probably go to the front, near the steps.

THE COURT: I don't know if they have a place where they take them. I'll ask the CSO. Maybe they will say they don't want to do it, but my hunch is the smoker is going to want to do it. Any other thoughts?

MS. GATTO: That's fine.

MS. CROWLEY: No, that's fine, your Honor.

(Jury present)

THE COURT: Good to see you. Haven't seen you guys in a while. I received a note asking if you could take a

**A001140**

15-minute break. The short answer is sort of, but you can't just go for a stroll. The court security officer can take you down. It's raining, so I don't know how much fresh air, wet fresh air.

If anybody wants a smoke or wanted to get some fresh air, then the court security officer can escort you for a brief period of time and then you bring back up. It's a little more restrictive than what you have had in mind. I thought I'd bring you out and let you know that.

Lunch is probably going to get here soon. That may factor into your calculations. If one or some of you wish to have a break of a sort, send me a note indicating how many. Don't tell me who necessarily, but how many. Then we will make arrangements for one of the court security officers to take you downstairs.

Where would they go?

THE OFFICER: The mezzanine out front where there is cover. That's about it.

THE COURT: If some were outside getting this fresh air or cigarette break, the others, of course, would not deliberate. Only when all 12 of you are together are you able to deliberate. Keep that in mind too.

Let me know how you would like to proceed: if you want to take that break, how many and when. If you want to wait until after lunch, that's fine too. I'll wait to hear from

**A001141**

you.  Thank you.

(Jury not present)

THE COURT:  I'm sometimes tempted to ask, when I ask questions of jurors, does anybody smoke.  Most people don't, it seems, these days.  But it does have an impact on jury deliberations.

(Pause)

THE COURT:  I have a note that says 12:30, signed and dated by the foreperson.  "Three people would like to step out."

I could have the court security officer who is otherwise stationed outside of the jury room take the three down to the mezzanine level.  That would leave the other nine in the jury room.  They are not deliberating.  Or I could get another court security officer to come up so there is one at the door and one with the three who are going out.  Preference?

MS. GATTO:  There is no preference.  We are perfectly comfortable with the 9 staying behind without a court officer.

MS. CROWLEY:  So are we.

THE COURT:  Whatever works.  I'll defer to the court officer.  Thank you.

(Luncheon recess)

**A001142**

AFTERNOON SESSION

2:05 p.m.

(Jury not present)

THE COURT:  We received a note which I have marked as Court Exhibit 18, dated and signed by the jury.  The time is 1:22.  It says, "Judge Sullivan, we have reached a verdict."

We will bring the jury out.  At that point I'll hand the foreperson hand the verdict form to Mr. Brody, he'll give to it me, I'll take a look to make sure it's in order, I'll hand it back.  Mr. Brody will then go through each count or each question on the verdict sheet and have the foreperson respond.  Once I've done that, I will have the jury polled.

After that, I'll thank the jury, excuse the jury.  I'll ask them to go back to the jury room so I can thank them personally.  At that point I typically ask them if they are willing to stick around, and if the lawyers wish to speak to them, I'll give them that opportunity.  Sometimes it depends on what the verdict is before people know whether they want to speak to the jury, so I'll check with you on that.

Anything else we should chat about before I bring in the jury?

MS. CROWLEY:  No, your Honor.

MS. GALLICCHIO:  No, your Honor.

THE COURT:  Let's bring in the jury.

(Jury present)

A001143

THE COURT:  Have a seat.  Thank you.

Ms. Frias, I understand that the jury has reached a verdict.  Is that correct?

THE FOREPERSON:  Yes.

THE COURT:  Could you hand the verdict form to Mr. Brody, and then he'll give it to me.  I'll take a quick look before I hand it back to you.

I'll hand this back to Ms. Frias.

Ms. Frias, if you could remain standing.  Mr. Brody will ask you each question on the verdict form and you should give the response.  Thank you.

THE CLERK:  As to Count One, which charges the defendant with provision of material support and resources to a designated foreign terrorist organization, how do you find the defendant, Akayed Ullah?

THE FOREPERSON:  Guilty.

THE CLERK:  As to Count two, which charges the defendant with use of a weapon of mass destruction, how do you find the defendant, Akayed Ullah?

THE FOREPERSON:  Guilty.

THE CLERK:  As to Count Three, which charges the defendant with bombing places of public use and a public transportation system, how do you find the defendant, Akayed Ullah?

THE FOREPERSON:  Guilty.

**A001144**

THE CLERK:  As to Count Four, which charges the defendant with destruction of property by means of explosive, how do you find the defendant, Akayed Ullah?

THE FOREPERSON:  Guilty.

THE CLERK:  As to Count Five, which charges the defendant with a terrorist attack against a mass transportation system, how do you find the defendant, Akayed Ullah?

THE FOREPERSON:  Guilty.

THE CLERK:  If you answered guilty to question 5, did you unanimously agree that the government proved beyond a reasonable doubt that the defendant placed the destructive device in, upon, or near a mass transportation vehicle with the intent to endanger the safety of any person or with a reckless disregard for the safety of human life?

THE FOREPERSON:  Yes.

THE CLERK:  Did you indicate whether the government proved beyond a reasonable doubt that the defendant knowingly placed the device in, upon, or near a mass transportation vehicle which was carrying a passenger or employee at the time of the events?

THE FOREPERSON:  Yes.

THE COURT:  To be clear, you did and the answer is yes?

THE FOREPERSON:  Yes.

THE CLERK:  If you answered guilty to question 5, did

**A001145**

you indicate whether you unanimously agreed that the government proved beyond a reasonable doubt that the defendant committed an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person who was in the terminal, structure, track, tunnel, station, or facility used in the operation of or in support of the operation of a mass transportation vehicle?

THE FOREPERSON:  Yes.

THE COURT:  To be fair, I think you said did you indicate.  That would be you indicated yes or no.  Did you find, did you unanimously agree that the government proved beyond a reasonable doubt the things in question 8?

THE FOREPERSON:  Yes.

THE CLERK:  Do you unanimously agree that the government prove beyond a reasonable doubt that the mass transportation vehicle or vehicles supported by the terminal, structure, track, tunnel, station or facility where the device was set off was or were carrying at least one passenger or employee at the time of the offense?

THE FOREPERSON:  Yes.

THE CLERK:  As to Count Six, which charges the defendant with the use of the a destructive device during and in furtherance of a crime of violence, how do you find the defendant Akayed Ullah?

THE FOREPERSON:  Guilty.

A001146

THE CLERK:  Which of the offenses charged in Counts One through Five of which you have found the defendant guilty did you find involved, as committed, a substantial risk of physical force might be used against the person or property of another?

THE FOREPERSON:  Counts Two through Five.

THE COURT:  Thank you, Ms. Frias.  Let me take that back from you.  That will be Court Exhibit 19.

What we are going to do now is poll the jury.  That simply means I'm going to ask each juror to indicate whether this in fact is your verdict.  Mr. Brody will go through each juror by number starting with Juror No. 1.

THE CLERK:  Juror No. 1, is that your verdict?

JUROR NO. 1:  Yes.

THE CLERK:  Juror No. 2, is that your verdict?

JUROR NO. 2:  Yes.

THE CLERK:  Juror No. 3, is that your verdict?

JUROR NO. 3:  Yes.

THE CLERK:  Juror No. 4, is that your verdict?

JUROR NO. 4:  Yes.

THE CLERK:  Juror No. 5, is that your verdict?

JUROR NO. 5:  Yes.

THE CLERK:  Juror No. 6, is that your verdict?

JUROR NO. 6:  Yes.

THE CLERK:  Juror No. 7, is that your verdict?

**A001147**

JUROR NO. 7: Yes.

THE CLERK: Juror No. 8, is that your verdict?

JUROR NO. 8: Yes.

THE CLERK: Juror No. 9, is that your verdict?

JUROR NO. 9: Yes.

THE COURT: Juror No. 10, is that your verdict?

JUROR NO. 10: Yes.

THE CLERK: Juror No. 11, is that your verdict?

JUROR NO. 11: Yes.

THE CLERK: And Juror No. 12, is that your verdict?

JUROR NO. 12: Yes.

THE COURT: Ladies and gentlemen, thank you. That concludes your service. On behalf of all the parties, I want to thank you for your service. You have been at this a little over a week. That was your full-time job for a little over a week to be a juror in this case. I know you took it very, very seriously. I'm grateful to you, as I know the parties are for your commitment to our system of justice. It only works because of citizen jurors like yourselves. Thanks very much.

What I would ask you to do now is go back to the jury room and I'll come back there in a few minutes to give you my thanks personally. But for one last time we will all rise as you leave as the judges of the facts.

(Jury discharged)

THE COURT: The jury has returned its verdict. A

**A001148**

couple of things we should do now is either set a schedule for post-trial briefing or motions.  Are there going to be any?

THE DEFENDANT:  I have something to say.

MS. GALLICCHIO:  May we have a moment?

THE COURT:  Sure.

THE DEFENDANT:  Your Honor --

THE COURT:  You should talk to your lawyers about whether it is advisable to speak.  Ultimately, if you have something to say, I would like you to say it.

THE DEFENDANT:  I didn't do it for ISIS group, your Honor.  With respect, I didn't do for ISIS group.

THE COURT:  Mr. Ullah, we have had the trial, the jury has returned its verdict.  What will happen now, there will be an opportunity for post-trial motions and then ultimately there will be sentencing that I will schedule as well.

THE DEFENDANT:  Your Honor, you heard what the government is trying to do.  They are trying to put me in the group, which I don't support, your Honor.

THE COURT:  Mr. Ullah, now is not the time for this.

THE DEFENDANT:  They didn't prove me one sentence, that I have one message.  I was angry with Donald Trump because he says he will bomb the Middle East and then he will protect his nation.  So I said Donald Trump, you cannot do like this.  Nobody likes bombing, your Honor.

THE COURT:  Mr. Ullah there will be an opportunity to

**A001149**

make these statements.  There will be an opportunity perhaps to make some motions.  I think it makes sense for you to do those other things first rather than make statements now because they compromise your ability to make certain motions and it could compromise your ability to appeal certain issues.

It would probably be advisable for you to confer with your attorneys before speaking here in court.  Also, I want to schedule what is next here.  I also want to excuse the jury, which I have waiting in the jury room.

THE DEFENDANT:  Another thing, your Honor.  I just wanted to make my statement.  I discussed with my lawyer that I want to make a statement.

THE COURT:  I don't think right now is the time for a statement.  There will be a time for a statement before sentencing.  You have a right to make a statement then.  But right now is not the time for a statement.  Please respect that, Mr. Ullah, because we have things to do still.

The first thing I want to set is a schedule for post-trial motions if there are any contemplated.  Ms. Gallicchio, are you contemplating motions?

MS. GALLICCHIO:  Yes, your Honor.

THE COURT:  The statute's rules of criminal procedure set dates by which to make those.  I guess we can extend those as necessary.  Do you have a schedule in mind?

MS. GALLICCHIO:  Let me consult, your Honor.

1001

THE DEFENDANT: Your Honor, I didn't do for ISIS group.

THE COURT: There will be an opportunity to speak later. Now is not the time. Okay?

THE DEFENDANT: Yes.

THE COURT: Thank you.

MS. GALLICCHIO: Your Honor, can we have 30 days?

THE COURT: Any objection to that from the government?

MS. CROWLEY: No, your Honor.

THE COURT: 30 days for post-trial motions by the defendant. And the government response?

MS. CROWLEY: Two weeks, your Honor?

THE COURT: Two weeks is fine. 30 days from today puts us at December 6th. The government should make its submission by December 20th. Then a reply, if any, I'll give you until after the holidays. Is January 4th all right?

MS. CASSIDY: Your Honor, I'm going to be away for that whole Christmas break.

THE COURT: January 11th, is that all right?

MS. CASSIDY: Yes.

MS. GALLICCHIO: Yes.

THE COURT: Let me set the date for sentencing now. If we have to change it in light of motions, we can, but I think it is best to schedule something now.

MS. GALLICCHIO: Your Honor, we would be looking for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A001151**

the longest date that your Honor would be willing to give us at this point.

THE COURT: March or April?

MS. GALLICCHIO: An April date is good.

THE COURT: Let's say Friday, April 5th.

MS. GALLICCHIO: Sure.

THE COURT: At 10:00 a.m.

MS. GALLICCHIO: Yes.

THE COURT: I'll set a schedule for sentencing submissions. Usually two weeks before for the defendants and one week before for the defendant.

MS. GALLICCHIO: Yes.

THE COURT: We can do that schedule. So that's that schedule.

Do any lawyers wish to speak to the jurors if they are willing to sit around and talk?

MS. GALLICCHIO: If they would like to speak with us?

THE COURT: I'll ask. I don't encourage or discourage, but I do ask if they want to stick around or want to talk to you. The government I think has a policy not to do that, right?

MS. CROWLEY: Yes, your Honor.

THE COURT: I'll ask them if they are willing to do that. I'll come back and let you know.

MS. GALLICCHIO: I'm not requesting, but if they would

A001152

like to speak to us, your Honor.

THE COURT: I don't usually put it that way. If you are not inclined to speak to them, then I probably won't ask them.

MS. GALLICCHIO: Fine.

THE COURT: With that, I'm going to speak very briefly to the jury. I don't talk to them about deliberations at all. I just thank them for their service and ask them if there was anything we could do to make it a better experience, usually having something to do with phones, lines, and food.

Let me commend the lawyers again for a fine job. It was really well tried all around. It is a privilege to have such good lawyers to preside over a trial with such capable lawyers. Let me thank the marshals and the court reporter. Have a nice day.

(Trial concluded)

**A001153**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,          :    **NOTICE OF MOTION**

                Appellee,   :    No. 18 Cr. 16 (RJS)

        -v.-               :

**AKAYED ULLAH,**            :

          Defendant-Appellant. :
------------------------------------X

    **PLEASE TAKE NOTICE** that defendant **AKAYED ULLAH,** by and through his counsel, will move this Court, before the Honorable Richard J. Sullivan, United States District Judge for the Southern District of New York, at the United States Courthouse, One Foley Square, New York, New York, for **(1)** the entry of a judgment of acquittal on the indictment for insufficient evidence pursuant to Rule 29 of the Federal Rules of Criminal Procedure; and **(2)** such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
       December 6, 2018

                   Respectfully submitted,

                   FEDERAL DEFENDERS OF NEW YORK, INC.
                    APPEALS BUREAU

        By:     /s/
                   **COLLEEN P. CASSIDY**
                   **AMY GALLICCHIO**
                   **JULIA L. GATTO**
                   Counsel for Defendant
                    **AKAYED ULLAH**
                   52 Duane Street, 10th Floor
                   New York, New York 10007
                   Tel. No.:  (212) 417-8742

**A001154**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA    :    18 Cr. 0016 (RJS)

     - v -        :

AKAYED ULLAH,         :

       Defendant.    :

------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF AKAYED ULLAH'S
## POST-TRIAL MOTIONS FOR ACQUITTAL AND A NEW TRIAL

FEDERAL DEFENDERS OF NEW YORK, INC.
52 Duane Street – 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Attorney for Defendant*
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
    Of Counsel

TO:  **GEOFFREY BERMAN, ESQ.**
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007

     Attn:  **GEORGE TURNER, ESQ.,**
          **REBEKAH DONALESKI, ESQ.**
          Assistant United States Attorneys
          Southern District of New York

**A001155**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

I. The Evidence Was Insufficient As A Matter of Law to Prove that Mr. Ullah Provided Material Support and Resources As Charged in Count One. . . . . . . . . . . 1

    A. The government's "personnel" theory of conviction was contrary to law because it was precluded by the statutory language. . . . . 5

    B. The "services" theory, as charged to the jury, likewise was based on an incorrect interpretation of the statute. . . . . . . . . . . . . . . . 9

II. The Evidence Was Legally Insufficient to Prove That Defendant Violated 18 U.S.C. §1992(a)(2) As Charged in Count Five. . . . . . . . . . . . . . . . . . . 11

    A. The evidence was legally insufficient to establish that the defendant "placed" a destructive device in a mass transportation vehicle. . . . . . . . . . . . . . . . . . . . 12

    B. The government's new theory for Mr. Ullah's violation of § 1992(a)(2) should not have been submitted to the jury because it was not charged in the indictment and was a constructive amendment. . . . . . . . . . . . . . . . . . 15

III. The Aggravating Element of 18 U.S.C. § 1992(b) Raising the Maximum Sentence From 20 Years to Life in Prison for an Attack on a Mass Transportation Vehicle that Contains a Passenger, Does Not Apply to subsection (a)(7), which Prohibits Any Assault in a Terminal or Station, and That Portion of the Verdict Should Be Vacated. . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 27

i

**A001156**

# TABLE OF AUTHORITIES

Page

**CASES**

Griffin v. United States, 502 U.S. 46 (1991) . . . . . 8, 9, 11

Holder v. Humanitarian Law Project, 561 U.S. 1
   (2010) . . . . . . . . . . . . . . . 2, 4, 5, 9, 11

Musacchio v. United States, 136 S.Ct. 709 (2016) . . . . . . . 3

Muscarello  v. United States, 524 U.S. 125 (1998) . . . . . . 12

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) . . . . . . . 13

Stirone v. United States, 361 U.S. 212 (1960) . . . . . . 17, 18

United States v. Bastian, 770 F.3d 212 (2d Cir. 2014) . . 19, 20

United States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012) . . . 20

United States v. Desnoyers, 637 F.3d 105 (2d Cir. 2011) . . . . 8

United States v. Frank, 156 F.3d 332 (2d Cir. 1998) . . . . . 18

United States v. Garcia, 992 F. 2d (2d Cir. 1993) . . . . . 8, 9

United States v. Miller, 471 U.S. 130 (1985) . . . . . . . 18

United States v. Milstein, 401 F.3d 53
   (2d Cir. 2005) . . . . . . . . . . . . . 17, 19, 21, 23

United States v. Rigas, 490 F.3d 208 (2d Cir. 2007) . . . . . 18

United States v. Santos, 553 U.S. 503 (2008) . . . . . . . 26

United States v. Zingaro, 858 F.2d 94 (2d Cir. 1988) . . 19, 20

Yates v. United States, 354 U.S. 298 (1957) . . . . . . . 8, 9

**STATUTES AND OTHER AUTHORITIES**

18 U.S.C. § 924(c)(1) . . . . . . . . . . . . . . . 13, 14

18 U.S.C. § 926A . . . . . . . . . . . . . . . . . 13

ii

**A001157**

18 U.S.C. § 1992(a)(2) . . . . . . . . . . . . . . . . . . . . .  *passim*

18 U.S.C. § 1992(a)(4) . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 1992(a)(4)(B) . . . . . . . . . . . . . . . . . . 15, 23, 24

18 U.S.C. § 1992(4)(B) . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 1992(a)(7) . . . . . . . . . . . . . . . . . . .  *passim*

18 U.S.C. § 1992(b) . . . . . . . . . . . . . . . . . . . 23, 26

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . 1, 4, 7, 9

18 U.S.C. § 2339B(h) . . . . . . . . . . . . . . . . . . . 2, 5, 6

A001158

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA    :    18 Cr. 0016

    - v -    :

AKAYED ULLAH,    :

    Defendant.    :

------------------------------x

## PRELIMINARY STATEMENT

This memorandum of law is submitted to provide legal authorities in support of Mr. Ullah's Rule 29(c) motion with respect to Counts One and Five. These Counts are based on statutes that are complex and/or raise novel issues of interpretation in this case. With respect to the remaining counts, Mr. Ullah renews his Rule 29 motion and relies on the motion made on the record at the end of the government's case. 772.[1]

**I.    The Evidence Was Insufficient As A Matter of Law to Prove that Mr. Ullah Provided Material Support and Resources As Charged in Count One.**

Count one charged Mr. Ullah with providing or attempting to provide material support and resources to a terrorist organization, in violation of 18 U.S.C. § 2339B. The government's theory was that he provided both personnel and services to ISIS by deflagrating the bomb in the tunnel of the Port Authority

---

[1] Numerical references are to pages of the trial transcript.

1

**A001159**

station. The statute specifically provides that "[n]o person may be prosecuted under this section in connection with the term 'personnel'"

> unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control to organize, manage, supervise, or otherwise direct the operation of that organization. *Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.*

18 U.S.C. § 2339B(h) (emphasis added). Although there is no parallel provision in the statute specifically referring to the term "services," which is undefined, the Supreme Court has held that the same limitation applies to services. Holder v. Humanitarian Law Project, 561 U.S. 1, 24 (2010).

There was no evidence at trial that Mr. Ullah's act was anything other than an independent act, at the most, inspired by ISIS but not under the direction of or in coordination with ISIS. There was no evidence that Mr. Ullah was in communication with or even acquainted with a single member of ISIS. It was not the government's theory that Mr. Ullah acted under the direction and control of, or even in coordination with any ISIS member. Its "personnel" theory was that just such an independent act qualified as providing personnel or as an attempt to provide

2

**A001160**

personnel if it was committed in an effort to become accepted by the organization. ("A jury reasonably could conclude from [Dr. Zelin's] testimony that the defendant attempted to provide himself to ISIS and join the group by carrying out a suicide attack -- and that he took a substantial step towards that goal by detonating the pipe bomb -- but that he did not actually provide personnel to ISIS because he did not succeed in killing and martyring himself at its direction." (Doc. 51, Govt letter dated November 3, 2018). Its "services" theory was that the independent act qualified as providing services or attempting to do so if it was committed in an effort to help ISIS. 713-14.

The Court denied the defense Rule 29 motion on both personnel and services and submitted both theories to the jury, with instructions that it could convict Mr. Ullah under either theory. Over strenuous defense objections, the Court instructed the jury on the government's attempt theory for personnel and instructed it that services included any act that was generally invited by ISIS propaganda and was motivated at least in part by that invitation, a definition not requested by the government. 789-90. The legal sufficiency of the evidence, however, is measured against the statutory elements, and not the jury instructions. Musacchio v. United States, 136 S.Ct. 709, 715 (2016).

The evidence was insufficient to prove that Mr. Ullah

3

**A001161**

provided either "personnel" or "services," within the meaning of 18 U.S.C. § 2339B, when he deflagrated the small pipe bomb in the tunnel in the Port Authority bus terminal. Viewing the evidence in the light most favorable to the government, it established: 1) that Mr. Ullah built and deflagrated the bomb entirely on his own, without assistance from or communication with any person; 2) that he was inspired to do it by propaganda videos put out by ISIS; 3) and that he said, when questioned, that he "did it for ISIS." This is precisely the conduct which the statute excludes in subsection (h): "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." While this is explicit in the statute with respect to "personnel" only, the Supreme Court has "interpret[ed] 'service' along the same lines," to cover only an action "performed in coordination with, or at the direction of, a foreign terrorist organization." Holder, 561 U.S. at 24.

Therefore, the evidence produced at trial was insufficient as a matter of law to prove Count I because it failed to establish the elements of providing personnel or services, each of which requires the act to have been committed under the control of, in coordination with, or at the direction of the foreign terrorist organization, and neither of which may include

4

**A001162**

an entirely independent act committed to advance the goals and objectives of the organization, but without any coordination with the organization.

In addition to the evidentiary insufficiency to establish the statutory elements, the theories submitted to the jury for both "personnel" and "services" were contrary to law, and provided the jury with incorrect legal theories on which to convict. As discussed below, because the general verdict could have been based on either "personnel" or "services," an incorrect legal theory given to the jury on either theory requires vacatur of the conviction.

