# 21-1058-cr

**United States Court of Appeals
for the Second Circuit**

———————————

Docket No. 21-1058-cr

———————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

———————————————

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT AKAYED ULLAH
VOLUME VI**

FEDERAL DEFENDERS OF NEW YORK, INC.
 APPEALS BUREAU
52 Duane Street - 10th Floor
New York, New York 10007
Tel. No.:  (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 Of Counsel

## TABLE OF CONTENTS TO THE APPENDIX
### VOLUME VI

District Court Docket Sheet,
S.D.N.Y. 18 Cr. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0004

Indictment, filed January 10, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0021

Defendant's Motion to Dismiss Counts,
dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0030

Memorandum in Support of Motion to Dismiss,
dated July 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0031

Government's Memorandum in Opposition to Motion to Dismiss,
dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0046

Defendant's Reply in Support of Motion to Dismiss,
dated August 17, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0084

Court Order Denying Motions, dated October 4, 2018 . . . . . . . . . . . . . . . . . . . . . . . A 0104

Defendant's Motion in Limine, dated October 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . A 0110

Defendant's letter to District Court regarding Rule 29 and Jury Charge
Issues, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0126

Government's letter to District Court regarding Jury Charge on Attempt,
dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0133

Defense Letter in Support of Rule 29 Motion and in Opposition to
Government Charge Requests, dated November 3, 2018 . . . . . . . . . . . . . . . . . . . A 0135

Government's Letter re Jury Charge and Rule 29 Motion,
dated November 3, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0142

Defendant's Objections to Proposed Jury Instructions, dated November 4, 2018 . . . . . . A 0147

Trial Transcript, dated October 29, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0151

Trial Transcript, dated October 30, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0159

Trial Transcript, dated October 31, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0325

Trial Transcript, dated November 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0575

Trial Transcript, dated November 2, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0833

i

Trial Transcript, dated November 5, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 0925

Trial Transcript, dated November 6, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1136

Defendant's Post-trial Motion for Acquittal, dated December 6, 2018 . . . . . . . . . . . . . . A 1154

Memorandum in Support of Motion, dated December 6, 2018 . . . . . . . . . . . . . . . . . . . . . A 1155

Government's Memorandum in Opposition to Motion for Acquittal,
        dated December 20, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1186

Reply Memorandum in Support of Motion for Acquittal,
        dated January 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1214

Court's Order for Supplemental Briefing,
        dated July 25, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1223

Defendant's Supplemental Memorandum in Support of Rule 29 Motion,
        dated September 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1224

Government Memorandum in Opposition to Supplemental Motion,
        dated October 22, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1248

Defendant's Reply Memorandum,
        dated November 5, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1275

District Court's Opinion & Order,
        filed January 4, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1295

Sentencing Memorandum with Exhibits A-I, dated March 25, 2021 . . . . . . . . . . . . . . . A 1313

Pimentel Letter, dated September 18, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1370

Sentencing Transcript, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1375

Judgment in a Criminal Case, dated April 22, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1420

Notice of Appeal, dated April 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1428

Government Exhibit 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1429

Government Exhibit 1001-02 (Submitted in attached DVD) . . . . . . . . . . . . . . . . . . . . . . A 1430

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v- | 18-cr-16 (RJS) |
| | <u>OPINION AND ORDER</u> |
| AKAYED ULLAH, | |
| Defendant. | |

<u>RICHARD J. SULLIVAN</u>, Circuit Judge:

On January 10, 2018, a grand jury returned an indictment of Defendant Akayed Ullah containing six counts:

(1)     Provision of material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B;

(2)     Use of a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(A)–(D);

(3)     Bombing a place of public use and a public transportation system, in violation of 18 U.S.C. § 2332f(a)(1)(A)–(B), 2332f(b)(1)(B), and 2332f(b)(1)(E);

(4)     Destruction of property by means of fire or explosive, in violation of 18 U.S.C. § 844(i);

(5)     Terrorist attack against mass transportation systems, in violation of 18 U.S.C. § 1992(a)(2), (a)(4)(B), (a)(7), (a)(10), (b)(1), and (c)(1); and

(6)     Use of a destructive device during and in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii).

(Doc. No. 6 (the "Indictment").)  The parties proceeded to trial on all counts, although the government abandoned one of its bases for liability under Count Five, and on November 6, 2018, a jury found Defendant guilty of all six counts charged in the Indictment.  On December 6, 2018, Defendant moved, pursuant to Federal Rule of Criminal Procedure 29(c), for a judgment of

**A001295**

acquittal. (Doc. No. 73.) Although Defendant's papers focus principally on his convictions for the offenses charged in Counts One and Five, his motion is directed at all six counts of conviction.[1] (*See* Doc. No. 74.) On July 25, 2019, the Court directed the parties to submit supplemental briefing in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). (Doc. No. 86.) The Court is now in receipt of those submissions, in which Defendant focuses on his conviction for the offense charged in Count Six. (*See* Doc. Nos. 87, 90, 91.) In the interim, the United States Court of Appeals for the Second Circuit has issued a series of opinions that clarify what constitutes a "crime of violence" under § 924(c). For the reasons set forth below, Defendant's motion is DENIED in its entirety.

## I. BACKGROUND

### A. Facts[2]

In the fall of 2017, Defendant constructed an improvised explosive device ("IED") at his home in Brooklyn. (*See* Tr. 298:2–309:12.) On the morning of December 11, 2017, he strapped the IED to his chest, donned an overcoat obscuring the bomb from view, left his home, and rode the subway from Brooklyn to the Times Square-42nd Street/Port Authority Bus Terminal subway station complex. (Tr. 218:24–219:22.) While on his way to Midtown, he posted a message to his Facebook account that taunted the President of the United States for failing to keep America safe and announced that he was acting on behalf of the Islamic State of Iraq and al-Sham ("ISIS").

---

[1] In this regard, Defendant's papers resemble his Rule 29 motion at the close of the government's case, in which the defense moved "to dismiss all counts in the indictment because the government has failed to meet its burden for each count" (Doc. No. 64 at 244), but, as here, focused exclusively on Counts One and Count Five in the arguments put forth on the record before the Court.

[2] The following facts are drawn from the Trial Transcript ("Tr.") (Doc. Nos. 58, 60, 62, 64, 66, 68, and 70) and from the trial exhibits. For purposes of this Order, all facts are stated in the light most favorable to the government. *See United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996) (holding that a court reviewing a conviction for sufficiency of the evidence "must credit every inference that could have been drawn in the government's favor" (internal quotation marks omitted)).

2

**A001296**

(Tr. 219:23–220:14.) At about 7:15 a.m., Defendant arrived at the Port Authority Bus Terminal section of the station (which is served by the A, C, and E subway lines), disembarked, and walked to the underground hallway connecting those lines to the Times Square portion of the station complex. (Tr. 345:9–351:20.) At about 7:20 a.m., in the middle of rush hour with commuters on all sides, Defendant connected two wires in his pocket, completing the IED's circuit and detonating the IED. (Tr. 237:20–23; 230:14–16.) Defendant, who was injured but not killed, was promptly apprehended by law enforcement authorities while still wearing remnants of the IED. (Tr. 65:20–72:11.) Fortunately, no one else was seriously injured by the blast. During interrogation at Bellevue Hospital (Tr. 88:20–22), Defendant informed police that he acted "for the Islamic State." (Tr. 212:7–11; *see also* Tr. 226:20–227:23.)

### B. Procedural History

Defendant made his Rule 29(a) motion at the close of the government's case. (Tr. 668:8–15.) After hearing arguments from the parties, the Court denied Defendant's motion (Tr. 772:8–9) and charged the jury. Following the jury's verdict, and at Defendant's request, the Court set a briefing schedule for post-trial motions. Defendant filed the instant motion under Rule 29(c) on December 6, 2018. (Doc. No. 74 ("Mem.").) The government opposed the motion on December 20, 2018 (Doc. No. 75 ("Opp'n")), and the motion was fully briefed on January 11, 2019 (Doc. No. 76 ("Reply")). Prior to the issuance of a decision in this matter, however, the Supreme Court issued an opinion in *United States v. Davis*, 139 S. Ct. 2319 (2019). In light of that opinion, the parties agreed that supplemental briefing was warranted. (Doc. No. 85.) Accordingly, the Court adjourned Defendant's sentencing and set a new briefing schedule whereby Defendant filed his supplemental memorandum on September 13, 2019 (Doc. No. 87), the government responded on October 22, 2019 (Doc. No. 90), and Defendant submitted his reply on November 5, 2019 (Doc. No. 91). Since then, Defendant has requested, with the government's consent, numerous

3

**A001297**

adjournments of his sentencing in light of the COVID-19 pandemic, which defense counsel explained impeded their ability to meet or communicate with Defendant to prepare for sentencing. (*See, e.g.*, Doc. Nos. 96, 98, 100.)

## II.  LEGAL STANDARD

"Rule 29(c)(2) states that 'if the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal'" where the evidence was insufficient to sustain a conviction. *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quoting Fed. R. Crim. P. 29(c)(2)) (brackets omitted).  "A defendant challenging a conviction based on insufficient evidence bears a heavy burden." *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In this analysis, the court does not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence.  *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). Further, the court is to apply this test to "the totality of the government's case and not to each element, as each fact may gain color from others," and draw "[a]ll permissible inferences . . . in the government's favor." *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir. 1999).  "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* at 130 (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

## III.  DISCUSSION

### A.  Count One

Defendant first challenges the legal sufficiency of his conviction on Count One, which charged him with providing "material support [or] resources" to ISIS, a designated foreign terrorist

**A001298**

organization. (Mem. at 1–11.) The government argued at trial that Defendant was guilty of providing two types of material support to ISIS: "personnel" and "services." The jury found Defendant guilty of providing material support to ISIS, but was not asked to identify whether it accepted the "personnel" theory, the "services" theory, or both. Accordingly, Defendant now argues that both theories are legally defective and that, if either fails, his conviction on Count One must be vacated. Because the Court finds that both of the theories submitted to the jury were legally proper, and that the record contains sufficient evidence to permit a rational jury to convict Defendant under either theory, Defendant's Rule 29 motion is denied as to Count One.

### 1. Personnel

Defendant first argues that he was improperly convicted of providing "personnel" – specifically, himself – to ISIS because his conduct is exempted from 18 U.S.C. § 2339B(h). That subsection provides:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, or attempted to provide . . . a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control . . . . *Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.*

18 U.S.C. § 2339B(h) (emphasis added). The Court incorporated § 2339B(h) into its instructions to the jury, and the jury returned a guilty verdict. (*See* Tr. 925:16–22.) Nevertheless, Defendant now argues that because he did not engage in two-way communications with ISIS, he can only have acted "entirely independently" of the group (rather than at its "direction or control") and cannot be found guilty of providing "personnel" to the group. (*See* Mem. at 2–8; Reply at 2–3.)

Defendant overreads the statutory exception for conduct undertaken "entirely independently of the foreign terrorist organization." (*See* Mem. at 2 (quoting 18 U.S.C. § 2239B(h).) His proposed two-way-communication requirement is inconsistent with (1) the text

5

of § 2339B(h) (which does not require coordination, but merely direction); (2) the common meaning of the word "direction" (which refers to a command from one person to another, not a two-party discussion of options, *see Direction*, Black's Law Dictionary (10th ed. 2014)); and (3) the manner in which international terrorist organizations, particularly ISIS, actually operate (Tr. 365:5–366:5). Significantly, Defendant cites no authority in support of his theory that a person must have communicated with a foreign terrorist organization in order to act at that organization's "direction." (*See* Tr. 697:5–20.) Instead, the limited case law that exists supports the government's position. *See United States v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016) ("Congress . . . did not intend to limit [§] 2339B's application to situations where prohibited support is delivered to designated or recognized leaders or to those who operate under some identifiable command and control structure. Rather, Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways."). The Court therefore rejects Defendant's argument as a matter of law.

Further, to the extent that Defendant argues that the evidence was insufficient to convict him of providing "personnel" to ISIS, he is mistaken. The record evidence, taken in the light most favorable to the government, amply establishes that Defendant acted at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials. Defendant informed arresting officers that he had viewed the video "Flames of War II" (Tr. 225:21–226:10), which encourages attacks similar to the one he carried out at the Port Authority (Tr. 371:22–372:8). The jury also saw several ISIS propaganda videos recovered from Defendant's computer and heard testimony from the government's expert, Dr. Aaron Zelin, explaining those videos and how ISIS used them to inspire attacks to advance its cause. (Tr. 372:22–380:3.) The jury also heard testimony about Defendant's pre-attack Facebook post, which Dr. Zelin explained contained language that serves

6

**A001300**

as an ISIS "rallying cry." (Tr. 380:18–382:2.) Finally, and perhaps most importantly, Defendant told police that he carried out the attack "for the Islamic State." (Tr. 212:10–11.) Accordingly, the record evidence is more than sufficient to support the jury's conclusion that Defendant provided "personnel" to ISIS.

Defendant's Rule 29 motion also challenges the Court's jury instruction on Count One. Specifically, Defendant asserts that he cannot have properly been convicted of "attempt[ing] to work under the 'direction or control' of an organization if the organization is not a participant in the transaction and does not even know the person." (Mem. at 6.) But as noted above, § 2339B(h) does not require two-way communication between a defendant and a foreign terrorist organization. Indeed, although the cases upon which the government relies deal with defendants who attempt to provide themselves to foreign terrorist organizations by traveling to that territory (*see* Opp'n at 8), the statute neither requires that a defendant provide "personnel" for ongoing group membership (as Defendant suggests) nor excludes the possibility that a defendant could provide "personnel" for a single suicide bombing. Thus, the jury could have permissibly concluded that Defendant attempted to provide himself to ISIS by carrying out a suicide attack in response to the directives in the group's propaganda videos. The Court therefore finds that the jury was properly instructed on the government's attempt theory.

### 2. Services

Defendant next challenges the Court's instruction regarding the providing of "services" in support of a terrorist organization. The Court instructed the jury that:

> A person provides or attempts to provide services as that term is defined in the statute when a person performs work commanded or paid for by another or done for the benefit of another, here ISIS.

> Only work performed in coordination with, at the direction of, or for the benefit of ISIS meets the definition of service. It's for you to decide whether or not the government has proven beyond a reasonable doubt that ISIS invited conduct such

7

**A001301**

> as the conduct alleged here, whether the defendant carried out the conduct alleged here, and, if you find that he did, whether the defendant was motivated by such an invitation.
>
> If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of services in the statute.

(Mem. at 10 (quoting Tr. 924:24–925:15) (emphasis omitted).)

Defendant argues that, under *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), a "service" must be performed "in coordination with or under the direction of" ISIS, and that the Court's instruction improperly permitted the jury to convict Defendant on the basis of an "entirely independent act undertaken" to advance ISIS's goals and objectives. (Mem. at 4, 10–11; Reply at 2.) But while the Supreme Court in *Holder* recognized that the term "service" includes "advocacy performed in coordination with, or at the direction of, a foreign terrorist organization" and excludes "independent advocacy," 561 U.S. at 24, the Supreme Court also defined "service" and "concerted activity" as "an act done *for the benefit or at the command* of another." 561 U.S. at 23–24 (emphasis added) (quoting Webster's Third New International Dictionary 2075 (1993)); *see also Jama*, 217 F. Supp. 3d at 892 (noting that, with § 2339B, "Congress intended to reach all persons who act *on behalf of an FTO to further its goals* and objectives in significant ways" (emphasis added)). The Court appropriately incorporated that definition into its instructions, and required the jury to find that Defendant had not acted on his own by considering whether (1) ISIS "invited" its followers to carry out attacks like Defendant's, and (2) Defendant acted in response to such an invitation. (*See* Tr. 925:11–15.) Further, though Defendant now asserts that he "built this device entirely on his own to further [ISIS's abstract political] goals" (Reply at 2), the record evidence readily supports the conclusion that Defendant carried out the attack as directed by ISIS in its propaganda videos for the express purpose of benefiting ISIS (*see, e.g.*, Tr. 437:24–438:1).

8

**A001302**

Defendant's challenge to the government's "service" theory therefore fails.  Because the Court concludes that the jury was properly instructed as to both the "personnel" and "services" prongs of § 2339B, and because the evidence in the record, viewed in the light most favorable to the government, is plainly sufficient to support the jury's verdict, Defendant's motion for a judgment of acquittal as to Count One must be denied.

### B.  Count Five

Defendant likewise challenges his conviction on Count Five, which, as a general matter, charged Defendant with committing a terrorist attack against mass transportation systems in violation of 18 U.S.C. § 1992.  Although the indictment's charging language tracked three specific subsections of the statute, the government proceeded to trial on only two of those subsections – (1) § 1992(a)(2), which subjects a person to criminal liability where he "places any . . . destructive device in, upon, or near . . . a mass transportation vehicle with intent to endanger the safety of any person, or with a reckless disregard for the safety of human life," and (2) § 1992(a)(7), which subjects to criminal liability a person who "commits an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person who is on [certain] property" used in the operation or support of a mass transportation vehicle.[3]  As reflected by the verdict form, the jury determined that Defendant violated both subsections.

Defendant makes three principal arguments as to Count Five, the first two of which relate to § 1992(a)(2).  First, Defendant argues that the evidence was legally insufficient to prove that he "placed" a bomb in a mass transportation vehicle because the IED was strapped to his person.

---

[3] Section 1992(a) also requires that the person act knowingly and without lawful authority or permission, and that the person do so in certain circumstances outlined in § 1992(c).  Neither of these requirements is disputed here.

9

**A001303**

Second, he asserts that the government constructively amended the Indictment in pursuing its theory that he did.

Finally, as to § 1992(a)(7), Defendant does not dispute the jury's finding of guilt under that subsection. He merely maintains that his conviction under § 1992(a)(7) cannot sustain a sentencing enhancement pursuant to § 1992(b)(1). But this argument is of no moment unless the Court were to vacate the jury's finding that Defendant violated § 1992(a)(2), which Defendant does not dispute constitutes a basis for the sentencing enhancement. Accordingly, because the Court upholds Defendant's conviction under § 1992(a)(2), it need not address his § 1992(7) sentencing challenge here.

## 1. Sufficiency of the Evidence

Defendant first challenges the government's contention that Defendant "placed" his bomb on a subway car when he rode on the train with the bomb attached to his body but with its circuit unconnected. (Mem. at 12–15.) Specifically, Defendant argues that the facts adduced at trial show that he "carried" or "transported" the bomb on the subway, but did not "place" it, and that if Congress had intended § 1992 to cover carrying or transporting a bomb (conduct which Defendant admits falls within the scope of 18 U.S.C. § 924(c)(1)), it would have used exactly those words. In essence, Defendant suggests that a jury could only have found him guilty of "placing" the bomb on the subway if he had taken it off, put it down, and then either left it behind or immediately detonated it. (Mem. at 12–13, Tr. 734:23–735:2.) The Court rejected this argument during trial (Tr. 802:5–22), and does so again now.

As the Court observed previously, Defendant's argument has some intuitive appeal. But while it is true that Congress chose to use the word "place" – which means "[t]o put or set (in a particular place, spot, or position); to station, position," *Place*, Oxford English Dictionary (3d ed. 2006) – rather than "carry" and "transport" – which generally relate to the transportation, and not

10

**A001304**

the placement, of items, *see Muscarello v. United States*, 524 U.S. 125, 128–32 (1998) – the nature of Defendant's explosive device collapses the distinction between carriage and placement. As the government points out in its brief, the evidence at trial established that Defendant made himself an integral part of his explosive device, which was attached to his chest and was designed to detonate when Defendant connected a circuit in his pocket. (*See* Opp'n at 14–15.) Accordingly, the only way for Defendant to "put" this particular bomb into position was to stand in that position himself. The government proved that Defendant rode the subway from Brooklyn to Manhattan with his improvised explosive device attached to his person. There is certainly nothing in the statutory language to suggest that Congress intended to distinguish suicide bombers from those who abandoned explosive devices prior to detonating them. The Court therefore has no difficulty concluding that there was sufficient evidence to support a finding that Defendant "placed" the bomb on a train.

## 2. Constructive Amendment

Defendant next contends that the government constructively amended the Indictment when it argued to the jury that Defendant "placed" his bomb on the subway by riding the train with it attached to his person. (Mem. at 15–23.) Defendant insists that the government's jury argument was contradicted by Count Five's "to wit" clause (*see* Mem. at 20), which, in his view, alleged that he placed the bomb *only* when he "detonated and attempted to detonate [the bomb] in the vicinity of the Port Authority Bus Terminal" (*id.* at 19 (quoting Indictment ¶ 5)). Defendant argues that because the "to wit" clause describes only conduct that occurred at the Port Authority Bus Terminal, he cannot have properly been convicted for carrying his bomb on the subway train – conduct which took place elsewhere. (*Id.* at 13–14.) Defendant thus maintains that the government impermissibly broadened the charges against him in violation of the Fifth Amendment. (*Id.* at 18).

11

**A001305**

"To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998). A constructive amendment is a *per se* violation of a defendant's constitutional rights. *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). However, "not all modifications constitute constructive amendments." *Id.* at 621. The Second Circuit "has 'consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial.'" *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphasis added in *Rigas*). "'Where charges are constructively narrowed or where a generally framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment." *Salmonese*, 352 F.3d at 620 (quoting *United States v. Wallace*, 59 F.3d 333, 337 (2d Cir. 1995)).

