# 21-1058

*To Be Argued By*:
GEORGE D. TURNER

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 21-1058

◄••►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AKAYED ULLAH,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

GEORGE D. TURNER,
REBEKAH DONALESKI,
WON S. SHIN,
  *Assistant United States Attorneys,
    Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Government's Case . . . . . . . . . . . . . . . . 2

        1. Ullah's Radicalization . . . . . . . . . . . . . . 3

        2. Ullah's Attack Planning . . . . . . . . . . . . 5

        3. The Bombing . . . . . . . . . . . . . . . . . . . . . 8

        4. Ullah's Post-Attack Statements . . . . . 12

    B. The Defense Case . . . . . . . . . . . . . . . . . . . . 12

    C. The Verdict, Post-Trial Motions, and
       Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT:

POINT I—The Evidence Was Sufficient and
the Jury Was Properly Instructed on
Count One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 14

    B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 17

        1. 18 U.S.C. § 2339B . . . . . . . . . . . . . . . . 17

        2. Sufficiency of the Evidence . . . . . . . . . 18

        3. Jury Instructions . . . . . . . . . . . . . . . . . 19

    C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ii

                                                    PAGE

    1.  "Personnel" . . . . . . . . . . . . . . . . . . . . . .  20

    2.  "Service" . . . . . . . . . . . . . . . . . . . . . . . .  25

POINT II—The Conviction on Count Five Is
Legally and Factually Sound . . . . . . . . . . . . . .  30

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  31

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  33

    1.  18 U.S.C. § 1992 . . . . . . . . . . . . . . . . . .  33

    2.  Constructive Amendment . . . . . . . . . .  33

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  35

    1.  The Evidence Was Sufficient to
       Support the Jury's Verdict on
       Count Five . . . . . . . . . . . . . . . . . . . . . .  35

    2.  The Indictment Was Not
       Constructively Amended . . . . . . . . . . .  38

    3.  The District Court Properly Instructed
       the Jury on Count Five . . . . . . . . . . . .  40

    4.  The Sentencing Enhancement in
       Section 1992(b)(1) Applies to Both
       Subsections of the Statute Under
       Which Ullah Was Convicted . . . . . . . .  43

POINT III—The Section 924(c) Conviction on
Count Six Is Valid . . . . . . . . . . . . . . . . . . . . . .  45

iii

PAGE

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  46

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  47

    1.  18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . .  47

    2.  Multiplicity and Double Jeopardy . . .  49

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  50

    1.  Count Three Qualifies as a Crime of
       Violence . . . . . . . . . . . . . . . . . . . . . . . . .  50

    2.  Count Five Qualifies as a Crime of
       Violence . . . . . . . . . . . . . . . . . . . . . . . . .  54

    3.  An Attempt to Commit the Offenses
       Charged in Counts Three and Five
       Qualifies as a Crime of Violence . . . . .  56

    4.  Count Six Is Not Multiplicitous with
       Counts Three and Five . . . . . . . . . . . . .  58

POINT IV—Ullah's Sentence Was Procedurally and
Substantively Reasonable. . . . . . . . . . . . . . . . . . .  62

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  63

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  65

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  66

    1.  The Sentence Was Procedurally
       Reasonable . . . . . . . . . . . . . . . . . . . . . . .  66

iv

PAGE

a. The Terrorism Enhancement
Applies . . . . . . . . . . . . . . . . . . . . . . 66

b. Ullah Was Not Entitled to a
Reduction for Acceptance of
Responsibility . . . . . . . . . . . . . . . . 70

c. The District Court's Factual
Findings Were Not Clearly
Erroneous . . . . . . . . . . . . . . . . . . . . 73

2. The Sentence Was Substantively
Reasonable . . . . . . . . . . . . . . . . . . . . . . 75

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## TABLE OF AUTHORITIES

*Cases*:

*Albernaz v. United States,*
450 U.S. 333 (1981). . . . . . . . . . . . . . . . . . . . . . . . 49

*Borden v. United States,*
141 S. Ct. 1817 (2021). . . . . . . . . . . . . . . . . . . . . . 55

*Conn. Nat'l Bank v. Germain,*
503 U.S. 249 (1992). . . . . . . . . . . . . . . . . . . . . . . . 44

*Garrett v. United States,*
471 U.S. 773 (1985). . . . . . . . . . . . . . . . . . . . . . . . 50

*Gonzales v. Duenas-Alvarez,*
549 U.S. 183 (2007). . . . . . . . . . . . . . . . . . . . . . . . 53

v

PAGE

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . .  26, 29, 33

*Jackson v. Virginia,*
   443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . 18

*Missouri v. Hunter,*
   459 U.S. 359 (1983). . . . . . . . . . . . . . . . . . . . . . . 60

*Moncrieffe v. Holder,*
   569 U.S. 184 (2013). . . . . . . . . . . . . . . . . . . . . . . 48

*Savoca v. United States,*
   — F.4th —, 2021 WL 6131165 (2d Cir. 2021). . . 56

*United States v. Agrawal,*
   726 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . . . . 35

*United States v. Albertini,*
   472 U.S. 675 (1985). . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Assi,*
   748 F.2d 62 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 42

*United States v. Barrett,*
   903 F.3d 166 (2d Cir. 2018) . . . . . . . . . . . . . . . . 46

*United States v. Basciano,*
   599 F.3d 184 (2d Cir. 2010) . . . . . . . . . . . . . . . . 50

*United States v. Bastian,*
   770 F.3d 212 (2d Cir. 2014) . . . . . . . . . . . . . . . . 40

*United States v. Bout,*
   731 F.3d 233 (2d Cir. 2013) . . . . . . . . . . . . . . . . 50

*United States v. Broxmeyer,*
   699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . . . 65

vi

PAGE

*United States v. Caesar,*
    10 F.4th 66 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 67

*United States v. Carr,*
    880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 19

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . 65, 66

*United States v. Chacko,*
    169 F.3d 140 (2d Cir. 1999) . . . . . . . . . . . . . . . . 49

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 18

*United States v. Cromitie,*
    2011 WL 2693293 (S.D.N.Y. 2011) . . . . . . . . . . . 70

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . 65

*United States v. Cruz,*
    446 F. App'x 344 (2d Cir. 2011) . . . . . . . . . . . . . 71

*United States v. D'Amelio,*
    683 F.3d 412 (2d Cir. 2012) . . . . . . . . . . 34, 39, 40

*United States v. Daugerdas,*
    837 F.3d 212 (2d Cir. 2016) . . . . . . . . . . . . . . . . 34

*United States v. Davis,*
    139 S. Ct. 2319 (2019). . . . . . . . . . . . . . . . . . *passim*

*United States v. Dove,*
    884 F.3d 138 (2d Cir. 2018) . . . . . . . . . . . . . . . . 33

*United States v. Dove,*
    916 F.2d 41 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 42

vii

PAGE

*United States v. Eldridge,*
  2 F.4th 27 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . 56

*United States v. Espaillet,*
  380 F.3d 713 (2d Cir. 2004) . . . . . . . . . . . . . . . . 18

*United States v. Fernandez,*
  443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 75

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . 19

*United States v. Hassan,*
  578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . . 18

*United States v. Heimann,*
  705 F.2d 662 (2d Cir. 1983) . . . . . . . . . . . . . . . . 34

*United States v. Hill,*
  890 F.3d 51 (2d Cir. 2018) . . . . . . . . . 48, 52, 53, 55

*United States v. Jama,*
  217 F. Supp. 3d 882 (E.D. Va. 2016) . . . . . . . 22, 27

*United States v. Kadir,*
  718 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . 77

*United States v. Khalil,*
  214 F.3d 111 (2d Cir. 2000) . . . . . . . . . . . . . . . . 60

*United States v. Kozeny,*
  667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . 18

*United States v. Legros,*
  529 F.3d 470 (2d Cir. 2008) . . . . . . . . . . . . . . . . 65

*United States v. Mathews,*
  36 F.3d 821 (9th Cir. 1994) . . . . . . . . . . . . . . 61, 62

viii

PAGE

*United States v. McCourty,*
562 F.3d 458 (2d Cir. 2009) . . . . . . . . . . . . . . . . 35

*United States v. McCoy,*
995 F.3d 32 (2d Cir. 2021) . . . . . . . . 56, 57, 58, 59

*United States v. Meskini,*
319 F.3d 88 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 67

*United States v. Mohammed,*
27 F.3d 815 (2d Cir. 1994) . . . . . . . . . . . . . . . 49, 59

*United States v. Mumuni,*
946 F.3d 97 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 66

*United States v. Nouri,*
711 F.3d 129 (2d Cir. 2013) . . . . . . . . . . . . . . . . 71

*United States v. Paredes-Batista,*
140 F.3d 367 (2d Cir. 1998) . . . . . . . . . . . . . . 70, 71

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . 18, 19

*United States v. Pope,*
554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 66

*United States v. Prawl,*
168 F.3d 622 (2d Cir. 1999) . . . . . . . . . . . . . . . . 42

*United States v. Pugh,*
2015 WL 9450598 (S.D.N.Y. 2015) . . . . . . . . . . . 26

*United States v. Quinones,*
511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . . 19

*United States v. Rahimi,*
2017 U.S. Dist. LEXIS 96686 (S.D.N.Y. 2017) . . 61

ix

PAGE

*United States v. Rigas,*
490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . 34

*United States v. Sabhnani,*
599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 18

*United States v. Salameh,*
261 F.3d 271 (2d Cir. 2001) . . . . . . . . . . . . . . 60, 61

*United States v. Salmonese,*
352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . . . . . . 34

*United States v. Scott,*
990 F.3d 94 (2d Cir. 2021) . . . . . . . . . . . . . . . . 54

*United States v. Sewell,*
252 F.3d 647 (2d Cir. 2001) . . . . . . . . . . . . . . . . 70

*United States v. Stewart,*
590 F.3d 93 (2d Cir. 2009) . . . . . . . . . . . . . . . . 67

*United States v. Suarez,*
893 F.3d 1330 (11th Cir. 2018) . . . . . . . . . . . . 28, 69

*United States v. Taylor,*
141 S. Ct. 2882 (2021). . . . . . . . . . . . . . . . . . . . . 57

*United States v. Tsarnaev,*
157 F. Supp. 3d 57 (D. Mass. 2016) . . . . . . . . . . . 53

*United States v. Ulbricht,*
858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . 72

*United States v. Valle,*
807 F.3d 508 (2d Cir. 2015) . . . . . . . . . . . . . . 44, 45

*United States v. Vilar,*
729 F.3d 62 (2d Cir. 2013) . . . . . . . . . . . . . . . . 34

x

PAGE

*United States v. Volpe,*
    224 F.3d 72 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . 69

*United States v. Waite,*
    12 F.4th 204 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 57

*United States v. White,*
    552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 19

*United States v. Wilkerson,*
    361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 19

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 844 . . . . . . . . . . . . . . . . . . . . .  2, 51, 61, 62

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2332a . . . . . . . . . . . . . . . . . . . . . . . . . 2, 60

18 U.S.C. § 2332f . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

U.S.S.G. § 2M6.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 3A1.4 . . . . . . . . . . . . . . . . . . . 63, 66, 67, 68

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . 63, 70, 71

S. Rep. No. 98-225 (1983), *reprinted in* 1984
    U.S.C.C.A.N. 3182 . . . . . . . . . . . . . . . . . . . . . . . . 59

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
### Docket No. 21-1058

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AKAYED ULLAH,

*Defendant-Appellant.*

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

Akayed Ullah appeals from a judgment of conviction entered on April 23, 2021 in the United States District Court for the Southern District of New York, following a one-week trial before the Honorable Richard J. Sullivan, United States Circuit Judge, sitting by designation, and a jury.

Indictment 18 Cr. 16 (RJS) (the "Indictment") was filed on January 10, 2018, in six counts. Count One charged Ullah with providing and attempting to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Count Two charged Ullah with using and

2

attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a. Count Three charged Ullah with bombing and attempting to bomb a place of public use and a public transportation system, in violation of 18 U.S.C. § 2332f. Count Four charged Ullah with destroying and attempting to destroy property by means of explosive, in violation of 18 U.S.C. § 844(i). Count Five charged Ullah with committing and attempting to commit a terrorist attack against a mass transportation system, in violation of 18 U.S.C. § 1992. Count Six charged Ullah with using and carrying a destructive device during and in relation to, and possessing a destructive device in furtherance of, a crime of violence, in violation of 18 U.S.C. § 924(c).

Trial commenced on October 29, 2018 and ended on November 6, 2018, when Ullah was convicted on all counts.

On April 22, 2021, Judge Sullivan sentenced Ullah principally to concurrent terms of 20 years' imprisonment on Counts One and Four, concurrent terms of life imprisonment on Counts Two, Three, and Five, and a mandatory consecutive term of 30 years' imprisonment on Count Six.

Ullah is serving his sentence.

## Statement of Facts

### A. The Government's Case

Ullah carried out a heinous bombing attack in New York City on behalf of the Islamic State of Iraq and al-Sham ("ISIS"), to serve that terrorist organization's depraved mission of murdering and terrorizing

3

innocent American civilians. Ullah radicalized in the years leading up to the attack, as he absorbed and drew inspiration from online ISIS propaganda glorifying brutal bombings, shootings, and stabbings targeting Americans, and he ultimately answered ISIS's call for its followers to carry out "lone-wolf" attacks in the United States. On December 11, 2017, Ullah executed his attack for ISIS, detonating a pipe bomb in a subway station in the heart of Manhattan.

