# 21-1058-cr

To be argued by:
**COLLEEN P. CASSIDY**

**United States Court of Appeals
for the Second Circuit**

Docket No. 21-1058-cr

UNITED STATES OF AMERICA,

Appellee,

-against-

AKAYED ULLAH,

Defendant-Appellant.

APPEAL FROM THE FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF FOR DEFENDANT-APPELLANT AKAYED ULLAH**

FEDERAL DEFENDERS OF NEW YORK, INC.
 APPEALS BUREAU
52 Duane Street – 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

Attorney for Defendant-Appellant
**AKAYED ULLAH**

**COLLEEN P. CASSIDY,**
 *Of counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION ..................................................................................................1

I. The government's "lone wolf" theory of material support is explicitly excluded by the statutory language of 18 U.S.C. § 2339B..........................2

II. The evidence was legally insufficient to prove guilt, and the indictment was constructively amended on the Count Five § 1992(a)(2) theory.......9

    A. The new theory was not charged in the indictment and was a quintessential constructive amendment ......................................................11

    B. In any event, Ullah boarding the subway carrying the unconnected device does not constitute "placement" under § 1992(a)(2)...................15

    C. The aggravated element of §1992(b) does not apply to § 1992(a)(7).....18

III. Ullah's conviction of 18 U.S.C. §924(c) should be vacated because neither Count Three nor Five qualifies as a "crime of violence"............23

    A. Count Three does not qualify. .................................................................24

    B. Count Five does not qualify ....................................................................26

    C. An attempt to commit either Count Three or Five is not a crime of violence under § 924(c).............................................................................28

IV. The extraordinary sentence of life plus 30 years for an offense that caused no serious physical injury except to Ullah himself was procedurally and substantively unreasonable. .........................................29

    A. The extraordinary sentence was based on the district court's factual statements about Ullah's conduct that were at odds with the record and clearly erroneous.............................................................................29

i

B. The district court incorrectly denied credit for acceptance of responsibility on the ground that Ullah went to trial. ............................32

C. Under the *Volpe* standard, the 12-level enhancement for a "federal crime of terrorism" should not apply on top of the base offense level for intent to aid a foreign terrorist organization ......................................34

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

***Cases***

*Borden v. United States,*
    141 S. Ct. 1817 (2021) ..................................................................................... 27

*Gonzalez v. Wilkinson,*
    990 F.3d 654 (8th Cir. 2021) ........................................................................... 26

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................................... 6, 8

*United States v. Bastian,*
    770 F.3d 212 (2d Cir. 2014) ................................................................... 11, 12, 13

*United States v. D'Amelio,*
    683 F.3d 412 (2d Cir. 2012) ....................................................................... 11, 13

*United States v. Davis,*
    139 S. Ct. 2319 (2019) ................................................................................ 24, 25

*United States v. Frank,*
    156 F.3d 332 (2d Cir. 1998) ............................................................................ 12

*United States v. Gaudin,*
    173 F.3d 798 (10th Cir. 1999) ......................................................................... 34

*United States v. Hill,*
    890 F.3d 51 (2d Cir. 2013) .......................................................................... 25, 26

*United States v. Jama,*
    217 F. Supp. 3d 882 (E.D. Va. 2016) ............................................................. 4, 8

*United States v. Leichtnam,*
948 F.2d 370 (7th Cir. 1991) .......................................................................12

*United States v. McCoy,*
995 F.3d 32 (2d Cir. 2021) ..........................................................................28

*United States v. Milstein,*
401 F.3d 53 (2d Cir. 2005) ..........................................................................11

*United States v. Pierson,*
925 F.3d 913 (7th Cir. 2019) .......................................................... 12, 13, 14

*United States v. Prawl,*
168 F.3d 622 (2d Cir. 1999) .........................................................................18

*United States v. Sabhnani,*
599 F. 3d 215 (2d Cir. 2010) ........................................................................34

*United States v. Taylor,*
141 S. Ct. 2882 (2021)...........................................................................28, 31

*United States v. Taylor,*
475 F.3d 65 (2007) ......................................................................................33

*United States v. Volpe,*
224 F.3d 72 (2d Cir. 2000) ..........................................................................34

*United States v. Zingaro,*
885 F.2d 94 (2d Cir. 1988) ..........................................................................12