A. **The government's "personnel" theory of conviction was contrary to law because it was precluded by the statutory language.**

As explained, there was no evidentiary basis for Mr. Ullah's conviction for providing material support to ISIS under the correct statutory elements. Prosecution for providing material support through either "personnel" or "services" was legally barred because Mr. Ullah's conduct, as established by the government's evidence, fell squarely within the express prohibition of 18 U.S.C. § 2339B(h). There was no evidence that he provided, attempted to provide, or conspired to provide ISIS with personnel(including himself) "to work under [the] organization's direction or control." Holder, 561 U.S. at 24. He knew not one person in the organization. This was undisputed. He

5

A001163

acted entirely alone. Viewing the evidence in the light most favorable to the government, as proving that Mr. Ullah was inspired by ISIS videos, he was exactly one of those "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives," who "*shall not* be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h).

Despite this express statutory prohibition, the Court accepted the government's argument, for purposes of submitting this count to the jury, that Mr. Ullah could still be convicted of providing personnel through an independent act on an attempt theory: that his act was an attempt to "provide himself to ISIS and join the group," by killing himself and being accepted as a martyr. 703-05, Doc. 51. This theory does not withstand logical scrutiny: one cannot attempt to work under the "direction or control" of an organization if the organization is not a participant in the transaction and does not even know the person. And if Mr. Ullah succeeded in his "attempt" to kill himself, he would be dead and not personnel to work under the direction and control of anyone. More significantly, this theory is barred by the express terms of subsection (h), prohibiting the prosecution of any person "*in connection with the term 'personnel'*" unless the personnel provided is working under the direction and control

6

**A001164**

of the organization.(Emphasis added). This statutory prohibition clearly includes an attempt charge -- it includes any charge "in connection with the term 'personnel'." To make it absolutely clear that this theory is prohibited, Congress went on to stipulate that "[individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered working under [the organization's] direction and control."

The statute could not be clearer that an entirely independent act committed "for ISIS" after watching some propaganda videos -- "to advance its goals or objectives"-- may not be prosecuted as providing or attempting to provide personnel under § 2339B. The government's attempt theory for personnel was nothing less than an end run around this express prohibition. Under the statutory terms, Mr. Ullah could not legally be convicted of providing or attempting to provide personnel and this theory of guilt should not have been submitted to the jury. However, over defense objections, the jury was instructed that he could be and it was given the "attempt" option.

The jury was instructed that it could convict Mr. Ullah under either theory -- personnel or services -- and it was not asked to specify which theory it found. Therefore, it is impossible to know the theory on which the jury based its verdict for this count. Because the "personnel" theory was "contrary to

7

**A001165**

law" -- barred by the statutory prohibition -- the possibility that the jury convicted on this theory requires vacatur of the conviction. <u>Griffin v. United States</u>, 502 U.S. 46, 59 (1991); <u>Yates v. United States</u>, 354 U.S. 298, 312 (1957); <u>United States v. Garcia</u>, 992 F. 2d 409, 416 (2d Cir. 1993). Where "disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty," if either theory is based on "legal deficiencies," the conviction cannot stand. <u>Garcia</u>, 992 F. 2d at 416. This is because

> [j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law -- whether, for example, the action in question ... fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

<u>Griffin</u>, 502 U.S. at 59. Thus, unlike a case of simple evidentiary insufficiency, "in which jurors *are* well equipped to analyze the evidence" and settle on the theory supported by the evidence, a general verdict must be vacated where the jury has been given alternative theories of guilt and one theory is based on "a mistake about the law." <u>United States v. Desnoyers</u>, 637 F.3d 105, 112 (2d Cir. 2011).

The jury was given the option of finding that Mr. Ullah attempted to provide personnel even if he acted entirely alone,

8

**A001166**

if his act could be seen as an attempt to be accepted as a martyr by ISIS. Because this theory was contrary to the express statutory language, and the jury may well have convicted Mr. Ullah of Count One on this theory, this conviction must be vacated. Griffin, 502 U.S. at 59, Yates, 354 U.S. at 312 (1957); Garcia, 992 F. 2d at 416.

B.     **The "services" theory, as charged to the jury, likewise was based on an incorrect interpretation of the statute.**

The term "services" is undefined in 18 U.S.C. § 2339B, but the Supreme Court held in Holder, 561 U.S. 24, that the same limitation applies to "services" as applies to "personnel." Referring to subsection (h)'s express limitation for personnel, and consulting the dictionary definition of service, the Supreme Court reasoned that "'service similarly refers to concerted activity," and that "Congress would not have prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'" Id. Thus, the Court concluded: "We interpret 'service' along the same lines," to cover action "performed in coordination with, or at the direction of, a foreign terrorist organization." Id. The Supreme Court's holding did not extend to independent action undertaken for the perceived benefit of an organization; this would amount to an independent act undertaken "to advance it goals or objectives," just the conduct expressly excluded in the statute.

9

**A001167**

However, this Court rejected Mr. Ullah's requested jury instructions that services likewise had to be performed in coordination with or under the direction of ISIS to constitute material support. 789-98. Instead, the charged the jury, over defense objections, that:

> A person provides or attempts to provide services as that term is defined in the statute when a person performs work commanded or paid for by another *or done for the benefit of another, here ISIS.*
>
> Only work performed in coordination with, at the direction of, or for the benefit of ISIS meets the definition of service. It's for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such as the conduct alleged here, whether the defendant carried out the conduct alleged here, and, if you find that he did, whether the defendant was motivated by such an invitation.
>
> *If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and* if you find *that the defendant engaged in conduct that was motivated in whole or in part by such an invitation,* that would be *sufficient* to meet the definition of services in the statute.

924-925 (emphasis added).

This charge instructed the jury to convict on the "services" theory if it found that ISIS "invited" its "sympathizers" to engage in conduct and that the defendant engaged in such conduct, motivated in whole or in part by such an invitation. This allowed the jury to convict on the services theory for exactly that conduct barred from prosecution as "personnel" under Subsection

10

A001168

(h): an entirely independent act undertaken "to advance the goals and objectives" of the organization. Contrary to the Supreme Court's holding in <u>Holder</u>, this instruction allowed -- indeed, directed -- the jury to convict Mr. Ullah for conduct Congress did not proscribe under this statute. <u>Holder</u>, 561 U.S. at 24 (Congress would not have prohibited under "service" what it specifically exempted from prohibition under "personnel"). The Court also accepted the government's "attempt" theory for services and instructed the jury on attempt for this as well.

Because the "services" instruction, just like the attempt to provide "personnel" theory, provided the jury with an theory of conviction that was "contrary to law"--giving it "the option of relying upon a legally inadequate theory," the jury's general verdict on Count One must be vacated on this ground also. <u>Griffin</u>, 502 U.S. at 59. An error in either theory means that the conviction on Count One fails because it could well have been based on an incorrect theory. <u>Id.</u>

## II. The Evidence Was Legally Insufficient to Prove That Defendant Violated 18 U.S.C. §1992(a)(2) As Charged in Count Five.

The jury convicted Mr. Ullah of Count Five under the theory that he knowingly placed a destructive device "in, upon, or near railroad on-track equipment or a mass transportation vehicle" with intent to endanger the safety of any person or with reckless disregard the safety of human life." § 1992(a)(2). The only

11

**A001169**

conduct charged in the indictment as committing this offense was the deflagration of the pipe bomb in the vicinity of the Port Authority bus terminal. However, faced with a directed verdict on this theory based on the evidence the bomb was deflagrated in the tunnel no where near a mass transportation vehicle, (730-32, 740-43) the government changed its theory. 733-34, 739-40, 771. It argued in summation, and the court instructed the jury, that Mr. Ullah could be convicted under subsection (a)(2) for "placing" the bomb on a subway car when he boarded the subway in Brooklyn carrying the unconnected device. 733, 736, 799. This theory of placement should not have been submitted to the jury because 1) the evidence failed to establish that Mr. Ullah "placed" the bomb within the meaning of the statute, and 2) this theory was never charged by the grand jury and constructively amended the indictment.

A.   **The evidence was legally insufficient to establish that the defendant "placed" a destructive device in a mass transportation vehicle.**

The term "places," as in "whoever...places any...destructive device," is not defined in 18 U.S.C. § 1992(a)(2). The verb "to place" is defined in the Oxford American Dictionary as "to put into a particular place or rank or position or order," in Webster's Ninth New Collegiate Dictionary as "to put in or as if in a particular place." It means something different from "to carry" or "to transport." See Muscarello v. United States, 524

12

**A001170**

U.S. 125, 128 (1998)("carries" means to convey on one's person or in a vehicle and "transport" includes carrying but is broad enough to include shipping). For example, one carries the groceries home from the store and then places them in the kitchen.

Both the terms "carry" and "transport" are used in the United States Criminal Code. See, e.g. 18 U.S.C. § 924(c)(1) (whoever uses or carries a firearm....); 18 U.S.C. § 926A (prohibits "transporting" a firearm). In fact, Mr. Ullah was charged with and convicted of carrying the destructive device under § 924(c)(1) in this very case. If Congress intended this statute to punish one who merely carried or transported, rather than placed, a destructive device on a mass transportation vehicle, it would have said so as it has elsewhere in Title 18. See Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004) ("[W]hen it is clear that Congress knew how to specify [one term] when it wanted to" but used "different language" in another part of the statute, "the court assumes different meanings were intended.").

To avoid the obvious difference in meaning between "placed" and "carried," the government theorized that Mr. Ullah was a "part of the bomb," that he was "the switch," because he had to connect the battery to a wire to deflagrate the bomb. (Doc. 53, Gov't letter dated Nov. 3, 2018). According to the government's

13

A001171

theory, he "placed" the bomb "on a mass transportation vehicle" when he "placed" himself on a subway car in Brooklyn to travel to the Port Authority. Ibid. But this theory is just a construct. In fact, Mr. Ullah was no more a "part of" the bomb than a gun carrier is a "part of" the gun because he must pull the trigger to fire.

Section 1992 statute is entitled "Terrorist attacks and other violence against railroad carriers and against mass transportation system on land, on water, or through the air" and that is what Congress intended to capture: conduct that constitutes an attack, e.g. the placement of a destructive device in, upon, or near such a vehicle. The acts prohibited in this section are affirmative acts of violence:

(1) Wrecks, derails, sets fire to, or disables…

(2) Places any biological agent or toxin, destructive substance, or destructive device on in or near…

(3) Places or releases a hazardous material or a biological agent or toxin near…

(4) Sets fire to, undermines, makes unworkable or hazardous to work on or use…

(5) Removes an appurtenance from, damages, or otherwise impairs the operation of a …signal system

(6) Disables or incapacitates a dispatcher, driver, or captain

(7) Commits an act …with intent to cause or serious bodily injury

Section 1992 does not prohibit the transporting or carrying of

14

**A001172**

such devices or substances; that is prohibited by 18 U.S.C. § 924(c)(1).

Finally, the evidence was legally insufficient to establish that when Mr. Ullah boarded the subway in Brooklyn carrying the unconnected device under his clothing, that there was in that act a substantial and unjustifiable risk of harm to human life, and that Mr. Ullah knew of that risk and deliberately disregarded it. These are all necessary, at a minimum, to prove that when Mr. Ullah boarded the subway while wearing the unconnected device, he placed the device in the subway with the intent to endanger the safety of any person or with reckless disregard for the safety of human life. § 1992(a)(2).

B. **The government's new theory for Mr. Ullah's violation of § 1992(a)(2) should not have been submitted to the jury because it was not charged in the indictment and was a constructive amendment.**

Count Five, as charged in the indictment, alleged a single act as the offense that Mr. Ullah committed, in violation of three subsections of §1992, (a)(2), (a)(4)(B), and (a)(7): the detonation and attempted detonation of an IED in the tunnel between the two subway stations. This is the theory that was presented to the Grand Jury and this is what it charged. Count Five of the indictment alleged that Mr. Ullah "(a) placed and attempted to place a destructive substance and a destructive device in, upon, and near a mass transportation vehicle... with intent to endanger the safety of any person, or with reckless

15

**A001173**

disregard ..., (b) placed and attempted to place [the device] in, upon, and near a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of... a mass transportation vehicle... with intent to ... derail, disable, or wreck a mass transportation vehicle ...,[2] and (c) committed and attempted to commit an act, including the use of a dangerous weapon, with the intent to cause death and serious bodily injury to persons who were on or in a garage, terminal, structure, track, ..., *to wit, ULLAH detonated and attempted to detonate an IEP in the vicinity of the Port Authority Bus Terminal which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense.*" (Indictment, Doc. 6)(emphasis added).

The italicized portion above is the complete and only factual description of the offense charged in Count Five. There is no mention anywhere in that count, or anywhere else in the indictment, of Mr. Ullah carrying the bomb on a subway car, or even boarding a subway car at all. The only other language in Count Five sets forth the statutory elements of 1992(a)(2), (a)(4), and (a)(7).

The government's opening likewise referred only to the detonation of the bomb as the offense. After describing the

---

[2] The government withdrew this theory at the end of its case because there was no evidence of intent to derail, disable, or wreck a vehicle.

16

A001174

explosion and the evidence that would prove the offense, the government told the jury: "Four of the charges relate to how and where the defendant committed this bombing at the Port Authority." 29. The other two charges were the material support and 924(c) charges, Counts One and Six. 29. The government's opening referred to Mr. Ullah's trip on the subway while carrying the bomb was only in the narrative leading to the bombing itself, along with him building the bomb and posting on Facebook. 26. At no point in its opening did the government allege that he "placed" the bomb on that subway car in Brooklyn or otherwise suggest that the carrying of the bomb to the Port Authority was a charged offense.

Only at the end of trial, because the evidence did not establish that the device was detonated anywhere near a mass transportation vehicle, did the government change its theory entirely to the allegation that Mr. Ullah "placed" the device when he boarded the subway in Brooklyn carrying the unconnected device under his clothing. As the defense argued below, submission of the government's new theory to the jury under Count Five was a constructive amendment of the indictment, which was unconstitutional and violated Mr. Ullah's Fifth Amendment right to be tried only for the offense charged by the Grand Jury. See Stirone v. United States, 361 U.S. 212, 215-16(1960); United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005).

17

**A001175**

"[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. at 215-16. "When the trial evidence or the jury charge has 'broaden[ed] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended," a *per se* violation of the defendant's Fifth Amendment rights. United States v. Milstein, 401 F.3d at 65, quoting United States v. Miller, 471 U.S. 130, 138 (1985). Put another way, a constructive amendment is established where "either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the jury was convicted of conduct that was the subject of the grand jury's indictment." United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998). In addition to the question whether the grand jury actually charged the same offense as that the government now presents, the indictment must have provided fair notice of the offense charged. If the indictment does not "fairly inform the defendant of the charge against which he must defend" because the government has changed its theory after the indictment was brought, it is a constructive amendment. See United States v. Rigas, 490 F.3d 208, 228 (2d Cir. 2007).

The government's new theory of placement under Count Five was a classic constructive amendment. The grand jury did not

18

**A001176**

charge this theory; it is not the crime charged the indictment. Indeed, the carrying of the bomb on the subway is nowhere mentioned in the indictment. To the contrary, the indictment charges a single act as the offense: that the defendant "detonated and attempted to detonate an IED in the vicinity of the Port Authority Bus Terminal." The government's new theory, that Mr. Ullah violated 1992(a)(2) by boarding the subway in Brooklyn while carrying the unconnected device under his clothes, impermissibly "broaden[ed] the possible bases for conviction". Milstein, 401 F.3d at 65; United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1988).

The government argued below that the indictment charged the theory that Mr. Ullah violated (a)(2) by carrying the unconnected bomb on the subway by simply quoting the statutory elements charging that he placed the device "in, upon, or near a mass transportation vehicle." (Doc. 53, Govt. Ltr to the Court dated Nov. 3, 2018). It quoted United States v. Bastian, 770 F.3d 212, 221 (2d Cir. 2014) that the Second Circuit has "never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment," and argued essentially that the conduct described in the 'to wit' clause is inconsequential. (Ibid., p. 2). This is not the law. And the government's selective quotation of Bastian was misleading.

19

**A001177**

The factual description of the crime in the indictment matters, whether or not it is in the "to wit" clause. Constructive amendment necessarily involves the factual description of the offense, not the statute-tracking language, because the statutory elements must be charged and are mandated by the statute. Constructive amendment occurs when the factual basis of conviction submitted to the jury constitutes a different act from the core criminal conduct alleged in the indictment. An indictment may simply track the statutory language or otherwise be "drawn in more general terms [to] support a conviction on alternative bases," but "where only one kind of [criminal conduct] is charged ... a conviction must rest on that charge and not another." United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1998). Bastian reaffirms this rule, distinguishing between minor factual variations in the way the crime was committed, e.g., United States v. D'Amelio, 683 F.3d 412, 417 (2d Cir. 2012)(use of the telephone rather than the internet to commit the same crime as charged), and a change that "permits conviction for a functionally different crime." 770 F.3d at 221.

Bastian itself involved review of a guilty plea where the particular firearm used in furtherance of a drug trafficking offense was different from the one charged in the indictment. The case involved waiver and invited error, and the Court of Appeals settled on plain error review. Id. at 223. The Court acknowledged

20

**A001178**

that substitution of a different firearm raised the constitutional concerns of constructive amendment, but affirmed on plain error grounds. Id.(because the law on that point was nuanced and unsettled, the Court could not "fault the district judge for failing to parse such novel distinctions" where there was no objection). In this case, the core criminal conduct submitted to the jury-- Mr. Ullah's boarding the subway in Brooklyn carrying the unconnected pipe bomb -- was an entirely different act from the single act charged by the grand jury, his detonation of the device in the vicinity of the Port Authority Terminal. The defense objected to this theory on this ground.

Finally, the specific offense alleged in the indictment, the detonation of the device in the terminal, provided no notice that the government would also try to prove that Mr. Ullah "placed" the device in a mass transportation vehicle when he boarded the subway while carrying the device much earlier. See Milstein, 401 F.3d at 61-65 (indictment allegations of misbranding pharmaceuticals did not provide notice of altered theory that the drugs were unsterile and therefore mislabeled as if they were sterile). Although the government tried to claim otherwise at the end of trial (see Doc. 53), this theory was a big surprise to everyone, this Court included. When the government sprang its second theory at the charge conference, the Court agreed with defense counsel that it did not realize this was the government's

21

**A001179**

theory, asked the government, "When did you disclose this theory? Did I miss it?" and said, "It wasn't obvious to me that that was what you were proposing as your theory for 1992(a)(2)," and "This is the first I'm hearing he did it in two ways here." 734-35, 739. The government claimed that it "talked extensively in the opening about how the defendant rode the subway with a bomb, an unstable bomb that could gone off at any time." 735. In fact, the government mentioned this fact only once, in its narrative about the events, including Mr. Ullah's building the bomb and posting on Facebook, leading up to the actual crime charged-- the detonation of the bomb in the Port Authority terminal. No one in the courtroom understood from this reference that this was an alternative theory of the crime charged in Count Five. In fact the government said the opposite when it told the jury that Counts Two through Five "relate to how and where the defendant committed this bombing at the Port Authority." 29.

Under the government's new theory, Count Five actually charged two separate offenses, not a single offense. The first offense was Mr. Ullah "placing" the device on the subway when he boarded it in Brooklyn in violation of 1992(a)(2). The second offense was the commission of the "act" of detonation in the passageway in violation of 1992(a)(7). The indictment provided no notice of this, but only charged one act of detonation, in violation of both subsections. This theory broadened the bases

22

**A001180**

for conviction and constructively amended the indictment, a *per se* Fifth Amendment violation. See <u>Milstein</u>, 401 F.3d at 65.

### III. The Aggravating Element of 18 U.S.C. § 1992(b) Raising the Maximum Sentence From 20 Years to Life in Prison for an Attack on a Mass Transportation Vehicle that Contains a Passenger, Does Not Apply to subsection (a)(7), which Prohibits Any Assault in a Terminal or Station, and That Portion of the Verdict Should Be Vacated.

Mr. Ullah was convicted of violating both 18 U.S.C. § 1992(a)(2) and (a)(7), and of the aggravated offense under subsection(b) for both theories. As the defense argued in its charge requests and Rule 29(a) motion, the aggravating element does not apply to the assault in a terminal offense prohibited under subsection (a)(7), and it should not have been submitted to the jury on this theory of guilt.

Section 1992(b) provides for an aggravated offense, increasing the maximum sentence from 20 years to life, for "anyone who commits an offense under subsection (a) in a circumstance in which *the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense" (emphasis added). This applies, by its terms, to those offenses in subsection (a) that involve an attack on a mass transportation vehicle, for example, subsection (a)(2), which prohibits "placing ... a destructive device *in, upon or near* railroad on track equipment or *a mass transportation vehicle,*" and subsection (a)(4)(B), which prohibits "placing ... a destructive device in upon or near any garage, terminal,

23

**A001181**

structure, track," etc. ... "used in the operation of, or in support of the operation of, a mass transportation vehicle," "*with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck a mass transportation vehicle.*" (emphasis added). These two statutory sections punish attacks on a mass transportation vehicle, e.g., a train or subway car, and subsection (b) punishes more severely an attack against a vehicle that contains passengers or employees.

Subsection (a)(7), however, punishes "any act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person" who is on property described in (4)(A) or (B). The property described in those sections includes, as relevant here, "a garage, terminal, structure, track, ... or facility used in the operation of, or in support of the operation of a mass transportation vehicle." This subsection thus punishes any act intended to kill or seriously injure anyone who is on the property of a subway, train or bus terminal, station, or facility. Unlike subsections (a)(2) and (a)(4)(B), it does not prohibit an attack on a vehicle or railroad on-track equipment. Because subsection (b)'s aggravator for committing the crime under circumstances in which "*the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee," does not relate to any such vehicle or equipment in subsection (a)(7), it logically does not apply to §(a)(7).

24

**A001182**

As argued at the charge conference, application of this section to subsection (a)(7) begged the question: which vehicle? The government's answer to this was: any subway car passing through the Port Authority/Times Square terminal complex. 747-48, 752-53. This is contrary to the statutory language. Subsection (b) does not refer to *any* vehicle in the terminal, but a specific vehicle, because it does not say "any" but specifies "*the* []  vehicle." It refers to "the" vehicle involved in an offense under those subsections of (a) that prohibit an attack on a vehicle, either by placing a device "in, upon, or near" the vehicle or by placing a device in the terminal with intent to derail, disable, or wreck a vehicle. Subsection (a)(7), by contrast, prohibits any act against a person in the terminal, and requires no attack on a vehicle.

The Court accepted the government's argument that because subsection (b) refers to subsection (a) in general when it includes anyone who "commits an offense under subsection (a) of this section in a circumstance in which" the vehicle was carrying a passenger or employee, it must sweep in every offense in subsection (a). 779-80. But it does not say that, and some subsections of (a) refer to vehicles and some do not. In addition to subsection (a)(7), for example, subsections (a)(3) and (9) do not prohibit attacks on vehicles but prohibit other acts, such as placing a toxic substance in a terminal, structure, or facility,

25

**A001183**

and conveying false information concerning an attempt to violate the section. The most sensible reading of all the terms of subsection(b) -- including "*the* railroad on-track equipment or mass transportation vehicle" -- is that it applies to those acts under subsection (a) that involve such a vehicle, and this is part of the "circumstance" which limits application of the aggravator.

The government's contrary interpretation, besides changing the statutory language from "the" to "any," would have absurd results that were certainly not intended by Congress. Subsection (a)(7), by its terms, prohibits any assault with intent to cause serious bodily injury in a subway, train or bus station or terminal. This would mean that a simple fist-fight anywhere in the Port Authority or Times Square stations, or the tunnel connecting them, could subject a participant to a life sentence if any subway car was passing through any part of the station at the time of the assault. This cannot be the meaning of subsection (b).

Finally, even if the statute is ambiguous enough to permit such an interpretation, the rule of lenity applies. See United States v. Santos, 553 U.S. 503, 514 (2008). "From the face of the statute, there is no more reason to think that," "the []vehicle" means any vehicle, "than there is to think" that it refers to the specific vehicle implicated in each offense directed against a

26

**A001184**

vehicle. Id. "Under a long line of [Supreme Court] decisions, the tie must go to the defendant." Id. The conviction for § 1992(b) as an aggravator to the conviction for violating § 1992(a)(7) should be vacated.