The theory of liability under § 1992(a)(2) that the government argued to the jury at trial – that Defendant "placed" the bomb on the subway when he boarded the car and rode to Port Authority – is plainly covered by the broad language of the Indictment, which charges Defendant with "plac[ing] and attempt[ing] to place" his bomb "in, upon, and near a mass transportation vehicle" on December 11, 2017. (Indictment ¶ 5.) Defendant's attempt to graft a limitation from the "to wit" clause of Count Five – which follows nearly a page of statutory language alleging violations under three subsections of § 1992(a) – is unavailing. Read in context, the "to wit" clause appears to relate only to the alleged subsection violation immediately preceding the "to wit"

12

**A001306**

language, which is for a violation under § 1992(a)(7).[4]  Significantly, the "to wit" language is set off from that subsection violation only by a comma, whereas the other subsections' allegations are separated from each other by semicolons.  (Indictment ¶ 5.)

Further, even if the government meant for the "to wit" clause to apply to all three of the subsections of § 1992(a) referenced in Count Five, the law is clear that the inclusion of a "to wit" clause in an indictment does not bind the government to prove the exact facts set out therein. *United States v. Bastian*, 770 F.3d 212, 221–22 (2d Cir. 2014).  Since Defendant's placement of the bomb on his person, and his placement of his person on the train while *en route* to the Port Authority Bus Terminal, occurred on the date identified in the Indictment and was part of a "single course of conduct" to commit the bombing, *D'Amelio*, 683 F.3d at 421–22, the government was not required to pinpoint the exact moment within that course of conduct that comprised the charged crime.  *See id.* at 421 (finding no constructive amendment where the course of conduct within which the charged offense fell "had a single, ultimate purpose," or "core of criminality" (internal quotation marks omitted)).  Accordingly, the Court finds that there was no constructive amendment as to subsection 1992(a)(2) and no risk that the jury convicted Defendant for "a functionally different crime" than the one charged in the Indictment. *Id.* at 423.

### C.  Count Six

In his supplemental briefing, Defendant seeks to overturn his conviction on Count Six, arguing that, in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319

---

[4] The allegation in Count Five preceding the "to wit" clause alleges that Defendant "committed, and attempted to commit, an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to persons who were on or in a garage, terminal, structure, track, electromagnetic guideway, supply, and facility used in the operation of, and in support of the operation of, a mass transportation vehicle, which mass transportation vehicle was carrying passengers and employees at the time of the offense, to wit, [Defendant] detonated and attempted to detonate an IED in the vicinity of the Port Authority Bus Terminal in New York, New York, which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense."  (Indictment ¶ 5.)

13

**A001307**

(2019), he was not convicted of a valid predicate "crime of violence," which is required to sustain a conviction under 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii). (Doc. No. 87 at 2–3.) In *Davis*, the Supreme Court concluded that the "residual clause" – one of the two bases for determining whether a predicate offense is a "crime of violence" within that statute – was unconstitutionally vague. *See Davis*, 139 S. Ct. at 2336. That clause provided that a crime of violence is one which, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C § 924(c)(3)(B). The remaining "elements" or "force" clause provides that a predicate offense is a crime of violence if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . ." *Id.* § 942(c)(3)(A). The categorical approach is used to determine whether an offense falls within this clause. *See United States v. Barrett*, 937 F.3d 126, 129 (2d Cir. 2019).[5]

Prior to trial in this matter, the Court determined, as a matter of law, that Counts Three and Five were categorically crimes of violence under the force clause (Doc. No. 36 at 6), and instructed the jury accordingly (Tr. 947: 9–14 ("I instruct you that Counts Three and [F]ive qualify as crimes of violence within the meaning of [Count Six's requirement that the government prove beyond a reasonable doubt that the defendant committed a crime of violence].").) In light of then-binding case law in this Circuit, the Court also asked the jury to determine whether the "residual clause" covered any counts on which the jury found Defendant guilty, instructing them that "[i]f you have found the defendant guilty of any of Counts One through Five, you must next determine whether

---

[5] "Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute." *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (internal quotation marks omitted). A court does not consider the particular facts of a case, but rather the elements of the offense. *Id.* For a defendant to show that a predicate offense is *not* a crime of violence, "there must be a realistic probability, not a theoretical possibility, that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Id.* at 56 (internal quotation marks omitted).

14

**A001308**

that offense or offenses involved a substantial risk that physical force might be used against the person or property of another." (Tr. 947: 21–24.)

Defendant now argues that, after *Davis*, the Court must set aside the jury's findings that Counts Two, Three, Four, and Five were crimes of violence under the residual clause. (Doc. No. 87 at 2.) He further contends that none of the convictions fall within the force clause, thereby challenging the Court's determination that Counts Three and Five constituted crimes of violence as a matter of law under that provision. (*Id.* at 4.) Moreover, Defendant argues that his convictions cannot be valid predicate crimes of violence for the additional reason that the jury might have convicted him for attempted, rather than completed, conduct. (*Id.* at 13.) In Defendant's view, the minimum conduct necessary to be convicted of an attempt to commit each of the charged offenses would not require as an element the use, attempted use, or threatened use of physical force, and therefore would not categorically constitute a crime of violence under the force clause. (*Id.* at 14.)

There is no dispute that the residual clause is now invalid; consequently, the jury's findings that certain offenses qualified as crimes of violence under that clause no longer make those offenses valid predicates for the Count Six conviction. Additionally, the government concedes that it "is not arguing that Counts One, Two, or Four qualify as crimes of violence after *Davis*." (Doc. No. 90 at 1 n.1.) The core of the parties' dispute therefore concerns whether Counts Three and Five constitute crimes of violence under § 924(c)'s force clause. Because the Court remains convinced that the offense charged in Count Three – whether attempted or completed – is a categorical crime of violence under the force clause, it upholds Defendant's conviction on Count Six without addressing whether Count Five also is a crime of violence.

15

**A001309**

Section 2332f(a), the crime charged in Count Three, criminalizes "deliver[ing], plac[ing], discharg[ing], or detonat[ing] an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility . . . with the intent to cause death or serious bodily injury, or with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss." Defendant, appearing to recognize the futility in arguing that this crime does not have "as an element the use, attempted use, or threatened use of physical force," 18 U.S.C. § 924(c)(3)(A), instead argues that the minimum conduct necessary to commit the offense does not categorically involve the use of force against *"the person or property of another,"* (Doc. No. 87 at 12 (quoting 18 U.S.C. § 924(c)(3)(A) (emphasis added)). Defendant contends that § 2332f(a) hypothetically would extend to a situation where someone intended only to injure himself in a public place, such as an attempted suicide on the National Mall. But the categorical approach requires a "realistic probability, not a theoretical possibility, that the statute at issue could be applied to conduct that does not constitute a crime of violence," *United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018) (internal quotation marks omitted), and there is no reason whatsoever to believe that any person ever has been or would be charged with a violation of § 2332f(a) for "detonat[ing] an explosive or other lethal device in . . . a place of public use . . . with the intent to cause death or serious bodily injury" only to himself, 18 U.S.C. § 233f(a)(1)(A). Defendant's theory here amounts to little more than an exercise of "legal imagination," *Hill*, 890 F.3d at 56, and need not be seriously entertained. After all, "the categorical approach must be grounded in reality, logic, and precedent, not flights of fancy." *Id.*

Nor is the Court persuaded that an attempt to commit the offense charged in Count Three could be committed without the use, attempted use, or threatened use of violence. To date, the

16

**A001310**

Second Circuit has not yet determined whether and when an attempt may constitute a crime of violence, although the issue of whether attempted Hobbs Act robbery is a crime of violence under the . . . force clause has been raised in several appeals now pending" before the Circuit. *United States v. Minaya*, No. 01-cr-619 (VM), 2020 WL 6701085, at \*1 (S.D.N.Y. Nov. 13, 2020) (internal quotation marks omitted)). However, persuasive authority indicates that attempted crimes of violence, including murder, will satisfy the force clause. *See United States v. Praddy*, 729 F. App'x 21, 23–24 (2d Cir. 2018); *United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017); *United States v. Samuels*, No. 18-cr-306 (ER), 2020 WL 5517772, at \*6 (S.D.N.Y. Sept. 14, 2020) (collecting cases finding that attempted Hobbs Act robbery qualifies as a crime of violence under the force clause); *Mayes v. United States*, No. 12-cr-0385 (ARR), 2019 WL 6307411, at \*3 (E.D.N.Y. Nov. 25, 2019) (collecting cases finding that attempted murder is a crime of violence under the force clause). Other circuits have also recently concluded that an attempt to commit a crime of violence satisfies the force clause, which by definition includes the *attempted* use of physical force. *See United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018) ("Like completed Hobbs Act robbery, attempted Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s use-of-force clause because that clause expressly includes '*attempted use*' of force."), *abrogated on other grounds by Davis*, 139 S. Ct. 2319; *Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017).

This conclusion is reasonable. Under federal law, "a person is guilty of an attempt to commit a crime if he or she (1) had the intent to commit the crime, and (2) engaged in conduct amounting to a substantial steps towards the commission of the crime." *United States v. Thrower*, 914 F.3d 770, 776 (2d Cir. 2019) (internal quotation marks and alterations omitted). Defendant argues that the minimum conduct necessary to take a "substantial step" does not necessarily

17

**A001311**

involve the attempted use of force. (Doc. No. 87 at 14–16.) But he does not point to any real possibility that preparations to place a bomb in a public place with the intent to cause death, serious bodily injury, or extensive destruction would not involve an attempt to use physical force, and the Court cannot foresee such a situation. Thus, Defendant's "attempt" argument is without merit. Therefore, in light of the fact that *Davis* and its progeny have no bearing on whether Count Three satisfies the "force" clause, it remains a valid predicate for Count Six.

### D. Counts Two, Three, and Four

Defendant purports to challenge his convictions on Counts Two, Three, and Four in his post-trial brief by relying on the Rule 29 motion he made as to all counts at trial. (Mem. at 1 (citing Tr. 772).) However, Defendant did not actually present arguments about Counts Two, Three, and Four when he made his motion, and he presents none now. Accordingly, Defendant's Rule 29 motion will be denied as to all remaining counts. *See United States v. Rivera*, 388 F.2d 545, 548 (2d Cir. 1968) (holding that because "[t]he specification of grounds in [a] motion is an indication that counsel has evaluated the record and has these particular reasons for his motion," a failure to object to venue in a motion for acquittal "made on specified grounds" waived the venue objection).

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal is DENIED as to all counts of conviction. The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 73.

Dated:      December 31, 2020
            New York, New York

                                        _____
                                        RICHARD J. SULLIVAN
                                        UNITED STATES CIRCUIT JUDGE
                                        Sitting by Designation

18

**A001312**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA    :
              :
              :
   - v -         :
              :   **18 CR 16 (RJS)**

**AKAYED ULLAH,**        :
   Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**SENTENCING MEMORANDUM
ON BEHALF OF AKAYED ULLAH**

           DAVID PATTON, ESQ.
           Federal Defenders of New York
           Attorney for Defendant
            **Akayed Ullah**
           52 Duane Street, 10th Floor
           New York, NY 10007
           Tel.: (212) 417-8728 / (917) 612-3274
           **Amy Gallicchio**, Esq.
           **Julia Gatto**, Esq
           **Colleen Cassidy**, Esq.
           Of Counsel

TO:   Audrey Strauss, Esq.
     Acting United States Attorney
     Southern District of New York
     1 St. Andrew's Plaza
     New York, NY 10007

Attn:   AUSA Rebekah Donaleski
     AUSA George Turner

**A001313**

**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 25, 2021

**BY ECF AND EMAIL**

Honorable Richard J. Sullivan
United States Circuit Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    **United States v. Akayed Ullah**
       **18 CR 16 (RJS)**

Dear Judge Sullivan:

*Mr. Ullah first encountered fundamentalist Islamic theology at a time of extraordinary personal fragility. The moment was a perfect storm of risk factors for Mr. Ullah: alienation from family and friends, severe depression, grief, direct exposure to the indescribable pain and suffering of Muslim refugees in Myanmar, and relentless harassment from people in the United States. Mr. Ullah was unmoored and desperate for answers. His love of the United States and its values had withered in the wake of his father's death and the subsequent unraveling of his support systems. Mr. Ullah tried to reconnect with his community in Bangladesh and attempted to return to his country of origin where he felt safe and understood, but his efforts were blocked at every turn. As Mr. Ullah's path to fulfillment continued to narrow, his desperation increased and he became increasingly vulnerable to the deeply distorted values of radical Islam.*

*Erik Mercer, L.C.S.W.  See* Mitigation Report, Exhibit A, p. 14-15.

**A001314**

The Honorable Richard J. Sullivan                                  March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

Akayed Ullah's crime did not result from a long standing commitment to violent extremism or jihadist movements.  He had no personal connection to nor did he communicate with any individual or group that advocated terrorist activities.  As Erik Mercer, a clinical social worker and mitigation specialist, quoted above, describes in detail in his report, Mr. Ullah committed this offense while in the grip of a personal crisis that left him isolated, depressed, vulnerable and suicidal.  The reasons for Mr. Ullah's conduct were and remain aberrational and there is no chance such conduct will be repeated.

Akayed Ullah is a 31 year old man with no prior criminal record.  Should the Court accept the guideline analysis provided by the Department of Probation ("Probation"), he faces a mandatory minimum sentence of 35 years and an unreasonably excessive guideline range of life in prison.[1]  The mandatory minimum sentence that the Court is required to impose is more than sufficient, if not greater than necessary, to achieve the statutory goals of sentencing.  Incarcerating Mr. Ullah until he is in his sixties is more than necessary to "send a message," prevent Mr. Ullah from committing further crimes, or protect the public.

**PERSONAL HISTORY AND MITIGATION**

Attached for the Court's consideration is the aforementioned mitigation report prepared by Erik Mercer who conducted numerous interviews with Mr. Ullah and members of his family to provide the Court with a full picture of Mr. Ullah's life history and insight into what drew him to extremist ideals.  Exhibit A.  We rely on Mr. Mercer's report here as a comprehensive description of Mr. Ullah's personal history.   In addition, we submit seven letters of support, attached as Exhibits B to H, from those who know Mr. Ullah best as evidence of his peaceful, nonviolent and gentle character.  The emotions and affection displayed in the letters of support are

---

[1] As outlined in the Guideline analysis section below, we disagree, in part, with Probation's calculations.

2

**A001315**

The Honorable Richard J. Sullivan                                  March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

palpable.  Mr. Ullah was raised in a loving environment by law abiding parents who held moderate religious beliefs.  His father was a great man and a hero to many, most importantly to Mr. Ullah.  There can be no doubt that Mr. Ullah is a man of profoundly decent character and that his actions on December 11, 2017 do not reflect his true nature nor foretell future danger to the community.

Mr. Ullah is a loving son and brother.  The letters of support from his mother and sisters portray a family traumatized and in great despair over the fate of their beloved Akayed.  They would never in a million years have thought him capable of the act he committed on December 11, 2017.  His mother writes, "When I learned about what Akayed did I was in disbelief and utter shock.  To this day I cannot comprehend what happened, or how it happened.  I never saw anything aggressive or violent in Akayed. From his childhood to his day, he had no bad habits, no aggressive behavior.  He always shares his feelings and everything with me but I don't know what happened this time I cannot imagine what he was thinking or feeling.  Respected Judge, I have only ever known my son to be honest, hardworking, with such a good heart.  As his mother, I feel great remorse for the event." *See* Exhibit B.  Mr. Ullah's younger sister, Liakat Jahan, writes, "I do not understand what happened on that day in December.  In my heart, I struggle to match the incident to the person.  The Akayed I know is my second father, my guardian, my shelter, my support, my closest friend.  Akayed is an affectionate and kind person . . . Having a brother like Akayed I always felt blessed and secured.  Now every single moment I feel I am helpless without him.  I sincerely request that you give Akayed a second chance at life.  You're not only giving him a second chance.  You're giving everyone in his family a second change." *See* Exhibit C.  And Mr. Ullah's youngest sister, Ayfa Hayat, writes, "The news of what Akayed did completely turned my life around.  I couldn't understand it.  We watched horrifying news on the media, but never have we ever thought this appalling occurrence could be part of our reality.  To this day, I cannot match the brother I know to the man behind those bars.  But I do know his true characteristics: soft, generous, with a

3

<strong>A001316</strong>

The Honorable Richard J. Sullivan                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

free-spirited mind.  The brother we know was always full of laughter and this image of him still lingers in my eyes.  I wish I could ask him at his moments of despair: What happened? What happened, brother? I wish I could give him a shoulder to lean on in his deepest dispirited moments of life." *See* Exhibit D.  Ms. Hayat adds, "The Akayed we have known for years is in complete contrast to what he has done.  In the past few years, Akayed did not know how to climb out of his own despair.  He was depressed and hopeless.  He did not have a figure to console his own grief after losing his father and favorite nephew in the family.  I think these traumatizing events led to his distress.  The constant pressure of staying strong and providing for his mother in this country and being the sole provide for his wife and son in Bangladesh pushed him towards depression and vulnerability. This depression played a role in his actions." *Id.*

Mr. Ullah is also a loving husband and devoted father.   His son, now 3 ½, was born six months before Mr. Ullah's arrest.   Because his wife, Jannatul Ferdous, and son live in Bangladesh, Mr. Ullah has only ever spent six weeks with his son.  The letters of support from his wife, her parents and her friend, attached as Exhibits E to H, reveal Mr. Ullah to be a kind, gentle, honest and peaceful man who adores his wife and son.  His mother-in-law writes, "After the marriage he won everyone's heart in our family and he especially won my heart with his behavior and nature.  He is very much a simple and soft-hearted person.  He did not have any bad habits.  In our family, everyone was so happy to welcome him as our family member." *See* Exhibit F.  Mr. Ullah's wife's good friend writes, "Akayed is a wonderful husband with lots of love and compassion.  He treats his wife like a queen . . . He was such a loving father to his child . . . He is the most loving father I have ever seen in my entire life." *See* Exhibit H.   The photos of Mr. Ullah, his wife and his son, attached as Exhibit I, capture the love and affection he has for his family.

Despite the distance from his son, Mr. Ullah felt a deep connection with him immediately upon meeting him four months after he was born.  Exhibit A at 7.

**A001317**

The Honorable Richard J. Sullivan                                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

"During his time with his wife and newborn son, Mr. Ullah recalls feeling a kind of clarity that had eluded him since his father died: he became absolutely convinced that his happiness depended on returning to his country." *Id*. Unfortunately, neither his wife and in-laws in Bangladesh nor his family in the United States, would sanction a move to Bangladesh. His wife "flatly rejected Mr. Ullah's proposal. Mr. Ullah pleaded with his wife and her family. He begged for their understanding and pointed to his significant weight loss as evidence of his extreme distress in the United States. But Ms. Ferdous and her family were unmoved: they were angry with Mr. Ullah for even considering a return to Bangladesh and insisted that generating income in the United States was Mr. Ullah's primary responsibility as a husband, and even more so as a father . . . Mr. Ullah's longing to be with his son was framed as a selfish impulse and his wish to live in a country where he felt welcome and understood was dismissed as unimportant." Exhibit A at 7-8. In hindsight, Mr. Ullah's family deeply regrets that they denied Mr. Ullah's desire to stay in Bangladesh with his wife and son. His wife writes, "Sometimes I hurt Akayed by saying harsh words to him, but he never got angry with me. He never hurt me. This gives so much pain now that he is gone. I realize how valuable Akayed is to me." *See* Exhibit E.

When Mr. Ullah returned to the United States in October of 2017, he was in crisis. Describing this period of his life, Mr. Ullah recalls, "I was dying. I was like a fish without water." Exhibit A at 8. Unhappy and defeated, he returned to find that his family had moved to apartment located away from the security and familiarity of his former Bengali community. Mr. Ullah recalls, "If I had one friend, maybe things would have been different. But I didn't. I felt so much pressure and I didn't have anyone to share my feelings with. I was totally alone in America." *Id*. at 9. And he felt "suffocated under his wife's constant demands for more money." *Id*. at 8. He was in the middle of a major depressive episode and, regrettably, searched for and ultimately found hope on the internet in the distorted messages of the Islamic State and its radical supporters. *Id*. at 14. "When Mr.

5

**A001318**

The Honorable Richard J. Sullivan                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

Ullah began building the bomb that he ultimately detonate in the Port Authority subway station, he was in an unprecedented state of confusion, disconnection and desperation." *Id*.

## <u>NATURE AND HISTORY OF THE OFFENSE OF CONVICTION</u>

The jury found Mr. Ullah guilty of Counts One through Six of the Indictment. Having presided over the trial, the Court is familiar with the evidence and the defense arguments about that evidence. For sentencing purposes, we recall the Court's attention to the fact that the evidence at trial did not establish that Mr. Ullah had any actual connection with a terrorist organization. That is because there wasn't, and isn't, any. He didn't communicate or coordinate with any foreign or domestic radical leaders or groups, including ISIS.

Mr. Ullah's conduct on December 7, 2017 was undeniably the culmination of a downward spiral resulting from a series of destabilizing events in his life. "Disconnected from his family, his community and his country of origin, Mr. Ullah sunk into a deep depression . . . [he] describes this time as a 'fog' and acknowledges that his thinking became catastrophically distorted by the ideology of the Islamic State." *Id*. at 9. Mr. Ullah's actions were without a doubt dangerous, intolerable and deserving of punishment, but they were also an attempt to take his own life, which evinces a man in extreme crisis.