Ullah's attack was premeditated and vicious. He packed his pipe bomb with metal screws and struck during the morning rush hour in a crowded underground tunnel, in a calculated effort to kill, maim, and terrorize as many people as possible. Shrapnel from Ullah's bomb sliced into the leg of one commuter, two victims partly lost their hearing in the blast, and countless others were traumatized by Ullah's attack, which paralyzed mass transportation systems and brought midtown Manhattan to a standstill. Following the attack, Ullah proudly declared to law enforcement that he carried out the bombing for ISIS, with the goal of causing maximum damage and terror. The evidence at trial laid bare Ullah's path to radicalization and meticulous planning and execution of his terrorist attack.

### 1.  Ullah's Radicalization

Ullah was born in 1990 in Bangladesh. (PSR ¶ 41).[1] In 2011, at age 21, Ullah immigrated to the United

---

[1]  "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in

4

States with his family, and resided in Brooklyn. (PSR ¶¶ 41, 44, 49). In 2014, Ullah started working jobs in construction, including as an electrician. (PSR ¶ 60). During the years following his immigration to the United States, Ullah radicalized, devoting himself to extremist Islamic jihadist ideology. Ullah was angry at American foreign policy in the Middle East, and was particularly incensed at the 2014 bombing of Muslims in the Gaza Strip, for which he held the United States responsible. (A.377). Ullah sought out and consumed online materials spewing anti-American sentiment and espousing radical Islamic terrorism. (A.375-77). In particular, Ullah was inspired by propaganda promoting ISIS and its depraved jihadist mission bent on killing and terrorizing Americans. (A.376). Ullah watched numerous ISIS propaganda videos glorifying the group, its leaders, and violent attacks against Americans, including truck attacks, stabbings, and bombings. (A.376).

Law enforcement recovered Ullah's laptop from his apartment following the December 11, 2017 attack, and the laptop contained a large volume of these terrorist propaganda materials. Ullah's laptop contained

–––––––––

connection with Ullah's sentencing; "Br." refers to Ullah's brief on appeal; "A." refers to the appendix filed with that brief; "GX" refers to a Government exhibit at trial; and "Dkt." refers to an entry on the District Court's docket for this case.

Unless otherwise noted, case text quotations omit internal quotation marks, citations, and alterations.

5

dozens of videos disseminated by ISIS's official media
outlet, al-Hayat Media Center, and hundreds of lec-
tures by radical jihadist leaders, including Anwar al-
Awlaki, the now-deceased former leader of al Qaeda in
the Arabian Peninsula, whose video messages encour-
aged supporters to attack Americans. (PSR ¶ 16;
A.518-20). For example, the ISIS propaganda on Ul-
lah's laptop included, among other things, videos de-
picting: a speech by ISIS's now-deceased leader, Abu
Bakr al-Baghdadi, promoting radical jihadist ideology
(A.527-28); ISIS operatives carrying out suicide bomb-
ing attacks (A.529-30); a chilling warning to Ameri-
cans that ISIS "will surely come and slaughter you"
(A.526-27); and a montage glorifying four ISIS sup-
porters who each carried out a lone-wolf attack—an at-
tack perpetrated by a single attacker—including Omar
Mateen, who killed nearly 50 people for ISIS in a mass
shooting at an Orlando nightclub in 2016 (A.522-25).
The Government's expert on ISIS and other militant
jihadist groups, Dr. Aaron Zelin, explained at trial that
ISIS specifically designs these videos to recruit and
radicalize followers in the United States. Through the
videos, ISIS instructed and inspired its supporters to
commit lone-wolf terrorist attacks to serve the organi-
zation. (A.514-18, 588; *see* Dkt.108 at 4-6 (still images
from videos on Ullah's laptop)).

### 2.  Ullah's Attack Planning

By 2017, Ullah was fully radicalized and devoted to
ISIS, ready to answer its call and carry out an attack.
Ullah began researching how to build an improvised
explosive device ("IED") about a year before the attack,
watching videos and reading magazines with

6

instructions for making a pipe bomb. (A.375). In November 2017, Ullah put his plan into action, as he collected materials and began building the bomb. (A.378). He obtained the materials to build the bomb from a construction site in Manhattan where he was working as an electrician. (A.368, 378). Ullah built the IED using a metal pipe, match heads, sugar, electrical wiring, Christmas lights, and a nine-volt battery. (A.369, 377-78, 747-48).

In the weeks leading up to the attack, Ullah methodically assembled the pipe bomb at his apartment in Brooklyn. (A.378). He ground up match heads and mixed them with sugar to create the explosive substance, and filled the pipe with that mixture. (A.369, 380). He severed Christmas lights from their strands, broke the glass on the lights to expose the filaments, and added the light fragments to the pipe, to serve as the heat source for igniting the explosive substance. (A.380, 457, 753). He used heavy-duty pliers that he stored at the construction site to fasten metal caps to the ends of the pipe, pressurizing the device. (A.653-54, 684-87). He drilled a hole in one of the metal end caps, ran the electrical wiring into the pipe, and connected the wiring inside the pipe to the broken Christmas lights. (A.749-50). The nine-volt battery was Ullah's power source—to detonate the pipe bomb, he would touch the loose end of the wiring to the battery, closing the electrical circuit. (A.752; PSR ¶ 13).

Ullah also filled his pipe bomb with dozens of metal screws. The screws were completely unnecessary to make the bomb explode. (A.757). Instead, the screws functioned as shrapnel. (A.757). Ullah's purpose in

7

using the screws was to maximize lethality and damage. (A.757; PSR ¶ 14). An FBI explosives expert explained at trial that Ullah's pipe bomb was capable of killing people, both from the force of the explosion and the shrapnel that it sprayed. (A.769).

On November 29, 2017, as Ullah was building his bomb and gearing up to attack, ISIS released a propaganda video called "Flames of War II." (A.596-97; GX 924). In the video, ISIS reiterated its instruction to supporters that they should carry out attacks in the United States. (A.521-22). The video shows U.S. military forces conducting operations in the Middle East, and then proclaims, "die in your rage, America," with an image of the U.S. Capitol's House Chamber in the background. (A.594-95; Dkt.108 at 8 (still image of video)). Ullah watched Flames of War II, and the video was a particularly important piece of inspiration for him. He specifically mentioned that video when interviewed by law enforcement following the attack. (A.375-76). And Ullah adopted the ISIS slogan that appears in the video: "Die in your rage, America." (A.608-09). Ullah scrawled that ISIS rallying cry in his passport, his visa, and on the bottom of a box containing some of the equipment he used to build the bomb, all of which were recovered from his apartment after the attack. (A.626, 636-37; PSR ¶ 16; Dkt.108 at 9-10 (images of passport, visa, and box)). Ullah planned to die in the attack, a "martyrdom" operation for ISIS, and he left these calling cards so the world would know he had acted for ISIS. (A.378).

Ullah finished building his bomb about a week before the attack. (A.379). He stored the bomb in his

8

apartment, biding his time. Ullah carefully selected his target: the subway station ("42nd Street Station") under the Port Authority Bus Terminal ("PABT") in midtown Manhattan. Ullah explained to law enforcement following the attack that he chose that location because he believed it was the station shown in a television interview he had seen where the reporter asked a commuter about a threat made by ISIS to attack Times Square, and the commuter said he did not feel threatened by ISIS; that was not acceptable to Ullah, so he chose to carry out his attack in that station, to send a message of terror in the name of ISIS. (A.374-75).

Of the 472 stations in the New York City subway system, the 42nd Street Station is the single busiest station in terms of passenger volume. (A.801). The PABT is the primary bus terminal in the city, and the busiest time of day for bus traffic is the morning rush hour. (A.779-82). That is precisely when Ullah chose to strike. He carried out his attack during rush hour on the morning of December 11, 2017, a busy Monday during the holiday season.

### 3. The Bombing

Early on that morning of December 11, 2017, Ullah strapped the pipe bomb to his chest, using zip ties, and concealed the bomb under multiple layers of clothing. (A.369). Ullah put the nine-volt battery—the power source for the IED—in his right pants pocket, and ran the loose end of the IED's wiring through a hole that he cut into the pocket, a tactic that other suicide bombers have used and which enabled Ullah to conceal the

9

triggering mechanism. (A.759-60). Surveillance video and MetroCard swipes captured Ullah's movements through the city, as he traveled to his target. (PSR ¶¶ 11-12; GX 1001). Ullah kept his right hand in his pants pocket, ready to connect the battery and wiring, closing the circuit and triggering the detonation. Ullah was, at that point, part of the bomb, ready to blow up himself and others for ISIS. After leaving his apartment, Ullah boarded a subway in Brooklyn bound for the 42nd Street Station—along with numerous passengers unaware that they were riding a train with a terrorist wearing a bomb that could explode at any moment if he was jostled. (A.767-68).

As Ullah rode the subway, he posted the following message to his Facebook account, stating that the then-President of the United States had failed to protect the country from Ullah's attack, and proclaiming his allegiance to ISIS: "O Trump you fail to protect your nation. Baqiah." (A.372; GX 401; *see* Dkt.108 at 12 (image of Facebook post)). ISIS uses the Arabic term "Baqiah"—which literally means "remaining"—as a slogan in its propaganda to signify that the group is remaining and expanding, and will defeat its enemies. (A.530-32). As Ullah later told law enforcement, he posted the Facebook message so that ISIS would know he had carried out the attack in its name. (A.372).

Surveillance footage showed Ullah arrive at the 42nd Street Station, approach his target location, and detonate his bomb. (GX 1001; *see* Dkt.108 at 13-15 (still images from surveillance video)). When Ullah arrived at the station, he exited the subway and strode

10

purposefully toward the long underground tunnel that connects the Port Authority and Times Square subway stations, both of which are part of the 42nd Street Station complex. (A.202, 800). He kept his right hand in his pants pocket, ready to trigger the bomb. Ullah reached the tunnel, which was crowded with morning commuters, and began walking through the tunnel. A few moments later, at 7:20 a.m., with commuters all around him, Ullah touched the wire to the battery and detonated the pipe bomb; flames burst from the IED as it exploded. (GX 1001-20).

The explosion shattered the pipe and caused sharp, jagged pipe fragments and the screws inside the pipe to fly through the tunnel. (PSR ¶ 13; A.313). As the FBI explosives expert explained, by choosing to detonate the IED in a narrow, underground, and enclosed space, Ullah increased the power and force of the explosion. (A.764-65). After the explosion, smoke spread through the tunnel, and terrified commuters ran screaming to get out of the station. (GX 1001-22; PSR ¶ 12). First responders rushed to the scene and found Ullah lying on the ground of the tunnel, alive but with injuries to his torso, where the bomb had detonated, ripping through his clothing. (A.220). First responders also found remnants of the bomb strewn across the tunnel, including shattered pipe fragments and screws —the shrapnel that Ullah's bomb had sprayed through the tunnel. (A.216; *see* Dkt.108 at 16 (images of shrapnel)).

Ullah injured, terrorized, and forever altered the lives of people in that tunnel. Two of his victims, David Wall and Veronica Chavez, testified at trial. Mr. Wall,

11

a construction project manager for New York City schools who was just a few feet in front of Ullah when he detonated the bomb, was treated at a hospital for a shrapnel wound to his leg, and also lost part of his hearing as a result of the explosion. (A.193-94; PSR ¶ 20). Ms. Chavez was walking towards Ullah in the tunnel, in the midst of her morning commute to a factory where she worked as a seamstress, when Ullah detonated the bomb. (A.812-14). As a result of the blast, Ms. Chavez lost part of her hearing, was unable to work at the factory due to trauma from the attack, and lost her job. (A.816-17; PSR at 10). Another victim was similarly diagnosed with post-traumatic stress disorder following the attack, and a fourth victim was treated at a hospital for heart palpitations and ringing in his ears as a result of the explosion. (PSR ¶ 19).

Ullah's attack also wreaked havoc on the city's mass transportation systems. Immediately after the attack, the Metropolitan Transportation Authority ("MTA") shut down the 42nd Street Station, and suspended service entirely on several subway lines. (A.808-10). The MTA executive responsible for train movement testified that in his 32 years at the MTA, he did not recall any other time when service was fully suspended during rush hour at the 42nd Street Station —the busiest station in the city. (A.810). Meanwhile, the PABT also shut down entirely for an extended period that morning as a result of the attack, another unprecedented event over at least the last three decades. (A.785-86, 791, 795). Ullah's attack disrupted the lives of hundreds of thousands of people, and brought portions of the city to a standstill.

12

### 4. Ullah's Post-Attack Statements

After the attack, Ullah waived his *Miranda* rights and spoke with law enforcement. During the interview, Ullah proudly declared that he carried out the attack "on behalf of the Islamic State." (A.376). Ullah also stated that he chose a busy weekday morning for his attack because "there would be more people to terrorize"; he filled his bomb with screws to inflict "maximum damage"; and he knew people might die. (A.375, 378, 380-81; PSR ¶ 14).

While in custody in the days following the attack, Ullah made additional, unprompted statements to law enforcement officers about the bombing. On December 14, 2017, Ullah told a Deputy U.S. Marshal, "System is not working, think who will come after me," and repeatedly warned, "More is coming." (PSR ¶ 17). About a week later, while incarcerated at the Metropolitan Correctional Center, Ullah chanted "more is coming" at a correctional officer and then stated: "You started this war, we will finish it. More is coming, you'll see." (PSR ¶ 17).

### B. The Defense Case

The defense cross-examined certain of the Government's witnesses but called no witnesses of their own.