*United States v.Zingaro,*
885 F.3d at 99.............................................................................................. 12

iv

*Statutes*

18 U.S.C. §924(c)............................................................................1, 23, 24, 28

18 U.S.C. § 1992 ..............................................................................1, 17, 24, 26

18 U.S.C. § 1992(a)(2)..............................................................1, 9, 15, 16, 17

18 U.S.C. § 1992(a)(7).......................................................................18, 19, 27

18 U.S.C. § 1992(b) .................................................................................19, 20

18 U.S.C. § 2332f(a) .........................................................................23, 24, 26

18 U.S.C. § 2332f(e)(2)..................................................................................24

18 U.S.C. § 2339A(b)(1) .................................................................................7

18 U.S.C. § 2339B............................................................................................2

18 U.S.C. § 2339B(h)...............................................................................2, 3, 4

## INTRODUCTION

This reply is submitted to respond to the government's arguments that: (1) the evidence was sufficient to prove the offense of material support to a foreign terrorist organization even though Ullah acted entirely on his own, with no communication or coordination with others; (2) Ullah's conviction under 18 U.S.C. § 1992, with the aggravating element for an offense against a subway car carrying employees or passengers, can stand even though Ullah detonated his device nowhere near a subway car but in a long tunnel connecting two stations; (3) the change in the theory of guilt under § 1992(a)(2) from the sole theory charged in the indictment that Ullah "placed" the device "in upon or near" a subway car by detonating the device in the tunnel to the theory that he "placed" a destructive on a subway car when he boarded the subway in Brooklyn carrying the unconnected device did not constructively amend the indictment; (4) Ullah's convictions on Counts Three and Five are "crime[s] of violence" under 18 U.S.C. § 924(c), triggering mandatory consecutive sentence of 30 years; and (5) the sentence of life plus 30 years was reasonable.

1

**I.**    **The government's "lone wolf" theory of material support is explicitly excluded by the statutory language of 18 U.S.C. § 2339B.**

The government contends that the evidence was sufficient to prove that Ullah provided "personnel" and "services" to ISIS because it proved that his act, while independent, was inspired by ISIS propaganda, that ISIS encourages such "lone wolf" attacks, that Ullah committed his act after watching such a propaganda video, and that he declared that he had done it for ISIS. G.Br. 20-22. The government argues that Ullah's lack of contact with a single member of ISIS "in no way precluded the jury from finding the nexus between his conduct and the terrorist group required by § 2339B." Ullah does not dispute that the evidence established the above facts and that there was a "nexus" between ISIS and Ullah's act. But a "nexus" is not sufficient. Those facts cannot establish that Ullah provided material support under the statute for the simple reason that the language of § 2339B explicitly excludes lone wolf acts from the definition of "personnel" and "services."

As shown in Ullah's opening brief, § 2339B(h) states: "no person shall be prosecuted under this section in connection with the term 'personnel'

2

unless that person has knowingly provided [or attempted or conspired to provide] a foreign terrorist organization with 1 more individuals (who may be or include himself) to work under that terrorist organization's direction or control to organize, manage, supervise, or otherwise direct the operation of that organization." Congress did not stop there. To make it absolutely clear that a lone wolf does not qualify, the statute further provides: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id.*

Despite this clear language, the government insists that the statute must cover lone wolf attacks because that is "how ISIS operates," by asking people to take independent action. G.Br. 23. It may well be that ISIS operates that way. Congress nevertheless intentionally and specifically excluded such acts from its definition of personnel. And the statute may not be rewritten just because the government or a court thinks such acts should be included. The only case the government cites for its claim that

3

§ 2339B(h) does not mean what it says is a district court decision from

Virginia that is entirely inapposite. G. Br. 22-23, quoting *United States v. Jama,* 217 F. Supp. 3d 882, 891-92 (E.D. Va. 2016). *Jama* did not address

§ 2339B(h) at all and did not involve a "lone wolf" or independent actor.

The government's quotes from that decision are taken out of context.

The issue in *Jama* was whether the defendant, who was part of a

group raising funds and supplies for a terrorist group, understood that the

support was for a foreign terrorist organization (FTO). A necessary

question was whether the group for whom the funds were raised was

actually part of the FTO. It was in answering this question that the district

judge said, "Congress plainly intended for courts to consider the nature of

an individual's actions broadly in determining whether someone is

deemed part of that organization," and "a person is deemed to be part of

an FTO if that person is engaged in significant activity on behalf of an FTO

relative to that FTO's goals and objectives." *Id.* at 891-92 This discussion, of

whether the evidence proved that the group receiving the support was a

part of the FTO, has no bearing on subsection (h)'s definition of

4

"personnel" and its specific exclusion of independent actors. There was no independent actor in *Jama*, only groups of people working together, and subsection (h) was not in issue.