## CONCLUSION

For the foregoing reasons, a judgment of acquittal should be entered on Counts One and Five.

Dated:     New York, New York
           December 6, 2018

                         Respectfully submitted,
                         Federal Defenders of New York

              By:    /s/_____
                     **COLLEEN P. CASSIDY**
                     **AMY GALLICCHIO**
                     **JULIA L. GATTO**
                     Attorneys for Defendant
                       **AKAYED ULLAH**
                     52 Duane Street - 10th Floor
                     New York, New York 10007
                     Tel.: (212) 417-8742

27

**A001185**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AKAYED ULLAH,

Defendant.

18 Cr. 16 (RJS)

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
*Of Counsel*

**A001186**

## <u>TABLE OF CONTENTS</u>

THE TRIAL EVIDENCE ............................................................................... 1

STANDARD OF REVIEW .......................................................................... 3

ARGUMENT .............................................................................................. 4

    I.    The Evidence Was Sufficient for a Rational Jury to Find the Defendant Guilty of Count One ....................................................................................................... 4

        A.    The Evidence Was Sufficient to Find That the Defendant Provided or Attempted to Provide "Personnel" to ISIS ................................................................... 4

        B.    The Evidence Was Sufficient to Find That the Defendant Provided or Attempted to Provide a "Service" to ISIS ................................................................. 9

    II.    The Evidence Established That the Defendant Was Guilty of Count Five as Charged in the Indictment ................................................................................................. 13

        A.    The Evidence Established That the Defendant "Placed" the Device in the Subway Car . ....................................................................................................... 14

        B.    The Indictment Was Not Constructively Amended ...................................... 17

        C.    The Aggravating Element in Count Five Applies to Both Provisions Under Which the Defendant Was Convicted ................................................................. 23

CONCLUSION ........................................................................................ 25

**A001187**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................ 10, 13

*Musacchio v. United States*, 136 S. Ct. 709 (2016) ................................................... 13

*United States v. Alimehmeti*, S1 16 Cr. 398 (PAE) (S.D.N.Y.) ................................. 8

*United States v. Baldeo*, 2014 WL 6807833 (S.D.N.Y. 2014) ................................. 4

*United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) ............................................ 20

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) .................................................. 3

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) ................................... passim

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) ...................................... 18

*United States v. Elhuzayel*, 2016 U.S. Dist. LEXIS 104328 (C.D. Cal. 2016) ........... 8

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) ........................................ 3

*United States v. Heimann*, 705 F.2d 662 (2d Cir. 1983) .......................................... 18

*United States v. Jama*, 217 F. Supp. 3d 882 (E.D. Va. 2016) .................................. 11

*United States v. Knuckles*, 581 F.2d 305 (2d Cir. 1978) .......................................... 20

*United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) ............................................. 21

*United States v. Nagi*, 254 F. Supp. 3d 548 (W.D.N.Y. 2017) ................................. 8

*United States v. Polos*, 723 F. App'x 64 (2d Cir. 2018) ........................................... 1

*United States v. Pugh*, 2016 U.S. Dist. LEXIS 101049 (E.D.N.Y. 2016) .................. 8

*United States v. Raishani*, S3 17 Cr. 421 (RA) (S.D.N.Y.) ...................................... 8

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ....................................... 18

*United States v. Vebeliunas*, 76 F.3d 1283 (2d Cir. 1996) ....................................... 22

*United States v. Wozniak*, 126 F.3d 105 (2d Cir. 1997) ........................................... 22

**Statutes**

18 U.S.C. § 1992 ................................................................................................... 13, 24

18 U.S.C. § 2339B ............................................................................................... 5, 8, 10

18 U.S.C. §§ 924, 926 ............................................................................................... 14

**Other Authorities**

*Oxford American Dictionary* ................................................................................... 16

*Webster's Third New International Dictionary* 2075 (1993) ...................................... 10

**A001188**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AKAYED ULLAH,

Defendant.

18 Cr. 16 (RJS)

The Government respectfully submits this memorandum of law in opposition to defendant Akayed Ullah's post-trial motions pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Dkt. 74) ("Br."). The defendant challenges the jury's verdicts on Count One and aspects of Count Five, recycling the same arguments that the Court rejected in the course of the trial. As explained below, the evidence was more than sufficient to sustain convictions on Counts One and Five, and the defendant's post-trial motions should be denied.

## THE TRIAL EVIDENCE

Granting all inferences in favor of the jury's verdicts, *see, e.g.*, *United States v. Polos*, 723 F. App'x 64, 66 (2d Cir. 2018), the following facts, among others, were established at trial.

In 2014, angry at U.S. policy in the Middle East, the defendant began to seek out and consume materials espousing the terrorist ideology that ultimately motivated him to bomb a crowded subway station in midtown Manhattan on December 11, 2017. (Tr. 225-27). He reviewed and drew inspiration from materials promoting terrorism, violent jihad, and particularly the Islamic State of Iraq and al-Sham ("ISIS"). (Tr. 226). The defendant watched videos about ways to "terrorize Americans" by conducting various types of attacks, such as truck attacks, knife attacks,

**A001189**

and bombings. (*Id.*). He began to research how to build a bomb online approximately a year before conducting his attack. (Tr. 225).

In the weeks leading up to his attack, the defendant used tools he acquired through his job as an electrician—at a worksite near the Port Authority Bus Terminal ("PABT")—to build a pipe bomb in his Brooklyn home. (Tr. 227-28, 499, 537-38). He filled a metal pipe with screws and ground-up match heads mixed with sugar, which functioned as a homemade explosive powder, then wired the pipe with broken Christmas-tree lightbulbs, and attached a nine-volt battery to operate as his bomb's "switch," or, power source. (Tr. 219, 227-28, 597-98 (expert testimony that the bomb was "command initiated")).

On the morning of December 11, 2017, the defendant strapped the explosive-filled pipe to his chest using zip ties, ran wires through his jacket into his pants pocket, and took the New York City subway from Brooklyn to the PABT. (Tr. 219; GX 1001-5, 1001-6, 1001-7, 1001-8, 1001-17). As the defendant rode the subway with the pipe bomb strapped to his chest, he posted the following statement to his Facebook page: "O Trump you fail to protect your nation," along with the ISIS rallying cry "baqiyah." (Tr. 219-20; GX 401).

At approximately 7:18 a.m., the defendant exited the subway at the PABT, walked into a crowded pedestrian tunnel connecting the PABT and Times Square subway stations, and detonated the pipe bomb. (Tr. 39-40; GX 1001-23). To detonate the bomb, the defendant touched a wire to the nine-volt battery in his pants pocket. (Tr. 224, 597-98, 606-07, 614, 617). The defendant chose a Monday morning for his attack because "there would be more people to terrorize." (Tr. 225). He expected to die in the attack, and expected that others might die as well. (Tr. 228).

2

**A001190**

The explosion knocked the defendant to the ground, and law enforcement officers responding to the bombing took him into custody.  (Tr. 54-58).  Following his arrest, the defendant admitted that ISIS and its online propaganda had inspired him to carry out the bombing, and that he "did it for the Islamic State."  (Tr. 225-27).

Law enforcement agents searched the defendant's home in Brooklyn following the attack, and recovered, among other things, materials consistent with those the defendant had used to construct the pipe bomb, as well as the defendant's passport, which contained an ISIS slogan scrawled in all capital letters:  "O AMERICA, DIE IN YOUR RAGE."  (Tr. 306-09, 371-72, 442-47, 471-76, 484-86; GX 924).  Law enforcement also recovered a laptop used by the defendant (the "Laptop"), which contained an array of ISIS propaganda videos, including videos distributed by ISIS depicting ISIS fighters engaging in violent combat operations such as suicide bombings. (Tr. 306; GX 601, 702-710-B).

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29(a) provides that a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  "A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient."  *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  "The Court must credit every inference that the jury might have drawn

3

**A001191**

in favor of the government, . . . review all the evidence in conjunction, not in isolation," and "be careful to avoid usurping the role of the jury." *United States v. Baldeo*, 2014 WL 6807833, at *1 (S.D.N.Y. 2014) (internal quotation marks omitted).

## ARGUMENT

### I. The Evidence Was Sufficient for a Rational Jury to Find the Defendant Guilty of Count One

The defendant first argues that the evidence was legally insufficient to convict him of providing or attempting to provide ISIS with material support or resources—in the form of "personnel" or a "service"—in violation of 18 U.S.C. § 2339B, as charged in Count One. (Br. 1-11). In advancing that claim, the defendant rehashes the same arguments that he made at the November 2, 2018 charge conference and in supplemental letter briefing. The Court considered and properly rejected those arguments before submitting Count One to the jury, and it should do so again here. As explained below, there was ample trial evidence to permit a rational jury to find that the defendant provided or attempted to provide personnel and services to ISIS through carrying out the attack, and the jury was not presented with any improper legal theory in connection with Count One.

#### A. The Evidence Was Sufficient to Find That the Defendant Provided or Attempted to Provide "Personnel" to ISIS

The defendant argues that no rational jury could have found that he provided or attempted to provide "personnel" to ISIS in light of subsection (h) of Section 2339B. (Br. 1-9). That subsection provides:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided,

4

**A001192**

attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h). At the defendant's request, the Court incorporated Section 2339B(h) into the charge, instructing the jury that providing or attempting to provide personnel means "provid[ing] or attempt[ing] to provide ISIS with one or more individuals who may be or include himself to work under that organization's direction or control." (Tr. 925). The Court further instructed the jury, quoting Section 2339B(h), that "individuals who act entirely independently of ISIS to advance its goals or objectives are not considered to be working under ISIS's direction and control." (*Id.*).

The evidence at trial easily permitted a rational jury to conclude that the defendant provided or attempted to provide personnel—himself—to ISIS, consistent with Section 2339B(h). Viewed in the light most favorable to the Government, the evidence established, among other things, the following:

- The defendant radicalized through watching ISIS propaganda online. (Tr. 225-26). The Laptop contained numerous ISIS propaganda videos. (Tr. 380).

- In its propaganda videos, ISIS instructs supporters to carry out "lone wolf" terrorist attacks in the United States. (Tr. 437-38). Such attacks are a key part of ISIS's global strategy. (Tr. 375, 439). ISIS relies on supporters based in the United States to carry out these attacks on its behalf. (Tr. 439). To carry out a lone-wolf attack for ISIS, a supporter need not communicate directly with ISIS members based in the Middle East, since ISIS instructs and guides lone-wolf attackers through its online propaganda. (Tr. 365, 479). ISIS considers supporters who carry out attacks in its name to be part of ISIS and "soldiers of the caliphate." (Tr. 366-67).

5

**A001193**

- On November 29, 2017, ISIS released the propaganda video "Flames of War II." (Tr. 446; GX 924). In that video, ISIS instructed supporters to carry out terrorist attacks in the United States. (Tr. 442-43). The defendant viewed the video, and just days later, on December 11, 2017, he carried out the attack in accordance with ISIS's direction in that video. (Tr. 225-26, 446).

- The phrase "die in your rage" is an ISIS slogan that appears in Flames of War II. (Tr. 444-45, 458-59). The defendant wrote that phrase on his passport, his visa, and a box where he stored bomb-making materials, all of which law enforcement found in his apartment after the attack. (Tr. 476, 486-87; GX 206, 209).

- Less than an hour before detonating the bomb, the defendant posted the ISIS rallying cry "baqiyah" on Facebook. (Tr. 219-20, 381-82; GX 401). The defendant posted *baqiyah* to ensure that ISIS would know that he had carried out the attack in its name. (Tr. 222).

- During his post-arrest interview, the defendant stated that he had carried out the attack "on behalf of the Islamic State," *i.e.*, ISIS. (Tr. 212, 226).

This evidence amply supported the conclusion that when the defendant carried out the attack, he was acting at ISIS's direction as conveyed through its online propaganda videos that the defendant studied. Indeed, the evidence established that the defendant carried out the attack specifically in response to ISIS's instructions in Flames of War II, among other places. During his post-arrest interview, the defendant not only referenced that video, but explicitly described ISIS's direction in the video that "if you cannot come here [*i.e.*, join ISIS in the Middle East], then . . . take the fight where you currently are [*i.e.*, carry out an attack in the United States]." (Tr. 225-26). On December 11, 2017, the defendant carried out that instruction.

The fact that the defendant did not have direct contact with ISIS members in Syria or Iraq in no way precluded the jury from finding the nexus between his conduct and ISIS required by Section 2339B(h). The defendant cites no authority—because there is none—for the proposition that a U.S.-based supporter of a foreign terrorist organization ("FTO") who does not communicate

6

**A001194**

directly with the FTO's overseas members necessarily acts "entirely independently" of the FTO within the meaning of Section 2339B(h). And that proposition is belied both by common sense and the reality of how ISIS operates, as the evidence in this case demonstrated. As Dr. Aaron Zelin explained, ISIS conveys attack instructions to its followers in the West through precisely the kinds of online propaganda videos that inspired the defendant. (Tr. 437-38). Moreover, ISIS specifically relies on U.S.-based supporters like the defendant to carry out those instructions and execute attacks on its behalf. (Tr. 439). Contrary to the defendant's mischaracterization (*see* Br. 2), the Government's theory was not that the defendant provided himself to ISIS through conduct that was entirely independent of the group, but rather that, based on the evidence summarized above, he carried out the attack at ISIS's direction to further its goals and objectives, consistent with Section 2339B(h). The evidence was sufficient to allow a rational jury to convict on that theory.

Nor is there any merit to the defendant's rehashed argument that it was improper to submit an attempt theory to the jury on the "personnel" prong of Count One. The Court heard extensive argument on this issue at the charge conference (Tr. 703-15), received supplemental briefing over the ensuing weekend (Dkt. 51, 52), and correctly determined that the Government's attempt theory was properly submitted to the jury. The defendant's motion provides no basis for reaching a different conclusion now.

As an initial matter, the defendant's suggestion that to be guilty of attempting to provide personnel to ISIS, he must have acted under ISIS's direction or control (Br. 6-9), is both puzzling and wrong. The assertion is at odds with the fundamental nature of an attempt, and if accepted,

7

**A001195**

would mean that a person cannot attempt to provide material support in the form of personnel to an FTO unless he actually succeeds in doing so—in other words, it would read the attempt provision out of Section 2339B. *See* 18 U.S.C. § 2339B(h) (a person "may be prosecuted under this section in connection with the term 'personnel' [if] that person has knowingly . . . *attempted to provide* . . . a foreign terrorist organization with 1 or more individuals (who may be or include himself) *to work* under that terrorist organization's direction or control" (emphasis added)).

That is not the law. For example, it is well established that a person can be guilty under Section 2339B of attempting to provide personnel to an FTO if he tries to travel overseas to join the group, but is arrested before he succeeds in doing so and never actually acts under the FTO's direction or control. *See, e.g.*, *United States v. Nagi*, 254 F. Supp. 3d 548, 558-59 (W.D.N.Y. 2017); *United States v. Pugh*, 2016 U.S. Dist. LEXIS 101049, at *4-5 (E.D.N.Y. 2016); *United States v. Elhuzayel*, 2016 U.S. Dist. LEXIS 104328, at *9-10 (C.D. Cal. 2016); *United States v. Raishani*, S3 17 Cr. 421 (RA) (S.D.N.Y.), Dkt. 1, 15, 52; *United States v. Alimehmeti*, S1 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 1, 70, 114. Thus, contrary to the defendant's contention, it was legally proper for the jury to find that the defendant attempted to provide himself to ISIS irrespective of whether he acted under its direction or control in the course of the attempt.

Ultimately, the defense's opening statement and cross-examination of Dr. Zelin confirmed the appropriateness of instructing the jury on attempt. The defense suggested to the jury in opening and through cross-examination that while the defendant might have shared some of ISIS's beliefs, he was not an ISIS member and did not become an ISIS member by carrying out the attack. (Tr. 32, 392-97, 407-19). For example, the defense elicited from Dr. Zelin that ISIS had not claimed

8

**A001196**

responsibility for the attack, whereas ISIS had claimed responsibility for other supporters' attacks—in particular, supporters who succeeded in killing themselves and others—and thereafter had considered those supporters to be part of the FTO. (Tr. 393-94, 418). Dr. Zelin further testified that ISIS likely had not claimed responsibility for the attack because the defendant had not died after detonating his bomb and was instead arrested. (Tr. 441-42; *see also* Tr. 366-67 (ISIS views supporters who carry out suicide attacks as "martyrs" who are "part of [ISIS's] cause")). Based on such testimony, it would have been reasonable for the jury to conclude that the defendant attempted to provide himself to ISIS and join the group by carrying out a suicide attack—and that he took a substantial step towards that goal by detonating the pipe bomb—but that he did not complete the offense and actually provide personnel to ISIS because he did not succeed in martyring himself for the cause. It was therefore appropriate to instruct the jury on attempt with respect to the "personnel" prong of Count One.

**B.    The Evidence Was Sufficient to Find That the Defendant Provided or Attempted to Provide a "Service" to ISIS**

The evidence was also sufficient to permit a rational jury to find that the defendant provided a "service" to ISIS by carrying out the attack on its behalf. As explained below, the defendant's sufficiency challenge relating to the services prong of Count One fails both legally and factually.

The defendant suggests that the "direction or control" requirement set forth in Section 2339B(h) applies not only to the provision of personnel, but also to the provision of services. (Br. 2, 4, 9). This purported limitation on the services prong of Section 2339B finds no support in the statute, case law, or logic. Personnel and services are different forms of material support, with distinct contours and requirements. Section 2339B(h), by its terms, applies to the personnel prong

9

**A001197**

of the statute. *See* 18 U.S.C. § 2339B(h) ("No person may be prosecuted under this section in connection with the term 'personnel' unless . . . ."). The defendant relies heavily on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*"), but mischaracterizes the holding in that case, which does not, in fact, support the proposition that Section 2339B(h)'s "direction or control" requirement applies to services. Instead, the Supreme Court simply recognized that "independent advocacy" cannot constitute a service, and that, similar to the provision of personnel and consistent with Section 2339B(h), a person naturally cannot provide a service "to" an FTO if he acts "entirely independently" from the group. *See id.* at 23 ("The use of the word 'to' indicates a connection between the service and the foreign group." (quoting 18 U.S.C. § 2339B(a)(1))). The Supreme Court explained that "service" refers to "concerted activity," and that the term—which is not defined in the statute—should be given its "ordinary meaning," specifically, "'the performance of work commanded or paid for by another: a servant's duty: attendance on a superior'; or *'an act done for the benefit* or at the command *of another*.'" *Id.* at 23-24 (emphasis added) (quoting *Webster's Third New International Dictionary* 2075 (1993)). The defendant quotes selectively from *HLP*, and conspicuously avoids mentioning that the Supreme Court's definition of "service" includes "an act done for the benefit . . . of another." (*See* Br. 9). That is perhaps not surprising, as the defendant's conduct—carrying out a terrorist attack on behalf of ISIS to advance its agenda—fits squarely within that clause of the definition.

The Court's jury instructions regarding "service" were consistent with *HLP*. (*See* Tr. 924-25). Indeed, the Court quoted *HLP*'s definition of service, instructing the jury that a service means "work commanded or paid for by another or done for the benefit of another." (Tr. 925). Nothing

10

**A001198**

in the Court's charge improperly instructed the jury that it could find that the defendant had provided a service to ISIS through activity that was entirely independent from ISIS. The defendant takes issue with the Court's instruction that, in substance, conduct undertaken by an ISIS supporter in response to an invitation from ISIS to its followers to engage in such conduct can qualify as a service. (Br. 10-11; Tr. 925). But that instruction, on its face, required the jury to find a connection between ISIS and the service—namely, that the service was provided in response to a call from ISIS. As reflected above, neither the statute, *HLP*, nor a common-sense construction of what it means to provide a service requires a different or greater nexus between the service provided and the recipient FTO. *See United States v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016) (recognizing that, while *HLP* established that "because the statute requires that the 'service' or other prohibited support be 'to' an FTO, there must be a sufficient connection between the service provided and an FTO," "Congress also did not intend to limit Section 2339B's application to situations where prohibited support is delivered to designated or recognized leaders or to those who operate under some identifiable command and control structure. *Rather, Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways*." (emphasis added)).

The evidence at trial was plainly sufficient for a rational jury to find that the defendant engaged in concerted activity for ISIS's benefit, and that he therefore provided a service to ISIS. Indeed, the evidence established that he provided a quintessential service for an FTO—carrying out a terrorist attack—and that he did so in direct response to ISIS's instructions as conveyed through its online propaganda videos, particularly Flames of War II. *See supra* at 6. Dr. Zelin

11

**A001199**

testified that ISIS supporters based in the United States, such as the defendant, can "serve" ISIS by carrying out an attack in accordance with the instructions in its propaganda videos. (Tr. 437-38). It was thus entirely reasonable for the jury to find that the defendant provided a service to ISIS by carrying out the attack. Once again, contrary to the defendant's assertion (*see* Br. 3), the Government's theory was not that the defendant provided a service to ISIS through conduct that was entirely independent of the group, but rather that he carried out the attack in concert with ISIS to further its agenda. The evidence was sufficient to support the jury's finding of guilt on that theory, and the theory is consistent with the statute.

Finally, for reasons similar to those discussed above in connection with "personnel," the Court properly submitted the Government's attempt theory to the jury on the "service" prong of Count One. *See supra* at 7-9. Based on the evidence presented, it would have been reasonable for the jury to conclude that while the defendant had carried out the bombing as part of an attempt to serve ISIS, he had not successfully provided his intended service. For example, while the attack succeeded in terrorizing Americans, the defendant did not succeed in providing ISIS the service of killing and maiming others. (*See* Tr. 407 (the goal of a suicide attack for ISIS is "to kill other people"), 442 (ISIS did not claim responsibility for the attack because it did not want to be associated with a "failed attack")). Accordingly, the Court should again reject the defendant's argument that it was improper to submit this attempt theory to the jury.

At bottom, the defendant's arguments relating to both "personnel" and "service" are misplaced, because they originate from the body of case law, most notably *HLP*, that addresses First Amendment concerns implicated by prosecuting an individual for engaging only in

12

**A001200**

"advocacy" on behalf of an FTO. *See HLP*, 561 U.S. at 23-24. But this case was not about advocacy. It involved a bombing carried out on behalf of an FTO—conduct that surely falls within the ambit of Section 2339B. In sum, it was entirely reasonable and legally proper for the jury to conclude that, by committing a bombing to benefit ISIS in direct response to ISIS's calls for such attacks, the defendant provided or attempted to provide material support to ISIS within the meaning of Section 2339B. Accordingly, the defendant's Rule 29 challenge to the guilty verdict on Count One should be rejected.[1]

## II.     The Evidence Established That the Defendant Was Guilty of Count Five as Charged in the Indictment

The jury convicted the defendant of violating two provisions of 18 U.S.C. § 1992 (Count Five): (1) Section 1992(a)(2), which prohibits the placement of a "destructive device . . . in, upon, or near" a "mass transportation vehicle"; and (2) Section 1992(a)(7), which prohibits the commission of "an act, including the use of a dangerous weapon, with the intent to cause death or seriously bodily injury to any person who is on," as relevant here, a "terminal . . . or facility used in the operation of, or in support of, a mass transportation vehicle." 18 U.S.C. § 1992(a)(2), (a)(4)(B), (a)(7).[2] The jury found also that the aggravating provision—18 U.S.C. § 1992(b)(1)—

---

[1] The defendant's citation to *Musacchio v. United States*, 136 S. Ct. 709 (2016) (Br. 3), is inapposite. As explained above, unlike that case, the Court's jury instructions were legally proper, and in any event, the evidence was sufficient to support a guilty verdict on Count One based on the statutory elements of Section 2339B.