## <u>GUIDELINES ANALYSIS</u>

Based on the jury's verdict, we agree with the Department of Probation that Counts One through five group together and that the proper base offense level for Counts One through Five is 42. PSR ¶ 26. However, for the reasons state below, we disagree that the "terrorism" enhancement advocated by the Department of Probation, pursuant to U.S.S.G. § 3A1.4 (b), applies to enhance either the offense level or the criminal history category. Furthermore, despite having gone to trial,

**A001319**

The Honorable Richard J. Sullivan                                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

Mr. Ullah should receive a two level reduction for acceptance of responsibility, resulting in an adjusted offense level of 40.  Mr. Ullah has no prior criminal convictions and therefore falls in criminal history category I.  The resulting applicable guideline range for Counts One through Five is 292 to 365 years.

In light of the wealth of mitigating factors outlined in this submission, we submit that the mandatory minimum sentence of 30 years on Count Six plus the 5 year mandatory minimum sentence on Count Four is more than sufficient to serve the goals of sentencing.  Despite a guideline range of 292 to 365 years for Counts One through Five, we respectfully ask the Court to impose no additional time on those Counts.

## I. The Correctly Calculated Guidelines Should Not Include the Terrorism Enhancement

The Probation Department calculates Mr. Ullah's total offense-level as 43 and, based on its calculation, recommends a "Guidelines sentence" of life imprisonment. The Probation Department's calculation yields the highest offense-level on the sentencing table and the most severe penalty recommended under the Guidelines. In other words, on the spectrum of offenses covered by the Guidelines--including offenses committed by strategic actors resulting in mass carnage--the Probation Department's calculation for Mr. Ullah's offense--committed by a psychologically broken man resulting in no loss of human life--places him in a rare category reserved for the single worst offenders in the Federal system. Mr. Ullah's offense was undeniably serious but it does not and should not elevate him to the highest level on the Guidelines Table.

As explained below, the correctly calculated range is lower than the Probation Department's calculation--a level 40, as opposed to a level 43, with a corresponding advisory range of imprisonment between 292 and 365 months. This guideline range still factors in the seriousness of Mr. Ullah's offense but also

7

**A001320**

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

recognizes that his offense can be proportionately and reasonably punished short of a life sentence.

The Probation Department's calculation is driven by two provisions in the Guidelines.  First, the Probation Department applies the enhanced base offense-level in U.S.S.G. 2M6.1(a)(1) for an offense "committed with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization." Application of the provision nearly doubles the base-offense level from 28 to 42. The Probation Department's calculation also applies U.S.S.G. 3A1.4(a)'s "terrorism enhancement." The "terrorism enhancement" is applicable when the offense "involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" is defined in 18 U.S.C. 2332b(g)(5) as relating to certain enumerated offenses, including those Mr. Ullah was convicted of, where the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Application of the "terrorism enhancement" increases the offense-level by 12 (the largest enhancement contemplated under the Guidelines) and propels the defendant into a Criminal History Category of VI regardless of prior criminal history.

Standing alone, either provision results in extraordinarily long recommended prison sentences. Together, as evidenced here, the provisions can drive a defendant's Guidelines calculation irrationally off the sentencing chart. For the reasons that follow, U.S.S.G. 3A1.4(a)'s enhancement is factually inapplicable. Alternatively, the enhancement cannot be applied because, when combined with U.S.S.G. 2M6.1(a)(1)'s enhanced base offense-level, it results in impermissible double counting.

### A.   The Terrorism Enhancement Does Not Apply

Based on the jury instructions and the jury verdict that followed, Mr. Ullah does not dispute that U.S.S.G. 2M6.1(a)(1)'s enhanced base-offense level applies because the jury found, in connection with its verdict on Count One, that Mr. Ullah's conduct in detonating an IED was intended to support ISIS. However, the

8

**A001321**

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

jury's verdict did not address whether Mr. Ullah's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Based on the trial testimony, the government cannot meet its burden to sustain the terrorism enhancement.

Support of a terrorist organization, even where that organization is ISIS, does not automatically equate to a specific intent to influence, affect, or retaliate against a government. *See, e.g., United States v. Alhaggagi*, No. 19-10092, 2020 WL 6192982, at \*7–9 (9th Cir. Oct. 22, 2020) (reversing district court's application of terrorism enhancement where defendant provided material support to ISIS); *United States v. Stewart*, 590 F.3d 93, 138-139 (2d Cir. 2009) (affirming district court's refusal to apply terrorism enhancement to translator convicted of lending material support to a terrorist conspiracy).

In order to sustain the terrorism enhancement, the government must establish that the defendant had the specific intent to commit an offense that was "calculated" to impact or retaliate against government conduct. As explained by the Second Circuit, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) The appropriate focus is on the "'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *Id.*

The government's expert, Aaron Zelin, testified that ISIS's goals include "to take over territory in Iraq and Syria and to continue to eventually everywhere around the globe and institute its form of Islamic governance based on its particular interpretation, as well as to of course defeat its enemies, whether locally, including what they describe as apostate Arab regimes or so-called Western governments." Tr. 362. Mr. Zelin confirmed that, while some of ISIS's goals clearly are directed at impacting government action, other goals of the organization--particularly as those goals relate to ISIS's religious objectives-- do not. There is a scenario where an individual can support ISIS's goal of spreading its interpretation of Islam globally

9

**A001322**

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

without harboring an intent to impact or alter government action. At Mr. Ullah's trial, the government failed to introduce evidence that could support a finding regarding which ISIS goal Mr. Ullah's offense was calculated to achieve. On this record, therefore, the enhancement cannot apply.

**B.     Alternatively, Application of the Terrorism Enhancement Results in Impermissible Double Counting.**

Alternatively, the terrorism enhancement cannot be used to enhance Mr. Ullah's already enhanced base offense-level. Application of the terrorism enhancement on top of U.S.S.G. 2M6.1(a)(1) results in impermissible double counting. "Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the Guidelines." *United States v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000) (quoting *United States v. Napoli,* 179 F.3d 1, 12 n. 9 (2d Cir. 1999), *cert. Denied,* 528 U.S. 1162 (2000)) (internal quotation marks omitted); *accord, United States v. Sabhnani,* 599 F.3d 215, 251 (2d Cir. 2010), *cert. Denied* 131 S. Ct. 1000 (2011).

While under certain circumstances both provisions can apply, here they cannot. U.S.S.G. 2M6.1(a)(1) is triggered because the jury found that Mr. Ullah's conduct in exploding the IED was in support of ISIS. The Probation Department's justification for application of the terrorism enhancement appears to be the exactly the same: that, because Mr. Ullah's conduct in exploding the IED was calculated to support ISIS's political goals, the enhancement applies. As such, the enhanced base offense-level and the terrorism enhancement are duplicative of each other and application of both is impermissible.

**II.     Acceptance Points**

Despite the fact that Mr. Ullah exercised his constitutional right to a trial, under the circumstances of this case, he is entitled to a two level decrease of the offense level pursuant to U.S.S.G. § 3E1.1.   "Conviction by trial [ ] does not

10

**A001323**

The Honorable Richard J. Sullivan                                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

automatically preclude a defendant from consideration of such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial." U.S.S.G. § 3E1.1, cmt. n.2.   That is indeed the case here.  Mr. Ullah has never denied his actions.  From his hospital bed, immediately following his arrest, he confessed his guilt to law enforcement and cooperated with their investigation, and, at trial he did not testify or introduce any evidence.  Mr. Ullah's theory of defense did not negate his factual guilt but instead challenged the applicability of the charged statues to his conduct.  *Id*.

Mr. Ullah has "clearly demonstrated acceptance of responsibility" and his offense level should be reduced by two levels.


### SENTENCE OF THIRTY FIVE YEARS IS GREATER THAN NECESSARY TO FURTHER THE GOALS OF 18 U.S.C. § 3553(a)

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *Id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

The applicable guidelines in this case are draconian and produce an unduly harsh and exceedingly excessive sentencing range.   They were promulgated in response to a congressional and political directive without empirical evidence to support the presumption that terrorism defendants are uniquely dangerous and

11

**A001324**

The Honorable Richard J. Sullivan                                    March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

incapable of being deterred and rehabilitated.  This presumption is unsupported and has led to unreasonably high sentences that fail to account for the nature and circumstances of an individual case and the history and characteristics of the defendant.  This Court should therefore not anchor its sentence to the applicable guidelines and should instead weigh the other § 3553(a) factors to arrive at the parsimonious sentence.

## I.      Punishment and Rehabilitation

There comes a point when a term of imprisonment no longer serves the goals of sentencing and only serves to incapacitate. For Mr. Ullah, that point would be any term beyond the statutory minimum of 35 years.  Thirty five years in prison is an extreme sentence even for the most hardened criminal, which Mr. Ullah certainly is not.  It is a misconception that, unlike other offenders, those convicted of acts of terrorism are uniquely dangerous and difficult to deter and rehabilitate and, therefore, longer and excessive sentences are necessary to incapacitate them.  This misconception mirrors the way young African Americans were perceived in the late 1980s and 1990s as "super-predators." That perception led to the "War on Drugs" and unreasonably harsh sentences disproportionately targeting African Americans. While neither terrorism nor drug sentencing laws explicitly target a specific religious, ethnic, or racial group, they have disproportionately affected Muslims and African-Americans.  The War on Drugs and the War on Terror have similar harmful results through lengthy sentences separated from any rehabilitative rationale. *See* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520 (2017).

Mr. Ullah must be punished but does not need to be incapacitated for the rest of his life.  He is not a "super-predator" or incapable of reform.  In fact, the reformation process is well under way.  Mr. Ullah has long disavowed, unequivocally, any allegiance to radical and violent Islamist ideals and organizations.  He clearly sees the error of his ways and he has already been

12

# A001325

The Honorable Richard J. Sullivan                                        March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

rehabilitated from his distorted thinking.  He is remorseful and profoundly laments his actions. He has genuine sorrow for the physical and psychological damage his actions inflicted upon David Wall, Veronica Chavez, and others presents in the walkway on December 7, 2017.  Furthermore, he deeply regrets the wide ranging effect his actions had on law enforcement and New York City generally.

████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████
██████████ He was prepared to provide the government with insight into the grievances and personal struggles that drove him to extremist ideals in the first place.  The Government was not interested, and, we suspect, will argue at sentencing that he is dangerous and irredeemable.

Finally we ask the court to consider that Mr. Ullah's incarceration will undoubtedly be onerous simply due to the nature of his offense.  His time in pretrial detention has already been exceedingly difficult, isolating and punitive. Mr. Ullah has not seen his family since the coronavirus pandemic gripped the nation shutting down the ability for inmates to have visits and much needed physical contact with loved ones.  Furthermore, Mr. Ullah is thousands of miles away from his wife and son, whom he has not seen in over three years and who very likely will never have the ability to travel to the United States to visit him even after he is sentenced.

## II.    Deterrence

In 2010, The Sentencing Project released a report analyzing the deterrent effects of sentencing. It explained that:

> Existing evidence does not support any significant public safety benefit
> of the practice of increasing the severity of sentences by imposing
> longer prison terms. In fact, research findings imply that increasingly
> lengthy prison terms are counterproductive. Overall, the evidence

A001326

The Honorable Richard J. Sullivan                                      March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.[2]

A study conducted by the National Institute of Justice made similar findings, concluding that the ***certainty* of being caught rather than the *severity* of punishment** is the more powerful deterrent.[3] *See also* Michael Tonry, *Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research* at 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").[4]

Furthermore, regarding general deterrence, studies have shown that individuals committing terrorism-related offenses are generally less concerned about being punished and more concerned with their movement and personal significance, so strategies that might be effective general deterrents for other crimes are not deterrents for violent terrorism. Laura Dugan, *Moving Beyond Deterrence: The Effectiveness of Raising the Expected Utility of Abstaining from Terrorism in Israel*, 77 American Sociological Review 597, 598 (2012).

For Mr. Ullah, a 35 year prison sentence would more than provide adequate specific deterrence.  In fact, social science research indicates low recidivism rates for individuals like Mr. Ullah with no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism rate of federal guidelines offenders entitled: *Recidivism and the "First Offender."*  In its report, the U.S.S.C. notes:

---

[2] Wright, Valerie, *Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment,* (2010), *available at* https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/

[3] *Five Things About Deterrence* (2016), National Institute of Justice, *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence

[4]*Available at* https://scholarship.law.umn.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1504&context=faculty_articles.

14

**A001327**

The Honorable Richard J. Sullivan                                        March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.[5]

The recidivism rate for individuals convicted of terrorism-related offenses follows similar patterns as other criminal offenses. Sentence length and age upon release reduce the risk of recidivism, and affiliation with a terrorist organization, which Mr. Ullah has not, increases the risk. Badi Hassi, *Crime and Terror: Examining Criminal Risk Factors for Terrorist Recidivism*, J. of Quantitative Criminology 1, 16 (2019).

Prior to this case, Mr. Ullah had never before been arrested, nor had he committed any crimes for which he had not been caught. For 31 years, he has lived a thoroughly law abiding life outside of the criminal justice system. Thirty-five years in prison, an amount of time that is impossible to fathom, is more than sufficient to ensure that Mr. Ullah will not recidivate.

### III.    A Sentence of 35 Years Would Not Create Any Unwarranted Sentence Disparities.

The Court must consider similarly situated defendants to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). A review of recent and similar cases demonstrates that Mr. Ullah's conduct does not warrant more than 35 years in prison. While it is true that the United States' aggressive War on Terror policies and the resultant trend to incapacitate rather than rehabilitate have led to the imposition of incapacitating prison sentences, there are many examples of thoughtful restraint that can be analogized to Mr. Ullah's circumstances. Below are some of those examples:

---

[5] U.S. SENTENCING COMM'N, RECIDIVISM AND THE FIRST OFFENDER (2004), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf., p. 1.

15

**A001328**

The Honorable Richard J. Sullivan                    March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

- *United States v. Mohamed Osman Mohamud*, 10 Cr. 475 (KI) (D. Ore): After a jury trial, the defendant was convicted of attempting to use a weapon of mass destruction, 18 U.S.C. § 2332a(a)(2)(A).  The defendant had planned for months to detonate a massive truck bomb at the annual Christmas tree lighting celebration in downtown Oregon.  He drove the truck to the location and dialed a cellphone – twice – that  he believed would trigger the explosion but the bomb did not explode because it was a non-functioning device given to Mohamud by FBI operatives.  Mohamud faced a guideline range of life in prison and the Government requested a variance of 40 years.  Gov't Sent'g Mem, ECF No. 477.  Mohamud was sentenced to 30 years in prison.

- *United States v. Nafis*, 12 Cr. 720 (E.D.N.Y.): The defendant was a 21-year-old Bangladeshi national, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at the Federal Reserve Bank of New York. He pleaded guilty and was sentenced to 30 years' imprisonment.

- *United States v. Khalifi*, 12 Cr. 37 (JCC) (E.D. Va.): The defendant was a 28-year-old Moroccan national, who attempted to conduct a suicide bombing attack on the U.S. Capitol using a suicide bomb vest and automatic weapon (that unbeknownst to him were inert).  He pleaded guilty and was sentenced to 30 years' imprisonment.

- *Kevin William Harpham, 11 Cr. 42 (E.D. WA):*  The defendant pleaded guilty to attempted use of a weapon of mass destruction and attempt to cause bodily injury with an explosive device because of actual or perceived race, color, and national origin of any person. He had designed and constructed a functioning radio-controlled improvised explosive device filled with fishing weights coated in rat poison containing an anticoagulant as shrapnel.  The device was placed in a backpack alongside a planned Martin Luther King Jr. Day Unity March in Spokane, Washington.   The backpack was discovered by parade workers and defused by law enforcement.   "The march was attended by approximately 2,000 individuals, including racial minorities. The explosive

16

**A001329**

The Honorable Richard J. Sullivan                                March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

device placed by Harpham was capable of inflicting serious injury or death, according to laboratory analysis conducted by the FBI. Harpham admitted that he is a white supremacist and white separatist, and that he placed the explosive device at the march with the intent to cause bodily injury to the person or persons in order to further his racist beliefs." *See* https://archives.fbi.gov/archives/seattle/press-releases/2011/washington-man-sentenced-to-32-years-for-attempted-bombing-of-martin-luther-king-unity-march. Harpham was sentenced to 32 years in prison.

- *United States v. Stephen Powers*, No. 18 Cr. 37 (AWA) (E.D. Va), ECF No. 37: The defendant detonated a homemade explosive device on a commercial strip in Colonial Williamsburg and had additional bomb materials in his home. Gov't Sent'g Mem. 1–3, ECF No. 37. Powers connected the device to an outlet in the commercial area that was programed to receive electrical current at 5:00 pm each evening so that decorative lights would activate in the shopping area. When the outlet activated, the explosive device ignited and exploded and sent large fragments of metal in several directions, landing as far away as 200 feet. No one was injured, though there was extensive property damage. Id. Powers was sentenced to 120 months. ECF No. 40.

Sentences of life imprisonment have typically been reserved for defendants who demonstrated an abiding commitment to terrorist organizations through, among other things, communications, travel, and training:

- *United States v. Ahmad Khan Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y.): After a jury trial, the defendant was convicted of eight counts including two counts of 18 U.S.C. § 924(c), for detonating one sophisticated pressure cooker bomb via cellphone trigger on a NYC street and unsuccessfully attempting to detonate another, injuring more than 30 people and causing hundreds of thousands of dollars in property damage. *See* Gov't Sent'g Mem. 2, ECF No. 188. He also carried 6 bombs in a backpack which he left at a train station in New Jersey.

17

**A001330**

The Honorable Richard J. Sullivan                                   March 25, 2021
<u>United States v. Akayed Ullah</u>
18 CR 16 (RJS)

One of those bombs detonated as a law enforcement officer attempted to defuse it. *Id.* at 5. As law enforcement officers attempted to arrest the defendant the following day, he pulled out a Glock piston and shot one police officer in the stomach and shot at other officers as he fled. *Id.* Additionally, two days prior, he had planted a pipe bomb in a trash can along the anticipated route of the Seaside Semper Five Marine Corps Charity 5K Race. *Id.* at 6. The defendant's "path to jihad" began four years prior when he began researching terrorist ideology. *Id.* at 3. He failed to show remorse for his crimes, and instead attempted to radicalize his fellow inmates and made light of his attacks. *Id.* at 2. Rahimi was sentenced to life without parole.

- *United States v. Faisal Shahzad*, 10 Cr. 541 (MGC) (S.D.N.Y.): The defendant was convicted of several terrorism related statutes for attempting to detonate a car bomb in Times Square. He had previously travelled to Pakistan and received explosives training from a terrorists group. He pleaded guilty and was sentenced to life in prison.

- *United States v. Umar Farouk Abdulmutallab*, 10 Cr. 20005 (E.D. Mich): The defendant attempted to blow up a plane with explosives concealed in his underwear. He was a Nigerian national who has trained in terrorist camps in Yemen run by al Qaeda, who claimed responsibility for the attack. He was a student of Anwar al-Awlaki, who some believe was involve in orchestrating the attack. After his trial commenced, Abdulmutallab pleaded guilty and was sentenced to four consecutive life sentences plus 50 years.

18

**A001331**

The Honorable Richard J. Sullivan                                       March 25, 2021
United States v. Akayed Ullah
18 CR 16 (RJS)

## **CONCLUSION**

Mr. Ullah's attraction to extremism began at a time of profound personal crisis and vulnerability.   He was not raised with extremist beliefs and no one in his life tolerated violence of any sort.  Mr. Ullah was – and still is – a peaceful man who never exhibited a violent or aggressive character.   His conduct was an aberration in a life otherwise lived lawfully and peacefully.

Imprisoning Mr. Ullah for longer than 35 years will most certainly be punishing, excessively so, but it is not necessary to deter him specifically and will certainly not serve to prevent or eradicate acts of terror by others.

.                                                          Respectfully submitted,

                                                          */s/ Amy Gallicchio*

                                                          _____
                                                          Amy Gallicchio, Esq.
                                                          Assistant Federal Defender
                                                          Federal Defenders of New York
                                                          212-417-8728

Cc:     AUSA Rebekah Donaleski
        AUSA George Turner

**A001332**



# EXHIBIT A

**A001333**

# ERIK MERCER, L.C.S.W

## 381 SPRING STREET, PORTLAND ME  04102

November 13, 2020

Amy Gallicchio, Esq.
Julia Gatto, Esq.
Assistant Federal Defenders
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York  10007

RE:     United States  v.  Akayed Ullah
        18 CR 16 (RJS)

Dear Ms. Gallicchio and Ms. Gatto:

This report is submitted on behalf of Akayed Ullah in advance of his sentencing before the Honorable Richard J. Sullivan on December 14, 2020. This submission provides detailed information about Mr. Ullah's developmental and psychosocial history.  In preparation for this report, eighteen interviews were conducted with Mr. Ullah at the Metropolitan Correctional Center in New York. Interviews were also conducted with members of Mr. Ullah's family and community.

PERSONAL BACKGROUND

*Early childhood*

Mr. Ullah was born at home in the small, island community of Sandwip, Bangladesh. The second of five children born to the union of Dilruba Begum and Sana Ullah, Mr. Ullah has two older siblings and two younger siblings. Life on Sandwip was simple: it's remote location fostered tight bonds between residents, and the long and often harrowing boat ride to mainland Bangladesh meant that people in Sandwip tended to remain on the island and look to one another for support and community.