### C. The Verdict, Post-Trial Motions, and Sentencing

On November 6, 2018, the jury convicted Ullah of all six counts in the Indictment. (A.1144-48).

13

On December 6, 2018, Ullah filed a post-trial motion pursuant to Federal Rule of Criminal Procedure 29, challenging the sufficiency of the evidence to support his convictions on Counts One and Five. (A.1154-1222). On September 13, 2019, following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), Ullah filed a supplemental Rule 29 motion, arguing that *Davis* required vacatur of his conviction on Count Six. (A.1223-94). On January 4, 2021, the District Court issued an opinion denying Ullah's Rule 29 motions. (A.1295-1312).

On April 22, 2021, Judge Sullivan sentenced Ullah to an aggregate term of life imprisonment on Counts One through Five and a mandatory consecutive term of 30 years' imprisonment on Count Six, which was the sentence called for by the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). (A.1375-1427).

## ARGUMENT

### POINT I

### The Evidence Was Sufficient and the Jury Was Properly Instructed on Count One

Ullah challenges his conviction on Count One under 18 U.S.C. § 2339B, arguing that the District Court's jury instructions were deficient and the evidence was insufficient to support the jury's verdict. (Br.35-45). Ullah's arguments all stem from the contention that he cannot have provided or attempted to provide material support to ISIS, in the form of "personnel" or a "service," because he purportedly acted

14

entirely independently from ISIS. That contention is legally and factually without merit. Judge Sullivan properly instructed the jury on the requisite nexus between a defendant's conduct and the relevant terrorist organization with respect to both the "personnel" and "service" prongs of the material-support statute, and the evidence at trial amply demonstrated that, by carrying out an attack on behalf of ISIS in direct response to the group's instructions to followers in its online propaganda, Ullah provided both "personnel" (himself) and a "service" (the attack) to ISIS within the meaning of Section 2339B. Ullah's challenges to his conviction on Count One therefore should be rejected.

## A. Relevant Facts

Count One charged Ullah with "provid[ing], and attempt[ing] to provide, 'material support or resources,' as that term is defined in [18 U.S.C. §] 2339A(b), namely, services and personnel (including himself), to a foreign terrorist organization, namely, [ISIS]." (A.21). Prior to the charge conference held after the close of evidence at trial, the defense submitted a letter outlining the parties' disagreement regarding the appropriate language for instructing the jury on the definitions of "service" and "personnel" for Count One. (A.126-28). At the conference, Judge Sullivan engaged in extensive colloquy with the parties regarding whether and how the term "service" should be defined in the charge, as well as the propriety of submitting to the jury the Government's attempt theory of liability for Count One. (A.838-68, 922). After receiving further briefing from the parties (A.133-36), Judge Sullivan circulated a draft charge. After considering further

15

written and oral argument on the issue, Judge Sulli-
van rejected the defense objection regarding the defi-
nition of "service." (A.147-49, 939-48).

As relevant here, Judge Sullivan subsequently in-
structed the jury on Count One as follows:

> The first element that the government
> must prove beyond a reasonable doubt is
> that the defendant knowingly and inten-
> tionally provided or attempted to provide
> material support or resources to ISIS. To
> be clear, the law does not prohibit advo-
> cating the political goals of ISIS. What is
> prohibited is the act of knowingly provid-
> ing materials or support to ISIS . . . The
> term "material support or resources" is
> defined by law to include any service or
> personnel, one or more individuals who
> may be or include oneself.
>
> A person provides or attempts to provide
> services as that term is defined in the
> statute when a person performs work
> commanded or paid for by another or
> done for the benefit of another, here ISIS.
> Only work performed in coordination
> with, at the direction of, or for the benefit
> of ISIS meets the definition of service. It's
> for you to decide whether or not the gov-
> ernment has proven beyond a reasonable
> doubt that ISIS invited conduct such as
> the conduct alleged here, whether the de-
> fendant carried out the conduct alleged
> here, and, if you find that he did, whether

16

the defendant was motivated by such an invitation. If you find that ISIS did in fact invite its followers or sympathizers to engage in such conduct and if you find that the defendant engaged in conduct that was motivated in whole or in part by such an invitation, that would be sufficient to meet the definition of services in the statute.

A person provides or attempts to provide personnel as that term is defined in the statute if he provides or attempts to provide ISIS with one or more individuals who may be or include himself to work under that organization's direction or control. However, individuals who act entirely independently of ISIS to advance its goals or objectives are not considered to be working under ISIS's direction and control.

(A.1073-75). Judge Sullivan also rejected the defense objection to the legal propriety of the Government's attempt theory, and instructed the jury on attempt for Count One. (A.1073-74).

Ullah's post-trial Rule 29 motions argued, with respect to Count One, that the evidence was insufficient to support the jury's verdict, and that the District Court's instructions regarding "personnel" and "service" were legally deficient. (A.1159-69). In its opinion denying the Rule 29 motions, the District Court concluded that the Government's theories of liability submitted to the jury on both "personnel" and "service"

17

were legally proper, that the jury was properly instructed with respect to both of those terms, and that the evidence was sufficient to permit a rational jury to find that, by carrying out the December 11, 2017 bombing, Ullah had provided or attempted to provide both personnel and a service to ISIS. (A.1298-1303).

## B.   Applicable Law

### 1.   18 U.S.C. § 2339B

The material-support statute criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so." 18 U.S.C. § 2339B(a)(1). The statute defines "material support or resources" to include, among other things, "any . . . service . . . [or] personnel (1 or more individuals who may be or include oneself)." *See id.* §§ 2339B(g)(4), 2339A(b)(1). With respect to the provision of personnel, the statute provides that:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or

18

> objectives shall not be considered to be
> working under the foreign terrorist or-
> ganization's direction and control.

*Id.* § 2339B(h). The statute does not contain a parallel provision or definition for the term "service."

### 2. Sufficiency of the Evidence

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). This Court reviews the sufficiency of the evidence *de novo*, *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010), but the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). Further, the Court analyzes the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and

19

must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

### 3. Jury Instructions

A defendant challenging a jury instruction faces a heavy burden, as he must demonstrate that (1) he requested a charge that "accurately represented the law in every respect"; and (2) the charge actually given, when viewed as a whole, was erroneous and prejudicial. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *see also United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) ("To secure reversal on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice."). In reviewing jury instructions, this Court does not look only to the particular words or phrases challenged by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see United States v. Quinones*, 511 F.3d 289, 314 (2d Cir. 2007) ("[W]e will reverse only where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule.").

20

## C. Discussion

### 1. "Personnel"

Ullah argues, as he did below, that (1) the evidence was insufficient to establish that he provided "personnel" to ISIS because he acted "entirely independently" of ISIS (Br.35-39 (citing 18 U.S.C. § 2339B(h)), and (2) Judge Sullivan erred in instructing the jury on attempt with respect to the "personnel" theory of liability (Br.40). Both arguments fail, as Judge Sullivan correctly concluded in his well-reasoned decision denying Ullah's Rule 29 motion.

*First*, the evidence at trial easily permitted a rational jury to find that Ullah provided "personnel"—in the form of himself—to ISIS, consistent with Section 2339B(h). Judge Sullivan specifically incorporated Section 2339B(h) into the charge, instructing the jury that Ullah could be guilty of providing personnel only if he "provide[d] ISIS with one or more individuals who may be or include himself to work under that organization's direction or control," and further instructed that "individuals who act entirely independently of ISIS to advance its goals or objectives are not considered to be working under ISIS's direction and control." (A.1075). Viewed in the light most favorable to the Government, the trial evidence established, among other things, the following:

- Ullah radicalized through watching ISIS propaganda online, including the numerous ISIS videos found on his laptop after the attack. (A.375-76).

21

- In those videos, ISIS instructed support-ers to carry out "lone wolf" terrorist at-tacks in the United States. (A.587-88). Such attacks are a key part of ISIS's global strategy. (A.525, 589). ISIS relies on supporters based in the United States to carry out such attacks on its behalf. (A.589). To carry out a lone-wolf attack for ISIS, a supporter need not communi-cate directly with ISIS members based in the Middle East, since ISIS instructs and guides lone-wolf attackers through its online propaganda. (A.515). ISIS consid-ers supporters who carry out attacks in its name to be part of ISIS and "soldiers of the caliphate." (A.516-17).

- On November 29, 2017, ISIS released the propaganda video "Flames of War II." (A.596). In that video, ISIS instructed supporters to carry out terrorist attacks in the United States. (A.521-22). Ullah viewed the video (A.375), and just 12 days later, on December 11, 2017, he carried out his bombing attack in accordance with ISIS's direction in that video.

- The phrase "die in your rage" is an ISIS slogan that appears in Flames of War II. (A.594-95, 608-09). Ullah wrote that phrase on his passport, his visa, and a box where he stored bomb-making mate-rials. (PSR ¶ 16).

22

- Less than an hour before detonating his pipe bomb, Ullah posted the ISIS rallying cry "baqiah" on Facebook. (GX 401). Ullah posted that ISIS slogan to ensure that ISIS would know that he had carried out the attack in its name. (A.372).

- After the bombing, Ullah declared to law enforcement that he had carried out the attack "on behalf of the Islamic State," that is, ISIS. (A.362, 376).

This evidence amply supported the conclusion that when Ullah carried out his attack, he was acting at ISIS's direction as conveyed through the group's online propaganda videos. Indeed, the evidence established that Ullah executed the attack specifically in response to ISIS's direction in Flames of War II, which instructed supporters that, if they were unable to join ISIS in the Middle East, they should carry out an attack in the United States ("if you cannot come here, then . . . take the fight where you currently are"). (A.375-76). Just days after watching that video, Ullah executed exactly that directive.

The fact that Ullah did not have direct contact with ISIS members in the Middle East in no way precluded the jury from finding the nexus between his conduct and the terrorist group required by Section 2339B(h). Ullah cites no authority—and there is none—for the proposition that a U.S.-based supporter of a foreign terrorist organization ("FTO") who does not communicate directly with the FTO's overseas members necessarily acts "entirely independently" of the FTO within the meaning of Section 2339B(h). *See United States v.*

23

*Jama*, 217 F. Supp. 3d 882, 891-92 (E.D. Va. 2016) (rejecting suggestion that direct contact with the FTO is required, and explaining that "Congress plainly intended for courts to consider the nature of an individual's actions broadly in relation to the overall goals of the terrorist organization in determining whether someone is to be deemed part of that organization," such that "a person is to be deemed part of an FTO if that person is engaged in significant activity on behalf of an FTO relative to that FTO's goals and objectives"). As Judge Sullivan explained below, Ullah "overreads" the statutory exception set forth in Section 2339B(h). (A.1299).

Moreover, Ullah's position is belied by both common sense and the reality of how ISIS operates. As the trial evidence established, ISIS imparts attack instructions to its followers in the West through precisely the kinds of videos that inspired Ullah, and the FTO specifically relies on supporters like Ullah to carry out those instructions and execute attacks on its behalf. In denying Ullah's Rule 29 motion, Judge Sullivan carefully reviewed the evidence, and was clearly correct in concluding that "[t]he record evidence, taken in the light most favorable to the government, amply establishes that Defendant acted at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials." (A.1299-1300). The jury's verdict was amply supported and entirely consistent with Section 2339B(h).

*Second*, it was proper to instruct the jury on attempt for the "personnel" prong of Count One. Judge Sullivan heard extensive argument on this issue at the

24

charge conference (A.853-65), received supplemental briefing (A.133-36), and correctly determined that the Government's attempt theory was properly submitted to the jury. In large part, Ullah's objection to instructing the jury on attempt is merely a variation on his argument that he cannot have violated Section 2339B because he acted "entirely independently" of ISIS. (*See* Br.38 (arguing that "a person cannot attempt to work under the 'direction or control' of an organization . . . without even trying to contact the organization")). As explained above, that is incorrect, and an overreading of the statutory exclusion in Section 2339B(h).

The Government's attempt theory was logical, supported by the evidence, and in no sense a "circumvention" of Section 2339B(h). (*See* Br.40). The trial evidence, including the testimony of the Government's ISIS expert, amply demonstrated the propriety of instructing the jury on attempt. For example, Dr. Zelin testified that ISIS did not claim responsibility for Ullah's attack, but had claimed responsibility for the attacks of other supporters—specifically, supporters who, unlike Ullah, succeeded in killing themselves and others—and that ISIS considered those martyred attackers to be part of the FTO. (A.543-44). Dr. Zelin explained that ISIS likely had not claimed responsibility for Ullah's attack precisely because Ullah did not die after detonating his suicide bomb and was instead arrested. (A.591-92; *see* A.516-17 (ISIS views supporters who carry out suicide attacks as "martyrs" who are "part of [ISIS's] cause")). Based on such testimony, it was entirely reasonable for the jury to conclude that Ullah attempted to provide himself to ISIS and join the group by carrying out a suicide attack—and that he

25

took a substantial step towards that goal by detonating the bomb—but that he did not complete the offense because he did not succeed in martyring himself for the cause. Furthermore, as Judge Sullivan explained in rejecting Ullah's Rule 29 challenge to the attempt instruction, Section 2339B "neither requires that a defendant provide 'personnel' for ongoing group membership (as Defendant suggests) nor excludes the possibility that a defendant could provide 'personnel' for a single suicide bombing." (A.1301). It was proper to submit the attempt theory to the jury.