Nor can the "attempt" theory circumvent the proscription of subsection (h). The government contends, as it did below, that Ullah's independent act was an attempt to "join" ISIS by killing himself and being considered a "martyr." G.Br. 23-25. This argument never made any sense because someone who tries to kill himself cannot be attempting to join the FTO to "work under [its] direction or control to organize, manage, supervise, or otherwise direct the operation of that organization," a necessary element of "personnel." There was no evidence that Ullah wanted to join ISIS. If he had, he could have reached out online to ISIS supporters, but he never did anything like that. Notwithstanding Dr. Zelin's testimony that ISIS sometimes claimed responsibility for attacks by supporters, there was no evidence that Ullah sought or wanted that. He acted alone and stated that he did it "on behalf of the Islamic State." At most, he tried to "advance its goals or objectives," exactly what "shall not

5

be considered to be working under the foreign terrorist organization's direction and control." *Id.* Prosecution for his attempted suicide to "advance its goals and objectives" is no less prohibited than a successful act.

The government contends that, personnel aside, the evidence was sufficient to prove that Ullah provided "services" under the statute and that the limitation of subsection (h) does not apply to "services." G.Br. 25. The problem with the government's argument is that the Supreme Court held that the same limitation applies to "services" in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010). The Supreme Court ruled that the same limitation applies to services, reasoning that "Congress would not have prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'" *Id.* The government tries to circumvent this holding by referring to *Holder*'s definition of a service as requiring "concerted activity," G.Br. 26, but this only proves Ullah's point. A service, like personnel, requires "concerted activity" and excludes action that is "entirely independent from the group." *Holder*, 561 U.S. at 23-24. *Holder*'s

6

further incorporation of the dictionary definition of service -- "'the performance of work commanded or paid for by another: a servant's duty; attendance on a superior'; or '*an act done for the benefit or at the command of another*'" *id.*, G. Br. 26 (emphasis in Government's brief) -- does not countermand its ruling that providing services requires concerted activity and may not be an independent act. The complete holding is that the subsection (h) exclusion does apply to services, as well as personnel, and that an act performed entirely independently to further the goals of the organization, without coordinated or concerted activity, is excluded from the statute.

It only makes sense that the same limitation must apply to "personnel" and "service" in a case, like this one, where the only service alleged to have been provided is "personnel" in the form of Ullah deflagrating the bomb on behalf of ISIS. In the statutory definition of material support, "personnel" is a kind of "service," one of many categories of service that include, *inter alia*, financial services, lodging, and training. 18 U.S.C. § 2339A(b)(1). "Material support" is defined as "any

7

property, tangible of intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." *Id.* As *Holder* reasoned, Congress could not have intended to bar prosecution of an independent actor for providing "personnel" only to allow the same prosecution as "services." They are one and the same: providing personnel *is* the service; so if a lone act cannot be personnel it is not a service either.

The government relies on the same out-of-context quotation from *Jama, see supra* at 4-5, to argue that the only required "nexus" for a "service" is that Ullah's act have been done in response to ISIS propaganda urging people to take action. G. Br. 27-28. The statute, however, does not require a mere "nexus" between the act and the FTO; it requires work performed "under that terrorist organization's direction or control to organize,

8

manage, supervise, or otherwise direct the operation of that organization"

and specifically excludes those "who act entirely independently" to

"advance its goals and objectives."

**II.    The evidence was legally insufficient to prove guilt, and the
indictment was constructively amended on the Count Five
§ 1992(a)(2) theory.**

The indictment charged Ullah with violating **§§** 1992(a)(2) and (b) by

detonating the pipe bomb in the tunnel of the Port Authority Bus Terminal

while subways were passing through the station. Subsection (a)(2)

prohibits unlawfully "plac[ing] . . . a destructive device in, upon, or near

railroad on- track equipment or a mass transportation vehicle." Subsection

(b) increases the maximum sentence to life for anyone who "commits an

offense under subsection (a) . . . in a circumstance in which . . . the railroad

on-track or mass transportation vehicle was carrying a passenger or

employee at the time of the offense." The indictment charged that Ullah

"placed" or "attempted to place" the destructive device "in, upon, and near

a mass transportation vehicle -- which was carrying passengers and

employees at the time of the offense -- with intent to endanger the safety of

9

persons, and with a reckless disregard for the safety of human life, . . . to wit, Ullah detonated and attempted to detonate an IEP in the vicinity of the Port Authority Bus Terminal which terminal was then in use by subway cars and buses that were carrying passengers and employees at the time of the offense." And the government's clear theory of guilt, as charged in the indictment, was that Ullah placed the bomb near a subway car when he deflagrated it in the tunnel at the Port Authority while cars were coming in and out of the station.

The only act described in the indictment was the detonation of the bomb. The indictment did not even mention Ullah's boarding the subway in Brooklyn while carrying the unconnected bomb. The government changed its theory only at the end of trial, after the evidence had shown that the bomb was deflagrated nowhere near a subway car and the district court stated that it would direct a verdict on subsection (a)(2). A. 881-91. The government then argued that the subsection (a)(2) crime was committed when Ullah boarded the subway in Brooklyn wearing the unconnected bomb. A. 883-86, 889-90, 921. It now argued that the

10

placement was not the detonation but Ullah himself boarding the subway while carrying the unconnected bomb on his body. Although the district court was surprised by this new theory, it charged the new theory to the jury over defense objections. This was a clear constructive amendment.