[2] The defendant does not argue that the evidence was insufficient to convict him of Section 1992(a)(7). Nor can he. The evidence overwhelmingly established that the defendant "used"—*i.e.*, detonated—a "dangerous weapon"—*i.e.*, a bomb—in the subway terminal, with the intent to cause death or seriously bodily injury to people in the terminal.

13

**A001201**

applied to both Section 1992(a)(1) and Section 1992(a)(7), because, at the time the defendant detonated the bomb in the PABT, there were subway cars in that terminal carrying passengers and employees of the Metropolitan Transit Authority ("MTA"). As explained below, the defense's arguments challenging the jury's verdict on Count Five—which the defense made at the charge conference and in its Rule 29 motion following the close of the Government's case—misapprehend the evidence and the law, and should be rejected once again.

### A. The Evidence Established That the Defendant "Placed" the Device in the Subway Car

The defense argues that, when the defendant boarded the train with a suicide bomb strapped to his chest, he carried the bomb, but did not "place" it, on a subway, and therefore no rational jury could have convicted him of Section 1992(a)(2). (Br. 12-14). Had Congress intended subsection (a)(2) to include the "carrying" or "transporting" of a device on a subway, the defense contends, it would have used that term, as it did elsewhere in Title 18. (*Id.* at 13 (citing 18 U.S.C. §§ 924(c), 926A)). Instead, the defense argues, the defendant could have been guilty of subsection (a)(2) only if he had removed the bomb from his body and physically "placed" it on the subway. This argument misconstrues the Government's theory with respect to subsection (a)(2) and improperly narrows that provision in a way that is clearly at odds with Congress's intent.

As an initial matter, the defendant did not just "carry" a bomb on a subway. The evidence established, and the Government argued to the jury, that the defendant made himself part of the bomb. He strapped the pipe to his chest using zip ties and duct tape and ran wires from the pipe, down the inside of his shirt, to the battery in his pants pocket. (*E.g.*, Tr. 614-16; GX 917). He designed the device so that he operated as the "switch"—when he touched the wire to the battery,

14

**A001202**

the bomb exploded. (Tr. 606). Thus, when the defendant stepped onto the subway with the explosive-laden pipe attached to his chest, he "placed" a destructive device—of which he was a crucial part—in and upon a mass transportation vehicle. He certainly was not required, as the defense argues, to remove the device from his body (thereby separating the switch from the other components of the bomb) and put it on the floor of the train to be guilty of subsection (a)(2). This would make little sense; as the Court noted at the charge conference and as the evidence established at trial, removing the bomb from his body would have made it *less* likely to explode. (Tr. 735).

Indeed, the defendant's strained interpretation of subsection (a)(2) would limit the applicability of that provision in a way that is inconsistent with Congress's intent. Section 1992 prohibits the commission of various dangerous acts in mass transit systems, including putting destructive devices on subway cars. The statute does not distinguish between suicide bombs— *i.e.*, those that must be attached to one's body in order to function as designed—and bombs that are detonated remotely. Nor does it require that a device be left on a floor or seat of a train. (*See* Tr. 801 ("THE COURT: And whether the bomb is on you or in a briefcase or something that you can separately place down I don't think is dispositive on whether one has placed a bomb on a mass transportation vehicle.")). But the defendant's interpretation of subsection (a)(2) reads in both of these illogical constraints. Under the defendant's reading of the statute, a person violates subsection (a)(2) if he puts a bomb on the floor of a subway car, but not if he detonates it while holding it in his hands.[3] And the defendant's theory would punish a suicide bomber who renders

_____

[3] Although the defense conceded at the charge conference that if the defendant had detonated the bomb on the subway car, he would have "placed" it for purposes of subsection (a)(2) (*see* Tr. 735),

15

**A001203**

a device *less* likely to detonate by detaching it from his body, but not one who, like the defendant, keeps the device intact and fully operable as he rides the train. (*See* Tr. 735 ("THE COURT: So a suicide attack could never be this, ever, unless he takes it off his person and puts it down?")). The defendant argues that, in drafting Section 1992, "Congress intended to capture . . . conduct that constitutes an attack" against mass transportation carriers. (Br. 14). The Government agrees. And riding the subway with a live, wired suicide bomb strapped to one's chest is as much an "affirmative act of violence" as putting the bomb on the floor of the train. (*Id.*).

Apparently acknowledging that his interpretation of subsection (a)(2) essentially reads out suicide bombs, the defendant attempts to analogize his bomb to a gun. The defendant argues that he "was no more a 'part of' the bomb than a gun carrier is 'part of' the gun because he must pull the trigger to fire." (Br. 14). This argument is both irrelevant—subsection (a)(2) deals with bombs, not guns—and incorrect. A gun is a fully constructed machine that is inherently distinct from, and designed to be operated by, a person holding it. By contrast, the defendant built his bomb so that he was a necessary component of it. He designed it to function only when attached to his body

---

they appear to have walked back that concession in their post-trial motion. This is unsurprising, as it is inconsistent with the defendant's current argument with respect to subsection (a)(2). The device was designed to detonate while strapped to the defendant's body. He could not have "placed" it on the subway—under his definition of that term—and still caused it to function as intended.

Nor does subsection (a)(2) require that the bomb explode on the subway car. The statute requires only that the bomb be "placed," not that it be detonated, discharged, or used. Indeed, the defendant concedes that "to place" means "to put into a particular place." (Br. 12 (citing *Oxford American Dictionary*)). Moreover, and as noted above, the "use" of a bomb in relation to a mass transportation system is proscribed in Section 1992(a)(7). *See supra* at 13.

16

and only when he touched the wires to the battery. To borrow the defendant's analogy, the defendant was not like a "gun carrier" who decided when to pull the trigger—he was the trigger itself. He did not simply carry the bomb, he *was* the bomb. And when he stepped onto the subway, he placed the bomb there.

Finally, the evidence was plainly sufficient for a rational jury to conclude that the defendant acted with reckless disregard for human life, and the defendant does not meaningfully contest this element. The defendant carried a live, unstable bomb on a crowded subway car. Although he designed the device to function when he touched the wires to the battery, the evidence established that the pipe bomb could have exploded in any number of ways, including if it had been dropped or subjected to force. (Tr. 585-86). The jury could also properly infer from the evidence presented—including the defendant's placement of the electrical fuzing system in his pocket— that the bomb could have exploded if the defendant had jostled it, or had himself been jostled, and the wires touched the battery. This evidence was more than sufficient for the jury to conclude that the defendant acted with reckless disregard for the safety of those around him, and that, as an electrician who taught himself to make and detonate bombs, he was aware that his conduct created that risk.

### B.    The Indictment Was Not Constructively Amended

Continuing to press another argument that was briefed, argued, and rejected during trial, the defendant maintains that Count Five was constructively amended because the to wit clause did not describe the defendant carrying a bomb on the subway, and therefore the Section 1992(a)(2)

17

**A001205**

theory was improperly submitted to the jury. (Br. 15-23). This argument is based, as it was before, on a misapprehension of the law and a selective reading of the facts.

"To prevail on a constructive amendment claim" under the Fifth Amendment's Grand Jury Clause,

> a defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.

*United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (quotation marks and internal citations omitted). As long as "the defendant was given notice of the core of criminality to be proven at trial," the Second Circuit "has consistently permitted significant flexibility in proof." *Id.* at 417. As "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment," *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983), it is well established that "not all modifications constitute constructive amendments," *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). The "core of criminality" of which a defendant must have notice is defined as "the essence of a crime, in general terms," and not "the particulars of how a defendant effected the crime." *D'Amelio*, 683 F.3d at 417-18. Thus, "there is no constructive amendment when the proof at trial does no more than supply the particulars" of the crime. *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

Based on the explicit language of the Indictment, the defendant was on notice that the "core of criminality" with respect to Count Five included his travel on the subway while carrying a bomb. The defendant concedes, as he must, that the Indictment charged him in Count Five with "plac[ing]

18

**A001206**

a destructive device in, upon, and near a mass transportation vehicle" which was "carrying passengers and employees at the time of the offense" with the "intent to endanger the safety of persons, and with a reckless disregard for the safety of human life" in connection with the attack (Br. 15-16 (citing Dkt. 6)), which is precisely what the trial evidence showed.[4] The "core of criminality" charged in Count Five, by its plain language, encompassed "plac[ing] a destructive device in, upon and near a mass transportation vehicle" as charged under subsection (a)(2), and the "use of a dangerous weapon" in a "terminal . . . or facility used in the operation of, or in support of, a mass transportation vehicle," as charged under subsection (a)(7), in connection with the attack. Simply because the defense argues that Count Five charged a single "act," that is, detonation (Br. 20-22), does not make it so. Count Five's plain language charged a violation of subsections (a)(2) and (a)(7) in connection with the attack, which was part of a "single set of discrete facts," and formed "part of a single course of conduct" with the same "ultimate purpose." *D'Amelio*, 683 F.3d at 419-21.

The crux of the defense's argument is that because the to wit clause described the attack in general terms and did not specifically reference "placing" a bomb on the subway, that the Government was prohibited from proving a violation under subsection (a)(2). But that is not the law. As the Court recognized at the November 5 charge conference (Tr. 776), the to wit clause does not "bind[] the government to prove the exact facts specified in a criminal indictment."

---

[4] As the defendant notes, and the Court is aware, the Government also charged a violation of Subsection (a)(5) in Count Five, but did not proceed on that charge at trial.

*United States v. Bastian*, 770 F.3d 212, 221 (2d Cir. 2014).[5] And the mere fact that the to wit clause described the attack in general terms does not automatically narrow the "core of criminality" to omit subsection (a)(2). *D'Amelio*, 683 F.2d at 423 (holding that "where the indictment charge[s] a single course of conduct," a mere deviation from the to wit clause does "not permit conviction for a functionally different crime" and therefore does not meaningfully broaden the indictment).

An indictment has not been constructively amended where the allegations in the indictment and the proof at trial both relate to a "single set of discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose." *Id.* at 419-21; *see also United States v. Knuckles*, 581 F.2d 305, 311-12 (2d Cir. 1978) (finding no constructive amendment when the evidence at trial related to cocaine rather than heroin, because the operative facts in the indictment and at trial were the same regardless of the substance involved). That is precisely the case here. The defendant was charged in Count Five with "plac[ing] a destructive device in, upon and near" a mass transportation vehicle, and using a "dangerous weapon" in a terminal or facility involved in the use of a mass transportation vehicle, in connection with the defendant's attack. (Dkt. 6). The Government's proof at trial established just that: the defendant rode the subway carrying a bomb, and approximately an hour later, detonated the bomb at the PABT. Plainly, this was part of a "single set of discrete facts consistent with the charge in the indictment." *D'Amelio*, 683 F.3d at

---

[5] The defense wrongly claims that the Government "misleading[ly]" used this direct quotation from *Bastian* in its prior briefing on this issue to argue that the to wit clause is meaningless. (Br. 19). This misstates the Government's argument. (Dkt. 53 at 2-3). As *Bastian* and its progeny make clear, the to wit clause of an indictment is not meaningless—and the Government did not argue that it was—but it also does not bind the Government to prove only the facts asserted in that clause. 770 F.3d at 221.

20

419. Far from broadening the possible bases for conviction, as the defense claims (Br. 19), the Government proved what was alleged in the Indictment.[6] (*See* Tr. 776 (the Court noting that "the language of the statute, which is in the indictment, is broad, [and] covers this conduct")).

The defendant devotes the remainder of his argument to complaining that he was "surprise[d]" by the Government's "new theory" (Br. 18), but that complaint neither withstands scrutiny nor provides any basis to disturb the jury's verdict as to Count Five. The defendant concedes that the Government's opening referred to the facts underlying subsection (a)(2)—*i.e.*, that the defendant rode the subway from Brooklyn to the PABT with an unstable bomb strapped to his chest—but asserts without any basis that "[n]o one in the courtroom understood from this reference" that this referred to Count Five, because the Government "said the opposite" when it told the jury that Counts Two through Five related to "how and where the defendant committed this bombing at the Port Authority." (Br. 22). This argument strains credulity. Obviously, the fact that the defendant rode the subway with a bomb strapped to his chest and then detonated it at the Port Authority, related to "how" and "where" the bombing happened. The defendant was plainly on notice of the core of criminality with respect to subsection (a)(2) through the explicit charges in the Indictment, the discovery produced over the pendency of this action, the factual

---

[6] The defense's reliance on *United States v. Milstein*, 401 F.3d 53, 61-65 (2d Cir. 2005), is misplaced. In holding that the indictment there was constructively amended, the *Milstein* court noted that at the time of the offense, there were "twenty different methods of misbranding," and the indictment's reference to one type of misbranding would not have placed the defendant on notice of a separate type of misbranding that was not alleged in the indictment. *Id.* at 64-65. By contrast here, the defendant was explicitly charged with "plac[ing]" a destructive device in, upon, or near a mass transportation vehicle in connection with the attack.

21

summary set forth in the Government's pretrial motions *in limine* (Dkt. 35 at 3), the Government's opening statement, and the testimony elicited at trial.[7]

In any event, the defendant cannot prevail on his constructive amendment claim because the Court properly instructed the jury as to both subsections (a)(2) and (a)(7), and thus there is no danger the defendant was "convicted of an offense other than that charged in the indictment." *D'Amelio*, 683 F.3d at 416. The Second Circuit has repeatedly held that "constructive amendment occurs when the government's presentation of evidence *and* the district court's jury instructions combine to modify essential elements of the offense charged." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (emphasis added) (quoting *United States v. Vebeliunas,* 76 F.3d 1283, 1290 (2d Cir. 1996)). Here, the defendant was explicitly charged with violating both subsections (a)(2) and (a)(7), the Court properly instructed the jury on both subsections, and the defense had the opportunity to argue with respect to both subsections in summation (Tr. 881-84).

The defendant has failed to show that the indictment was constructively amended either through the Government's proof at trial or the jury instructions, and his constructive amendment claim should be rejected.

---

[7] Discovery produced to the defendant prior to trial included (1) surveillance footage documenting the defendant's travel from his home in Brooklyn, on the subway, to the PABT on the morning of the attack; (2) MetroCard data from the MTA showing that the defendant traveled by subway from Brooklyn to Manhattan on the morning of the attack (the "MetroCard Data"); and (3) MTA records showing that there were passengers and employees present on the train the defendant took from Brooklyn to the PABT. (Dkt. 53 at 3). The Government also proposed a stipulation to the defense regarding the MetroCard Data four weeks in advance of trial.

22

**A001210**

**C.      The Aggravating Element in Count Five Applies to Both Provisions Under Which the Defendant Was Convicted**

Section 1992's aggravating provision—Section 1992(b)(1)—provides enhanced penalties when a person commits a terrorist attack or other violence against mass transportation systems, and, at the time of the offense, there is a mass transportation vehicle carrying at least one person or employee. The defendant argues that the aggravating provision applies only to those offenses that prohibit attacks on mass transportation vehicles, and thus can never apply to subsection (a)(7). (Br. 23-24). Once again, the defense is attempting improperly to narrow Section 1992 in a way that is contradicted by its plain language. As the Court noted at the charge conference, subsection (b)(1) applies to anyone who commits an "offense under subsection (a)" in circumstances in which the mass transportation vehicle is carrying a passenger or employee. (Tr. 749 ("The statute doesn't say whoever commits an offense under section (a)(2) or (a)(4). It says section (a), a circumstance in which the railroad on-track equipment or mass transportation vehicle was carrying a passenger.")). Under the defendant's reading of subsection (b)(1), however, the aggravating provision would never apply to at least five of the 10 offenses listed in subsection (a): subsections (a)(3), (a)(5), (a)(7), (a)(8), and (a)(9). But had Congress intended for the aggravator to apply only to half of the offenses set forth in subsection (a), the statute would have said that.

Instead, the plain language of Section 1992 makes clear that the aggravating provision applies to every offense listed in subsection (a)—including subsection (a)(7)—when the offense involves a mass transportation vehicle carrying passengers or employees. Subsection (a)(7) proscribes the "use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person who is on property described in subparagraphs (A) or (B) of paragraph (4)," which

23

**A001211**

includes, as relevant here, a "terminal . . . or facility used in the operation of, or in support of, a mass transportation vehicle." 18 U.S.C. § 1992(a)(7), (a)(4)(B). The evidence established at trial, and the Government argued in summation, that the defendant had detonated his bomb—*i.e.*, "use[d] a dangerous weapon"—with intent to cause death or serious bodily injury to people in the subway tunnel. A subway tunnel is clearly a "terminal . . . or facility used in the operation of . . . a mass transportation vehicle," *id.* § 1992(a)(4)(B), and the defendant does not argue otherwise. And, with respect to the aggravating provision, at the time the defendant detonated the bomb, the mass transportation vehicles that the terminal was being used to operate—*i.e.*, the subway cars that were stopped in the PABT subway station—were carrying passengers and employees.

The defendant argues that, because the aggravating provision refers to "*the* mass transportation vehicle"—and not "any" mass transportation vehicle—the Government must prove that a specific mass transportation vehicle involved in the attack was carrying at least one passenger or employee. (Br. 24-25 (emphasis added)). It is not sufficient, the defendant contends, that when his bomb exploded, any subway train anywhere in the PABT was carrying passengers. The Government did not argue otherwise at trial. Instead, the Government argued, and the evidence established, that when the defendant exploded his bomb in the PABT, that terminal was being "used in the operation of" at least two specific mass transportation vehicles that were carrying passengers and employees. Barry Greenblatt, the Vice President of the MTA, testified that, at 7:18 a.m.—the precise moment the defendant set off the bomb—there were two A trains in that terminal, both of which carried at least one employee and thousands of passengers. (Tr. 654058; GX 1105). Indeed, the defendant had just exited an A train and entered the tunnel from

24

the A/C/E subway platform when he detonated his bomb.  (Tr. 59-62; GX 140).  Thus, the evidence was more than sufficient for a rational jury to conclude that the defendant violated subsection (a)(7), and that, when he did so, the mass transportation vehicles involved in the offense were carrying passengers and employees.  The defendant's motion should be denied in this respect as well.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's post-trial motions.

Dated: New York, New York
December 20, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:  _____/s/_____
Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
212-637-1098 / 2423 / 2562

25

**A001213**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA          :      18 Cr. 0016 (RJS)

          - v -                   :

AKAYED ULLAH,                     :

          Defendant.             :

------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF AKAYED ULLAH'S POST-TRIAL MOTIONS FOR ACQUITTAL AND A NEW TRIAL

FEDERAL DEFENDERS OF NEW YORK, INC.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Attorney for Defendant*
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
     Of Counsel

TO:  **GEOFFREY BERMAN, ESQ.**
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007

     Attn:  **SHAWN G. CROWLEY, ESQ.,**
            **REBEKAH DONALESKI, ESQ.,**
            **GEORGE TURNER, ESQ.,**
            Assistant United States Attorneys
            Southern District of New York

# A001214

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

I.     Insufficiency of the evidence to prove Count One,
material support to a terrorist organization . . . . 1

II.   The "placement" theory of Count Five . . . . . . . . 4

III. Constructive amendment of the indictment . . . . . . 4

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 6

i

**A001215**

## TABLE OF AUTHORITIES

Page

**CASES**

Holder v. Humanitarian Law Project, 561 U.S. 1 (2010) . . . . . 2

United States v. Elhuzayel, 2016 U.S. District LEXIS 104328
  (C.D. CA 2016) . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Milstein, 401 F.3d 53 (2d Cir. 2005) . . . . . 5

United States v. Nagi, 254 F.Supp.3d 548 (W.D. N.Y. 2017) . . . 3

United States v. Pugh, 2016 U.S. District LEXIS 101049
  (E.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . 3

United States v. Zingaro, 858 F.2d 94 (2d Cir. 1988) . . . . . 5

**MISCELLANEOUS**

Oxford American Dictionary . . . . . . . . . . . . . . . . . . 3

A001216

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA    :    18 Cr. 0016 (RJS)

    - v -    :

AKAYED ULLAH,    :

    Defendant.    :

------------------------------x

This reply memorandum is submitted in support of Mr. Ullah's Motion For a Judgment of Acquittal. Most of the government's arguments in its response were made below and were therefore anticipated and addressed in the defendant's memorandum in support of the motion. The government's response did not address other arguments made. Therefore, this reply very briefly addresses those few government contentions, such as new factual assertions, that require a response.

**I. Insufficiency of the evidence to prove Count One, material support to a terrorist organization**

The government contends that Ullah referenced "Flames of War" in his interview and this proves that he specifically followed ISIS instructions in that video to carry out an attack in the United States. G. Mem. 5-6. The evidence proves no such thing. As this Court noted at the charge conference, we still don't know what was said "in that hospital room for four hours" with Detective Byrnes, "about what the goal was." 732. The most that can be extracted from the Byrnes testimony, viewing it in the light most favorable to the Government, is that Byrnes asked

**A001217**

Ullah if he had seen the video and he said yes. We don't know how much of it he saw, it may have been an excerpt on You-tube. The video was not on his computer, phone, or any other device.

The Government incorrectly states that <u>Holder</u>'s definition of services includes an act done for the benefit of another. (G. Mem. at 10). Actually, the only reference in <u>Holder</u> to the "for the benefit of" language is in a parenthetical quoting one dictionary definition of services as "for the benefit of or at the command of another," among definitions of service. 561 U.S. 1, 23-24. The holding of the case is that the same limitation that applies to "personnel" applies to "services," which is that it covers "concerted activity, not independent" activity: acts "performed in coordination with, or at the direction of, a foreign terrorist organization." <u>Id</u>. And the government proved, at most, that Mr Ullah was inspired by ISIS propaganda and built this device entirely on his own to further its goals, the kind of independent action excluded from the statute.

Given the legal reality that personnel and services both require concerted activity, the government now claims that it proved this: "The evidence at trial was plainly sufficient for a rational jury to find that the defendant *engaged in concerted activity* for ISIS's benefit, and that he therefore provided a service to ISIS." G. Mem. 11 (emphasis added). This is despite all of the evidence that Mr. Ullah acted entirely alone, that he

2

**A001218**

built the device himself and told no one about it. It was not even the government's theory at trial -- nor could it be -- that he engaged in "concerted activity." The government's theory was that he acted under ISIS's direction by watching its propaganda video and taking action in its name. Words have meaning. "Concerted" means "arranged by mutual agreement, done in cooperation." <u>Oxford American Dictionary</u>. It is undisputed that there was no agreement, no cooperation or coordination, and that Mr. Ullah never communicated with a single member of ISIS. Yet now the government's claim has morphed from one that Mr. Ullah acted at the direction of ISIS, through the one-sided emission of its propaganda, into the patently unproven claim that he acted "in concert" with ISIS.

The government's attempt argument (G. Mem 7-8) does not address the situation in this case of a "lone wolf," or independent actor who makes no effort to join or contact ISIS. To be sure, someone can attempt to provide personnel to ISIS, as in the cases cited by the government, by undertaking specific actions, like traveling or attempting to travel to Syria, that do not ultimately succeed. However, these cases involve attempts to travel to Syria or elsewhere in the Middle East to join the ISIL or IS fighting force, <u>United States v. Nagi</u>, 254 F.Supp.3d 548 (W.D. N.Y. 2017); <u>United States v. Pugh</u>, 2016 U.S. Dist. LEXIS 101049 (E.D.N.Y. 2016); <u>United States v. Elhuzayel</u>, 2016 U.S.

3

**A001219**

Dist. LEXIS 104328 (C.D. CA 2016), not the kind of independent acts specifically excluded by the statute. An independent actor cannot "attempt" to provide personnel, and satisfy the element of direction and control, by creating a public spectacle or committing a crime on his own and then saying he did it for ISIS. In this case, there was no act, no step taken, to join ISIS or act in coordination with anyone in ISIS.