**A001334**

The environment within Mr. Ullah's family mirrored the closeness of the community that surrounded it.  Mr. Ullah's parents had a loving relationship and the home was free of major conflicts. The political and religious culture within Mr. Ullah's family was informed by his father's strong support of the Bangladesh Awami League (AL), one of the two major political parties in Bangladesh since the country's independence from Pakistan. Mr. Ullah's father was a freedom fighter in the 1971 Indo-Pakistani War, and he was a staunch supporter of secular government and held moderate religious beliefs. The family identified as Hanafi Sunni Muslims and Mr. Ullah attended mosque services when he was a child, but it was something he remembers as primarily a social activity. Mr. Ullah's parents did not talk about religion at home and it was a peripheral part of his daily life.

Mr. Ullah's father was a beloved member of his community. Mr. Ullah's older brother, Ashan, recalls that most people referred to him as "uncle" because of his emotional accessibility and exceptional willingness to help people in need. Described by his family as a calm and exceedingly honest man, Mr. Ullah's father was  trusted to such an extent that people in the community often gave him money to hold for them because they knew he would keep it safe.

When Mr. Ullah was four years old, his father required gastro intestinal surgery and traveled to Dhaka for treatment. Concerned about the lack of medical care in Sandwip, Mr. Ullah's mother made the decision to move the entire family to Dhaka following her husband's surgery. Mr. Ullah and his family moved into the apartment of his mother's sister, Sofia Begum. Mr. Ullah's brother, Ashan, recalls that the adjustment from the small Sandwip village of Musapur to the busy city of Dhaka was hard. The community that the children had known was small and tight knit – a sharp contrast to the busy, sprawling city of Dhaka. Mr. Ullah's father's illness prevented him from working and so the family financial situation was strained.  Mr. Ullah and his family remained in Ms. Begum's apartment for two years until his father was able to work again.

Mr. Ullah's mother remembers the years following her husband's surgery as a period of emotional and financial hardship. His return to work provided some relief, but the family continued to struggle. Mrs. Ullah recalls that, even as a young child, Mr. Ullah was particularly sensitive to the challenges she faced while caring for her husband and her family. Mrs. Ullah fondly remembers Mr. Ullah's attempts to prepare meals for the family to lessen her burden.

2

A001335

Despite his father's illness and gradual recovery, Mr. Ullah remembers his childhood in Dhaka as a happy one. Mr. Ullah had a group of good friends and, while he was not an exceptional student, he enjoyed school. Mr. Ullah recalls feeling free when he was young; he enjoyed the trust of his parents and was allowed spend his time how he wanted. Mr. Ullah's father valued education above all else for his children and did not allow his sons to work in his grocery store so they could focus on their schoolwork. Ashan describes his father as a "hero" because of his commitment to caring for the household so his children had time to devote to their studies. Mr. Ullah recalls that though the educational system was not strong, his father remained adamant about providing his children with the opportunity to learn.

*Late childhood and adolescence*

As Mr. Ullah's father's health continued to improve, the undercurrent of instability that characterized Mr. Ullah's early childhood diminished. The Ullah family moved into their own apartment and the father was able to work consistently. While his father did not allow Mr. Ullah to work in his grocery store, Mr. Ullah contributed to the family income by tutoring younger students in the school he attended. Mr. Ullah's emotional and practical support bolstered the family when their resources were strained.

The sensitivity that Mr. Ullah displayed within his family also began to endear him to the community around him. Neighbors and friends who witnessed Mr. Ullah interacting with his family frequently commented to his mother on the thoughtfulness they observed in him. For Mrs. Ullah, her son's deep sensitivity was most apparent when her youngest son, ▮▮▮▮, was born at home. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

A001336

Mr. Ullah's caretaking impulses were also evident in his love of animals. The family's landlord in Dhaka often commented on Mr. Ullah's deep love of animals and was touched by the fact that he would rush home from school to care for the pigeons he was raising on the roof of their apartment building. When the pigeons had babies, Mr. Ullah spent much of his free time nurturing the baby pigeons and ensuring that they were well cared for.

Mr. Ullah graduated from high school in 2007 and enrolled as a full-time student in Dhaka City College the following year. Mr. Ullah remembers this period of his life fondly. He had a good group of friends and recalls that they did not think much about the future. Socializing was a priority for Mr. Ullah during this time, but he did not lose sight of his schoolwork and passed all of his university exams.

*Move to the United States*

Mr. Ullah was nineteen when he first learned of his family's intention to immigrate to the United States.  Mr. Ullah's maternal uncle, Razaul Karim, had immigrated to the United States several years prior and returned home to tell stories about abundant opportunity and a welcoming Bengali community in Brooklyn. Mr. Ullah was excited about the prospect of living in America. The promise of a higher standard of living and better job opportunities made him feel hopeful about the future.

With the sponsorship of his uncle, Mr. Ullah and his family made plans to immigrate to the United States in February of 2011. Mr. Ullah remembers talking with his friends about "living the American dream, " and began shopping for clothes and other necessities for his new life in America. Mr. Ullah describes it as a time of celebration and hope.

But the family's enthusiasm was shattered three weeks before their scheduled departure when Mr. Ullah's father suffered a massive stroke. The family's celebratory feelings evaporated and were replaced by sadness and uncertainty. Mrs. Ullah believes that her husband's stroke impacted Mr. Ullah more deeply than other members of the family. She recalls that, while other people came and went from the hospital where he was being treated, Mr. Ullah stayed by his father's side for the entire thirteen days that he was admitted. Mr. Ullah describes the time with his father as one of deep reflection. He recalls that his father became "like a new born baby" and Mr. Ullah was forced to reconcile a sudden shift in their family paradigm. Mr. Ullah's father, the community caretaker, the former freedom fighter and the beloved father was suddenly unable to care even for himself.

4

**A001337**

When the time came for Mr. Ullah and his family to depart for the United States, Mr. Ullah's father had stabilized enough to make the journey, but he remained significantly impaired. Mr. Ullah's arrival in Brooklyn was not the celebration he had anticipated. He describes feeling pulled between the desire to help his father at home and the need to bring in money for the household. He began working immediately with his brother, Ashan, doing construction work. While working with his brother, Mr. Ullah applied for a Taxi and Limousine Commission (TLC) license.

As Mr. Ullah adapted to his new family circumstances, he began to regain some optimism about his new life in the United States. He started a job at a Dunkin Donuts store in his Brooklyn neighborhood and planned to begin driving a taxicab when his TLC license was granted. But the hint of emerging stability did not last long; nine months after he arrived in the United States, Mr. Ullah's fatherwas diagnosed with stage four-lung cancer and given a short time to live. The family was, once again, filled with fear, sadness and uncertainty.

*Young adulthood*

After his father's death in August of 2012, Mr. Ullah traveled to Bangladesh to be with his family and community in Dhaka. When he returned to Brooklyn a month later, he began driving for the TLC. Mr. Ullah recalls this time as a period of growing interest in religion. His father's illness and death had left him with existential questions that he began looking to religion to answer. Mr. Ullah wanted a deeper understanding of why Muslims fast and why they pray five times a day. He tried to educate himself about Christianity and Judaism too, and remembers that learning about all religions became an enjoyable pastime. Mr. Ullah felt grounded when he attended mosque services and tried to find a mosque that felt comfortable for him. He grew a beard because many of the men in the mosque wore them and he wanted to feel connected. But this was also a period of growing alienation for Mr. Ullah. As he struggled to find a community in Brooklyn, he became the object of increasing harassment because his new beard made him "look Muslim." When the Boston Marathon bombing occurred, in 2013, Mr. Ullah remembers a sharp increase in hostile and provocative behavior directed toward him. Mr. Ullah recalls that even his unequivocal denouncements of the Tsarnaev brothers and radical Islam did little to diminish the hatred he experienced during interactions with many people in his cab or on the street.

Compounding Mr. Ullah's feelings of isolation was the tepid response he was receiving from people in the Muslim community as he tried to educate himself about

5

A001338

Islam. Mr. Ullah recalls feeling deeply ashamed when other Muslims expressed surprise at the elementary nature of his questions about basic tenets of Islamic belief. On one occasion, he was humiliated before a group of men in a Brooklyn mosque when he did not know what the Islamic calendar was. To avoid feeling embarrassed, Mr. Ullah began searching for his answers online.

As Mr. Ullah felt increasingly marginalized, he also became more politically aware. Mr. Ullah describes a political awakening in the summer of 2014, during the Israeli bombings in Gaza. He was appalled by the loss of life and, for the first time, felt a profound connection to the global Muslim community (the Ummah). Mr. Ullah recalls feeling horrified that President Obama, a man he had once respected, did not take action to stop the loss of Palestinian lives. Mr. Ullah says,

> "When Israel was bombing Palestine in 2014, I was hearing about it day and night on the news. I couldn't understand how they could be killing so many innocent people. And I couldn't understand how the US was not doing anything about it."

When Mr. Ullah visited Bangladesh with his sister in 2014, he felt a kind of solidarity with his Muslim brothers and sisters that he had not experienced there before. Feeling unmoored in his Brooklyn community and distraught about United States foreign policy in the Middle East, Dhaka felt more like home to him than it had in the past. Mr. Ullah's dreams of wealth and opportunity in America had been tempered by his father's death and by his experience of rejection and Islamophobia in his community.

Mr. Ullah began to yearn for his home country. In the years following his father's death, Mr. Ullah struggled to regain his footing in the United States. As he continued to experience harassment on the street, he felt less and less welcome in the country he had once loved. Mr. Ullah began to talk about his wish to return to Bangladesh, but the idea was consistently met with firm resistance from everyone in his family. The clear expectation was that Mr. Ullah remain in United States, whether or not he enjoyed it, to earn money for the family.

*Marriage*

Mr. Ullah was twenty-six years old when his mother decided that it was time for him to marry. As is the custom in Bengali families, Mrs. Ullah selected a wife for Mr. Ullah and arranged for the two to meet in Dhaka. Mr. Ullah's future wife, Jannat ul Ferdous, was a classmate of Mr. Ullah's sister in Dhaka. When Mr. Ullah traveled to Bangladesh in January of 2016 to meet Ms. Ferdous, he felt hopeful. Mr. Ullah's sister-in-law, Helen

6

A001339

Jahan, recalls that Mr. Ullah immediately endeared himself to Ms. Ferdous and her family. Ms. Jahan says,

> "Everyone used to say that the girl who married Akayed was so lucky because he is so extraordinary. After he got married, his mother-in-law said, 'I have never seen anyone so caring.'"

Mr. Ullah returned from Bangladesh in March of 2016, after his wedding to Ms. Ferdous, feeling deeply conflicted; he had experienced a sense of connection and possibility in Dhaka with his new wife and her family, and with it, even greater pressure to provide for them by remaining in the United States. When Mr. Ullah, again, indicated a desire to return to Dhaka to be with his new family, the suggestion was dismissed outright. Rather than consider Mr. Ullah's longing to be with his wife, the Ferdous family began demanding more money from him and criticizing him when he could not deliver. The marriage that had provided Mr. Ullah a brief sense of buoyancy and purpose became another destabilizing factor in his steady decline into depression and hopelessness.

*Birth of Mr. Ullah's son*

It was against a backdrop of fraying connections to family, community and culture in the United States, and an ever-intensifying search for meaning, that Mr. Ullah's son, ████████, was born in June of 2017. Mr. Ullah was in the United States at the time of his son's birth and it was four months before he was able to travel to Bangladesh to meet him. Mr. Ullah recalls that having a son initially felt abstract, but when he traveled to Dhaka four months after ████████ birth, he experienced an internal shift that took him by surprise. Mr. Ullah felt a deep connection with his son. He describes a sort of emotional realignment that occurred during the weeks he spent with his son and his wife in Dhaka. The primacy of financial success that had once drawn him to the United States had evaporated completely and his longing to return to the safety and community he experienced in Bangladesh intensified further.

During his time with his wife and newborn son, Mr. Ullah recalls feeling a kind of clarity that had eluded him since his father died: he became absolutely convinced that his happiness depended on returning to his country of origin. Hoping that the birth of their son had shifted his wife's feelings about his desire to return to Dhaka, Mr. Ullah proposed to his wife that he remain in Bangladesh to live with them. If remaining in Dhaka was not financially viable, Mr. Ullah suggested to his wife that they leave Dhaka for a less expensive place outside of the city. Ms. Ferdous flatly rejected Mr. Ullah's proposal. Mr. Ullah pleaded with his wife and her family. He begged for their understanding and

7

**A001340**

pointed to his significant weight loss as evidence of his extreme distress in the United States. But Ms. Ferdous and her family were unmoved; they were angry with Mr. Ullah for even considering a return to Bangladesh and insisted that generating income in the United States was Mr. Ullah's primary responsibility as a husband, and even more so as a father. Undeterred, Mr. Ullah began looking for work in Dhaka, hopeful that their thinking would shift if he secured a job. When Ms. Ferdous learned of his job search, she was furious and called Mr. Ullah's mother to complain. When the Ferdous family informed Mrs. Ullah of her son's wish, she was also angry. Mr. Ullah recalls that the potential to make more money in the United States was the only variable that seemed to matter. Mr. Ullah's longing to be with his son was framed as a selfish impulse and his wish to live in a country where he felt welcome and understood was dismissed as unimportant.

In the emotional haze of this period, Mr. Ullah sought out a local Muslim leader who was working in a Rohingya refugee camp on the Myanmar border who invited Mr. Ullah to travel there. The suffering of Muslims around the world was something with which Mr. Ullah did not have firsthand experience and so he readily accepted the invitation. Mr. Ullah remained in the camp for one day, handing out medicine, before returning to Dhaka. While the visit was brief, the impact was profound. The widespread pain and misery he witnessed in the Rohingya camp intensified his yearning to live in a Muslim country – and, with it, his despair about life in America.

*Increasing isolation*

Mr. Ullah's return to the United States in October of 2017 was the beginning of a downward spiral. Mr. Ullah says about this period of his life, "I was dying. I was like a fish without water." When he arrived back in Brooklyn, Mr. Ullah discovered that his family had moved into a new apartment in a different Brooklyn community. Mr. Ullah was shaken; the move came as a complete shock to him and his new neighborhood felt alien. The new family apartment was located in a building inhabited primarily by Russian immigrants. There was no easily accessible mosque and the family was separated from the Bengali community that had offered a degree of safety and comfort in an otherwise hostile environment. The Bengali friends that frequented the family's former apartment did not travel the distance to be with them in their new location and the home felt empty. Mr. Ullah begged his family to return to their old community, but they refused.

Mr. Ullah returned to his work as an electrician but he was suffocating under his wife's constant demands for more money. Mr. Ullah's family was unsympathetic to his predicament and refused to recognize his suffering. On the street, Mr. Ullah remained

8

**A001341**

the target of unrelenting verbal abuse and was taunted and spit on. At work, his co-workers directed a steady stream of Islamophobic rhetoric toward him. Mr. Ullah says about this time,

> "If I had had one friend, maybe things would have been different. But I didn't. I felt so much pressure and I didn't have anyone to share my feelings with. I was totally alone in America."

It was during this period of disconnection that Mr. Ullah began to look more obsessively at videos of religious lectures on YouTube. Mr. Ullah settled into a routine: he worked during the day and then came home to sit in an apartment alcove where he watched YouTube videos alone. He wore headphones to tune out his family around him and absorbed himself in the lectures of Islamic scholars. When Mr. Ullah first encountered a video by ISIS, he describes being drawn to the economic, social and political message, but deterred by the violence. He listened to the Islamic State directive that Muslims live in a Muslim country and he even researched moving to Saudi Arabia and Oman.

In the months leading up to Mr. Ullah's decision to detonate a bomb in the Port Authority subway station, he was bereft and felt utterly alone. Disconnected from his family, his community and his country of origin, Mr. Ullah sunk into a deep depression. He stopped eating and lost an alarming amount of weight. He stopped communicating with his family and spent all of his time watching YouTube videos in a desperate search for meaning. Mr. Ullah describes this time as a "fog" and acknowledges that his thinking became catastrophically distorted by the ideology of the Islamic State.

MITIGATING CIRCUMSTANCES

Mr. Ullah's early life was defined by support and relative stability. The Ullah family was a close and functional unit throughout Mr. Ullah's father's long recovery from surgery when Mr. Ullah was a child. As Mr. Ullah's father's strength grew, so did the financial and emotional strength of the family. Mr. Ullah's late childhood and adolescence was stable and happy. When Mr. Ullah learned that the family was immigrating to the United States, he was thrilled. Mr. Ullah and his family had a very favorable opinion of the United States and believed that they could build a fulfilling life here.

Mr. Ullah's father's stroke in January of 2011 was the beginning of a cascade of destabilizing events that occurred over the next five years. With his father's illness and

9

**A001342**

death, Mr. Ullah lost his primary source of guidance and support. Still adjusting to a new country, Mr. Ullah was left untethered and afraid. When Mr. Ullah sought solace in Islam, he began to experience harassment from people in his Brooklyn community who became suspicious and hostile when Mr. Ullah grew a beard. When Mr. Ullah attempted to find a sense of kinship and community by returning to Bangladesh, after the birth of his son, he lost the support of his family and the family of his new wife. Increasingly depressed and isolated, Mr. Ullah turned to the Internet for guidance and answers.

It was against this backdrop of confusion and personal disconnection that Mr. Ullah began to tune into politics. When Mr. Ullah saw news coverage of the 2014 Gaza bombings, he felt appalled by the United States support of Israel's aggression and devastated by Palestinian suffering that ensued. Mr. Ullah began to feel increasingly identified with the Ummah and the persecution of Muslims worldwide. The central Islamic belief that the entire Muslim body feels the suffering of any one part began to resonate strongly with him.

The nexus of Mr. Ullah's grief, isolation, desperate search for meaning, and burgeoning political awareness left him highly susceptible to the profoundly distorted ideas of radical Islam. The mitigating circumstances outlined below contextualize Mr. Ullah's journey from a theologically and politically moderate, supportive family to his deeply misguided embrace of radical Islam in a moment of unprecedented personal isolation and vulnerability.

*Father's illness and death*

The illness and death of Mr. Ullah's father was an inflection point in his life. The excitement and optimism Mr. Ullah had felt in the months leading up to his immigration to the United States suddenly drained away when his father had a major stroke three weeks before he was scheduled to leave. Mr. Ullah spent all of his time by his father's side in the hospital and recalls a profound change in his frame of reference during that time. Mr. Ullah began to pray and found solace in his growing faith. The friends that had always provided him a sense of connection and support were suddenly alien to him. Mr. Ullah recalls being hurt and angry when his friends laughed and joked while visiting Mr. Ullah in the hospital, insensitive to the sobriety of the situation.

Mr. Ullah's father recovered enough to travel to the United States but his functioning was significantly impaired. He was unable to work and remained home most of the time. But despite his impairments, Mr. Ullah recalls that being in the United States elevated his father's mood. Mr. Ullah worked hard to reclaim some of the optimism he

10

A001343

had once felt about living in the United States, but he was overwhelmed with sadness for his father. Mrs. Ullah describes Mr. Ullah as "full of shock and despair" when he arrived in Brooklyn. Managing the abrupt cultural change while coming to terms with his father's sudden loss of functioning was overwhelming to Mr. Ullah. His father, a man who had provided unwavering stability, guidance and direction for Mr. Ullah now required constant care. Mr. Ullah remembers helping his father dress, bathe and eat because he was unable to perform even basic daily living tasks on his own.

When Mr. Ullah's father was diagnosed with stage 4 lung cancer nine months later, Mr. Ullah felt even more scared and adrift. Far from the familiarity of his community in Dhaka, and facing the loss of his role model and protector, Mr. Ullah began to seek meaning and solace though faith. Mr. Ullah describes attending mosques throughout Brooklyn and Manhattan in an attempt to find a place that felt comfortable and safe. He attended services in the Uzbek, Pakistani, Somali, Bosnian and Bengali communities. Mr. Ullah recalls a 2012 visit from Pope Ratzinger in which the Pope arranged for a Muslim man and a Jewish man to publicly embrace in his presence. Mr. Ullah was moved by the symbolism and sought out the mosque in lower Manhattan where the Muslim man attended services. Mr. Ullah listened carefully when he was visiting mosques in an attempt to learn as much as possible about Islam. But he recalls feeling deep shame when he began to ask his own questions and was forced to admit that he did not know basic tenets of Islam. Mr. Ullah says,

> "I had experiences where I would ask questions in the mosque to try to educate myself and they would look at me like, 'how could you not know that?' I felt shame about it. I didn't even know the dates of Ramadan. It felt like no one understood me. Because of this I stopped trying to learn from the community and went to the Internet instead."

Mr. Ullah searched for answers on the internet privately. He began by reading about Yasir Qadhi because his brother and sister-in-law were followers. Qadhi, an Islamic scholar known for his critique of violent Islamic extremism, made sense to Mr. Ullah. Qadhi's theologically moderate stance resonated with Mr. Ullah who did not condone acts of violence for any reason.

Mr. Ullah's father remained in the hospital for one month after his cancer diagnosis. In January of 2012 Mr. Ullah's father returned home and began chemotherapy treatment. Mr. Ullah describes this time as "touching" both because of his relationship to his father and his developing faith. Mr. Ullah says,

11

**A001344**

"I felt close to my father. I didn't talk with him about my faith – it was private to me – but it gave me a comfort and strength while I was with him."

With the encouragement of the Ullah family's Bengali community in Brooklyn, Mr. Ullah's mother made the decision to travel to Mecca with her husband before his death. The opportunity to do the Umrah (an Islamic pilgrimage to Mecca) appealed to Mr. Ullah. Umrah offered an intimate experience with his parents and an opportunity to further explore his burgeoning interest in Islam. He was still learning about Islam at the time and remembers that he did not even know how to read the Q'uran.