## 2. "Service"

As to the "service" prong of Count One, Ullah similarly argues that Judge Sullivan's instruction was deficient because it improperly allowed the jury to convict Ullah based on conduct undertaken "entirely independent" from ISIS. (Br.42). Ullah also advances the argument, which is intertwined with his challenge to the jury instruction, that the evidence was legally insufficient to support conviction on a "service" theory because he did not act with the requisite coordination with ISIS. (Br.35-39). Both claims are without merit, as Judge Sullivan correctly found in denying Ullah's Rule 29 motion. (A.1301-03).

Ullah's challenge to Judge's Sullivan's instruction depends on the contention that the "direction or control" requirement in Section 2339B(h) applies not only to the provision of "personnel," but also to the provision of a "service." (*See* Br.41). But this purported limitation on the "service" prong of Section 2339B finds no support in the statute, case law, or logic. Personnel

26

and services are different forms of material support, with distinct contours and requirements. Section 2339B(h), by its terms, applies to the "personnel" prong of the statute. *See* 18 U.S.C. § 2339B(h) ("No person may be prosecuted under this section *in connection with the term 'personnel'* unless . . . ." (emphasis added)); *see also United States v. Pugh*, 2015 WL 9450598, at *8-11 (S.D.N.Y. 2015) ("Section 2339B(h) further defines 'personnel' and is not an affirmative defense or an essential element of the offense of providing material support to an FTO." (collecting cases)).

Ullah relies, as he did below, on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*"), but he continues to mischaracterize the holding in that case, which does not in fact support the proposition that Section 2339B(h)'s "direction or control" requirement applies to the provision of services. The *HLP* Court recognized that the term "service" excludes "independent advocacy" and that a person naturally cannot provide a service "to" an FTO if he acts "entirely independently" from the group. *See id.* at 23-24 ("The use of the word 'to' indicates a connection between the service and the foreign group." (quoting 18 U.S.C. § 2339B(a)(1))). But the Supreme Court also explained that a "service" for purposes of Section 2339B simply refers to "concerted activity," and defined the term by assigning its "ordinary meaning," specifically: "'the performance of work commanded or paid for by another: a servant's duty: attendance on a superior'; or '*an act done for the benefit or at the command of another.*'" *Id.* at 23-24 (emphasis added) (quoting Webster's Third New International Dictionary 2075

27

(1993)). Ullah conspicuously avoids mentioning that the Supreme Court's definition of "service" includes "an act done for the benefit . . . of another." Ullah's conduct—a terrorist attack that he admittedly carried out "on behalf of" ISIS to advance the FTO's agenda (A.376)—fits squarely within that piece of the definition. Judge Sullivan carefully considered—during extended colloquy at the charge conference and prior to summations—the appropriate language for instructing the jury on the meaning of the term "service," and ultimately delivered an instruction that directly quoted *HLP*'s definition, instructing the jury that a service includes "work commanded or paid for by another or done for the benefit of another." (A.1075). The instruction was entirely consistent with *HLP*, and legally correct.

Contrary to Ullah's unsupported assertion, nothing in the charge improperly instructed the jury that it could find Ullah had provided a service to ISIS through activity that was entirely independent from ISIS. Ullah takes issue with the portion of the instruction conveying that, if the jury found he engaged in conduct in response to an invitation from ISIS to its followers to engage in such conduct, that would be sufficient to qualify as a service. (*See* Br.41-42; A.1075). But that instruction, on its face, required the jury to find a connection between ISIS and the service: that the service was provided in response to a call from ISIS. Neither the statute, *HLP*, nor a common-sense construction of what it means to provide a service requires a different or greater nexus between the service and the FTO. To the contrary, the limited case law addressing this subject supports Judge Sullivan's instruction. *See Jama*,

28

217 F. Supp. 3d at 892 (recognizing that, while the statute requires "a sufficient connection between the service provided and an FTO," "Congress also did not intend to limit Section 2339B's application to situations where prohibited support is delivered to designated or recognized leaders or to those who operate under some identifiable command and control structure"; instead, "Congress intended to reach all persons who *act on behalf of an FTO to further its goals and objectives in significant ways*." (emphasis added)); *see also United States v. Suarez*, 893 F.3d 1330, 1334-35 (11th Cir. 2018) (rejecting sufficiency challenge to conviction for attempting to provide material support to ISIS where evidence showed defendant posted ISIS propaganda, sought to build bombs, attempted to recruit others to join him in attacks, and filmed a recruitment video, but had "no coordination or direct contact with [ISIS]," concluding that "it is irrelevant that he did not make contact with ISIS, because the law requires only that [the defendant] directed (or attempted to direct) his services to ISIS").

Here, the evidence established that Ullah provided a quintessential service for an FTO—carrying out a terrorist attack—and that he did so in direct response to ISIS's instructions imparted through its propaganda videos, particularly Flames of War II. Indeed, Dr. Zelin explained that ISIS supporters based in the United States can "serve" the FTO by carrying out an attack in accordance with such instructions. (A.587-88). The "service" theory that the Government presented to the jury was not, as Ullah mischaracterizes, that he provided a service to ISIS through an "independent act" (Br.36), but rather that he carried out his

29

attack in concert with ISIS to benefit the group and further its agenda. The evidence was sufficient to support the jury's finding of guilt on that theory, and the theory is consistent with the statute and *HLP*.

Finally, to the extent Ullah challenges the validity of the Government's attempt theory of liability for the "service" prong (*see* Br.38), the District Court properly submitted that attempt theory to the jury, for reasons similar to those discussed above relating to the "personnel" prong. Based on the trial evidence, it would have been reasonable for the jury to conclude that Ullah carried out the bombing as part of an attempt to serve ISIS, but that he did not successfully provide his intended service, as he failed to kill any victims. (*See* A.590 (the goal of a suicide attack on behalf of ISIS is "to kill other people"), 592 (ISIS did not claim responsibility for Ullah's bombing because it was a "failed attack")). Accordingly, Judge Sullivan was correct to instruct the jury on attempt in connection with the "service" prong of Count One.

At bottom, Ullah's arguments relating to both "personnel" and "service" are misplaced, as they trace back to analysis, in *HLP* and other cases, addressing the First Amendment concerns that can arise if an individual is prosecuted under the material-support statute for engaging merely in "advocacy" for an FTO. *See HLP*, 561 U.S. at 23-24. But this case was not about advocacy. It involved a bombing carried out on behalf of an FTO—conduct that falls squarely within the ambit of Section 2339B. It was entirely reasonable and legally proper for the jury to conclude that, by bombing a subway station to benefit ISIS in response to ISIS's

30

calls for such attacks, Ullah provided or at least attempted to provide material support to ISIS within the meaning of Section 2339B. Ullah's challenges to his conviction on Count One fail.

## POINT II

### The Conviction on Count Five Is Legally and Factually Sound

Ullah raises a series of challenges to his conviction on Count Five under 18 U.S.C. § 1992 (Br.45-61), which criminalizes terrorist attacks and other violence against mass transportation systems. Ullah's challenges are without merit. *First*, the evidence was legally sufficient to support the jury's finding that Ullah violated the statute in two ways, by riding a subway train with a bomb strapped to his body (in violation of Section 1992(a)(2)), and by detonating the bomb in a subway terminal (in violation of Section 1992(a)(7)). *Second*, the theory of liability that the Government argued to the jury under subsection (a)(2) did not constructively amend the Indictment, which covered that theory on its face. *Third*, Judge Sullivan's instructions on Count Five were legally sound and appropriately balanced. And *fourth*, the sentencing enhancement set forth in Section 1992(b)(1) applies, by its express terms, to both subsections of the statute under which Ullah was convicted. Ullah's arguments reflect his continued efforts, which the District Court carefully considered and properly rejected, to narrow the scope of Section 1992 in ways that the language of the statute simply does not support.

31

### A. Relevant Facts

Count Five charged Ullah with committing a terrorist attack against a mass transportation system, in violation of 18 U.S.C. § 1992. (A.24-25). At trial, the Government proceeded under two subsections of the statute: (a)(2) and (a)(7). (A.1303).

At the charge conference, Judge Sullivan engaged in extensive colloquy with the parties regarding the proper contours of the instruction for Count Five. (A.880-906), during which the Government noted that its theory of liability for subsection (a)(2) included that Ullah had "place[d]" a destructive device "in, upon, or near" a mass transit vehicle by riding the subway to the 42nd Street Station with the pipe bomb strapped to his chest (A.883-86 (quoting 18 U.S.C. § 1992(a)(2))). Following the conference, the defense filed a letter arguing that this theory should not be submitted to the jury because it constituted a constructive amendment of the Indictment and was legally insufficient to violate (a)(2) because Ullah had "merely carried or transported" the bomb on the subway, not "place[d]" it there. (A.137-41). The Government opposed the defense request. (A.142-46).

Judge Sullivan thereafter circulated a draft charge that allowed the jury to consider this theory under (a)(2). The defense renewed its objection and further argued that a sentence in the proposed charge that summarized the Government's theory should either be deleted or "balanced" with the following sentence: "The defense contends that the government has failed to meet its burden of proof on this element because carrying a disconnected device under one's clothes on a

32

mass transportation vehicle is not placing a device in, upon, or near a mass transportation vehicle." (A.149). After further colloquy on this issue, Judge Sullivan rejected the defense objection, explaining that: it was important for the charge to include a sentence summarizing the Government's theory of liability under (a)(2) so the jury understood each of the multiple theories it was being asked to consider on Count Five; that the defense's proposed additional sentence amounted to "legal argument" not properly included in the charge; but that, in light of the defense's position, a sentence would be added to the instruction explicitly reflecting the defense's contention that the Government had failed to prove this theory. (A.948-56). Judge Sullivan proceeded to instruct the jury on Count Five consistent with that ruling. (A.1088-96 (instructing, in part: "Under this theory [of liability on Section 1992(a)(2)] the government contends that the defendant violated the statute when he boarded and rode the subway with a destructive device. The defendant argues that the government has failed to prove this theory beyond a reasonable doubt.")).

Ullah's Rule 29 motion challenged his conviction on Count Five, advancing the same arguments that Judge Sullivan rejected during trial. (A.1169-85, 1201-13, 1220-21). In his decision denying the motion, Judge Sullivan concluded that (1) the evidence was legally sufficient to support Ullah's conviction under subsection (a)(2); (2) the Government's theory of liability under (a)(2) did not constitute a constructive amendment of the Indictment; and (3) Ullah's contention that Section 1992(b)(1)'s sentencing enhancement applied only

33

to (a)(2), not (a)(7), need not be resolved because the conviction under (a)(2) was valid. (A.1303-07).

## B.  Applicable Law

### 1.  18 U.S.C. § 1992

Section 1992 criminalizes "[t]errorist attacks and other violence against ... mass transportation systems." 18 U.S.C. § 1992. As relevant here, (a)(2) prohibits "plac[ing] any ... destructive device in, upon, or near ... a mass transportation vehicle with intent to endanger the safety of any person, or with a reckless disregard for the safety of human life," *id.* § 1992(a); and (a)(7) prohibits "commit[ting] an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to any person who is on property" used in the operation of, or in support of the operation of, a mass transportation vehicle, *id.* § 1992(a)(7). (*See* A.1089-90, 1092-93 (elements of violations of (a)(2) and (a)(7))). The maximum penalty for a violation of Section 1992(a) is increased from 20 years to life in prison if the defendant commits the offense "in a circumstance in which ... the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense." 18 U.S.C. § 1992(b)(1).

### 2.  Constructive Amendment

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). A defendant raising a constructive

34

amendment claim must establish that "the presentation of evidence and jury instructions . . . so modif[ied] *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). The prohibition against constructive amendments rests upon two concerns: "first, that [the indictment] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007).

In light of this standard, and since "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment," *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983), it is well established that "not all modifications constitute constructive amendments," *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). Rather, this Court has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *Rigas*, 490 F.3d at 208. The "core of criminality" is "the essence of the crime, not the particulars of how a defendant effected the crime." *United States v. Vilar*, 729 F.3d 62, 91 (2d Cir. 2013). Thus, "there is no constructive amendment when the proof at trial does no more than supply the particulars" of the crime. *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016). Further, where an indictment describes all the means by which

35

a defendant may violate the statute, the specification of one such means in the "to wit" clause is merely illustrative, and proof of additional means does not work a constructive amendment. *See United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013) ("[T]he 'to wit' clause is properly understood to be illustrative rather than definitional of the core of criminality charged by the grand jury."). This Court reviews preserved constructive amendment claims *de novo. See United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009).[2]

## C.  Discussion

### 1.  The Evidence Was Sufficient to Support the Jury's Verdict on Count Five

Ullah argues, as he did below, that when he boarded a subway train with a bomb strapped to his chest, he "carried" or "transported" the device but did not "place" it on the subway, such that no rational jury could convict him under Section 1992(a)(2). (Br.47-49). In essence, Ullah contends that a jury could only find him guilty of "placing" the bomb on the subway if he had taken it off and put it down. This argument defies common sense and seeks to narrow subsection (a)(2) in a way that finds no support in the statute. The District Court carefully considered and correctly rejected this

---

[2]  The standards of review and legal principles applicable to Ullah's challenges to the sufficiency of the evidence and jury instructions on Count Five are set forth above in Point I.B.2-3.

36

argument during trial and in its decision denying Ullah's Rule 29 motion. (A.1304-05).