**A. The new theory was not charged in the indictment and was a quintessential constructive amendment.**

The government essentially argues that it does not matter what conduct was charged in the indictment so long as the uncharged, new theory could fit within the statutory language that is quoted in the indictment. G.Br. 38-40. It claims that the "core criminality" is the statutory language and that the government is not required to prove "the exact facts specified in the indictment." *Id*. 39-40. This is not the law, and neither of the two cases the government cites, *United States v. Bastian*, 770 F.3d 212, 221-22 (2d Cir. 2014); and *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012), supports this position.

It is settled law that a constructive amendment occurs where the facts proved at trial or the jury instructions, or both, "broaden the possible bases for conviction." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005);

11

*United States v. Zingaro*, 885 F.2d 94, 99 (2d Cir. 1988), and "allow the jury to convict for an offense outside the scope of the indictment." *United States v. Pierson*, 925 F.3d 913, 919-20 (7th Cir. 2019); *see also United States v. Leichtnam*, 948 F.2d 370, 380 (7th Cir. 1991) ("any broadening of the possible bases of conviction from those which appeared in the indictment . . . is fatal"). The conviction cannot stand if "the proof at trial or the trial court's jury instructions so altered an element of the charge that, upon review, it is uncertain whether the jury convicted of conduct that was the subject of the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998). Minor factual variations between the indictment and proof at trial can be tolerated, but the core criminal conduct charged in the indictment must be the same as that proven at trial and not "a functionally different crime." *United States v. Bastian*, 770 F.3d 212, 221(2d Cir. 2014); *Zingaro*, 885 F.3d at 99. *Bastian* and *D'Amelio* only reinforce this principle. *Bastian* concluded that the substitution of one firearm for another did raise constitutional concerns of constructive amendment but affirmed on plain error grounds because there was no objection. 770 F.3d at 223. *Accord,*

12

*Pierson*, 925 F.3d at 913 ( jury charge that allowed firearm conviction based on a different firearm than that charged in the indictment was constructive amendment, affirming on plain error grounds). *D'Amelio* allowed the minor variation in proof of use of the telephone rather than the Internet to commit the core crime alleged, reaffirming the principle that a change in proof cannot permit "conviction for a functionally different crime." 770 F.3d at 221.

In this case, the government changed its whole theory of how Ullah "placed" a bomb "in, upon , or near" a subway car that was carrying passengers. The only act alleged in the indictment to constitute this crime was his detonation of the bomb in the vicinity of the Port Authority. When the evidence failed to prove that -- because he detonated it far from any subway car -- it switched to the theory that he "placed" the bomb on the subway car when he boarded the subway in Brooklyn to ride to the Port Authority. The core criminal act was completely different.

The government contends there could be no notice issue because the facts of Ullah's travel on the subway to the Port Authority, although not

13

charged in the indictment, were proven at trial, disclosed in discovery, and mentioned in the government's opening. G.Br. 39. But constitutional protection from constructive amendment of the indictment is concerned not only with notice of the charges but also with the defendant's Fifth Amendment right to be charged by the grand jury and not with whatever the government comes up with at trial. *Pierson*, 925 F.3d at 919. Moreover, there was no notice, until the very end of trial, that this would be the government's theory. Everyone, including the court, was surprised by it. This is because it was not the government's theory until the original theory came up short in the proof. Ullah's boarding the train in Brooklyn was part of the background facts leading to the offense charged, not the offense itself. The mere fact that the conduct lurks somewhere in the evidence does not provide notice that this is the offense charged, where a different act was charged in the indictment. Similarly, a mere mention of these background facts in the government's opening statement did not constitute notice that the charged conduct had changed. To the contrary, the government's opening emphasized that the conduct charged was the

14

detonation *in* the Port Authority: "Four of the charges [Counts 2-5] relate to how and where the defendant committed this bombing." A. 179. Its reference to Ullah boarding the train was simply part of the story leading up to the act, like building the bomb, taping it on, and posting on Facebook.

**B.   In any event, Ullah boarding the subway carrying the unconnected device does not constitute "placement" under § 1992(a)(2).**

As argued in Ullah's opening brief, the crime of "placing" an explosive device "in, upon, or near" a subway car, proscribed in § 1992(a)(2), does not encompass carrying or transporting the device, but actually putting it somewhere to detonate. In a case like this, of attempted suicide, the device is "placed" where it is detonated. This was, indeed, the government's theory until the evidence proved that Ullah deflagrated the device so far from any subway cars that the court stated it would direct a verdict on subsection (a)(2).