## II. The "placement" theory of Count Five

The government simply repeats its assertion that Mr. Ullah made himself "part of the bomb" and so placed the bomb wherever he went, including on the subway he rode. But, to repeat, he was no more part of the bomb just because he had to put two wires together to detonate it, than a gun carrier is part of the gun because he has to pull the trigger. This theory is based on a semantic house of cards. Again, just saying it does not make it true.

## III. Constructive amendment of the indictment

The government purports to identify "the crux of the defense's argument" on constructive amendment as "because the to wit clause described the attack in general terms and did not specifically reference 'placing' a bomb on the subway that the Government was prohibited from proving a violation under subsection (a)(2)". G. Mem. 19. No, that is not the defense argument, let alone the crux of it. The crime alleged in Count

4

**A001220**

Five was *not* framed in general terms. That is the point: it was framed in very specific terms. And the use of "to wit" is of no moment.

The crux of our argument is that the indictment focused solely and precisely on the detonation of the bomb in the vicinity of the Port Authority Bus Terminal as the crime charged in Count Five. There is no hint anywhere in the indictment that the offense alleged in Count Five was committed when Mr. Ullah boarded the subway in Brooklyn an hour earlier to carry the device to the Port Authority, that transit is not mentioned anywhere in the indictment, and there is no basis to infer that the Grand Jury ever considered it. Yet the jury was instructed that the crime charged in Count Five, theory one, was his boarding the subway in Brooklyn while carrying the device. That is a classic constructive amendment. See United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005); United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1988).

5

**A001221**

## CONCLUSION

For the foregoing reasons, a judgment of acquittal should be entered on Counts One and Five.

Dated:     New York, New York
           January 11, 2019

                              Respectfully submitted,
                              Federal Defenders of New York

              By:    /s/_____
                     **COLLEEN P. CASSIDY**
                     **AMY GALLICCHIO**
                     **JULIA L. GATTO**
                     Attorneys for Defendant
                       **AKAYED ULLAH**
                     52 Duane Street - 10th Floor
                     New York, New York 10007
                     Tel.: (212) 417-8742

6

**A001222**

Case 21-1058, Document 43, 10/04/2021, 3186342, Page216 of 288

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

-v-

AKAYED ULLAH,

Defendant.

18-cr-16 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

The Court is in receipt of a joint letter from the parties in which they propose a schedule for briefing regarding the application of *United States v. Davis* to Defendant's Rule 29 motion and request a corresponding adjournment of sentencing. (Doc. No. 85.) IT IS HEREBY ORDERED THAT Defendant shall submit a supplemental memorandum in support of his Rule 29 motion no later than September 13, 2019. IT IS FURTHER ORDERED THAT the government shall respond no later than October 15, 2019, and Defendant may reply no later than October 28, 2019. IT IS FURTHER ORDERED THAT Defendant's sentencing, previously scheduled for September 10, 2019, is adjourned until December 17, 2019 at 3:00 p.m. in Courtroom 15A of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, 10007. Defendant's sentencing submission shall be filed no later than December 3, 2019, and the government's sentencing submission shall be filed no later than December 10, 2019.

SO ORDERED.

Dated:     July 25, 2019
           New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

**A001223**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

UNITED STATES OF AMERICA   :    18 Cr. 0016 (RJS)

       - v -          :

AKAYED ULLAH,          :

        Defendant.    :

------------------------------------------------x

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR JUDGEMENT OF ACQUITTAL
PURSUANT TO RULE 29(c)**

FEDERAL DEFENDERS OF NEW YORK, INC.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700
*Attorney for Defendant*
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
   Of Counsel

TO:  **GEOFFREY BERMAN, ESQ.**
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007

     Attn:  **SHAWN G. CROWLEY, ESQ.,**
           **REBEKAH DONALESKI, ESQ.**
           **GEORGE TURNER, ESQ.,**
          Assistant United States Attorneys

**A001224**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . ii

I. The Categorical Approach Determines Whether a Predicate Offense Qualifies Under the Force Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. None of the Predicate Offenses Qualify Under the Force Clause . . . . . . . 4

    A. The jury acquitted Mr. Ullah of the § 924(c) count in relation to Count I, Providing Material Support to a Terrorist Organization, which is not a "crime of violence." . . . . . . . . . . . . . . . . . . . . . . . 4

    B. Counts II and IV, Use of a Weapon of Mass Destruction (18 U.S.C. § 2332a) and Destruction of Property by Use of Explosive (18 U.S.C. § 844(i)) do not qualify under the force clause because they do not require the use of force against "the person or property of another." . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. The sections of 18 U.S.C. § 1992 of which Mr. Ullah was convicted in Count V, (a)(2) and (a)(7), in violation of do not categorically require the use of physical force because it section (a)(2)requires only a reckless state of mind and section (a)(7) prohibits the intentional commission of "any act," which can be an act of omission. . . . . . . . . . . . . . . . . . . . . . . 8

    D. The offense charged in Count III, placing an explosive in a place of public use or public transportation system in violation of 18 U.S.C. § 2332f(a)(1), does not qualify under the force clause because it does not require the use of force against "the person or property of another." . . . . . . . . . . . . . . . . . . . . . . . . 12

    E. Attempt to commit any of the offenses of conviction is not a crime of violence under the force clause. . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**A001225**

# TABLE OF AUTHORITIES

## CASES

*Bailey v. United States,* 516 U.S. 137 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Barrett v. United States,* 139 S.Ct. 2774 (2019) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Chambers v. United States,* 555 U.S. 122 (2009) . . . . . . . . . . . . . . . . . . . . . . . 10

*Chrzanoski v. Ashcroft,* 327 D.3d 188, 197 (2d Cir. 2003) . . . . . . . . . . . 10, 11, 12

*Descamps v. United States,* 570 U.S. 254 (2013) . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Gomez v. United States,* No. 16-56503, Dkt. Entry 13 (9th Cir. July 18, 2019) . . 6

*Holder v. Humanitarian law Project,* 561 U.S. 1, 130 S.Ct. 2705 (2010) . . . . . . . 5

*Hylor v. United States,* 896 F.3d 1219 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . 15

*Hylton v. Sessions,* 897 F.3d 57 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . 3, 4, 7, 11

*Jobson v. Ashcroft,* 326, F.3d 367 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 8

*Leocal v. Ashcroft,* 543 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Russell v. United States,* 471 U.S. 858 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Acosta,* 470 F.3d 132 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . 3

*United States v. Aldrich,* 566 F.3d 976 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . 7

*United States v. Alfonso,* 2019 WL 1916100 (D. Conn. April 30, 2019) . . . . . . . 15

*United States v. Anderson,* 787 F.3d 51 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . 14

*United States v. Begay,* 2019 WL 3884261 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A001226

*United States v. Davis,* 139 S. Ct. 2319 (2019) . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Dean,* 591 Fed. Appx. 11, 15 (2d Cir. 2014) . . . . . . . . . . . . . . 6

*Unites States v. Barrett,* 903 F.3d 166 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Barrett,* _ F.3d _ 2019 WL 4121728 (2d Cir. Aug. 30, 2019) . 1,2

*United States v. Farhane,* 634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 5, 14

*United States v. Gonzalez,* 520 U.S. 1 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Hill,* 890 F.3d 51 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Jackson,* 560 F.2d 112 (2d Cir. 1977) . . . . . . . . . . . . . . . . 14, 15

*United States v. Mayo,* 901 F.3d 218 (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . 11

*United States v. Moreno,* 821 F.3d 223 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 8

*United States v. Pawlowski,* 682 F.3d 205 (3rd Cir. 2012) . . . . . . . . . . . . . . . . 7

*United States v. Paul Rosenfeld,* Dkt No. 7:19 Cr. 69 (S.D.N.Y.) . . . . . . . . . . . 12

*United States v. Salas,* 889 F.3d 681 (10th Cir. 2018) . . . . . . . . . . . . . . . . . . . 6

*United States v. St. Hubert,* 918 F.3d 1174 (11th Cir. 2019) . . . . . . . . . . . . . . 15

*United States v. Stallworth,* 543 F.2d 1038 . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Taylor,* 848 F.3d 476 (1st Cir. 2017) . . . . . . . . . . . . . . . . . . . . 3

*United States v. Teague,* 469 F.3d 205 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . 11

*United States v. Weisinger,* 586 Fed. Appx. 733, 739 (2d Cir. 2014) . . . . . . . . . 7

*United States v. Yousef,* 327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . 14

iii

**A001227**

## STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 16 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

18 U.S.C. § 844(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 16

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 924 (e)(2)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 9

18 U.S.C. § 1992(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

18 U.S.C. § 2332a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

18 U.S.C. § 2332a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

18 U.S.C. § 2332f(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

18 U.S.C. § 2339A(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 2339B(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 2332f(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

18 U.S.C. § 2332f(e)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Conn. Gen. Stat. § 53a-61(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Model Penal Code § 5.01(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Leonard B. Sand et al., Modern Federal Jury Instructions (Criminal)* 10.1 at 10-3 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

https://www.nytimes.com/2019/05/29/us/politics/immolation-white-house. html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A001228

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------x

UNITED STATES OF AMERICA     :     18 Cr. 0016 (RJS)

       - v -     :

AKAYED ULLAH,     :

       Defendant.     :

-----------------------------------------------x

This memorandum is submitted to supplement Mr. Ullah's motion for a judgment of acquittal, in light of the Supreme Court's decision in *United States v. Davis,* 139 S. Ct. 2319, 2336 (2019). *Davis* struck down the residual clause of 18 U.S.C. § 924(c) as unconstitutionally vague. Before *Davis*, the Second Circuit in *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018) ("*Barrett I*") had upheld the constitutionality of the residual clause and held that the jury should decide whether the predicate offense was a crime of violence under that clause. *Davis* overruled *Barrett I* and shortly thereafter the Supreme Court vacated and remanded *Barrett* in light of *Davis*. *Barrett v. United States*, 139 S.Ct. 2774 (2019) The Second Circuit just issued a new opinion in *United States v. Barrett,* __ F.3d __ 2019 WL 4121728 (2d Cir. August 30, 2019) ("*Barrett II*"), holding

1

**A001229**

that the residual clause of § 924(c) is unconstitutional under *Davis* and therefore

Hobbs Act robbery conspiracy is not a crime of violence under that statute. After

*Davis* and *Barrett II*, the only basis for a conviction on Count VI, using or

carrying a destructive device during and in relation to a crime of violence in

violation of 18 U.S.C. § 924(c), would be a finding that at least one of the Counts

of conviction qualified as a crime of violence under the force clause (also called

the "elements clause") of § 924(c).

Relying on *Barrett I*, this Court submitted to the jury the question whether

each offense of conviction, as committed, constituted a crime of violence under

the residual clause, as one of the elements of the § 924(c) count charged in Count

VI. Tr. 947-49.[1] The jury answered special interrogatories specifying whether the

destructive device was used in furtherance of each count. The jury found Mr.

Ullah guilty of Count VI, the § 924(c) count, specifically finding that the he used

or carried the device in furtherance of Counts II, III, IV, and V. Tr. 997. The jury

found that Count I was not a crime of violence. *Id*. All the jury's findings that

Counts II, III, IV and V are crimes of violence are invalid under *Davis* and must be

set aside.

This Court made alternative findings that Counts III and V qualified as

---

[1]     "Tr." refers to the trial transcript.

2

**A001230**

crimes of violence under the "force" clause. Tr. 947. The Court made no such findings with respect to Counts I, II, and IV. For the reasons that follow, *Davis* requires that Count VI be vacated based on the lack of a qualifying predicate.

## I. The Categorical Approach Determines Whether a Predicate Offense Qualifies Under the Force Clause.

After *Davis*, an offense qualifies as a crime of violence only if it satisfies § 924 (c)(3)(A)'s force clause; that is, only if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." In determining whether an offense satisfies the force clause, this Court applies the categorical approach. *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018). "That means we consider the elements of the crime of conviction, not the facts of how it was committed." *United States v. Taylor*, 848 F.3d 476, 491(1st Cir. 2017). Courts look "only to the statutory definitions -- i.e., the elements -- of the offense, and not to the particular underlying facts." *Hill*, 890 F.3d at 55."Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute." *Hylton v. Sessions*, 897 F.3d 57, 60 (2d Cir. 2018), quoting *Hill* and *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). If the statute sweeps more broadly than the force clause, a conviction under that statute cannot count as a predicate, regardless of the defendant's actual conduct. *Descamps v. United States*, 570 U.S. 254, 261 (2013).

3

**A001231**

A statute that "on its face extends to conduct beyond" the definition in the force clause cannot be a crime of violence. *Hylton*, 897 F.3d at 63 Where a statute has indeterminate reach the court should look to case law to determine whether there is a "realistic probability" that the statute would apply to such conduct. *Id.* But where the statute's language makes its breadth unambiguous, there is no burden to show how it has been applied in a specific case. *Id.* at 65. Such a requirement would be "fundamentally inconsistent with formal categorical analysis." *Id.* at 65.

## II.     None of the Predicate Offenses Qualify Under the Force Clause

**A.     The jury acquitted Mr. Ullah of the § 924(c) count in relation to Count I, Providing Material Support to a Terrorist Organization, which is not a "crime of violence."**

The jury found that this predicate was not a crime of violence even under the residual clause. Nor did the Court make a finding that this offense was a crime of violence under the force clause. And, as the government concedes, the offense of providing material support to a terrorist organization clearly does not require the use of force and therefore does not qualify under the force clause of § 924(c).

A conviction for providing material support to a terrorist organization can be based on providing, among other things, "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities,

4

**A001232**

financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification information" to any organization designated by the Secretary of State as a foreign terrorist organization. 18 U.S.C. § 2339A(b)(1), 2339B(a)(1). Provision of material support has been held to include medical care, *United States v. Farhane,* 634 F.3d 127 (2d Cir. 2011), training about how to resolve disputes peacefully and to petition for relief, and political advocacy as long as it is "performed in coordination with, or at the direction of, a foreign terrorist organization." *Holder v. Humanitarian law Project*, 561 U.S.1, 130 S. Ct. 2705, 2707 (2010). Clearly, commission of this offense does not require the use of force.

> **B. Counts II and IV, Use of a Weapon of Mass Destruction (18 U.S.C. § 2332a) and Destruction of Property by Use of Explosive (18 U.S.C. § 844(i)) do not qualify under the force clause because they do not require the use of force against "the person or property of another."**

As the government concedes, the offense charged in Count IV, federal arson in violation 18 U.S.C. § 844(i), is not a crime of violence under the force clause. This is because federal arson includes the malicious destruction, by means of fire and explosive, of "*any* building, vehicle, or other real and personal *property* used in interstate and foreign commerce" and can be committed against the defendant's own property. (Emphasis added). *Id*. Therefore it does not require the use of

5

**A001233**

physical force "against the person or property *of another.*" *Russell v. United States*, 471 U.S. 858, 859-62 (1985). *See also United States v. Salas*, 889 F.3d 681, 683-84 (10th Cir. 2018) (recognizing government concession that 'arson does not require, as an element, the use of force against the property 'of another'"); *Gomez v. United States*, No. 16-56503, Dkt. Entry 13 (9th Cir. July 18, 2019) (government stipulation that federal arson is not a crime of violence after *Davis*).

The offense charged in Count II, use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a, is likewise committed by using such a device "against *any* person or *property within the United States.*" Like the arson statute, this offense by its terms can be committed against the property of the defendant himself and therefore need not be committed "against the person or property of another," as required under the force clause of section 924(c). Despite use of the same language in both statutes -- "any property" and "any person or property" -- the government has not conceded that this offense does not qualify under the force clause. But clearly this offense is not limited to use of a weapon against "the person or property *of another.*" The Second Circuit and other Circuits have held that the plain language of the term "any person" includes the defendant himself, in the statute defining sexual contact as the intentional touching of parts of "any person." *United States v. Dean*, 591 Fed. Appx. 11, 15 (2d Cir. 2014);

6

**A001234**

*United States v. Weisinger,* 586 Fed. Appx. 733, 739 (2d Cir. 2014) ("When the language is plain the language controls"); *United States v. Pawlowski,* 682 F.3d 205, 212 (3rd Cir. 2012) (" 'any' means 'every'" so "the language of the statute is unambiguous: it is clear that 'of any person' includes a defendant himself"); *United States v. Aldrich,* 566 F.3d 976, 977 (11th Cir. 2009) (plain meaning of "any person" includes the defendant). A person would be guilty of this crime, like the arson offense, by using or attempting to use a bomb to blow up his own house or car, or anything he owned, as long as it was located in the United States. *See also United States v. Gonzalez,* 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning").

There is no logical basis for distinguishing between arson and this statute in terms of its failure to meet the definition of crime of violence under the force clause. That clause requires the use of force against "the person or property of another" and each of these statutes proscribe use of an explosive or bomb against "any person or property." Like the federal arson offense, this offense is broader on its face than the definition of "crime of violence" under the force clause and does not categorically qualify. See *Descamp*s, 570 U.S. at 261; *Hylton*, 897 F.3d at 63. Therefore, neither Count II nor Count IV qualifies under the force clause.

7

**A001235**

**C.** **The sections of 18 U.S.C. § 1992 of which Mr. Ullah was convicted in Count V, (a)(2) and (a)(7), do not categorically require the use of physical force because section (a)(2)requires only a reckless state of mind and section (a)(7) prohibits the intentional commission of "any act," which can be an act of omission.**

The offense that Mr. Ullah was convicted of in Count V -- entitled "Terrorist Attacks and Other Violence Against a Mass Transportation System" -- is not a crime of violence under the force clause of section 924(c). Of the two alternative subsections of the offense of which Mr. Ullah was convicted, subsection (a)(2) requires only a reckless state of mind and subsection (a)(7) requires only the commission of any "act" with intent to cause death or serious bodily injury. Neither of these categorically require the use of force.

18 U.S.C. § 1992(a)(2) prohibits the placement of any destructive device in, upon or near a mass transportation vehicle "with intent to endanger the safety *of any person, or with reckless disregard for the safety of human life.*" (Emphasis added). An offense with a *mens rea* of recklessness does not qualify under the force clause because the use of violent force must be intentional. *See United States v. Moreno,* 821 F.3d 223, 228 (2d Cir. 2016) ("reckless conduct does not constitute a crime of violence" under the identical force clause of § 16 (a))*; Jobson v. Ashcroft,* 326, F.3d 367, 373-74 (2d Cir. 2003) (the use of physical force must be intentional; therefore, reckless manslaughter does not even pose a

8

**A001236**

substantial risk that such force will be used, and does not qualify under the residual clause of § 16(b)). *See also United States v. Begay*, 2019 WL 3884261, at * 4-6 (9th Cir. 2019) (after *Davis*, federal second degree murder no longer qualifies as a crime of violence because it can be reckless and the force (or "elements") clause requires the intentional use of force). Thus, because the offense in violation of subsection (2) can be committed with a reckless state of mind, it does not qualify as a crime of violence under the force clause. In addition, like Counts II and IV, it can be committed with the intent to endanger the safety of "any person," which includes the defendant himself.

Subsection (a)(7) of § 1992 requires only the commission of any "act" with the intent to cause death or serious bodily injury to anyone in a terminal, structure, track, or facility, etc. Any "act" is so broad that it includes acts that involve no use of force and that are acts of omission. For example, a passenger on a platform could ignore or walk away from a distraught companion who says he will jump on the tracks, or a disgruntled MTA employee could intentionally fail to remove ice, leave a slippery condition on the steps and say "I hope they fall down the stairs." The statute does not even require a result, only any act plus the intent.

The force clause requires the "use, attempted use, or threatened use of

9

**A001237**

physical force." "[U]se denotes active employment," *Bailey v. United States*, 516 U.S. 137, 150 (1995), and, in the context of a provision defining "crime of violence," "suggests a category of violent, active crimes." *Leocal v. Ashcroft*, 543 U.S. 1, 9, 11 (2004). Crimes that can be committed by inaction do not qualify. *See, e.g., Chambers v. United States*, 555 U.S. 122, 127–28 (2009)(failure to report to penal institution, which "[c]onceptually speaking, amounts to a form of inaction," "does not have 'as an element the use, attempted use, or threatened use of physical force against the person of another'") (quoting 18 U.S.C. § 924 (e)(2)(B)(i)).

Nor can an act of omission constitute the use of force. In *Chrzanoski v. Ashcroft*, 327 D.3d 188, 197 (2d Cir. 2003), the Second Circuit held that a Connecticut assault offense criminalizing intentionally causing physical injury did not fall within 18 U.S.C. § 16(a)'s identically worded force clause. *See* Conn. Gen. Stat. § 53a–61(a)(1) ("A person is guilty of assault in the third degree when ... with intent to cause physical injury to another person, he causes such injury to such person or a third person."). *Chrzanoski* reasoned: "the intentional causation of injury does not necessarily involve the use of force," explaining that "under Connecticut law, ... an individual could be convicted ... for injury caused not by physical force, but by ... deliberate omission." *Id.* at 195. Nor was that improbable:

10

**A001238**

"human experience suggests numerous examples of intentionally causing physical injury without the use of force, such as a doctor who deliberately withholds vital medicine from a sick patient." *Id.* at 196. *See also, e.g., United States v. Mayo*, 901 F.3d 218, 230 (3d Cir. 2018) (Pennsylvania aggravated assault statute that "criminalizes certain acts of omission" does not satisfy force clause); *United States v. Teague*, 469 F.3d 205, 208 (1st Cir. 2006) (Texas child endangerment statute that "captures ... negligent omissions" does not satisfy force clause).

Likewise, an employee with a duty to keep the station safe could maliciously fail to do so -- could commit the "act" of going home without clearing the ice, for example -- with the intent that people be seriously injured.  Or an employee could omit to turn on a switch or signal with the intent to cause a crash. This would be an act of omission but not the use of force, and would not qualify as a crime of violence under the force clause. Because the statute's proscription of any "act" on its face applies to acts that do not necessarily use, threaten, or attempt to use force, it categorically fails to satisfy the force clause. *Hylton*, 897 F.3d at 63.

11

**A001239**

**D.** **The offense charged in Count III, placing an explosive in a place of public use or public transportation system in violation of 18 U.S.C. § 2332f(a)(1), does not qualify under the force clause because it does not require the use of force against "the person or property of another."**

The offense charged in Count III prohibits delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use or public transportation system or attempting to do so, "with intent to cause death or serious bodily injury or to cause extensive destruction of such a place." 18 U.S.C. § 2332f(a). The minimum conduct necessary to commit this offense is the placement of an explosive device "in a place of public use" with the intent to cause death or serious bodily injury. *Id*.

A place of public use includes "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally." 18 U.S.C. § 2332f(e)(6). The statute does not require intent to cause death or serious bodily injury "to another" but includes the perpetrator himself. Thus, this statute categorically applies to one who would use such a device to blow himself up or burn himself to death in the middle of the Washington mall or other open public space. Again, such an act is not improbable but is within "human experience." *Chrzanoski* 327 F.3d at 195. *See u.c., e.g., United States v. Paul Rosenfeld*, Dkt No. 7:19 Cr. 69

12

**A001240**

(S.D.N.Y.), entries # 1, 18, 27 at ¶¶ 32-37 (defendant manufactured a bomb with the intent to blow it and himself up on the National Mall in protest of election laws);[2] https://www.nytimes.com/2019/05/29/us/politics/immolation-white-house. html (report of a man who set himself on fire at ellipse in front of White House).