Mr. Ullah made the decision to leave his job and he joined his parents on their trip to Mecca. Knowing little about the Umrah ritual, the experience was unexpectedly powerful for Mr. Ullah. He recalls that it felt "like coming home." Despite the large crowds of people, Mr. Ullah marveled at the peace he felt in the holy city of Mecca performing the ritual of solidarity with Muslims and declaring his submission before God.

Mr. Ullah's father died in August of 2012. Without the voice of reason, moderation and inspiration that his father provided for him, Mr. Ullah became immediately more susceptible to the radical Islamic ideas he was beginning to find on-line.

*Harassment in the United States*

Mr. Ullah's faith was an anchor for him after his father's death, but as he embraced his faith, and found solace in its traditions, he began to experience something very different in the Brooklyn community where he had always felt a sense of belonging. When Mr. Ullah grew a beard, he noticed a sudden shift in the way people responded to him. Mr. Ullah remembers that people would regularly call him a terrorist. and he watched as people changed subway cars when he entered the train. On one occasion, a man ran after him with a bat, shouting Islamic slurs. Mr. Ullah remembers feeling hurt and confused by the change in the way he was being treated. He pretended not to hear the hurtful comments in an effort to avoid confrontation.

After the Boston Marathon bombings in 2013, the harassment intensified. Mr. Ullah was driving for the TLC at the time and recalls multiple hostile encounters with passengers who accused him of being a terrorist because he was Muslim. Mr. Ullah tried to de-escalate the situations by vocalizing his disapproval of Dzhokhar Tsarnaev and his actions, but he recalls that passengers often remained hostile. Mr. Ullah's moderate

12

A001345

theological and political stance seemed to do little to soften these encounters and he was left feeling hurt and misunderstood. Mr. Ullah says,

> "I wanted to understand other people's views, and I wanted to make them understand that I was different – I wasn't a terrorist. But it seemed like I couldn't make them know that. I just felt that I wasn't welcome here anymore."

Mrs. Ullah was aware of the harassment that Mr. Ullah was experiencing and acknowledges her son's increasing desire to return to Bangladesh to escape the negativity. Mr. Ullah's brother, Ahsan describes that the "macho" culture in the construction business that he worked in with Mr. Ullah resulted in frequent verbal assaults on Mr. Ullah because of his beard. With every hostile encounter, Mr. Ullah was pushed further to the margins of his life in New York while his family remained willfully ignorant of his suffering and, instead, offered constant reminders of his obligation to remain the United States and earn income for his family.

*Family relocation*

As Mr. Ullah felt increasingly marginalized, his family remained inattentive to his emotional and psychological fragility. The most glaring example of this inattention occurred while Mr. Ullah was in Bangladesh and his family relocated to a different Brooklyn neighborhood without telling him. The move was profoundly destabilizing for Mr. Ullah who remembers feeling panicked when he returned from Dhaka to Brooklyn to find the family was in an entirely new community. Mr. Ullah says,

> "No one told me. They never asked me, they just did it. The new apartment was in a Russian neighborhood and I felt uncomfortable. There were no mosques, no Bengali stores – nothing that was familiar."

Mr. Ullah begged his mother to move back to their old neighborhood. Living in a Bengali community in Brooklyn was one of the only stabilizing elements in his rapidly deteriorating experience in the United States. But despite Mr. Ullah's pleas, Mrs. Ullah was resolute in her decision and they remained where they were.

*Travel to Rohingya refugee camp*

At the time of his visit to the Rohingya refugee camp, Mr. Ullah felt trapped between his family's demands that he remain in the United States and his deep desire to be in a Muslim country. Mr. Ullah was also struggling to reconcile his relative privilege with the extreme suffering around the world and he was working to fill the emotional void left by his father's death. And throughout it all, he was feeling increasingly alienated

13

A001346

by his community and his family. When he arrived at the refugee camp, Mr. Ullah recalls, "The suffering was so great that I forgot my own suffering." When he returned to Dhaka, he felt compelled to go back to the camp but his wife and her family forbade it.

When Mr. Ullah returned to Brooklyn in October 2017, he was bereft.  In his increasingly desperate search for meaning, Mr. Ullah came across the work of British Islamist, Anjem Choudary. Choudary, an outspoken proponent of anti-western violence as a response to Muslim suffering, expressed strong support for radical Islamic organizations. Mr. Ullah's fractured identity and Choudary's writing proved to be a toxic combination. Mr. Ullah had never believed in violence as a tool for change but, in his heightened state of vulnerability, Choudary's ideas resonated with him in the wake of his visit to the Myanmar border.

*Major depression*

As a radical Islamic identity formed in his mind, Mr. Ullah was the middle of a major depressive episode. In the months prior to the offense, Mr. Ullah fit all the DSM V criteria that define a major depressive episode: 1) depressed mood (sad, empty, hopeless); 2) diminished interest or pleasure in all his activities; 3) significant weight loss and decreased appetite; 4) insomnia; 5) being slowed down; 6) fatigue or loss of energy; 7) feeling of inappropriate guilt (eating when people are suffering; not living with Muslims where he can share their suffering…); 8) diminished ability to think, concentrate, or indecisiveness; 9) recurrent thoughts of death. The major depressive episode lasted for months during 2017 and interfered with Mr. Ullah's everyday functioning. Mr. Ullah stopped eating and his extreme weight loss was jarring to the people around him. He reported difficulty sleeping and recalls ruminating at night about the suffering of Muslims around the world. Mr. Ullah spent his days doing electrical work and his evenings watching religious videos. With tenuous family connections and no friends, Mr. Ullah considered killing himself, but the thought provided no relief because of the Islamic prohibition against suicide. When Mr. Ullah began building the bomb that he ultimately detonated in the Port Authority subway station, he was in an unprecedented state of confusion, disconnection and desperation.

CONCLUSION

Mr. Ullah first encountered fundamentalist Islamic theology at a time of extraordinary personal fragility. The moment was a perfect storm of risk factors for Mr. Ullah: alienation from family and friends, severe depression, grief, direct exposure to the indescribable pain and suffering of Muslim refugees in Myanmar, and relentless harassment from people in the United States. Mr. Ullah was unmoored and desperate for

14

A001347

answers. His love of the United States and its values had withered in the wake of his father's death and the subsequent unraveling of his support systems. Mr. Ullah tried to reconnect with his community in Bangladesh and attempted to return to his country of origin where he felt safe and understood, but his efforts were blocked at every turn. As Mr. Ullah's path to fulfillment continued to narrow, his desperation increased and he became increasingly vulnerable to the deeply distorted values of radical Islam.

Thank you for your consideration of the mitigating circumstances outlined in this report.

Respectfully,

Erik Mercer, L.C.S.W.

15

**A001348**

REFERENCES

Coker, M., Gross, J. (5 August 2015).  Islamic Preacher Anjem Choudary Charged in U.K. With Inviting Support of Terror. The Wall Street Journal.

Yeginsu, C. (18 May, 2018). One of U.K.'s Most Prolific Extremist Cells Is Regrouping. The New York Times.

Livesey, B. (25 January, 2005). The Salafist Movement. Frontline. Public Broadcasting Service.

16

**A001349**

# EXHIBIT B

A001350

Dear Honorable Judge Sullivan,

Assalamu alaikum (peace be upon you). I'm the despaired mother of Akayed Ullah. I couldn't find any words to articulate the way I feel today. Because of my depression and anxiety, I am not thinking clearly. More than one year has passed that Akayed's not with me. I keep myself busy with prayer, in the hope that God's mercy would allow my son to see freedom again one day. I feel helpless without him here, not knowing if he will be okay.

Akayed has always been a loving and doting son. When my husband died from lung cancer Akayed consoled me like a child is consoled when they fall. Akayed now has his own son, who is only two. For that little child, I ask you to please be lenient with Akayed.

My family moved to the United States in 2011. Akayed and his siblings live with me in the same building in Brooklyn. Akayed would sometimes tell me "I will go to Bangladesh and start a business over there." I told him first to earn some money then go to Bangladesh. A few years ago I noticed a change in Akayed. Suddenly Akayed stopped eating, talking, he became sleepless. I could tell by he was depressed by the way he appeared. Slowly he began to eat in less quantity, keep things to himself. He wouldn't share his despairing state and I would get tense and worried. When I noticed his distress I told Akayed he should visit his son in Bangladesh to feel better. I didn't know what to say to help my son out of his despair.

When I learned about what Akayed did I was in disbelief and utter shock. To this day I cannot comprehend what happened, or how it happened. I never saw anything aggressive or violent in Akayed. From his childhood to this day, he had no bad habits, no aggressive behaviors. He always shares his feelings and everything with me but I don't know what happened this time. I cannot imagine what he was thinking or feeling. Respected Judge, I have only ever known my son, to be honest, hardworking, with such a good heart. As his mother, I feel great remorse for the event.

I feel alone without Akayed here. After my husband passed away Akayed stood by me. Now I have no comfort or solace. Please, Your Honor, I ask you to think of his mother and his young son. Please give Akayed a chance to return to his family. At least his two-year-old son's life will be fulfilled with his father.

Thank you,

Dilruba Begum

# EXHIBIT C

**A001352**

Honorable Judge Sullivan:

My name is Liakat Jahan. I am Akayed Ullah's younger sister. I know how difficult a decision you have in front of you. I know that you have to be fair in your decision. I hope that you decide to spare Akayed's life.

I do not understand what happened on that day in December. In my heart, I struggle to match the incident to the person. The Akayed Ullah I know is my second father, my guardian, my shelter, my support, and my closest friend. Akayed is an affectionate and kind person. When we were younger, our financial situation was very poor, so we would have to save pennies for months to buy a toy, comic book, etc. Sometimes he would go to the Bazar to buy himself a toy car, with the money he saved for months, rather he would buy my favorite hairband and come home with it so I can be the happiest kid. I grew up watching Akayed always helping people—whether they are poor or old or young. In Bangladesh there are lots of beggars, whenever a beggar would come to Akayed for money, he would buy them food, sit next to them, joking with them, making them laugh. While everyone despised beggars, he never distinguished people rather embraced them with kindness and humor. He was respectful to our parents. He would not make any decisions on his own, especially not without asking my mother first.

Akayed was my mother's best friend after we lost our father. My mother used to cry constantly when my father passed from cancer. Akayed used to console her. He was our main support during this very difficult time. Akayed is naturally very gentle. He is very fond of kids. He is affectionate towards children and always used to play with my baby after work. He used to sing to my baby to make her calm. This is the Akayed I know.

When Akayed used to work for a car service, he would pick up and drop off our mom from her doctor's appointments. If my mother told Akayed to pick her up from the doctor's office, even if he was far away in Queens, he would come to pick my mom up. He was always grateful for us and would drop everything for his family.

Akayed also has his own family. A loving wife and adorable baby boy. His wife is waiting for him in Bangladesh, she has a big hope that one day her husband will be by her side. His wife is hopeless, waiting for Akayed to return to her. His two-year-old son has already started learning, walking, and talking. His son wants to see his dad even if it is on video chat, he wants to hear his

**A001353**

dad's voice. His son's life just started. Every baby needs both their mother and father's support. I was twenty-one years old when I lost my own father. I cannot imagine what it will be like for Akayed's son to not be reunited with his father again.

Having a brother like Akayed I always felt blessed and secured. Now every single moment I feel I am helpless without him. I sincerely request that you give Akayed a second chance at life. You're not only giving him a second chance. You're giving everyone in his family a second chance. My sincere request is to please be merciful with Akayed. He can learn from his wrongdoings. Thank you for taking the time to read this letter.

Sincerely,

Liakat Jahan

**A001354**

# EXHIBIT D

**A001355**

Dear Honorable Judge Sullivan,

Each letter tells a different story. Each individual narrative of a person is different, isn't? I am Ayfa, Akayed's youngest sister. Your Honor, this decision you will make regarding Akayed's case is of deep importance to our family. This decision will determine if Akayed is worthy of seeing his child again, worthy of reuniting with his old inconsolable mother, who cries for her son day and night hoping that a miracle might spare his life. Your decision will determine whether Akayed is able to see his heartbroken wife, who had only just started to explore the world of happiness with the man she loved affectionately.

Growing up, Akayed was always a joyful and free-spirited kid. I remember when I was eight and my sister was thirteen, we had a group of pigeons in our balcony. Akayed loved those birds like a parent who loves a child, like most of the dog owners, love their dogs. He loved rock music, he even had his ear pierced and had drums and guitars in our home. At this point in his life, he wanted to be a musician, naive and content with his existence. He was always a gentle and doting brother. During festivals Akayed and I would open a greeting card installment cart around the block, fully enjoying ourselves with friends. Later when Akayed received his first paycheck I remember he took us to KFCC Restaurant for dinner, which seemed like a luxury for middle-class people like us.

The news of what Akayed did completely turned my life around. I couldn't understand it. We watched horrifying news on the media, but never have we ever thought this appalling occurrence could be part of our reality. To this day, I cannot match the brother I know to the man behind those bars. But I do know his true characteristics: soft, generous, peaceful, with a free-spirited mind. The brother we know was always full of laughter and this image of him still lingers in my eyes. I wish I could ask him at his moments of despair: What happened? What happened, brother? I wish I could give him a shoulder to lean on in his deepest dispirited moments of life.

The beautiful life my brother and his wife desired to create together with hard work and commitment now have become a painful torment for both. This terrible incident has been traumatizing for Akayed's family members, especially his mother. He was always there for people

**A001356**

in need regardless of their faiths, beliefs, and standards. He considered others' best interests, sheltered our mother from her grief and pain after our father perished from cancer.

The Akayed we have known for years is in complete contrast to what he has done. In the past few years, Akayed did not know how to climb out of his own despair. He was depressed and hopeless. He did not have a figure to console his own grief after losing his father and favorite nephew in the family. I think that these traumatizing events led to his distress. The constant pressure of staying strong and providing for his mother in this country and being the sole provider for his wife and son in Bangladesh pushed him towards depression and vulnerability. This depression played a role in his actions.

Your Honor, I appeal to you to give my brother a second chance at life. I hope he is worthy of mercy and deserves a second chance to repent. Your decision will affect not only his life but the family around him who love him and need him back. Please, my purest request is for you to spare my brother's life, give him another chance to be the father and husband he intended to be.

Sincerely,

Ayfa Hayat

**A001357**

# EXHIBIT E

A001358

Honorable Judge Sullivan,

My name is Jannatul Ferdous Jui. I am Akayed Ullah's wife. We have a child together. He is now two years old. We live with my parents in Bangladesh. My English is very weak. I can't express my feelings in English fluently. But I think you can understand my pain. I haven't seen my husband for a long time. I don't know how I am alive. How badly I want to see him. I can't express these emotions through words.

I married Akayed in 2016. We both belong to ordinary families and are very ordinary people. After my wedding my life became colorful. Akayed's family is well educated, they are decent and very social. Akayed has a good relationship with everyone in my family and loves them dearly. He is responsible to his family and always has made sacrifices to provide for us. Every person loves Akayed's personality when they meet him. He is a very modest, polite, simple, and true hearted person.

Akayed has no bad reports in Bangladesh. He spent many years here. I never saw Akayed hurt anyone with his behaviors or words. If anyone hurt him, he forgave them. Sometimes I hurt Akayed by saying harsh words to him, but he never got angry with me. He never hurt me. This gives so much pain now that he is gone. I realize how valuable Akayed is to me. Now that he is not with me my life has become a disaster. I cannot comprehend how this incident happened. I never saw Akayed be aggressive or hurtful, I know how soft hearted he is. I don't even believe this could be happening in our life.

We were once happy in our life together. Akayed was happy. He is very much a family person. We have dreamed so many things about our family. Like every couple we also wanted to live happily and start a family. Whenever he visited Bangladesh Akayed gave his full time to me.

**A001359**

We went for walks, going to eat outside. Most of the time we stayed at home and talked a lot. He is the best husband to me.

Akayed loves children a lot. He cherishes his younger brother and nephew a lot. I always imagined how much he will love his child. When our son was born he was so happy. He visited us in Bangladesh in September 2017 for one and a half months. For this short time my child got his father. The entire time Akayed stayed with him. He played with him, fed him, and changed his diaper. I saw Akayed so happy. And he returned to America happily. But I know Akayed missed us a lot. He wanted to stay with us. He wanted to hug our son again. But now he doesn't get to see his son.

My child calls for his father all the time. He roams the whole house saying "Baba Baba" as if he searches for his father. He can't ask anyone where his father is. How painful this is for me. How can I explain to him why his father doesn't return? I always knew how much Akayed loves his child. But now he doesn't get to show his son affection.

Akayed and I had so many dreams together. We wanted to spend our whole life together. Now I feel lost and always tired. I don't want to do anything alone. I am sick mentally day by day. Akayed is not getting his punishment alone. We as his family are also being punished. We lock ourselves in our house. We don't go outside except for emergencies. My child wants to go outside and play with his father. He is suffering. Akayed is also very devoted to his mother. Please give his mother a chance to get her son back.

We don't have any social life now because of my child's last name. All the time my son looks outside through the window. Sometimes he sees our neighbor's child in their father's lap. He stares at them curiously. I know he wants to play in his father's lap. He also wants to feel his

**A001360**

father's love. Your Honor please be merciful to Akayed for our son. Every human needs a chance at redemption. Our life is connected with Akayed. Don't destroy our life. I am valueless without him. I feel helpless without him.

I don't want to stay a single moment without Akayed. I am dying every day. I want to go back to my happy days. Our whole family was so happy when our son was born. So many plans we made for our son. Now my son will be without his father's love. Our family is in a great shock. We forget to smile.

I want our son to get both father's and mother's love in his life. He is so little. I know Akayed did something wrong. Every person in our family is suffering for it. Please give him a chance to lead a better life with his family. Please give Akayed an opportunity to arrange his life in a better way. Send him back permanently in Bangladesh. He will stay here with us.

I don't want to cry anymore. I don't want any sad tears. I want to see Akayed again desperately. I want to see how my son runs to his father and hugs him tightly. We are all hoping to reunite with him once more. I humbly request you allow Akayed to live with us. In our belief "if anyone saved a life, it would be as if he saved the life of the whole of mankind." Please be kind to him and judge him softly.

Sincerely,

Jannatul Ferdous

**A001361**

# EXHIBIT F

**A001362**

Dear Honorable Judge Sullivan,

I am Mahfuza Akter, mother-in-law of Akayed Ullah. Akayed Ullah is my only son-in-law. After the marriage he won everyone's heart in our family and he especially won my heart with his behavior and nature. He is very much a simple and soft-hearted person. He did not have any bad habits at all. In our family, everyone was so happy to welcome him as our family member. Akayed is like an elder son to me and he's beloved to everyone. He respected me as his mother in law. I cooked for him, I fed him, he was always appreciative. He loved my cooking. I miss those times and wish I could see him again. My whole family misses him.

My daughter Jannatul was always so content with Akayed. I saw her and my grandson so happy together with Akayed, laughing and playing around. When Akayed became the father of a son his happiness was boundless. He had a lot of dreams for his son. He never hurt, not even shouted to my daughter or my grandson. Akayed wanted to give his son everything he deserved.

Now I have to see my family in pain. I don't know what to do. My grandson gives me a sad-eyed look. This tears out my heart. I can't bear it. Akayed is a family person full of joy and dreams. His son wants him back, we all want him back. We can assure you he is remorseful and just wants to see his family again. Please let Akayed come to us, let him come to his son.

Akayed Ullah is human. He wants a life full of joy. He's not receiving punishment alone. We are also living our life as prisoners without him. His life is connected to my daughter's and my grandson's. We don't want to live our life without Akayed here with us.

Sincerely,

Mahfuza Akter

**A001363**

# EXHIBIT G

A001364

Dear Judge Sullivan,

I am Zulfikar Haider and I am the father-in-law of Akayed Ullah. Akayed is a very simple, honest and soft-hearted person. After Akayed and my daughter got married we all lived together in the same house in Bangladesh, and I never saw any bad things in Akayed's character. Akayed has remained committed to my daughter, and after marriage, he came to visit Bangladesh twice. He last visited Bangladesh on 7 September in 2018. At that time my daughter gave birth to a boy. Akayed was incredibly happy to see his son and was overjoyed at being a father.

My grandson is now deprived of his father's love. He is growing up only able to see his father's picture. My daughter is also deprived of her husband's love, my daughter cries all day, I never see her happy. She loves and misses her husband very much, her life is stuck in one place, she is in a stage of emotional weakness. I am her helpless father. I have to see my daughter suffer in pain in front of my eyes every day. Her mother and I cannot endure this pain.

My wife is a heart patient and has been bedridden worrying about Akayed. I am old and sick, we both have reached the end of our lives. I want desperately to see Akayed before I die. There is no one who can take care of my daughter and grandson beside us. I know that what Akayed did was wrong and that he must take responsibility. I humbly request that you be merciful with Akayed for the sake of his family. Please be kind to him, give him a chance to correct his life with his wife and child. Please give him back to us, please help us. This is a father's last wish. To see his family happy.