As Judge Sullivan explained, "the nature of Defendant's explosive device collapses the distinction between carriage and placement." (A.1305). The evidence established, and the Government argued to the jury, that Ullah made himself part of the bomb. He strapped the pipe containing explosive material to his chest using zip ties and duct tape, and ran the wiring from the pipe attached to his chest down the inside of his clothing and through a hole he had cut into his right pants pocket, where he held the battery that was the power source for the IED. (PSR ¶¶ 11, 13). He designed the IED so that he operated as the "switch": when he touched the wire to the battery, the bomb exploded. (A.756). This meant that, as Judge Sullivan recognized, "the only way for Defendant to 'put' this particular bomb into position was to stand in that position himself." (A.1305). Thus, it was entirely reasonable for the jury to conclude that, when Ullah stepped onto the subway with the pipe bomb attached to his chest, he "placed" a destructive device—of which he was a crucial part—in and upon a mass transportation vehicle.

Ullah was not required, as his argument suggests, to remove the IED from his body—thereby separating the switch from the other components of the bomb and rendering it *less* likely to explode—and put it on the floor of the train to be guilty under (a)(2). As Judge Sullivan found, "[t]here is certainly nothing in the statutory language to suggest that Congress intended to distinguish suicide bombers from those who abandoned explosive devices prior to detonating them."

37

(A.1305). Indeed, under Ullah's unsupported and illogical reading of the statute, a person would violate (a)(2) if he puts a bomb on the floor of a subway car and leaves it there, but not if he detonates a bomb in a subway car while holding it in his hands. Moreover, riding the subway with a live, wired bomb strapped to one's chest is as much an "affirmative act of violence" (Br.48) as putting the bomb on the floor of the train—particularly when, as in this case, the bomb is more dangerous strapped to the person's body than on the floor of the train.

Perhaps because his strained interpretation of (a)(2) essentially reads out suicide bombs, Ullah attempts to analogize his bomb to a gun. Ullah argues that he "was no more a 'part of' the bomb than a gun carrier is a 'part of' the gun because he must pull the trigger to fire." (Br.48). This argument is both irrelevant—(a)(2) deals with bombs, not guns—and wrong. A gun is a fully constructed machine that is inherently distinct from, and designed to be operated by, a person holding it. By contrast, Ullah built his bomb so that he was a necessary component of the device: he designed the IED to function only when attached to his body and he touched the wires to the battery. To borrow Ullah's analogy, he was not like a "gun carrier" who decided when to pull the trigger, he was the trigger itself. He was part of the bomb and when he stepped onto the subway, he placed the bomb there.

Finally, the evidence was plainly sufficient for a rational jury to conclude that, by riding a subway during rush hour with a bomb strapped to his chest, Ullah acted with at least "a reckless disregard for the safety

38

of human life." *See* 18 U.S.C. § 1992(a)(2). Ullah brought a live, unstable bomb onto a crowded subway car. Although he designed the device to detonate when he touched the wires to the battery, the evidence established that the IED could have exploded if Ullah was bumped or jostled, or if he inadvertently prematurely completed the circuit. (A.767-68). The fact that Ullah worked as an electrician (*see* Br.49) only reinforces the reasonableness of the conclusion that he was well aware that his conduct endangered the passengers around him.

### 2. The Indictment Was Not Constructively Amended

Ullah's contention that Count Five was constructively amended is based, as it was below, on a misapprehension of the law and a selective reading of the facts. As Judge Sullivan correctly concluded, the theory of liability under Section 1992(a)(2) that the Government argued to the jury—that Ullah "placed" his bomb on the subway when he boarded the train with the device strapped to his chest—was plainly covered by the broad language of the Indictment. (A.1306).

The "core of criminality" charged in Count Five, by its plain language, encompassed both "plac[ing] a . . . destructive device in, upon, and near a mass transportation vehicle," as charged under subsection (a)(2), and the "use of a dangerous weapon" in a "terminal . . . [or] facility used in the operation of, [or] in support of the operation of, a mass transportation vehicle," as charged under subsection (a)(7), on December 11, 2017. (A.24-25). Simply because Ullah claims that

39

Count Five alleged a "single act," that is, the detonation of the bomb (Br.49-50), does not make it so. The allegations in the Indictment encompassed, and the Government's proof at trial established, both that Ullah rode the subway with his bomb, and that approximately an hour later, he detonated the bomb. *See D'Amelio*, 683 F.3d at 419-21 (no constructive amendment where the indictment and the proof at trial both relate to a "single set of discrete facts" or form "part of a single course of conduct" with the same "ultimate purpose"). Thus, far from broadening the possible bases for conviction, the Government proved what was alleged in the Indictment. Moreover, the Government's opening statement at trial expressly referenced the facts underlying its theory of liability under (a)(2), *i.e.*, that Ullah rode the subway with an unstable bomb strapped to his chest. (A.175-76). And the fact that Ullah rode the subway to his target with the bomb strapped to his chest—which obviously was an integral part of the charged narrative of the events of December 11, 2017—was naturally reflected in the discovery produced during the case, the summary of the Government's anticipated trial proof set forth in its motions *in limine* (Dkt.35 at 3), and the testimony at trial. Accordingly, Ullah's claims of "surprise" and lack of notice (Br.55) do not withstand scrutiny and fall well short of providing any basis for disturbing the jury's verdict.

Finally, Ullah argues that because the to wit clause in Count Five described the attack in general terms and did not specifically reference placing the bomb on a subway, the Government was prohibited from proving a violation of (a)(2) based on that theory. But that

40

is not the law. As Judge Sullivan recognized, the to wit clause does not "bind[] the government to prove the exact facts specified in a criminal indictment," (A.1307 (citing *United States v. Bastian*, 770 F.3d 212, 221-22 (2d Cir. 2014)). *See also D'Amelio*, 683 F.3d at 423 (holding that "where the indictment charge[s] a single course of conduct," a mere "deviation" from the to wit clause does "not permit conviction for a functionally different crime" and therefore does not constructively amend the indictment). Thus, the District Court was correct in concluding that "[s]ince Defendant's placement of the bomb on his person, and his placement of his person on the train while *en route* to the Port Authority Bus Terminal, occurred on the date identified in the Indictment and was part of a single course of conduct to commit the bombing, the government was not required to pinpoint the exact moment within that course of conduct that comprised the charged crime." (A.1307). Ullah's constructive amendment claim fails.

### 3. The District Court Properly Instructed the Jury on Count Five

Ullah's conclusory challenge to the jury charge on Count Five falls well short of establishing that the instruction, viewed as a whole, was erroneous and prejudicial. (*See* Br.56-57). Over the course of lengthy colloquy with the parties, and with the benefit of supplemental briefing, Judge Sullivan carefully analyzed a complex and little-used statute, and ultimately delivered an instruction that was legally correct and appropriately balanced.

41

For both subsections (a)(2) and (a)(7), Judge Sullivan set forth the elements, summarized the Government's theory of liability in a single sentence, and immediately followed that with a sentence stating that the defense contended that the Government had not met its burden of proof on that theory. (A.1088-96). It was particularly appropriate for Judge Sullivan to structure the instruction in this fashion since the jury was required, as both parties agreed was proper, to answer a special interrogatory asking which (if either) of the two theories it had found beyond a reasonable doubt. (A.1095; *see* A.950 (Judge Sullivan explaining that "[m]y goal is just so the jury understands what these two theories are for Count Five")).

Judge Sullivan was entirely correct to reject the defense's proposed additional language relating to the first theory—"The defense contends that the government has failed to meet its burden of proof on this element because carrying a disconnected device under one's clothes on a mass transportation vehicle is not placing a device in, upon, or near a mass transportation vehicle"—which constituted legal argument not properly before the jury about the meaning of the term "place" and the legal viability of the Government's theory of liability. As discussed above, Judge Sullivan correctly determined that the theory was legally proper under the statute—a question of law that was not for the jury. Moreover, the defense's concern about "balancing" was adequately addressed by instructing the jury, immediately after the single sentence summarizing the Government's theory, that "[t]he defendant argues that the government has failed to prove this theory beyond a reasonable doubt." (A.1089). Further

42

undermining Ullah's position, he does not argue that the instruction on the other theory of liability for Count Five, under subsection (a)(7), was "unbalanced" —even though that instruction used precisely the same structure: a sentence summarizing the Government's theory followed by a sentence stating that the defense contended the Government had failed to meet its burden on that theory (A.1092).

In sum, the District Court's instruction on Count Five was neither erroneous nor prejudicial. The cases cited by Ullah are wholly inapposite and do not support a contrary conclusion. *See United States v. Dove*, 916 F.2d 41, 44-47 (2d Cir. 1990) (finding unbalanced instructions on witness identification and direct and circumstantial evidence that, unlike here, assumed defendant's guilt and did not reflect the defense's contention that prosecution had failed to meet its burden); *United States v. Assi*, 748 F.2d 62, 65-67 (2d Cir. 1984) (vacating conviction based on a combination of errors not claimed or present here, including patently "inflammatory" language at several points in the trial court's instructions); *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (vacating conviction where trial court failed to include an entire limiting instruction on co-defendant's guilty plea that Government conceded was legally proper). Ullah's challenge to the jury instruction on Count Five fails.

43

### 4. The Sentencing Enhancement in Section 1992(b)(1) Applies to Both Subsections of the Statute Under Which Ullah Was Convicted

Section 1992's aggravating provision imposes enhanced penalties when a person commits any of the offenses delineated in Section 1992(a), and the offense was committed in a circumstance involving a mass transportation vehicle carrying at least one passenger or employee. *See* 18 U.S.C. § 1992(b)(1). Ullah argues, as he did below, that the aggravating provision applies only to offenses in subsection (a) that specifically prohibit attacks on mass transportation vehicles, and thus cannot apply to subsection (a)(7). (Br.57-61). As an initial matter, the Court need not reach this argument, since Ullah's conviction under subsection (a)(2) is valid, and Ullah concedes that the aggravating provision applies to (a)(2) (*see* Br.57).

In any event, the argument is without merit. Once again, Ullah attempts to narrow Section 1992 in a way that is contradicted by its plain language. The sentencing enhancement in subsection (b)(1) applies by its express terms to "[w]hoever commits an offense under subsection (a)" in a circumstance in which the mass transportation vehicle is carrying a passenger or employee at the time of the offense. 18 U.S.C. § 1992(b)(1). As Judge Sullivan noted at the charge conference, "[t]he statute doesn't say whoever commits an offense under section (a)(2) or (a)(4)," but rather "it says section (a)." (A.899). Under Ullah's unsupported reading of (b)(1), however, the aggravating provision would never apply to several of the offenses listed in

44

subsection (a), because they do not expressly require that the attack involve railroad on-track equipment or a mass transportation vehicle. *See, e.g.*, 18 U.S.C. § 1992(a)(3), (a)(4), (a)(5), (a)(7), (a)(8), (a)(9). But had Congress intended for the aggravator to apply only to some of the offenses set forth in subsection (a), the statute would have said that. *See United States v. Albertini*, 472 U.S. 675, 680 (1985) (statutory interpretation "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Ullah's invocation of the rule of lenity is also unavailing (*see* Br.61), as the statute is unambiguous with respect to the issue presented. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 540 (2d Cir. 2015) ("[W]here statutory . . . provisions unambiguously cover the defendant's conduct . . . the rule of lenity does not come into play.").

The plain language of subsection (b)(1) makes clear on its face that the aggravating provision applies to every offense listed in subsection (a), so long as the commission of the offense in a particular case involves a mass transportation vehicle carrying a passenger or employee. With respect to subsection (a)(7), the evidence at trial established that Ullah "use[d] a dangerous weapon"—by detonating his bomb—with "intent to cause death or serious bodily injury" to people "on property described in subparagraph [(a)(4)]," specifically the subway tunnel at the 42nd Street Station. *See* 18 U.S.C. § 1992(a)(7). The subway tunnel clearly

45

constituted a "terminal . . . or facility used in the oper-
ation of, or in support of the operation of, a mass trans-
portation vehicle," *id.* § 1992(a)(4)(B), and Ullah does
not argue otherwise. And at the time Ullah detonated
the bomb, the circumstances involved a particular
mass transportation vehicle—in this case, multiple
such vehicles—carrying passengers and employees.
(*See* A.804-08 (MTA executive testifying that at 7:18
a.m.—when Ullah set off the bomb—there were two
subway trains running on the "A" line in that particu-
lar station, both of which were carrying at least one
employee and thousands of passengers); *see also*
A.499-501 (when Ullah detonated bomb, he had just
exited "A" train in the station)). Thus, the evidence
was more than sufficient for the jury to conclude that
Ullah carried out his attack in a terminal used in the
operation of a mass transportation vehicle, thereby vi-
olating (a)(7), and that he did so in a circumstance in
which the mass transportation vehicle was carrying a
passenger or employee, such that (b)(1) applies. Ul-
lah's challenge to the application of the aggravating
provision should be rejected.

## POINT III

### The Section 924(c) Conviction on Count Six Is Valid

Ullah raises several challenges to his conviction
under Section 924(c) (Br.61-73), but fails to identify
any basis for disturbing the jury's verdict on Count
Six. *First*, Count Three remains a valid predicate for
Count Six, because 18 U.S.C. § 2332f(a) qualifies as a
crime of violence pursuant to the so-called "elements

46

clause" of Section 924(c). *Second*, Count Five likewise remains a valid predicate for Count Six, because 18 U.S.C. § 1992(a)(7) qualifies as a crime of violence pursuant to the elements clause. *Third*, even if the jury convicted Ullah only of attempting to commit each predicate crime of violence, such an attempt itself necessarily qualifies as a crime of violence. And *fourth*, Count Six is not multiplicitous with Counts Three and Five, because even to the extent each of those counts was based on the same conduct, Section 924(c) proscribes an offense distinct from the predicate crime of violence, as multiple decisions of this Court have recognized.