The government incorrectly contends that Ullah argues that "placing" required Ullah to take off the bomb and set it down. G.Br. 36-37.

15

That is not and was never Ullah's argument. It is a straw man, a false argument that the government can call "illogical." *Id*. at 37. The defense agreed with the government that "placement" in this case of a suicide bomb would be detonation. However, the evidence proved that Ullah intentionally detonated the device in the tunnel between the stations and not "in, upon, or near" a subway car. So Ullah did not commit the offense charged in subsection (a)(2).

As argued in Ullah's opening brief at pp. 47-48, the ordinary meaning of "place" and the text of the statute make clear that it does not mean "carry" or "transport." The government does not dispute this. Instead, its claim that the device was "placed" on a subway car within the meaning of § 1992(a)(2) when Ullah boarded the subway wearing the unconnected device hangs entirely on its theory that "Ullah made himself a part of the bomb" and therefore when he got on the subway, he "placed" the bomb. G. Br. 36. The government's theory that Ullah was "part of the bomb" and "the switch" because he had to connect the wire to the battery to detonate is a semantic ploy that does not advance the argument that he placed the

16

bomb on the subway when he transported it. Someone who carries a bomb that must be connected to detonate is no different than someone who carries a gun that must be fired to shoot, and the government cannot explain why the former is a "part of" the weapon while the latter is not. G. Br. at 37.

The government's semantic theory is clearly at odds with legislative intent. Congress could have written §1992 to cover carrying or transporting a destructive device on a subway car. It did not. Instead, §1992 prohibits affirmative acts of violence -- "wrecks, derails, . . . sets fire to . . . places or releases hazardous materials," etc. -- not the mere carrying or transporting of a device. Specifically, § 1992(a)(2) prohibits placing a bomb in, upon, or near a subway car with intent to endanger people or reckless disregard for human life.

Finally, the district court not only accepted the government's eleventh-hour theory of placement, but delivered a one-sided charge that nudged the jury to convict. It charged the government's theory that Ullah "placed" the bomb on the subway when he boarded the subway in

17

Brooklyn, but it refused to charge the defense theory that this did not constitute "placement" of the bomb. As argued in the opening brief at pp. 56-57, the court's one-sided charge, explaining the government's theory but refusing to explain the defense theory, was unbalanced and violated the rule that, if requested, the court must instruct the jury on the theory of defense. *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999).

The government's only answer is that what constituted "placement" was a legal question, without citing any cases. G. Br. 41. But whether Ullah intentionally placed a bomb on a subway car carrying passengers was a factual issue for the jury. The defense theory was that Ullah did not place the bomb on a crowded subway car, but deliberately detonated it in an uncrowded part of a tunnel, far from subway cars, in order to kill himself in a public way. The district court's ruling that this was improper legal argument and its refusal to charge this theory was legal error.

C.   **The aggravated element of § 1992(b) does not apply to § 1992(a)(7).**

Ullah's sentence for violating § 1992 was increased dramatically based on his conviction of the aggravating element of subsection (b) that

increases the maximum sentence from 20 years to life for "whoever commits an offense under subsection (a) in a circumstance in which the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense." 18 U.S.C. § 1992(b)(1). Ullah was convicted under two alternative subsections of § 1991(a)(2) and (7). As argued *supra*, in III, the conviction under § (a)(2) cannot stand because (1) the government's theory that he "placed" the device on the subway when he boarded it to transport the unconnected device constructively amended the indictment, and (2) this placement theory does not fit the definition of the offense and is insufficient as a matter of law. Subsection (a)(2) punishes one who attacks a train or subway car with a destructive device; subsection (b) increases the punishment if the car is carrying a passenger or employee. Ullah did not place the device on a subway car, but detonated it in the tunnel.

The only theory of guilt under § 1992(a) for which the evidence was legally sufficient is the subsection (7) theory, which proscribes "any act, including the use of a dangerous weapon, with the intent to cause death or

19

serious bodily injury to any person" who is in "a garage, terminal, structure, track, . . . or facility used in the operation of, or support of the operation of a mass transportation vehicle." For the reasons stated in Ullah's opening brief at pp. 57-61, this aggravator does not apply to subsection (7) as a matter of plain text: (a)(7) prohibits any act with intent to cause death or serious bodily injury to a person in a terminal or station, not an attack on railroad on-track equipment or mass transportation vehicle, so it involves no vehicle that is "*the* railroad on-track equipment or mass transportation vehicle" that could be carrying a passenger. (Emphasis added.)

The government's only argument against the plain reading of the statute -- i.e., that it only applies to the offenses in (a) that involve an attack on a subway car or vehicle -- is that subsection (b) begins with "whoever commits an offense under subsection (a)" and that this must mean every single subsection of (a). But this is immediately followed in § (b)(1) by "in a circumstance in which *the* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of

20

the offense" (emphasis added), thus narrowing its application to those violations in (a) that involve "the railroad on-track equipment or mass transportation vehicle."