### E. Attempt to commit any of the offenses of conviction is not a crime of violence under the force clause.

Each of the offenses charged in Counts I through V were charged as attempts in the alternative. Tr. 924-25, 928-29, 931-32. Therefore, the jury's verdict on each offense could have been based on only an attempt to commit the offense, which does not meet the requirements of the force clause. The jury was instructed that it could convict Mr. Ullah of this count based on an attempt and there was no special interrogatory as to whether he was convicted of the substantive offense or the attempt. An attempt to commit each offense does not require "the use, attempted use, or threatened use" of physical force against the person or property of another, as required for a crime of violence under § 924(c).

There are only two elements of a federal attempt offense: "[T]he defendant '(a) had the intent to commit the object crime and (b) engaged in conduct

---

[2]    This case was handled by the Federal Defenders office and a plea was negotiated to lesser charges in the information to avoid an indictment on more serious charges of attempted arson and attempted use of a weapon of mass destruction.

13

**A001241**

amounting to a substantial step towards its commission.'" *United States v. Anderson,* 787 F.3d 51, 73 (2d Cir. 2014), *quoting Farhane,* 634 F.3d at 145. Thus, "[a] defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed, so that 'dangerous persons [may be apprehended] at an earlier stage . . . without immunizing them from attempt liability.'" *United States v. Yousef,* 327 F.3d 56, 134 (2d Cir. 2003), *quoting United States v. Jackson,* 560 F.2d 112, 120 (2d Cir. 1977). For example, "reconnoitering the place contemplated for the commission of the crime" shall "not be held insufficient as a matter of law" to constitute a substantial step. Model Penal Code § 5.01(2)(c).

The Second Circuit, like every other federal appellate court, has adopted the Model Penal Code's definition and standards for federal attempt. *Jackson,* 560 F.2d at 117-18. *See generally Leonard B. Sand et al., Modern Federal Jury Instructions (Criminal)* ¶ 10.1 at 10-3 (2018). In defining what constitutes a "substantial step," the *MPC* lists several examples of conduct or circumstances it deems legally sufficient, including such reconnaissance and possessing materials needed for the crime (so long as they are "strongly corroborative of the actor's criminal purpose," the first element of attempt). *See* Model Penal Code § 5.01(2) (c), (e) & (g). Accordingly, where would-be robbers "reconnoitered the place

14

**A001242**

contemplated for the commission of the crime and possessed the paraphernalia to be employed in the commission of the crime," the Second Circuit held "either type of conduct, standing alone, was sufficient as a matter of law to constitute 'a substantial step.'" *Jackson,* 560 F.2d at 118-20; *see also United States v. Stallworth,* 543 F.2d 1038, 1040-41 n. 5 (2d Cir. 1976).

One can therefore attempt to commit a crime that, if completed, would be a crime of violence, without using, threatening to use, or attempting to use physical force. For example, a court in this Circuit has held that "the elements of attempt to commit robbery could clearly be met without any use, attempted use, or threatened use of violence." *United States v. Alfonso*, 2019 WL 1916100 at 83 (D. Conn. April 30, 2019) (Arterton, J.). At least three judges of the Eleventh Circuit agree. *See, e.g.*, *United States v. St. Hubert*, 918 F.3d 1174, 1210-13 (11th Cir. 2019) (Jill Pryor, J., joined by Wilson and Martin, JJ., dissenting from denial of rehearing en banc) (attempted Hobbs Act robbery is not a § 924(c) "crime of violence" because it does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another"); *see also Hylor v. United States*, 896 F.3d 1219, 1225-26 (11th Cir. 2018) (Jill Pryor, J., concurring) (attempted Hobbs Act robbery does not qualify under elements clause because one can commit this offense by "renting a getaway van, parking the van a block from

15

**A001243**

the bank, and approaching the bank door before being thwarted -- without having used, attempted to use, or threatened to use force.").

A defendant who intends to use an explosive device against any person or property (including his own) and downloads bomb-making instructions, acquires some materials, and reconnoiters his target location is guilty of attempted use a weapon of mass destruction (18 U.S.C. § 2332a) and attempted federal arson (18 U.S.C. § 844(i)) , the offenses charged in Counts II and IV. Likewise, a person who takes the same steps and intends to place a bomb in a place of public use or a subway system with intent to cause death or serious bodily injury or to cause extensive destruction of such a place is guilty of attempting to bomb a place of public use in violation 18 U.S.C. § 2332f(a), the offense charged in Count III. And a person who takes those steps with the intent to place the explosive device in, upon or near a mass transportation vehicle with intent to endanger the safety of any person, or with reckless disregard for the safety of human life is guilty of attempting to violate 18 U.S.C. § 1992(a)(2). This is despite the fact that none of these acts -- downloading instructions, gathering some supplies, or reconnoitering the target place -- nor the intent to do something at some future point, involves "the use, attempted use, or threatened use" of physical force. Because Mr. Ullah's convictions could all have been based only on attempt to commit the offenses, and

16

**A001244**

the attempts do not require as an element the "use, attempted use, or threatened use" of physical force, none of these offenses can qualify as a crime of violence predicate for the § 924(c) count.

## CONCLUSION

For the foregoing reason, a judgment of acquittal should be granted on Count VI.

_____/s/_____
**COLLEEN P. CASSIDY**
Assistant Federal Defender

_____/s/_____
**AMY GALLICCHIO**
Assistant Federal Defender

_____/s/_____
**JULIA L. GATTO**
Assistant Federal Defender

17

**A001245**

A001246

## CERTIFICATE OF SERVICE

I certify that a copy of this Supplemental Memorandum has been served by CM/ECF on the United States Attorney/S.D.N.Y; Attention: **GEOFFREY BERMAN, ESQ.**, Assistant United States Attorney; One St. Andrew's Plaza, New York, New York 10007.

Dated:  New York, New York
        September 13, 2019

            ___/s/_____
            **COLLEEN P. CASSIDY**

18

**A001247**

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Supplemental Memorandum has been served by CM/ECF on the United States Attorney/S.D.N.Y; Attention: **GEOFFREY BERMAN, ESQ.**, Assistant United States Attorney; One St. Andrew's Plaza, New York, New York 10007.

Dated:  New York, New York
       September 13, 2019

                            /s/_____
                            **COLLEEN P. CASSIDY**

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AKAYED ULLAH,

Defendant.

18 Cr. 16 (RJS)

## GOVERNMENT'S OPPOSITION TO THE
## DEFENDANT'S SUPPLEMENTAL POST-TRIAL MOTION

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
 *Of Counsel*

**A001248**

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    Applicable Law ................................................................................... 2

    II.    Count Three Qualifies as a Crime of Violence ................................. 4

    III.    Count Five Qualifies as a Crime of Violence ................................... 8

        A.    Section 1992(a)(2) is a Crime of Violence ........................... 9

        B.    Section 1992(a)(7) is a Crime of Violence .......................... 13

    IV.    Attempts to Commit the Offenses Charged in Counts Three and Five are Crimes of Violence ................................................................. 18

CONCLUSION........................................................................................................... 22

i

**A001249**

**Table of Authorities**

**Cases**

*Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017)..........................................20

*Arellano Hernandez v. Lynch*, 831 F.3d 1127 (9th Cir. 2016) ......................................................19

*Banegas Gomez v. Barr*, __F.3d__, 2019 WL 1768914 (2d Cir. Apr. 23, 2019).......................13

*Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003).............................................................14, 15

*Cornejo-Villagrana v. Sessions*, 870 F.3d 1099 (9th Cir. 2017) ............................................14, 16

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) .............................................................6, 7, 16

*Hill v. United States*, 139 S. Ct. 352 (Oct. 9, 2018).............................................................19, 20

*Hill v. United States*, 877 F.3d 717 (7th Cir. 2017) .............................................................19, 20

*Hill v. United States*, No. 18-6798, 2019 WL 113451 (Jan. 7, 2019)............................................3

*Leyones v. United States*, No. 10-CR-743(ARR), 2018 WL 1033245 (E.D.N.Y. Feb. 22, 2018) 18

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) ...............................................................................3, 7

*Morissette v. United States*, 342 U.S. 246 (1952)........................................................................18

*Neder v. United States*, 527 U.S. 1 (1999)...................................................................................17

*Sekhar v. United States*, 570 U.S. 729 (2013) .............................................................................17

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)...............................................................................20

*Stokeling v. United States*, 139 S. Ct. 544 (2019)....................................................................8, 11

*United States v. Acosta*, 470 F.3d 132 (2d Cir. 2006) ...................................................................3

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ..............................................................19

*United States v. Barrett*, __ F.3d __, 2019 WL 4121728 (2d Cir. Aug. 30, 2019).......................3

*United States v. Castleman*, 134 S. Ct. at 1408 .............................................................12, 13, 15

*United States v. Castleman*, 572 U.S. 157 (2014) ....................................................................8, 13

*United States v. Celaj*, 649 F.3d 162 (2d Cir. 2011)....................................................................19

*United States v. Collins*, 799 F.3d 554 (6th Cir. 2015)................................................................14

*United States v. Davis*, 139 S. Ct. 2319 (2019) ...................................................................1, 3, 4

*United States v. Davis*, 8 F.3d 923 (2d Cir. 1993)......................................................................19

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)..........................................................18, 19

*United States v. Hill*, 890 F.3d 51 (2d Cir. 2018) .............................................................3, 6, 8, 16

*United States v. Jason Dobey*, No. 18 Cr. 707 (LGS) (Oct. 16, 2019) ........................................14

**A001250**

*United States v. Jennings*, 860 F.3d 450 (7th Cir. 2017) .......................................................... 14

*United States v. Johnson*, 559 U.S. 133 (2010) ...................................................................... 11

*United States v. Middleton*, 883 F.3d 485 (4th Cir. 2018) ....................................................... 14

*United States v. Moreno*, 821 F.3d 223 (2d Cir. 2016) ............................................................ 10

*United States v. Ontiveros*, 875 F.3d 533 (10th Cir. 2017) ..................................................... 14

*United States v. Peeples*, 879 F.3d 282 (8th Cir. 2018) .......................................................... 14

*United States v. Reyes-Contreras*, 882 F.3d 113 (5th Cir. 2018) ........................................... 14

*United States v. Sanchez*, __F.3d__ 2019 WL 4854922 (11th Cir. Oct. 2, 2019) ...................... 13

*United States v. Scott*, 681 F. App'x 89 (2d Cir. 2017) ........................................................... 18

*United States v. St. Hubert*, 909 F.3d 335 (11th Cir. 2018) ............................................... 18, 20

*United States v. Stallworth*, 543 F.2d 1038 (2d Cir. 1976) ..................................................... 18

*United States v. Studhorse*, 883 F.3d 1198 (9th Cir. 2018) .................................................... 13

*United States v. Thrower*, 914 F.3d 770 (2d Cir. 2019) ........................................................... 18

*United States v. Tsarnaev*, 157 F. Supp. 3d 57 (D. Mass. 2016) ............................................... 5

*United States v. Upton*, 512 F.3d 394 (7th Cir. 2008) ............................................................. 14

*United States v. Walker*, 442 F.3d 787 (2d Cir. 2006) ............................................................. 19

*United States v. Waters*, 823 F.3d 1062 (7th Cir. 2016) .......................................................... 14

*Villanueva v. United States*, 893 F.3d 123 (2d Cir. 2018) ............................................. 13, 14, 16

*Voisine v. United States*, 136 S.Ct. 2272 ............................................................................ 9, 10

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................................................... 20

**Statutes**

18 U.S.C. § 1992 ........................................................................................................ 2, 8, 12, 15

18 U.S.C. § 2332 ............................................................................................................... 2, 4, 6

18 U.S.C. § 2339 ...................................................................................................................... 1

18 U.S.C. § 844 .................................................................................................................... 2, 4

18 U.S.C. § 921 .................................................................................................................... 9, 12

18 U.S.C. § 924 ............................................................................................................. 2, 3, 4, 12

Conn. Gen. Stat. §53a-60 ........................................................................................................ 10

Firearms Owners' Protection Act, § 104 ................................................................................. 18

iii

**A001251**

Fla. Stat. §812.13(1) (1995) ................................................................................ 11

Me. Rev. Stat. Ann., Tit. 17-A §207 .................................................................. 10

iv

**A001252**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AKAYED ULLAH,

Defendant.

18 Cr. 16 (RJS)

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Akayed Ullah's supplemental post-trial motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Dkt. 87) ("Def. Br."). The defendant argues that the jury's verdict on Count Six, charging a violation of 18 U.S.C. § 924(c), must be set aside because Counts One through Five no longer qualify as predicate crimes of violence following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). As explained below, the defendant's challenge to Count Six fails, because Counts Three and Five qualify as crimes of violence post-*Davis*.[1]

As the trial evidence established, on December 11, 2017, the defendant detonated a pipe bomb strapped to his chest in the Port Authority subway station. He carried out the bombing for and in the name of the Islamic State of Iraq and al-Sham ("ISIS").

The Indictment in this case charged the defendant in six counts:

- Count One: Providing material support or resources to a designated foreign terrorist organization, namely, ISIS, in violation of 18 U.S.C. § 2339B;

---

[1] The Government is not arguing that Counts One, Two, or Four qualify as crimes of violence after *Davis*, such that the Court need not address the defendant's arguments with respect to those counts.

1

**A001253**

- <u>Count Two</u>: Using a weapon of mass destruction, in violation of 18 U.S.C. § 2332a;

- <u>Count Three</u>: Bombing a place of public use and a public transportation system, in violation of 18 U.S.C. § 2332f;

- <u>Count Four</u>: Destroying property by means of explosive, in violation of 18 U.S.C. § 844(i);

- <u>Count Five</u>: Committing a terrorist attack against a mass transportation system, in violation of 18 U.S.C. § 1992; and

- <u>Count Six</u>: Using and carrying a destructive device during and in relation to, and possessing a destructive device in furtherance of, the crimes of violence charged in Counts One through Five, in violation of 18 U.S.C. § 924(c).

The defendant was convicted on all six counts at trial. With respect to Count Six, the jury found that Counts Two through Five qualified as predicate crimes of violence. (Tr. 997). On December 6, 2018, the defendant filed his initial Rule 29 motion, challenging the jury's verdicts on Count One and aspects of Count Five, and that motion was fully briefed. (Dkt. 74-76). The defendant now argues in his supplemental Rule 29 motion that the conviction on Count Six should be vacated because none of Counts One through Five qualify as crimes of violence after *Davis*. The motion should be denied, as both Counts Three and Five qualify as crimes of violence under the so-called "elements" clause of 18 U.S.C. § 924(c)(3)(A), and therefore remain valid predicates underlying the conviction on Count Six.

## **ARGUMENT**

### I. **Applicable Law**

As relevant here, Section 924(c) imposes a mandatory consecutive 30-year term of imprisonment when a defendant uses a destructive device, such as a bomb, in connection with a

2

**A001254**

"crime of violence." 18 U.S.C. § 924(c)(1)(A). The statute defines "crime of violence" as a federal felony

> (A)     [that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3)(A)-(B).

In *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court struck down the "residual" clause of Section 924(c)(3)(B) as unconstitutionally vague. *Id.* at 2336; *see also United States v. Barrett*, __ F.3d __, 2019 WL 4121728 (2d Cir. Aug. 30, 2019) (reversing Circuit precedent and holding that the residual clause is invalid under *Davis*).

Accordingly, following *Davis*, in order for an offense to serve as a predicate crime of violence for a Section 924(c) count, it must qualify as a crime of violence under the "elements" or "force" clause of Section 924(c)(3)(A). That is, the offense must "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).

Whether an offense qualifies as a crime of violence under the elements clause of Section 924(c)(3)(A) is a question of law for the court, determined by applying the "categorical approach." *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018), *cert. denied*, No. 18-6798, 2019 WL 113451 (Jan. 7, 2019). Under the categorical approach, "courts identify 'the minimum criminal conduct necessary for conviction under a particular statute,'" *Hill*, 890 F.3d at 55 (quoting *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006)), by reviewing the elements of the offense in the context of "reality, logic, and precedent." *Id.* (citing *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013)).

**A001255**

In *Davis*, the Supreme Court reaffirmed that Section 924(c)'s elements clause must be interpreted using the categorical approach. *See* 139 S. Ct. at 2328.

**II.      Count Three Qualifies as a Crime of Violence**

Count Three, which charges a violation of 18 U.S.C. § 2332f(a), has as an element the "use, attempted use, or threatened use of physical force against the . . . property of another." 18 U.S.C. § 924(c)(3)(A). It therefore qualifies as a crime of violence under the elements clause and serves as a valid predicate for the defendant's conviction on Count Six.

On its face, Section 2332f applies to the use of force against the property of another. As charged in Count Three of the Indictment, the statute prohibits "deliver[ing], plac[ing], discharg[ing], or detonat[ing] an explosive or other lethal device in, into, or against *a place of public use [or] a public transportation system* . . . with the intent to cause death or serious bodily injury, or . . . with the intent to cause extensive destruction of such a place . . . or system, where such destruction results in or is likely to result in major economic loss." (Dkt. No. 6, ¶ 3 (emphasis added)). The statute thus plainly contemplates the use of force against property that does not belong to the defendant. *See* 18 U.S.C. §§ 2332f(e)(6), (7) (defining "place of public use" as "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public" and "public transportation system" as "all facilities, conveyances, and instrumentalities, whether publicly or privately owned, that are used in or for publicly available services for the transportation of persons or cargo"). This statutory language sets Section 2332f apart from 18 U.S.C. § 2332a (Count Two) and 18 U.S.C. § 844(i) (Count Four), both of which— unlike Section 2332f—apply to the use of force against "any" property. *See* 18 U.S.C. §§ 2332a (prohibiting use of weapon of mass destruction "against *any* person or property within the United

4

**A001256**

States"), 844(i) (prohibiting use of fire or explosive to damage or destroy "*any* building, vehicle, or other real or personal property").

Tellingly, during pretrial briefing, the defense initially conceded that Count Three qualifies as a crime of violence under the elements clause (*see* Dkt. 31 at 3-4), before reversing course and adopting the novel and puzzling position that a statute criminalizing the bombing of public places somehow does not satisfy the elements clause. The Court was manifestly correct in holding, in its decision on the defendant's pretrial motions, that Count Three "qualif[ies] under the elements clause as a crime of violence" (Dkt. No. 36 at 6), and properly instructed the jury that Count Three qualifies as a crime of violence as a matter of law. *See United States v. Tsarnaev*, 157 F. Supp. 3d 57, 75-79 (D. Mass. 2016) (holding that Section 2332f qualifies as a crime of violence under the elements clause, and rejecting defendant's argument to the contrary as "a mix of ingenuity and sophistry").

The defense's supplemental brief provides no reason whatsoever to revisit the Court's ruling that Count Three qualifies under the elements clause as a crime of violence. The defense's argument regarding Count Three is unsurprisingly conclusory (*see* Def. Br. at 12-13), as any meaningful analysis yields the conclusion that Section 2332f satisfies the elements clause. The defense's reliance on the hypothetical scenario of a defendant who blows himself up in a public space like the National Mall intending to harm only himself in order to make a political statement, misses the mark entirely. A person who detonates a bomb in a public place, whether intending to harm himself and/or others, necessarily uses force—and, at the very least, attempts or threatens the use of force—against that public space, *i.e.*, the property of another.

Indeed, the bombing at issue in this case is instructive. At trial, the defense suggested that the defendant intended to harm only himself when he detonated his pipe bomb in the Port Authority

5

**A001257**

subway tunnel. Even if that were true—which it is not, as the evidence established and the jury's verdict reflects—the defendant's actions, which caused an *explosion* in the tunnel, clearly involved the use of force against property that did not belong to him. Nor is there any question that violating Section 2332f by "deliver[ing]" or "plac[ing]" a bomb in a public place (for example, by walking into the National Mall with a bomb strapped to one's body), irrespective of whether the bomb is "discharged" or "detonated," entails the use of force, or at least the attempted or threatened use of force, particularly since the statute requires that the act of delivering or placing the device be coupled with the intent to cause death, serious bodily injury, or extensive destruction. *See* 18 U.S.C. § 2332f(a); *Hill*, 890 F.3d at 57-59 ("physical force" as used in Section 924(c)(3)(A)'s elements clause does not require a "particular quantum of force," encompasses any force capable of causing injury to property, including the indirect application of force, and would include acts such as throwing paint on a house, spray painting a car, or pouring chocolate syrup on a passport). Ultimately, while the defense's hypothetical scenario illustrates that a violation of Section 2332f does not require the use of force against another *person*, the scenario does in fact involve the use of force against the *property* of another.

Moreover, even to the extent the defense's hypothetical scenario describes conduct falling outside the elements clause—which it does not, as explained above—the application of Section 2332f to such conduct is farfetched and, as far as the Government is aware, would be unprecedented. It is well established that employing the categorical approach to show that a predicate offense is not a crime of violence "'requires more than the application of legal imagination to [the] . . . statute's language.'" *Hill*, 890 F.3d at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). There must instead be "'a realistic probability, not a theoretical possibility,'" that the statute under consideration could be applied to conduct that does

6

**A001258**

not qualify under the elements clause. *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193). "To show that a particular reading of the statute is realistic, a defendant 'must at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the . . . manner for which he argues.'" *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193). "To that end, the categorical approach must be grounded in reality, logic, and precedent, not flights of fancy." *Id.* (citing *Moncrieffe*, 133 S. Ct. at 1684-85).

The defense does not cite a single case, and the Government is not aware of any, where Section 2332f was charged based on an act of political protest intended to harm only the defendant. Section 2332f—a statute that, as its title in the federal code makes clear, is intended to apply to "bombings" of public, governmental, transportation, and infrastructure facilities—is a statute historically used in cases involving *terrorist bombings*, acts of violence intended to cause and resulting in mass casualties and destruction. The statute was charged, for example, in the prosecutions stemming from the 2013 Boston Marathon bombings and the 2016 bombing in the Chelsea neighborhood of New York City.

Similarly, while the defense does not make this argument, any suggestion that Section 2332f does not require the use of force against the person or property of another because it could be applied to a "place of public use" or "public transportation system" that belongs to the defendant, is purely speculative and meritless. The Government is not aware of a single case, and the defense cites none, involving the application of Section 2332f to the bombing of a public place or transportation system that the defendant owned. Moreover, the combination of the statute's *mens rea* requirements and jurisdictional prerequisites—which further differentiate Section 2332f from the arson statute, Section 844(i)—make it virtually inconceivable, and certainly not a "realistic probability," *Hill*, 890 F.3d at 56, that a person could violate Section 2332f by blowing

7

**A001259**

up, for example, a store that he owned, without also exerting force against other property or people. *See* 18 U.S.C. § 2332f(a), (b) (requiring intent to cause "extensive destruction" and "major economic loss," and one or more jurisdictional elements such as that the offense was committed against a governmental facility or "to compel another state or the United States to do or abstain from doing any act").

In sum, the defense's motion regarding Count Three fails because the plain language of Section 2332f applies to the use, attempted use, or threatened use of force against the property of another; the hypothetical scenario posited by the defense does, in fact, involve the use of force against the property of another; and, in any event, the notion that Section 2332f would be applied to conduct somehow falling outside the elements clause is purely theoretical and utterly unrealistic. Section 2332f qualifies as a crime of violence under the elements clause, and is therefore a proper predicate for the defendant's Section 924(c) conviction.

## III.     Count Five Qualifies as a Crime of Violence

The jury convicted the defendant of violating two provisions of 18 U.S.C. § 1992 (Count Five): (1) Section 1992(a)(2), which prohibits the placement of a "destructive device . . . in, upon, or near" a "mass transportation vehicle with intent to endanger the safety of any person, or with a reckless disregard for the safety of human life"; and (2) Section 1992(a)(7), which prohibits the commission of "an act, including the use of a dangerous weapon, with the intent to cause death or seriously bodily injury to any person who is on," as relevant here, a "terminal . . . or facility used in the operation of, or in support of, a mass transportation vehicle."  18 U.S.C. §§ 1992(a)(2), (a)(4)(B), (a)(7).  Both of these provisions qualify as crimes of violence under the elements clause of Section 924(c)(3)(A) and therefore are proper predicates for Count Six.