Sincerely, Zulfikar Haider

**A001365**

# EXHIBIT H

A001366

Dear Honorable Judge Sullivan,

I am Salma, a friend of Jannatul Ferdous. Akayed Ullah is like my elder brother. I have known him since 2006 because his sister is my dear friend. I have a close relationship with his family. Growing up I went to Akayed's house to study with his sister and I frequently saw him. He was always kind to me. He was a generous, gentle, honest, soft-hearted and religious person. After he married one of my best friends Jannatul Ferdous, I got to know Akayed even better. Jannatul was so happy with him which shows in her eyes. She would always talk about her husband, 'Akayed is this.' 'Akayed is that.' Indeed Akayed is a wonderful husband with lots of love and compassion. He treats his wife like a queen.

After the birth of his son, I saw a new side to Akayed. He was such a loving father to his child. Whenever I went to visit Jannat's house, I saw Akayed playing with his son in his arms. He is the most loving father I have ever seen in my entire life. And he is also one of my favorite persons. He has an amazing character which attracts everyone.

On 12th December 2017, when I heard the news about the arrest of Akayed, it stopped my breath for a second. I couldn't believe my eyes what I was seeing in the news. At that moment, there was only one thing which comes in my mind: how is Jannat? Does she know the news? I ran to her house. Seeing her in that devastated and shocked condition, my heart was broken. Since that moment I have not seen Jannatul laughing openly. Once upon a time, she used to be a cheerful girl but now she is completely different. She has locked herself in a room. She never speaks with anyone. We used to go out together, shopping together, we laughed, and we shared our emotions. But nowadays she never goes out. Always cries to herself. I feel helpless. I don't know how to help her situation. She has a baby boy who is so cute and adorable. While he plays in the house he

**A001367**

calls out for his father ("Baba Baba"), and I feel so bad for him. I feel so helpless that I can't do anything for my best friend and her son.

I don't know what will be your decision, but I have a strong appeal to you. Please be kind to this family. Please make a humane decision that you won't regret. Please let Akayed return to his family.

Sincerely,

Salma

**A001368**

# EXHIBIT I
# **REDACTED**

**A001369**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 18, 2018

By Email
Amy Gallicchio, Esq.
Julia Gatto, Esq.
Federal Defenders of New York, Inc.
52 Duane Street
New York, New York 10007

  Re: **United States** v. **Akayed Ullah, 18 Cr. 16 (RJS)**

Dear Ms. Gallicchio and Ms. Gatto:

  This document is not a plea agreement. Rather, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), this letter sets forth the current position of the United States Attorney's Office for the Southern District of New York (the "Office") regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to defendant Akayed Ullah (the "defendant") in this case.

  Count One charges the defendant with providing and attempting to provide material support and resources to a designated foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of Title 18, United States Code, Section 2339B, and carries a maximum term of imprisonment of twenty years; a maximum term of supervised release of life; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

  Count Two charges the defendant with the use and attempted use of a weapon of mass destruction, in violation of Title 18, United States Code, Sections 2332a(a)(2)(A), (a)(2)(B), (a)(2)(C), and (a)(2)(D), and carries a maximum term of imprisonment of life; a maximum term of supervised release of life; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

  Count Three charges the defendant with bombing and attempting to bomb a place of public use and a public transportation system, in violation of Title 18, United States Code, Sections 2332f(a)(1)(A), (a)(1)(B), (b)(1)(B), and (b)(1)(E), and carries a maximum term of imprisonment of life; a maximum term of supervised release of life; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

04.09.2018

**A001370**

Count Four charges the defendant with the destruction and attempted destruction of property by means of fire or explosive, in violation of Title 18, United States Code, Section 844(i), and carries a maximum term of imprisonment of forty years; a mandatory minimum term of imprisonment of seven years; a maximum term of supervised release of life; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Five charges the defendant with conducting and attempting to conduct a terrorist attack against mass transportation systems, in violation of Title 18, United States Code, Sections 1992(a)(2), (a)(4)(B), (a)(7), (a)(10), (b)(1), and (c)(1), and carries a maximum term of imprisonment of life, a maximum term of supervised release of life; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

Count Six charges the defendant with using and carrying a destructive device during and in relation to, and possessing a destructive device in furtherance of, a crime of violence, to wit, the offenses charged in Counts One through Five of the Indictment, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and (c)(1)(B)(ii), and carries a maximum term of imprisonment of life; a mandatory minimum term of imprisonment of thirty years, which must run consecutive to any other sentence imposed; a maximum term of supervised release of five years; a maximum fine of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory $100 special assessment.

The total maximum term of imprisonment on Counts One though Six is life imprisonment, with a mandatory minimum term of thirty-seven years' imprisonment.

The Government currently believes that the Guidelines apply to the crimes charged in the Indictment as follows:

A. Offense Level

**Counts One through Five**

1. The Guidelines manual, and all applicable amendments, effective November 1, 2017, is the appropriate Guidelines manual used to calculate the defendant's recommended Guidelines sentencing range.

Count One

2. The Guideline applicable to Count One is U.S.S.G. § 2M5.3.

04.09.2018

**A001371**

Page 4

17. Accordingly, the adjusted offense level for Count Four is 36.

Grouping of Counts One through Five

18. Pursuant to U.S.S.G. § 3D1.2(a), because Counts One through Five involve the same victims and the same act or transaction, they are grouped together into a single Group.

19. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the Group is the highest offense level of the counts in the Group. Accordingly, the offense level for the Group is 54.

20. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level for Counts One through Five is 51.

**Count Six**

21. Pursuant to U.S.S.G. § 2K2.4(b), the Guideline sentence for Count Six is thirty years, which is the minimum term of imprisonment required by Title 18, United States Code, Section 924(c)(1)(B)(ii).

22. Pursuant to U.S.S.G. § 5G1.2(a), the thirty-year term of imprisonment required for Count Six shall be imposed independently of, and consecutive to, any terms of imprisonment imposed on Counts One through Five.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points. Pursuant to U.S.S.G. § 3A1.4(b), however, the defendant's criminal history category is VI.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's Guidelines sentence is life imprisonment, with a mandatory minimum sentence of thirty-seven years' imprisonment, thirty years of which must run consecutive to any other sentence imposed. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 51, the applicable fine range is $50,000 to $500,000.

04.09.2018

**A001372**

Page 3

3. Pursuant to U.S.S.G. § 2M5.3(a), the base offense level for Count One is 26.

4. Pursuant to U.S.S.G. § 2M5.3(b)(1), because the offense involved in Count One involved the provision of explosives or other material support or resources with the intent, knowledge, or reason to believe they were to be used to commit a violent act, two levels are added.

5. Pursuant to U.S.S.G. § 2M5.3(c)(2), because the offense was tantamount to attempted murder and the resulting offense level is greater than the offense level determined pursuant to U.S.S.G. § 2M5.3(a) and (b)(1), U.S.S.G. § 2A2.1 applies.

6. Pursuant to U.S.S.G. § 2A2.1(a)(1), the base offense level is 33.

7. Pursuant to U.S.S.G. § 2A2.1(b)(1)(B), because a victim sustained serious bodily injury, two levels are added.

8. Pursuant to U.S.S.G. § 3A1.4(a), because Count One is a felony that involved a federal crime of terrorism, 12 levels are added.

9. Accordingly, the adjusted offense level for Count One is 47.

Counts Two, Three, and Five

10. The Guideline applicable to each of Counts Two, Three, and Five is § 2M6.1.

11. Pursuant to U.S.S.G. § 2M6.1(a), the base offense level for each of Counts Two, Three, and Five is 42, because the offense was committed with the intent to injure the United States or to aid a foreign terrorist organization.

12. Pursuant to U.S.S.G. § 3A1.4(a), because each of Counts Two, Three, and Five is a felony that involved a federal crime of terrorism, 12 levels are added.

13. Accordingly, the adjusted offense level for each of Counts Two, Three, and Five is 54.

Count Four

14. The Guideline applicable to Count Four is § 2K1.4.

15. Pursuant to U.S.S.G. § 2K1.4(a)(1), the base offense level for Count Four is 24, because the offense created a substantial risk of death or serious injury to a person other than a participant in the offense, and that risk was created knowingly, and because the offense involved the destruction or attempted destruction of a mass transportation facility, public transportation system, state or government facility, infrastructure facility, or a place of public use.

16. Pursuant to U.S.S.G. § 3A1.4(a), because Count Four is a felony that involved a federal crime of terrorism, 12 levels are added.

04.09.2018

**A001373**

Page 5

The foregoing Guidelines calculation is based on facts and information currently known to the Office. Nothing in this letter limits the right of this Office (1) to change its position at any time as to the appropriate Guidelines calculation in this case, even if that change is based, in whole or in part, on information that was in the Government's possession as of the date of this letter; and/or (2) to present to the Court or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing that are available to the Office at the time of sentencing. Nor does anything in this letter limit the right of this Office to seek a departure under or variance from the Guidelines, or to take a position on any departure or variance that may be suggested by the Court, the United States Probation Office, or the defendant.

This letter does not and cannot bind either the Court or the United States Probation Office, either as to questions of fact or as to determinations of the correct application of the Guidelines in this case. Instead, the sentence to be imposed upon the defendant will be determined solely by the Court. This Office cannot and does not make any promise or representation as to what sentence the defendant will receive.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant is entitled to and should seek advice from his counsel on this issue.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
(212) 637-1034/2423/2562

04.09.2018

A001374

L4M5ullS                    sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               18 Cr. 16 (RJS)

AKAYED ULLAH,

            Defendant.

------------------------------x

                                             April 22, 2021
                                             10:15 a.m.


Before:

              HON. RICHARD J. SULLIVAN,

                                   District Judge


                         APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  REBEKAH A. DONALESKI
     GEORGE D. TURNER
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
BY:  AMY GALLICCHIO

A001375

L4M5ullS                    sentence

(Case called)

THE COURT:  Good morning.  Let me take appearances.  For the government?

MS. DONALESKI:  Good morning, your Honor.  Rebekah Donaleski and George Turner for the government.

THE COURT:  Good morning.

And for the defendant?

MS. GALLICCHIO:  Good morning, your Honor.  The Federal Defenders by Amy Gallicchio.  I am accompanied at counsel table by Alondra Reyes, who is our paralegal, and of course Mr. Akayed Ullah is present.

THE COURT:  So, Ms. Cassidy is not here today?

MS. GALLICCHIO:  No.  She is not, your Honor.

THE COURT:  There are some friends and family members of Mr. Ullah here today?

MS. GALLICCHIO:  Yes, your Honor.

THE COURT:  You don't have to identify them, but.

MS. GALLICCHIO:  Yes; his mother is here today and a companion of hers.

THE COURT:  Let me welcome them as well.  I know we have a number of people also in the overflow room and some listening in on this proceeding in light of COVID, so welcome to everybody here today.

We are here for sentencing.  Mr. Ullah was convicted after a jury trial on November 6 of 2018, which is a while ago.

**A001376**

L4M5ullS                    sentence

Since then we have had some post trial motions, we have also had some adjournments in light of COVID, but it appears we are ready to go today.

THE COURT: So, Mr. Ullah, good morning to you.

THE DEFENDANT: Good morning.

THE COURT: You can hear me all right?

THE DEFENDANT: Yes, sir.

THE COURT: If you have difficulty hearing at any point, let me know. Okay?

THE DEFENDANT: Okay.

THE COURT: I guess I am going to wear this mask which muffles sound a little bit but I think the microphones should make it okay. But if you have difficulty understanding or hearing, let me know and I will make sure that we take steps to correct that. Okay?

THE DEFENDANT: Okay.

THE COURT: So, let me just confirm with the parties what I have received and reviewed in connection with sentencing. If I have left anything out, of course let me know.

So, I have reviewed the presentence report prepared by the Probation Department back in 2019. There is an amended report. I reviewed the defense sentencing submission which is dated March 25 of 2021; it also includes attachments including a number of letters as well as a report from a clinical social

L4M5ullS                    sentence

worker Mr. Mercier, I have read that.  I have read the government's sentencing memorandum which is dated April 1 of this year.  That also included victim impact statements which are also included into the presentence report.

Are there any victims here today who wish to be heard in connection with sentencing?

MS. DONALESKI:  There are not, your Honor.  There is one victim listening in with her family that we know of.

THE COURT:  All right.  So, let me extend my welcome to the victim and victim's family as well.  Victims have a right to be heard in court.  The victim statements, I guess, are the statements they intend to rest on and that's fine; I have read them.

I have also received a proposed restitution order that was agreed to by the parties and it appears to have been signed or stipulated to back about a week ago on April 14th.

I have also reviewed the trial transcripts, I have reviewed the post-trial motions and briefs in this matter, and I took another look at my order resolving those post-trial motions.  I have also looked at some of the sentencings of other cases in the court house that involve some of the same charges, many of which are referenced in the sentencing submission.

So, is there anything I have missed or failed to mention?

**A001378**

L4M5ullS                          sentence

MS. DONALESKI:  No, your Honor.

THE COURT:  Ms. Gallicchio?

MS. GALLICCHIO:  No, your Honor.

THE COURT:  Ms. Gallicchio, let me ask you first of all if you have had a chance to review the presentence report with your client.

MS. GALLICCHIO:  Yes, your Honor.

Your Honor, would you mind if I remained seated?  I think it might be easier with the microphone.

THE COURT:  That's fine.  Everybody can remain seated. The microphones are at that level and jumping up and down is probably going to make it harder to hear and probably less hygienic as well.  So, that's fine.  Thank you.  That's a good point.

MS. GALLICCHIO:  Thank you, your Honor.

Yes, your Honor; I have reviewed it with my client.

THE COURT:  Mr. Ullah, you had a chance to review the presentence report with your attorney or attorneys?

THE DEFENDANT:  Yes, sir.

THE COURT:  Ms. Gallicchio, as I recall, you have a couple of objections to the sentencing guidelines.  Are there any other objections to the presentence report?

MS. GALLICCHIO:  No, your Honor.

THE COURT:  No.

MS. GALLICCHIO:  Only those that I have raised in my

**A001379**

6

L4M5ullS                          sentence

submission.

THE COURT:  And we will get to those in a minute.

Let me ask the government the same question. Ms. Donaleski, have you received the presentence report and reviewed it?

MS. DONALESKI:  I have, your Honor.

THE COURT:  Do you have any objections to what's in the report?

MS. DONALESKI:  No, your Honor.

THE COURT:  So.  Mr. Ullah, let me sort of remind you where we have been.  The jury returned guilty verdicts on all of the counts, all six counts in the indictment, and so as a result, those counts, just so we are clear, Count One carries a maximum term of imprisonment of 20 years; Counts Two and Three carry maximum terms of imprisonment of life; Count Four carries a maximum term of imprisonment of 20 years, as well as a five-year mandatory sentence; Count Five carries a maximum term of imprisonment of life; and Count Six carries a maximum term of life, it is a mandatory minimum 30 years consecutive to any other sentence imposed.

So, that's my understanding of the maximum penalties that Mr. Ullah faces.  Does anybody disagree with that characterization?

MS. DONALESKI:  No, your Honor.

MS. GALLICCHIO:  No, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001380**

L4M5ullS                    sentence

THE COURT: So, the mandatory minimum sentence -- the lowest sentence -- that I can possibly impose is 35 years. I guess the maximum sentence I can impose is a life sentence, followed by a mandatory consecutive sentence of life. I guess that's right. Is that correct? I mean 30 year minimum. It is sort of --

MS. GALLICCHIO: Right.

THE COURT: It is something almost strange about saying that but that is, I guess, technically the maximum sentence in any event. So, that's the statutory maximums and the statutory mandatory minimums.

Now, there are other considerations that I have to take into account, Mr. Ullah, and one of those relates to something called the United States Sentencing Guidelines. Have you heard of the Sentencing Guidelines, Mr. Ullah?

THE DEFENDANT: Yes, sir.

THE COURT: And you discussed those a bit, I am sure, with your attorneys.

THE DEFENDANT: Yes.

THE COURT: For your benefit and for the benefit of others who are here today, let me explain what these are. So, the Sentencing Guidelines are this big book and it is a book that's put out by a commission, the United States Sentencing Commission. So, this book, it is long. It is, like, 500 pages long, but what it attempts to do or endeavors to do is give

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001381**

L4M5ullS                    sentence

guidance to judges like me who have to impose sentences on real people.  And so, the way it works is that every crime or type of crime is covered by a chapter in this book and the Judge then goes to the chapter relating to that crime, and in that chapter the judge is directed to make certain findings of fact and to assign numerical value based on those findings.  So, the Judge makes finding, assigns points effectively, goes through other parts of the book to add or subtract points, and ultimately the judge comes up with a number.  That number is referred to as the offense level.  This can sound kind of technical like accounting in some ways but it is important.  So, in addition to the offense level, the judge then has to go to another section of this book which relates to criminal history and, not surprisingly, people who committed crimes in the past, people who have been sentenced to prison before, they will typically be treated more harshly than a person who has no prior convictions or no jail time.  So, the Judge goes through the prior convictions that a person might have and, depending on how long the sentence was for, or when the sentence was if it was really old, the judge will assign points, add points, and come up with another number that number is referred to as the Criminal History Category.  There are six criminal history categories; Category I is the lowest and least serious, Category VI is the highest and most serious.  Then, with the two numbers I talked about, the offense level on the one hand

**A001382**

L4M5ullS                              sentence

and the Criminal History Category on the other, the judge then goes to the back of this book where there is a table or a grid. I don't know if you can see it, I don't know how good your eyesight is -- it is basically a chart. So, there is a column here on the far left which is the offense level column, it starts at 1 and it goes all the way down to 43. So, the judge goes down that column until the judge reaches the offense level that the judge found to be appropriate. The judge then goes across these other columns from left to right, each of which reflects a criminal history category. Where the judge's finger finally stops, well, that is the range in terms of months that, according to this book, would be appropriate for that offense level and that Criminal History Category.

So, it is kind of technical, it feels like accounting and it, in many ways, is accounting. But, it is important because this book is an important consideration. Now, it is not mandatory. I don't have to follow this book so I am free to go above or below what this book recommends -- I guess I can't go above life. But, unlike the statutory mandatory minimum sentences which are -- there is nothing I can do about that, I cannot sentence you below the 35-year mandatory sentence that you face for these crimes. I am permitted to go below the guidelines if I think it is appropriate.

Now, there are other factors that I am entitled to consider in deciding whether or not the guidelines number is

L4M5ullS                    sentence

appropriate and I will talk about those in a minute, but now we are going to talk a little bit about these guidelines because there is a disagreement, among the parties here, and so I am going to have to resolve that. So, with apologies to everybody else because this can again sound technical and kind of boring, we are going to do that. It is not unimportant, it is just not simple. So, we are going to talk about that now.

Ms. Gallicchio, you are, as I understand it, you agree that the base offense level here is 42, that's the highest base offense level for the crimes for which Mr. Ullah has been convicted. You are objecting to an enhancement under 3A1.4 of the guidelines which is the so-called terrorist or terrorism enhancement, and you are also objecting to the Probation Department's recommendation that there be no adjustment for acceptance of responsibility. You are suggesting that a two-level reduction is appropriate for acceptance of responsibility.

Do I have that right?

MS. GALLICCHIO: That's correct, your Honor.

THE COURT: So I have read your papers which are very clear but I am happy to hear if you want to discuss those factors in more detail.

MS. GALLICCHIO: Your Honor, no. I think we have laid out our position clearly in our submission and I don't have anything additional to add to that today.

**A001384**

L4M5ullS                    sentence

THE COURT:  All right.  Ms. Donaleski, you obviously oppose both of those positions.  Your view is that the base offense level is 42 and then there is an enhancement of 12 levels for the terrorism enhancement and that there should be no adjustment for acceptance of responsibility, correct?

MS. DONALESKI:  That's correct, your Honor.

THE COURT:  Anything else you would like to say on that score?

MS. DONALESKI:  No.  We will rest on our papers.

THE COURT:  Okay.  All right.  So, let me then resolve that.

I am persuaded, certainly, that the terrorism enhancement applies here.  I think it is clear from the record that Mr. Ullah intended to influence or affect the conduct of the government by intimidation or coercion and to retaliate against the government for its conduct.  I think his statements after his apprehension made that clear so I think that to the extent there is an argument that Mr. Ullah does not meet the requirements for that enhancement, I would disagree.  I think the evidence demonstrated that.

Now, there was a secondary argument made by Ms. Gallicchio that even if it does apply it would be impermissible double-counting.  That is a slightly different argument and I am not prepared to accept that argument either. It seems to me that it is not double-counting.  I think

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001385**

L4M5ullS                          sentence

Congress and the sentencing commission are free to impose an enhancement of this sort, even for a terrorist offense, that there is not complete overlap between the two, and that in this case the base offense level specified in Section 2M6.1A1 doesn't necessarily always lead to the enhancement here but the enhancement here is certainly warranted by virtue of statements made by Mr. Ullah and writings by Mr. Ullah on his Facebook and left behind in his apartment to indicate what was the purpose of this attempted bombing which was a terrorist act.  So, I will impose the 12-level enhancement.  That moves us from 42 to 54.

With respect to acceptance of responsibility, I don't find that Mr. Ullah is entitled to any reduction for acceptance of responsibility.  Mr. Ullah certainly made admissions, even more than that, in some cases he boasted about more attacks to follow.  He didn't hide the fact, following his apprehension, that he was responsible, nor could he, really, given the circumstances.  But I don't think he really ever accepted responsibility for that crime in the sense that he acknowledged and expressed remorse.  He went to trial, he challenged the government's evidence.  I think the suggestion that you could say, yeah, I did it but I don't think you can prove it, is somehow consistent with acceptance of responsibility.  It would turn the notion of acceptance of responsibility on its head.  There are rare instances where a defendant can go to trial and

**A001386**

L4M5ullS                    sentence

still get credit for accepting responsibility but they are rare and I don't think this one comes close.  So, I won't make any adjustment for acceptance of responsibility.