## A.   Relevant Facts

Count Six charged Ullah with using and carrying a destructive device during and in relation to, and possessing a destructive device in furtherance of, a crime of violence, in violation of 18 U.S.C. § 924(c). (A.26). The Indictment alleged that each of the offenses charged in Counts One through Five qualified as a predicate crime of violence for purposes of Count Six. (A.26). Ullah moved pretrial to dismiss Count Six, arguing that it was multiplicitous of Counts Two through Five, and that Count One did not qualify as a crime of violence. (A.30-103). The District Court denied the motion, concluding that Count Six alleged a distinct offense and that—under this Court's then-controlling decision in *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018), which upheld Section 924(c)'s "residual clause"—each of Counts One through Five could serve as a valid predicate crime of violence for Count Six. (A.104-09). Judge Sullivan further held that Counts

47

Three and Five categorically qualified as crimes of violence under the elements clause of Section 924(c), and later instructed the jury accordingly. (A.109, 1097).

The jury's guilty verdict on Count Six included a finding that Counts Two through Five qualified as predicate crimes of violence. (A.1147). After trial, following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which struck down the residual clause, Ullah filed a supplemental Rule 29 motion arguing that his conviction on Count Six should be vacated because Counts Two through Five no longer qualified as crimes of violence. (A.1223-45). In opposing that motion, the Government argued that both Counts Three and Five were valid predicates because they qualified as crimes of violence under the elements clause. (A.1248-74). Judge Sullivan denied the motion, holding that Count Three qualified as a crime of violence under the elements clause. (A.1307-12 (declining to reach Count Five)).

## B. Applicable Law

### 1. 18 U.S.C. § 924(c)

"[A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence," be punished as specified in the statute. 18 U.S.C. § 924(c)(1)(A). Section 924(c)(1)(B)(ii) imposes a mandatory consecutive 30-year term of imprisonment when the firearm used or possessed is a "destructive device," such as a

48

bomb. The statute defines "crime of violence" as a felony

> (A)　[that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)　that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3)(A)-(B).

In *Davis*, the Supreme Court struck down the "residual clause" of Section 924(c)(3)(B) as unconstitutionally vague. 139 S. Ct. at 2336. Accordingly, following *Davis*, in order for an offense to serve as a predicate crime of violence for a Section 924(c) charge, it must qualify as a crime of violence under the "elements clause" or "force clause" of Section 924(c)(3)(A).

Whether an offense qualifies as a crime of violence under the elements clause is a question of law, determined by applying the "categorical approach." *Davis*, 139 S. Ct. at 2328; *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018). Under the categorical approach, "courts identify the minimum criminal conduct necessary for conviction under a particular statute," *Hill*, 890 F.3d at 55, by conducting an analysis of the elements of the offense grounded in "reality, logic, and precedent, not flights of fancy," *id.* at 56 (citing *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013)).

49

### 2. Multiplicity and Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment "protects a criminal defendant from multiple prosecutions as well as multiple punishments for the same criminal offense." *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). An indictment is multiplicitous "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). To conduct the multiplicity inquiry, courts apply the *Blockburger* test, and it is thus "not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *Id.* at 146. As the Supreme Court has explained "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1981).

Further, "[i]t is well settled that the legislature may impose multiple punishments for the same conduct without violating the Double Jeopardy Clause, so long as it expresses its intent to do so clearly." *Mohammed*, 27 F.3d at 819 ("Where the same conduct violates two statutory provisions, whether each violation is a separate offense is a question of legislative intent."). The *Blockburger* test—which looks to whether each offense includes at least one unique element—"'is not controlling when the legislative intent is clear from the face of the statute or the legislative history.'" *Id.*

50

(quoting *Garrett v. United States*, 471 U.S. 773, 778-79 (1985)). Thus, when the legislative intent to impose multiple punishments for the same conduct is "clear from the face of the statute or the legislative history," the double jeopardy and multiplicity inquiry is concluded, and any challenge to the imposition of such punishments based on those principles necessarily fails. *Garrett*, 471 U.S. at 779.

When reviewing the denial of a motion to dismiss an indictment, this Court reviews a district court's "conclusions of law *de novo* and . . . factual findings for clear error." *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013). Given that the issue of multiplicity was raised below, and because a double jeopardy challenge presents a question of law, this Court's review is *de novo. See United States v. Basciano*, 599 F.3d 184, 196 (2d Cir. 2010).

## C. Discussion

### 1. Count Three Qualifies as a Crime of Violence

On its face, the statute charged in Count Three, 18 U.S.C. § 2332f(a), has as an element the use of physical force against the person or property of another. Ullah's argument to the contrary is an exercise in legal imagination that is easily rejected.

Section 2332f criminalizes "bombings" of certain specified places, providing that:

> Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a

51

> place of public use, a state or government
> facility, a public transportation system,
> or an infrastructure facility—(A) with the
> intent to cause death or serious bodily in-
> jury, or (B) with the intent to cause ex-
> tensive destruction of such a place, facil-
> ity, or system, where such destruction re-
> sults in or is likely to result in major eco-
> nomic loss, [violates the statute].

18 U.S.C. § 2332f(a). The statute plainly contemplates
the use of physical force against the person or property
of another. *See* 18 U.S.C. § 2332f(e) (defining "place of
public use," "state or government facility," "public
transportation system," and "infrastructure facility").
This distinguishes Section 2332f from the arson stat-
ute charged in Count Four, 18 U.S.C. § 844(i), which
Ullah cites as purportedly analogous (Br.63), but
which applies, in contrast to Section 2332f(a), to the
use of force against "any" property, including property
that is exclusively one's own. *See* 18 U.S.C. § 844(i)
(prohibiting use of fire or explosive to damage or de-
stroy "any . . . property used in interstate or foreign
commerce").

Any suggestion that Section 2332f could be applied
to a place of public use, government facility, transpor-
tation system, or infrastructure facility that is exclu-
sively the defendant's own property is purely theoreti-
cal. The Government is not aware of a single case, and
Ullah cites none, involving the application of Section
2332f to the bombing of the defendant's property.
Moreover, the statute's *mens rea* requirements make
it virtually inconceivable, and certainly not a "realistic

52

probability," *Hill*, 890 F.3d at 56, that a person could violate Section 2332f by bombing his own property without also exerting force against the person or property of another. *See* 18 U.S.C. § 2332f(a) (requiring intent to cause "death or serious bodily injury" or "extensive destruction" resulting in "major economic loss").

Ullah's reliance on the hypothetical scenario of a defendant who blows himself up in a public space like the National Mall intending to harm only himself misses the mark entirely. A person who detonates a bomb in such a place, whether intending to harm himself and/or others, necessarily uses force against the property of another. Indeed, the bombing at issue in this case is instructive. At trial, the defense suggested that Ullah intended to harm only himself when he detonated his bomb in the 42nd Street Station. But even if that were true—which it is not, as the evidence established and the jury's verdict confirmed—Ullah's actions, which caused an explosion in the tunnel, clearly involved the use of force against property (a subway station) of another (the city of New York).

Most fundamentally, even to the extent the defense's hypothetical scenario could be construed as describing conduct falling outside the elements clause, the application of Section 2332f to such conduct is not only farfetched but, as far as the Government is aware, would be wholly unprecedented. (*See* A.1310 (District Court concluding that "there is no reason whatsoever to believe that any person ever has been or would be charged with a violation of § 2332f(a) for [such conduct]")). The categorical approach "'requires more than the application of legal imagination to [the] . . .

53

statute's language.'" *Hill*, 890 F.3d at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). There must instead be "a realistic probability, not a theoretical possibility," that the statute could be applied to conduct that does not qualify under the elements clause, which means that "a defendant must at least point to his own case or other cases in which the . . . courts in fact did apply the statute in the . . . manner for which he argues." *Id.*

Ullah utterly fails to make any such showing here. He does not point to a single case, and the Government is aware of none, where Section 2332f was charged based on conduct intended to harm only the defendant. Section 2332f is a statute historically used in cases involving terrorist attacks, acts of violence resulting in mass casualties and destruction. *See, e.g.*, *United States v. Tsarnaev*, No. 13 Cr. 10200 (GAO) (D. Mass.) (Boston Marathon bombings); *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) (bombings in Chelsea neighborhood of New York City). Perhaps tellingly, during the pretrial phase, the defense initially conceded that Count Three qualifies as a crime of violence under the elements clause (*see* Dkt.31 at 3-4), before later reversing course. Judge Sullivan was manifestly correct, in denying Ullah's Rule 29 motion, to conclude that Count Three clearly qualifies as a crime of violence under the elements clause. (*See* A.1310 ("Defendant's theory here amounts to little more than an exercise of legal imagination, and need not be seriously entertained.")); *see also United States v. Tsarnaev*, 157 F. Supp. 3d 57, 75-79 (D. Mass. 2016) (holding that Section 2332f qualifies as a crime of violence under the elements clause and rejecting defendant's

54

argument to the contrary as "a mix of ingenuity and sophistry").

## 2. Count Five Qualifies as a Crime of Violence

Because Count Three is a valid predicate for Count Six, the Court need not reach whether the Section 1992 offense charged in Count Five also qualifies as a crime of violence. In any event, it does. Ullah's conviction under Section 1992(a)(7) qualifies as a crime of violence, and Ullah barely musters any argument to the contrary.

*First*, Ullah contends, as he did below, that (a)(7) is not a crime of violence under the elements clause because it can be violated through an "act of omission," which "does not qualify as the use of force." (Br.67-68). But as Ullah concedes, this Court's recent *en banc* decision in *United States v. Scott*, 990 F.3d 94 (2d Cir. 2021), which held that an act of omission can involve the use of physical force required by analogous elements clause provisions of the Armed Career Criminal Act and the career offender guideline, forecloses his argument. (Br.68).

*Second*, similar to his meritless hypothetical argument regarding Count Three, Ullah engages in another "exercise of legal imagination," arguing that (a)(7) is not a crime of violence because it theoretically could apply to a "defendant who attempts to kill himself in a subway or train station," without exerting any force against the person or property of another. (Br.66-67). Perhaps revealingly, when Ullah argued in his Rule 29 motion that (a)(7) does not qualify as a crime of violence under the elements clause, he relied solely

55

on his "act of omission" argument—which had not yet been foreclosed by *Scott*—and did not even attempt to advance this hypothetical claim. (A.1236-39). In any event, the argument is easily rejected. The application of (a)(7) to a person who commits an act on a subway or in a train station with intent only to injure himself —for example, a suicide by stabbing or jumping onto the tracks—is merely "theoretical" not "realistic," and nothing more than a "flight[ ] of fancy." *See Hill*, 890 F.3d at 56. Section 1992 criminalizes "[t]errorist attacks and other acts of violence against railroad carriers and against mass transportation systems." The Government is unaware of any case, and Ullah cites none, in which the statute has been applied to conduct intended to injure only the perpetrator, nor is there any reason to think the statute ever would be applied to such conduct.[3]

Accordingly, both Counts Three and Five qualify as predicate crimes of violence for Section 924(c) under the elements clause, and Ullah's conviction on Count Six is valid.

---

[3] Because a violation of Section 1992(a)(7) qualifies as a crime of violence, the Government is not relying in this appeal on Section 1992(a)(2) as a predicate. Accordingly, the Court need not address whether a violation of Section 1992(a)(2) qualifies as a crime of violence after *Borden v. United States*, 141 S. Ct. 1817 (2021) (holding that an offense that may be committed with a *mens rea* of ordinary recklessness does not satisfy the Armed Career Criminal Act's elements clause).

56

### 3. An Attempt to Commit the Offenses Charged in Counts Three and Five Qualifies as a Crime of Violence

Ullah next challenges his Section 924(c) conviction on the ground that the jury's verdict on Counts Three and Five could have been based on a finding that Ullah merely attempted to commit the charged crimes, and an attempt to violate Section 2332f(a) or Section 1992(a)(7) does not qualify as a crime of violence under the elements clause. (Br.70-73). This argument fails. Consistent with a straightforward reading of the elements clause and this Court's precedent, an attempt to commit a crime of violence necessarily has as an element the attempted use of physical force, and itself qualifies as a crime of violence. Therefore, even if the jury convicted Ullah only of attempting to violate Sections 2332f(a) and 1992(a)(7)—which, as discussed above, are crimes of violence under the elements clause—his Section 924(c) conviction was necessarily predicated on a valid crime of violence.

This Court recently held that "Hobbs Act attempted robbery qualifies as a crime of violence under § 924(c) because an attempt to commit Hobbs Act robbery using force necessarily involves the 'attempted use . . . of force' under § 924(c)(3)(A)." *United States v. McCoy*, 995 F.3d 32, 57 (2d Cir. 2021); *accord Savoca v. United States*, — F.4th —, 2021 WL 6131165, at *3 (2d Cir. 2021); *United States v. Eldridge*, 2 F.4th 27, 35-36 (2d Cir. 2021).[4] As the Court explained, the

_____

[4] Four of the other five circuit courts to consider the issue have squarely held that attempted Hobbs Act

57

federal definition of "attempt" had "long been settled" when the relevant language of the elements clause was enacted in 1986. *McCoy*, 995 F.3d at 55 (describing attempt requirements of "intent to commit the crime" and "conduct amounting to a substantial step towards commission of the crime"). Thus, "when Congress used 'attempted use' in § 924(c) without providing a different definition for the phrase, it adopted the concept of 'attempt' existing under federal law." *Id.* Under the federal law of attempt, any attempt to commit a crime of violence "necessarily require[s] (a) an intent to complete the substantive crime (including an intent to use physical force) and (b) a substantial step towards completing the crime (which logically means a substantial step towards completion of all of that crime's elements, including the use of physical force)." *Id.* Accordingly, "for substantive crimes of violence that include the use of physical force as an element, defendants also commit crimes of violence when commission of those crimes is attempted." *Id.*

Under these principles, an attempt to commit each crime of violence charged in Counts Three and Five itself qualifies as a crime of violence within the meaning of the elements clause. Taking a substantial step

———————

robbery is a crime of violence within the meaning of the elements clause. *See McCoy*, 995 F.3d at 56 (discussing cases). The Supreme Court has granted *certiorari* to review the question. *United States v. Taylor*, 141 S. Ct. 2882 (2021); *see also United States v. Waite*, 12 F.4th 204, 212 n.7 (2d Cir. 2021) (noting pendency of *Taylor* while holding that *McCoy* remains binding).