The government's argument hangs on the notion that (b) applies to *every* offense in (a) -- despite its textual reference only to offenses against vehicles carrying people -- and even though the statute does not include "every offense" or even "any offense" "under subsection (a)," but only those committed in a circumstance in which "*the*" vehicle was carrying passengers. The government's reading of the statute requires the Court to read in the word "any" and read out the limiting circumstance. The government appears to recognize at least the limiting circumstance when it states: "The plain language of subsection (b)(1) makes clear on its face that the aggravating provision applies to every offense listed in subsection (a), so long as the commission of the offense in a particular case involves a mass transportation vehicle carrying a passenger or employee." G.Br. 44. But it then claims that any act in a station or terminal that has subway cars running through it somewhere is an offense involving a mass

21

transportation vehicle, complete swallowing the limiting "in a circumstance in which the [vehicle] is carrying passengers." The government's position would actually require a wholesale rewriting of subsection (b)(1) to make it applicable to "whoever commits *any* offense under subsection (a) in a circumstance in which *any* railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee."

The absurdity of the government's argument is demonstrated by its limitless and nonsensical reach. Subsection (7) would apply to any assault with intent to cause serious bodily injury -- one person punching or knocking down another -- in a subway station. Under the government's theory -- in which subsection (b)(1) applies to every offense in (a) committed in a station containing subway cars carrying passengers -- this simple assault would trigger a life sentence. Application of this theory to subsection (a)(9), conveying false information about such an assault, would likewise trigger a life sentence if the offense was committed in a station with subway cars carrying passengers running through any part of it.

22

There are four subsections of (a) that involve attacks on "railroad on-track equipment or a mass transportation vehicle": §§ (a)(1), (2), (4) and (6). Those are the only offenses that can be committed "in a circumstance in which the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense. "

Application of this aggravated sentence enhancement to Ullah punished him for what he clearly did not do. He did not attack a subway car carrying passengers. Rather, as the evidence proved and the government argued, he got off the subway, walked into the tunnel between the Port Authority and the subway station, and intentionally detonated the device there.

**III. Ullah's conviction of 18 U.S.C. §924(c) should be vacated because neither Count Three nor Five qualifies as a "crime of violence."**

The district court ruled that Ullah's conviction of Count Three, for "delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use or public transportation system" or attempting to do so "with intent to cause death or serious physical injury," in violation of 18 U.S.C. § 2332f(a), qualifies as a crime of violence. The

23

court did not reach the question whether Ullah's conviction for Count Five, for violating 18 U.S.C. § 1992 also qualified, but the jury convicted Ullah of violating section § 924(c) with respect to both counts. Ullah contends that neither count qualifies under the required categorical approach of *United States v. Davis*, 139 S. Ct. 2319 (2019), because neither offense requires "as an element, the use, attempted use, or threatened use physical force against the person or property *of another*."

### A. Count Three does not qualify.

As argued in Ullah's opening brief at pp. 63-64, the minimum conduct required to violate § 2332f(a) is placement of a lethal device in a place of public use with intent to cause death or serious injury to any person, including the defendant himself. Therefore, no use of force against the person "of another" is required. Nor is any damage to the property of another required because a place of public use includes any open land or waterway, 18 U.S.C. § 2332f(e)(6), and a suicide attempt by an explosive or lethal device on open land or water would not require the use of force against the property of another. An example of this would the man who

24

attempted to set himself on fire in *United States v. Paul Rosenfeld*, Dkt No. 7:19 Cr. 69 (S.D.N.Y.), ECF#1, 18, 27, at 32-37. The same analysis would apply to someone who attempts to commit suicide by blowing up his own boat in open water.

The government responds by calling this a "hypothetical scenario" that is "farfetched," even though it is based on an actual case. G.Br. 52-53. The government suggests that such a case would not be charged under § 2332f, *id.*, but Rosenfeld negotiated a plea to lesser charges to avoid indictment for similarly serious charges of arson and attempted use of a weapon of mass destruction; the government could have charged him under § 2332f as well. The government erroneously contends that *United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2013), requires a showing that § 2332f has actually been applied to someone who tries to kill himself in a public place. A "realistic probability" does not require an actual reported case of the statute being applied to such conduct. The plain text of the statute applies to such conduct. An example of a statute being applied in a particular case may be required only where the scope of the statute is

25

ambiguous. *Gonzalez v. Wilkinson*, 990 F.3d 654, 660 (8th Cir. 2021). "But when the statute's reach is clear on its face, it takes no 'legal imagination' or 'improbable scenarios' to understand how it may be applied." *Id.*

Finally, the government points to the facts of this case, in which Ullah detonated the device in the tunnel between stations, to argue that of course this involved the use of force against the property of another, the station belonging to New York. G.Br. 52. As the government well knows, G.Br. 48, the categorical approach considers not the actual facts of the case but only the minimum conduct required to establish the offense. *Hill*, 890 F.3d at 55. The minimum conduct under § 2332f(a) does not require the use of force against the person or property of another, and therefore does not qualify under § 924(c).