8

**A001260**

### A.      Section 1992(a)(2) Is a Crime of Violence

Section 1992(a)(2) prohibits the knowing placement of a destructive device in, upon, or near a mass transportation vehicle with the intent to endanger the safety of any person, or with a reckless disregard for the safety of human life.  The act of placing a bomb on or near a train constitutes a use or attempted use of force, irrespective of whether the bomb is ever deployed or anyone is injured.  The Supreme Court and Second Circuit have made abundantly clear that physical force "means no more nor less than force capable of causing physical pain or injury to a person or injury to property."  *Hill*, 890 F.3d at 58.  The elements clause does not require any quantum of force, *see Stokeling v. United States*, 139 S. Ct. 544, 554 (2019) (force "does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality), and it can be satisfied even where the harm that flows from the use of force occurs indirectly, *see United States v. Castleman*, 572 U.S. 157, 171 (2014) (That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter. . . . [A]fter all, one could say that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim.").  Clearly, the placement of a bomb on or near a train involves force capable of causing pain or injury to persons or property, and is therefore a crime of violence under the elements clause.

The defendant nonetheless argues that Section 1992(a)(2) does not "categorically require the use of force" because it has a *mens rea* of recklessness.  (Def. Br. at 8).  He contends that, to qualify as a crime of violence under the elements clause, "the use of violent force must be intentional," which, he claims, Section 1992(a)(2) does not require.  (*Id.*).  This conclusory argument misapprehends the statute and ignores Supreme Court precedent squarely addressing this issue.  As discussed above, Section 1992(a)(2) plainly *does* require volitional use or attempted use

9

**A001261**

of force against property or persons: the knowing placement of a bomb on or near a mass transportation vehicle. The recklessness *mens rea* applies not to use of force, but to the potential harm such force may cause. That a person may recklessly disregard the consequence of his intentional use of force does not run afoul of the elements clause. When one knowingly places a bomb (including, as here, a suicide bomb) on or near a subway, he has used force against property of another, irrespective of his subjective intent or belief about the potential devastation or injury his placement of the bomb may cause.

*Voisine v. United States*, 136 S. Ct. 2272, which the defense declines to mention or address in its supplemental motion, is controlling. There, the Supreme Court considered whether a state misdemeanor domestic violence offense involved the "use . . . of physical force" for purposes of 18 U.S.C. § 922(g)(9), which makes it a crime for anyone convicted of a "misdemeanor crime of domestic violence" to possess a firearm. *Id.* at 2272. Similar to Section 924(c)'s elements clause, a "misdemeanor crime of domestic violence" includes a misdemeanor committed by a person with a specified relationship with the victim that "has, as an element, the use or attempted use of physical force." 18 U.S.C. § 921(a)(33)(A).

The statute at issue in *Voisine*, Section 207 of the Maine Criminal Code, makes it a misdemeanor to "intentionally, knowingly or recklessly cause[] bodily injury or physical contact to another person." Me. Rev. Stat. Ann., Tit. 17-A §207(1)(A). The petitioners in *Voisine* argued—as the defense appears to argue here—that Section 922(g)'s force provision could not apply to reckless assaults. *Voisine*, 36 S. Ct. at 2277-78. The Supreme Court rejected that argument, holding that while the force involved in the qualifying act must be volitional, the use of force "does not demand that the person applying force have the purpose or practical certainty that it will cause harm, as compared to the understanding that it is substantially likely to do so." *Id.* at

10

**A001262**

2279 ("Or, otherwise said, th[e] word [use] is indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct."). Because Section 1992(a)(2) requires the knowing use of force against people or property of another, it is a crime of violence under the elements clause.

The defendant relies on the Second Circuit's decision in *United States v. Moreno*, 821 F.3d 223 (2d Cir. 2016), for the blanket proposition that "[a]n offense with a *mens rea* of recklessness does not qualify under the force clause." (Def. Br. at 8). In *Moreno*, the Second Circuit addressed a provision of Connecticut's second-degree assault statute, which makes a person guilty of that offense if he, among other things "recklessly causes serious physical injury to another person by means of a deadly weapon or dangerous instrument." *Moreno*, 821 F.3d at 228 (quoting Conn. Gen. Stat. §53a-60). The court determined that, because the Connecticut statute "criminalizes reckless conduct" it is not a crime of violence under 18 U.S.C. § 16(a)'s elements clause.

As an initial matter, *Moreno* was decided four months before *Voisine* and may be difficult to harmonize with that decision. Moreover, *Moreno* dealt with a statute wholly distinct from Section 1992(a)(2) and is therefore of little use to the defendant even if it remains good law. Section 1992(a)(2) requires a volitional and knowing act of force—the placement of a bomb on or near a subway. The recklessness *mens rea* applies not to the use of force—which must be knowing and intentional—but to the potential consequences of it. By contrast, the provision of the Connecticut statute at issue in *Moreno* may be violated if a person commits the act of force—*i.e.*, physical injury to another—recklessly. The Supreme Court's decision in *Stokeling v. United States*, 139 S. Ct. 544 (2019), supports this distinction. The Court in *Stokeling* considered whether a Florida statute defining robbery as "'the taking of money or other property . . . from the person or custody of another, . . . when in the course of the taking there is the use of force, violence,

11

A001263

assault or putting in fear'" was a crime of violence under the Armed Career Criminal Act ("ACCA"). *Stokeling*, 139 S. Ct. at 549 (quoting Fla. Stat. § 812.13(1) (1995)). The Supreme Court determined that it was, holding that the definition of "physical force" was "'force capable of causing physical pain or injury.'" *Id.* at 554 (quoting *United States v. Johnson*, 559 U.S. 133, 140 (2010)). As with Section 1992(a)(2), the "use of force" contemplated by the Florida statute at issue in *Stokeling*—*i.e.*, the taking of money or property from the person through force or violence—is built into the elements of the offense, not, as in *Moreno*, into the potential consequence of that offense. Thus, even if *Moreno* remains good law, it is of no help to the defense in this case.

Finally, the defendant's one-sentence argument that Section 1992(a)(2) does not qualify as a crime of violence because it can be committed with intent to endanger the safety of "any person," including the defendant himself (Def. Br. at 9), fails for the same reasons articulated above with respect to Count Three. The defense conveniently ignores that, apart from endangering the safety of another person, the elements clause also includes the use, attempted use, or threatened use of force against the *property* of another. 18 U.S.C. § 924(c)(3)(A). Section 1992(a)(2) clearly satisfies this requirement. The statute prohibits placing a bomb—*i.e.*, using, attempting, or intending force—"in, upon, or near railroad ontrack equipment or a mass transportation vehicle"—*i.e.*, property that does not belong to the defendant. Indeed, the defense initially conceded in pretrial briefing that Count Five was a crime of violence under the elements clause (*see* Dkt. No. 31 at 3-4), and the Court properly instructed the jury that it qualified as a crime of violence as a matter of law. There is no basis to revisit that decision now.

12

**A001264**

**B.     Section 1992(a)(7) Is a Crime of Violence**

Section 1992(a)(7) prohibits "an act, including the use of a dangerous weapon, with the intent to cause death or seriously bodily injury to any person who is on," as relevant here, a "terminal . . . or facility used in the operation of, or in support of, a mass transportation vehicle." 18 U.S.C. § 1992(a)(2), (a)(4)(B), (a)(7).  The defendant argues that Section 1992(a)(7) is not a crime of violence under the elements clause because it encompasses "acts that involve no use of force and are acts of omission." (Def. Br. at 9).  Once again, the defendant relies on abrogated or non-binding case law and ignores the controlling authority that dooms his argument.

In *United States v. Castleman*, the Supreme Court addressed what it means to "use" physical force.  The issue in that case was whether a defendant's prior conviction for "intentionally or knowingly caus[ing] bodily injury" to the mother of his child, in violation of Tennessee law, qualified as a "misdemeanor crime of domestic violence" for purposes of 18 U.S.C. § 922(g)(9). 134 S. Ct. at 1408.  To qualify as a "misdemeanor crime of domestic violence," the crime had to (among other things) "ha[ve], as an element, the use . . . of physical force." 18 U.S.C. § 921(a)(33)(A)(ii).  The Court held, first, that "physical force" in this context should bear its common-law meaning and thus include "offensive touching." 134 S. Ct. at 1410.  The Court then turned to the question of whether the Tennessee statute at issue had use of force "as an element," even though it did not expressly require that "bodily injury" be inflicted by any particular means. *See id.* at 1413-14.  The Court answered yes, reasoning that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *Id.* at 1414.  In reaching this conclusion, the Court rejected the petitioner's suggestion that deceiving someone into drinking poison, without ever making contact with the victim, could not qualify as "use" of physical force.

13

**A001265**

*Id.* at 1414-15.  "That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter."  *Id.* at 1415.

Although the majority in *Castleman* declined to reach the question "[w]hether or not the causation of bodily injury necessarily entails violent force," *id.* at 1413, the Second Circuit has subsequently held that a crime which has as an element the causing of serious bodily injury or death by intentional action necessarily has as an element the use of violent force.  *See, e.g.*, *Banegas Gomez v. Barr*, __F.3d__, 2019 WL 1768914, at *4 (2d Cir. Apr. 23, 2019) (Connecticut first-degree assault is a "crime of violence" under the force clause of 18 U.S.C. § 16(a) because "'the knowing or intentional causation of bodily injury necessarily involves the use of physical force'") (quoting *Castleman*, 572 U.S. at 169); *Villanueva v. United States*, 893 F.3d 123, 129 (2d Cir. 2018) (Connecticut statute criminalizing the causing of "serious physical injury to another person" with intent to do so and by means of a "dangerous instrument" qualifies as a violent felony under ACCA's force clause, even where assault could be committed by, for example, poison).[2]

---

[2] *See also United States v. Sanchez*, __F.3d__, 2019 WL 4854922, at *7-*8 (11th Cir. Oct. 2, 2019) (rejecting "omission" argument with respect to New York's second-degree murder statute, which prohibits killing "[w]ith intent to cause the death of another person," because "the intentional causation of bodily injury or death, even by indirect means such as withholding medical treatment or food, necessarily involves the use of physical force"); *United States v. Studhorse*, 883 F.3d 1198, 1205 (9th Cir. 2018) (in holding that Washington attempted murder qualified as a crime of violence under 18 U.S.C. § 16(a), reaffirming that "'the use of physical force' may not be dissociated from intentionally or knowingly causing physical injury'" (quoting *Cornejo-Villagrana v. Sessions*, 870 F.3d 1099, 1106 (9th Cir. 2017)); *United States v. Peeples*, 879 F.3d 282, 287 (8th Cir. 2018) ("Because it is impossible to cause bodily injury without force, it would also be impossible to cause death without force."); *United States v. Ontiveros*, 875 F.3d 533, 536-38 (10th Cir. 2017) (explaining that *Castleman*'s "logic is applicable to the 'physical force' requirement as used in a felony crime of violence"); *United States v. Jennings*, 860 F.3d 450, 458-60 (7th Cir. 2017) ("a criminal act (like battery) that causes bodily harm to a person necessarily entails the use of physical force to produce the harm" under ACCA's force clause); *United States v. Waters*, 823 F.3d 1062, 1064-66 (7th Cir. 2016) ("proving intentional causation of bodily harm 'unambiguously requires proving physical force'" (quoting *United States v. Upton*, 512 F.3d 394, 405 (7th Cir. 2008)); *United States v. Collins*, 799 F.3d 554, 597 (6th Cir. 2015) ("crimes which require proof of physical injury necessarily have as an element the use, attempted use, or threatened

14

**A001266**

Notwithstanding this binding authority, the defendant relies on an "outdated conception of force," *Villaneuva*, 893 F.3d at 130, to argue that Section 1992(a)(7) is not a crime of violence under the elements clause because it encompasses omissions or acts that do not involve force. (Def. Br. at 9). The authority on which the defendant principally relies for this argument, *Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003), was—as the Second Circuit repeatedly has recognized—abrogated by *Castleman*. *See Villanueva*, 893 F.3d at 130 ("*Chrzanoski . . .* has been abrogated by the Supreme Court's decision in *Castleman*); *Hill*, 832 F.3d at 144 ("the *Chrzanoski* panel did not have the benefit of the Supreme Court's reasoning in *Castleman* to the effect that a use of physical force can encompass acts undertaken to cause physical harm, even when the harm occurs indirectly"). *But see United States v. Jason Dobey*, No. 18 Cr. 707 (LGS), Dkt. No. 27 (Oct. 16, 2019). The question in *Chrzanoski* was whether intentional third-degree assault in violation of Connecticut law qualified under the force clause of 18 U.S.C. § 16(a). In holding that it did not, the Second Circuit reasoned that nothing in the Connecticut statute "require[d] the government to prove that force was used in causing the injury," and even intentional causing of physical injury was not necessarily a "use of force." 327 F.3d at 193, 195. To support its conclusion that "the intentional causation of injury does not necessarily involve the use of force," the court observed that "human experience suggests numerous examples of intentionally causing

---

use of physical force against the person of another" within meaning of Sentencing Guidelines force clause (quotation marks and citation omitted)). *But see, e.g.*, *United States v. Middleton*, 883 F.3d 485, 491 (4th Cir. 2018) (in context of statute that did not require intentional causing of bodily injury or death, stating that "*Castleman* does not support the Government's argument that any form of bodily injury requires violent force"); *United States v. Reyes-Contreras*, 882 F.3d 113, 122-23 (5th Cir. 2018) (holding that *Castleman* does not abrogate circuit precedent requiring direct application of physical force under ACCA).

15

**A001267**

physical injury without the use of force, such as a doctor who deliberately withholds vital medicine from a sick patient." *Id.* at 196.

*Chrzanoski*'s reasoning does not survive *Castleman*, which forecloses the defendant's argument here. Section 1992(a)(7) prohibits the commission of "an act, including the use of a dangerous weapon, *with the intent to cause death or seriously bodily injury* to any person who is on," certain mass transportation property described in the statute. 18 U.S.C. §1992(a)(7) (emphasis added). C*astleman* expressly rejected the notion that "the intentional causation of injury does not necessarily involve the use of force," *Chrzanoski*, 327 F.3d at 195, instead concluding the opposite: "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *Castleman*, 134 S. Ct. at 1414; *accord id.* at 1416-17 (Scalia, J., concurring) ("it is impossible to cause bodily injury without using force 'capable of ' producing that result"). Because Section 1992(a)(7) requires a perpetrator to commit an act with the intent to cause death or serious injury, it necessarily implicates an act of force, and is therefore a crime of violence under the elements clause.

Indeed, even the far-fetched hypotheticals the defense poses in its supplemental motion— walking away from a passenger who declares he's going to jump on the tracks and kill himself, or failing to remove ice from the subway stairs (Def. Br. at 9-11)—would involve the use of force if they were committed with the intent to injure others, as required by the statute. *Castleman* made clear that, for purposes of determining whether an act or failure to act constitutes force, it does not "matter that the mechanism of harm is negative (pinching off the victim's oxygen supply or withholding an EpiPen in the midst of a severe allergic reaction) or positive (swinging a fist or administering poison)," if "the natural and intended result of that force in physical pain, injury, or illness." *United States v. Jennings*, 860 F.3d at 458-60 (rejecting argument that Minnesota felony

16

**A001268**

domestic assault does not require use of force because it could be violated through intentional withholding of food or medicine); *see also Villanueva*, 893 F.3d at 129 ("initiating, however gently, a consequence that inflicts injury constitutes the use of physical force"); *Cornejo-Villagrana*, 870 F.3d at 1105 ("the 'use of physical force' may not be dissociated from intentionally and knowingly causing physical injury"). Because Section 1992(a)(7) requires that an act be committed with intent to cause serious injury, it is a crime of violence under the elements cause.

Finally, although the defendant does not argue that Section 1992(a)(7) is not a crime of violence because it requires intent to seriously injure "any person," which could include the defendant himself, such argument would also fail. Application of the statute to a theoretical scenario in which a person commits an act on a subway or mass transit equipment with intent *only* to seriously injure himself requires "legal imagination." *Hill*, 890 F.3d at 56 (quoting *Duenas-Alvarez*, 549 U.S. at 193). 18 U.S.C. § 1992 penalizes terrorist attacks and other acts of violence in or against mass transportation systems. The Government is unaware of any case in which the statute has been applied to conduct solely intended to injure the perpetrator—such as, for example, a suicide by stabbing or ingesting poison—nor is there a "realistic probability" that Section 1992 could be applied to that conduct. *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193).

Because Section 1992(a)(7) requires the use, attempted use, or intended use of force against another person, it is a crime of violence under the elements clause. It is therefore a proper predicate for Count Six.

17

**A001269**

**IV.     Attempts to Commit the Offenses Charged in Counts Three and Five Ar Crimes of Violence**

Finally, the defendant contends, as relevant here, that Counts Three and Five are not crimes of violence under the elements clause because they were charged as attempts in the alternative.[3] (Def. Br. at 13).  This argument also fails.  Any conduct sufficient to qualify as an attempt to commit a crime of violence necessarily also has as an element the attempted use of physical force. As discussed above, Sections 1992(a) and 2332f(a) are crimes of violence—they each require the use of force against persons or property of another.  Thus, to the extent the jury convicted the defendant of attempting to commit those crimes, as opposed to completing them, they necessarily found that he attempted to use such force.

Congress considers proposed legislation against the backdrop of the statutory scheme it would join, so when Congress includes a particular term of art in a new law, it presumably intends to use that term's accepted definition in that context.  "It is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'"  *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)).  Thus, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."  *Morissette v. United States*, 342 U.S. 246, 263 (1952).

---

[3] The defense appears to be reversing course from the argument they made during the charge conference that the offenses alleged in this case constituted a "completed action."  (Tr. 708; *see also* Tr. 710 ("MS. GATTO:  the bomb explode[d], and there's absolutely no question that this is a case about a completed crime. . . . What you have here is the most completed of all offenses . . . . )).

18

**A001270**

The definition of "attempt," in both federal law and in the Model Penal Code, had long since been established by the time the current version of Section 924(c)(3)(A) was adopted in 1986. The Second Circuit "effectively adopted the Model Code's formulation of attempt in *United States v. Stallworth*, 543 F.2d 1038, 1040–41 (2d Cir. 1976)." *United States v. Farhane*, 634 F.3d 127, 146 (2d Cir. 2011); *see* Firearms Owners' Protection Act, § 104(a)(2)(B), (C), and (F), 100 Stat. 457 (1986). So when Congress used "attempted use" of force in Section 924(c)(3)(A), without providing a different definition, they intended to use the concept of "attempt" existing under federal law at the time.

"Attempt" requires a substantial step toward commission of the offense, coupled with the intent that the offense be completed. *United States v. Thrower*, 914 F.3d 770, 776 (2d Cir. 2019). Thus, the "attempted use" prong of Section 924(c)(3)(A)'s definition of "crime of violence" covers any offense that has as an element a substantial step toward using physical force coupled with an intent to use such force. Every attempt to commit a crime of violence satisfies this standard. *See, e.g.*, *United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017) ("Attempted murder in the second degree is a crime unmistakably involving 'an attempted use . . . of physical force' within § 924(c)(3)(A)." (ellipses in original)); *United States v. St. Hubert*, 909 F.3d 335, 352 (11th Cir. 2018) ("[T]he definition of a crime of violence in § 924(c)(3)(A) equates the use of force with attempted force, and thus the text of § 924(c)(3)(A) makes clear that actual force need not be used for a crime to qualify under § 924(c)(3)(A)."); *Leyones v. United States*, No. 10-CR-743(ARR), 2018 WL 1033245, at *4 (E.D.N.Y. Feb. 22, 2018) (attempted bank robbery under 18 U.S.C. § 2113 constitutes a crime of violence under the elements clause); *United States v. Walker*, 442 F.3d 787, 788 (2d Cir. 2006) (holding that attempted New York assault is a "violent felony" under the Armed Career Criminal Act); *Hill v. United States*, 877 F.3d 717, 718-19 (7th Cir. 2017)

19

**A001271**

("When a substantive offense would be a violent felony under § 924(e) and similar statutes, an attempt to commit that offense also is a violent felony."), *cert. denied*, 139 S. Ct. 352 (Oct. 9, 2018); *Arellano Hernandez v. Lynch*, 831 F.3d 1127, 1132 (9th Cir. 2016) ("We have generally found attempts to commit crimes of violence, enumerated or not, to be themselves crimes of violence." (internal quotation marks omitted)).

Consistent with the attempt instruction this Court provided to the jury (*see* Tr. 924), the Second Circuit has held that "for a defendant to have taken a 'substantial step,' he must have engaged in more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime." *United States v. Anderson*, 747 F.3d 51, 73-74 (2d Cir. 2014) (quoting *United States v. Celaj*, 649 F.3d 162, 171 (2d Cir. 2011)). The focus is not on what aspect of the offense the act furthers, but on the nature of the act related to the offense as a whole. "[T]he identification of a substantial step, like the identification of attempt itself, is necessarily a matter of degree that can vary depending on the particular facts of each case viewed in light of the crime charged." *United States v. Farhane*, 634 F.3d 127, 147 (2d Cir. 2011) (quotations and citations omitted). "[I]mportant to a substantial-step assessment is an understanding of the underlying conduct proscribed by the crime being attempted." *Id.* at 148. "Conduct is not considered a substantial step unless it is strongly corroborative of the criminal intent of the accused." *United States v. Davis*, 8 F.3d 923, 927 (2d Cir. 1993).

Thus, any offense that has as an element the use or threatened use of force necessarily has as an element the attempted use of force. If a defendant has gone beyond mere preparation for the crime, as required to commit an attempt, to the point of affirmative conduct planned clearly to

**A001272**

complete the offense, that defendant has attempted to use force.[4] The defendant has taken

concrete, directed action with the intent that offense take place, and as such has taken a substantial

step toward using force. Taking a substantial step toward committing the physical acts of force

proscribed by the statutes charged in Counts Three and Five—placing a bomb on a train,

committing an act in a mass transit system that is intended to cause serious injury to others, and

bombing public property—necessarily requires a defendant to have attempted to use force against

persons or property of another. "'Given §924(c)'s statutory specification that an element of

attempted force operates the same as an element of completed force, and the rule that conviction

of attempt requires proof of an intent to commit all elements of the complete crime,'" an attempt

to commit a crime of violence is also a crime of violence. *St. Hubert*, 909 F.3d at 352 (quoting

*Hill*, 877 F.3d at 719).

Finally, the defense's speculation about what a defendant could theoretically do to be guilty

of attempting to commit the offenses charged in Counts Four and Five (*see* Def. Br. at 16) is

precisely the kind of conduct-specific analysis courts routinely reject under the categorical

approach. *Davis* reinforces the admonition that the force clause looks to what an offense typically

entails. *See* 139 S. Ct. at 2328-29 (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018)

(stating that "everyone agrees that, in connection with the elements clause, the term 'offense'

---

[4] This interpretation also gives the "attempted use" provision of § 924(c)(3) some meaning independent of the "use" or "threatened use" of force. It is "a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotations omitted); *see also Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("the employees' construction runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason"). No federal criminal offense defines its elements by reference to the "attempted use" of force. As a result, Congress must have intended this provision to apply not to a nonexistent offense with such an element, but rather to attempts to commit crimes involving the use or threatened use of physical force.

carries . . . [a] 'generic' meaning" that refers to "what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion"). Moreover, and to the extent the defense's speculative examples are properly considered when applying the categorical approach, they would themselves qualify as crimes of violence under the elements clause. In posing these hypotheticals, the defense appears to ignore that the elements clause includes attempted or threatened use of force. The suggestion that "a person who downloads bomb-making instructions, acquires some materials, and reconnoiters his target location" has not attempted or threatened to use force should be readily rejected.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's supplemental post-trial motion.