So, that then puts us at level 54 but, as I said, the book only goes to 43 so I am capped out at 43.  I can tell you, whether we are at 42 or 43 I don't think it will really matter for purposes of sentencing today but that is my guidelines calculation.  So, the guidelines calculation is an offense level of 43 and a Criminal History Category of VI by virtue of the terrorism enhancement which puts us at the end of the Criminal History Category table even though Mr. Ullah has no prior convictions of any kind and would otherwise be in Criminal History Category I.  So, it doesn't make that much difference what Criminal History Category he is in because offense level 43 carries a life sentence under the Guidelines across the board whether you are in Criminal History Category I or VI.

Those are my findings.  Does anybody have any questions or anything they need to add with respect to those findings to make a further record or something?

Ms. Donaleski?

MS. DONALESKI:  Not from the government.

THE COURT:  Ms. Gallicchio?

MS. GALLICCHIO:  No, your Honor.

THE COURT:  So, the guidelines then call for a life

L4M5ullS                    sentence

sentence but, as I said, the Sentencing Guidelines are not mandatory.  Mr. Ullah, I am free to consider a variety of other factors and go below that if I think appropriate.  Those other factors include, first of all, your own personal history, the facts and circumstances of your life.  I have to look at your entire experience from your birth right up until now and consider that.  You are not defined solely by this one act, I have to look at this whole person.  So, that's a factor that's important that judges are required to consider.  And a lot has been written about that and I expect more will be said about it and something I have taken very seriously.

Another factor that I have to consider are the facts and circumstances of this crime or these crimes because it is six different crimes that are the same conduct that informs them all.  I have to consider what it is that you did here, consider the seriousness of those offenses, and I have to make sure that the sentence that I impose reflects the seriousness of those crimes.  I have to make sure that the punishment fits the crime and so, looking at the details of the crime is important and I will do that.

I have to consider also the need to deter or discourage you and others from committing crimes like this in the future.  This is the hope that by imposing a sentence on you today that it will send a message -- a message to you, but also importantly to others who will see what happened in your

**A001388**

L4M5ullS                    sentence

case, who will learn of this sentence, and perhaps their future conduct will be affected by it.  That's the hope.  I don't have a crystal ball, I can't know for sure what impact my sentence will have on you or others in the future, but I have to use my best judgment because that's certainly one of the goals of sentencing, is to have that impact on future behavior.

I have to consider your own needs while you are in custody so that includes your medical needs, mental health needs.  Sometimes I have defendants who have substance abuse treatment needs.  That doesn't seem to be you.  But, whatever the needs of an individual defendant, the judge has to consider them and make sure that whatever sentence is imposed, it involves incarceration that the needs of that individual will be addressed.  So, I have to consider that.

Then, finally, I have to consider the need to avoid what is sometimes referred to as unwarranted sentencing disparities between similarly situated people and that's simply, it means that I have to make sure that the sentence I impose in this case is consistent with sentences imposed in other cases involving other individuals who are similar, who engaged in similar conduct, who have similar histories where there are some similarities.  No two people are exactly alike, no two cases are exactly alike, but where there are strong similarities it is important that there be some coherence, that the sentences be similar, otherwise the whole system would look

**A001389**

L4M5ullS                    sentence

arbitrary and that, perhaps, would undermine people's respect for the law and promoting respect for the law is one of the goals of sentence, that people after a sentencing will say, okay, there is greater respect now for the law than there was before.  That's the hope.  Okay?

So, those are the factors I have to consider and my job is to balance them, along with the guidelines, to come up with a sentence that is appropriate, that is just.  It's a difficult thing.  I think most judges would tell you it is the hardest thing they do and probably the most important thing they do and that's certainly no exception today.

So, what we are going to do going forward is I am going to hear from the attorneys.  I will start with Ms. Gallicchio.  I will give her a chance to develop some of the points she made in her submission which was very thorough. I will then give the government a chance to respond and make whatever points they think appropriate, some of which perhaps remain in their submission which also was very thorough.  I will let Ms. Gallicchio respond, if she wishes, to whatever the government has said.  We may go back and forth a little.  I have may have some questions myself.  After they have finished I will check again to make sure there is no victim who wishes to be heard but it doesn't sound like it.  If there were victims here they would have a right to be heard, the law permits that, and I would give them a chance to speak.  But, I

**A001390**

L4M5ullS                    sentence

have two written statements from victims, I have read them, and that is sufficient.  But then, finally, I will give you an opportunity to address the Court, if you wish.  You are not required to speak and it is your decision whether you wish to.  But, if you want to speak, you certainly have the right to speak and I will make sure that you have that opportunity.  Okay?

So, that's how we are going to proceed.  We are in no rush, this is a really important day in your life.  It is an important day for your family.  It is an important day for a lot of people.  Certainly an important day for the Court.  So, we will take the time needed to do it carefully.  If at any point you don't understand what is being discussed, if you have any questions, just let me know, or talk to Ms. Gallicchio and she will tell me.  But, it is important that you understand what's taking place and that you have an opportunity to clarify if you have any confusion, that you ask me to clarify if you have any confusion.  Okay?

THE DEFENDANT:  Okay.

THE COURT:  Thank you.

So, Ms. Gallicchio, I will hear from you.

MS. GALLICCHIO:  So, your Honor, I want to begin by reading just briefly from an article by Clinton Watts that the Court will recall, from the testimony of the government as witness Aaron Zelin, during the trial.

L4M5ullS                    sentence

Clint Watts is a senior fellow at the Center for Cyber and Homeland Security at George Washington University. He is a national security contributor to MSNBC and NBC. He is also a former special agent for the FBI and served in the counter-terrorism task force, counter-terrorism division and national security branch. The article, your Honor, is entitled: "Inspired, Networked, and Directed." In it he writes: We analysts and followers of Jihadi activity sometimes give terrorists too much credit. Many, if not most western Jihadis, are deeply troubled souls, at times more confused by their intentions and motivations than we are.

Mr. Zelin, the government's witness, was asked about this article, was asked about Mr. Watts, was asked about this statement. Mr. Zelin recognized Mr. Watts as a fellow academic and scholar and thought that the article was a good one. He was asked whether he agreed with the statement and he said he did commenting, however, *that each individual is different --* saying, *So I can't speak on a specific individual without knowing the particular case.*

This statement, "many, if not most Western Jihadis are deeply troubled souls, at times more confused about their intentions and motivations than we are." Some of the labels in that statement I think certainly rings true here: The deeply troubled soul in this case was Akayed Ullah.

Now, your Honor, from what I gather from the

**A001392**

L4M5ullS                    sentence

government's sentencing submission they don't want the Court to look at Akayed Ullah, the specific individual, and understand what troubled his soul.  They have called our representations a cry for leniency, they doubt that he was troubled and depressed but say that even if he was, that it is self-serving and it provided no justification for mitigation for his conduct.  The government adopts an unsupported opinion by the probation officer in the presentence report who is not an academic or a scholar in the field of extremism who states that depression neither explains nor mitigates an act of terrorism and that terrorism is catalyzed by hatred and extremism.  These are simplistic views and an opinion unsupported by scholarly research.

The government has said in their statement in their submission that the best indications of Mr. Ullah's motivation was his post-arrest statements which the Court has already made reference to, statements made from his hospital bed shortly after his arrest, and statements made within a week of arriving at the MCC and somehow find these words inconsistent with a man in personal crisis.  They say, pay no attention to the loving family and a solid upbringing because he sought to blow himself up despite them.  They say, don't credit representations made by the defense that Mr. Ullah has renounced the ideology of ISIS.  They say it is an effort to win leniency.  And, finally, citing no basis for their opinion they say that they doubt that

**A001393**

L4M5ullS                    sentence

his offer to assist the government was sincere and they declined to meet with him.  As a result, the government has no idea who he is and what troubled his soul but, fortunately, the Court is required to consider those things.  The government wants to focus only on the act which, of course, is important for the Court to consider and, as I expected, and I am sure they will today, argue that Mr. Ullah is dangerous and irredeemable.

So today, your Honor, I want to focus on the man, Mr. Ullah; on his personal history and characteristics and not only on the nature of the offense but the circumstances leading up to the offense.  These factors are not excuses, they're not justifications.  Let me make that very clear.  They provide context to help the Court to understand what caused a quiet, peaceful, lawful, non-violent man and a loving son, brother, husband, and father, to act in a manner so contrary to his character.

As the Court has just said, his act does not define him and it doesn't, in and of itself, change the character of the man who is so lovingly described by his family in the letters provided to the Court.  They are the best judges of his character.

Mr. Ullah is a human being.  He is not an evil man, he is not a monster.  He is man who is loved dearly by his family and described by them as kind, gentle, peaceful and loving.  He

**A001394**

L4M5ullS                    sentence

was raised by loving, law-abiding parents who did not tolerate violence.  His mother, who is in court today, wrote to the Court very poignantly that her son has always been loving and doting.  He had no bad habits and showed no aggression.  His sisters, who could not bear to be here today, call him affectionate, gentle, and kind.  This is a man who cared for his father when he got terminally sick, who sat vigil by his hospital bed when he passed away.  This is a man who comforted his grieving mother and was her solid support.  This is a father who, despite distance and circumstance, loves his son with all his heart.  But, this is also a man who struggled beginning after the death of his father, who was searching for meaning and direction in his life, who thought he found it when he married and had a child in Bangladesh and thought that he found it in a community there, but obligation and familial pressure forced them apart and forced him back into this country.  He returned to the United States out of obedience and duty but he felt alone and isolated.  He had witnessed suffering in Myanmar at the camps, the Roghingya refugee camps, and he felt like his purpose was elsewhere.  Back in the U.S. he was the target of hatred, racism, Islamophobia.  To use his words, he was suffocating and dying.  He was like a fish out of water.  His life was in a downward spiral and he lost his will to live.  No matter how you characterize the act, Mr. Ullah tried to take his life and was in extreme crisis.

**A001395**

L4M5ullS                    sentence

This is depression at its worst.

THE COURT:  Has a psychiatrist --

MS. GALLICCHIO:  No.  There was a licensed clinical social worker who spent hours with Mr. Ullah who supports the evaluation and the assessment that he was suffering depression.

THE COURT:  But does the social worker have the expertise to make a diagnosis of depression?

MS. GALLICCHIO:  Yes; I believe a licensed clinical social worker does do mental health assessment.

In any event, Your Honor, all the factors in his life support that diagnosis.  Looking back, his family struggles -- probably not rightfully so -- with the guilt that they didn't see the signs of despair and hopelessness but, in hindsight, they recognize they were there.  They know that he began to turn inward shutting them out, eating less, sleeping less, talking less.  His sister writes very poignantly that how difficult it was to watch the news, the media, and never thought this appalling occurrence could be part of their reality.  She writes:  *The brother we know was always full of laughter and his image of him lingers in our eyes.  I wish I could ask him at his moments of despair what happened?  What happened, brother?*

Consistent with Clint Watts' research, your Honor, Mr. Ullah was deeply troubled and tortured; more confused about his intentions and motivations than we are.  His search for

**A001396**

L4M5ullS                    sentence

answers and meaning took him down a terrible path.  He was vulnerable to these, as so many others, distorted and radical messages of extremism.

These life events that I have laid out we have laid out in our submission that I won't go into great detail here are critical to understand and fashion the appropriate sentence.  They're not excused by any means, they're explanations and they do offer mitigation.  But Mr. Ullah, your Honor, is not stuck in that place.  His actions on December 11, 2017 do not define who he is or who he will become.  He has in fact, your Honor, expressed remorse soon after his arrest not in an effort to gain leniency or to pull the wool over anyone's eyes.  It is a genuine examination of his life and his distorted thinking.

If I can interject a personal note, your Honor, I have known Mr. Ullah perhaps since the day after his arrest when I met him in the hospital.  I and my team, including our social worker, the Social Worker Eric Mercer, have spent hundreds of hours with Mr. Ullah and his family.  I think it is fair to say that I know him extremely well.  He is, as his family describes him:  Kind, gentle, and caring.  And I can tell you that he was quick to see the errors of his ways and lament his behavior. He is deeply sorry for the pain and suffering he caused others and he genuinely struggles and is tormented to understand how he got where he is and how he did what he did.

**A001397**

L4M5ullS                    sentence

Your Honor, when he first arrived at the MCC he was placed in the high-security, high-risk segregation unit, but soon even the BOP determined that he was not a security risk and within months he was moved to general population.  He has never presented a threat to the prison, to staff, to other inmates.  He has never promoted from the jail extremist ideals or possessed or circulated extremist propaganda.  He has conducted himself with dignity and has treated fellow staff and detainees with respect.  That's his true nature.

Let me be clear, your Honor:  A request for 35 years in prison is not a plea for leniency by any stretch of the imagination.  Life in prison does not need to be the default sentence, the going rate for these cases.  Life in prison for this case and Mr. Ullah in particular is greater than necessary to achieve what 35 years can sufficiently achieve.  Let's think about what 35 years is.  It's longer than Mr. Ullah has been alive.  His son will be older than Mr. Ullah is now when Mr. Ullah is released.  His son will likely be married and have children.  In 35 years, Mr. Ullah may be a grandfather.  He may lose loved ones.  Some of us in this room, including myself, may no longer be on this earth.  35 years is an eternity.  It certainly is extremely and sufficiently punishing.  Life is greater than necessary to punish Mr. Ullah.  35 years is sufficient to deter Mr. Ullah from re-offending.  Life, of course, specific deterrence is irrelevant with a life sentence.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001398**

L4M5ullS                    sentence

The government, in their papers, notes that terrorism -- opines that terrorism is a crime of high recidivism rates and rehabilitation is notoriously difficult for those convicted of it citing a Second Circuit case, but there are no comprehensive studies for statistics on recidivism rates in terrorism cases that support this assertion because there are none.  The guidelines in this case, your Honor, are astronomical derived from, as the Court has already laid out, application of enhancements that increase the base offense level and the Criminal History Category putting Mr. Ullah, a 31-year-old first offender, from Category I to Category VI -- a category, I submit to the Court, that should be reserved for career criminals who are at extremely high risk of recidivism.

35 years serves, in our position, your Honor, to promote general deterrence.  The government says that it's particularly important in terrorism cases -- I understand that -- but, again, cites to no statistics or studies or research that supports that assertion that a life sentence is necessary to deter others.  Quite to the contrary, your Honor, the only studies that I am aware of are those that show that for individuals committing terrorism-related offenses, they are less concerned about punishment than they are about the movement and the ideology.  And why isn't 35 years deterring generally?  Why isn't it?  I'm not sure the government can answer that question.  35 years is certainly incapacitating.

**A001399**

L4M5ullS                    sentence

Why does society need to be protected from Mr. Ullah more than 35 years?  The government says Mr. Ullah is a young man who is still fully capable of extreme and deadly violence, that he is dangerous and in need of individual specific deterrence.  Even if that is true -- which it isn't -- he will be in his 60s when he is released from a sentence of 35 years.  There is no rational argument that he will re-offend or still present a threat to public safety.

35 years, your Honor, will not create unwarranted disparities.  I have laid out examples in my submission that I won't repeat here.  The government points to three examples that support their position but I submit to the Court that in fact they support my position.  They point to Richard Reid, Mohammed Mansour Jabarah, and Abdul Hakim Murad.  All of those gentlemen had strong ties to Al Qaeda.  All of those gentlemen trained in training camps in foreign countries with Al Qaeda.  Some of those had direct connections with Osama Bin Laden.  They were provided support, financial support, all other support including a shoe bomb for Richard Reid by Al Qaeda operatives.  They were operatives.  Mr. Ullah was not an operative of ISIS, he never communicated with ISIS members or leaders, he didn't travel for ISIS, he didn't train with ISIS, he wasn't financed by ISIS.  Mr. Ullah is a far cry from those men.  He is not in the same category and he should be treated differently.

**A001400**

L4M5ullS                    sentence

Life in prison is a sentence that should be reserved for the most dangerous, unrepentant, violent individuals, hardened criminals, those with a demonstrated history of violence.  Mr. Ullah is not that person.  He is not incapable of reform.  In my opinion, he already is reformed.  He has disavowed allegiance to radical and violent ideals and organizations.  He is deeply remorseful.  His actions are no doubt abhorrent but they do not reflect his true nature, they do not foretell future danger, and they do not deserve a life sentence.

Thank you.

THE COURT:  Thank you, Ms. Gallicchio.

Ms. Donaleski?

MS. DONALESKI:  Yes.  Thank you, your Honor.

Your Honor, let me start by saying we are here to look at the man.  The Court should, and is required, to look at Akayed Ullah.  The Court should look at his actions and his words, and the Court should weigh those against the proposed excuses or mitigating circumstances that he is now putting forth at sentencing and ask whether they do mitigate or whether they do excuse what he did and the government respectfully submits that they do not.

Your Honor, I would like to highlight two factors that we believe compel a guideline sentence, the first is the seriousness of the offense and let me start with the victims.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001401**

L4M5ullS                    sentence

This, of course was not an attempted bombing, this wasn't a sting operation. The defendant detonated a bomb in a tunnel on a Monday morning during rush hour in the City's busiest subway station. He harmed innocent New Yorkers who struggle with the after-effects of that attack to this day. The defendant told law enforcement after the attack that his goal was to terrorize people. And, unfortunately, he accomplished that goal with respect to at least some of the people in that tunnel.

The victim impact statements paint powerful pictures of two people who are struggling with the emotional and physical effects of the defendant's attack more than two years later. One victim lost 70 percent of his hearing in the attack. Another victim lost her job because she couldn't go to work every day; she couldn't walk through that tunnel, she couldn't be at her job without experiencing severe anxiety, and she had trouble supporting her family for some time thereafter. Both of these victims write about the anxiety that they experience on a daily basis and they painfully explain how that anxiety has affected their families and how they interact with others. In sum, this attack had real significant and lasting implications on the victims.

It also bears noting that this attack had a significant impact on New York City. Hundreds of thousands of New Yorkers had their daily commute and their days disrupted as

**A001402**

L4M5ullS                    sentence

a result of the defendant's attack, as a result of the closure of the city's busiest subway station, and the effect on bus and other transport within the city.  It also bears noting that the defendant's attack was one of the few completed terror attacks in New York City since 911.

The nature of the offense also underscores the extreme seriousness here.  This was a premeditated, carefully planned attack.  This wasn't an attack that was conceived in the heat of passion, in the darkest moment.  This was an attack that the defendant planned for some time.  The defendant told law enforcement that he thought other people might die in his attack.  That's transcript 228.  Today the defendant says he just wanted to kill himself, he was depressed, he was distraught over his father's death some years earlier.  Your Honor, if the defendant's goal was to kill himself, why did he do it in a way that would kill other people?  Why did he do it in a way that he knew might kill other people?  The defendant also said that he specifically chose a Monday morning to "terrorize as many people as possible."  He thought there would be more people to terrorize.

How the defendant completed this attack is chilling and heinous.  He completed the bomb a week prior to the attack so for a week the defendant knew that he had a completed explosive device sitting in his apartment with his family present and the defendant was simply biding his time, he was

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001403**

L4M5ullS                     sentence

waiting for that Monday morning.

The defendant spent 15 to 20 days before the attack building the bomb, meticulously collecting the materials that he needed from the construction site, from various stores, grinding up individual match heads, breaking Christmas lights, carefully wiring the pipe bomb that he knew would explode, and most gallingly, packing the pipe bomb full of screws -- screws that had no purpose in the device other than, to quote from the defendant, "inflict maximum damage." that's transcript 231. One of those screws tore through David Wall's leg. He had to have it removed in the emergency room thereafter. It is a miracle that no one was killed, that no one was more seriously injured, but that happened despite the defendant's best efforts. In sum, it is difficult to overstate the seriousness of the defendant's attack. He committed a terror attack on New York City in the name of ISIS and that deserves a guideline sentence.

Second and finally, I would like to emphasize deterrence and the need to protect the public because the government sees things quite differently than the defense here.

For Ullah, this was an ideological crime. This was a crime that happened because he self-radicalized over years and no one knew what he was doing. That's exceptionally dangerous because the defendant proved himself able to hide from those around him, to hide from those that he loved what he was

**A001404**

L4M5ullS                          sentence

thinking and what he was planning.  The defendant stands here today telling the Court that he has renounced ISIS, that he no longer accepts their ideology, that he no longer poses a threat.  That's quite a gamble to take on the word of a man who has proved himself adept at radicalizing and hiding his beliefs and his intentions from those closest to him.  The fact that his family, many of whom were in the apartment with him while he was building the bomb or hiding the bomb parts from them, the fact that they were so shocked afterward to know what he had done, that they had no idea that this was coming, your Honor, that's telling.  That is telling about how capable the defendant is of hiding what he truly believes inside.

Your Honor, the defense says that the defendant's words and actions following the attack and in the week following the attack, those don't paint the full picture of what he did or why he did it but, your Honor, we encourage you to look at those statements and we encourage you to look at the context in which the defendant made those statements.  Those are lucid, clear statements that provide a very clear window into what the defendant was thinking at the time.  He wasn't confused, he wasn't unsure of his motivations.  He made plain to everyone that would listen why he did it.  He proudly boasted of the fact that he did it in the name of ISIS.  He explained his problems with U.S. policy in the Middle East.  On the way to commit the attack he posted a Facebook message

**A001405**

L4M5ullS                    sentence

directed at the President of the United States at the time. After the attack, the defendant warned multiple people at the MCC that more is coming and that's consistent with what he told Detective Byrne after the attack which is that American foreign policy are the symptoms and people like him are the cause and the cause would continue unless U.S. foreign policy changed.