58

toward committing the physical acts of force proscribed by Sections 2332f(a) and 1992(a)(7) with the requisite intent—bombing a place of public use with the intent to cause death, serious bodily injury, or extensive destruction, and committing an act in a mass transit system with the intent to kill or seriously injure others—necessarily requires that Ullah attempted to use force against the person or property of another. (*See* A.1310-12 (District Court holding that an attempt to violate Section 2332f(a) constitutes a crime of violence)). Ullah's primary argument to the contrary, that a defendant could take a substantial step toward commission of those offenses—such as downloading bombmaking instructions, collecting supplies, or conducting surveillance—that does not itself involve the use of physical force (Br.72-73), was squarely considered and rejected in *McCoy*: "even if a defendant's substantial step does not itself involve the use of physical force, a defendant must necessarily intend to use physical force and take a substantial step towards using physical force, which constitutes 'attempted . . . use of physical force' within the meaning of § 924(c)(3)(A)." 995 F.3d at 56. For the foregoing reasons, even if the jury convicted Ullah of Counts Three and Five on an attempt theory, those convictions are valid predicate crimes of violence for Count Six.

### 4. Count Six Is Not Multiplicitous with Counts Three and Five

Finally, Ullah challenges his conviction on Count Six on the ground that it is "multiplicitous" with Counts Three and Five. (Br.68-70). This argument sounding in double jeopardy is without merit.

59

Congress has unambiguously authorized multiple punishments for conduct that both violates Section 924(c) and constitutes the underlying crime of violence. And in any event, the argument also fails because neither Count Three nor Count Five is the same offense as Section 924(c) under the *Blockburger* test.

The text and history of Section 924(c) make clear Congress's intent to impose separate punishments for the Section 924(c) violation and the predicate crime of violence, regardless of whether those charges rest on the same conduct. On its face, Section 924(c) provides that whoever violates the statute in connection with "*any* crime of violence" must receive a consecutive term of imprisonment for the Section 924(c) violation "in addition to the punishment provided for such crime of violence," 18 U.S.C. § 924(c)(1)(A) (emphasis added), and that the prison term imposed for the Section 924(c) violation may not run concurrently with "any term of imprisonment imposed for the crime of violence," *id.* § 924(c)(1)(D)(ii). When Congress amended Section 924(c) in 1984, the Senate Judiciary Committee expressly stated that Section 924(c) was intended "to ensure that *all persons who commit Federal crimes of violence* . . . receive a mandatory sentence, without the possibility of the sentence being made to run concurrently with that for the underlying offense." S. Rep. No. 98-225, at 313 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3491 (emphasis added). Accordingly, this Court has concluded that Section 924(c) "was intended to impose an additional, consecutive sentence upon a defendant who commits *any* federal crime of violence while using or carrying a firearm." *Mohammed*, 27 F.3d at 819 (rejecting similar double-

60

jeopardy challenge to Section 924(c) charge predicated on carjacking offense) (emphasis in original); *accord United States v. Salameh*, 261 F.3d 271, 277-78 (2d Cir. 2001) (rejecting similar double-jeopardy challenge as "foreclosed by a clear act of Congress").

This Court's decision in *United States v. Khalil*, 214 F.3d 111 (2d Cir. 2000), is particularly instructive. There, the Court rejected the argument, parallel to Ullah's here, that a conviction under Section 924(c) violated double jeopardy because it was based on the same conduct underlying the predicate crime of violence—use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a. *See Khalil*, 214 F.3d at 117-21. The Court reiterated the core principles that doom Ullah's argument: "[S]imply because two criminal statutes may be construed to proscribe the same conduct . . . does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes," and "[w]here . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the same conduct under *Blockburger* . . . the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Id.* at 118-19 (quoting *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983)). Applying these principles, the Court unambiguously held that the plain language of Section 924(c) reflected "explicit congressional directives" and left "no doubt" that the statute establishes an "offense that is distinct from the underlying crime of violence." *Id.* at 120. *Khalil*, *Mohammed*, and *Salameh* squarely apply here and compel rejection of Ullah's argument. *See*

61

*also, e.g.*, *United States v. Mathews*, 36 F.3d 821, 823 (9th Cir. 1994) ("Congress intended to punish both the crime of violence effected by the use of the bomb under 18 U.S.C. § 844(i) and, cumulatively, to add the punishment for carrying the bomb in relation to this crime of violence" pursuant to Section 924(c)); *United States v. Rahimi*, 2017 U.S. Dist. LEXIS 96686, at *2 (S.D.N.Y. 2017) (citing *Khalil* and *Salameh* and rejecting nearly identical double-jeopardy challenge to Section 924(c) charge predicated on crimes of violence that included Section 2332f(a)).

Moreover, the underlying premise of Ullah's position does not withstand scrutiny. Each of the predicate crimes of violence charged in Counts Three and Five required the Government to prove elements beyond those required to establish the Section 924(c) violation charged in Count Six. For example, Count Three required proof that the bombing involved a "place of public use" or "public transportation system"; the intent to cause "death or serious bodily injury" or "extensive destruction . . . likely to result in major economic loss"; and the presence of certain additional circumstances, such as the "perpetrator is a national of another state." *See* 18 U.S.C. § 2332f(a), (b)(1). And Count Five required proof that Ullah's bombing involved the "intent to cause death or serious bodily injury" and a victim located on specified types of property relating to mass transportation. *See* 18 U.S.C. § 1992(a)(7). Count Six, in turn, charged Ullah with possessing, carrying, and using a destructive device in connection with the distinct activities alleged in those underlying crimes of violence. *Cf. Salameh*, 261 F.3d at 279 (noting "the separate, and separately culpable, nature of defendants'

62

use and carriage of the bomb"); *Mathews*, 36 F.3d at 823 ("[The defendant's] action in transporting . . . the bomb to the alley where it was placed is the fact which makes him liable under 18 U.S.C. § 924(c) [and] [i]t is a fact distinct from use of the bomb which makes him liable under 18 U.S.C. § 844(i)."). Furthermore, the relevant weapon covered by each offense represents a different element. *See* 18 U.S.C. §§ 924(c)(1)(B)(ii) ("destructive device"), 1992(a)(7) ("dangerous weapon"), 2332f(a)(1) ("explosive or other lethal device"). Accordingly, in addition to being legally untenable in the face of this Court's decisions discussed above, the premise of Ullah's position also is baseless. (*See* A.107-08 (District Court denying Ullah's double-jeopardy challenge to Count Six, concluding that the charged predicate crimes of violence constituted distinct offenses)). Ullah's challenges to Count Six fail.

### POINT IV

### Ullah's Sentence Was Procedurally and Substantively Reasonable

Ullah's sentence was both procedurally and substantively reasonable. Ullah claims that the District Court's Guidelines calculation was incorrect, that the sentence was based on erroneous factual findings, and that life imprisonment was unreasonable. (Br.73-81). The arguments are meritless. As to the Guidelines, Judge Sullivan correctly held that the so-called "terrorism enhancement" applied and that Ullah was not entitled to an offense-level reduction for acceptance of responsibility. Judge Sullivan's factual findings were firmly rooted in the trial record, and his decision to

63

sentence Ullah to a Guidelines term of life imprison-
ment for carrying out a terrorist bombing for ISIS was
appropriate and certainly not an abuse of discretion.

## A.   Relevant Facts

On February 5, 2019, the Probation Office issued
the Presentence Report in connection with Ullah's sen-
tencing. The Presentence Report detailed Ullah's rad-
icalization, meticulous planning of the attack, execu-
tion of the bombing, and chilling statements after the
blast. (PSR ¶¶ 11-17). The Probation Office calculated
that the applicable Guidelines offense level was 54—
11 levels higher than the maximum offense level in the
Guidelines Sentencing Table—and that the applicable
Guidelines sentence therefore was life imprisonment,
plus the mandatory consecutive term of 30 years on
Count Six. (PSR ¶¶ 23-34, 67). The Probation Office's
calculation included a 12-level increase pursuant to
U.S.S.G. § 3A1.4(a), because the offense conduct in-
volved, or was intended to promote, a federal crime of
terrorism (the "Terrorism Enhancement"). (PSR ¶ 28).
The Probation Office also concluded that a reduction
for acceptance of responsibility under U.S.S.G. § 3E1.1
was not warranted. (PSR ¶ 33).

The Probation Office recommended a Guidelines
sentence of life plus 30 years. (PSR at 20). In reaching
its recommendation, the Probation Office cited, among
other facts, that Ullah "filled [the bomb] with metal
screws—not necessary for the bomb to function—in or-
der to inflict maximum damage," and that Ullah
"chose a busy weekday morning to detonate it in an
attempt to harm as many people as possible." (PSR at

64

21). The Probation Office determined that, in light of
the exceptionally serious and depraved nature of Ul-
lah's terrorist bombing, a sentence of life in prison
"could not be more suitable for Ullah's offense." (PSR
at 21). The Probation Office further stated, in support
of its recommendation: "Ullah was willing to give his
life for his radical beliefs. We believe it is justified that
he gives his freedom instead." (PSR at 21).

In his sentencing submission, Ullah asked the Dis-
trict Court to impose the statutory minimum sentence
of 35 years' imprisonment, claiming that his bombing
was merely a suicide attempt, reflecting his "deep de-
pression." (A.1314-19). With respect to the Guidelines
calculation, Ullah argued that the Terrorism Enhance-
ment did not apply, and that he was entitled to a re-
duction for acceptance of responsibility notwithstand-
ing having proceeded to trial. (A.1320-24). In response,
the Government argued in its submission that the Pro-
bation Office had correctly calculated the Guidelines,
and that the 18 U.S.C. § 3553(a) factors strongly sup-
ported the imposition of a Guidelines sentence.
(Dkt.108).

Ullah appeared before Judge Sullivan for sentenc-
ing on April 22, 2021. (A.1375-1419). Judge Sullivan
began by calculating the applicable Guidelines, finding
that the Terrorism Enhancement applied and that Ul-
lah was not entitled to a reduction for acceptance of
responsibility. (A.1381-88). After hearing from the
Government, defense counsel, and Ullah, Judge Sulli-
van imposed a Guidelines sentence of life plus 30
years. (A.1388-1414). Judge Sullivan explained his
sentence with reference to the Section 3553(a) factors,

65

concluding that Ullah's terrorist attack was "truly heinous," an "evil" act that was "about as serious a crime as there is," and necessitated a Guidelines sentence. (A.1408-14).

## B. Applicable Law

This Court reviews sentencing determinations for both substantive and procedural reasonableness. *See United States v. Crosby*, 397 F.3d 103, 114-15 (2d Cir. 2005). With respect to procedural reasonableness, "[a] district court commits procedural error where it fails to calculate the Guidelines range . . . makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory. It also errs procedurally if it does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc); *see United States v. Legros*, 529 F.3d 470, 474 (2d Cir. 2008) (this Court's sentencing review "incorporates *de novo* review of questions of law (including interpretation of the Guidelines) and clear-error review of questions of fact").

This Court's "review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). Indeed, this Court will set aside a district court's decision on the ground of substantive unreasonableness "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Cavera*, 550 F.3d at 189. In reviewing sentences, this Court does "not substitute [its] own judgment for the district court's on the question of what is

66

sufficient to meet the § 3553(a) considerations in any particular case," *id.*, and does "not second guess the weight (or lack thereof) that the judge accorded to a given [Section 3553(a)] factor or to a specific argument made pursuant to that factor," *United States v. Pope*, 554 F.3d 240, 247 (2d Cir. 2009).

## C. Discussion

### 1. The Sentence Was Procedurally Reasonable

#### a. The Terrorism Enhancement Applies

The District Court was plainly correct in concluding that the Terrorism Enhancement applies in this case, which involves a bombing attack on behalf of a foreign terrorist organization. In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that defendants convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Mumuni*, 946 F.3d 97, 112 & n.64 (2d Cir. 2019) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting enhancement set forth in U.S.S.G. § 3A1.4(a), which increases the applicable offense level by 12 and places the defendant in criminal history category VI, reflects Congress's intent that defendants convicted of terrorism offenses serve sentences that are appropriate in light of their uniquely dangerous crimes and risk of recidivism.

67

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*United States v. Stewart*, 590 F.3d 93, 172-73 (2d Cir. 2009) (Walker, J., concurring in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Caesar*, 10 F.4th 66, 79 (2d Cir. 2021).

The Terrorism Enhancement applies when the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). The term "federal crime of terrorism" means an offense that is a violation of an enumerated statute and was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *see* U.S.S.G. § 3A1.4 comment. (n.1).