## B. Count Five does not qualify.

As argued in Ullah's opening brief at pp. 64-68, Ullah's conviction for violating 18 U.S.C. §1992 does not qualify as a crime of violence under § 924 (c). A conviction under subsection (a)(2) requires only a reckless state of mind, and the force clause (or "elements" clause) includes only offenses

26

that require the intentional use of force and excludes offenses that can be committed recklessly. *Borden v. United States*, 141 S. Ct. 1817 (2021). After *Borden*, the government no longer disputes this and argues only that the conviction for § 1992(a)(7) qualifies under the force clause. G.Br. 54-55, n.3. It does not, because its proscription of "any act" committed in a terminal, structure or facility, etc., with the intent to cause death or serious physical injury to "any person" does not require force against the person or property "of another," but includes any act in which the defendant tries to hurt himself. Further, "any act" is so broad that it includes acts involving no force, like an employee's leaving the job without removing a hazardous condition, so long as he intended to cause physical injury.

The government's only answer is that someone who tries to kill only himself in a train station would not be prosecuted under this section. That is clearly not so, as seen by this very case. Ullah stated under questioning that he only intended to kill himself, and when asked if he expected to die, said only "maybe," expressing at most indifference or recklessness. The

27

jury did not have to find that he intended to cause death or serious physical injury to others.

### C. An attempt to commit either Count Three or Five is not a crime of violence under § 924(c).

The jury was allowed to convict Ullah of every count under an attempt theory, with no special interrogatories to determine whether the verdict for each count was for the substantive offense or the attempt. As argued in Ullah's opening brief at pp. 70-73, an attempt to commit either Count Three or Count Five is not a crime of violence. The government's response relies on *United States v. McCoy*, 995 F.3d 32, 57 (2d Cir. 2021), which held that attempted Hobbs Act robbery necessarily involves the attempted use of force under § 924(c). G. Br. 56-57. However, as the government acknowledges, *id.*, n.4, this question is currently pending before the Supreme Court, which has heard argument in *United States v. Taylor*, 141 S. Ct. 2882 (2021) (granting cert.), and will decide this term whether an attempt to commit robbery involves the attempted use of force.

28

**IV.** **The extraordinary sentence of life plus 30 years for an offense that caused no serious physical injury except to Ullah himself was procedurally and substantively unreasonable.**

   **A. The extraordinary sentence was based on the district court's factual statements about Ullah's conduct that were at odds with the record and clearly erroneous.**

The trial evidence established that Ullah did not detonate the device in either of the packed subway cars in which he rode but waited until he was in the long tunnel between stations -- as the district judge stated, "with no one within 10 feet" of him. A. 882. There was no evidence that there was even one child in that tunnel. The government's evidence proved that he chose that tunnel because he had seen an interview of a man in that very tunnel stating that he did not fear ISIS, and Ullah wanted people to be fearful. Ullah stated, in a long interview in which he admitted all of his conduct, that he intended to kill himself and frighten people. He never stated that he intended to kill or maim anyone but himself. This was clearly threatening, dangerous, and reckless conduct, but the evidence did not establish that he intended to "kill[] indiscriminately men, women and children," or that he made a "calculated decision to kill as many people as

29

he could." Clearly, if that were his goal, he would have at least detonated the device on one of the crowded subway cars. These findings of the district court were unsupported by the evidence and clearly erroneous.

The government ignores its own evidence at trial of Ullah's intent and purpose and instead focuses on the single fact that the small low-explosive pipe bomb was made with screws to contend that the court's findings were supported. G. Br. 73-74. The government suggests that its expert testified that Ullah put screws in the bomb "to injure and kill as many other people as possible." G. Br. 73. But that is not what the expert said. The expert testified only that screws enhanced the lethality of the device, not that that they made the small low-explosive bomb more likely to kill others rather than Ullah. A. 757. In his confession, Ullah said that the online bomb-making instructions he followed included screws to inflict maximum damage, but he said he intended to kill himself with the bomb.

The expert never testified that this bomb as detonated could have killed many other people. The most the government could get the expert to say was that the gases and fragmentation of the pipe could kill someone

30

"in close proximity" to the device. Ullah was the only one in close proximity to the device when he detonated it, "in a hallway with no one within 10 feet." A. 882. Indeed, the district court remarked on the lack of testimony about the "power of the pipe bomb to do damage." *Id*.