Dated: New York, New York
       October 22, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:            /s/
   Shawn G. Crowley
   Rebekah Donaleski
   George D. Turner
   Assistant United States Attorneys
   212-637-1098 / 2423 / 2562

22

**A001274**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X

UNITED STATES OF AMERICA,   :     **18 Cr. 0016 (RJS)**

          Plaintiff,   :

      - v -           :

**AKAYED ULLAH**,       :

          Defendant.  :

-----------------------------------------------X

## **DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO SUPPLEMENTAL MEMORANDUM IN SUPPORT OF RULE 29 MOTION**

> Federal Defenders of New York, Inc.
> 52 Duane Street - 10th Floor
> New York, New York 10007
> Tel.: (212) 417-8700
> *Attorney for Defendant*
>   **AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 Of Counsel

To:  **GEOFFREY BERMAN, ESQ.**
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007

  Attn.:  **SHAWN G. CROWLEY, ESQ.,**
        **REBEKAH A. DONALISKI, ESQ.,**
        **GEORGE TURNER, ESQ.,**
        Assistants United States Attorney

# A001275

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Count III is Not Categorically a Crime of Violence. . . . . . . . . . . . . 1

      B.    Count V is Not a Categorical Crime of Violence . . . . . . . . . . . . . . . 3

      C.    Attempt to Commit Count III or V is Not a Crime of
           Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**A001276**

# TABLE OF AUTHORITIES

*CASES*

*Banegas Gomez v. Barr,* 922 F.3d 101 (2d Cir. 2019). . . . . . . . . . . . . . . . . . 10, 11

*Bennett v. United States,* 868 F.3d 1 (1st Cir. 2017).. . . . . . . . . . . . . . . . . . . . . 5

*Chrzanoski v. Ashcroft,* 327 F.3d 188 (2d Cir. 2003). . . . . . . . . . . . . . . . 6, 7, 9, 10

*Descamps v. United States,* 570 U.S. 254 (2013). . . . . . . . . . . . . . . . . . . . . . . . 14

*Grant v. United States,* 2017 WL 2881132.. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hylton v. Sessions,* 897 F.3d 57 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . 2, 14

*Jobson v. Ashcroft,* 326, F.3d 367 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 4, 7

*Leocal v. Ashcroft,* 543 U.S. 1 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sessions v. Dimaya,* 138 S. Ct. 1204 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Brown,* 322 F. Supp. 3d (S.D.N.Y. 2018). . . . . . . . . . . . . . . . 7, 9

*United States v. Castleman,* 134 S. Ct. 1405 (2014).. . . . . . . . . . . . . . . 8, 9, 10, 11

*United States v. Davis*, 139 S. Ct. 2319, 2328-29 (2019). . . . . . . . . . . . . . . . . . 13

*United States v. DeFreitas,* 2010 WL 2292194 (E.D.N.Y. June 3, 2010). . . . . . . . 2

*United States v. Dobey,* 2019 WL 5205475 (S.D.N.Y. Oct. 16, 2019). . . . . 7, 9, 10

*United States v. Hausa,* 258 F. Supp. 3d ( E.D.N.Y. 2017). . . . . . . . . . . . . . . . . 2

*United States v. Hubert,* 909 F.3d 335 (11th Cir. 2018).. . . . . . . . . . . . . . . . . . 12

*United States v. Kadir,* 718 F.3d 115 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . 2

A001277

*United States v. Mayo,* 901 F.3d 218 (3d Cir. 2018). . . . . . . . . . . . . . . . . . . . 7, 9

*United States v. Moreno,* 821 F.3d 223 (2d Cir. 2016).. . . . . . . . . . . . . . . . . . 4, 6

*United States v. Orona,* 923 F.3d 1197(9th Cir. 2019).. . . . . . . . . . . . . . . . . . 4, 5

*United States v. Pereira-Gomez,* 903 F.3d 155 (2d Cir. 2018).. . . . . . . . . . . . . 12

*United States v. Reyes-Contreras,* 910 F.3d 169 (5th Cir. 2018). . . . . . . . . . . . . 9

*United States v. Rose,* 896 F.3d 104 (1st Cir. 2018).. . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Scott,* 2017 WL 2414796 (S.D.N.Y. July 2, 2018).. . . . . . . . . . 7, 9

*United States v. Scott,* 681 Fed. Appx 89, 95 (2d Cir. 2017). . . . . . . . . . . . . 11, 12

*United States v. Thrower,* 914 F.3d 770 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . 12

*United States v. Tsarnaev,* 157 F. Supp. 3d (D. Mass. 2016).. . . . . . . . . . . . . . . 3

*United States v. Walker,* 442 F.3d 787 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . 12

*Villanueva v. United States,* 893 F.3d 123 (2d Cir. 2018). . . . . . . . . . . . . . 8, 10, 11

*Voisine v. United States,* 136 S. Ct. 2272 (2016). . . . . . . . . . . . . . . . . . . . . 4, 5, 6

## STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 1992(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 9

18 U.S.C. § 1992(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2332f(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.Y. Penal Law § 16(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

N.Y. Penal Law § 125.15(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

iii

**A001278**

N.Y. Penal Law § 125.20(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tenn. Code Ann. §§ 39-13-101(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**A001279**

## INTRODUCTION

The government does not contend that the crimes charged in Counts I, II, or IV are crimes of violence within the definition of the force (or elements ) clause. G. Mem. at 1. It contends, consistent with this Court's finding below, Tr. 947, that only Counts III and V qualify under the force clause. We respond to those arguments here.

### A.      Count III is Not Categorically a Crime of Violence

The government contends that 18 U.S.C. § 2332f(a) is a crime of violence because, at a minimum, it requires the use of force against the property of another. G. Mem. 5-6. It does not. The statute prohibits the placing of an explosive in a place of public use with intent to cause death or serious bodily injury. By its terms, it applies to one who wears a bomb onto any place of public use -- which would include a wide open field, a beach, or even a lake or other body of water -- with intent to cause death or serious physical injury to any person, including the actor himself. Therefore, it does apply to the person who attempts to blow himself up or immolate himself in a public place, like the National Mall.

The government counters that this scenario is "farfetched"  because we have not cited a case in which the statute has been applied that way. G. Mem. 6-7. 18 U.S.C. § 2332f(a) is a statute of recent enactment (2002) and there are few

1

**A001280**

reported cases charging a violation of this statute. Those few involve a crime committed in a public transportation system or a government facility, not the more general "place of public use." *See, e.g.*, *United States v, Kadir*, 718 F.3d 115 (2d Cir. 2015); *United States v. Hausa*, 258 F. Supp. 3d 265 ( E.D.N.Y. 2017); *United States v. DeFreitas*, 2010 WL 2292194 (E.D.N.Y. June 3, 2010). Thus the lack of reported cases thus far that does not mean the statute does not apply to the person who brings an explosive to blow himself up into a wide open public space. It clearly does, on its face. Indeed, in our opening memorandum we did cite a case in which this charge was threatened against a defendant, a client of the Federal Defenders, who had attempted just that -- to bring a bomb to the National Mall and blow himself in protest against the elections laws. *United States v. Paul Rosenfeld*, Dkt No. 7:19 Cr. 69 (S.D.N.Y.), entries #1, 18, 27 at ¶¶ 32-37. This charge and an arson charge were averted when the defendant pled guilty to an information charging lesser counts. The government has no response to this.

Moreover, the Second Circuit has held that if the statute "on its face extends to conduct beyond" the definition in the force clause, it is not necessary to show how it has been applied in a specific case. *Hylton v. Sessions*, 897 F.3d 57, 65 (2d Cir. 2018). Such a requirement would be "fundamentally inconsistent with formal categorical analysis." *Id*.

2

**A001281**

The government contends that this set of facts still involves the use of force against the property of another because the bomb would be detonated on government property. G. Mem. 6. While such a crime *could* involve the use force against public property, for example, if it were committed inside a building, it would not *necessarily* involve the use of force if committed in a wide open space like the National Mall, or in a body of water.

Finally, the government relies on the Massachusetts District Court's decision in *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 75-79 (D. Mass. 2016), rejecting the argument that this offense does not categorically require the use of force.[1] That court undertook no analysis whatsoever, but simply rejected the argument that "bombing a place of public use," as well as arson and use of a weapon of mass destruction (both conceded by the government here not to qualify), were not crimes of violence as "refuted by its mere statement." *Id*. at 76-77.

**B.    Count V is Not a Categorical Crime of Violence**

As argued in the defendant's supplemental memorandum at 8-9 , an offense with a reckless *mens rea* does not qualify under the force clause because the use

---

[1]The government claims, incorrectly, that the defense conceded that Count III was a crime of violence under the elements clause before  trial. In the letter motion the government refers to, defense counsel did not make the argument made here with respect to Count III, but it conceded nothing. (Dkt. 31).

3

**A001282**

of violent force must be intentional. *See United States v. Moreno,* 821 F.3d 223, 228 (2d Cir. 2016) ("reckless conduct does not constitute a crime of violence" under the identical force clause of § 16 (a))*; Jobson v. Ashcroft,* 326, F.3d 367, 373-74 (2d Cir. 2003) (the use of physical force must be intentional; therefore, reckless manslaughter does not even pose a substantial risk that such force will be used, and does not qualify under the residual clause of § 16(b)). 18 U.S.C. § 1992(a)(2) allows conviction based on reckless disregard for the safety of human life and therefore is not categorically a crime of violence.

The government contends that the Supreme Court essentially overruled these cases in *Voisine v. United States*, 136 S. Ct. 2272 (2016), when it held that a reckless misdemeanor assault could qualify as the use of physical force under a different statute, not § 924(c), prohibiting anyone convicted of a misdemeanor crime of domestic violence from possessing a firearm. G. Mem. 10-11. The government is incorrect. This Circuit has not addressed the impact, if any, of *Voisine* on prior case law holding that a reckless crime is not a crime of violence under the force clause, but the First and Ninth Circuits have addressed this question and held in well-reasoned opinions that *Voisine* does not undermine their holdings that reckless conduct cannot qualify as a crime of violence under the force clause of § 924(c). *United States v. Orona*, 923 F.3d 1197(9th Cir. 2019);

4

**A001283**

*United States v. Rose*, 896 F.3d 104, 109-110 (1st Cir. 2018).

Both the First and Ninth Circuit distinguished *Voisine* from both *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004) (negligent conduct does not qualify as use of force under the identical force clause of § 16(b)) and their own case law holding that reckless conduct does involve the use of physical force, on the ground that the particular statute at issue in *Voisine* was deliberately broad and meant to sweep in reckless behavior. *Orona*, 923 F.3d at 1201; *Bennett v. United States*, 868 F.3d 1, 15-17 (1st Cir. 2017), opinion vacated on ground of mootness but reasoning relied on in *Rose*, 896 F.3d at 109-110. As *Orona* explained, *Voisine*'s reasoning relied on the broad purpose and history of the statute: "Congress enacted § 922(g)(9) in 1996 to bar those domestic abusers convicted of garden-variety assault or battery misdemeanors -- just like those convicted of felonies -- from owning guns . . . In linking § 922(g)(9) to those laws, Congress must have known that it was sweeping in some persons who had engaged in reckless conduct." *Voisine*, 136 S. Ct. at 2280, *quoted in Orona*, 923 F.3d at 1201. The inclusion of misdemeanors in that statute obviously evinces a very different, far broader reach than § 924(c)'s limitation to violent felonies.

Indeed, as both the First and Ninth Circuits noted, *Orena*, 923 F.3d at 1202; *Bennett*, 868 F.3d at 17, *Voisine* expressly limited its holding to the specific

5

**A001284**

provision before it and stated that its decision "does not resolve whether §16 [whose force clause is identical to § 924(c)'s] includes reckless behavior." 136 S.Ct. at 2280 n. 4. The Supreme Court explained: "Courts have sometimes given those two statutory definitions divergent readings in light of differences in their contexts and purposes, and we do not foreclose that possibility with respect to their required mental states. " *Id*. The First Circuit ultimately held that any remaining ambiguity as to whether the § 924(c) force clause applies to reckless conduct must be resolved by the rule of lenity. *Rose*, 896 F.3d at 109-110.

In this Circuit also, there is precedent holding that an offense with a reckless *mens rea* does not constitute a crime of violence under the force clause. *Moreno*, 821 F.3d at 228. *Voisine* did not overrule *Moreno*; to the contrary, *Voisine* explicitly stated that its holding only applied to the statute before it and that it might well not apply to the definition in § 924(c). *Voisine* provides no ground to disregard Second Circuit precedent, which binds this Court.

As argued in our supplemental memorandum at 9-11, the alternative subsection of §1992 charged against Mr. Ullah, (a)(7), is not categorically a crime of violence because it prohibits any "act," even an act of omission. The Second Circuit has held that an act of omission does not necessarily involve the use of force. *Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003). *Accord United States*

6

**A001285**

*v. Mayo*, 901 F.3d 218, 230 (3d Cir. 2018). *Chrzanoski* establishes that doing nothing, even if injury results, does not constitute the use of force. On the same analysis, this Court has held that offenses that can be committed by omission do not present a substantial risk of the use of force, for purposes of § 16(b). *Jobson*, 326 F.3d at 373 (New York second-degree manslaughter, N.Y. Penal Law § 125.15(1) "does not necessarily present 'a substantial risk that physical force against the person . . . of another may be used'" because "omissions alone are sufficient for conviction") (quoting § 16(b)). Accordingly, courts in this district have applied *Chrzanoski* and held that New York state manslaughter and assault offenses that can be accomplished by omission do not satisfy the force clause. *E.g.*, *United States v. Dobey*, 2019 WL 5205475 (S.D.N.Y. Oct. 16, 2019) ( New York first-degree manslaughter is not a crime of violence under the Guidelines force clause); *United States v. Brown*, 322 F. Supp. 3d 459 (S.D.N.Y. 2018) (New York second degree assault is not a crime of violence under the Guidelines force clause); *United States v. Scott*, 2017 WL 2414796, at *2–3 (S.D.N.Y. July 2, 2017) (first-degree manslaughter, N.Y. Penal Law § 125.20(1), is not violent felony under ACCA). *See also Grant v. United States*, 2017 WL 2881132, at *5–6 (E.D.N.Y. July 5, 2017) (§ 120.05(1) is not violent felony under ACCA).

The government contends that *Chrzanoski* has been abrogated by *United*

7

**A001286**

*States v. Castleman*, 134 S. Ct. 1405, 1415 (2014), that *Castleman* governs this case, and that a crime of omission necessarily involves violent physical force so long as there is intent to cause serious physical injury. G. Mem. 13-15. The government is wrong. *Castleman* did not address inaction or crimes of omission at all. Neither did *Villanueva v. United States,* 893 F.3d 123 (2d Cir. 2018), the other case on which the government relies. G.Br. 42-43. And no case cited by the government holds that the mere intent to cause death or serious physical injury constitutes the use of force, as the government contends. G. Mem. at 16-17.

The question in *Castleman* was whether the defendant's prior conviction for Tennessee assault was a "misdemeanor crime of domestic violence" -- meaning one requiring "use of physical force" -- which precluded him possessing a gun. Specifically, his prior conviction was for "'intentionally or knowingly caus[ing] bodily injury to' the mother of his child" in violation of Tenn. Code Ann. §§ 39-13-101(a)(1) and 39-13-111(b). *Castleman*, 134 S. Ct. at 1409.

Castleman argued that this offense could be committed by using force indirectly -- such as by "sprinkl[ing] poison in a victim's drink," *id.* at 1415 -- and that indirect uses of force do not count under the federal statute. The Court disagreed: "The 'use of force' . . . is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly

8

**A001287**

(as with a kick or punch), does not matter." *Id.* The Court said nothing about inaction.

The *Castleman* Court did not consider whether inaction is a "use" of force and Castleman made no such argument. The Supreme Court understood Castleman's offense to require the "knowing or intentional *application* of force," which "is a 'use' of force." 134 S. Ct. at 1415 (emphasis added). But unlike an offense that requires the perpetrator to apply force to his victim (whether directly or indirectly), § 1992 allows conviction based on any act, even the act of walking away and doing nothing.

Thus, as many courts have observed, "*Castleman* does not address whether an omission, standing alone, can constitute the use of force." *United States v. Reyes-Contreras,* 910 F.3d 169, 181 n.25 (5th Cir. 2018) (en banc). *See Mayo*, 901 F.3d at 230 (*Castleman* "does not support" "conflat[ing] an act of omission with the use of force"); *Dobey,* 2019 WL 5205475 *at* *3 (*Castleman* is "consistent with the conclusion that 'use of force' does not encompass the failure to act")*; Brown*, 322 F. Supp.3d at 462("*Castleman's* concept of 'indirect force' focuses on *acts* (e.g., employing poison), not omissions"); *Scott*, 2017 WL 2414796, at *2 (*Castleman* "did not address inaction at all"). *Chrzanoski*'s pertinent conclusion -- intentionally causing injury "by . . . deliberate omission" does not categorically

**A001288**

involve the use of violent force, 327 F.3d at 195 -- remains the law of this Circuit. See *Dobey* at *3 n.2 ("*Chrzanoski* remains good law for the proposition that a state crime that can be based on an omission is not one that necessarily involves the use of physical force"). Indeed, although the government asserts broadly that *Villanueva* "recognized" that *Chrzanoski* was "abrogated by *Castleman*" (G.Mem. 15), *Villanueva* recognized that abrogation only to the extent of *Chrzanoski's* poisoning example because "'physical force encompasses even its indirect application,' as when a battery is committed by administering a poison." 893 F.3d at 130. *See Dobey*, at *3 n.2. The Second Circuit actually took pains to note that otherwise "the holding of *Chrzanoski* has not been disturbed." *Villanueva,* at 130 n.6.

The government relies further on *Villanueva* and on *Banegas Gomez v. Barr*, 922 F.3d 101, 108-09 (2d Cir. 2019), both of which held that Connecticut first degree assault requiring the intentional causation of serious physical injury with a deadly weapon or dangerous weapon requires the use of force, to argue that any act committed with the intent to cause serious injury necessarily uses violent force. G. Br. 14-17. This is a great leap and conflates intent with the actual infliction of serious physical injury. Unlike § 1992(a)(7), the offense at issue in *Villanueva* and *Banegas-Gomez* requires the actual infliction of serious physical

10

**A001289**

injury by means of a dangerous instrument. 922 F.3d at 107; 893 F.3d at 127.

What both cases hold is that where a defendant causes serious physical injury by

means of a dangerous instrument, he necessarily uses physical force, even if the

dangerous instrument is poison. *Banegas Gomez*, 922 F.3d at 108-09; *Villanueva,*

893 F.3d at 129-30. *Banegas Gomez* and *Villanueva* merely applied the *Castleman*

rationale on the indirect use of force -- specifically the poisoning scenario -- to the

same first degree assault offense and held that it qualifies under the force clause of

the ACCA and § 16(a) respectively. *Banegas Gomez*, 922 F.3d at 108-09;

*Villanueva*, 893 F.3d at 123. Neither case addresses the much broader offense

here, which is the commission of any act -- even an act of omission, like walking

away -- with the intent to cause serious physical injury.

## C.     Attempt to Commit Count III or V is Not a Crime of Violence

The government contends that any attempt to commit a crime of violence

necessarily has as an element the attempted use of physical force. But no Second

Circuit precedent holds this with respect to federal attempt. Indeed , the Court of

Appeals recently requested briefing on this question in *United States v. Nolan*, 18-

1113, # 116 (argued Nov. 4, 2019).

The government cites an unpublished and non-precedential decision, *United

States v. Scott*, 681 Fed. Appx 89, 95 (2d Cir. 2017), holding that RICO

11

**A001290**

conspiracy with an attempted murder predicate is a crime of violence on the theory that "conspiracy to commit [a crime of violence] is itself a crime of violence."  In addition to *Scott's* lack of precedential value, this theory has been abrogated by the *Davis* and *Barrett* holdings that conspiracy to commit a Hobbs Act robbery is not a crime of violence. Other than *Scott*, the government cites out of Circuit cases, including the Eleventh Circuit's split en banc decision in *United States v. Hubert*, 909 F.3d 335, 352 (11th Cir. 2018), and *United States v. Walker*, 442 F.3d 787, 788 (2d Cir. 2006), a pre-*Johnson* case based on the assumption that the residual clause was constitutional.

The only Second Circuit cases holding attempts to be crimes of violence under the force clause post-*Johnson*  are those addressing New York attempted robbery and holding it to be a crime of violence based on the New York requirement that attempt entails an action "so near to its accomplishment that in all reasonable probability the crime itself would have been committed but for timely interference." *United States v. Thrower*, 914 F.3d 770, 776 (2d Cir. 2019); *United States v. Pereira-Gomez*, 903 F.3d 155, 166 (2d Cir. 2018) (both citing New York Court of Appeals cases). As the Court instructed the jury in this case, federal attempt requires only a "substantial step" be taken toward committing the crime. The question whether federal attempt to commit a crime of violence necessarily

12

**A001291**

requires as an element the use of physical force is an open question in the Second Circuit, as its request for briefing demonstrates.

Finally, the government contends in the last paragraph of its memorandum that the defense hypotheticals about what conduct the offense reaches is "precisely the kind of conduct-specific analysis courts routinely reject under the categorical approach." G.Mem. At 21-22. In support of this argument, it cites *Dimaya* and *Davis* for the proposition that the term "offense" refers to what an offense "ordinarily" entails, the generic offense, "not what happened to occur on one occasion." *Id*. The government is confused. In those passages of *Dimaya* and *Davis*, the Supreme Court was distinguishing between the two meanings of the word "offense," one being the specific act that was committed and other being the generic offense. *United States v. Davis*, 139 S. Ct. 2319, 2328-29 (2019); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018). It decided that in both the residual clause and the elements clause (force clause), the word offense has its generic meaning and is not the specific conduct that was committed in the case. This is why the residual clause -- which defines an offense "by its nature. . ." -- is too vague to be constitutional. But the force (or "elements" clause) contains far more specific language: it only includes an offense that "has as an element the use, attempted use, or threatened use of physical force . . . ," thus allowing the categorical

13

**A001292**

approach to be employed.

And the categorical approach, contrary to the government's suggestion, does require the court to identify "the minimum criminal conduct necessary for conviction" under the statute at issue, *Hylton*, 897 F.3d at 60, and if that minimum conduct sweeps more broadly than the force clause, the offense is not a crime of violence. *Descamps v. United States*, 570 U.S. 254, 261 (2013). Discussion of which types of conduct could be reached by the statute is the essence of the categorical approach, and is not the conduct-specific analysis rejected by the Supreme Court. Here, the minimum conduct for attempt would be the gathering of bomb-making instructions or materials, with the intent to place an explosive in a place of public use, or place a destructive device in upon or near a mass transportation vehicle, or commit any act with intent to cause death or serious injury to any person in a terminal, structure or facility.

**A001293**

## CONCLUSION

For the foregoing reason and the reasons states in Defendant's Supplemental Memorandum in Support of his Rule 29 Motion, a judgment of acquittal should be entered for Count VI.

Dated: New York, New York
    November 5, 2019

        Respectfully submitted,

         /s/
        **COLLEEN P. CASSIDY**
        **AMY GALLICCHIO**
        **JULIA GATTO**

        FEDERAL DEFENDERS OF NEW YORK, INC.
         APPEALS BUREAU
        52 Duane Street - 10th Floor
        New York, New York 10007
        Tel.: (212) 417-8742
        *Attorney for Defendant*
        **AKAYED ULLAH**

15

**A001294**

## CERTIFICATE OF SERVICE

I certify that a copy of this six volume appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.**, Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
       October 4, 2021

                            /s/
                        **COLLEEN P. CASSIDY**