The defendant was committed. He was committed and he was prepared to give his life and the lives of others around him to this cause.

Your Honor, I would like to close on the note of general deterrence. Your Honor is right, it is difficult to tell how this will affect other people and other people's actions but I think here it's important to weigh what has happened in other cases in this district. We also cite the Rahimi case which is another lone wolf attack committed in the name of ISIS where multiple people were injured and maimed. It bears noting that, unlike many of the cases the defendant cites, this wasn't a sting attack. Victims were hurt and victims were going to be hurt as a result of the defendant's actions. It is important to send a message. It is important to send a message here that when you attack New York City, there will be no leniency. What the defendant did cannot be explained by depression over his father's death, cannot be explained by the constraints of new parenthood. What the defendant did was a calculated choice that he reached after

**A001406**

L4M5ullS                    sentence

self-radicalizing over a multi-year period.  It compels a life sentence.

So, in sum, the defendant committed a heinous terror attack on our city in the name of a depraved terrorist organization.  He did so knowing full well what he was doing and there simply is no mitigation and no excuse for his crimes, he injured and maimed and terrorized innocent New Yorkers in the process, and he deserves to pay the price for his crimes by spending the rest of his life in prison.

Unless your Honor has any questions, I will rest on my submission.  Thank you.

THE COURT:  Thank you.  I have no questions.

Ms. Gallicchio, anything you would like to say in response?

MS. GALLICCHIO:  No, your Honor.  Thank you.

THE COURT:  Since there are no victims who wish to be heard, Mr. Ullah, you have the right to speak, if you would like, you are very welcome to, but it is your decision.  Is there anything you would like to say?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.

THE DEFENDANT:  Your Honor, what I did in December 11, it was wrong.  I can tell you from the bottom of my heart I am deeply sorry for what I did.  I am sorry to David Wall, Ms. Chavez, and anyone else who was affected by what I did.

**A001407**

L4M5ullS                    sentence

Your Honor, I do not condone violence or the belief of those who are championing killing and terrorizing innocent people around the world.  They are evil.  I apologize to NYC, to law enforcement, and to this country.  I never support harming innocent people.  I do not support harming innocent people and I will not support harming innocent people.  What I was doing, it was wrong.  And, finally, I apologize to my family whose lives have been ruined by my action.  I am sorry.

Thank you.

THE COURT:  Thank you, Mr. Ullah.

Well, let me tell you the sentence I intend to impose and my reasons for it.  In our system of justice, Judges have to give reasons, have to explain themselves which I think is a good thing.  I don't think a defendant should ever have to wonder what the judge was thinking, I don't think the defendant's family or loved ones should ever have to wonder, nor should the public or victims.  That's why we do it all here openly in court and judges say things on the record, it is written down so it is clear what the judge's reasons were. Judges have an obligation to explain themselves, to be candid, and to be thorough.  So, I will attempt to do that now.

I told you the different factors that I have to consider and one of them, or the first one, as far as I'm concerned, is the individual person in front of me.  Mr. Ullah, like all of us, like all defendants, like all people, is

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001408**

L4M5ullS                    sentence

unique.  He is an individual, he is a human being, and so he is not all one thing or all another.  He is not a caricature.  He is a human being and human beings are complicated.  No question about that.  It is true of every sentencing.  That's why judges are required to consider carefully the individual in all of their complicated detail.  So, Mr. Ullah, you are like everybody, a constellation of different experiences, traits, relationships, decisions, conditions.  You are multi-faceted.  There is a lot of different aspects to your experience and your character, no question about that.  That is certainly reflected in the defense submission that I got from Ms. Gallicchio.  It is very, very clear from the letters I received from your family, from your mother, from your sisters, from your wife, your wife's friend, they all provide insights into your life, into who you are that I couldn't possibly know otherwise.  I mean, I have seen you in court, we have known each other for several years now, but I haven't had access to that kind of information until I heard it from the people who know you very well.  They write very movingly about you.  They write about a person who has a child who is kind, generous, and funny; a good son; a good sibling.  They write very movingly about the impact you had on their lives.  Your wife writes about you as a father.  Your mother writes about you as a son after she lost her husband.  I don't doubt these things, I credit them.  You are complicated and there are people who know you and love you,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001409**

L4M5ullS                    sentence

have been touched by you, and who mourn your separation.
They're suffering with you that's very, very clear.  And I
understand that and I respect that and I want the family
members to know that.  That is true of every sentencing.

You are a human being, you are worthy of respect, are
you not disposable, you are not expendable, you are not
worthless, you are not meaningless.  I believe that.  Our
system is premised on that, the importance of every individual.
So, that, I believe.  But it has to be acknowledged that you
didn't extend those same considerations to others.  On December
11th, 2017 after weeks and months of planning you strapped a
bomb to your person, you got on a subway, and you purposefully
went to the most crowded station at the most crowded time of
day for the purpose of killing indiscriminately men, women, and
children, of maiming and injuring others, of spreading terror
and fear even wider.  You didn't think about the humanity of
the people that you were going to injure.  That didn't occur to
you.  You didn't think about their suffering siblings, parents,
and children.  They were just people on their way to work or
school because students are traveling the subways at that time
of day; the people who, you know, maybe finished the night
shift and were heading home after a long night of work trying
to put the food on the table and the roof over the head of
their loved ones.  You didn't think about that.  For you, these
people were expendable, they were disposable.  You gave that no

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001410**

consideration.  So, I mean, ultimately we can't ignore that.

Your personal experience is important but your conduct here is truly heinous.  I mean this is about as bad a crime as there is.  This was not a crime of passion, this was not an exercise in bad judgment.  This was not a crime of violence motivated by greed like a robbery or drug dealing or something.  This is not any of those things.  This was a calculated premeditated decision to kill as many people as you could, injure others, all in the name of an organization that is dedicated to spreading terror.  That's what it was.  And it seems to me that the enormity of that crime eclipses the other positive aspects of your character.  I mean, I recognize that you are capable of kindness and the good things but you are also capable of horrible violence and it was not something that was done on a whim, it was done carefully, dispassionately, over weeks and months.

So, this is about as serious a crime as there is.  Now, you ultimately failed in the execution.  You didn't execute this as well as you might have -- thankfully -- but it doesn't make you less culpable.  It doesn't make your intent any less sinister or, frankly, evil.  I agree with Ms. Gallicchio, I don't think you are an evil man.  I don't throw that word around lightly but this act was evil, this act was designed to kill people and hurt them without a thought as to what it was going do in their lives.  So, I have to say, in

**A001411**

L4M5ullS                    sentence

terms of a just punishment, it seems to me that a life sentence is appropriate. And I should also say that the sentence I impose on you today will be more human and, frankly, less draconian, than the sentence would you have imposed on yourself and your family. Your goal was to end your own life making your wife a widow and your son an orphan, and your mother and siblings to mourn your loss. That was your goal. You had decided to do those things. The sentence I impose today will not prevent you from being a father to your son. It will limit your ability to see him and I am sad for your son and your wife, and your siblings and your mother, but you will be able to have a relationship with them through writing, through perhaps talking on the phone. That is still possible for you. That would not have been possible had you succeeded on December 11 and it would not have been possible for people who would have been killed as you intended by the bomb that you strapped onto your body and detonated at the 42nd Street Station.

So, it seems to me as a matter of just punishment, it seems to me as a just sentence that fits the crime, this is appropriate. I don't say that lightly but I think that is the case. And I think there is a recognition that crimes like this involving terrorism are the worst kinds of crimes because they are an attack on an entire society. I mean, the goal was, in part, to terrify people to make them think twice before they got on a bus or a subway, to make them think that, as you said

**A001412**

L4M5ullS                          sentence

in the hours or days after you were executing this attack that more was coming so that they would alter their lives, so that they would always be in fear, that they would think twice before they put a child on a subway to go to school.  That's barbaric.  I mean, it was committed in a modern transportation facility with a modern weapon but it is a truly barbaric act and it seems to me that a just punishment is a life sentence.

I also think, candidly, that general deterrence is also another reason to impose a life sentence.  I mean, it is very hard to deter a would-be suicide bomber.  This is a person who is willing to sacrifice their own life to advance the cause of an organization like ISIS in this case.  The person who succeeds in doing that cannot be punished, not by any earthly court.  They are beyond the reach of an earthly court.  The hope is that perhaps by sentencing those who attempt but failed to carry out or execute a suicide bombing, their martyrdom is delayed for the entirety of their life.  It may deter others who might otherwise be willing to engage in such martyrdom.  I don't know for sure but if it deters one person it would seem to me that would be worth while.  But, my principal reason for doing this is just a just punishment for a truly barbaric and heinous crime.  I mean, I am glad that no one was killed but there were people who were certainly affected.  We have heard from a couple.  There are no doubt others as well but the goal of this crime was to do much, much more.  That's what you

**A001413**

L4M5ullS                    sentence

yourself said when you carried it out.

So, it seems to me that the appropriate sentence, the only appropriate sentence whatever the guidelines are whether it is level 42, Criminal History Category I or level 43, Criminal History Category VI, ultimately, I'm not allowing this book to make the decision for me.  It seems to me that a life sentence is appropriate here.  So, that's the sentence that I intend to impose, with restitution in the amount of $7,380, and supervised release which would be I think -- a life term of supervised release, five years on Count Six.  So, that is the sentence I intend to impose.  Just so it is clear it will be 20 years on Count One and Count Four; life sentences on Counts Two, Three, and Five, with a mandatory consecutive 30 years on Count Six, to be followed by a term of supervised release of life on Counts One through Five, Five years on Count Six, all to run concurrently.  I'm not going to impose a fine, I don't think Mr. Ullah has the ability to pay a fine.  I will order restitution in the amount of $7,380 which the parties stipulated to as well as special assessment of $600.

Is there any legal impediment to my imposing that sentence, Ms. Donaleski?

MS. DONALESKI:  No, your Honor.

THE COURT:  Ms. Gallicchio?

MS. GALLICCHIO:  No, your Honor.

THE COURT:  Mr. Ullah, you don't have to stand.  I

**A001414**

L4M5ullS                    sentence

have told you the sentence I intend to impose and my reasons for it.  I will now just formally restate it.

Having presided over your trial at which the jury returned guilty verdicts on Counts One through Six I will sentence you as follows:  I sentence you to 20 years on Count One; life sentences on Counts Two and Three; 20 years on Count Four; a life sentence on Count Five; and a 30-year mandatory consecutive sentence on Count Six for the total amount of life plus 30 years.  In addition, I impose a term of supervised release of life on Counts One through Five, and five years on Count Six run concurrently.  No fine.  Special assessment of $600, restitution in the amount of $7,380.

MS. GALLICCHIO:  Your Honor, I'm sorry.  Just to be clear, the sentence imposed on Counts One through Five are running concurrent with each other?

THE COURT:  Yes.  I'm sorry if that wasn't clear.

Concurrent on Counts One through Five, they're basically a combination of life sentences and 20-year sentences to run concurrent, with Count Six to run consecutive which is 30 years.  Okay?

I can go through the details of the restitution order about payments and 15 percent, things like that.  I don't know if it is necessary if it is stipulated to by the parties but let me know if you disagree.

MS. GALLICCHIO:  It is not necessary.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001415**

L4M5ullS                    sentence

THE COURT:  OK.  In terms of supervised release, which may also be academic, I think basically there are terms and conditions of supervised release including some mandatory conditions.  I will suspend the drug testing condition which Mr. Ullah has never had any kind of substance abuse problem.  There are standard conditions, 12 in all, which I will impose here as I do in every case, with special conditions that you obey the immigration laws and comply with the lawful directives of immigration authorities should you be released.  Also that you submit your person, your residence, place of business, your vehicle, your papers, your computers, other electronic devices to a search by the probation officer should the probation officer believe there is evidence of a crime or violation of the terms of your supervised release.  Again, I don't know that that will matter too much because it is a life sentence, but to the extent you do get released and you are on supervised release, that is a condition that will be imposed.  Okay?  $600 special assessment, $7,380 I said.

Ms. Gallicchio, are there any recommendations you would like me to make with respect to where Mr. Ullah will be housed?

MS. GALLICCHIO:  Yes, your Honor.  I would ask the Court to recommend that he be housed in a facility within the tri-state area to allow for continued communication, visits with family.

**A001416**

L4M5ullS                         sentence

THE COURT:  So, this is just a recommendation, Mr. Ullah, I can't order the Bureau of Prisons to do this, they have a number of considerations they have to take into account including I think the nature of the offense and the offender, but I will make the recommendation that you be as close as possible to your family here in the New York metropolitan area.

Mr. Ullah, I should tell you, you have the right to appeal this sentence.  If you wish to appeal, you would need to file a notice of appeal within two weeks.  That's a firm deadline.  Talk to Ms. Gallicchio about that, she will assist you, it just means filing the notice of appeal, the rest of the appeal will be filed later, but to discuss that with her if that is something you wish to do.

Let me just say a couple of other things.  This is a tragic day -- every sentencing is -- and today is no different.  This is a very harsh sentence.  I have explained my reasons for it.  I do want to say that I meant what I said about Mr. Ullah.  I do hope that while he is incarcerated he can still find a measure of peace and happiness and fulfillment that he is able to maintain relationships with the people close to him, and grow, because people are not static, they have the opportunity to grow.  I hope that would be the case for him.

With respect to his family, it is clear that they are suffering.  From the letters that I read my heart breaks for them.  They are innocent victims of this crime along with other

**A001417**

L4M5ullS                    sentence

innocent victims and would be victims. I hope his family, although disappointed I am sure, will recognize that this is not an indictment on them, they are not to blame in any way. They are victims who are really suffering. They had the courage to come here as immigrants and build a better life for themselves. That's one of the things that makes this a great country and I think immigrants bring so much to this country and have been so responsible for such a rich history that we have. And so, I think Mr. Ullah's family is a good family and a strong family that must be very bewildered by all of this and their suffering but certainly they're not to be blamed, and I hope that they will not blame themselves too much because although it is a natural tendency, I don't think that they are to blame in any way.

Finally, let me say with respect to Ms. Gallicchio, Ms. Cassidy, Ms. Gatto, and Ms. Reyes, I just want to say, Mr. Ullah, you were appointed counsel to represent you in this case early on and I think you were fortunate to have among the finest lawyers anywhere. The Federal Defenders office is a collection of lawyers that is the equal or the better of virtually any lawyers in the country. I have always had tremendous admiration for that office but my admiration has only grown throughout this trial and this representation.

I am sure that Ms. Gallicchio and Ms. Reyes and others are also disappointed by my sentence. I have explained my

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**A001418**

L4M5ullS                          sentence

reasons.  Sometimes you just have to disagree but I hope that disagreement won't obscure my respect and admiration for the job that you have done on behalf of your client.  You are incredibly zealous, incredibly careful and thoughtful in all your submissions and all your arguments and I think, Mr. Ullah, you were fortunate to have such lawyers.  And, it is really a testament to our system of justice that we make sure that people accused of serious crimes nonetheless have access to superb counsel.

The government has a job to do, I think you also did your job very well.  I was the beneficiary of such good lawyering and I want to just say thank you.

Mr. Ullah, good luck to you.  There is no anger in anything that I have said.  I have tried to be dispassionate, I have certainly tried to explain myself.  I know you are disappointed but I do hope that going forward you can learn and grow from this as well.  So, that is my hope for you.

Let me thank the marshals, let me thank everybody who is here today.

Court is adjourned.  Thanks.

o0o

**A001419**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case       (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| AKAYED ULLAH | Case Number:  18-cr-16 |
| | USM Number:  79827-054 |
| | Amy Gallicchio |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1-6
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 2339B | Providing material support or resources to a designated foreign terrorist organization, Class C Felony | 12/11/2017 | 1 |
| 18 USC § 2332a | Use of a weapon of mass destruction, Class A Felony | 12/11/2017 | 2 |

   The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____  ☐ is   ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/22/2021

Signature of Judge

Hon. Richard J. Sullivan

Name and Title of Judge

4/22/2021

Date

A001420

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1A

| | Judgment—Page | 2 | of | 8 |

DEFENDANT:  AKAYED ULLAH
CASE NUMBER:  18-cr-16

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 2332f | Bombing a place of public use and a public transportation system, Class A felony | 12/11/2017 | 3 |
| 18 USC § 844(i) | Destruction of property by means of fire or explosive, Class C Felony | 12/11/2017 | 4 |
| 18 USC § 1992 | Terrorist attack against mass transportation systems, Class A Felony | 12/11/2017 | 5 |
| 18 USC § 924(c) | Use of a destructive device during and in furtherance of a crime of violence, Class A Felony | 12/11/2017 | 6 |

**A001421**

AO 245B (Rev. 09/19)  Judgment in Criminal Case
 Sheet 2 — Imprisonment

DEFENDANT:   AKAYED ULLAH
CASE NUMBER:   18-cr-16

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Life imprisonment on Counts 2, 3, and 5, and 20 years' imprisonment on Counts 1 and 4, to run concurrently, followed by a term of  30 years' imprisonment on Count 6, to run consecutive to the sentences imposed on Counts 1-5.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that Defendant be housed in a facility as close to New York City as possible so that his family may more readily visit him.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ ,  with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# A001422

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page  4  of  8

DEFENDANT:   AKAYED ULLAH
CASE NUMBER:   18-cr-16

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

life on Counts 1-5 and five years on Count 6, to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**A001423**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT: AKAYED ULLAH
CASE NUMBER: 18-cr-16

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**A001424**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — Supervised Release

Judgment—Page    6    of    8

DEFENDANT: AKAYED ULLAH
CASE NUMBER: 18-cr-16

## SPECIAL CONDITIONS OF SUPERVISION

1. You shall obey the immigration laws and comply with the lawful directives of immigration authorities.

2. You shall submit your person and any premises or property under your control, including your residence, place of business, vehicle, papers, computer, other electronic devices, data storage devices, cloud storage or media, and other effects, to a search by any United States Probation Officer, with the assistance of any law enforcement officer if needed. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

A001425

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: AKAYED ULLAH
CASE NUMBER: 18-cr-16

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ 7,380.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| (Sealed) | $7,380.00 | $7,380.00 | |

| **TOTALS** | $ 7,380.00 | $ 7,380.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☑ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A001426

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments

Judgment — Page  8  of  8

DEFENDANT:  AKAYED ULLAH
CASE NUMBER:  18-cr-16

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☑  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☑ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:
    See separately docketed restitution order.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**A001427**

# NOTICE OF APPEAL
## UNITED STATES DISTRICT COURT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/23/2021

SOUTHERN    District of    NEW YORK

UNITED STATES OF AMERICA

- v -

**Akayed Ullah,**      **Defendant.**

Docket Number ___**18 Cr. 00016 (RJS)**___

**Honorable Richard J. Sullivan**
(District Court Judge)

Notice is hereby given that **the defendant, Akayed Ullah** ___
appeals to the United States Court of Appeals for the Second Circuit from the:

judgment ☑ : order ☐ : other ☐ : _____
(specify)

entered in this action on ___**04/22/21**___.
(date)

Offense occurred after November 1, 1987    Yes ☑    No ☐

The appeal concerns: conviction only ☐ : sentence only ☐ : conviction and sentence ☑.

Date: ___**April 23, 2021**___

TO:
George D. Turner & Rebekah A. Donaleski, Esqs.
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York NY 10007

Barry Leiwant, Esq.
(Counsel for Appellant)

Address: Federal Defenders of New York, Inc.

52 Duane Street - 10ᵗʰ Flor

New York NY 10007

Telephone Number (212) 417-8700

ADD ADDTIONAL PAGE IF NECESSARY

---

| (TO BE COMPLETED BY ATTORNEY) | TRANSCRIPT INFORMATION - FORM B |
|---|---|

| ➤QUESTIONNAIRE | ➤TRANSCRIPT ORDER ➤ | DESCRIPTION OF PROCEEDINGS FOR WHICH TRANSCRIPT IS REQUIRED (INCLUDE DATE). |
|---|---|---|
| ☐ I am ordering a transcript<br>☑ I am not ordering a transcript<br>Reason:<br>  ☐ Daily copy is available<br>  ☐ U.S. Attorney has placed order<br>  ☐ Other. Attach explanation | Prepare transcript of<br>☐ Pre-trial proceedings _____<br>☐ Trial _____<br>☐ Sentence _____<br>☐ Post-trial proceedings _____ | Dates |

The ATTORNEY certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript.
(FRAP 10(b)) ➤ Method of payment ☐ Funds ☐ CJA Form 24

| ATTORNEY'S signature | | DATE |
|---|---|---|
| *Amy Gallicchio* | | 04/23/21 |

---

➤ **COURT REPORTER ACKNOWLEDGMENT**

To be completed by Court Reporter and forward to Court of Appeals.

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
| | | |

Date _____      Signature _____
(Court Reporter)

COPY I - ORIGINAL

**A001428**



GOVERNMENT
EXHIBIT
918
18 Cr. 16 (RJS)

A001429

# GOVERNMENT EXHIBIT

## GX 1001-20

## (Submitted in attached DVD)

**A001430**

## CERTIFICATE OF SERVICE

I certify that a copy of this six volume appendix has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.**, Assistant United States Attorneys, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
      October 4, 2021

                                   /s/
                                 **COLLEEN P. CASSIDY**