Here, there is no dispute that Ullah was convicted of violating multiple statutes enumerated in Section 2332b(g)(5)(B), and the trial record clearly established the other prong of the definition. The jury convicted Ullah of providing material support to ISIS, and as Dr. Zelin explained, ISIS's mission is squarely directed at impacting the conduct of governments, including through violence, intimidation, and coercion, both in

68

the Middle East and the West. (A.512). Thus, the fact that Ullah served ISIS and its cause, by answering the group's call to carry out a lone-wolf terrorist attack in its name, firmly supported application of the Terrorism Enhancement. Furthermore, the trial evidence demonstrated not only that Ullah sought to advance ISIS's agenda in a general sense, but also that his attack was specifically calculated to impact U.S. foreign policy, and to intimidate and retaliate against the U.S. government. For example, Ullah told law enforcement that he was motivated by his anger at American foreign policy in the Middle East and the bombings of Muslims. (A.377). In the days leading up to the attack, Ullah was inspired by the ISIS propaganda video Flames of War II, which shows U.S. military forces conducting operations in the Middle East and proclaims—against the backdrop of the U.S. Capitol—"die in your rage, America," a slogan that Ullah adopted and scrawled on multiple items recovered from his apartment. (A.594-95; PSR ¶ 16). And on the morning of the attack, Ullah posted the Facebook message referencing the then-President of the United States: "O Trump you fail to protect your nation. Baqiah." (GX 401). Ullah also proudly declared after the blast that he intended his attack to "terrorize" as many people as possible. (A.375). This record easily established that Ullah's crimes involved and were intended to promote federal crimes of terrorism within the meaning of U.S.S.G. § 3A1.4(a).

Nor does application of the Terrorism Enhancement result in any impermissible "double counting." (*See* Br.74-76). Contrary to Ullah's argument, the applicable base offense level specified in U.S.S.G.

69

§ 2M6.1(a)(1) does not fully account for the nature of and harm caused by Ullah's offenses absent application of the Terrorism Enhancement. *See United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000) ("Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines . . . . On the other hand, multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct."). Among other things, the Terrorism Enhancement, unlike § 2M6.1, depends on the offense being calculated to impact government conduct through intimidation or coercion, or to retaliate against government conduct—which, as discussed above, was a core driving component of Ullah's attack in this case. *See Suarez*, 893 F.3d at 1337 (relying on *Volpe* to hold that § 2M6.1 and § 3A1.4 "serve different sentencing considerations" that "account for different harms").

Ullah cites no authority supporting his claim that applying the Terrorism Enhancement constitutes impermissible double counting if the base offense level is determined pursuant to § 2M6.1(a)(1), and quite the contrary, the Terrorism Enhancement has been consistently applied in terrorist attack-related cases where § 2M6.1(a)(1) supplied the applicable base offense level. *See, e.g.*, *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.), Dkt.205 (terrorist bombing in Chelsea neighborhood of Manhattan); *United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.), Dkt.131 (thwarted plot to bomb New York City subway system on behalf of ISIS); *United States v. Sayoc*, No.

70

18 Cr. 820 (JSR) (S.D.N.Y.), Dkt.41 (mailings of pipe bombs to political and media targets); *see also United States v. Cromitie*, 2011 WL 2693293, at *5 (S.D.N.Y. 2011) (holding that "application of the terrorism enhancement is not impermissible 'double counting' when the base offense level is calculated using § 2M6.1(a)(1)"). Thus, as Judge Sullivan correctly concluded, Ullah's double-counting argument fails. (A.1385-86 (finding that "there is not complete overlap" between § 2M6.1(a)(1) and the Terrorism Enhancement)). The Terrorism Enhancement plainly applies in this case.

### b. Ullah Was Not Entitled to a Reduction for Acceptance of Responsibility

Ullah next claims that Judge Sullivan erred in denying him an offense-level reduction for acceptance of responsibility. (Br.76-77). The argument is easily rejected.

The adjustment for acceptance of responsibility set forth in U.S.S.G. § 3E1.1(a) "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *United States v. Paredes-Batista*, 140 F.3d 367, 379 (2d Cir. 1998) (quoting U.S.S.G. § 3E1.1, comment. (n.2)). "[I]n 'rare situations' such as 'where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt,' a defendant may be entitled to the reduction." *United States v. Sewell*, 252 F.3d 647, 652 (2d Cir. 2001) (quoting

71

U.S.S.G. § 3E1.1, comment. (n.2)); *see Paredes-Batista*, 140 F.3d at 380 (whether defendant is entitled to reduction for acceptance of responsibility is predominantly factual determination within district court's discretion and "entitled to great deference on review," and will not be disturbed unless it is "without foundation").

As Judge Sullivan recognized, this case was not one of those "rare situations." (A.1386-87). Ullah did not proceed to trial merely to preserve issues unrelated to factual guilt. He contested his factual guilt in numerous respects, perhaps most notably by arguing that the bombing was not a terrorist attack at all and was unrelated to ISIS, such that he was not guilty of the charged terrorism crimes. Indeed, the defense summation was rife with arguments contesting guilt that underscored the inappropriateness of any reduction for acceptance of responsibility. (*E.g.*, A.999, 1001 (arguing that "[t]his is not a terrorist attack"; "[t]his act is not about ISIS"; and Ullah "never intended to harm or to hurt anyone else")); *see United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013) (rejecting argument that defendant "contested only legal conclusions and not any underlying facts" where defense theory at trial was that defendant lacked requisite intent). Moreover, Ullah filed post-trial motions challenging the sufficiency of the evidence on multiple counts of conviction, including Count One, claiming that he did not provide material support to ISIS, and he continues to advance sufficiency challenges on appeal. *See United States v. Cruz*, 446 F. App'x 344, 346 (2d Cir. 2011) (affirming denial of adjustment for acceptance of responsibility where "[e]ven on appeal, [defendant] continues to

72

maintain that there was insufficient evidence to support his guilt").

Not surprisingly, Ullah does not cite any case even remotely supporting application of the reduction under the circumstances here. As Judge Sullivan found, awarding the reduction to Ullah would "turn the notion of acceptance of responsibility on its head," and Ullah did not "come[] close" to warranting the adjustment. (A.1386-87). In short, Ullah carried out a terrorist bombing, proceeded to trial, contested his factual guilt, and challenged the sufficiency of the evidence against him post-trial. A reduction under § 3E1.1 was entirely unwarranted. Accordingly, Ullah's challenges to the District Court's Guidelines calculation are without merit.

\*       \*       \*

Even if Judge Sullivan committed error in calculating the Guidelines, it was harmless because "the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Ulbricht*, 858 F.3d 71, 124 (2d Cir. 2017). When he announced his Guidelines calculation, Judge Sullivan observed that he "d[id]n't think it will really matter for purposes of sentencing today." (A.1387). Then, when imposing sentence, Judge Sullivan discussed at length the Section 3553(a) factors that supported a term of life imprisonment before explicitly stating that life in prison was "the only appropriate sentence whatever the guidelines are." (A.1414). Thus, any Guidelines error was harmless.

73

### c.  The District Court's Factual Findings Were Not Clearly Erroneous

Ullah takes issue with two statements made by the District Court at sentencing: that Ullah carried out his bombing "for the purpose of killing indiscriminately men, women and children, of maiming and injuring others, of spreading terror and fear even wider," and that Ullah aimed "to kill as many people as [he] could." (Br.77-78 (quoting A.1410-11)). But the record amply supported both findings.

As the evidence at trial established, Ullah carried out his bombing in direct response to ISIS's instruction to followers to attack and kill innocent American civilians. (*E.g.*, A.375-76). Critically, Ullah packed his pipe bomb with metal screws. The FBI explosives expert explained that the screws were completely unnecessary to make the bomb explode, and instead functioned as an "enhancement" designed to increase "lethality." (A.757). There is simply no explanation for why Ullah filled his bomb with screws other than that he wanted to injure and kill as many other people as possible. The FBI expert further testified, contrary to Ullah's unsupported assertions (*see* Br.78), that Ullah's pipe bomb was fully capable of killing people, both from the force of the explosion and the shrapnel that it sprayed. (A.769). Further, Ullah carried out his attack during rush hour, in a crowded subway tunnel. By choosing to detonate the IED in that space, Ullah increased the power and force of the explosion. (A.764-65). And after the attack, Ullah declared to law enforcement that he carried out the bombing to send a message "on behalf of the Islamic State"; that he chose the time and

74

location for the attack because "there would be more people to terrorize"; and that he filled the bomb with screws to "inflict maximum damage." (A.375-76, 380-81). Indeed, the *undisputed* recitation of the offense conduct in the Presentence Report stated, among other things, that Ullah "chose[ ] a busy weekday morning for his attack in order to terrorize as many people as possible," and "[t]o that end, Ullah had filled the pipe bomb . . . with metal screws, which he believed would cause maximum damage; they were not necessary for the pipe bomb to function." (PSR ¶ 14).

Moreover, several of the offenses of conviction required the jury to make findings utterly inconsistent with the defense's claim at trial that Ullah's attack was merely a suicide attempt. For example, Count Two required the jury to find that Ullah used or attempted to use a weapon of mass destruction against people or property (A.1078); Count Three required the jury to find that Ullah carried out his bombing intending to cause death, serious bodily injury, or extensive destruction (A.1082); Count Four required the jury to find that Ullah acted maliciously (A.1086-88); and Count Five required the jury to find that Ullah acted with the intent to cause death or serious bodily injury (A.1092-93).

Ultimately, Ullah's alternative explanation for what was quite clearly an attack intended to kill and terrorize—that he was merely trying to harm himself —is simply untethered to the reality of what actually happened on December 11, 2017. His continued attempt to minimize his actions is utterly inconsistent with the evidence at trial and the jury's verdict. The

75

District Court's factual findings were manifestly correct, and certainly not clearly erroneous.

### 2. The Sentence Was Substantively Reasonable

The sentence imposed was entirely justified and well within the District Court's discretion. Judge Sullivan's sentence was carefully considered and well-reasoned, and was the sentence called for by the Guidelines. *See United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006) (Guidelines sentence reasonable in "overwhelming majority of cases"). Ullah's substantive reasonableness challenge to his sentence is meritless.

Ullah principally argues that his sentence is unreasonably long because all he did was "attempt[ ] suicide." (Br.80). But as discussed above, the trial evidence and jury's verdict eviscerated that claim, and Judge Sullivan was well within his discretion to reject it. The remainder of Ullah's conclusory challenge to the length of his sentence consists primarily of the generalized contention that life sentences are rare. (*See* Br.79-80). But so are terrorist bombings. Ullah is responsible for planning and perpetrating one of the very few consummated terrorist attacks in New York City since 9/11. The Section 3553(a) factors overwhelmingly supported the imposition of a Guidelines sentence. Judge Sullivan thoughtfully and thoroughly considered those factors, and quite reasonably concluded that the depraved nature and extreme seriousness of Ullah's premeditated attack—which injured multiple victims, terrorized countless others, and paralyzed midtown Manhattan—as well as the need to deter

76

other would-be ISIS bombers, compelled the imposition of a life sentence. (A.1408-14).

Ullah asserts, as he did below, that leniency was warranted because his bombing did not result in death. (Br.80). But it was nothing short of miraculous that Ullah did not succeed in killing or injuring more victims as he hoped and planned when he packed his bomb with screws and chose to detonate it in a crowded tunnel. It was entirely reasonable for Judge Sullivan to conclude that Ullah's failure to murder or more seriously injure his victims did not mitigate his conduct. (*See* A.1411 ("Now, you ultimately failed in the execution. You didn't execute this as well as you might have —thankfully—but it doesn't make you less culpable. It doesn't make your intent any less sinister or, frankly, evil."); *see also* PSR at 21 (stating, in support of recommendation for life sentence: "It was extremely fortunate that no deaths of innocent bystanders were caused by his actions, but the defendant should not be rewarded for his failure with anything less than a guideline sentence. Victims did suffer physical and emotional trauma from which they will likely never fully recover.")). Moreover, the imposition of a life sentence in this terrorist attack case was anything but disparate compared to other cases. The Government cited in its submission, and Judge Sullivan considered as part of his sentencing calculus, numerous examples of district courts in this Circuit and others imposing life sentences in terrorism cases where, as here, the defendant carried out an attack targeting Americans, or conspired or attempted to do so, but the plot ultimately was thwarted or unsuccessful in the sense that no one was killed, and life imprisonment therefore was

77

not mandatory. (*See* Dkt.108 at 40; A.1378); *see also, e.g.*, *United States v. Kadir*, 718 F.3d 115, 126 (2d Cir. 2013) (affirming life sentences for defendants convicted of conspiracy to attack JFK Airport).

In sum, there is simply no question that Judge Sullivan did not abuse his discretion in sentencing Ullah to life imprisonment. The imposition of a life sentence—the sentence called for by the Guidelines and recommended by the Probation Office—for an individual who carried out a terrorist bombing for ISIS in the heart of New York City was entirely reasonable. Ullah's substantive sentencing challenge is easily rejected.

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
          January 3, 2022

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the
                    Southern District of New York,
                    Attorney for the United States
                    of America.*

GEORGE D. TURNER,
REBEKAH DONALESKI,
WON S. SHIN,
    *Assistant United States Attorneys,
    Of Counsel.*

## CERTIFICATE OF COMPLIANCE

The Government has moved for leave to file an oversized brief of no more than 19,000 words. As measured by the word processing system used to prepare this brief, there are 18,933 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*