We do not contend that Ullah was "merely trying to harm himself," as the government asserts. G. Br. 74. He wanted to kill himself publicly, on behalf of the Islamic State to scare people. The evidence proved that in this effort, Ullah was reckless with respect to injury to others but not that he intended to "kill as many people as he could" and "indiscriminately kill[] men, women and children." This factual finding was simply unsupported by the evidence. Nor, contrary to the government's suggestion, G. Br. 74, was the jury required to find that Ullah intended to kill or even seriously injure others to find him guilty of any count. Each count could produce a guilty verdict on the finding of intent to cause death or serious injury to himself or damage to property.

31

**B. The district court incorrectly denied credit for acceptance of responsibility on the ground that Ullah went to trial.**

The government contends that the district was correct to rule that Ullah could not receive credit for acceptance of responsibility because he went to trial and challenged the government's evidence. The government claims this was correct because Ullah challenged, and continues to challenge, the sufficiency of the evidence on some counts. G. Br. 71-72. However, Ullah's challenges are legal arguments based on the statutory provisions of some of the offenses, and not disputes about whether he committed the act.

As argued in Ullah's opening brief at pp. 76-77, Ullah always admitted his factual guilt, that he built and detonated the bomb and that he did it on behalf of the Islamic State to send a message about American conduct in the Middle East. A. 1019. In summation, his counsel admitted that he was guilty of Count Four, destruction of property by means of an explosive device. A. 1012. He challenged the legal applicability of certain statutory provisions to his conduct, like the application of § 2339B's "personnel" and "services" to his independent act, given the prohibition of

32

subsection (h); whether his detonation of the bomb in the tunnel was "in, upon, or near" a mass transportation vehicle; whether, instead, his boarding of the subway in Brooklyn could be considered "placement" of the bomb on the subway car; whether the aggravating sentencing element of § 1992(b) legally applied to "any act" committed anywhere in the station under subsection (a)(7); and whether certain offenses legally qualify as "crimes of violence" under section 924(c). Ullah never denied he committed the bombing and meant to frighten people by trying to blow himself up in public. He denied that he intended to kill or seriously injure others, something that was not required to find him guilty as charged.

The government argues that there is no case just like this supporting application of acceptance of responsibility. G. Br. 72. But the rule is that the credit may not be denied solely because the defendant exercised his right to a trial, and that is what happened here. The same rule applies to this case that applies to any other case in which the defendant admits that he committed the criminal act but presents a legal defense. *E.g., United States v. Taylor*, 475 F.3d 65, 69-70 (2007) (entrapment defense would permit credit

33

for acceptance); *United States v. Gaudin*, 173 F.3d 798 (10th Cir. 1999) (where defendant did not deny guilt but went to trial to contest the legal element of intent, credit appropriate).

### C. Under the *Volpe* standard, the 12-level enhancement for a "federal crime of terrorism" should not apply on top of the base offense level for intent to aid a foreign terrorist organization.

The government responds to Ullah's argument that application of the 12-level enhancement was double-counting by noting that district court cases have applied the enhancement in addition to the terrorism base offense level. G.Br. 69-70. It notes that no case has held that this constitutes impermissible double-counting. It is true that this is an issue of first impression in this Circuit. But this does constitute impermissible double-counting under this Court's standard because it "increase[s] [the] defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Sabhnani*, 599 F. 3d 215, 251 (2d Cir. 2010); *quoting United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000). The base offense level was increased and the enhancement levied for exactly the same harm: that Ullah's act was

34

committed on behalf of ISIS, a foreign terrorist organization. The

enhancement should not apply where the base offense level already

accounts for the harm of terrorism.

## CONCLUSION

For the foregoing reasons and the reasons stated in Ullah's opening

brief, the convictions on Counts One, Five, and Six should be vacated and

the case remanded for resentencing.

Dated:    New York, New York
February 22, 2022

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU

By: *Colleen P. Cassidy*
**COLLEEN P. CASSIDY**
Attorney for Defendant-Appellant
**AKAYED ULLAH**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

35

## CERTIFICATE OF SERVICE

I certify that a copy of this Reply Brief has been served by CM/ECF electronic filing on the United States Attorney/S.D.N.Y.; Attention: **REBEKAH DONALESKI, ESQ.,** Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007.

Executed on:    New York, New York
                February 22, 2022

*Colleen P. Cassidy*
**COLLEEN P. CASSIDY**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This reply brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4) because:

> this reply brief contains 6,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this reply brief has been prepared in a monospaced typeface using **MS Word** with **14 characters per inch in Palatino Linotype** style.

Attorney for Appellant **AKAYED ULLAH**

Dated:    New York, New York
          February 22, 2022

*Colleen P. Cassidy*
**COLLEEN P. CASSIDY**